UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICOLAS GOUREAU and STEPHANIE :
MENKIN, individually and derivatively on behalf :
of GOOBERRY CORP., a New York corporation, :
                                     :
               Plaintiffs, :     Civil Action No.  20-cv-4691
                                       :
     v. :
                                       :
MARCUS LEMONIS, an individual, ML :   **COMPLAINT**
RETAIL, LLC, a Delaware limited liability :
company, and MARCUS LEMONIS, LLC, a :   **DEMAND FOR JURY TRIAL**
Delaware limited liability company, :   **ON ALL CLAIMS SO TRIABLE**
                                       :
           Defendants, :
and :
GOOBERRY CORP., a New York corporation, :
                                       :
      Nominal Defendant. :
                                       :
                                       :
                                       :

       Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin") (collectively, "Plaintiffs"), by and through their undersigned counsel, individually and on behalf of Gooberry Corp. ("Gooberry" or the "Company"), bring this action against Defendants, Marcus Lemonis ("Lemonis"), ML Retail, LLC ("ML Retail"), and Marcus Lemonis, LLC ("ML, LLC") (collectively "Lemonis Entities") (Lemonis and Lemonis Entities are collectively referred to as "Defendants") and allege as follows:

## INTRODUCTION

1.      This action arises from the fraudulent scheme by, bad faith actions by, and breaches of the fiduciary duties of Defendant Marcus Lemonis via the entities he controls, including ML Retail, LLC, a shareholder of Gooberry Corp., and Marcus Lemonis, LLC.  These Defendants have knowingly and purposefully mismanaged the Company and used it solely for their own personal gain.  Defendants are siphoning money from the Company, actively preventing it from meeting its obligations, and lootings its assets.

2.      Defendant Marcus Lemonis is a false prophet who uses his fame and fortune to steal small businesses from everyday Americans.  Through his television show, "The Profit," Lemonis preys on small businesses and slowly drowns them in debt in order to expand his own empire.  On the show, Lemonis portrays himself as the savior to small businesses, when in reality, he is a cancer that destroys the businesses he purports to save from the inside out.  Like the Wizard of Oz, Lemonis conducts his operations through a constellation of entities, the Lemonis Entities, but in reality, he stands behind all of them.

3.      On every episode of "The Profit," Lemonis says the same line, "there is one condition, I am 100 percent in charge."  This strongman persona gives Lemonis the opportunity to saddle the businesses with exorbitant debt to him and his entities making them ever beholden to him.  Eventually, Lemonis calls his debt, forecloses on the business, and takes all of its assets for himself leaving the original owners to pick up the pieces.

4.      Courage.B began in 2008 as an upscale women's clothing store and brand owned and operated by Neomi Goureau and her children Plaintiffs Goureau and Menkin through their entity Gooberry Corp.  Gooberry Corp. owns the Courage.B brand.  The brand focused on high-end garments and accessories, inspired by the family's French roots.

5.     Over the next six years, Courage.B became very successful.  In 2014, Courage.B had seven different retail stores around the country, including locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA, and was valued at over $2.6M based on Lemonis' own investment.

6.     Plaintiffs Goureau and Menkin's family-owned clothing line was featured on a 2014 episode of "The Profit."   In their episode, Lemonis agreed to invest in Courage.B by acquiring a 30% interest in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 whose use was to be determined.

7.     However, while the show was filming and before the deal finalized, Lemonis spent millions renovating its stores.  While he was making the renovations, Lemonis represented to Plaintiffs that he was taking care of renovations, that they did not have to worry about it, and that they should "trust the process."   Plaintiffs had no idea that Lemonis was vastly exceeding the $200,000 renovations budget.

8.     When Plaintiffs received the exorbitant bills for the renovations and questioned the costs being incurred on Gooberry's behalf, Lemonis said if they no longer wanted to do the deal, they would have to pay him back the millions he spent on Gooberry—a demand that was impossible for Plaintiffs to meet.

9.     On November 18, 2014, the deal reached on the show was memorialized and Lemonis purchased his stake in Gooberry through Defendant ML Retail, LLC.

10.     As detailed below, Lemonis was sure to give himself unbridled control over Gooberry by allowing himself, as owner and Chief Executive Officer of ML Retail, to make any and all business decisions for the Company without the consent of Goureau or Menkin.

11.     Once Lemonis had control of Gooberry, he began to use it for his personal gain. Time and time again, as set forth below, Lemonis forced Gooberry to become further indebted to him by unnecessarily renovating and rebranding stores, buying inventory above what Gooberry could afford, and buying inventory that was not profitable.

12.     These debts often forced the Company to obtain loans from one of Lemonis' controlled entities to meet its payment obligations such as payroll and rent.

13.     As discussed below, Defendants used the television show, "The Profit," to bait small business owners into Defendants' web.  Defendants made fraudulent representations that Defendants would be helping the small businesses, when in reality, they were setting them up to fail so that Defendants could take the business for themselves.  Defendants' fraudulent and deceptive scheme violates the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

14.     Recently, Lemonis has taken his misconduct, mismanagement, and misuse of power of Gooberry to the next level.  Lemonis is actively using the global pandemic to further loot Gooberry.  Lemonis has unilaterally closed its retail stores and moved the Company's inventory, furniture, fixtures, and equipment to other entities and/or businesses owned or controlled by Lemonis.

15.     Without the Court's intervention, the Company will be irreparably harmed. Through this Complaint, Plaintiffs seek redress for Lemonis' mismanagement of the Company, the appointment of a receiver to prevent Lemonis from further harming the Company, and to hold

Lemonis and Lemonis Entities accountable for their RICO violations, for breaching their fiduciary duties, wasting the Company's corporate assets, and operating the Company as a self-enrichment vehicle for Lemonis and Lemonis Entities.

## PARTIES

16.    Plaintiff Goureau is an individual, resident of Florida, and co-founder and a majority shareholder of Gooberry Corp.  Goureau is an entrepreneur and clothing and retail executive.  He is a signatory to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 34% of the shares of the Company.  Together with his sister, Plaintiffs Goureau and Menkin own 56% of the shares of Gooberry, a majority interest in the Company.

17.    Plaintiff Menkin is an individual, a resident of New York County, and co-founder and a minority shareholder of Gooberry Corp.  Menkin is an entrepreneur and clothing and retail executive.  Menkin is a signatory to the Shareholder Agreement (defined and described below) and owns 22% of the shares of the Company. Together with her brother, Plaintiffs Menkin and Goureau own 56% of the shares of Gooberry, a majority interest in the Company.

18.    Nominal Defendant Gooberry Corp. is a privately-held New York corporation. Gooberry has its principal place of business in New York, New York and owns and operates a number of fashion brands and retail stores that have included Runway, Denim & Soul and Courage.B.  As of the filing of this Complaint, Gooberry owns and operates the Runway brand and has stores in Greenwich, Connecticut and Lake Forest, Illinois.

19.    Defendant Marcus Lemonis is an individual domiciled in Illinois and owner of ML, LLC and ML Retail, LLC.   Lemonis is an investor and television personality of CNBC's reality show, "The Profit."  Lemonis signed the Stock Purchase Agreement (defined and described below)

on behalf of ML Retail, LLC.  Upon information and belief, Lemonis also signed the Shareholder Agreement (defined and described below) on behalf of ML Retail, LLC.   He is also chairman and CEO of Camping World, Good Sam Enterprises, Gander Outdoors, and The House Boardshop.

20.     Defendant ML Retail LLC is a limited liability company organized and existing under the laws of Delaware with its principle place of business in the State of Illinois.  ML Retail LLC is a party to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 32% of the shares of the Company.  On information and belief, either Lemonis or ML, LLC is the sole member of ML Retail.

21.     Defendant ML, LLC is a limited liability company organized and existing under the laws of Delaware with a principle place of business in the State of Illinois.  On information and belief, Lemonis is the sole member of ML, LLC.

22.     Upon information and belief, at all times relevant to this action, Defendant Marcus Lemonis had exclusive and complete dominion and control over ML Retail, LLC and ML, LLC, such that these entities were his alter egos and the acts of ML Retail and ML, LLC as set forth in this Complaint are also the acts of Defendant Marcus Lemonis.

23.     There is such a unity of interest and ownership between Defendant Marcus Lemonis on one hand and ML Retail and ML, LLC on the other hand, that the individuality of ML Retail and ML, LLC or their separateness from Defendant Marcus Lemonis have ceased because, upon information and belief:

   a.   ML Retail and ML, LLC are completely influenced and governed by Defendant Marcus Lemonis;

   b.   Defendant Marcus Lemonis completely controls ML Retail and ML, LLC;

c.  ML Retail and ML, LLC were at all times material to this matter, instrumentalities used for the benefit of Defendant Marcus Lemonis;

d.  ML Retail and ML, LLC are, and at all times herein mentioned were, kept under-capitalized by Defendant Marcus Lemonis, in relation to the reasonable needs of their businesses;

e.  The corporate form, entity, and structure of ML Retail and ML, LLC were at all times disregarded by Defendant Marcus Lemonis;

f.  The assets of ML Retail and ML, LLC were or are intermingled with the assets of Defendant Marcus Lemonis, or transferred without consideration, to Defendant Marcus Lemonis in disregard of the purported separate corporate form, entity and structure of ML Retail and ML, LLC, so as to make it impossible to separate from individual liabilities;

g.  The business and corporate affairs of ML Retail and ML, LLC are intermingled with those of Defendant Marcus Lemonis; and

h.  ML Retail and ML, LLC have failed to abide by corporate formalities.

24.     Upon information and belief, Defendants ML Retail and ML, LLC were never intended to have, and never have had, any true existence as a corporation.  Indeed, ML Retail and ML, LLC are and were organized and designed to act as devices by which Defendant Marcus Lemonis could evade his obligation, responsibility, and liability to third parties, including Plaintiffs, by engaging in unlawful activity without personal liability.

25.     Continued adherence to the fiction of the separate existence of ML Retail and ML, LLC would sanction fraud and promote injustice, in that Defendant Marcus Lemonis is attempting to escape liability for his unlawful activity, as set forth below, by hiding behind ML Retail and

ML, LLC and manipulating assets and liabilities to avoid responsibility for the unlawful acts that he directed and caused for his own benefit.

## JURISDICTION AND VENUE

26.     This action arises under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and under the common law of the State of New York.  This Court has subject matter jurisdiction over the RICO claims pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331.  The Court has subject matter jurisdiction over the related New York state law claims pursuant to 28 U.S.C. § 1367.

27.     Additionally, as stated above, Plaintiffs Goureau is domiciled in the State of Florida and Menkin is domiciled in the State of New York.  No non-nominal defendant is a citizen of the States of New York or Florida or domiciled in the States of New York or Florida.  Defendant Lemonis is domiciled in Illinois, Defendant ML Retail is a citizen of either Delaware or Illinois, and Defendant ML, LLC is a citizen of either Delaware or Illinois.

28.     This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 because all Plaintiffs are residents of different states than the non-nominal Defendants and the amount in controversy exceeds $75,000.  As set forth below, Plaintiffs claim millions of dollars in damages.

29.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2)  and (c)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district and because Defendants have extensive contacts with, and conduct business within this judicial district and have caused injuries to Plaintiffs, as described herein, in this judicial district.

## FACTS

**A.      Courage.B is a Successful Business**

30.      Along with their mother Neomi Goureau ("Neomi"), Plaintiffs Nicolas Goureau and Stephanie Menkin began the luxury women's fashion line and retail stores, Courage.B, in 2008.

31.      Plaintiffs and their mother ran the clothing enterprise through the corporation, Gooberry Corp.  Gooberry owns the Courage.B brand. Goureau owned 100% of the stock of Gooberry and was its CEO, Menkin was Gooberry's President, and Neomi was the Chief Designer for the brand.

32.      Through their hard work over the next six years, the three were able to grow their company and expand to seven different retail boutiques across the country, including store locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA.

**B.      "The Profit" Comes to Help Courage.B**

33.      Marcus Lemonis is an entrepreneur and reality television personality who is featured in the documentary reality series, "The Profit."  "The Profit" has aired for roughly seven years and has featured around one hundred businesses.

34.      On each episode of the show, Lemonis visits a purportedly ailing business and offers his business acumen and a financial investment in exchange for an ownership interest in the entity.  Lemonis promises to save the struggling businesses and use his expertise and resources to make them profitable.  Moreover, in every episode, Lemonis says the same line, that he will help, but there is one condition: that he is "100 percent in charge."

35.     As Plaintiffs would soon learn, Lemonis used the show to prey upon desperate and often less sophisticated business owners to build his own individual wealth at the expense of the businesses he was supposed to be helping.

36.     Goureau first learned about "The Profit" when he saw an episode on television. The family business had experienced success and growth, and the three were ready to take the next step in their business.  Goureau e-mailed the television show and applied for Courage.B to appear on the show.  Unfortunately, Goureau, Menkin, and their mother Neomi believed that "The Profit" and Lemonis would be able to help their growing business make it to the next level.

37.     On or around June 2014, Plaintiffs' episode of "The Profit" was filmed.  While the episode was being filmed, Lemonis made renovations to a Gooberry store in Greenwich, Connecticut.  On "The Profit," renovations are done during the filming of the episode so that the episode can show the supposedly great improvements that Lemonis makes to the businesses.  The owners purposefully are kept in the dark about how much the renovations are costing and who ultimately will be paying for them.

38.     Here, Plaintiffs were told by Lemonis and production that they could not visit the store while it was undergoing the renovations.  Prior to the show, Lemonis did not tell Plaintiffs how much he was spending on the renovations, and when Plaintiffs asked, he told them, "I got it," that they should "trust the process," and that they "didn't have to deal with it."

39.     During the course of filming the show, when the parties discussed the terms of Lemonis' potential investment, Lemonis told Plaintiffs that $200,000 of his initial investment would be used towards renovations.  Lemonis led Plaintiffs to believe that the work he had done to the Greenwich location during the filming would be covered by that $200,000 investment.

40.     While filming the television show, Plaintiffs and Lemonis reached a handshake agreement for Lemonis to invest in Courage.B and Gooberry.  As discussed on the show, Lemonis was to purchase a 30% stake in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 whose use was to be determined.

### C.     Lemonis Takes Over and Drowns the Company in Debt

41.     After the show finished filming, based on their handshake deal, Lemonis began taking control over Gooberry and Courage.B.  Lemonis started renovating Gooberry's additional stores.  Once again, Lemonis told Plaintiffs not to worry about the renovations and that he was taking care of it.  Because of Lemonis' representations, Plaintiffs believed that Lemonis was staying in the $200,000 renovations budget.  Lemonis, however, forced Gooberry to incur upwards of $2M in debt for renovating Gooberry's stores in only six months.  Lemonis and his representative, Johnny Sirpilla, completely controlled the renovations and did not allow Plaintiffs to give any input or keep them informed of the costs of the renovations.

42.     During the filming of the show, Lemonis represented himself as an expert in retail and promised to introduce Plaintiffs to his team of expert retail and business executives who would help Plaintiffs grow the brand.  However, that is not what happened once the cameras stopped rolling.  It turned out that all of Lemonis' purported executives were employees of Camping World—a now public company that Lemonis serves as its CEO.  Lemonis did not tell Plaintiffs how much Gooberry was paying these so-called expert executives.  Again, whenever Plaintiffs inquired about the costs, Lemonis would tell them that he had it covered and not to worry about it.

Eventually, however, Plaintiffs learned that these executives were charging Gooberry exorbitant fees.

43.     When Plaintiffs questioned Lemonis about the skyrocketing renovation and executive costs, Lemonis berated them, called them ungrateful, and told them that if they want to back out of the deal, all they had to do was pay him back for the renovations.  At that point, of course, Plaintiffs were not able to repay Lemonis the over $2M that Lemonis had unilaterally decided to spend on the store—despite telling Plaintiffs that renovations would only cost $200,000 and keeping them in the dark about how much Lemonis was truly spending.  Feeling entrapped and like they had no other choice, Plaintiffs moved forward with Lemonis.

44.     Plaintiffs later learned that this was part of Defendants' fraudulent pattern and practice in his dealings with businesses that appeared on "The Profit."  Lemonis would spend money on the businesses making it seem like the money he spent would either be part of his investment or otherwise covered by him, only to present them with a bill that would automatically give him a debt positon over the company that he would then use to try to strong-arm the deal or take the business.

45.     Lemonis made several representations to Plaintiffs during the filming of the show that later turned out to be false.  For example, Lemonis told Plaintiffs that they would have access to his executive team that consisted of retail experts to assist with human resources, finance, business operations, marketing, etc., when in reality, those executives were employees of Camping World.  Unbeknownst to Plaintiffs, Lemonis' employees made purchases on behalf of Gooberry, leaving Goureau and Menkin to foot the bill.  Plaintiffs were also charged for Lemonis' Camping World employees' time and fees even though this was represented as a part of the Lemonis expertise package.

46.     Additionally, Lemonis misrepresented the costs of renovating the retail stores, that he was taking care of the stores, and that Plaintiffs did not need to worry about the renovations.  In reality, Lemonis was spending millions of dollars so that Plaintiffs would have no choice but to close the deal with him.

47.     On or around November 18, 2014, the parties executed the paperwork memorializing Lemonis' investment.  Gooberry, Goureau, and ML Retail entered into a Stock Purchase Agreement ("Gooberry Stock Purchase Agreement").  *See* Ex. A.  Lemonis' entity, Defendant ML Retail, purchased 32 shares of Gooberry (a 32% ownership interest) for $800,000. *Id.*  at § 2. 2.

48.     At the same time, the shareholders of Gooberry, Plaintiff Goureau, Plaintiff Menkin, their mother Neomi, and Defendant ML Retail entered into a Shareholder Agreement ("Gooberry Shareholder Agreement").  *See* Ex.  B.  According to the Gooberry Shareholder Agreement, up to four Directors are allowed on the Board, and each shareholder was given the right to appoint one Director.  *Id.*  at § 3.  Lemonis, Goureau, Menkin, and Neomi appointed themselves.  Accordingly, the Gooberry Board of Directors consisted of the four shareholders: Lemonis, Goureau, Menkin and Neomi.

49.     Concerningly, Section 2 of the Gooberry Shareholder Agreement gives ML Retail broad power over Gooberry.  *Id.*  at § 2.  For example, Gooberry needs ML Retail's "affirmative shareholder vote" in order to make any fundamental business decisions:

**2. 1. 1**  the following actions shall not be taken without the affirmative vote of the ML Shareholder:

(a)     enter into any transaction outside of the ordinary course of business of the Company;
(b)     A merger, consolidation, stock exchange, or similar transaction involving the Company;

(c)     Any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors, or affiliates of any of them;

(d)     The admission of new Shareholders;

(e)     The dissolution or liquidation of the Company;

(f)     Amendment of the Articles or this Agreement;

(g)     Incurrence of any Indebtedness of issuance of any guarantee or indemnity of any obligation of any other Person or entity if the aggregate amount of the principal amount…shall exceed $25,000;

(h)     Make any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;

(i)     Make any Distributions to Shareholders, other than a Tax Distribution;

(j)     Increase of modify compensation plans to senior executives of the Company of pay bonuses or other amounts outside of approved compensation plans;

(k)     Hire, remove or otherwise replace any of the senior executive team of the Company;…

*Id.* at § 2.1.1

50.     Essentially, Gooberry needs ML Retail's affirmative shareholder vote in order to, among other things: (1) enter into any contract outside of the normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, (4) hire or replace any member of Gooberry's executive team, and (5) dissolve or liquidate the Company.

51.     Moreover, Section 2 of the Gooberry Shareholder Agreement also gives ML Retail "the sole and absolute discretion over" the financials and operation of the Company:

**2. 2**     Notwithstanding anything to the contrary contained herein, the ML Shareholder shall have sole and absolute discretion over:

**2. 2. 1** All financial and accounting functions, controls, decisions and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for store expansions, remodels and new locations; and

**2. 2. 2** Tax matters, including, without limitation, causing the Company to make an election to be treated as a Subchapter S corporation under the Internal Revenue Code.

*Id.* at § 2.2

52.     Not only did the Agreement give ML Retail the sole power to manage and control Gooberry's bank accounts, but also the power to open certain retail locations and control Gooberry's revolving line of credit with the Lemonis Entities.  *Id.*  at §§ 2. 1. 2, 2. 3, and 2. 4. Under Section 2.3, Gooberry's line of credit with the Lemonis Entities accrued interest at 5% per annum.  *Id*. at § 2.3.

53.     Lemonis represented that the line of credit would be used to provide the capital for his $800,000 investment.  Lemonis did not tell Plaintiffs that he would use the line of credit to make Gooberry insurmountably indebted to him and the Lemonis Entities.

54.     Not long after the deal was finalized, Lemonis sent IT personnel from Camping World to the Gooberry offices to upgrade their e-mail and computing systems.  During the process, the IT technicians, allegedly on accident, deleted all of the e-mails from Gooberry's system.  This meant that years and years of e-mail records were now gone.

55.     Plaintiffs were then given new @courageb e-mail addresses.  Eventually, Plaintiffs e-mails were transitioned to @marcuslemonis e-mail addresses.  Plaintiffs used these e-mails to conduct the business of Gooberry and eventually ML Fashion.  However, as discussed below, one by one Plaintiffs, and their mother Neomi, were removed from the business venture and lost access to their @marcuslemonis e-mail accounts.

56.     Lemonis used the power given to him in the formation documents to make good on his promise that he was "100 percent in charge" and took over Gooberry and Courage.B.  ML Retail, through Lemonis, had all of Gooberry's retail stores renovated and changed the product that the locations were selling.  However, despite making these changes himself, Lemonis later determined that he did not like the changes or the product.

57.     Lemonis then forced Gooberry to sell old inventory at a steep discount and forced the Company to purchase new inventory.  Lemonis now wanted the stores to carry younger and hipper brands.  This change in inventory reduced Gooberry's typical profit margins from 73% to 52%.

58.     Destroying Gooberry's profit margins was part of Lemonis' pattern and practice.  For example, Courage.B had a lucrative and very successful handbag line.  On one occasion, Lemonis purchased over $150,000 in inventory from a factory in Milan in styles and colors that the stores had not carried before.  Shortly thereafter, Lemonis determined that he did not like the order and forced the stores to sell the handbags for pennies on the dollar.  This ultimately destroyed Gooberry's legacy handbag line.

59.     All of the renovations, inventory purchases, and other large expenses were funded through Gooberry's line of credit with the Lemonis Entities.  By making these large purchases, reducing Gooberry's profit margins, and forcing the company to sell inventory at a loss, Lemonis ensured that Gooberry would need to rely on its revolving line of credit with the Lemonis Entities to meet its normal financial obligations, such as payroll and rent.  This practice insured that Gooberry was always heavily indebted to Lemonis giving Lemonis the power to foreclose on the Company's assets at any time.

60.     When it came to running the business, Lemonis was mostly concerned with building his television persona on his show, "The Profit."  To that end, Lemonis would use the businesses featured on the show to boost his image and add debt to Gooberry by forcing Gooberry to take on fledgling brands, businesses, and products featured on the show, as described below.  On the show, Lemonis tells business owners that he is there to help save their business when he is really there to steal it.

61.     In 2015, a retail concept called Blues Jean Bar was featured on an episode of "The Profit."  Lemonis unilaterally determined that Gooberry would purchase the Blues Jean Bar business and its three stores.  Lemonis rebranded the Blues Jean Bar stores and two Courage.B locations as Denim & Soul.  Lemonis then renovated all of the stores, including the Gooberry stores he had just renovated for hundreds of thousands of dollars, on Gooberry's tab.

62.     In 2015, a candle business called Wick'ed was featured on an episode of "The Profit."  On the show, Lemonis and the business owner entered into a deal where Lemonis would invest $200,000 for 33% of the business.  However, what actually happened was that Lemonis forced Gooberry to buy thousands of candles from Wick'ed in order to get cash into the Wick'ed owners' hands.  Gooberry stores did not sell candles, so the purchase did not make sense for Gooberry's brands.  Eventually, as is often the case, Lemonis' relationship with the Wick'ed owners soured, and the deal fell through.  Gooberry was left holding the bag and had to liquidate the candles at a huge loss.

63.     In 2016, a t-shirt business called DiLascia was featured on an episode of the show. On the show, the parties agreed that Lemonis would invest $200,000 for 50% of the business. Lemonis produced tons of tee-shirts with the original owners and then, of course, had a falling out with them.  Lemonis then forced Gooberry to purchase the shirts and sell them in its stores despite being completely off brand for the Gooberry stores.  Eventually, Gooberry was forced to liquidate its inventory of the shirts at a loss.

**D.     Lemonis Wants More and Insists on the Formation of Another Entity**

64.     Eventually, Plaintiffs and Lemonis decided to expand beyond the Courage.B brand and began investing in additional business entities together.  The idea was that Plaintiffs would be

investors with Lemonis on various fashion and retail-related businesses.  Those ventures often included businesses that Lemonis encountered through his television show.

65.     Despite wielding an incredible amount of control over Gooberry, Lemonis wanted more.  Lemonis told Plaintiffs that he wanted to be equals in the business with them.  He also told them that their mother Neomi should receive equity of the business because Lemonis was making the decisions on the inventory and branding.

66.     Lemonis represented to Plaintiffs that ML Fashion, LLC ("ML Fashion") would be an umbrella entity for the parties' various business ventures.  He told Plaintiffs that he wanted to help them grow their business and that they could build something special together.  Lemonis represented that a limited liability company, as opposed to a corporation, would be more beneficial for everyone.  ML Fashion was formed on March 29, 2016 as a Delaware limited liability corporation.

67.     Although Goureau and Menkin were given 33.33% membership interest in ML Fashion, Lemonis was sure to give himself the controlling 33.34% interest as well as make himself Chairman and CEO of ML Fashion.  This meant he was able to bind ML Fashion to any and all agreements.  Eventually, Lemonis began running Plaintiffs' business through the ML Fashion entity instead of Gooberry.

**E.     Lemonis Further Mismanages Gooberry**

68.     Lemonis' misconduct often related to credit agreements and loans he made to Gooberry through entities he controlled.  For example, on or around October 2016, Lemonis executed a credit agreement between Gooberry and ML Fashion ("Credit Agreement").  *See* Ex. C.  Under this Credit Agreement, Gooberry could receive up to $10,000,000 in loans from ML Fashion at a rate of 7.5% per annum.

69.     While the agreement is signed by Menkin, the decision for Gooberry to enter into the Credit Agreement was solely Lemonis' decision.  Lemonis often used Menkin to sign documents on Gooberry's behalf in an attempt to add legitimacy to his actions.  However, he would often have his attorney send packages with hundreds of pages and several documents to her with the instruction to sign them.  Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

70.     Concurrent with the execution of the Credit Agreement, Gooberry and ML Fashion entered into a Security Agreement.  *See* Ex.  D.  The Security Agreement gave ML Fashion a continuing security interest in essentially all of Gooberry's assets.  *Id*.

71.     These agreements combined gave Lemonis the unfettered ability to misuse the assets of Gooberry.  Again, the Gooberry Shareholder Agreement gave Lemonis, as owner and CEO of ML Retail, the sole power to bind Gooberry.  Thus, Lemonis forced Gooberry to buy assets, leaving it unable to meet its current obligations, and then force Gooberry to take a loan from ML Fashion.  Eventually, he could render Gooberry insolvent such that ML Fashion could foreclose on all of the assets owned by Gooberry.

72.     While ML Fashion was owned by Lemonis and Plaintiffs, ML Fashion's funding came from a Credit Agreement that it had with ML, LLC.  Thus, whenever ML Fashion lent money to Gooberry, those funds were actually coming from Lemonis through ML, LLC.  As such, loans between ML Fashion and Gooberry gave Lemonis the ability to kill two birds with one stone and increase his debt position in both companies at one time.

73.     That was not the only way in which Lemonis gained control over Gooberry's assets.  Lemonis transferred promissory notes issued by Gooberry to Lemonis Entities.  For example, Gooberry issued a $7.9M promissory note to ML, LLC.  Then, on or around December 2016, the

note was purchased by ML Retail LLC and on the same day sold to ML Fashion.  Lemonis engaged in this practice of forcing Gooberry to take on more debt in order to gain control over the Company's assets in the process.

74.     Another example of Lemonis using the Company for his personal gain related to the retail boutique Runway Boutique ("Runway").  In early 2016, Lemonis met Roberta Raffel ("Bobbi" or "Raffel"), owner of Runway, at a trade show in New York City.  Raffel approached Lemonis and Menkin because she wanted Lemonis to purchase her Runway store in Deerfield, Illinois.

75.     Shortly thereafter, Lemonis visited Runway and decided that Gooberry would purchase the store and on March 23, 2016, Gooberry purchased Runway.

76.     On information and belief, Lemonis wanted Gooberry to acquire Runway because Lemonis was romantically interested in its owner Raffel, not because he believed the acquisition would help Gooberry or ML Fashion, which was formed shortly after the acquisition.

77.     In May 2016, Gooberry and ML Fashion paid to completely renovate the Runway store in Deerfield, Illinois and stock it with new inventory.  Once again, these expenditures forced the companies to take on additional debt from Lemonis to meet its basic expenses.

78.     Not long after Gooberry acquired Runway, Lemonis began courting Raffel.  As part of their courtship, Lemonis allowed Raffel to make business decisions for Gooberry and ML Fashion.  Raffel was buying inventory for ML Fashion's other retail stores despite not having a position with ML Fashion.  Indeed, Lemonis and Raffel began buying inventory together and spending far more than Gooberry's or ML Fashion's allocated budget on inventory.  Again, overspending on inventory forced Gooberry and ML Fashion further into debt.

79.     Indeed, Plaintiffs witnessed Lemonis do this with several entities he encountered through "The Profit."  For example, a January 19, 2016 episode of the "The Profit" featured the brand Inkkas Shoes.  On the show, the parties agreed to a deal where Lemonis would invest $750,000 for 51% of the business.

80.     After the episode aired, but before the acquisition was completed under the ML Fashion umbrella, Lemonis forced Inkkas Shoes to hold a sale called "Free Shoe Friday."  Lemonis tweeted a code that allowed shoppers to buy shoes from the Inkkas website for zero dollars.  This led to $200,000 of inventory being given away.

81.     Lemonis used this and other tactics to force debt on Inkkas and, a few months later, foreclosed on the business, took its assets, and removed the original owners.

82.     Indeed, in March 2016, when Goureau started questioning decisions Lemonis was making for Gooberry and ML Fashion, Lemonis moved Goureau to ML, LLC and had him work on Lemonis' non-fashion related businesses.  Then in May 2017, Lemonis moved Goureau from ML, LLC to Camping World.  Lemonis represented that working Camping World would be beneficial for Goureau because it was a publicly traded company that could offer stock vesting and other employment benefits.  However, Lemonis fired Goureau from Camping World in December 2018.  Lemonis also removed Goureau's access to all of his Company files and e-mails.

83.     Lemonis also used Plaintiffs' mother, Neomi, as a pawn to keep Plaintiffs in line.  Whenever Menkin or Goureau questioned Lemonis, he would threaten to fire Neomi and remove her from the business.

84.     In September 2019, Lemonis made good on his threats to remove Neomi and abruptly terminated her employment with the Company.  Giovanni Senafe, one of Lemonis' agents, called Neomi to tell her that she was terminated immediately, that she would receive no

further compensation moving forward, and that her health insurance was being cut off.  As a result, Neomi lost access to her Company files and e-mails.

85.    Furthermore, Lemonis was not actually interested in growing the Courage.B brand or any of the other brands he forced Gooberry or ML Fashion to acquire, such as Denim & Soul. Instead, Lemonis, together with Raffel, now his wife, sought to use ML Fashion's assets and Plaintiffs' know-how to grow his new brand MARCUS.

86.    In 2017, Lemonis wanted to open a store in downtown Chicago.  At the time, Menkin and Goureau advised that opening a retail store in that location would be extremely expensive.  Despite their concern, Lemonis opened a retail store branded MARCUS.

87.    Once the new MARCUS store was opened, Lemonis renovated and rebranded retail locations from Courage.B and Denim & Soul as MARCUS stores.  For the most part, these were stores that the Company and ML Fashion had recently spent hundreds of thousands of dollars renovating and now had to spend even more money to renovate and change branding and inventory to become MARCUS stores.

88.    Whenever Plaintiffs complained about Lemonis and Raffel's overspending, Lemonis would threaten to foreclose on Gooberry and ML Fashion because of the huge debt it owed to Lemonis and his entities.   Plaintiffs knew that if they did not play ball, Lemonis would foreclose on the debt and take the company they worked so hard to build.

89.    Sometime in 2018, Lemonis sought to move the assets of Gooberry to another entity MLG Retail, LLC ("MLG Retail").  MLG Retail is a Delaware limited liability company owned by ML Fashion, and ML Fashion is its manager.  Transferring the assets and operations of Gooberry to MLG Retail would have finally given Lemonis the complete, unfettered control over Gooberry that he wanted.  Lemonis represented to Plaintiffs that the move would help the business

because MLG Retail was a limited liability company and it would officially put the Gooberry business under the ML Fashion umbrella.  In reality, Lemonis just wanted more control over Gooberry's operations and to separate Plaintiffs' mother Neomi from the business—which as discussed above, Lemonis eventually did.

90.     Lemonis was successful in moving several of Gooberry's assets and its debts to MLG Retail.  However, the paperwork to fully memorialize the transfer was never fully completed, and some of Gooberry's assets were not transferred to MLG Retail.  For example, Gooberry's asset, the Runway business, was never transferred to MLG Retail.  Thus, Gooberry still has assets that Lemonis is currently mismanaging and depleting.

**F.     Lemonis Seeks to Benefit from the Pandemic**

91.     Recently, however, Lemonis has taken his misconduct, mismanagement, and misuse of power of Gooberry to the next level.  In or around March 2020, Lemonis cut off Menkin without any warning and removed her access to her company e-mails and files.  By shutting out Menkin, Lemonis had now removed all three original owners from their business.

92.     Moreover, Lemonis is actively using the global pandemic to continue to loot Gooberry.  Lemonis has been unilaterally closing its retail stores and moving the Company's inventory to other entities and/or businesses owned or controlled by Lemonis.

93.     On or around May 8, 2020, Lemonis flew employees out to close on one of Gooberry's retail stores in Greenwich, Connecticut and ship out all product and inventory in the store.  The employees took roughly $148,313 worth of inventory and $89.056 in furniture, fixtures, and equipment ("FFE") from the store.  Like all past actions taken by Lemonis, Goureau and Menkin were not made aware of these plans nor do they have any knowledge of what Lemonis did with the store's inventory and FFE.

94.     From June 2014 to present, with Lemonis' "help", Gooberry has gone from a valuation of roughly $2.6 Million to being practically insolvent.  Without Lemonis' involvement, Gooberry would have continued to thrive and likely would be worth several million dollars.  Given Lemonis' recent activity, it is clear that he is planning on foreclosing on Gooberry and even further removing Plaintiffs from the fashion and retail business they worked so hard to build.

95.     Without the Court's intervention, the Company will be irreparably harmed.  Plaintiffs seek redress for Lemonis' mismanagement of the Company, the appointment of a receiver to prevent Lemonis from further harming the Company, and to hold Lemonis and Lemonis Entities accountable for breaching their fiduciary duties, wasting the Company's corporate assets, and operating the Company as a self-enrichment vehicle for themselves.

## DERIVATIVE ACTION

96.     Plaintiffs bring this action derivatively in the right of and for the benefit of Gooberry to redress injuries suffered, and to be suffered, by Gooberry as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, and use of Gooberry as a vehicle for personal gain at the detriment of the Company.

97.     Gooberry is named as a Nominal Defendant in this case solely in a derivative capacity.  Plaintiffs are shareholders of Gooberry at the time of the transgressions of which they complain and continue to be shareholders of the Company.

98.     Plaintiffs will adequately and fairly represent the interests of Gooberry and its members in prosecuting and enforcing their rights.  Prosecution of this action is in the best interests of the Company.

99.     The wrongful acts complained of herein subject, and will continue to subject, Gooberry to continuing harm because the adverse actions are continuing and the consequences of those actions are still in effect and ongoing.

## DERIVATVE DEMAND FUTILITY

100.     Plaintiffs have not made any demand to the Company's Board of Directors to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.  A pre-suit demand for the allegations alleged herein would be futile because in entering into the Gooberry Shareholder Agreement, Lemonis, as owner and CEO of ML Retail, was given complete dominion and control over the assets and operation of the Company, thus a demand would require Lemonis to essentially sue himself.

101.     As the Chairman and CEO of ML Retail, Lemonis is the only controlling shareholder that has the "sole and absolute discretion over all financial and accounting functions, controls, decisions, and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for the store expansions, remodels and new locations." *See* Ex.  B, § 2. 2.  Moreover, according to the Gooberry Shareholder Agreement, the affirmative vote of the ML Shareholder, Lemonis, is needed for the Company to: "…enter into any transaction outside of the ordinary course of business of the Company;…[make] any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors of affiliates or any of them;…[admit] new Shareholders;…[t]he dissolution or liquidation of the Company;…[m]ake any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;…[h]ire, remove or otherwise replace any of the senior executive team of the Company; …" *Id.*  at § 2. 1. 1.

102.    Lemonis suffers from a patent conflict interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein. Stated differently, a demand for Lemonis to bring this suit and assert the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself; and, in that regard, potentially subject himself to personal liability. The extraordinary personal gains and profits that Lemonis has been able to extract from the Company at the expense of the Company and its other shareholders renders him too self-interested to independently evaluate the merits of the claims asserted against him herein.

103.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis used the Company's assets to enrich himself and the Lemonis entities by, among other things, taking actions that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of the Company to the detriment of the other shareholders.

104.    Further, Lemonis used his control of the Company via ML Retail to force the Company to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on the Company at any time.  Lemonis also benefited from his use of the Company to acquire the fledgling brands, business, and products featured on the "Profit" to boost his own image at the expense of the Company.  Moreover, Lemonis has since removed assets of the Company and transferred them to other entities and/or businesses owned or controlled by Lemonis.

105.    In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced the Company to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment.  As President and CEO of ML Retail, and Director of Gooberry, Lemonis consistently mismanaged

the Company's assets and pursued a business strategy that was so reckless and vastly against the Company's interests that his decisions could not have been the products of sound business judgment.  Lemonis' actions include: (1) saddling the Company with expensive inventory then forcing the Company to sell the inventory at a loss; (2) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying the Company's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail,  decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (6) using the assets of the Company to grow Lemonis' personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing the Company's retail stores and removing its inventory, furniture, fixtures, and equipment; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

106.    Even if Lemonis acceded to a demand from Plaintiffs and pursued litigation against himself on behalf of the company, there is no reason to believe that he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies.

107.    In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: FRAUDULENT INDUCEMENT
### [By Plaintiffs Against Defendants Lemonis, ML Retail, and ML, LLC]

108.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

109.    Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs in order to induce them into entering the Gooberry Shareholder Agreement and in giving ML Retail and Lemonis control and ownership interest in the Company.

110.    Defendants' false material misrepresentations and/or failures to disclose described above include but are not limited to: (1) representing to Plaintiffs that Defendants wanted to help Plaintiffs expand their business through Gooberry and not saddle it with debt in order to take its assets; (2) representing that Plaintiffs and Lemonis would be treated as partners and equals in running Gooberry; (3) representing that Defendants would run Gooberry in a way that would benefit Plaintiffs and the Company; and (4) representing that Gooberry would invest in other business to and help grow and develop the businesses in their profile.

111.    At all times, Defendants knew these misrepresentations were false and that Defendants intended to use Gooberry as a vehicle for self-enrichment at the detriment of Plaintiffs and the Company itself.  Defendants further knew that they would use credit agreements to force debt upon Gooberry allowing them to foreclose on the Company on a whim and that Defendants would use Gooberry to defraud other small business owners Lemonis purported to save.

112.    Defendants intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

113.     Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts.

114.     Defendants' actions were willful, wanton, malicious and oppressive.

115.     As a direct and proximate result of Defendants' fraud, Plaintiffs have been harmed in an amount to be proven at trial, but at least millions of dollars.

**SECOND CAUSE OF ACTION: FRAUD**
**[By Plaintiffs Against Defendants Lemonis, ML Retail, and ML, LLC]**

116.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

117.     Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous misrepresentations of material facts to Plaintiffs and/or failed to disclose material information to Plaintiffs.

118.     Defendants' false material misrepresentations and/or failures to disclose described above include but are not limited to: (1) representing that Gooberry was investing in stores, brands, and retail businesses in order to further grow those businesses and Gooberry; (2) representing that purchases made for Gooberry were done to benefit the brand and not increase Lemonis' debt position in Gooberry; (3) representing that Plaintiffs would have access to Lemonis' team of experts in the retail industry, not Lemonis' employees at Camping World; (4) representing that this team of experts were part of the Lemonis expertise package, not that Plaintiffs would have to pay for their fees and services; and (5) representing that Lemonis would be investing in Plaintiffs' business in order to help grow their business not to saddle it with debt in order to remove its assets.

119.     Defendants intended Plaintiffs to rely on these representations; however, none of these statements were true when made.  Defendants knew these misrepresentations were false and that Defendants intended to use Gooberry as a vehicle for self-enrichment at the detriment of

Plaintiffs and the Company itself.   Defendants further knew that they would use credit agreements to force debt upon Gooberry, allowing them to foreclose on the Company on a whim and that Defendants would use Gooberry to defraud other small business owners Lemonis purported to save.

120.    Defendants knew or should have known that Plaintiffs would rely upon representations that Lemonis would grow the Company business and brand because this is what Lemonis said he would do.

121.    Upon information and belief, Lemonis intended that Plaintiffs rely on his misrepresentations and fraudulent omissions of material facts.

122.    Upon information and belief, the sole purpose for Lemonis' misrepresentations to Plaintiffs was to take their money and their Company and make a profit, without regard to the consequences that Plaintiffs would have to be left with, such as debt and no assets.

123.    Plaintiffs believed and justifiably relied on those misrepresentations and were induced by them in continuing to do business with Defendants to their detriment.

124.    As a result of Defendants' acts described above, Plaintiffs have been damaged in an amount to be proven at trial, but at least millions of dollars.

125.    In committing the above-described acts, Lemonis acted with fraud, oppression, and malice.   Given Defendants' conduct that was willfully and wantonly reckless or malicious and Defendants' high degree of moral culpability, punitive damages are appropriate and warranted.

### THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTIES
### [By Plaintiffs, derivatively on behalf of Gooberry, Against Defendant Lemonis]

126.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127.    Lemonis currently serves as a Director of Gooberry. As a Director of Gooberry, Lemonis owes the Company fiduciary duties of care, loyalty and good faith.

128.    Lemonis engaged in misconduct and breached his fiduciary duty to Gooberry, as described above, by doing the following, among other things: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss; (2) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying the Company's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail,  decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (6) using the assets of the Company to grow Lemonis' personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing the Company's Greenwich, Connecticut store and removing roughly $148,313 worth of inventory and $89.056 in furniture, fixtures, and equipment from the store; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

129.    As a direct and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least millions of dollars.

### FOURTH CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### [By Plaintiffs Against Defendants Lemonis, ML Retail, and ML, LLC]

130.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131.    Within every contract is an implied covenant of good faith and faith dealing; thus, the Gooberry Shareholder Agreement contains this implied covenant.

132.    Plaintiffs and Defendants—either individually or through their agents/alter egos—are parties to the Shareholder Agreement.

133.    Defendants breached this covenant by abusing, unreasonably and in bad faith and for their own interests and to the detriment of the Company, the power over the Company provided to them in the Shareholder Agreement.  Actions which breached the covenant, described above, include, but are not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss; (2) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying the Company's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (6) using the assets of the Company to grow Lemonis' personal brand Marcus; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing the Company's Greenwich, Connecticut store and removing roughly $148,313 worth of inventory and $89.056 in furniture, fixtures, and equipment from the store; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

134.    As a direct and proximate result of Defendants' breaches of the implied duty of good faith and fair dealing, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least millions of dollars.

## FIFTH CAUSE OF ACTION: UNJUST ENRICHMENT
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

135.   Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

136.   Plaintiffs allege that the Company has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

137.   By their wrongful acts and omissions, as alleged herein, the Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.  The Defendants used the Company as a self-enrichment vehicle while forcing the Company to take actions counter to the Company's interests and to assume increasing debt.

138.   As President and CEO of ML Retail, and Director of Gooberry, Lemonis used the Company's assets to enrich himself and his entities by, among other things: (1) decreasing the Company's profit margins in order to make it dependent on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other Companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of the Company to the detriment of the other shareholders; (4) using the assets of the Company to grow Lemonis' personal brand MARCUS; (5) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save on his television show; and (6) forcing Gooberry to acquire Runway and thereby incur more debt.

139.   Further, upon information and belief, Defendants have continued to enrich themselves at the Company's expense and have been closing the Company's store in Greenwich,

Connecticut and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store.

140.    The Defendants had knowledge of the benefits conferred upon them by the Company.

141.    Plaintiffs, as shareholders of the Company, seek restitution from the Defendants to disgorge all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct and fiduciary breaches.

142.    Further, it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used the Company's assets to enrich themselves at the expense of the Company and its other shareholders. There is no justification for Defendants' actions.

143.    As a result of Defendants' actions, the Company has been harmed in an amount to be proven at trial, but at least millions of dollars.

### SIXTH CAUSE OF ACTION: MISAPPROPRIATION OF CORPORATE ASSETS
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail, and ML, LLC]**

144.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.    This is an action for relief arising out of the misappropriation of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

146.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis misappropriated assets of the Company by, for example: (1) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or

other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (4) using the assets of the Company to grow Lemonis' personal brand MARCUS; (5) closing the Company's Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store, and (6) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save.

147.    As a direct and proximate result of Defendants' malfeasance, acts or omissions, the Company and Plaintiffs have been harmed in an amount to be proven at trial, but at least millions of dollars.

### SEVENTH CAUSE OF ACTION: CORPORATE MISMANAGEMENT AND WASTE
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail, and ML, LLC]**

148.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    This is an action for relief arising out of the mismanagement and waste of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

150.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis has grossly mismanaged the Company by, for example: (1) forcing the Company to spend hundreds of thousands of dollars renovating its stores only to then rebrand and spend additional hundreds of thousands of dollars on rebranding those stores; (2) decreasing the Company's margins from 73% to 52%; (3) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss; (4) destroying the Company's legacy handbag line; (5) closing the Company's

Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; and (6) getting rid of all but one Courage.B retail store and destroying the Courage.B brand.

151.    Beginning in May 2020, Defendants have been closing retail stores owned and/or operated by Gooberry and have removed the Company's inventory and assets from those stores.

152.    These actions by Defendants amount to waste and mismanagement of corporate assets.

153.    As a result of their mismanagement and waste of corporate assets, Defendants are liable to the Company and Plaintiffs under common law and New York Bus. Corp. Law § 720.

154.    As a direct and proximate result of the foregoing, the Company and Plaintiffs have been injured in an amount to be determined at trial in an amount to be proven at trial, but at least millions of dollars.

## EIGHTH CAUSE OF ACTION: CONVERSION
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

155.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    Gooberry has a property interest in the assets and inventory in its retail stores and a right to possess those assets and inventory and have them used for legitimate business purposes.

157.    Defendants converted roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the Company's Greenwich, Connecticut store for no legitimate business purpose.

158.    Without Plaintiffs' knowledge, Defendants took possession of the assets and inventory of the Company, in derogation of the Company's rights.

159.    Defendants' acts were willful, wanton, malicious, and oppressive.

160.    As a result of Defendants' conversion, Plaintiffs have been damaged in an amount to be proven at trial, but at least $237,369.

## NINTH CAUSE OF ACTION: RICO § 1962
### [By Plaintiffs Against Defendants Lemonis, ML Retail and ML, LLC]

161.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

162.    This cause of action asserts claims against Defendants for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "Lemonis Enterprise" described herein, through the "pattern of racketeering activity" described herein.

163.    At all relevant times, Plaintiffs, Lemonis, ML Retail, and ML, LLC are "persons" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

164.    Plaintiffs are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

165.    At all relevant times, each Defendant was, and is, a "person" who conducted the affairs of the "Lemonis Enterprise" described below, through the "pattern of racketeering activity" described below.  While each Defendant participates in the Lemonis Enterprise, it has an existence separate and distinct from the enterprise.  Further, the Lemonis Enterprise is separate and distinct from the "pattern of racketeering activity" in which each Defendant has engaged and is engaging.

166.    At all relevant times, each Defendant was associated with, operated or controlled, the Lemonis Enterprise, and each Defendant participated in the operation and management of the affairs of the Lemonis Enterprise, through a variety of actions described herein. Each Defendant's participation in the Lemonis Enterprise is necessary for the successful operation of the Defendants' scheme.

**The Lemonis Enterprise**

167.    Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

168.    The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "Lemonis Enterprise:"

        a.  Defendant Marcus Lemonis;

        b.  Defendant ML Retail;

        c.  Defendant ML, LLC.

169.    The RICO "enterprise" was an association-in-fact Enterprise, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Lemonis, ML Retail, ML, LLC and their respective agents and employees, who associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.  The Lemonis Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern Lemonis Enterprise was used as a tool to effectuate the pattern of racketeering activity.

170.    Each Defendant was responsible for and carried out separate roles in pursuit of the common purpose of the Enterprise:

        a.  Marcus Lemonis' role in the Lemonis Enterprise was to use his personality, fame, purported business acumen, and fraudulent representations to bait Plaintiffs, and the other businesses he encountered through "The Profit," to

allow him to invest and obtain equity in their businesses.  Lemonis represented to Plaintiffs, and other participants on "The Profit" that he was there to help their business and that he had their best interest in mind.  Lemonis' role in the enterprise also included keeping Plaintiffs, and other business owners, in line by threatening to foreclose on their businesses and take their assets from them.

b.  ML Retail's role in the Lemonis Enterprise was to act as the corporate vehicle through which the Lemonis Enterprise invested in Plaintiffs' business and, on information and belief, the other businesses that the Lemonis Enterprise baited through "The Profit."  Thus, ML Retail was used to represent the Lemonis Enterprises' equity in these businesses.  In the agreements with Plaintiffs, ML Retail was given broad management power over Gooberry which it used to run the Company to Defendants' benefit, to the detriment of Plaintiffs and the Company.

c.  ML, LLC's role in the Lemonis Enterprise was to act as the financing behind the enterprise.  Part of the Lemonis Enterprise's fraudulent conduct was making Plaintiffs' business, Gooberry, and the other businesses the Lemonis Enterprise encountered through "The Profit," insurmountably indebted to the Lemonis Enterprise.  The funding to make the unnecessary inventory purchases, renovations, and other fraudulent capital expenditures came from ML, LLC.

171.   The Lemonis Enterprise is an ongoing enterprise which engages in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. § 1962(c), by, among other things, marketing and advertising "The Profit" television show and Defendants' purported ability to save fledgling businesses through television, media, and Internet outlets, and using the

instrumentalities of interstate commerce to make fraudulent representations to Plaintiffs and others as part of a scheme to defraud.  The Lemonis Enterprise began by at least July 2013 and presently continues to operate as a single unit.

172.   The overarching purpose of the Lemonis Enterprise is for each of its members to profit from defrauding small businesses across the Country, primarily through the guise of the television show "The Profit."  Defendants accomplished the purpose of the Lemonis enterprise by: (1) falsely representing Lemonis as a business savior who helps failing small businesses, (2) inducing small businesses, including Plaintiffs, to appear on the television show "The Profit," (3) representing to each business that Lemonis will help the business, make the businesses profitable, and provide marketing and publicity by virtue of being on the show and part of the Lemonis family of businesses, (4) saddling the business with debt to the Lemonis Entities, both prior to finalizing the Lemonis Entities' investment and after, in order to give the Lemonis Enterprise leverage over the business and its owners, (5) obtaining an ownership interest in the business that gave the Lemonis Entities complete control over the business, its finances, and its line of credit with the Lemonis Entities, (6) mismanaging the business in a way that benefited the Lemonis Enterprises, to the detriment of the business and its owners, and in a way that make it insurmountably indebted to the Lemonis Entities, and (7) eventually foreclosing on the debt in order to take the business from its original owners and fold it into the Lemonis Entities and its various companies.

**Predicate Acts (Mail and Wire Fraud)**

173.   Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud).

174.    As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendant has engaged in, and continues to engage in, the affairs of the Lemonis Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud):

a.  Without limitation, instructions to open U.S. banking accounts, make banking transactions, carry out activities in furtherance of the fraud, material misrepresentations made to Plaintiffs, and the negotiation, finalization, and notarization of documents in furtherance of the fraud were sent by the Lemonis Enterprise or their authorized agents via mail and wire to and from the United States, and specifically to and from New York.

b.  The Lemonis Enterprise used the mail and wire, including television, media, and Internet, to make fraudulent representations to Plaintiffs, and other businesses, that Lemonis would help their business through "The Profit," to transmit documents used to give the Lemonis Entities equity positions in these businesses, to make fraudulent representations after the Lemonis Entities' invested that the Lemonis Enterprise was helping these businesses while they were actually mismanaging them to the detriment of the business, including Plaintiffs' business, to make loans to Plaintiffs and the other businesses that made them insurmountably indebted to the Lemonis Enterprise, and to foreclose on these businesses whenever the Lemonis Entities wanted to get rid of the original owners.

c. The fraud would not have been possible had the Lemonis Enterprise, their entities, and their authorized agents not used the mail and wire to send and receive the communications throughout the Country.

d. Defendants conducted exchanges, payments, and monetary transfers using the wires concerning the receipt and distribution of the proceeds of Defendants' improper racketeering enterprise.

175.   Defendants' misrepresentations and acts were knowing and intentional, and made with the intent to defraud, primarily through the show "The Profit."

176.   Plaintiffs reasonably relied on Defendants' false representations by, among other things, allowing Defendants to invest in their company Gooberry, allowing Defendants to obtain control of Gooberry, and allowing to Defendants to control Gooberry's line of credit with the Lemonis Entities.

177.   These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

**Pattern of Racketeering Activity**

178.   As set forth herein, Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past ten years.

179.   Defendants have engaged in a scheme to defraud small business owners, including Plaintiffs, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact in their television show "The Profit," which has run for seven seasons and featured approximately 100 businesses, e-mail and other communications, marketing

materials, on their website, and in other advertisements, with the use of United States mail or interstate telecommunication systems for the purpose of executing its scheme.

180.     Defendants' scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiffs.

181.     Defendants' scheme to defraud was made with intent to induce reliance by Plaintiffs upon such misrepresentations, concealments, suppressions, or omissions.

182.     Defendants' scheme to defraud was made with the purpose of gaining millions of dollars in equity, assets, trade secrets, inventory, good will, loan interest, monies, and profits from Plaintiffs, and other small businesses, that would not have been gained but for Defendants' acts and omissions alleged herein.

183.     As detailed below, Defendants' long running fraudulent scheme and conspiracy consisted of, among other things: (1) falsely representing Lemonis as a business savior who helps failing small businesses, (2) inducing small businesses, including Plaintiffs, to appear on the television show "The Profit," (3) representing to each business that Lemonis will help the business, make the businesses profitable, and provide marketing and publicity by virtue of being on the show and part of the Lemonis family of businesses, (4) saddling the business with debt to the Lemonis Entities, both prior to finalizing the Lemonis Entities' investment and after, in order to give the Lemonis Enterprise leverage over the business and its owners, (5) obtaining an ownership interest in the business that gave the Lemonis Entities complete control over the business, its finances, and its line of credit with the Lemonis Entities, (6) mismanaging the business in a way that benefited the Lemonis Enterprises, to the detriment of the business and its owners, and in a way that made it insurmountably indebted to the Lemonis Entities, and (7) eventually foreclosing on the debt in

order to take the business from its original owners and fold it into the Lemonis Entities and its various companies.

184.     The above-described racketeering activities amount to a common course of conduct intended to deceive and harm Plaintiffs and other small business owners.  Each such racketeering activity is related, has a similar purpose, involves the same or similar participants and methods of commission, and has similar results affecting similar victims, including Plaintiffs.  These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

**Injury to Plaintiffs**

185.     As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Defendants, Plaintiffs have been injured in their property within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial, but not less than millions of dollars.

186.     Under the provisions of 18 U.S.C. § 1964(c), the Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**TENTH CAUSE OF ACTION: ACCOUNTING**
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

187.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

188.     As detailed above, by diverting and misusing corporate funds for Defendants' own benefit, and by engaging in the other misconduct described above, the Defendants are guilty of mismanagement and waste under New York Bus. Corp. Law § 720.

189.    According to the Shareholder Agreement, Lemonis, as President and CEO of ML Retail, was given the sole and absolute discretion over financial and accounting functions, controls, decisions, and procedures for the Company.  Further, as a Director of Gooberry, Lemonis owed a fiduciary duty to act in the best interests of the Company.  Thus, the Company is entitled to an accounting from Defendants.

190.    Plaintiffs, as shareholders, are entitled to commence an action to compel Defendants to account for their failure to perform their duties and their waste of corporate assets.

191.    In view of the foregoing, the Company is entitled to an accounting of all transactions, receipts, and disbursements undertaken by the Company and by the Defendants, purportedly on its behalf.

192.    The Company is entitled to an accounting from the Defendants as to all sums they have received from the Company, as compensation or any other form of disbursement, regardless of whether the funds went directly to Defendants or to third parties.

193.    Such an accounting is necessary to determine the rights of the Company and Plaintiffs to funds that have been improperly in Defendants' possession and control because the Company and Plaintiffs have an interest in these funds.

194.    Given that Defendants have failed, neglected, or refused to account to the Company and Plaintiffs, proper accounting is both appropriate and necessary.

195.    Plaintiffs have no adequate remedy at law.

## ELEVENTH OF CAUSE OF ACTION: APPOINTMENT OF A TEMPORARY RECEIVER
### [By Plaintiffs Against Defendants]

196.    Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

197.     Given Defendants' abuse of power by misappropriating and mismanaging the Company's assets and engaging in other criminal conduct, as detailed above, there is an imminent danger that corporate assets will continue to be improperly diverted and misused by the Defendants for their personal benefit.

198.     Although Plaintiffs are co-founders and shareholders of Gooberry, the Shareholder Agreement gives Lemonis, as CEO and President of ML Retail, all financial power, accounting, and business control over Gooberry.

199.     Lemonis is actively removing assets from Gooberry, purposefully rendering it unable to meet its current obligations.  As of the filing of this Complaint, Lemonis has closed one of the remaining two stores and removed all of the store's assets.  As for the remaining store, it is only a matter of time before Lemonis takes action.

200.     Lemonis' conduct has and is causing significant financial harm to the Company and has exposed it to potential insolvency.  There is a significant risk that if Lemonis is allowed to remain in control of the Company and its finances, the corporate assets will continue to be diverted to his pockets and the Company will be run into the ground.

201.     To prevent the Company and Plaintiffs, as shareholders, from suffering serious and irreparable harm, it is both necessary and appropriate for a temporary receiver to be instated to control the Company's finances and preserve its assets.

202.     As a result of Lemonis' misappropriation of the Company's funds and assets, the appointment of a custodian or receiver to direct and supervise Gooberry's business and affairs pending a decision on the merits of Plaintiffs' claims is necessary and appropriate to avoid irreparable harm to the Company and its shareholders.

203.     Plaintiffs have no adequate remedy at law.

**TWELFTH CAUSE OF ACTION: PERMANENT INJUNCTION RESTRAINING THE DEFENDANTS FROM CONTINUING TO MAINTAIN CONTROL OVER THE COMPANY'S FINANCES AND ASSETS**
**[By Plaintiffs Against Defendants]**

204.    Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

205.    As stated above, Lemonis continues to maintain exclusive control over the finances, accounting, and business decisions of the Company.  If Defendants are permitted to continue to exert such wrongful control over the Company, Gooberry and Plaintiffs will suffer serious and irreparable harm, because the Company will be rendered insolvent.

206.    By purposefully rendering Gooberry unable to pay its debts, closing its stores and removing its assets, and seeking to misappropriate Gooberry's funds for their personal benefit, Defendants' actions threaten to cause irreparable harm to Plaintiffs and the Company.  Such harm can only be prevented by an Order removing Defendants from positions of influence or authority over the Company's finances and assets.

207.    To preserve the status quo and prevent damage to Gooberry, Plaintiffs seek an order immediately restraining and enjoining Defendants, or those acting in privity with them, from (or as appropriate, requiring them to take the following action):

  i.    Spending, transferring or dissipating any funds of Gooberry except as absolutely necessary in the ordinary course of business for Gooberry, and including specifically that no funds will be expended for:

    a.    Any payments whatsoever to Defendants or their affiliates, for any purpose, including bonuses; or

    b.    Any payments whatsoever to Defendants' personal attorney from the Company's funds.

  ii.  Entering into any banking, borrowing and/or investment arrangements on behalf of the Company.

  iii.  Closing any retail stores of Gooberry and/or moving, or removing any of the assets located in such stores.

208. The issuance of a temporary restraining order will prevent further harm to the Company until a preliminary injunction hearing is held and will not unduly prejudice Defendants.

209. Plaintiffs have no adequate remedy at law.

## THIREENTH CAUSE OF ACTION: DISSOLUTION UNDER N.Y. BUS. CORP. LAW § 1104-a
### [By Plaintiffs Against Defendants]

210. Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

211. Pursuant to N.Y. Bus. Corp. Law § 1104-a, and as of the filing of this Complaint, Plaintiff Goureau is holder of at least 34 shares of Gooberry. Plaintiff Menkin is holder of at least 22 shares of Gooberry.

212. Defendants are guilty of illegal, fraudulent, or oppressive actions toward Plaintiffs, the complaining shareholders.

213. Illegal, fraudulent or oppressive conduct engaged in by Defendants, include, but are not limited to: (1) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (4) using the assets of the Company to grow Lemonis'

personal brand MARCUS; (5) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; and (6) closing Gooberry owned retail stores and removing its inventory, furniture, fixtures, and equipment.

214.    Furthermore, the property or assets of Gooberry have been looted, wasted, or diverted for non-corporate purposes to the benefit of Defendants.

215.    Liquidation is the only feasible means whereby Plaintiffs may obtain a fair return of their investment and is reasonably necessary for the protection of the rights and interests of the shareholders.

216.    Upon dissolution, the Defendants' interests, if any, should be subject to a surcharge due to willful or reckless dissipation or transfer of assets or corporate property without just or adequate compensation.

217.    Plaintiffs accordingly request that the Court dissolve Gooberry and that a liquidating trustee be appointed to oversee the dissolution and winding up of Gooberry, instead of the Defendants.  A liquidating trustee would ensure that Plaintiffs are protected from further harm caused by the Defendants—who have demonstrated a history of mismanagement and misappropriating of Company's funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants, as follows:

1. For monetary damages in an amount to be determined at trial;

2. For treble damages and reasonable attorneys' fees under 18 U.S.C. 1964(c);

3. For an accounting under Court supervision of the money owed/due for all assets Defendants misappropriated from the Company, as well as any benefits they have realized from those assets;

4.  For disgorgement from the Defendants all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

5.  A judgment that Gooberry be dissolved;

6.  The appointment of an independent liquidating trustee to wind up the affairs of Gooberry;

7.  An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses;

8.  For punitive damages; and

9.  For such further relief as the Court may deem just and proper under the circumstances.

<u>**JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE**</u>

Dated: June 18, 2020                              **Gerard Fox Law P.C.**

*/s/ Maja Lukic*
Gerard P. Fox (*pro hac vice forthcoming*)
Maja Lukic (SBN 4888038)
1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
gfox@gerardfoxlaw.com
mlukic@gerardfoxlaw.com

Lauren M. Greene (*pro hac vice forthcoming*)
1880 Century Park East, Suite 1410
Los Angeles, California 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447
lgreene@gerardfoxlaw.com