EXHIBIT 1

**EFiled:  Mar 30 2021 12:47PM EDT**
**Transaction ID 66467690**
**Case No. 2020-0486-MTZ**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| NICHOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of ML FASHION, LLC, a Delaware limited liability company, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 2020-0486-MTZ |
| MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, MARCUS LEMONIS LLC, a Delaware limited liability company, ROBERTA RAFFEL aka Bobbi Lemonis, an individual, and MLG RETAIL, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) |  |
| Defendants, | ) ) |  |
| and | ) ) |  |
| ML Fashion, LLC, a Delaware limited liability company, | ) ) ) |  |
| Nominal Defendant. | ) |  |

## MEMORANDUM OPINION

Date Submitted: December 4, 2020
Date Decided: March 30, 2021

Sean J. Bellew, BELLEW LLP, Wilmington, Delaware; Gerard P. Fox and Lauren M. Greene, GERARD FOX LAW P.C., Los Angeles, California; *Attorneys for Plaintiffs Nicholas Goureau and Stephanie Menkin.*

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Michael D. Wexler, SEYFARTH SHAW LLP, Chicago, Illinois; Jesse M. Coleman, SEYFARTH SHAW LLP, Houston, Texas; *Attorneys for Defendants Marcus Lemonis, ML Retail, LLC, Marcus Lemonis, LLC, Roberta Raffel and MLG Retail, LLC.*


**ZURN, Vice Chancellor.**

*The Profit* is a business-themed reality television series.  It stars defendant Marcus Lemonis, a well-known entrepreneur and CEO.  In each episode, Lemonis offers his own money, as well as his experience as an entrepreneur and executive, in exchange for an equity stake in the featured struggling business.  Plaintiffs and their business, a women's clothing store, were featured on a 2014 episode.  During filming, Lemonis agreed to invest in plaintiffs' business and substantially renovated one of plaintiffs' retail stores.

Before the ink dried on Lemonis' investment, he allegedly began a scheme to take over plaintiffs' business and use it for his own benefit.  Unbeknownst to plaintiffs, during the show's production, Lemonis saddled their company with millions of dollars in debt owed to Lemonis and his entities.  When plaintiffs protested, Lemonis told them they could only back out of the deal if they paid him back.  Unable to do so, plaintiffs agreed to Lemonis' terms.  Thereafter, Lemonis continued to cause plaintiffs' company to borrow money from Lemonis' other entities, threatening to foreclose if they defaulted.  Meanwhile, he drove down profits, forcing plaintiffs to incur even more debt just to stay afloat.

According to plaintiffs, their extensive debt and lack of foreseeable profit left them with no choice but to acquiesce when Lemonis proposed they expand their business relationship.  The parties formed a new entity for their expanded venture and began investing in other fashion brands that appeared on *The Profit*.  As alleged,

Lemonis continued his pattern, saddling the new entity with debt owed to Lemonis' other entities.  With plaintiffs under his thumb, Lemonis leveraged their businesses for his personal gain, enriching himself and boosting his personal brand at plaintiffs' expense.  Eventually, Lemonis removed plaintiffs from their salaried employment positions and looted their businesses.

To stop Lemonis and recover their losses, plaintiffs filed two complaints on the same day:  one in the United States District Court for the Southern District of New York, asserting derivative claims on behalf of plaintiffs' original entity, and one in this Court, asserting derivative claims on behalf of the parties' new holding company.  Both complaints describe Lemonis' alleged scheme of overloading plaintiffs with debt, and then using that leverage to mismanage their businesses for his benefit.  They both describe allegations across the same time period, and point to many of the same underlying instances of misconduct.

Defendants moved to dismiss on several grounds, including that plaintiffs' overlapping complaints violate the rule against claim splitting.  They do.  To remedy that violation, this action is stayed pending resolution of the proceeding in federal court.  Defendants' other grounds for dismissal, as well as the parties' other disputes, are held in abeyance while this matter is stayed.

## I.     BACKGROUND

On this motion to dismiss, I draw the facts from the first amended complaint in this action, as well as the documents integral to it.[1]  Because the motion to dismiss presents the question of whether plaintiffs engaged in improper claim splitting, I present their allegations with perhaps some unnecessary detail for the purpose of parsing their claims.

### A.     Plaintiffs Appear On *The Profit*.

In 2008, plaintiffs Nicholas Goureau and Stephanie Menkin (together, "Plaintiffs"), along with their mother, Neomi Goureau,[2] founded Courage.B, a high-end women's clothing store.  Plaintiffs owned Courage.B through a New York entity, Gooberry Corporation ("Gooberry").  Over the next six years, the family business expanded to seven retail stores throughout the United States.

Plaintiffs first learned of Lemonis by watching an episode of *The Profit* on CNBC.  The show portrays Lemonis as a savior for struggling small businesses who offers his personal investment and expertise in exchange for a share of the featured company.  According to CNBC's website, "In each one-hour episode of *The Profit*, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the

---

[1] *See* Docket Item ("D.I.") 17 [hereinafter "FAC"].

[2] This opinion refers to Neomi Goureau by her first name to distinguish her from Plaintiff Nicholas Goureau.  I intend no familiarity or disrespect.

business and a percentage of the profits."[3]   During commercial breaks, Lemonis invites struggling business owners to apply to appear on the show through a casting website.  That website states:

> [Lemonis] has been called America's number one business turnaround artist.  He will do whatever it takes to fix YOUR failing business.  When Marcus Lemonis isn't running his multi-billion[-]dollar company, Camping World, he is on the hunt for struggling businesses that are desperate for cash and ripe for a deal.  In the past 10 years, he's successfully turned around over 100 companies.[4]

Generally, featured businesses are family-owned, and their owners are less sophisticated than Lemonis.

Courage.B was no exception.  Goureau applied to appear on *The Profit* and in the spring of 2014, representatives from the show's production company, Machete Corporation ("Machete"), reached out to Goureau for an interview.  During that interview, a Machete producer explained to Plaintiffs that the successes portrayed in the show are real; she also explained that if Lemonis decided to invest, they would strike a deal during filming, and that deal would be real.  Plaintiffs were selected for the show and filmed their episode in June 2014 (the "Episode").

On the Episode, Lemonis offered Plaintiffs $800,000 in exchange for full control of Courage.B and 50% of Gooberry's stock, with a warning:  "before you

---

[3] FAC ¶ 48 (italics added).

[4] *Id.* ¶ 47.

answer, just know that if you don't do a deal with me, you may not make it."[5]
Plaintiffs and Lemonis agreed to a deal wherein Lemonis would invest $800,000 in
exchange for a 30% stake in Gooberry.[6]  They also agreed on how that cash would
be spent:  $200,000 to renovate the Courage.B stores; $300,000 for new inventory;
$150,000 as new working capital; $50,000 to build a new e-commerce site; $40,000
to eliminate high interest debt; and the final $60,000 for a yet-undetermined use.
Lemonis' investment was not formalized until several months after the Episode's
filming ended.

Plaintiffs' relationship with their new business partner was fraught from the
outset.  As part of filming the Episode, Lemonis and his team renovated Gooberry's
Greenwich, Connecticut store.  Lemonis led Plaintiffs to believe that the work on
the Greenwich store would be covered by the $200,000 of his investment set aside
for renovations.   When Plaintiffs asked about the renovations' costs, Lemonis
demurred with "I got it," and stated that Plaintiffs "didn't have to deal with it" and
should "trust the process."[7]   Despite the $200,000 renovation budget, Lemonis
caused Gooberry to incur over $2 million in debt renovating Courage.B stores.

---

[5] *Id.* ¶ 59.

[6] For reasons Plaintiffs do not explain, Lemonis ultimately purchased 32% of Gooberry's shares.

[7] FAC ¶ 62.

Plaintiffs learned of these excessive costs before their deal was finalized. When they confronted Lemonis, he berated them and told them that if they wanted to back out of the deal, they would need to repay the $2 million renovation debt. "Feeling entrapped and like they had no other choice," Plaintiffs ultimately went through with the deal.[8]  Lemonis' investment was finalized on November 18.

Lemonis invested in Gooberry through his investment vehicle, ML Retail, LLC ("Investment Vehicle").  Gooberry, Plaintiffs, Neomi, and Investment Vehicle executed a shareholder agreement (the "Gooberry Shareholder Agreement"), which gave Investment Vehicle, and by extension Lemonis, extensive control over Gooberry's operations.  In particular, Investment Vehicle's affirmative vote was required to:  "(1) enter into any contract outside of the normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, and (4) hire or replace any member of Gooberry's executive team."[9]  The Gooberry Shareholder Agreement also gave Investment Vehicle sole control over Gooberry's bank account and its revolving line of credit with Lemonis' other entities, which was Gooberry's main source of cash.

---

[8] *Id.* ¶ 68.

[9] *Id.* ¶ 70.  Plaintiffs did not attach the Gooberry Shareholder Agreement to their complaint, so I cannot cite the particular provisions involved.

Plaintiffs allege that they had no choice but to accept Lemonis' structure. According to Plaintiffs, "Lemonis made clear that if Plaintiffs objected to the Gooberry documents that he would force them to repay the money that he had put into the renovations—which would wipe them out—and take their business from them."[10]

Going forward, Lemonis used his considerable leverage and governance authority to keep Plaintiffs indebted to him.  In 2015, Lemonis caused Gooberry to purchase a retail concept featured on *The Profit* called Blues Jean Bar.  He rebranded Blues Jean Bar and two Courage.B stores as Denim & Soul, incurring more debt for Gooberry along the way.  Once the rebrand was complete, Lemonis continued to drain Gooberry's resources and increase its debt by ordering further renovations and inventory purchases.  According to Plaintiffs, Lemonis' changes only made their business less profitable.  Faced with growing debt and declining profits, Gooberry became increasingly reliant on its line of credit with Lemonis' entities to meet its basic operating expenses.  Lemonis threatened to foreclose on Gooberry's mounting debt to "keep Plaintiffs in line" and control the business.[11]

---

[10] *Id.* ¶ 72.

[11] *Id.* ¶ 81.

**B.     The Parties Expand Their Relationship, And Lemonis Continues To Exploit Plaintiffs.**

Using his superior leverage, Lemonis encouraged Plaintiffs to expand their investments with him, telling them that doing so was the only way they would be able to turn a profit.  Plaintiffs agreed to do so and formed a new entity with Lemonis called ML Fashion, LLC ("Holdings") for their continuing ventures.  Goureau and Menkin each owned 33.33% of Holdings, and Lemonis, through Investment Vehicle, owned the remaining 33.34%.[12]

Holdings was formed on March 29, 2016.  Lemonis became its chairman and CEO, and Menkin became its president.  Pursuant to Holdings' limited liability company operating agreement (the "Holdings LLC Agreement"),[13] Investment Vehicle is the company's sole manager, and has the "full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of [Holdings]."[14]  Contemporaneously with the Holdings LLC Agreement, Holdings entered into a credit agreement with Investment Vehicle, under which it could borrow up to $30,000,000 at a 6% interest rate,[15] as well as a security agreement that

---

[12] While Neomi appears to have owned a stake in Gooberry, she did not own a stake in Holdings.  Plaintiffs allege that "Lemonis removed Neomi's equity and placed it with Menkin.  Lemonis told Plaintiffs that their mother's equity laid with them, her children." *Id.* ¶ 86.

[13] D.I. 22 [hereinafter "Holdings LLC Agr."].

[14] FAC ¶ 98 (quoting Holdings LLC Agr. § 6.1(a)).

[15] D.I. 23.

granted Investment Vehicle a security interest in essentially all of Holdings' assets.[16] Investment Vehicle, in turn, was funded by a similar credit agreement with Marcus Lemonis, LLC ("Funding Vehicle"), another Lemonis-owned entity. Plaintiffs allege that both Investment Vehicle and Funding Vehicle are Lemonis' alter egos. Holdings' documents were prepared by Lemonis' attorneys, though Lemonis told Plaintiffs that the attorneys represented all three of them.

To secure their participation in Holdings, Lemonis told Plaintiffs that the three would split Holdings' profits evenly once Lemonis' debts were repaid. This turned out to be an empty promise. Lemonis drowned Holdings in debt to his entities, such that it never turned a profit and Plaintiffs' equity was worthless. And because at least Neomi and Menkin drew salaries from Gooberry and Holdings, Plaintiffs were forced to continue working for Lemonis to be able to support their families.

Around the time the parties formed Holdings, Lemonis met defendant Roberta Raffel at a trade show in New York City. Raffel owned a boutique called Runway. After Lemonis became romantically interested in Raffel, he decided Gooberry should purchase her store. Gooberry purchased the store on March 23, days before Holdings was formed. By May, Gooberry and Holdings had paid to completely renovate Raffel's store and add new inventory, with funds borrowed from Lemonis' entities. After revamping Runway, Lemonis and Raffel purchased unnecessary

---

[16] D.I. 24.

inventory, driving Holdings and Gooberry into more debt.  The pair married in February 2017.

After the parties formed Holdings, Lemonis transferred all of Gooberry's assets—except Runway—into a new entity called MLG Retail, LLC ("Retail Sub"). Holdings owns Retail Sub and is its manager.  In October 2016, Lemonis made Retail Sub dependent on Holdings via the same credit structure that made Holdings dependent on Investment Vehicle.  Under a credit agreement, Retail Sub could borrow up to $10 million from Holdings at a 7.5% interest rate.  Because Holdings funded these loans by borrowing from Investment Vehicle, which in turn borrowed from Funding Vehicle, Retail Sub was effectively funded by borrowing from Lemonis.  Plaintiffs allege that this series of credit agreements allowed Lemonis to continue his predatory lending practices and allowed him to foreclose on the operating entities at any time.[17]

---

[17] Lemonis also contributed to the cash crunch by using funds from Holdings and Retail Sub to pay off his personal credit card.  To make up for these deficiencies, those entities would need to borrow more money from Lemonis to pay vendors.

The chart below summarizes the ownership and debt structures of the relevant entities after the parties formed Retail Sub.  Solid lines denote ownership, and dotted lines indicate the flow of credit.



Plaintiffs were employed at these various entities.  Menkin was Holdings' president and collected a salary in that role.  Goureau had a position at Holdings until Lemonis moved him to Funding Vehicle; Plaintiffs do not specify what his roles were, when he started, or whether he was paid.  Neomi had an undefined role at Holdings, earning a "management fee."[18]

---

[18] FAC ¶ 162.

Lemonis used Holdings to house his many other ventures, incurring substantial debt along the way.  In fall 2017, Lemonis and Raffel opened a store branded MARCUS.  Eventually, Lemonis rebranded several stores owned by Holdings, including Courage.B, Runway, and Denim & Soul locations, as MARCUS stores.[19]  Predictably, Holdings financed these changes by borrowing from Lemonis and his entities.[20]

Lemonis also used Holdings to invest in many of the floundering businesses featured on *The Profit*.  In doing so, Lemonis caused Holdings to incur more debt by purchasing these businesses' inventory and hiring their employees.  These businesses included Flex Watches, from a September 2016 episode of *The Profit*; Susan Monaco, from a November 2016 episode; Swim by Chuck Handy, from a June 2017 episode; Ellison Eyewear, from a June 2018 episode; and Ben's Garden, from a January 2019 episode.  These ventures all resulted in substantial losses to Holdings.  The mounting losses forced Holdings to take on more loans from Lemonis

---

[19] While Plaintiffs describe Courage.B, Denim & Soul, and Runway as "[Holdings'] other retail locations," *id.* ¶ 159, it appears that, as of fall 2017, Courage.B and Denim & Soul were owned by Retail Sub.  Plaintiffs also allege that Gooberry owned the Runway brand, and retained it even after the asset transfer from Gooberry to Retail Sub.

[20] Despite the parties' apparent joint venture, Lemonis applied for the trademark for the MARCUS name under a separate entity that does not involve Plaintiffs.

and his entities.  Plaintiffs allege Lemonis intentionally kept these losses high so that he could secure a personal tax write-off.

Lemonis also used Investment Vehicle to buy stakes in businesses from *The Profit* and presented those stakes as sham contributions to Holdings.  As part of a deal negotiated on the show, Gooberry purchased the assets of a shoe company called Inkkas.  Inkkas' assets were transferred to an entity called Inkkas, LLC. Investment Vehicle purchased these assets from Inkkas, LLC on June 6, 2017.  Later that same day, Investment Vehicle transferred those assets to Holdings as a membership contribution.  In a third transaction that day, Holdings then transferred those assets into a Lemonis-owned entity called ML Footwear LLC.  Effectively, Lemonis took assets from Gooberry, which were already part of the parties' joint venture; transferred them to Holdings as a membership contribution from Investment Vehicle; and then transferred them back out to one of his own entities.  Lemonis also used promissory notes to make sham contributions.  Because the Holdings LLC Agreement prioritized distributions to those members who had made "Unreturned Capital Contributions," these contributions ensured that Investment Vehicle was first in line for distributions.[21]

Ultimately, Lemonis' many projects saddled the parties' jointly-owned entities with substantial debt owed to Lemonis and his entities.  As of February 2020,

---

[21] *Id.* ¶ 131 (quoting Holdings LLC Agr. § 5.1(b)(i)).

Holdings owed nearly $12 million to Investment Vehicle, despite owning assets worth only $5 million.  Plaintiffs allege that this substantial debt, and Lemonis' threats to foreclose on it, kept them under his control.

### C.   Lemonis Removes Plaintiffs And Continues His Abuses.

Lemonis wielded his considerable leverage against Plaintiffs personally. Lemonis repeatedly threatened to remove Neomi from the business.  Allegedly to create a "rift" between Plaintiffs, Lemonis prohibited Goureau from entering stores owned by Holdings.[22]   Goureau did not resist, fearing that Lemonis would fire Menkin and Neomi, both of whom relied on salaries from their roles at Holdings and Gooberry to make a living.

In May 2017, Lemonis moved Goureau's employment from Funding Vehicle to Camping World, where Lemonis was the CEO.  Lemonis then fired Goureau in December 2018.  Lemonis fired Neomi from her role at Holdings in September 2019. Menkin was in discussions with Lemonis about how to separate from their joint venture.  Once the COVID-19 pandemic hit, those talks stopped and Lemonis

---

[22] *Id.* ¶ 167.

"abruptly cut off Menkin" from her role as Holdings president, removing her electronic access and ceasing her bi-weekly paychecks.[23]

Lemonis also put pressure on Goureau by manipulating the company credit card. Retail Sub used an American Express card (the "AMEX Card") to pay its expenses. Retail Sub paid against the AMEX Card's substantial balance via automatic $18,696 monthly withdrawals from Retail Sub's bank account. Goureau was personally liable for the debts on the AMEX Card if Retail Sub did not pay. Aware of this fact, Lemonis would threaten to stop the automatic payments as part of his plan to "keep [Plaintiffs] in line."[24]

With Plaintiffs sidelined, Lemonis set out to "loot" Holdings.[25] Starting in April 2020, he directed his employees to remove inventory, fixtures, furniture, and equipment from Holdings' brands' various stores across the country. He held "fire sales" of Holdings inventory, including private liquidation events at Holdings' Deerfield, Illinois store.[26] And he misappropriated funds Holdings received under the federal Paycheck Protection Program in May 2020. Meanwhile, Lemonis depleted Retail Sub's bank account so that it could not make the AMEX Card

---

[23] *Id.* ¶ 169.

[24] *Id.* ¶ 181.

[25] *Id.* ¶ 172.

[26] *Id.* ¶ 187. Plaintiffs also allege that these gatherings violated local stay-at-home orders then in effect.

payments, again to put pressure on Goureau.  After Plaintiffs filed suit, Defendants reversed roughly $94,000 in payments on the AMEX Card.  American Express has threatened collections proceedings against Goureau personally.

### D.    Plaintiffs File Lawsuits In This Court And Federal Court.

On June 18, 2020, Plaintiffs filed their initial complaint in this action against Lemonis, Investment Vehicle, Funding Vehicle, Retail Sub, and Raffel (together, "Defendants").[27]  Holdings is the nominal defendant for the derivative claims.  The complaint was accompanied by a motion to expedite[28] and a proposed status quo order.[29]  On July 14, Defendants removed this action to the United States District Court for the District of Delaware.[30]  On August 21, the case was remanded due to lack of subject matter jurisdiction over Plaintiffs' claims.[31]  The remand order left pending a motion to dismiss Defendants had filed in the District of Delaware.[32]  Upon return to this Court, Plaintiffs filed their first amended complaint (the "Delaware Complaint") on August 25.[33]

---

[27] D.I. 1.

[28] D.I. 2.

[29] D.I. 3.

[30] D.I. 15.  While in federal court, this case was identified by the case number 1:20-cv-00940-MN.  The docket sheet and some relevant entries for the removal action were filed in this action.  *See* D.I. 39.

[31] *See* D.I. 39, Ex. F [hereinafter "Remand Order"].

[32] *See id.* at 4.

[33] *See generally* FAC.

The Delaware Complaint sets forth fifteen counts:

- Count I alleges Lemonis, Investment Vehicle, and Funding Vehicle fraudulently induced Plaintiffs to enter into the Holdings LLC Agreement. Count II, against the same three Defendants, contains similar claims of fraud, which Plaintiffs allege caused them to continue their business venture with Lemonis.

- Counts III and IV allege breaches of fiduciary duty.  Count III is a derivative claim (on behalf of Holdings) against Lemonis.  Count IV is a direct claim (by Plaintiffs) against Lemonis, Investment Vehicle, and Funding Vehicle; Plaintiffs allege these entities formed a control group. The underlying breaches are substantially similar.  Count V alleges Raffel aided and abetted these breaches.

- Counts VI, VII, and VIII relate to the Holdings LLC Agreement.  Count VI alleges Lemonis, Investment Vehicle, and Funding Vehicle breached the implied covenant of good faith and fair dealing in that agreement. Count VII alleges the same defendants breached that agreement.  Because Count I seeks to rescind the LLC Agreement, Count VIII, against the same defendants, alleges unjust enrichment as an alternative theory.

- Count IX alleges Lemonis, Investment Vehicle, and Funding Vehicle grossly mismanaged Holdings and its assets.  Count X alleges waste and misappropriation of Holdings' assets by the same Defendants.

- Count XI, against all Defendants, alleges conversion.

- Counts XII, XIII, and XIV focus on remedies for the above-described misconduct.  Count XII seeks appointment of a receiver.  Count XIII seeks injunctive relief.  Count XIV seeks to dissolve Holdings.

- Count XV alleges that by failing to pay Menkin her salary as Holdings' president, Holdings and Retail Sub breached a contract between the parties.

After they filed the Delaware Complaint, Plaintiffs renewed their request for expedited proceedings and a status quo order.[34]  On September 1, the Court held oral argument and denied the motion to expedite.[35]  After the parties conferred, the Court entered a status quo order, limiting, among other things, the parties' use of the AMEX Card for purchases outside the ordinary course of business (the "Status Quo Order").[36]

---

[34] D.I. 30.

[35] D.I. 47.

[36] D.I. 55.

Defendants initially attacked the Delaware Complaint as procedurally deficient, moving to strike it on August 28.[37]  On September 2, Defendants withdrew their motion to strike[38] and, instead, moved to dismiss the Delaware Complaint on September 16 (the "Motion").[39]  The parties briefed the Motion and the Court held oral argument on December 4.[40]

On the same day Plaintiffs initiated this action, they initiated overlapping litigation regarding Plaintiffs' joint venture with Lemonis in the United States District Court for the Southern District of New York (the "New York Action").[41]  Plaintiffs amended their complaint in the New York Action on August 17, eight days before they filed the Delaware Complaint (the "New York Complaint").[42]

The New York Complaint asserts thirteen claims against Lemonis, Investment Vehicle, ML LLC, and Machete.[43]  It also asserts derivative claims on behalf of

---

[37] D.I. 36.

[38] D.I. 48.

[39] D.I. 57.

[40] D.I. 74; *see also* D.I. 79.

[41] *See generally* Complaint, *Goureau v. Lemonis*, 1:20-cv-04691-MKV (S.D.N.Y. June 6, 2020), ECF No. 1.  Other citations to that docket are styled "New York D.I. —".

In addition to this action and the New York Action, Lemonis, Investment Vehicle, and others filed suit against Plaintiffs and others in Illinois federal court on August 31.  *See* D.I. 64 at 18:23–19:5.

[42] *See* New York D.I. 24 [hereinafter "New York FAC"].

[43] *See id.* at 1.

Gooberry, which is a New York corporation.[44]  As described in more detail below, the facts alleged in the New York Complaint overlap substantially with the claims in this action.  The theories of recovery also overlap.  Like the Delaware Complaint, the New York Complaint includes claims for fraudulent inducement,[45] common law fraud,[46] breaches of fiduciary duty,[47] breaches of the implied covenant,[48] unjust enrichment,[49] misappropriation of assets,[50] mismanagement and waste,[51] and conversion.[52]  The New York Complaint also seeks similar relief:  appointment of a receiver,[53] injunctive relief,[54] statutory dissolution,[55] and money damages.[56]  Unlike the Delaware Complaint, the New York Complaint alleges an additional claim that

---

[44] *See id.*

[45] *See id.* ¶¶ 133–42.

[46] *See id.* ¶¶ 143–53.

[47] *See id.* ¶¶ 154–57.

[48] *See id.* ¶¶ 158–62.

[49] *See id.* ¶¶ 163–72.

[50] *See id.* ¶¶ 173–76.

[51] *See id.* ¶¶ 177–83.

[52] *See id.* ¶¶ 184–89.

[53] *See id.* ¶¶ 226–33.

[54] *See id.* ¶¶ 234–39.

[55] *See id.* ¶¶ 240–47.

[56] *E.g.*, *id.* at 59.

Lemonis, Investment Vehicle, Funding Vehicle, and Machete violated the Racketeering Influenced and Corrupt Organizations Act ("RICO").[57]

On September 16, the defendants in the New York Action informed the District Court of their intention to file a motion to dismiss in that action, raising, among other issues, the argument that Plaintiffs' two complaints violate the rule against claim splitting.[58]  The parties began briefing that motion in October,[59] with the last brief filed on December 18.[60]  As of today, the motion to dismiss in the New York Action remains pending.  The last filing on the New York Action's docket is a December 18 request for oral argument.[61]

## II.    ANALYSIS

Defendants' Motion argues, among other things, that in light of the New York Action, Plaintiffs violated the rule against claim splitting.  I agree, and therefore stay this action pending resolution of the New York Action.  Because the claim splitting issue is dispositive, I do not reach Defendants' other arguments.[62]

---

[57] *See id.* ¶¶ 190–216; *see also* 18 U.S.C. §§ 1961–1968.

[58] *See* New York D.I. 33.

[59] *See* New York D.I. 44; New York D.I. 45.

[60] *See* New York D.I. 55.

[61] *See* New York D.I. 56.

[62] Defendants also argue that the Delaware Complaint must be dismissed under Rule 12(b)(3) because this Court is not the proper venue to hear Plaintiffs' claims.  *See* D.I. 57 at 8–10.  Defendants' argument is based on forum selection clauses in several of the credit and security agreements.  *See id.*  Defendants have made a similar argument in the New

The crucial question the Motion presents is whether Plaintiffs violated the rule against claim splitting.  As explained in *Maldonado v. Flynn*,

> The rule against claim splitting is an aspect of the doctrine of *res judicata* and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times.[63]

Importantly, the rule "eliminates the contemporaneous litigation of the same factual or legal issues in different courts."[64]  "Two basic principles animate the rule.  First, the rule is founded upon the principle that no person should be unnecessarily harassed with a multiplicity of suits.  Second, the rule is designed to prevent a litigant from getting two bites at the apple."[65]  In short, the rule against claim splitting is designed to "prevent burdening the same defendant with duplicative proceedings in

---

York Action.  *See* New York D.I. 33 at 2.  While venue is typically a threshold question, addressing this argument would require me to consider the merits of Plaintiffs' claims and construe the relevant agreements.  *See Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1241 (Del. Ch. 2010) (describing venue as a "threshold question").  Because I find that Plaintiffs' claims have been improperly split, I leave the venue questions for the District Court in the New York Action.

[63] 417 A.2d 378, 382 (Del. Ch. 1980) (italics added).

[64] *Balin v. Amerimar Realty Co.*, 1995 WL 170421, at *4 (Del. Ch. Apr. 10, 1995).

[65] *J.L. v. Barnes*, 33 A.3d 902, 918 (Del. Super. Ct. 2011) (alterations and internal quotation marks omitted) (collecting sources).

different courts brought by the same plaintiff based on different causes of action arising out of a common underlying nucleus of facts."[66]

Delaware takes a modern "transactional" view of claim splitting,[67] barring overlapping complaints that arise from the "same transaction or from a 'common nucleus of operative facts.'"[68]   In *LaPoint v. AmerisourceBergen Corp.*, the Delaware Supreme Court applied the analysis described in the Restatement (Second) of Judgments:

> Determining whether two claims arise from the same transaction requires pragmatic consideration, with the fact finder "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."   Two claims "derive[d] from a common nucleus of operative fact[s]" arise from the same transaction.[69]

---

[66] *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *18 (Del. Ch. Dec. 23, 2008).

[67] *See Maldonado*, 417 A.2d at 381; *see also Villare v. Beebe Med. Ctr., Inc.*, 2013 WL 2296312, at *3 (Del. Super. Ct. May 21, 2013) ("In making this determination, Delaware courts apply the transactional approach to define a claim."); *DeRamus v. Redman*, 1986 WL 13089, at *5 (Del. Super. Ct. Nov. 14, 1986) (applying the "'transactional' approach [to *res judicata*] described by Restatement (Second) Judgments § 24").

[68] *Villare*, at *3 (quoting *DeRamus*, 1986 WL 13089, at *5).

[69] 970 A.2d 185, 193 (Del. 2009) (quoting Restatement (Second) Judgments § 24(2) (1982), and then quoting *Maldonado*, 417 A.2d at 383); *see also DeRamus*, 1986 WL 13089, at *5 ("Among the factors relevant to a determination [are] whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first." (quoting Restatement (Second) Judgments § 24 cmt. (b))).

In some circumstances, duplicitous litigation over a "series" of transactions may also be barred.[70] Whether a factual grouping constitutes a series of transactions is also a pragmatic question and turns on the same factors.[71] Thus, the rule against claim splitting is not limited to complaints that are word-for-word identical or present identical theories. A second complaint may include additional defendants or assert additional theories and still be barred.[72]

This action and the New York Action arise from a connected series of transactions and the same common nucleus of operative facts. Plaintiffs argue the New York Action focuses on the events surrounding *The Profit* and the Episode,

---

[70] *See Villare*, 2013 WL 2296312, at *3 ("Simply put, if the action arises from the same transaction or series of connected transactions, it will be barred as a matter of law."); *DeRamus*, 1986 WL 13089, at *5 ("When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." (alterations omitted) (quoting Restatement (Second) Judgments § 24)); *see also Transamerica Corp. v. Reliance Ins. Co. of Ill.*, 1995 WL 1312656, at *5 (Del. Super. Ct. Aug. 30, 1995) ("Although there may not be an absolute identity of parties and issues in both actions, lack of absolute identity of parties and issues is not a prerequisite to granting a motion to stay.") (collecting sources).

[71] *See DeRamus*, 1986 WL 13089, at *5.

[72] *See J.L.*, 33 A.3d at 917–21 (staying action on claim splitting grounds, despite the fact that fact that plaintiffs added additional defendants); Restatement (Second) of Judgments § 24 cmt. (a) ("The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.").

while the Delaware action focuses on the parties' subsequent business relationship. But the line Plaintiffs seek to draw is blurred by the two actions' extensively overlapping allegations, which span from the Plaintiffs' initial application for *The Profit* in 2014 through Lemonis' looting of their businesses in 2020.

Both complaints begin by describing Plaintiffs' application to appear on *The Profit* in 2014,[73] including their initial conversations with Machete producers.[74] They then cover Plaintiffs' Episode,[75] Lemonis' excessive spending on renovations for the Gooberry store,[76] and the substantial debt those renovations incurred.[77] Against the backdrop of Gooberry's problems, both complaints then describe the formation of Holdings.[78] The Delaware Complaint alleges Plaintiffs agreed to form Holdings because of Gooberry's debt incurred after accepting Lemonis' offer on *The Profit*.[79] Lemonis allegedly presented Holdings not as a "separate business

---

[73] *Compare* New York FAC ¶¶ 45–46, *with* FAC ¶¶ 51–52.

[74] *Compare* New York FAC ¶¶ 47, 51, *with* FAC ¶¶ 53–54.

[75] *Compare* New York FAC ¶¶ 52–56, 62, *with* FAC ¶¶ 55–60, 65.

[76] *Compare* New York FAC ¶¶ 57–60, *with* FAC ¶¶ 61–63.

[77] *Compare* New York FAC ¶¶ 61, 65, *with* FAC ¶¶ 64, 68.

[78] *Compare* New York FAC ¶¶ 89–92, *with* FAC ¶¶ 82–86, 91.

[79] *See* FAC ¶ 9 ("By March 2016, Lemonis had destroyed Gooberry's profit margins and saddled it with debt owed to himself and his entities that neither Gooberry nor the Plaintiffs could ever repay. Lemonis represented to Plaintiffs that the only way they could make money from their business venture now was to join him in investing in other businesses."); *id.* ¶ 82 ("Lemonis told Plaintiffs that investing in these other businesses [through Holdings] was the only way to make profits—this was, of course, after Lemonis slashed Gooberry's profit margins."); *id.* ¶ 84 ("Lemonis represented that Plaintiffs would be able

venture"[80] unconnected to Gooberry, but rather an opportunity to "expand" or "grow" their existing business.[81]  The New York Complaint also acknowledges the overlap:  "Eventually, Lemonis began running Plaintiffs' business through the ML Fashion entity instead of Gooberry."[82]

A central focus of both complaints is Lemonis' scheme to saddle the parties' joint ventures with substantial debt, on which he would threaten to foreclose to keep Plaintiffs "in line."[83]  Both complaints allege he facilitated this scheme using his alter ego entities, Investment Vehicle and Funding Vehicle.[84]  Both specifically point to the credit and security agreements between Holdings, Gooberry, Retail Sub, and Lemonis' other entities as critical instruments of Lemonis' scheme.[85]  Both

---

to make more money in this new business venture than they were making with Gooberry."); *id.* ¶ 87 ("Lemonis also represented that he and Plaintiffs would work to grow a fashion empire that they would eventually be able to sell for millions in profit.  Lemonis represented that Plaintiffs and Lemonis would split any such profits equally—after Lemonis' debts were repaid.").

[80] *See* D.I. 65 at 14.

[81] *See* FAC ¶ 204 ("Defendants' material misrepresentations and/or failures to disclose material information described above include but are not limited to: (1) representing that Defendants wanted to help Plaintiffs expand their business through [Holdings] . . . ."); *id.* ¶ 88 ("Lemonis represented to Plaintiffs that [Holdings] would be an umbrella entity to hold the parties' various business ventures.  He told Plaintiffs that he wanted to help them grow their business and that they could build something special together.").

[82] New York FAC ¶ 92.

[83] *See* New York FAC ¶¶ 96–97, 113, 199(a); FAC ¶¶ 12, 81, 146, 155.  *Compare* New York FAC ¶¶ 130, 156, 161, 167, 175, 243, *with* FAC ¶¶ 199, 220, 224, 232, 252, 255.

[84] *Compare* New York FAC ¶ 23, *with* FAC ¶ 25.

[85] *Compare* New York FAC ¶¶ 93–97, *with* FAC ¶¶ 105–06, 108–14.

26

complaints also specify transactions through which Plaintiffs incurred oppressive debt, including investments in Blues Jean Bar[86] and Runway.[87]

Both allege that as Lemonis forced Plaintiffs and their entities into more debt, he also intentionally drove down profits, forcing Plaintiffs to take on more loans from Lemonis to stay afloat.[88]  Both allege that his threats to foreclose on that debt gave Plaintiffs no choice but to continue to cooperate.[89]  Both complaints tell the story of Lemonis removing Plaintiffs and Neomi from their employment positions,[90] and continue through Lemonis looting the businesses in spring 2020.[91]  While Plaintiffs in briefing describe the New York Complaint as being focused on the show, it relies on post-Episode allegations—including the formation of MARCUS, the parties' investments in other businesses featured on *The Profit*, and Lemonis' looting of the parties' stores—to support several theories, including demand

---

[86] *Compare* New York FAC ¶ 86, *with* FAC ¶ 76.

[87] *Compare* New York FAC ¶¶ 99–103, *with* FAC ¶¶ 136–40.

[88] *Compare* New York FAC ¶¶ 82–84, 130, 156, 161, 167, 175, 243, *with* FAC ¶¶ 9, 79–81, 199, 220, 224, 232, 252, 255, 280.

[89] *Compare* New York FAC ¶¶ 97, 113, 199(a), *with* FAC ¶¶ 12, 81, 146, 155.

[90] *Compare* New York FAC ¶¶ 107–09, 116, *with* FAC ¶¶ 166–69.

[91] *Compare* New York FAC ¶¶ 117–18, *with* FAC ¶¶ 172–77.

futility,[92] breach of fiduciary duty,[93] breach of the implied covenant,[94] unjust enrichment,[95] misappropriation of assets,[96] and dissolution.[97]

And both complaints allege Lemonis engaged in all of these actions out of self-interest.[98] Lemonis allegedly used his considerable influence over Holdings and Gooberry to: (1) build a relationship with Raffel;[99] (2) expand his personal MARCUS brand;[100] (3) boost his own image by investing in companies that appeared on *The Profit*;[101] and (4) otherwise "financially favor[]" his other entities, particularly Investment Vehicle.[102] These allegations of self-interest support

---

[92] *See* New York FAC ¶ 130.

[93] *See id.* ¶ 156.

[94] *See id.* ¶ 161.

[95] *See id.* ¶ 167.

[96] *See id.* ¶ 175.

[97] *See id.* ¶ 243.

[98] *Compare id.* ¶¶ 1, 11, 99–101, 110–12, 121, 127, *with* FAC ¶¶ 1, 12, 116, 124–25, 136–38, 156–58; *see LaPoint*, 970 A.2d at 193 (considering "whether the facts are related in time, space, origin, or motivation" as part of the "common nucleus" analysis (quoting Restatement (Second) of Judgments § 24(2))).

[99] *Compare* New York FAC ¶¶ 99–101, *with* FAC ¶¶ 136–38.

[100] *Compare* New York FAC ¶¶ 110–12, 130, 156, 161, 167, 175, 243, *with* FAC ¶¶ 156–58, 199, 220, 224, 232, 252, 255, 280.

[101] *Compare* New York FAC ¶¶ 85, 129, *with* FAC ¶¶ 116, 198. Both complaints allege that this practice was fraudulent. *Compare* New York FAC ¶¶ 130, 138, 147, 156, 161, 167, 175, 243, *with* FAC ¶¶ 199, 205, 213, 220, 224, 232, 255.

[102] *Compare* New York FAC ¶¶ 128, 130, 156, 161, 167, 175, 243, *with* FAC ¶¶ 197, 199, 220, 224, 232, 252, 255.

multiple theories of recovery in both complaints, including breaches of fiduciary duty and breaches of the implied covenant.[103]

Plaintiffs' attempt to distinguish the two actions based on the two different nominal defendants is belied by their own allegations.  The New York Complaint alleges that Gooberry was funded through a credit agreement with Holdings.[104] When Lemonis forced Gooberry to draw from its credit line with Holdings, he also effectively forced Holdings to borrow money from Lemonis' other entities.[105] Asserting that both Gooberry and Holdings were harmed when Gooberry drew from that credit line, the New York Complaint calls this practice "killing two birds with one stone."[106]  The complaints' common nucleus—Lemonis throwing the stone—

---

[103] *Compare* New York FAC ¶¶ 156, 161, *with* FAC ¶¶ 220, 224, 232.

[104] *See* New York FAC ¶ 93.  It appears that this credit agreement may be the same agreement between Holdings and Retail Sub described in the Delaware Complaint. *Compare id.*, *with* FAC ¶ 105.  While the agreement referenced by the Delaware Complaint was not attached, the agreement attached to the New York Complaint fits the description in the Delaware Complaint:  the contract was executed on October 1, 2016, and provides for a $10 million revolving line of credit at 7.5% interest.  *Compare* FAC ¶ 105, *with* New York FAC, Ex. C.  To the extent the two complaints derive their claims from the same contract, a contract is considered a single "transaction" for *res judicata* purposes.  *See LaPoint*, 970 A.2d at 194.  In any case, it appears that Retail Sub is effectively Gooberry's successor, having purchased substantially all its assets other than Runway.  *See* FAC ¶ 104. The close connections between these entities further underscore the value of treating them as a single trial unit.

[105] New York FAC ¶ 97.

[106] *Id.*

should be evaluated in one court.  The fact that the stone, by design, killed two birds does not warrant two actions.

In sum, the two complaints derive from a "common nucleus of operative facts."[107]  Both allege facts across the same time period, from Plaintiffs' Episode in 2014 to Lemonis' looting of their stores in 2020.[108]  As alleged, these events stem from a common self-interested motivation.[109]  Moreover, Plaintiffs' interconnected allegations and resultant theories of recovery are a "convenient trial unit."[110]  Forcing the parties to litigate these overlapping issues in two forums would unfairly "burden[] the same defendant with duplicative proceedings in different courts brought by the same plaintiff"[111] and open the possibility for double recovery.[112]  Plaintiffs' two actions violate the rule against claim splitting.

The Court has ample discretion in considering how to remedy claim splitting.[113]  While dismissal with prejudice is sometimes appropriate, Delaware Courts may also dismiss split claims without prejudice or stay the action, pending

---

[107] *See LaPoint*, 970 A.2d at 193 (alterations omitted) (quoting *Maldonado*, 417 A.2d at 383).

[108] *See id.*

[109] *See id.*

[110] *See id.* (quoting Restatement (Second) Judgments § 24(2)).

[111] *Winner*, 2008 WL 5352063, at *18.

[112] *See J.L.*, 33 A.3d at 919.

[113] *See id.* at 921 n.115.

resolution of the overlapping proceeding.[114]   Here, I conclude that efficiency

supports staying this action in favor of the New York Action and its exclusive federal

question.

In *J.L. v. Barnes*, the Court chose to stay an action on claim splitting grounds

pending resolution of an overlapping case in federal court:

> A dismissal with prejudice of Plaintiff's claims in this Court may have
> *res judicata* implications for the Plaintiff in the District Court if she
> tried to name the dismissed defendants in that action.  There may be
> statute of limitations consequences too.  Neither of these consequences
> are consistent with the purposes of the claim splitting doctrine which
> are to prevent exposure to duplicitous litigation and/or double
> recoveries.[115]

A similar approach is warranted here.  The District Court has not yet passed on the

merits of Plaintiffs' claims in the New York Action, where a similar motion to

dismiss remains pending.  The New York Complaint alleges that the District Court

has federal question jurisdiction over the RICO claim,[116] and pendent jurisdiction

over the related state law claims.[117]   As explained, Plaintiffs' claims in this action

and the New York Action "derive from a common nucleus of operative fact."[118]  Like

the plaintiff in *Maldonado*, "[Plaintiffs] could, therefore, have presented [their

---

[114] *See id.* at 920–21.

[115] *Id.* at 921.

[116] New York FAC ¶ 27 (citing 28 U.S.C. § 1331).

[117] *Id.* (citing 28 U.S.C. § 1367).

[118] *See Maldonado*, 417 A.2d at 383.

related state law claims] in the same action as that in which [they] sought to present [their] [RICO claim], and the District Court could have exercised its discretionary judicial power to hear as pendent claims, the claims based on state common law."[119] As in *J.L.*, "[i]f the [New York Action] is dismissed, either voluntarily or otherwise, then the Court will consider an application to lift the stay. But the Court will not countenance Plaintiff 'taking two bites at the apple.'"[120]

A stay is particularly appropriate in light of Plaintiffs' claim seeking statutory dissolution of Holdings, a Delaware entity. Generally, an exception to the rule against claim splitting applies when "a plaintiff could not for jurisdictional reasons presented his claim in its entirety" in a single action.[121] Plaintiffs correctly point out that this Court has the unique ability to dissolve Delaware entities.[122] The unique

---

[119] *Id.* I note that when this case was removed to District of Delaware, it was remanded based on that Court's determination that it lacked original subject matter jurisdiction—particularly diversity jurisdiction—over Plaintiffs' claims. *See* Remand Order 4. The District of Delaware thus did not reach the question of whether it would exercise pendent jurisdiction over Plaintiffs' related state law claims.

[120] 33 A.3d at 921 (quoting *Balin*, 1995 WL 170421, at *4).

[121] *Maldonado*, 417 A.2d at 383.

[122] *In re TGM Enters., L.L.C.*, 2008 WL 4261035, at *2 (Del. Ch. Sept. 12, 2008) ("The Court understands that jurisdiction rests solely with the Court of Chancery where a party moves for dissolution of a company . . . ."); *see* 6 *Del. C.* § 18-802 ("On application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement.").

nature of a request for dissolution counsels in favor of a stay to preserve Plaintiffs' remedial options while furthering Delaware's strong policy against claim splitting.

> Dissolution is an extreme remedy to be applied only when it is no[] longer reasonably practicable for the company to operate in accordance with its founding documents, not as a response to fiduciary or contractual violations for which more appropriate and proportional relief is available. And, in many instances, such fiduciary and contractual claims may be subject to important, policy-based rules governing how they may be brought . . . . For these reasons, parties should first prove their fiduciary claims in a plenary action, and then seek dissolution only if the remedy granted in that action is insufficient to make continuation of the entity in accordance with its operating agreement reasonably practicable.[123]

Whether Holdings should be dissolved will turn in part on whether Lemonis is found to have committed the conduct Plaintiffs allege. The policies against claim splitting and the unique nature of dissolution support considering dissolution of Holdings only after the parties' underlying disputes are resolved, rather than subjecting Defendants to duplicitous litigation and risking inconsistent findings.[124] When the New York Action comes to an end, the parties may petition the Court to lift the stay and consider whether the record developed in New York supports

---

[123] *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *1 (Del. Ch. Apr. 23, 2009); *see id.* at *2 ("[T]his court views any form of judicial dissolution as a limited remedy that should be granted sparingly.").

[124] *See In re TGM Enters., L.L.C.*, 2008 WL 4261035, at *2 ("The Court understands that jurisdiction rests solely with the Court of Chancery where a party moves for dissolution of a company; therefore, after defendant's claims have been resolved in the Superior Court the parties will maintain the opportunity to re-open and resolve any remaining issues, including plaintiff's motion to dissolve [the entity], in the Court of Chancery.").

dissolution.  Staying this action while Plaintiffs pursue their claims in New York would not prejudice Defendants, who themselves suggested that "the issue of dissolution can be dealt with separately by the [Court of Chancery] after [the District Court] resolves Plaintiffs' underlying claims."[125]

I also note that several other motions are currently pending in this action, including a motion to enforce the Status Quo Order and a motion to compel.[126]  These motions will be held in abeyance during the stay.  The Status Quo Order is also vacated during the stay.

## III.   CONCLUSION

For the foregoing reasons, the action is **STAYED**, pending resolution of the New York Action.  The remaining questions raised by the Motion are held in abeyance.  The Status Quo Order is vacated.  The parties' pending motions are held in abeyance.  An implementing order accompanies this decision.

---

[125] D.I. 68 at 10.

[126] *See* D.I. 73; D.I. 94; *see also* D.I. 95.  Plaintiffs also recently filed a motion to quash a subpoena to AT&T.  D.I. 106.  Discovery in this matter is also stayed.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NICHOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of ML FASHION, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0486-MTZ |
| MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, MARCUS LEMONIS LLC, a Delaware limited liability company, ROBERTA RAFFEL aka Bobbi Lemonis, an individual, and MLG RETAIL, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ML Fashion, LLC, a Delaware limited liability company, | ) ) ) | |
| Nominal Defendant. | ) | |

## <u>ORDER STAYING ACTION</u>

**WHEREAS**, on June 18, 2020, Plaintiffs filed their initial complaint in this action;[1] and

---

[1] Docket Item ("D.I.") 1.  This order uses the defined terms from the Court's March 30, 2021 opinion.

**WHEREAS**, on August 25, Plaintiffs filed the Delaware Complaint in this action;[2] and

**WHEREAS**, on September 16, Defendants filed the Motion, seeking to dismiss the Delaware Complaint on several grounds, including that it violated the rule against claim splitting;[3] and

**WHEREAS**, on December 4, after briefing, the Court held oral argument on the Motion;[4] and

**WHEREAS**, on March 30, 2021 the Court issued a memorandum opinion addressing the claim splitting issue (the "Opinion");[5]

**IT IS HEREBY ORDERED**, this 30th day of March 2021, for the reasons stated in the Opinion:

1.      This matter is stayed pending resolution of the New York Action.  The remaining questions raised by the Motion are held in abeyance during the stay.

2.      Discovery is also stayed.  The parties' pending discovery motions are held in abeyance during the stay.

---

[2] D.I. 17.

[3] D.I. 57.

[4] D.I. 74.

[5] D.I. 107.

3.      The Status Quo Order is vacated during the stay.  The motion to enforce

the Status Quo Order is held in abeyance during the stay.


                              */s/ Morgan T. Zurn*
                              Vice Chancellor Morgan T. Zurn