EXHIBIT – 2 –

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
11242484

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**FIRM NO. 90747**

## IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
## COUNTY DEPARTMENT – LAW DIVISION

-----------------------------------------------------------------x

ML FASHION, LLC and ML RETAIL, LLC,      :

          Plaintiffs,                     :

        v.                             :

NICOLAS GOUREAU, STEPHANIE MENKIN,  :
and NOEMI GOUREAU,                :

          Defendants.                 :

-----------------------------------------------------------------x

Case No.   **2020L012546**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"), by their undersigned attorneys, as and for their Complaint against Defendants Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin"), and Noemi Goureau ("Noemi") (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract, breach of fiduciary duty, unjust enrichment, fraud, and tortious interference with contracts. Plaintiff ML Fashion operates a retail clothing business. ML Retail is a member of, and has loaned money to, ML Fashion and those loans are secured by, among other things, ML Fashion's cash and other assets. Defendants Menkin and Goureau are also members and/or officers of Plaintiff ML Fashion, while Defendant Noemi is Menkin's and Goureau's mother.

2.     As set forth in greater detail below, Defendants Menkin, Goureau, and Noemi have for years embarked on a scheme to steal funds from ML Fashion (and, by extension, ML Retail) for their own personal gain. Defendants have used a company American Express corporate card

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(the "AMEX Card") as their own personal piggybank, using it to pay everything from steakhouse dinners to travel to monthly subscriptions to the dating website "Match.com."   Menkin and Goureau also improperly paid a $175,000 annual salary to their mother using ML Fashion funds, despite the fact that Noemi did not perform work for ML Fashion and despite the fact that the manager of ML Fashion specifically directed that these payments cease.   Defendants also misappropriated ML Fashion funds for other unauthorized, personal purposes, including to make car payments, car insurance payments, Menkin's nanny, a mortgage for Noemi's house in the Hamptons, and Menkin's and Goureau's paying for Noemi's lifestyle on top of Noemi's improper annual salary.

3.      After being confronted with some of these unauthorized charges, Defendants then lied to ML Fashion and its manager, claiming, for example, that they had ceased using the AMEX Card and ML Fashion funds for personal purposes and improperly paying Noemi.   Yet Defendants, in fact, continued to improperly steal ML Fashion's funds for years more.

4.      Recently, Defendants have took their misconduct to the next level by making false representations to Plaintiffs and a Delaware Court regarding the AMEX.   Menkin and Goureau obtained an order requiring ML Fashion to make payments on the AMEX Card.

5.      After ML Fashion paid off the outstanding balance of the AMEX Card, totaling hundreds of thousands of dollars, Goureau belatedly produced the AMEX Card billing statements. It was quickly apparent why Goureau had tried to hide the truth for so long: the statements revealed Defendants had embezzled funds from ML Fashion for their own personal use, totaling hundreds of thousands if not millions of dollars.   Plaintiffs accordingly seek to recover these and other ML Fashion funds (which secure loans from ML Retail) that Defendants have misappropriated for their own personal use as part of their years-long, fraudulent scheme to attempt to loot ML Fashion.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## PARTIES

6.      Plaintiff ML Fashion is a limited liability company organized under the laws of Delaware with its principal place of business in New York.  Plaintiff owns and operates fashion brands and retail stores across the country, including in Illinois.

7.      Plaintiff ML Retail is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  ML Retail owns a 33.34% membership interest in ML Fashion.  The sole member of ML Retail is Marcus Lemonis, a citizen of Illinois.

8.      Defendant Nicolas Goureau is an individual residing in Florida.  Goureau owns a 33.33% membership interest in ML Fashion.  Defendant Goureau may be served with process at 138 E. 71st Street, New York, New York 10021-5011 and 45 SW 9th Street, Apt. 3603, Miami, Florida 33130, or wherever he may be found.

9.      Defendant Stephanie Menkin is an individual residing in New York.  Menkin owns a 33.33% membership interest in, and is an officer of, ML Fashion.  Defendant Menkin may be served with process at 332 South Shore Road Bastrop, Texas 78602, 188 East 70th Street, Apt. 17A New York, New York 10021, 175 E. 62nd Street, Apt. 7D, New York, New York 10065-1991, or wherever she may be found.

10.     Defendant Noemi Goureau is an individual residing in New York.  She is the mother of Goureau and Menkin.  Defendant Noemi may be served with process at 190 East 72nd Street, Apt. 8B, New York, New York 10021, 251 Sebonac Road, Southampton, New York 11968, or wherever she may be found.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the parties because the parties conduct business in Illinois, and the Defendants have committed tortious acts in Illinois.

3

FILED DATE: 11/23/2020 4:20 PM   2020L012546

12.     Specifically, this Court has personal jurisdiction over Defendants by reason of, among other things, their systematic and continuous contacts with this forum by virtue of establishing a business, ML Fashion, that intended to and did operate retail stores in Illinois; their misappropriation of funds rightfully belonging to ML Fashion and/or ML Retail in Illinois; and because they have tortiously interfered with agreements between Plaintiffs that have mandatory choice-of-law, jurisdiction, and venue provisions in Chicago, Illinois.  As President of ML Fashion, Menkin was responsible for all of ML Fashion's retail stores in Illinois and regularly travelled to Illinois to manage their operation and was in constant contact by telephone with ML Fashion employees in Illinois.  As part of his employment with ML Fashion, Goureau moved to Chicago to oversee the initial buildout of ML Fashion's retail stores in Illinois.

13.     Defendants Menkin, Goureau, and Noemi have also committed tortious and illegal behavior, as outlined below, that occurred in Cook County, Illinois, and/or were specifically and purposefully aimed at harming Plaintiffs in Cook County, Illinois, thus subjecting themselves to this Court's general and specific personal jurisdiction pursuant to due process and/or the Illinois long arm statute, 735 ILCS 5/2-209.

14.     This Court has personal jurisdiction over all Defendants because, among other things, they intentionally and tortiously interfered with a contract having a personal jurisdiction provision limited to Cook County, Illinois, thus subjecting themselves to this Court's general personal jurisdiction pursuant to due process and/or the Illinois long arm statute, 735 ILCS 5/2-209.  Further, Menkin, Goureau, and Noemi are closely related parties to those agreements as Menkin signed on behalf of ML Fashion, Goureau is 33.33% member of ML Fashion, and Noemi is their mother and was supposed employee of ML Fashion, therefore all Defendants could foresee

their tortious interference with these agreements would bring them within the scope of the agreements.

15.     Venue is proper in Cook County because (1) a substantial part of the events giving rise to the claims occurred in Cook County; (2) a mandatory venue provision requires exclusive venue in Cook County, Illinois, and (3) Defendants are otherwise subject to personal jurisdiction in this venue.

## **FACTS**

### A.     **Background.**

16.     In or about 2014, Defendants Menkin and Goureau solicited an investment from Marcus Lemonis ("Lemonis") to rescue their failing fashion retail business, operating under the brand name "Courage.B."

17.     Lemonis resides in Illinois.

18.     In connection with their solicitation of an investment from Lemonis to rescue their business, in or about 2014, Defendants Menkin and Goureau appeared on Lemonis' popular CNBC television series, "The Profit."

19.     While appearing on "The Profit," Defendants Menkin and Goureau admitted that their business had been poorly run and had lost more than $500,00 the year before and that they just completed a lawsuit against their step-father involving the business.

20.     In or about 2014, Lemonis agreed to invest $800,000 in Menkin's and Goureau's failing business in order to allow their business to purchase inventory, pay other fees and for Goureau to receive monies for the first time in exchange for ML Retail, for which Lemonis serves as managing member, receiving an ownership stake in that business.

21.     After Lemonis invested in, and became a part owner of, Menkin and Goureau's business, the business acquired new brands and opened new stores.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

22.     In or about 2016, Menkin, Goureau, and ML Retail formed ML Fashion to oversee and operate their expanding fashion retail business.  Menkin, Goureau, and ML Retail formed ML Fashion with the specific intent to conduct business in and across Illinois.

23.     From the outset of their new venture, Menkin, Goureau, and ML Retail intended and agreed that ML Fashion would aim their operations at Illinois.  Menkin and Goureau formed ML Fashion envisioning a continuing and wide-ranging presence in Illinois, with Menkin and Goureau specifically interested in the Chicago market.  Menkin and Goureau planned to capture this market for ML Fashion via the suburb model.   Indeed, and as set forth in more detail below, ML Fashion's first retail store opened in the Chicago suburb of Lake Forest, Illinois.

**B.      The Agreements.**

24.     On or about March 29, 2016, Menkin, Goureau, and ML Retail entered into a limited liability company agreement for ML Fashion (the "LLC Agreement") (attached hereto as **Exhibit 1** to the Complaint).  Menkin and Goureau each signed the LLC Agreement individually.

25.     Lemonis signed the LLC Agreement on behalf of ML Retail in Illinois.

26.     **Exhibit A** of the LLC Agreement provides that ML Retail owned a 33.34% membership interest in ML Fashion, and that Menkin and Goureau each owned a 33.33% membership interest in ML Fashion.

27.     **Exhibit B** of the LLC Agreement provides that Lemonis is the chairman and CEO of ML Fashion, and that Menkin serves as ML Fashion's president.

28.     Section 2.3 of the LLC Agreement provides that "[t]he purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the 'Business')."

29.     Section 1 of the LLC Agreement further defines "Business Day" as "a day of the year on which banks are not required or authorized to close in Chicago, Illinois."

30.     Section 2.8 of the LLC Agreement provides that ML Fashion's "credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, **any individual obligation of any Member**" (emphasis added).

31.     Section 6 of the LLC Agreement provides that the management of ML Fashion is "vested entirely and exclusively in" the manager of ML Fashion (the "Manager").

32.     Section 6.1(b) of the LLC Agreement provides that the Manager of ML Fashion is Marcus Lemonis.

33.     Section 7.1 of the LLC Agreement provides that ML Fashion's members do not have any right to participate in the management or control of ML Fashion, or to act for or bind ML Fashion in any way.

34.     Also on or about March 29, 2016, the same day they formed ML Fashion, the parties further executed additional agreements in order to obtain funding for the newly created entity. Specifically, the parties arranged for a revolving multi-million dollar loan between ML Fashion as borrower and ML Retail and lender ("Loan"), which is secured by a Credit Agreement (attached hereto as **Exhibit 2** to the Complaint) and a Security Agreement (attached hereto as **Exhibit 3** to the Complaint).

35.     The Loan was specifically contemplated in the LLC Agreement as, among other things, a "Member Loan" under Section 5.1(a).

36.     Section 5.3 of the Credit Agreement provides that ML Fashion could not incur indebtedness beyond what was provided for in the Credit Agreement, meaning the Loan was ML Fashion's sole source of capital funding.

37.     Section 7.4 of the Credit Agreement provides the agreement is governed by the laws of Illinois and that "the parties hereby agree to irrevocably submit to the personal and subject matter jurisdiction of the federal and state courts sitting in Chicago, Cook County, Illinois, and agree not to object to such venue for any reason at law or in equity."

38.     Section 2 of the Security Agreement provides that ML Retail has a security interest in, among other things, ML Fashion's "[f]inancial assets" and "money."

39.     Section 8 of the Security Agreement provides:

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. … DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

40.     Menkin signed both the Credit Agreement and the Security Agreement on behalf of ML Fashion.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

41.     Menkin, Goureau, and Noemi were each specifically aware of both the Credit and Security Agreements as the mechanism to provide funding to ML Fashion and consented to them. They also knew that without the money provided by these agreements, ML Fashion would not exist because neither Menkin nor Goureau made any capital contributions nor otherwise invested any of their own money in the business.

**C.     ML Fashion's business expansion strategy in Illinois and beyond.**

42.     Beginning in or about 2016, ML Fashion began its business operations and took its first planned step toward the eventual goal of opening retail stores across the country by permanently establishing its first retail store in Illinois.

43.     Using the capital provided to ML Fashion under the Credit and Security Agreements, Menkin and Goureau opened ML Fashion's first store in their desired location of Lake Forest, Illinois.

44.     Goureau physically moved to Chicago, Illinois to handle the initial buildout and installation of fixtures at the Lake Forest location.  While living in Illinois, Goureau oversaw the buildout of additional ML Fashion retail stores across Illinois, including in Hinsdale, Halsted, and Winnetka.

45.     As President of ML Fashion, Menkin was ultimately responsible for managing all of ML Fashion's Illinois locations.  As part of this responsibility, Menkin regularly travelled to Illinois to manage ML Fashion's Illinois stores.  Menkin further took a specific interest in ML Fashion's downtown Chicago location and worked to open that location.

46.     Ultimately, Goureau and Menkin's activities in Illinois led to the systematic expansion of at least ten ML Fashion retail outlets in Illinois.

47.     ML Fashion owns and operates retail stores throughout the country.

48.     ML Fashion currently operates at least four stores in Illinois.

49.     ML Fashion is predominantly situated and conducting business in Illinois as the state with the most retail locations over the rest of the country.

**D.     Defendants' fraudulent misrepresentations and misappropriation of company funds.**

50.     Following the formation of ML Fashion, Menkin served as ML Fashion's president.

51.     Following the formation of ML Fashion, Menkin and Goureau began using ML Fashion funds to pay their mother, Noemi Goureau, one of the highest salaries in the company, $175,000 annually.

52.     Menkin and Goureau both falsely represented to ML Fashion's manager, Lemonis, that in exchange for this salary Noemi was performing services on behalf of ML Fashion.

53.     When Lemonis inquired about the nature of Noemi's services, Menkin and Goureau falsely represented that Noemi was running an ML Fashion store in New York City.

54.     In reality, Noemi hardly performed any services for ML Fashion and rarely, if ever, even showed up at the New York City store—much less run it.

55.     Upon discovering this scheme, Lemonis told Menkin and Goureau that Noemi could not be paid not to work and instructed that Noemi stop being paid.

56.     Lemonis further provided a written instruction, on behalf of ML Fashion, to Menkin and Goureau directing that they stop paying Noemi on behalf of ML Fashion.

57.     Menkin and Goureau falsely told Lemonis and other ML Fashion employees that they had stopped paying Noemi.  Yet they nevertheless continued to pay Noemi her "salary" through misappropriation of ML Fashion funds.

58.     Following the formation of ML Fashion, Goureau, Menkin and Goureau's mother Noemi took in excess of $2,000,000 from ML Fashion including the $175,000 in annual payments to Noemi.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

59.     From 2016 through at least 2019, Menkin, Goureau, and Noemi charged significant amounts of personal expenses to the company's AMEX Card issued in Goureau's name, despite the fact that the AMEX Card was only authorized for inventory purchases.

60.     Many of these AMEX Card charges made by Menkin, Goureau, and Noemi occurred in Illinois.

61.     In addition to Defendants' misuse of the AMEX Card, Defendants misappropriated ML Fashion funds to make personal car payments, car insurance payments, payments to Menkin's nanny, payments for the mortgage on Noemi's house in the Hamptons (Long Island, New York), and other payments to support Noemi's lifestyle on top of her exorbitant, unauthorized salary.

62.     None of these expenditures by Defendants for cars, car insurance, a nanny, a mortgage, and to support Noemi's lifestyle were authorized by ML Fashion, and all of these expenditures were made for personal purposes using ML Fashion funds.

63.     When Lemonis began hearing about improper and unauthorized personal expenditures (for which he had no idea and no reason to know of the total breadth and scope of misappropriation), he spoke to Menkin and Goureau and asked them to stop any such expenditures. Both Menkin and Goureau promised they would stop using company resources for their personal benefit.

64.     Menkin even told her brother Goureau not to use the AMEX Card for personal expenses.

65.     When Lemonis would check in with Menkin on this issue, she would say " I know, I know; I am dealing with it."

66.     Menkin and Goureau lied, however, and continued to use the AMEX Card and ML Fashion funds for their personal use throughout their entire tenures with ML Fashion.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

67.     Lemonis received no monies from ML Fashion.

68.     Following the formation of ML Fashion, ML Retail invested significant sums into ML Fashion and its related businesses to keep them afloat.

69.     Lemonis was never paid a salary or reimbursed for expenses in his role as the manager and an officer of ML Fashion, and never otherwise took any money out of the company as the company did not have sufficient funds to pay Lemonis.

70.     Following the formation of ML Fashion, neither Menkin nor Goureau put any money into ML Fashion or its related businesses, despite paying themselves through ML Fashion funds hundreds of thousands of dollars a year in "consulting fees."

71.     In or about early 2020, Lemonis began discovering Defendants' misconduct, improper use of ML Fashion's funds for their personal expenses, and diversion of company assets.

72.     Upon discovery, Lemonis began discussions with Menkin and Goureau about their exit from ML Fashion.  Lemonis and Menkin proposed that Menkin would exchange all of her equity in ML Fashion and exit from the company for mutually agreeable inventory.

73.     Lemonis and Goureau similarly discussed a deal where Goureau would exchange all of his equity in ML Fashion and exit from the company for mutually agreeable inventory and to make payments on the AMEX Card for ML Fashion-authorized charges.

74.     Ultimately, Menkin and Goureau did not follow through with transferring their equity to Lemonis and instead stopped all communications with Lemonis in early 2020.  Then in June 2020, they filed their lawsuits, as set forth below.

75.     Despite Lemonis' good-faith attempts to resolve the parties' differences, it has become apparent that all of Menkin's and Goureau's negotiations with Lemonis about exchanging their equity for inventory were a smoke-screen to fraudulently mislead Lemonis into thinking they

were resolving their disputes, all while Defendants were secretly preparing offensive lawsuits so they could appear as the purported victims.

**E.      Menkin and Goureau's lawsuits.**

76.     On or about June 18, 2020, Menkin and Goureau filed simultaneous, duplicative lawsuits against, *inter alia*, Lemonis and ML Retail in Delaware state court (the "Delaware Action") and in the United States District Court for the Southern District of New York (the "New York Action") in an attempt to recast their culpability for improper actions regarding ML Fashion in a misguided scheme to attempt to extract even more money from ML Fashion, ML Retail, and Lemonis.

77.     Among other things, the Delaware Action seeks to prevent Lemonis and ML Retail from continuing to operate ML Fashion and to dissolve ML Fashion so that Menkin and Goureau can take ML Fashion's assets for themselves.

**F.      Menkin and Goureau Makes Misrepresentations to the Delaware Court and to Plaintiffs.**

78.     On June 18, 2020, Goureau and Menkin filed a motion in the Delaware Action seeking, *inter alia*, to compel ML Fashion to pay the balance of the AMEX Card and monthly payments on that card going forward.

79.     As part of that motion, Goureau and Menkin asserted that the AMEX Card was a "corporate" company card that was "tied to Goureau personally."

80.     Goureau and Menkin further asserted that "Goureau has been informed by American Express that if payments are not made before June 26, 2020 it will come after him personally for the entire balance amount of roughly $463,112."

81.     In a sworn declaration to the Delaware Court dated August 31, 2019, Goureau stated: "…[I] cannot afford to make the required payments on the [AMEX Card] myself, nor should I as the card was used for Company purchases."

82.     In his August 31, 2019 declaration to the Delaware Court, Goureau also stated: "I have not used [ML Fashion] funds to purchase fancy cars or take lavish trips."

83.     In a sworn declaration to the Delaware Court dated August 31, 2019, Menkin stated: "I never made Company transactions without Lemonis's knowledge and/or approval and have not misappropriated Company Funds. . . .  I have not use [sic] Company funds to purchase fancy cars or take lavish trips."

84.     On September 4, 2020, Lemonis informed the Delaware Court that he would make a loan, either individually or through a wholly-owned company, to ML Fashion to ensure that ML Fashion would have sufficient funds to pay the balance of the AMEX Card.

85.     Lemonis' agreement to loan the funds was conditioned upon his reserving the right to pursue claims for repayment of any amounts that ML Fashion could demonstrate were not legitimate and authorized ML Fashion company expenses.

86.     On September 8, 2020, the Delaware Court entered an Order (the "September 8 Order") that, among other things, directed ML Fashion to make payments on the AMEX Card, without prejudice to Plaintiffs' rights to pursue claims regarding unauthorized purchases.

87.     After entry of the September 8 Order, Lemonis, while in Illinois, loaned funds to ML Fashion, individually or through a wholly-owned entity, to pay the balance of the AMEX Card.

88.     After entry of the September 8 Order and after receiving the loan from Lemonis in Illinois, ML Fashion paid the balance of the AMEX Card.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

### G.   Discovery Reveals Plaintiffs' Fraud

89.   In the Delaware Action, ML Fashion sought discovery from Goureau and Menkin regarding, *inter alia*, the AMEX Card.

90.   In response to those requests, Goureau objected to the discovery sought, asserting that "***the AMEX card is a corporate card—not a personal card***—that is linked to Nicolas Goureau.   As such, all information regarding the card is in the possession of the company" (emphasis added).

91.   On or about November 6 and November 13, 2020, after ML Fashion had paid the balance on the AMEX Card, Goureau belatedly produced certain billing statements for the AMEX Card.

92.   The AMEX Card statements revealed that Goureau, Menkin, and Noemi made ***hundreds of thousands (if not millions) of dollars of charges that had nothing to do with ML Fashion's business***, including:

- Restaurants, fast food chains, and coffee;

- Gym and other exercise-related memberships (*e.g.*, Soulcycle, Equinox);

- Taxi, Uber, and limousine services;

- Haircuts and beauty salons;

- Airline flights, including numerous flights to Paris and one to Israel;

- Hotels;

- Home décor and furnishings;

- Cable TV and streaming services (*e.g.*, Hulu);

- Internet radio and streaming music (*e.g.*, Pandora, Amazon Music);

- Dry cleaning tabs;

- Mass transportation services;

15

FILED DATE: 11/23/2020 4:20 PM   2020L012546

- Auto Insurance;

- Jewelry stores;

- Parking meters;

- Trips to an "Escape Room" game in Chicago;

- Bar tabs;

- Medical services;

- Personal clothing from high-end retailers such as Barney's, Saks Fifth Avenue, and Bergdorf Goodman; and

- Ongoing monthly subscriptions to the dating website "Match.com" for Noemi Goureau.

93.     None of these charges on Goureau's "corporate" card were authorized by Lemonis or ML Fashion, and none of these charges reflect legitimate Company expenses.

94.     Many of the improper charges made by Menkin, Goureau, and Noemi were made while they were physically present in Illinois and/or were charges for payments to businesses located in Illinois.

95.     Defendants' improper charges on the AMEX Card have cost ML Fashion and, by extension, ML Retail hundreds of thousands, if not millions of dollars, in misappropriated funds.

## FIRST CAUSE OF ACTION
### (Breach of Contract by Plaintiffs Against Menkin and Goureau)

96.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     ML Retail, Menkin, and Goureau are parties to the LLC Agreement.

98.     The LLC Agreement is a valid contract.

99.     Menkin and Goureau owe obligations to both ML Retail and ML Fashion under the terms of the LLC Agreement.

16

FILED DATE: 11/23/2020 4:20 PM   2020L012546

100.    ML Retail and ML Fashion have each fully performed their obligations under the LLC Agreement.

101.    Menkin and Goureau have breached the LLC Agreement by, *inter alia*, using ML Fashion funds for personal purposes in violation of Section 2.8 of the LLC Agreement, and disregarding written and oral directives from ML Fashion's manager, Lemonis, regarding improper payments to Noemi, improper AMEX Card charges, and improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

102.    ML Fashion has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including in the form of lost funds that were misappropriated by Menkin and Goureau in order to make payments to Noemi, improper charges on the AMEX Card, and improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

103.    ML Retail has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including because of the impact of Menkin's and Goureau's improper conduct on the value of ML Retail's membership interests in ML Fashion.

104.    In addition, Menkin and Goureau's improper conduct diminished the collateral on the loan between ML Fashion and ML Retail.  This further harmed ML Fashion by risking default on the loan, and it harmed ML Retail by reducing the value of the Loan and the likelihood of full repayment.  Moreover, the jobs of the employees of ML Fashion will be jeopardized if ML Fashion ceases to operate due to its inability to repay its loans or pay for its operations.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

105.     By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duty by ML Fashion Against Menkin and Goureau)**

106.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 106 of this Complaint as if fully set forth herein.

107.     Menkin is a member and officer of ML Fashion.

108.     Goureau is a member of ML Fashion.

109.     As members and/or officers of ML Fashion, Menkin and Goureau owed fiduciary duties to ML Fashion.

110.     Menkin and Goureau have breached their fiduciary duties to ML Fashion by, among other things repeatedly, intentionally, and improperly misusing and embezzling ML Fashion funds (secured through the Credit and Security Agreements) for personal use, including, without limitation, unauthorized payments to their mother, Noemi, improper, unauthorized charges made for personal purposes on the AMEX Card, and improper, unauthorized misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

111.     ML Fashion has been harmed and damaged by Menkin's and Goureau's breaches of their fiduciary duties, including because their conduct jeopardizes the existence of ML Fashion's business, the jobs of its employees, and its reputation.

112.     By reason of the foregoing, ML Fashion is entitled to damages in an amount to be determined at trial.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

### THIRD CAUSE OF ACTION
**(Unjust Enrichment by Plaintiffs Against Noemi)**

113.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 113 of this Complaint as if fully set forth herein.

114.    Noemi has retained improper benefits, in the form of improper salary payments despite not performing work for ML Fashion, in the form of improper charges through her use of the AMEX Card, and in the form of improper payments for the mortgage on her house in the Hamptons and to support her lifestyle.

115.    Noemi's retention of improper benefits has been to the detriment of ML Fashion, which has had its cash depleted as a result of Noemi's receipt of an improper salary, without receiving commensurate work from Noemi in return, Noemi's improper use of the AMEX Card for personal purposes, and her receipt of other unauthorized payments to pay for her mortgage and her lifestyle.

116.    Noemi's retention of improper benefits has been to the detriment of ML Retail, including because of the impact of Noemi's improper conduct on the value of ML Retail's membership interests in ML Fashion and the diminishment of the collateral on the loan between ML Fashion and ML Retail.

117.    Noemi's retention of these improper benefits violates the fundamental principles of justice, equity, and good conscience because none of these benefits were authorized by ML Fashion or its manager, Lemonis, and are injuring ML Fashion and ML Retail.

118.    Moreover, the jobs of the employees of ML Fashion are jeopardized if ML Fashion ceases to operate as a result of the misappropriation and improper depletion of its funds.

119.    By reason of the foregoing, Plaintiffs are entitled to damages from Noemi in an amount to be determined at trial.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## FOURTH CAUSE OF ACTION
### (Fraud by Plaintiffs Against Menkin and Goureau)

120.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 119 of this Complaint as if fully set forth herein.

121.    Menkin and Goureau each made false statements of material fact they knew were false or made with culpable ignorance of their truth or falsity, specifically that Noemi's salary was for services rendered to ML Fashion; that the payments would stop as requested by ML Fashion's manager, Lemonis; that ML Fashion funds and the AMEX Card would only be used for proper business expenses and not personal gain; and that Menkin and Goureau would only use their positions of trust within ML Fashion to advance the company's interests.

122.    Plaintiffs reasonably relied upon Menkin's and Goureau's false statements to their detriment, including because ML Retail continued to provide funding to ML Fashion for operations in reliance on Menkin's and Goureau's false statements and because ML Fashion continued to allow Menkin, Goureau, and Noemi to access the AMEX Card and other company funds in reliance on Menkin's and Goureau's misrepresentations.

123.    Even as Plaintiffs relied upon Menkin's and Goureau's false statements, Menkin and Goureau went behind Plaintiffs' backs, continuing to pay Noemi an unauthorized salary, continuing to make improper charges on the AMEX Card for personal purposes, and continuing their improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

124.    When ML Fashion discovered at least some of Menkin's and Goureau's misconduct in or about late 2019, Menkin and Goureau made further intentional misrepresentations to ML Fashion's manager, Lemonis, regarding their desire to resolve any disputes between the parties.

FILED DATE: 11/23/2020 4:20 PM    2020L012546

125.    Menkin and Goureau made these additional misrepresentations in order to induce ML Fashion to delay in seeking to vindicate its rights while Menkin and Goureau prepared their own lawsuits seeking to portray themselves as victims.

126.    ML Fashion delayed in seeking to vindicate its rights based upon its reliance on Menkin's and Goureau's intentional misrepresentations, to ML Fashion's detriment.

127.    Menkin and Goureau also made misrepresentations to Plaintiffs and to the Delaware Court in the Delaware Action by claiming that the AMEX Card was used for proper business purposes only and not for personal purposes.

128.    Based upon those misrepresentations to Plaintiffs and the Delaware Court, Lemonis, acting in Illinois, agreed to lend funds to ML Fashion to pay the AMEX Card, and the Delaware Court directed ML Fashion to pay the balance of the AMEX Card, totaling more than $450,000.

129.    As a result of Menkin's and Goureau's fraud, Plaintiffs have suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Tortious Interference with Credit and Security Agreements Against Defendants)

130.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 130 of this Complaint as if fully set forth herein.

131.    The Credit and Security Agreements are valid, enforceable, and binding contracts between Plaintiffs.

132.    All Defendants had knowledge of the Credit and Security Agreements and ML Fashion's obligations under these agreements, at least through Menkin and Goureau who are 33.33% owners of ML Fashion.

133.     As set forth above, Defendants intentionally engaged in actions in ways they knew would cause violation of the terms of these agreement, including but not limited to repeatedly, intentionally, and improperly utilizing ML Fashion's funds obtained through the Credit and Security agreements for their own personal purposes via the AMEX Card, unauthorized salary payments to Noemi, and improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

134.     Defendants' tortious interference resulted in a situation where ML Fashion's full performance under the Credit Agreement and Security Agreement has been compromised, ML Fashion is in jeopardy of defaulting and breaching the agreements, and its performance will be rendered impossible.

135.     As a result of Defendants intentional interference with Plaintiffs agreements, Plaintiffs have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(a)     On the First Cause of Action for Breach of Contract, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(b)     On the Second Cause of Action for Breach of Fiduciary Duty, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial;

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(c)     On the Third Cause of Action for Unjust Enrichment, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(d)     On the Fourth Cause of Action for Fraud, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(e)     On the Fifth Cause of Action for Tortious Interference with Credit and Security Agreements, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(f)     Awarding judgment that Defendants are liable under each of the above Counts;

(g)     Awarding compensatory damages in an amount to be proved after the discovery of all relevant evidence and trial;

(h)     Award the disgorgement of all improperly gained monies by Defendants;

(i)     Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in connection with this action and the enforcement of their rights;

(j)     Costs and expenses in this action; and

(k)     For such other and further relief as the Court deems just and proper.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Dated:  November 23, 2020

SEYFARTH SHAW LLP

By: _Michael D. Wexler_

   Michael D. Wexler (mwexler@seyfarth.com)
   Robyn E. Marsh (rmarsh@seyfarth.com)

233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:  (312) 460-5559
Firm No. 90747

Jesse M. Coleman (*pro hac vice* application to
be filed)
700 Milam Street, Suite 1400
Houston, Texas  77002
(713) 238-1805

*Attorneys for Plaintiffs ML Fashion, LLC and
ML Retail, LLC*

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012546
11242484

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# EXHIBIT 1

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ML FASHION, LLC

The interests evidenced by this Agreement have not been registered under the Securities Act of 1933, as amended, or applicable state securities laws. The interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws and in accordance with the provisions of this Agreement.

# TABLE OF CONTENTS

**Page**

SECTION 1     DEFINITIONS ................................................................................................ 1
SECTION 2     THE COMPANY ............................................................................................ 7
   2.1     Formation of the Company ............................................................................. 7
   2.2     Name ............................................................................................................... 7
   2.3     Purpose; Powers ............................................................................................. 7
   2.4     Principal Place of Business ............................................................................ 7
   2.5     Term ................................................................................................................ 7
   2.6     Registered Agent and Registered Office ....................................................... 7
   2.7     Title to Property ............................................................................................. 7
   2.8     Payments of Individual Obligations ............................................................... 7
   2.9     Independent Activities; Transactions with Affiliates ..................................... 8
   2.10    Override of Certain Statutory Defaults .......................................................... 8
SECTION 3     INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS ........... 8
   3.1     Capital Contributions ..................................................................................... 8
   3.2     Additional Capital Contributions ................................................................... 8
   3.3     Additional Members ....................................................................................... 8
   3.4     Limitation on Withdrawal of Capital ............................................................. 9
SECTION 4     CAPITAL ACCOUNTS; PROFITS AND LOSSES ................................... 9
   4.1     Capital Accounts ............................................................................................ 9
   4.2     Allocation of Profits and Losses .................................................................... 9
SECTION 5     DISTRIBUTIONS ........................................................................................ 11
   5.2     Amounts Withheld .......................................................................................... 12
   5.3     Tax Distributions ............................................................................................ 12
   5.4     Limitations on Distributions .......................................................................... 13
   5.5     Certain Liquidity Events ................................................................................ 13
SECTION 6     MANAGEMENT ........................................................................................... 13
   6.1     Manager .......................................................................................................... 13
   6.2     Duties and Obligations of the Manager; Discretion ...................................... 14
   6.3     Reimbursements .............................................................................................. 14
   6.4     Indemnification of the Manager and Officers ................................................ 14

FILED DATE: 11/23/2020 4:20 PM     2020L012546

# TABLE OF CONTENTS
(continued)

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Page

| | | |
|---|---|---|
| SECTION 7 | ROLE OF MEMBERS | 15 |
| 7.1 | Rights or Powers | 15 |
| 7.2 | Voting Rights | 15 |
| 7.3 | Member Liability | 16 |
| 7.4 | Partition | 16 |
| 7.5 | Transactions Between a Member and the Company | 16 |
| 7.6 | Other Instruments | 16 |
| 7.7 | Non-Solicitation and Non-Competition | 16 |
| 7.8 | Investment Representations and Warranties | 17 |
| SECTION 8 | ACCOUNTING, BOOKS AND RECORDS | 18 |
| 8.1 | Bank Accounts; Accounting, Books and Records | 18 |
| 8.2 | Tax Matters | 19 |
| 8.3 | Certificates | 21 |
| SECTION 9 | AMENDMENTS | 21 |
| 9.1 | Amendments Generally | 21 |
| 9.2 | Amendments by the Manager | 21 |
| SECTION 10 | TRANSFERS; DRAG-ALONG RIGHTS | 21 |
| 10.1 | Restrictions on Transfers | 21 |
| 10.2 | Permitted Transfers | 21 |
| 10.3 | Conditions to Permitted Transfers | 22 |
| 10.4 | Prohibited Transfers | 22 |
| 10.5 | Rights of Unadmitted Assignees | 23 |
| 10.6 | Admission of Substituted Members | 23 |
| 10.7 | Distributions in Respect of Transferred Membership Interests | 23 |
| 10.8 | Sale of the Company; Drag-Along Rights | 24 |
| SECTION 11 | REDEMPTION | 24 |
| SECTION 12 | DISSOLUTION AND WINDING UP | 24 |
| 12.1 | Dissolution Events | 24 |
| 12.2 | Winding Up | 25 |
| 12.3 | Liquidating Trust; Reserves | 26 |

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 12.4 | Rights of Members | 26 |
| 12.5 | Notice of Dissolution/Termination | 26 |
| 12.6 | Character of Liquidating Distributions | 26 |
| 12.7 | The Liquidator | 27 |
| 12.8 | Form of Liquidating Distributions | 27 |
| SECTION 13 | MISCELLANEOUS | 27 |
| 13.1 | Notices | 27 |
| 13.2 | Binding Effect | 27 |
| 13.3 | Effect of Consent or Waiver | 27 |
| 13.4 | Construction | 28 |
| 13.5 | Time | 28 |
| 13.6 | Headings and References | 28 |
| 13.7 | Severability | 28 |
| 13.8 | Incorporation by Reference | 28 |
| 13.9 | Governing Law | 28 |
| 13.10 | Waiver of Jury Trial | 28 |
| 13.11 | Specific Performance | 28 |
| 13.12 | Counterparts; Signatures | 29 |
| 13.13 | Trustee Exculpation | 29 |

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## ML FASHION, LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT OF ML FASHION, LLC**, a Delaware limited liability company (the **"Company"**), is entered and effective as of March 29, 2016 (the **"Effective Date"**), and is entered into by and among the Persons identified as Members on Exhibit A hereto, and such additional Persons as are hereinafter admitted as Members. Capitalized terms and phrases not otherwise defined herein shall have the meanings ascribed to them in Section 1 hereof.

**WHEREAS**, the Company is organized as a limited liability company under and pursuant to the Limited Liability Company Act of the State of Delaware, as amended; and

**WHEREAS**, the Members desire to set forth the terms and conditions in which the Company shall be operated, all as more particularly set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## SECTION 1

## DEFINITIONS

In addition to terms defined elsewhere in this Agreement, the following capitalized words and phrases used in this Agreement shall have the following meanings:

**"2015 Budget Act"** means the Bipartisan Budget Act of 2015 (Pub. L. 114-74).

**"2015 Budget Act Audit Rules"** means the provisions of Subchapter C of Chapter 63 of the Code, as revised by Section 1101 of the 2015 Budget Act, as such provisions may thereafter be amended and including Treasury regulations or other guidance issued thereunder.

**"Act"** means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, *et seq.*, as amended from time to time (or any corresponding provisions of succeeding law).

**"Additional Member"** shall have the meaning set forth in Section 3.3 hereof.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the applicable fiscal year after (a) crediting thereto any amounts which such Member is, or is deemed to be, obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) debiting such Capital Account by the amount of the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**"Affiliate"** means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any Person who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or

1

FILED DATE: 11/23/2020 4:20 PM   2020L012546

indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person or entities.

"**Agreement**" or "**Limited Liability Company Agreement**" means this Limited Liability Company Agreement of ML Fashion, LLC, including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"**Approval of the Members**" means the written consent of Members holding, in the aggregate, more than fifty percent (50%) of the Percentage Interests.

"**Business**" shall have the meaning set forth in Section 2.3(a) hereof.

"**Business Day**" means a day of the year on which banks are not required or authorized to close in Chicago, Illinois.

"**Capital Account**" means, with respect to each Member, the Capital Account maintained for such Member in accordance with Section 4.

"**Capital Contributions**" means, with respect to any Member, the amount of money and the initial net fair market value of any Property (other than money) contributed to the Company with respect to the Membership Interests in the Company held or purchased by such Member.

"**Carrying Value**" means, with respect to any Company asset, the asset's adjusted basis for U.S. federal income tax purposes, except as otherwise provided in this definition. The Carrying Value of an asset contributed to the Company shall be equal to its Fair Market Value at the time of contribution. The Carrying Values of all Company assets shall be adjusted to equal their respective Fair Market Values in accordance with the rules set forth in Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, in connection with (a) the acquisition of any additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution of more than a de minimis amount of Company Property to a Member as consideration for an interest in the Company; (c) the distribution of Company Property (other than money) to a Member; (d) the grant of any Membership Interest or other equity interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company within the meaning of Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iii); or (e) the issuance by the Company of a noncompensatory option (a "warrant") (other than a warrant for a de minimis Company interest); provided, that, in the case of an exercise of a warrant to acquire Membership Interests, the adjustment of Carrying Values shall also take account of Regulations Section 1.704-1(b)(2)(iv)(s); and, provided further that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager in good faith determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Carrying Value of any Company asset other than cash denominated in Dollars distributed to any Member shall be adjusted immediately prior to such Distribution to equal its Fair Market Value. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits" and "Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes.

"**Certificate of Cancellation**" means a certificate filed in accordance with 6 Del. C.§ 18-203.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**"Certificate of Formation"** means the certificate filed pursuant to 6 Del. C.§ 18-201 of the Act to form the Company.

**"Change in Control"** means the following and shall be deemed to occur if any of the following events occur:

(a)      Any Person becomes, after the date of this Agreement, the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the combined fair market value of the Company's then outstanding Membership Interests or the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of managers, except that any change in the ownership of the Membership Interests of the Company as a result of a private financing of the Company that is approved by the Manager will not be considered a Change in Control unless the Manager specifically states that such change is a Change in Control for purposes of this Agreement;

(b)      Consummation by the Company of a Reorganization; or

(c)      Approval by the Manager and the Voting Members of the Company or any order by a court of competent jurisdiction of a plan of liquidation of the Company.

Notwithstanding the foregoing, unless determined otherwise by the Manager, a Change in Control shall not be deemed to occur solely on account of any of the following:

(i)      a Reorganization that would result in the voting securities of the Company outstanding immediately prior thereto (or, in the case of a Reorganization that is preceded or accomplished by an acquisition or series of related acquisitions by any Person, by tender or exchange offer or otherwise, of voting securities representing 5% or more of the combined voting power of all securities of the Company, immediately prior to such acquisition or the first acquisition in such series of acquisitions) continuing to represent, either by remaining outstanding or by being converted into voting securities of another entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such other entity outstanding immediately after such Reorganization (or series of related transactions involving such a Reorganization);

(ii)      a Reorganization effected to implement a recapitalization or reincorporation of the Company (or similar transaction) that does not result in a material change in beneficial ownership of the voting securities of the Company or its successor;

(iii)      any acquisition by a lender of the Company pursuant to a debt restructuring thereof; or

(iv)      any acquisition by, or consummation of a Reorganization with, an Affiliate of the Company.

(d)      A Change in Control of the type described in paragraph (a)(ii), (b) or (c) shall be deemed to be completed on the date it occurs, and a Change in Control of the type described in paragraph (a)(i) shall be deemed to be completed as of the date the entity or group attaining 50% or greater ownership has elected its representative(s) as the managers of the Company and/or caused its nominees to become Officers with the authority to terminate or alter the terms of employees' employment.

**"Code"** means the United States Internal Revenue Code of 1986, as amended from time to time.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

"**Company Minimum Gain**" shall have the same meaning attributed to "partnership minimum gain" as set forth in Regulations Section 1.704-2(b)(2) and Section 1.704-2(d).

"**Dissolution Event**" shall have the meaning set forth in <u>Section 12.1(a)</u> hereof.

"**Distribution**" means any distributions by the Company to the Members with respect to their Membership Interests in accordance with this Agreement.

"**Drag-Along Members**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Dragging Member**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Drag Notice**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Drag Transaction**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"**Fair Market Value**" means, with respect to any asset, the fair market value of such asset, as reasonably determined by the Manager, except as otherwise expressly provided herein.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America from time to time.

"**Liquidator**" has the meaning set forth in <u>Section 12.7(a)</u> hereof.

"**Manager**" means, at any point in time, the Person then serving the Company as Manager pursuant to <u>Section 6</u> hereof.

"**Member**" means any Person (i) who is referred to as such on <u>Exhibit A</u> to this Agreement, or who has become a Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member pursuant to the terms of this Agreement. "**Members**" means all such Persons.

"**Member Nonrecourse Debt**" shall have the meaning attributed to "partner nonrecourse debt" as set forth in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount with respect to each Member Nonrecourse Debt equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability (as defined in Regulations Section 1.752-1(a)(2)) determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" shall have the meaning attributed to "partner nonrecourse deductions" as set forth in Regulation Section 1.704-2(i)(2).

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, the Percentage Interest of such Member, as well as any and all other rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds arising under this Agreement, and management rights, voting rights or rights to consent by a Member arising hereunder.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**"Misconduct"** means fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct.

**"ML Retail"** means ML Retail LLC, a Delaware limited liability company, and its successors and assigns.

**"Net Cash Flow"** means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments (including debt payments to Members or their Affiliates), capital improvements, replacements, and contingencies, all as determined by the Manager. **"Net Cash Flow"** shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

**"Nonrecourse Deductions"** has the meaning set forth in Regulation Sections 1.704-2(b)(1).

**"Officers"** has the meaning set forth in Section 6.1(c) hereof.

**"Partnership Representative"** has the meaning set forth in Section 8.3(d)(iii) hereof.

**"Percentage Interest"** means, with respect to any Member as of any date, the percentage of Membership Interests held by such Member set forth on Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to Section 9.2.

**"Permitted Transfer"** has the meaning set forth in Section 10.2 hereof.

**"Person"** means any individual, limited liability company, corporation, general partnership, limited partnership, trust, estate, governmental agency, cooperative, association, nominee or other entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person, as the context may require.

**"Profits"** and **"Losses"** means, for each fiscal year of the Company or other period, the Company's taxable income or loss for such year or period, or particular items thereof, determined in accordance with the accounting method used by the Company for U.S. federal income tax purposes and in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), which are not deductible in computing taxable income or loss, not properly capitalizable, and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be treated as deductible items and shall be subtracted from such taxable income or loss;

(c)     If the Carrying Value of any Company asset is adjusted pursuant to the definition of "Carrying Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(d)      Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Carrying Value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Carrying Value in accordance with Regulations Section 1.704-1(b)(2)(iv);

(e)      If the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Profits and Losses shall be an amount which bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided, that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the Manager may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and

(f)      Notwithstanding anything to the contrary herein, items that are specially allocated pursuant to Section 4.2(b) shall not be taken into account in computing Profits and Losses.

"**Property**" means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"**Reconstitution Period**" has the meaning set forth in Section 12.1(b) hereof.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"**Reorganization**" means any merger, consolidation, sale or other disposition of all or substantially all of the assets of the Company or other reorganization.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors, managers, general partners or persons exercising similar authority are owned, directly or indirectly, by the Company.

"**Tax Distributions**" has the meaning set forth in Section 5.3(a) hereof.

"**Tax Matters Member**" has the meaning set forth in Section 8.3(d)(i) hereof.

"**Third Party Purchaser**" means, with respect to a proposed sale of Membership Interests pursuant to Section 10.8, a Person, other than an Affiliate or Permitted Transferee of any Member, who offers to purchase outstanding Membership Interests pursuant to a bona fide written offer.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of (including in each case, without limitation, by way of merger, consolidation, reorganization, forced sale or otherwise).

"**Unreturned Capital Contributions**" means, with respect to any Member, the difference between (a) the sum of (i) such Member's initial Capital Contribution plus (ii) any subsequent Capital Contribution(s) made by such Member, less (b) any distributions previously made to such Member pursuant to Sections 5.1(b)(i) and 12.2(c).

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## SECTION 2

## THE COMPANY

**2.1      Formation of the Company**.  The Company shall operate as a Delaware limited liability company under and pursuant to the Act, and pursuant to the terms of this Agreement.  A Certificate of Formation was filed on March 29, 2016, with the Office of the Delaware Secretary of State by the organizer of the Company acting as agent for the Company.  The Members shall be the "members" of the Company within the meaning of the Act, and except as expressly provided herein to the contrary, the rights and obligations of the Members shall be as provided in the Act.

**2.2      Name**.  The name of the Company shall be "ML Fashion, LLC" and all business of the Company shall be conducted in such name.  The Manager may change the name of the Company at any time.

**2.3      Purpose; Powers**.

          (a)      The purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the "**Business**").

          (b)      The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 2.3(a) hereof.

**2.4      Principal Place of Business**.  The principal place of business of the Company shall be located at such place as the Manager may determine from time to time.  The initial principal place of business of the Company shall be at 38 E. 29th Street, New York, New York 10016.

**2.5      Term**.  The term of the Company commenced on the date the Certificate of Formation was filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 12 hereof.

**2.6      Registered Agent and Registered Office**.  The registered agent and registered office of the Company in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, or any successor as appointed by the Manager.

**2.7      Title to Property**.  All Property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in his or its individual name, and each Member's interest in the Company shall be personal property for all purposes.  At all times, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**2.8      Payments of Individual Obligations**.  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**2.9     Independent Activities; Transactions with Affiliates.**

(a)     The Manager shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that such Manager may deem appropriate in his, her or its discretion.

(b)     Except as otherwise set forth in <u>Section 7.7</u> and insofar as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager or their Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member or the Manager or its Affiliates to participate in any such activities.

(c)     To the extent permitted by applicable law and subject to the provisions of this Agreement, the Manager is hereby authorized to cause the Company to purchase Property from, sell Property to or otherwise deal with any Member, acting on its own behalf, or any Affiliate of any Member on terms that are arms' length market terms or are more favorable to the Company than arms' length market terms.

**2.10    Override of Certain Statutory Defaults.**  To the extent permitted by law, the provisions of this Agreement shall govern over all provisions of the Act which would apply but for (and that are inconsistent with) this Agreement.  For each issue (a) with respect to which the Act provides a rule (a **"default rule"**) but permits a limited liability company's operating agreement to provide a different rule and (b) which is addressed by this Agreement, the default rule shall not apply to the Company.  Without limiting the generality of the foregoing, except as expressly provided in this Agreement, the following provisions of the Act shall not apply to the Company: Section 18-604 (Distribution upon Resignation), Section 18-801 (Dissolution) and Section 18-804 (Distribution of Assets).

## SECTION 3

## INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS

**3.1     Capital Contributions.**  Each Member has made such Capital Contributions as are set forth in the books and records of the Company.

**3.2     Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contribution.

**3.3     Additional Members.**  By approval of the Manager and the Approval of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an **"Additional Member"**).  In connection with the admission of an Additional Member, the Manager shall agree with the Person to be admitted as an Additional Member as to what Capital Contribution, if any, such Additional Member shall make to the Company.  The Percentage Interest to be issued to any Additional Member shall represent the value of the Capital Contribution made by such Additional Member relative to the value of the Company at the time of such Capital Contribution and shall dilute all existing Members' Percentage Interests proportionately unless otherwise agreed by the Members.  Each Person admitted as an Additional Member will be deemed admitted at the time such Person (a) executes this Agreement or a counterpart of this Agreement and such other documents as are requested by the Manager and (b) is named as a Member on <u>Exhibit A</u> hereto.  In the event any Additional Members are admitted to the Company, the Manager shall cause <u>Exhibit A</u> to be updated to accurately reflect the

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Additional Member and the related changes in the Members' Percentage Interests.  The legal fees and expenses associated with such admission shall be borne by the Company.

**3.4      Limitation on Withdrawal of Capital.**  Except as expressly provided in this Agreement, no Member (a) shall have the right to withdraw or receive any return on such Member's Capital Contributions (including any part of its Capital Account) or a claim to any Company capital prior to termination of the Company pursuant to Section 12 hereof, (b) shall have any right to demand and receive property other than cash in return for such Member's contributions to the capital of the Company, or (c) shall be liable to any other Member for the return of such other Member's contributions to the capital of the Company, or any portion thereof (except as otherwise expressly required under the Act), it being expressly understood that such return shall be made solely from Company assets.

## SECTION 4

## CAPITAL ACCOUNTS; PROFITS AND LOSSES

**4.1      Capital Accounts.**  The Company shall establish and maintain a separate Capital Account for each Member in accordance with Regulations Section 1.704-1(b).

**4.2      Allocation of Profits and Losses.**

(a)      Profits and Losses.  After giving effect to the special allocations in Section 4.2(b) and after adjusting for all Capital Contributions and Distributions made during such taxable year, Profits and Losses (and, if necessary, individual items of gross income or loss) shall be allocated annually (and at such other times in which it is necessary to allocate Profits or Losses) in a manner such that, after such allocations have been made, the balance of each Member's Capital Account shall, to the extent possible, be equal to (i) an amount that would be distributed to such Member if (A) the Company were to sell its assets for their Carrying Values, (B) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Values of the assets securing such liability), (C) the Company were to distribute the proceeds of sale pursuant to Section 12.2 and (D) the Company were to dissolve pursuant to Section 12, minus (ii) the sum of (1) such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, and (2) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company, computed immediately prior to the hypothetical sale of assets.

(b)      Special Allocations.

(i)      Nonrecourse Deductions.  Notwithstanding the general rule on allocation of Losses stated in Section 4.2(a), Nonrecourse Deductions will be allocated to and among the Members in accordance with their respective Percentage Interests, and Member Nonrecourse Deductions will be allocated to and among those Members bearing the economic risk of loss for such debt in accordance with each Member's share of such risk.  The allocation of liabilities to a property, the determination of Nonrecourse Deductions and Member Nonrecourse Deductions, the effect of property revaluations and all other issues affecting the allocation of such items will be determined in accordance with the Regulations under Code Section 704(b).

(ii)      Minimum Gain Chargeback.  Notwithstanding the general rule on allocation of Profits stated in Section 4.2(a), if there is a net decrease in Company Minimum Gain for any fiscal year, each Member will be allocated items of Company income or gain for such year equal to such Member's share of the net decrease in Company Minimum Gain.  If there is a net decrease in Member Nonrecourse Debt Minimum Gain for any fiscal year, each Member

9

FILED DATE: 11/23/2020 4:20 PM   2020L012546

having a share of such Member Nonrecourse Debt Minimum Gain will be allocated items of Company income or gain equal to such Member's share of such net decrease in Member Nonrecourse Debt Minimum Gain.  The determination of net decreases in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, allocations of such net decreases, exceptions to minimum gain chargebacks and all other issues affecting the minimum gain chargeback requirements will be determined in accordance with the Regulations under Code Section 704(b).

(iii)    Qualified Income Offset.   If a Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases an Adjusted Capital Account Deficit with respect to such Member, items of Company gross income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.

(iv)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts in accordance with Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(v)    Loss Limitation.  Losses allocated pursuant to Section 4.2(a) hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have or increase an Adjusted Capital Account Deficit at the end of any fiscal year of the Company or other allocation period in which any other Member does not have an Adjusted Capital Account Deficit.  In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 4.2(a), the limitation set forth in this Section 4.2(b)(v) shall be applied on a Member by Member basis and Losses not allocable to a Member as a result of such limitation shall be allocated proportionately to the other Members without an Adjusted Capital Account Deficit so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

(vi)    Interpretation.   The foregoing provisions of this Section 4.2(b) ("Regulatory Allocations") are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently with this intention.   Any terms used in such provisions that are not specifically defined in this Agreement shall have the meaning, if any, given such terms in such Regulations.  The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to this Section 4.2(b) shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (e) of the definition of "Profits" and "Losses" in Section 1.1.

(vii)    Curative Allocations.  If any allocation of gain, income, loss, expense or any other item is made pursuant to the Regulatory Allocations with respect to one or more Members, then the balance of such items for the current and all subsequent fiscal years shall be allocated among the Members so that, to the extent possible and without requiring further Regulatory Allocations, the Members receive aggregate net allocations under Section 4.2 equal to the net allocations that would have been made to the Members if the Regulatory Allocations had

FILED DATE: 11/23/2020 4:20 PM   2020L012546

not occurred. This Section 4.2(b)(vii) is intended to minimize to the extent possible and to the extent necessary any economic distortions which may result from application of Regulations Section 1.704-1(b) and shall be interpreted in a manner consistent therewith.

**4.3    Tax Allocations.**  For income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided, that in the case of any Company asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any reasonable manner determined by the Manager) so as to take account of the difference between the Carrying Value and adjusted basis of such asset.

**4.4    Other Allocation Provisions.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. Sections 4.1 to and including Section 4.4 hereof may be amended at any time by the Manager if, in the opinion of tax counsel to the Company, it is necessary to comply with Regulations Section 1.704-1(b), so long as any such amendment does not change the relative economic interests of the Members.

**4.5    Authority to Withhold; Treatment of Withheld Tax.**  Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other Taxes payable by the Company with respect to such Member or as a result of such Member's participation in the Company.  If and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes with respect to a Member, such Member shall be deemed for all purposes of this Agreement to have received a Distribution from the Company as of the time such withholding or other tax is required to be paid.  In the event that the Company receives a payment in respect of which Tax has been withheld, the Company shall be deemed to have received cash in an amount equal to the amount of such withheld Tax, and each Member shall be deemed to have received as a Distribution the portion of such amount that is attributable to such Member's interest as equitably determined by the Manager.  Any Distribution deemed made to a Member pursuant to this Section 4.5 shall reduce the amounts the Member would otherwise be entitled to receive pursuant to Section 5.1(a).

## SECTION 5

## DISTRIBUTIONS

**5.1    Distributions of Net Cash Flow.**

(a)    Conditions to Cash Distributions to Members.  No Distributions may be made to the Members unless (i) the Company is current on all payments of interest due and payable by the Company to any Member that has made a loan to the Company (each, a **"Member Loan"**), and (ii) the Company has no trade accounts payable in excess of sixty (60) days past due.  Further, at any time any amount is due and owing under any Member Loan, no Distributions may be made to the Members unless an amount equal to the Distribution is used to pay down the principal balance and any related accrued and unpaid interest of such loan, pro rata to and among the Members holding Member Loans in accordance with the relative remaining balances of their respective Member Loans.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(b)    Cash Distributions to Members.   Subject to the requirements and limitations of this Section 5.1(a) and 5.4, the timing and amount of Distributions shall be determined by the Manager in his reasonable business judgment.   Except as set forth in Section 5.3 and Section 12.2 and subject to the requirements and limitations of this Section 5.1(a) and 5.4, the Manager, in his discretion, may distribute Net Cash Flow to and among the Members, provided that any such Distribution shall be made as follows:

(i)    first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(ii)    second, pro rata among the Members, provided that any such distribution shall be made pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

**5.2    Amounts Withheld**.   All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 5.2 for all purposes under this Agreement but only to the extent such amounts are paid by the Company to such taxing authority.   The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld and paid to the taxing authority.

**5.3    Tax Distributions**.

(a)    If the distributions to the Members pursuant to Section 5.1 above (exclusive of Tax Distributions) for a taxable year are not expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income for such taxable year, then the Company shall be required to make additional distributions pursuant to this Section (**"Tax Distributions"**) to the Members in accordance with their Percentage Interests in such amount as determined pursuant to Section 5.3(b) below, to the extent the Company has sufficient Net Cash Flow.   If the distributions to the Members during the taxable year pursuant to Section 5.1 above (exclusive of Tax Distributions) are expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income, then no distributions shall be made pursuant to this Section 5.3.    Any distribution deemed made to a Member pursuant to this Section 5.3 shall reduce the amounts the Member would otherwise be entitled to receive pursuant to Section 5.1(b)(i) or 5.1(b)(ii).

(b)    The aggregate amount of the Tax Distributions shall be determined by the Manager and shall equal the amount of cash the Manager deems necessary to enable each Member to pay its federal and state taxes on its distributive share of the Company's taxable income for the taxable year, taking into account the distributions expected to be received from the Company (exclusive of Tax Distributions) during the taxable year.   To the extent the Company has sufficient Net Cash Flow, the Manager shall attempt to make the Tax Distributions on a quarterly basis to enable the Members to make their quarterly state and federal estimated tax payments.   In any event the Manager shall, to the extent the Company has sufficient Net Cash Flow, cause the Company to make the Tax Distribution no later than the April 10 following the taxable year to which the Tax Distribution relates.   The Manager shall be entitled to make reasonable assumptions concerning Member's tax rates and, when making quarterly Tax Distributions, the Company's ultimate taxable income for the entire taxable year.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**5.4    Limitations on Distributions.**

(a)    The Company shall make no Distributions to the Members except (i) as provided in this <u>Section 5</u> and in <u>Section 12</u> hereof, or (ii) as determined by the Manager.

(b)    The Company shall not make, and a Member may not receive, a Distribution from the Company to the extent that, after giving effect to the Distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions and liabilities for which the recourse of creditors is limited to specific property of the Company, would exceed the fair value of the Company's assets.

**5.5    Certain Liquidity Events.**  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Members dispose of all Membership Interests in the Company (whether in a merger or sale of all of the equity of the Company), the Members agree and acknowledge that the consideration paid to each Member for their Membership Interests shall be redistributed among them to equal that which each Member would have received if the Company had sold all of its assets for an amount equal to the aggregate consideration payable under such transaction plus all Company liabilities (including transaction expenses, brokers' commissions, attorney's and accountants' fees, debt repayment and other similar charges), and the sales proceeds (net of such liabilities) were distributed in accordance with <u>Section 12.2</u>.  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Company disposes of assets, with proceeds from such transaction received by the Company, then the Distribution of any such proceeds to the Members shall be made in accordance with <u>Section 12.2</u>.

**SECTION 6**

**MANAGEMENT**

**6.1    Manager.**

(a)    The management of the Company shall be vested entirely and exclusively in the Manager.  Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company.  No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

(b)    The Manager need not be a Member of the Company.  The initial Manager of the Company as of the Effective Date shall be Marcus Lemonis.  The Manager shall serve as the Manager until his or its death, dissolution, voluntary resignation, or appointment of a successor Manager.  ML Retail shall have the sole power to remove a Manager and to appoint any successor Manager.

(c)    The Company may, but shall not be required to, have officers (the **"Officers"**), who shall be appointed by the Manager and may include a President, a Vice President, a Secretary and a Treasurer or Chief Financial Officer.  The Manager may also appoint a Chairman, more than one Vice President, and one or more Assistant Secretaries and Assistant Treasurers.  The Manager may appoint such other Officers and agents as he shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. Any number of offices may be held by the same Person.  The Manager may, in his own

13

FILED DATE: 11/23/2020 4:20 PM   2020L012546

discretion, fix the salaries of all Officers and agents of the Company, in their capacity as such. Each of the Officers of the Company shall hold office until such Officer's successor is appointed or until such Officer's earlier death, resignation or removal. Any Officer may be removed at any time by the Manager. Any vacancy occurring in any office of the Company may be filled by the Manager. The initial officers of the Company shall be the persons identified as such on the attached Schedule A.

(d)     The Manager may engage on behalf of, and at the expense of, the Company, such Persons as the Manager in his judgment shall deem advisable for the conduct and operation of the business of the Company.

(e)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

(f)     Instruments and documents of the Company shall be valid and binding upon the Company if executed by the Manager or a duly designated officer by the Manager, and Persons dealing with the Company shall be entitled to rely conclusively on such power and authority of the Manager and such officers.

(g)     The Manager is hereby authorized to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company. The Manager may authorize any Officer or agent of the Company to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

**6.2     Duties and Obligations of the Manager; Discretion**.

(a)     In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

**6.3     Reimbursements**. The Company may reimburse the Manager for all expenses incurred and paid in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

**6.4     Indemnification of the Manager and Officers**.

(a)     Unless otherwise provided in Section 6.4(c) hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Property) shall indemnify, save harmless, and pay all judgments and claims against the Manager, any former Manager, Officer, former

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Officer or any agent of the Company (each such Person, a **"Covered Person"**) relating to any liability or damage incurred by reason of any act performed or omitted by the Covered Person in connection with the Company, including reasonable attorneys' fees and expenses incurred by the Covered Person in connection with the defense of any action based on any such act or omission, which attorneys' fees and expenses may be paid as incurred.

        (b)     Unless otherwise provided in <u>Section 6.4(c)</u> hereof, in the event of any action by a Member against the Covered Person including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Covered Person, including reasonable attorneys' fees and expenses incurred in the defense of such action.

        (c)     Notwithstanding the provisions of <u>Sections 6.4(a)</u> and <u>6.4(b)</u> above, such Sections shall be enforced only to the maximum extent permitted by law and the Covered Person shall only be indemnified (i) if such Person acted in good faith and without Misconduct and in a manner that he or it reasonably believed to be in or not opposed to the best interests of the Company, and (ii) with respect to any criminal action or proceeding, if such Person had no reasonable cause to believe his or its conduct was unlawful, unless the conduct in question involved actual (rather than simply alleged) criminal conduct, fraud, willful and wanton misconduct or gross negligence.

        (d)     The obligations of the Company set forth in this <u>Section 6</u> are expressly intended to create third party beneficiary rights of the Covered Person and any Manager, any Member, or any Officer is authorized, on behalf of the Company, to give written confirmation to the Covered Persons of the existence and extent of the Company's obligations to the Covered Persons hereunder.

        (e)     The provisions of this <u>Section 6.4</u> shall survive the dissolution, liquidation, winding up and termination of the Company.

## SECTION 7

## ROLE OF MEMBERS

    **7.1**    **Rights or Powers**.  The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.  Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act.

    **7.2**    **Voting Rights**.  No Member has any voting rights except as otherwise provided in this Agreement and with respect to the following, which shall require the Approval of the Members:

        (a)     any conversion of the Company to any other entity; or

        (b)     any merger of the Company with or into any other entity that is not subject to a Drag Transaction; and

        in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**7.3     Member Liability**.  No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the debts or any other obligations or liabilities of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, *provided* that a Member may be required to repay distributions made to it as provided in 6 Del. C.§ 18-607 of the Act. No Manager shall have any personal liability for the repayment of any Capital Contributions of any Member.

**7.4     Partition**.  While the Company remains in existence, each Member agrees and waives its rights to have any Property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

**7.5     Transactions Between a Member and the Company**.  Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a Person who is not a Member. A Member, any Affiliate thereof or an employee, stockholder, member, manager, agent, director or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

**7.6     Other Instruments**.  Each Member shall execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement, so long as any such documents do not materially or substantially change the rights of a Member under this Agreement.

**7.7     Non-Solicitation and Non-Competition**.

(a)     While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to), directly or indirectly (including, without limitation, through any of his, her or its Affiliates or immediate family members, i.e., spouse and unemancipated children), in any capacity: (i) employ any employee of the Company or a Subsidiary; or (ii) solicit or induce any employee of the Company or a Subsidiary to cease employment with the Company or any Subsidiary.

(b)     While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to) directly or indirectly (including, without limitation, through any of his or its Affiliates or immediate family members, i.e., spouse and unemancipated children), anywhere in the United States, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, independent contractor, stockholder or in any other capacity of any company or entity, engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that

16

FILED DATE: 11/23/2020 4:20 PM   2020L012546

engages in or competes, directly or indirectly, with the Business; provided, however, that the ownership by any Person of not more than five percent (5%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 7.7(b).

(c)     If a Member or Manager breaches any obligation under Section 7.7(a) or 7.7(b), such breach will suspend and toll the running of the restrictive period for such obligation for such Member or Manager from the date of breach until such time as such violation ceases.

(d)     Each Member and the Manager agrees that any violations of Section 7.7(a) or 7.7(b) would be highly injurious and cause irreparable harm to the Company and its Members. Therefore, each Member and the Manager consents and agrees that if the terms of Section 7.7(a) and/or 7.7(b) are violated, the Company shall be entitled, in addition to any other rights and remedies that it may have (including monetary damages), to apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any continuing or threatened violation of, the provisions of Section 7.7(a) and/or 7.7(b) by such Member, Manager, or any of their respective Affiliates. If the Company shall institute any action or proceeding to enforce the provisions of Section 7.7(a) and/or 7.7(b), each Member and the Manager hereby irrevocably waives any claim or defense that such Member or Manager may have that an adequate remedy at law is available, and each Member and each Manager hereby agrees not to interpose in any such action or proceeding any claim or defense that a remedy exists at law.  Notwithstanding the foregoing provisions, the Manager in his sole discretion may waive or otherwise modify the restrictions set forth in Section 7.7(a) and/or 7.7(b) pursuant to a written agreement with any Member (or their Affiliate), as applicable.  Further, if any Member (or their Affiliate) or Manager is subject to a separate written agreement with the Company containing similar restrictive covenants, then the terms of such other agreement shall govern and these restrictive covenants shall not apply to such Person.

(e)     It is the Members' and the Manager's intent that each of the restrictive covenants contained in Section 7.7(a) and/or 7.7(b) be read and interpreted with every reasonable inference given to its enforceability. However, it is also the Members' and the Manager's intent that if any term, provision or condition of such restrictive covenants is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Further, it is also the Members' and the Manager's intent that if a court should determine any of such restrictive covenants are unenforceable because of over-breadth, then the court shall modify said covenant to the minimum extent possible so as to make it enforceable under the circumstances.

(f)     Notwithstanding the foregoing subsections (a) through (e) of this Section 7.7, neither Marcus Lemonis nor ML Retail or any other entity controlled by Marcus Lemonis is subject to the restrictions set forth in this Section 7.7.

**7.8     Investment Representations and Warranties**.  Each Member executing this Agreement hereby represents and warrants to the Company and each other Member that: (a) if such Member is not a natural person, that it is organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder; (b) such Member is acquiring his, her or its Membership Interests in the Company for such Member's own account as an investment and without an intent to distribute the Membership Interests; (c) such Member acknowledges that the Membership Interests have not been registered under federal securities laws, or any state securities laws, and may not be resold or transferred by such Member without appropriate registration or the availability of an exemption from such requirements; (d) such Member has such knowledge and experience in financial and business matters so

17

FILED DATE: 11/23/2020 4:20 PM   2020L012546

that such Member is capable of evaluating the merits and risks of an investment in the Company; and (e) such Member has been given the opportunity to ask questions of and receive information from the Company.

## SECTION 8

## ACCOUNTING, BOOKS AND RECORDS

**8.1     Bank Accounts; Accounting, Books and Records.**

(a)     All funds of the Company shall be deposited in its name in accounts designated by the Manager.  The Manager, the Chief Financial Officer of the Company, if any, and such person or persons as the Manager may designate shall have the right to draw checks thereon and make, deliver, accept and endorse negotiable instruments in connection with the Company business.

(b)     The Company shall keep on site at its principal place of business each of the following:

(i)     Separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, and all income derived in connection with the conduct of the Company in accordance with this Agreement;

(ii)     A current list of the full name and last known business, residence, or mailing address of each Member and Manager;

(iii)     A copy of the Certificate of Formation and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v)     Copies of this Agreement;

(vi)     Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

(vii)     Unless contained in this Agreement, a statement prepared and certified as accurate by the Manager of the Company which describes:

(A)     The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

(B)     The times at which or events on the happening of which any additional Capital Contributions agreed to be made by each Member are to be made;

(C)     If agreed upon, the time at which or the events on the happening of which a Member may terminate its Membership Interests in the Company and

18

FILED DATE: 11/23/2020 4:20 PM   2020L012546

the amount of, or the method of determining, the distribution to which he may be entitled respecting its Membership Interests and the terms and conditions of the termination and distribution;

        (D)    Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution; and

        (viii)    Any written consents obtained from Members pursuant to 6 Del. C.§ 18-302 of the Act regarding action taken by Members without a meeting.

        (c)    Any Member or its designated representative has the right to have reasonable access to and inspect the books and records of the Company to the extent required by law.  The rights granted to a Member pursuant to this <u>Section 8.1</u> are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

**8.2**    **Tax Matters**.

        (a)    **Tax Elections**.  ML Retail shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law:  (i) to adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with Transfers of Membership Interests and Company distributions;  (ii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and (iii) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

        (b)    **Tax Information**.  Necessary tax information shall be delivered to each Member as soon as practicable after the end of each taxable year of the Company but not later than five (5) months after the end of each taxable year.

        (c)    **Tax Classification**.

        (i)    The Manager shall take such action as may be required under the Code and the Regulations to cause the Company to be taxable as a partnership for Federal income tax purposes.

        (ii)    To the extent <u>Section 8.2(c)(i)</u> does not govern the state and local tax classification of the Company, the Manager shall take such action as may be required under any state and/or local law applicable to the Company to cause the Company to be taxable as, and in a manner consistent with, a partnership (or the functional equivalent thereof under applicable law) for state and/or local income tax purposes.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

     (d)       **Tax Matters Member and 2015 Budget Act Audit Rules**.

          (i)     *Tax Matters Member*. ML Retail shall be the "tax matters partner" of the Company within the meaning of Code § 6231(a)(7) as in effect immediately prior to the effective date of its amendment by the 2015 Budget Act (the **"Tax Matters Member"**) for any period during which the Company is permitted or required to have such a tax matters partner, and shall serve as such until its successor is duly designated by the Manager. The Tax Matters Member shall have authority to take any action that may be taken by a "tax matters partner" under Code §§ 6221 through 6234. The Company shall indemnify and hold harmless the Tax Matters Member for any liabilities and all reasonable and documented costs and expenses incurred by the Tax Matters Member in its capacity as such. Notwithstanding any other provision of this Agreement, the Tax Matters Member, in its capacity as Tax Matters Member, shall have no authority with respect to matters subject to the 2015 Budget Act Audit Rules.

          (ii)     *No Early Election into the 2015 Budget Act Audit Rules*. The Company shall not elect, under Section 1101(g)(4) of the 2015 Budget Act or otherwise, for any portion of the 2015 Budget Act Audit Rules to apply to the Company for any taxable years beginning before January 1, 2018.

          (iii)     *Partnership Representative*. ML Retail shall be the "partnership representative" of the Company within the meaning of Code § 6223 (as amended by the 2015 Budget Act) (the **"Partnership Representative"**) for any period during which the Company is permitted or required to have a Partnership Representative and shall serve as such until its successor is duly designated by the Manager. The Partnership Representative shall have authority to take any action that may be taken by a "partnership representative" under the 2015 Budget Act Audit Rules. The Company shall indemnify and hold harmless the Partnership Representative for any liabilities, costs and expenses reasonably incurred by the Partnership Representative in its capacity as such.

          (iv)     *Notification of Members*. The Partnership Representative shall, on a timely basis, provide the Company with copies of all notices received by the Partnership Representative in connection with any proceeding or potential adjustment relating to the Company that is subject to the 2015 Budget Act Audit Rules. With respect to any proceeding or potential adjustment subject to the 2015 Budget Act Audit Rules, the Company shall, on a timely basis, provide each Member with copies of all notices received by the Company or the Partnership Representative from the Internal Revenue Service.

          (v)     *Election Out of Imputed Underpayment*. To the maximum extent permitted under the 2015 Budget Act Audit Rules, the Company shall elect, and each Member shall cooperate in electing, under Code § 6226(a) (as amended by the 2015 Budget Act) or otherwise, for Code § 6225 (as amended by the 2015 Budget Act) not to apply, and for each Member to take any adjustment into account as provided in Code § 6226(a) (as amended by the 2015 Budget Act).

          (vi)     *Survival*. The provisions of this <u>Section 8.2</u> shall survive the termination of the Company or the termination of any Membership Interests and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members (relating to the operations of the Company).

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**8.3      Certificates**.  No certificates or other evidence of ownership shall be issued in respect of the Membership Interests in the Company except this Agreement.

## SECTION 9

## AMENDMENTS

**9.1      Amendments Generally**.     Except as otherwise provided in <u>Section 9.2</u>, and notwithstanding any contrary provision of the Act, any amendments to this Agreement may be adopted with the Approval of the Members; <u>provided</u>, <u>however</u>, that no part of <u>Section 6</u> may be amended without the approval of the Manager.

**9.2      Amendments by the Manager**.  Without limiting the power to amend this Agreement granted by <u>Section 9.1</u> hereof, this Agreement may be amended by the Manager (a) to effect changes of a ministerial nature that do not materially and adversely affect the rights, duties or obligations of the Members; (b) to amend <u>Exhibit A</u> to add, remove or change any Member and/or Percentage Interests held by a Member, in accordance with the terms hereof; (c) to conform the terms of this Agreement with any Regulations, *provided* that, in the opinion of counsel to the Company, such amendment does not adversely affect the rights or interests of any of the Members; (d) with respect to the Company's status as a partnership (and not as an association taxable as a corporation) for federal tax purposes, (i) to comply with the requirements of the Regulations, or (ii) to ensure the continuation of partnership status, <u>provided</u>, <u>however</u>, that, in the opinion of counsel of the Company, such amendment does not adversely affect the rights or interests of any of the Members; and (e) to change the name of the Company.

## SECTION 10

## TRANSFERS; DRAG-ALONG RIGHTS

**10.1      Restrictions on Transfers**.  Except as otherwise permitted by this Agreement, including <u>Section 10.8</u>, no Member shall Transfer all or any portion of its Membership Interests without the approval of the Manager. In the event that any Member pledges or otherwise encumbers all or any part of its Membership Interests as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this <u>Section 10</u>.  Each Member hereby acknowledges the reasonableness of the restrictions on the Transfer of Membership Interests imposed by this Agreement in view of the Company's purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

**10.2      Permitted Transfers**.  Subject to the conditions and restrictions set forth in <u>Section 10.3</u> hereof, (a) a Member may at any time Transfer all or any portion of its Membership Interests to the Company pursuant to <u>Section 11</u>; and (b) with respect to ML Retail, ML Retail may Transfer all or any part of its Membership Interests to Affiliates of ML Retail (any such Transfer described in (a) or (b) being referred to in this Agreement as a **"Permitted Transfer"**).  **"Permitted Transfer"** shall also include, any Transfer by a Member to a Person that is (i) a trust, estate, guardianship or custodianship, including those established under any of the Uniform Gifts to Minors Act of any state, established for such Member or one or more of such Member's spouse and/or natural or adoptive lineal ancestors or descendants, (ii) an entity in which all of the equity interests are beneficially owned by such Member and/or its Permitted Transferees, and (iii) if such Member is an entity, the holders of its equity securities in a liquidating distribution of such entity's assets in proportion to their ownership thereof.  The subsequent Transfer of any Membership Interests by a Permitted Transferee shall be subject to the same restrictions of this <u>Section 10</u> in the same manner as if the Membership Interests to be Transferred were still owned by the

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Member from whom such Permitted Transferee acquired such Membership Interests; and for this purpose, references herein to a Transfer by a Member shall include any Transfer by the Permitted Transferee(s) that acquired such Member's Membership Interests, and references to a Member in the context of Transfer restrictions and related provisions shall include its Transferees. If at any time a Member is required to Transfer its Membership Interests pursuant to this Agreement, such Transfer shall include or be applicable to all Membership Interests owned by such Member's Permitted Transferees and other Transferees.

      **10.3    Conditions to Permitted Transfers**.  Except for a Transfer to the Company, a Transfer shall not be treated as a Permitted Transfer under <u>Section 10.2</u> hereof unless and until the following conditions are satisfied:

            (a)    Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer. In the case of a Transfer of Membership Interests involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

            (b)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interests transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interests until it has received such information.

            (c)    In addition to the foregoing, each Transfer of Membership Interests shall satisfy the following conditions: (i) the Transfer will not require registration of Membership Interests under the Securities Act or any state securities laws and (ii) if requested by the Manager, the transferor delivers to the Company an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

      **10.4    Prohibited Transfers**.  Any purported Transfer of Membership Interests that is not a Permitted Transfer shall be null and void and of no force or effect whatever; *provided* that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Manager approves a Transfer that is not a Permitted Transfer pursuant to <u>Section 10.1</u> hereof), the Membership Interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company.

      In the case of a Transfer or attempted Transfer of Membership Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**10.5    Rights of Unadmitted Assignees**.  A Person who acquires Membership Interests but who is not admitted as a substituted Member pursuant to <u>Section 10.6</u> hereof shall be entitled only to allocations and distributions with respect to such Membership Interests in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

**10.6    Admission of Substituted Members**.  Subject to the other provisions of this <u>Section 10</u>, a transferee of Membership Interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this <u>Section 10.6</u>:

(a)    The Membership Interests with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer or a Transfer otherwise approved by the Manager;

(b)    The transferee of Membership Interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Agreement, including this <u>Section 10</u> and (ii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Membership Interests.  The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement, (y) in the case of a Transfer to any Person other than a Member or any of its Affiliates, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer, and (z) in the case of a Transfer to any of its Affiliates, any Capital Contribution or other financing obligation of the transferor Member under this Agreement;

(c)    The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Membership Interests; and

(d)    Except in the case of a Transfer involuntarily by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer.

**10.7    Distributions in Respect of Transferred Membership Interests**.  If any Membership Interests are Transferred during any taxable year in compliance with the provisions of this <u>Section 10</u>, all distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, *provided* that, if the Company is given notice of a Transfer at least five (5) Business Days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer.  If the Company has not received notice of a Transfer prior to a distribution date, all distributions shall be made to the Person who, according to the books and records of the Company, was the owner of the Membership Interests on the record date of such distribution.  Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of this <u>Section 10.7</u>, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Membership Interests.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**10.8    Sale of the Company; Drag-Along Rights**.

(a)    Notwithstanding any Transfer restrictions contained in this Section 10, in the event that ML Retail (the **"Dragging Member"**) proposes to sell all of its Membership Interests to a Third Party Purchaser, whether by merger or otherwise (the **"Drag Transaction"**), the Dragging Member may elect to require all other holders of Membership Interests, including unadmitted assignees (the **"Drag-Along Members"**), to sell to the Third Party Purchaser their Membership Interests on the same terms and conditions (including, without limitation, making customary representations, warranties and indemnification covenants applicable to the ownership of the Membership Interests of such Drag-Along Members) upon which the Dragging Member sells, transfers or assigns its Membership Interests. The Dragging Member shall cause the Drag Transaction to be reduced to writing and shall provide a written notice (the **"Drag Notice"**) of the Drag Transaction to the Drag-Along Member at least thirty (30) days prior to the anticipated closing of the Drag Transaction. The Drag Notice shall contain written notice of the exercise of rights pursuant to this Section 10.8 and shall set forth the consideration to be paid by the Third Party Purchaser and the other material terms and conditions of the Drag Transaction. If, prior to the closing of the Drag Transaction, the terms of the Drag Transaction change from those set forth in the original Drag Notice, the Dragging Member shall issue a revised Drag Notice stating such revised terms.

(b)    Each holder of Membership Interests agrees to (i) use commercially reasonable efforts, in good faith and in a commercially prompt manner, to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable, under applicable laws and regulations (including, without limitation, to ensure that all appropriate legal and other requirements are met and all consents of third persons are obtained), to consummate the Drag Transaction, (ii) vote all of its Membership Interests in favor of the Drag Transaction (if necessary, depending on the form of the transaction and the voting rights of such Membership Interests) and (iii) raise no objection to, bring no claim against and not contest such Drag Transaction. Execution of this Agreement or a joinder hereto constitutes each holder of Membership Interests' (and its Transferees') binding agreement to sell all his, her or its Membership Interests on the same terms and conditions set forth in the Drag Notice, as adjusted in accordance with this Section 10.8. Upon the closing of a Drag Transaction, such Third Party Purchaser shall pay to each holder of Membership Interests his, her or its share of the proceeds thereof.

## SECTION 11

## REDEMPTION

The Company shall redeem, and any Member shall sell to the Company, any of the Member's Membership Interests pursuant to the terms and provisions of any agreement binding upon the Company and such Member.

## SECTION 12

## DISSOLUTION AND WINDING UP

**12.1    Dissolution Events**.

(a)    **Dissolution**. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a **"Dissolution Event"**):

(i)    The written consent of the Manager and the Approval of the Members to dissolve, wind up, and liquidate the Company; or

FILED DATE: 11/23/2020 4:20 PM    2020L012546

(ii)      The entry of a decree of judicial dissolution under Section 18-802 of the Act.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)      **Reconstitution**.  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the **"Reconstitution Period"**), the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on terms identical to those set forth in this Agreement.  Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 12.2 hereof.  If such an election is made within the Reconstitution Period, then:

(i)      The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in Section 12.1(a);

(ii)      Unless otherwise agreed to by the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests, the Certificate of Formation and this Agreement shall automatically constitute the Certificate of Formation and Agreement of such new Company.  All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company.  No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided, that the right of the Members to select  a successor manager and to reconstitute and continue the Company's business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

**12.2      Winding Up**.  Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 12.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided, that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Certificate of Formation has been canceled pursuant to the Act.  The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 12.1(b) hereof.  The Liquidator shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 12.7 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)      First, to the payment of the debts and liabilities of the Company (including any loans or advances made by any of the Members to the Company or any of its Subsidiaries), and the expenses of liquidation;

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(b)     Second, to the creation of any reserves which the Manager deems reasonably necessary for the payment of any contingent, unliquidated or unforeseen liabilities or obligations of the Company or any of its Subsidiaries or the Members (to the extent the Company is liable therefor) arising out of or in connection with the business and operations of the Company and its Subsidiaries;

(c)     Third, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(d)     Finally, the balance, if any, to the Members, pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 12.2.

**12.3    Liquidating Trust; Reserves**.  In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

(a)     Distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 hereof; or

(b)     Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, *provided* that such withheld amounts shall be distributed to the Members as soon as practicable.

**12.4    Rights of Members**.  Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for the return of its Capital Contribution and has no right or power to demand or receive Property other than cash from the Company.  If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

**12.5    Notice of Dissolution/Termination**.

(a)     In the event a Dissolution Event occurs, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager).

(b)     Upon completion of the distribution of the Company's Property as provided in this Section 12, the Company shall be terminated, and the Liquidator shall cause the filing of the Certificate of Cancellation pursuant to Section 18-203 of the Act and shall take all such other actions as may be necessary to terminate the Company.

**12.6    Character of Liquidating Distributions**.  All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**12.7    The Liquidator**.

(a)    **Definition**.  The **"Liquidator"** shall mean the Manager or a Person appointed by the Manager to oversee the liquidation of the Company.

(b)    **Fees**.  The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this <u>Section 12</u> and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    **Indemnification**.  The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

**12.8    Form of Liquidating Distributions**.  For purposes of making distributions required by <u>Section 12.2</u> hereof, the Liquidator may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

**SECTION 13**

**MISCELLANEOUS**

**13.1    Notices**.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed, (ii) on the date sent by e-mail of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (iii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members and the Manager:

(a)    If to the Company, to the address determined pursuant to <u>Section 2.4</u> hereof;

(b)    If to the Manager, at the same address of the Company;

(c)    If to a Member, to the address of such Member according to the Company's books and records;

or at such other address of a Person as such Person may furnish to the Company from time to time.

**13.2    Binding Effect**.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, legal representatives, administrators, successors, transferees, and assigns.

**13.3    Effect of Consent or Waiver**.  No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member (or Transferee) in the performance by such other

27

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Member (or Transferee) of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any breach or default by such other Person in the performance by such other Person of the same or any other obligations of such Person hereunder. Failure on the part of any Member to object to or complain of any act or failure to act of any of the other Members (or Transferees) or to declare any of the other Members (or Transferees) in default, regardless of how long such failure continues, shall not constitute a waiver by any such Member of its rights hereunder.

13.4    **Construction**.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

13.5    **Time**.  In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

13.6    **Headings and References**.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.  References herein to the singular shall include the plural and to the plural shall include the singular, and references to one gender shall include the other, except where inappropriate.

13.7    **Severability**.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section 13.7 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

13.8    **Incorporation by Reference**.  Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

13.9    **Governing Law**.  The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.  To the extent this Agreement is inconsistent with the Act, this Agreement shall govern (to the maximum extent permitted by the Act).

13.10    **Waiver of Jury Trial**.  Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement.

13.11    **Specific Performance**.  Because Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**13.12   Counterparts; Signatures**.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same document.  This Agreement may be executed and delivered by electronic mail in portable document format (.pdf) and, if executed and delivered in such manner, shall be binding as though an executed original shall have been delivered by hand.

**13.13   Trustee Exculpation**.   When and if this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually but solely as trustee in the exercise of and under the power and authority conferred upon and invested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any party which is a trust to the Company or another party shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

{Remainder of page intentionally left blank.}

29

FILED DATE: 11/23/2020 4:20 PM   2020L012546

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

MEMBERS:

ML RETAIL LLC

By:_____
         Marcus Lemonis, Authorized Person


_____
Nicolas Goureau

_____
Stephanie Menkin


THE COMPANY:

ML FASHION, LLC

By:_____
         Marcus Lemonis, Manager

30

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## <u>EXHIBIT A</u>

## **MEMBERS**

| <u>Members</u> | <u>Percentage Interest</u> |
|---|---|
| ML Retail LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |
| **Total** | <u>100.0%</u> |

FILED DATE: 11/23/2020 4:20 PM   2020L012546

SCHEDULE A
Officers

Chairman/CEO:                          Marcus Lemonis

President:                             Stephanie Menkin

Chief Financial Officer:               Manish Karna

24649273.3

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012546
11242484

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# EXHIBIT 2

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** is made and entered into as of March 29, 2016, by and between **ML FASHION, LLC**, a Delaware limited liability company ("Borrower"), and **ML RETAIL LLC**, a Delaware limited liability company ("Lender").

W I T N E S S E T H:

**WHEREAS**, subject to the terms and conditions set forth herein, Lender is willing to make revolving loans (the "Loans") to Borrower in amounts not to exceed $30,000,000 in the aggregate.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual covenants set forth herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS; ETC.

1.1    Definitions.  As used in this Agreement, the following terms and phrases shall have the following meanings:

"Agreement" means this Credit Agreement, as the same may hereafter be amended, modified, supplemented or restated.

"Borrower" is defined in the first paragraph.

"Borrowing" means a future borrowing of a Loan by Borrower.

"Business Day" means each day other than a Saturday, a Sunday or any other day on which banks are permitted to be closed in the City of New York, New York.

"Closing Date" means the date on which both of the following shall have occurred: (a) Lender has received counterparts of, or signature pages to, the Loan Documents executed by Borrower, and (b) the conditions set forth in Article IV have been satisfied.

"Collateral" means all property and interests in property now owned or hereafter acquired by Borrower in or upon which a security interest, lien or mortgage is granted to Lender by Borrower, whether under this Agreement, or under any other documents executed by Borrower and delivered to Lender.

"Collateral Documents" means, collectively, (a) the Security Agreement, and all other security agreements, mortgages, deeds of trust, patent and trademark assignments, lease assignments, guarantees and other similar agreements made by Borrower for the benefit of Lender now or hereafter delivered to Lender pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter

filed in accordance with the Uniform Commercial Code or comparable law) against Borrower as debtor in favor of Lender as secured party, and (b) any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the foregoing.

"Commitment" means the commitment of Lender to make Loans to Borrower in an aggregate amount at any time outstanding not in excess of $30,000,000.

"Commitment Termination Date" means the earlier of (a) Borrower's sale, transfer, pledge or other disposition of all or any substantial part of its assets, Borrower's consolidation or merger with any other entity or the sale, transfer, pledge or other disposition of all or substantially all of the membership interests of Borrower, other than to an affiliate, (b) the date on which the Commitment shall terminate pursuant to Article VI, and (c) the date that is three (3) years from the date hereof; provided, however, that Borrower and Lender shall extend the initial 3-year term, and any subsequent term thereof, automatically for so long as Borrower is "current" in the payment of its accounts payable.

"Default" means any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Dollars" and "$" mean the lawful money of the United States of America.

"Event of Default" has the meaning ascribed to it in Article VI.

"Indebtedness" means (a) indebtedness for borrowed money or the deferred purchase price of property or services purchased (other than amounts constituting accrued expenses and trade payables arising in the ordinary course of Borrower's business), (b) obligations arising in respect of letters of credit or similar instruments, (c) obligations under capital leases, (d) indebtedness of the type described in clauses (a), (b) and (c) which have been directly or indirectly assumed or guaranteed.

"Interest Period" means the period commencing on the date of a Loan or the last day of the preceding Interest Period (with the first Interest Period to commence on the date of this Agreement) and ending on the last day of the calendar month which is one month thereafter; provided, however, that if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.

"Interest Rate" means, for each loan, six percent (6%) per annum with annual compounding.

"Lender" is defined in the first paragraph.

"Loan Documents" means this Agreement, the Note, the Security Agreement, and all other documents, instruments, notes and agreements executed in connection therewith or contemplated thereby, as the same may be amended, restated or otherwise modified and in effect from time to time.

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

"Loans" has the meaning ascribed to it in the recitals.

"Note" is defined in Section 2.3(a).

"Obligations" means all amounts owing by Borrower to Lender or any other Person or any of their respective successors and assigns pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any proceeding under any debtor relief law relating to Borrower, or would accrue but for such filing or commencement, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to Lender incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, together with all renewals, extensions, modifications or re-financings thereof.

"Person" means an individual, a corporation, a partnership, an association, a trust or other entity or organization, including a government or political subdivision or an agency or an instrumentality thereof.

"Restricted Payment" means (a) any distribution, dividend or other payment of a similar nature paid to holders of equity interests of Borrower or any of its Subsidiaries (expressly excluding any Tax Distributions (as defined in Borrower's Limited Liability Company Agreement) and, with respect to holders of equity interests of Borrower or any of its Subsidiaries who are employees of Borrower or such Subsidiary, any payments with respect to such employment), and (b) any redemption, retirement or other acquisition by Borrower or a Subsidiary or affiliate thereof of any equity interest of Borrower or such Subsidiary.

"Security Agreement" means the Security Agreement, dated as of the date hereof, between Borrower and Lender, as the same may be amended from time to time, pursuant to which Borrower grants Lender a security interest in and to all of Borrower's assets.

"Subsidiary" means any corporation, partnership or limited liability company of which Borrower owns, directly or indirectly, such number of shares, partnership interests or membership interests as have more than 50% of the ordinary voting power and any limited liability company in which Borrower has invested in which it is also the manager.

1.2   References.   All references in this Agreement to particular Sections or Articles shall, unless expressly otherwise provided or unless the context otherwise requires, be deemed to refer to the specific sections or articles in this Agreement.  In addition, the words "hereof," "herein," "hereunder," and words of similar import, refer to this Agreement as a whole and not to any particular section or article.

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## ARTICLE II
## THE LOANS

2.1     Loans.  Lender agrees, upon the terms and subject to the conditions of this Agreement, to make the Loans to Borrower on any Business Day and from time to time from the Closing Date to the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Commitment.

2.2     Borrowing Procedures.

(a)     Borrower shall give at least seven (7) Business Days' prior written notice to Lender of each Borrowing.  Each such notice in order to be effective must be received by Lender not later than 11:00 am (Chicago time) on the day required and shall specify the Business Day on which such Loan is to be made and the aggregate principal amount of the requested Loan.

(b)     Subject to Article IV, on the borrowing date specified in such notice, Lender shall disburse funds in the amount of the requested Borrowing to Borrower via wire transfer into an account specified by Borrower.

2.3     Notes; Repayment.

(a)     The Loans made by Lender shall be evidenced by a secured promissory note substantially in the form of Exhibit A hereto (the "Note") in the face amount equal to the Commitment, duly executed on behalf of Borrower and dated as of the date hereof.   The outstanding principal amount of the Loans as evidenced by the Note shall be payable in full on the Commitment Termination Date, subject to acceleration as provided in Article VI.

(b)     Lender is hereby authorized by Borrower, but not obligated, to enter on the last page of the Note the amount of the Loans made by Lender hereunder and the other information provided for on such last page; provided, however, that the failure of Lender to set forth the amount of such Loans, or the other information, or any error with respect thereto, shall not in any manner affect the obligation of Borrower to repay the Loans and all other Obligations due hereunder.

2.4     Interest; Default Interest.

(a)     The Note shall bear and accrue interest on the outstanding principal amount thereof at the Interest Rate.  Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the end of the most recent Interest Period.  Interest shall be payable quarterly, on a calendar quarter basis, and, subject to Section 2.4(b) and Article VI, shall be due in full at the earlier of (i) the Commitment Termination Date, and (ii) the Borrower's payment in full of all outstanding Loans pursuant to Section 2.6. Borrower may elect not to pay the accrued interest in cash on any interest due date, in which event such interest shall be paid in kind and shall accrete as additional principal on the Loans on the applicable payment date and shall thereafter accrue interest as part of the principal amount of the Loans at the Interest Rate.

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(b)      If the Borrower shall default in the payment of the principal of, or interest on, any Loan or any other amount becoming due hereunder, whether at the Commitment Termination Date, by acceleration or otherwise, Borrower shall on demand from time to time pay interest, to the extent permitted by applicable law, on overdue amounts outstanding up to the date of actual payment of such defaulted amount at a rate equal to the Interest Rate plus 300 basis points.

(c)      Anything in this Agreement or the Note to the contrary notwithstanding, the interest rate on the Loans shall in no event be in excess of the maximum rate permitted by applicable law.

2.5      Termination of Commitment.   The Commitment shall be automatically and permanently reduced to zero Dollars ($0) on the Commitment Termination Date. Simultaneously with the termination of the Commitment, Borrower shall pay Lender an amount equal to the principal amount of Loans outstanding, together with (a) all accrued interest thereon and (b) all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) due hereunder.

2.6      Permissive Prepayment of Loans.   Borrower shall have the right at its option at any time and from time to time to prepay the Loans, in whole or in part, upon at least one (1) Business Day's prior written notice to Lender.   All prepayments shall be accompanied by accrued but unpaid interest on the principal amount being prepaid to the date of (but not including) the date of prepayment.

2.7      Manner of Payment.   All payments of interest and principal in respect of the Loans shall be made directly to Lender without offset or counterclaim, in Dollars, in immediately available funds, at the offices of Lender specified in Section 7.8.   All payments made by Borrower to Lender shall be applied first to accrued and unpaid interest on the Loans and the remainder thereof to the unpaid principal amount of the Loans.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender as follows:

3.1      Authority.   Borrower has the full power, right and legal authority to execute and perform the Loan Documents in accordance with their respective terms.

3.2      Validity.   The Loan Documents have been duly and validly executed by Borrower and, upon delivery thereof by Borrower, will constitute a legal, valid and binding obligation of Borrower enforceable against it in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles relating to enforceability, regardless of whether such enforceability is considered in a proceeding at law or in equity.

3.3      Compliance with Laws and Contracts.   The execution, delivery and performance of the Loan Documents by Borrower in compliance with their respective terms and provisions do

-5-

not and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of any mortgage, lien or other security arrangement or any agreement, instrument, order, judgment, decree or any other restriction of similar kind or character to which Borrower is a party or is otherwise bound.

    3.4   <u>Organization</u>.  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

    3.5   <u>Representations to Be Continuing</u>.  Each of the foregoing representations and warranties are true and correct as of the date of this Agreement and will continue to be true at the date of the disbursement of each Loan hereunder.  By submitting to Lender a request for Borrowing hereunder, Borrower shall be deemed to have restated each of such representations and warranties as of the date of such request.

**ARTICLE IV**
**<u>CONDITIONS</u>**

    4.1   <u>Conditions Precedent to the Initial Loans</u>.  The obligation of Lender to make the initial Loan hereunder shall be subject to the satisfaction by Borrower or waiver by Lender on or prior to the Closing Date of the following conditions precedent:

    (a)   Lender shall have received the Note duly executed by Borrower, dated the date hereof and payable to the order of Lender in the principal amount of the Commitment.

    (b)   Lender shall have received the Security Agreement, duly executed by Borrower and dated the date hereof.

    (c)   No action, suit, claim or proceeding before any domestic court, governmental agency, commission, or administrative or regulatory authority shall have been commenced by a party other than Lender and be pending which (i) seeks to restrain, prevent, or materially restructure the Loans contemplated hereby or which otherwise questions the validity or legality thereof, or (ii) could, in Lender's reasonable judgment, impair Borrower's ability to satisfy the Obligations.

    4.2   <u>Conditions Precedent to each Loan</u>.  The obligation of Lender to make any Loan hereunder shall be subject to the satisfaction by Borrower or waiver by Lender on or prior to the requested Borrowing date of the following conditions precedent:

    (a)   Lender shall have received a written notice with respect to such Borrowing as required by <u>Section 2.2(a)</u>.

    (b)   The representations and warranties of Borrower set forth in <u>Article III</u> shall be true and correct on and as of the date of each Borrowing, with the same effect as if made on and as of such date.

    (c)   On the date of each Borrowing, no Event of Default or Default shall have occurred and be continuing.

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(d)      Lender, in its sole and absolute discretion, shall have determined there is no malfeasance by Borrower.

Each Borrowing hereunder shall be deemed to be a representation and warranty by Borrower on the date of such Borrowing as to the matters and to the extent specified by paragraphs (b) and (c) of this Section.

# ARTICLE V
# COVENANTS

5.1      <u>Affirmative Covenants</u>.   From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall (a) use the proceeds of the Loans to make investments and for working capital and other general corporate purposes (including without limitation, for avoidance of doubt, to make loans or advances to any of its Subsidiaries), (b) deliver to Lender such information from time to time concerning the financial condition of Borrower and its Subsidiaries as Lender may request, (c) file all tax returns when due and pay and discharge, when due, all taxes reflected on such returns; and pay, when due, all assessments and other liabilities, except such liabilities which are contested in good faith and by proper proceedings and for which appropriate reserves have been established in accordance with generally accepted accounting principles then in effect, (d) comply with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (federal, state, local or foreign), a breach of which would adversely affect the interest of Lender hereunder, and (e) preserve its company existence.

5.2      <u>Indemnification</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall indemnify and hold Lender and its affiliates harmless from and against any and all claims, damages, losses, liabilities, costs, expenses and fees resulting from Borrower's breach of any representation, warranty, agreement or covenant made by Borrower to Lender in any of the Loan Documents. The indemnification provisions of this <u>Section 5.2</u> shall survive each Loan and any termination of this Agreement.

5.3      <u>Limitation on Indebtedness</u>.   From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, without the prior written consent of Lender, Borrower shall not create, incur, assume or suffer to exist any Indebtedness, except Indebtedness hereunder.

5.4      <u>Limitation on Restricted Payments</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall not declare, make or incur any liability to make any Restricted Payments without Lender's prior written consent.

25725673.4

## ARTICLE VI
## EVENTS OF DEFAULT

In the case of the happening and during the continuance of any of the following events (herein called "Events of Default"):

(a)     default shall be made in the payment of any principal of, or interest on, the Note when and as the same shall become due and payable, whether at the due date thereof or at the date fixed for prepayment thereof or acceleration thereof or otherwise;

(b)     default shall be made in the due performance of any covenant or agreement contained in any of the Loan Documents (other than a payment covenant of the kind contemplated by clause (a) of this Article VI) and such default shall remain unremedied for ten (10) Business Days after receipt by Borrower of a written notice of such default;

(c)     any representation or warranty of Borrower contained in any of the Loan Documents shall be false or misleading as of the date made or deemed made;

(d)     any of the Loan Documents shall cease, for any reason, to be in full force and effect;

(e)     default in payment, after the expiration of any applicable grace period, shall be made with respect to any Indebtedness of Borrower other than the Indebtedness hereunder in an amount or amounts over $25,000.00 in the aggregate; or other default in connection with such Indebtedness, if the effect of such default is to accelerate or permit the holder thereof to accelerate the maturity of such Indebtedness or to permit the holder thereof to cause such Indebtedness to become due prior to its stated maturity;

(f)     Borrower or any of its Subsidiaries is generally unable to pay its debts as they become due or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or Borrower or any of its Subsidiaries commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property or shall file an answer or other pleading in any such case, proceeding or other action admitting the material allegations of any petition, complaint or similar pleading filed against it or consenting to the relief sought therein; or Borrower or any of its Subsidiaries shall take any action to authorize any of the foregoing;

(g)     any involuntary case, proceeding or other action against Borrower or any of its Subsidiaries shall be commenced seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property,

25725673.4

FILED DATE: 11/23/2020 4:20 PM    2020L012546

and such case proceeding or other action (i) shall result in the entry of any order for relief against it or (ii) shall remain undismissed or undischarged for a period of 60 days; or

(h)     final judgment(s) for the payment of money in excess of $100,000 shall be rendered in the aggregate against Borrower or any of its Subsidiaries which within 60 days from the entry of such judgment(s) shall not have been discharged or stayed pending appeal or which shall not have been discharged within 60 days from the entry of a final order of affirmance on appeal from which no further appeal may be taken;

then, in every such event and at any time thereafter during the continuance of such event, the Lender may take, in its sole discretion, any or all of the following actions, at the same or different times:

(i)     terminate forthwith the Commitment;

(ii)    declare the principal of, and interest on, the Loans and the Note and all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) payable hereunder or thereunder to be forthwith due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or the Note to the contrary notwithstanding; and/or

(iii)   exercise any and all rights and remedies available to Lender under law.

If an Event of Default specified in paragraphs (f), (g) or (h) above shall have occurred with respect to Borrower or any of its Subsidiaries, the Loans, the Note and all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) payable hereunder or thereunder shall thereupon and concurrently become due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or the Note to the contrary notwithstanding and the Commitment shall thereupon forthwith terminate.

## ARTICLE VII
## MISCELLANEOUS

7.1     No Waiver.  No failure or delay on the part of Lender in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

7.2     Amendments, Etc.  No amendment, waiver, modification, supplementation or termination of any term or provision of this Agreement nor any consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender and then (if in respect of a waiver or consent) shall be effective only in the specific instance and for the specific purpose for which given.

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

7.3    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Borrower may not assign this Agreement or its rights or obligations hereunder without the prior written consent of Lender.

7.4    Governing Law; Venue.  **THIS AGREEMENT SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.  THE PARTIES HEREBY AGREE TO IRREVOCABLY SUBMIT TO THE PERSONAL AND SUBJECT MATTER JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN CHICAGO, COOK COUNTY, ILLINOIS, AND AGREE NOT TO OBJECT TO SUCH VENUE FOR ANY REASON AT LAW OR IN EQUITY.**

7.5    Severability of Provisions.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

7.6    Counterparts; Effectiveness.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.

7.7    Complete Agreement.   The Loan Documents, and the other documents and agreements expressly referred to herein and therein collectively embody the complete agreement and understanding among the parties hereto and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

7.8    Notices.   Any notice, waiver, consent or other communication required or permitted hereunder shall be in writing and shall be delivered personally (including delivery by a internationally recognized courier service), by email transmission, or by pre-paid certified or registered mail, return receipt requested, addressed as follows:

> To Borrower:    ML Fashion, LLC
> 38 E. 29th Street
> New York, NY 10016
> Attention:  President
> Email:    stephanie.menkin@marcuslemonis.com
>
> To Lender:    ML Retail LLC
> c/o Marcus Lemonis LL
> 4192 IL Route 83, Suite C
> Long Grove, Illinois 60047
> Attention:  Marcus Lemonis
> Email: marcus@marcuslemonis.com

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Notice hereunder shall be deemed to have been received and be effective for all purposes hereunder (a) if given by prepaid certified or registered mail, return receipt requested, on the third Business Day after mailing or (b) if given by any other means, when delivered at the address specified in this Section.  The address and facsimile number of any party hereto may be changed by notice given in accordance with the provisions hereof.

      7.9    <u>Survival</u>.  All warranties, representations and covenants made by Borrower herein shall be considered to have been relied upon by Lender and shall survive the making of the Loans and the issuance and delivery to Lender of the Note regardless of any investigation made by Lender and shall continue in full force and effect so long as any Obligation due or to become due is outstanding and unpaid and so long as the Commitment has not been terminated in its entirety.

      7.10    <u>Waiver of Jury Trial</u>.  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

25725673.4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**BORROWER**:

ML FASHION, LLC,
a Delaware limited liability company

By: _____
Name:  Stephanie Menkin
Title:  President

**LENDER**:

ML RETAIL LLC,
a Delaware limited liability company

By: _____
Name:  Marcus Lemonis
Title:  CEO

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**EXHIBIT A**

**<u>FORM OF SECURED PROMISSORY NOTE</u>**

Attached

EXHIBIT C

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# SECURED PROMISSORY NOTE

U.S. $30,000,000                                                                              Chicago, Illinois
original principal amount                                                              as of March 29, 2016

      **FOR VALUE RECEIVED**, the undersigned ("Maker") hereby promises to pay to the order of **ML RETAIL LLC**, a Delaware limited liability company ("Payee"), at the address of Payee set forth in the Credit Agreement (as hereinafter defined), in lawful money of the United States of America in immediately available funds, the principal amount of U.S.$30,000,000 plus the amount of interest which as accrued thereon pursuant to Section 2.4 of the Credit Agreement, or the aggregate principal amount of all Loans (as defined in the Credit Agreement) made by Lender to Maker pursuant to the Credit Agreement, whichever is less, on such date or dates as is provided in the Credit Agreement, and to pay interest on the unpaid principal amount from time to time outstanding hereunder, in like money, at such address and at such times and in such amounts, as set forth in the Credit Agreement.

      Maker and any and all sureties, guarantors and endorsers of this Secured Promissory Note (this "Note") and all other parties now or hereafter liable hereon, severally waive all grace periods (except grace periods expressly provided for in the Credit Agreement), demand, presentment for payment, protest, notice of any kind and diligence in collecting and bringing suit against any party hereto and agree to the extent permitted by applicable law (i) to all extensions and partial payments, with or without notice, before or after maturity, (ii) to any substitution, exchange or release of any security now or hereafter given for this Note, (iii) to the release of any party primarily liable hereon, and (iv) that it will not be necessary for any holder of this Note to first institute or exhaust such holder's remedies against the Maker or any other party liable herefor or against any security for this Note.  The non-exercise by any holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver in that or any subsequent instance.

      This Note is secured under and pursuant to the terms of certain Collateral Documents, to which reference is hereby made for a statement of their respective terms and conditions and a description of the collateral security for this Note.

      This Note is the Note referred to in that certain Credit Agreement dated as of the date hereof (the "Credit Agreement") by and between Maker and Payee, to which reference is hereby made for a statement of said terms and provisions.  Capitalized terms used herein shall have the meanings set forth in the Credit Agreement unless otherwise defined herein or unless the context otherwise requires.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

25725673.4

**IN WITNESS WHEREOF**, Maker has executed and delivered this Note as of the day and year first above written.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**MAKER**:

ML FASHION/LLC,
a Delaware limited liability company

By: _____
Name:  Stephanie Menkin
Title:   President

[SIGNATURE PAGE TO SECURED PROMISSORY NOTE]

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Schedule attached to Secured Promissory Note dated as of March 29, 2016
of ML Fashion, LLC payable to the order of ML Retail LLC

### LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Notation made by |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

The aggregate unpaid principal amount shown on this schedule shall be rebuttable presumptive evidence of the principal amount owing and unpaid on this Note.  The failure to record the date and amount of any Loan on this schedule shall not, however, limit or otherwise affect the obligations of Borrower under the Credit Agreement or under this Note to repay the principal amount of the Loans together with all interest accruing thereon.

25725673.4

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012546

11242484

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# EXHIBIT 3

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement") dated as of March 29, 2016, is made by **ML FASHION, LLC**, a Delaware limited liability company (the "Debtor"), and **ML RETAIL LLC**, a Delaware limited liability company (the "Lender").

## W I T N E S S E T H:

**WHEREAS,** Debtor and Lender have entered into a Credit Agreement of even date herewith (as amended or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender has agreed to make loans and other financial accommodations to Debtor; and

**WHEREAS**, the obligations of Debtor under the Credit Agreement are to be secured pursuant to this Agreement;

**NOW, THEREFORE**, for and in consideration of any loan, advance or other financial accommodation heretofore or hereafter made to Debtor under or in connection with the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Definitions.   When used herein, (a) the terms "Certificated Security," "Chattel Paper," "Commercial Tort Claims," "Deposit Account," "Document," "Equipment, " "Financial Asset," Fixture, Goods," "Letter-of-Credit Rights," "Inventory," "Instrument," "Investment Property," Security," "Security Entitlement" and "Uncertificated Security" have the respective meanings assigned thereto in the UCC (as defined below); (b) capitalized terms which are not otherwise defined have the respective meanings assigned thereto in the Credit Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"Account Debtor" means the party who is obligated on or under any Account Receivable, Contract Right or General Intangible.

"Account Receivable" means any right of Debtor to payment for goods sold or leased or for services rendered.

"Assignee Deposit Account" is defined in Section 4.

"Collateral" means all property and rights of Debtor in which a security interest is granted hereunder.

"Computer Hardware and Software" means all of Debtor's rights (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including all

25738943.1

FILED DATE: 11/23/2020 4:20 PM   2020L012546

operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

"Contract Right" means any right of Debtor to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

"General Intangibles" means all of Debtor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of Debtor's trademarks, trade names, patents, copyrights, trade secrets, customer lists, inventions, designs, software programs, mask works, goodwill, registrations, licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

"Intellectual Property" means all past, present and future: trade secrets and other proprietary information; trademarks, service marks, business names, designs, logos, indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights; unpatented inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, source codes, object codes and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; and all common law and other rights throughout the world in and to all of the foregoing.

"Liabilities" means all obligations and liabilities of Debtor under the Credit Agreement, any Note, any other Loan Document or any other instrument, document or agreement, now existing or hereafter arising, evidencing any financing, leasing, or other extensions of credit of whatever type or form from time to time made by Lender to or for the benefit of Debtor in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Non-Tangible Collateral" means collectively Debtor's Accounts Receivable, Contract Rights and General Intangibles.

"UCC" means the Uniform Commercial Code as in effect in the State of Illinois on the date of this Agreement; provided that, as used in Section 8 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

2.    <u>Grant of Security Interest</u>.  As security for the payment of all Liabilities, Debtor hereby assigns to Lender, and grants to Lender a continuing security interest in, the following, whether now or hereafter existing or acquired:

All of Debtor's:

(a)    Accounts Receivable;

(b)    Certificated Securities;

(c)    Chattel Paper;

(d)    Commercial Tort Claims;

(e)    Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f)    Contract Rights;

(g)    Deposit Accounts;

(h)    Documents;

(i)    Financial Assets;

(j)    General Intangibles;

(k)    Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(l)    Instruments;

(m)    Intellectual Property;

(n)    Investment Property;

(o)    Letter-of-Credit Rights;

(p)    money (of every jurisdiction whatsoever);

(q)    Security Entitlements;

(r)    Uncertificated Securities; and

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(s)     to the extent not included in the foregoing, other personal property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, and all proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that to the extent that the provisions of any lease or license of Computer Hardware and Software or Intellectual Property expressly prohibit (which prohibition is enforceable under applicable law) the assignment thereof, and the grant of a security interest therein, Debtor's rights in such lease or license shall be excluded from the foregoing assignment and grant for so long as such prohibition continues, it being understood that upon request of Lender, Debtor will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of Lender in Debtor's rights under such lease or license.

3.     Warranties.  Debtor warrants that: (a) no financing statement (other than any which may have been filed on behalf of Lender or in connection with liens expressly permitted by the Credit Agreement ("Permitted Liens")) covering any of the Collateral is on file in any public office; (b) Debtor is and will be the lawful owner of all Collateral, free of all liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute this Agreement and perform Debtor's obligations hereunder, and to subject the Collateral to the security interest hereunder; (c) all information with respect to Collateral and Account Debtor set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by Debtor to Lender is and will be true and correct in all material respects as of the date furnished; (d) Debtor's principal place of business and jurisdiction of organization are as set forth on Schedule I hereto; (e) each other location where Debtor and its subsidiaries maintain a place of business is set forth on Schedule II hereto; (f) Debtor is not now known and during the five years preceding the date hereof has not previously been known by any trade name; (g) Schedule III hereto contains a complete listing of all of Debtor's Intellectual Property; (h) Debtor does not own any motor vehicles; (i) Debtor is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its organization; (j) the execution and delivery of this Agreement and the performance by Debtor of its obligations hereunder are within Debtor's company powers, have been duly authorized by all necessary company action, have received all necessary governmental approval (if any shall be required), and do not and will not contravene or conflict with any provision of law or certificate of formation of Debtor or of any material agreement, indenture, instrument or other document, or any material judgment, order or decree, which is binding upon Debtor; (k) this Agreement is a legal, valid and binding obligation of Debtor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); and (l) Debtor is in compliance with the requirements of all applicable laws (including the provisions of the Fair Labor Standards Act), rules, regulations and orders of every governmental authority.

25738943.1                                          4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

4.    <u>Collections, etc</u>.  Until such time during the existence of an Event of Default as Lender shall notify Debtor of the revocation of such power and authority, Debtor (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by Debtor for such purpose, use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by Debtor for such purpose, and use, in the ordinary course of its business (but subject to the terms of the Credit Agreement), the cash proceeds of Collateral and other money which constitutes Collateral, (b) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as Lender may reasonably request or, in the absence of such request, as Debtor may deem advisable, and (c) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-Tangible Collateral.  Lender, however, may, at any time that an Event of Default exists, whether before or after any revocation of such power and authority or the maturity of any of the Liabilities, notify any parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder and enforce collection of any of the Non-Tangible Collateral by suit or otherwise and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby.  Upon the request of Lender during the existence of an Event of Default, Debtor will, at its own expense, notify any or all parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder.

Upon request by Lender during the existence of an Event of Default, Debtor will forthwith, upon receipt, transmit and deliver to Lender, in the form received, all cash, checks, drafts and other instruments or writings for the payment of money (properly endorsed, where required, so that such items may be collected by Lender) which may be received by Debtor at any time in full or partial payment or otherwise as proceeds of any of the Collateral.  Except as Lender may otherwise consent in writing, any such items which may be so received by Debtor will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Lender until delivery is made to Lender.  Debtor will comply with the terms and conditions of any consent given by Lender pursuant to the foregoing sentence.

Upon demand by Lender, whether or not an Event of Default shall have occurred and be continuing, all items or amounts which are delivered by Debtor to Lender on account of partial or full payment or otherwise as proceeds of any of the Collateral shall be deposited to the credit of a deposit account (each an "<u>Assignee Deposit Account</u>") of Debtor with a financial institution selected by Lender over which Lender has sole dominion and control, as security for payment of the Liabilities.  Debtor shall have no right to withdraw any funds deposited in the applicable Assignee Deposit Account.  Lender may, from time to time, in its discretion, and shall upon request of Debtor made not more than once in any week, apply all or any of the then balance, representing collected funds, in the Assignee Deposit Account toward payment of the Liabilities, whether or not then due, in such order of application as Lender may determine, and Lender may, from time to time, in its discretion, release all or any of such balance to Debtor.

25738943.1

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Lender (or any designee of Lender) is authorized to endorse, in the name of Debtor, any item, howsoever received by Lender, representing any payment on or other proceeds of any of the Collateral.

5.  Certificates, Schedules and Reports.  Debtor will from time to time, as Lender may reasonably request, deliver to Lender such schedules, certificates and reports respecting all or any of the Collateral at the time subject to the security interest hereunder, and the items or amounts received by Debtor in full or partial payment of any of the Collateral, as Lender may reasonably request.  Any such schedule, certificate or report shall be executed by a duly authorized officer of Debtor and shall be in such form and detail as Lender may specify.  Debtor shall immediately notify Lender of the occurrence of any event causing any loss or depreciation in the value of its Inventory or other Goods which is likely to have a material adverse effect on Debtor and such notice shall specify the amount of such loss or depreciation.

6.  Agreements of the Debtor.  Debtor (a) will, upon request of Lender, execute such financing statements and other documents (and pay the cost of filing or recording the same in all public offices reasonably deemed appropriate by Lender) and do such other acts and things (including delivery to Lender of any Instruments or Certificated Securities which constitute Collateral), all as Lender may from time to time reasonably request, to establish and maintain a valid security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Liabilities; (b) will keep all its Inventory at, and will not maintain any place of business at any location other than, its address(es) shown on Schedules I and II hereto or at such other addresses of which Debtor shall have given Lender not less than 10 days' prior written notice, (c) will keep its records concerning the Non-Tangible Collateral in such a manner as will enable Lender or its designees to determine at any time the status of the Non-Tangible Collateral; (d) will furnish Lender such information concerning Debtor, the Collateral and the Account Debtor as Lender may from time to time reasonably request; (e) will permit Lender and its designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice during the existence of an Event of Default) to inspect Debtor's Inventory and other Goods, and to inspect, audit and make copies of and extracts from all records and other papers in the possession of Debtor pertaining to the Collateral and the Account Debtor, and will, upon request of Lender during the existence of an Event of Default, deliver to Lender copies of all of such records and papers; (f) will, upon request of Lender, stamp on its records concerning the Collateral, and add on all Chattel Paper constituting a portion of the Collateral, a notation, in form satisfactory to Lender, of the security interest of the Lender hereunder; (g) except for the sale or lease of Inventory in the ordinary course of its business and sales of Equipment which is no longer useful in its business or which is being replaced by similar Equipment, will not sell, lease, assign or create or permit to exist any Lien on any Collateral other than Permitted Liens; (h) will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, and cause all such policies to provide that loss thereunder shall be payable to Lender as its interest may appear (it being understood that (A) so long as no Event of Default shall be existing, Lender shall deliver any proceeds of such insurance which may be received by it to Debtor and (B) whenever an Event of Default shall be existing, Lender may apply any proceeds of such insurance which may be received by it toward payment of the Liabilities, whether or not due, in such order of

application as the Lender may determine), and such policies or certificates thereof shall, if the Lender so requests, be deposited with or furnished to Lender; (i) will take such actions as are reasonably necessary to keep its Inventory in good repair and condition; (j) will take such actions as are reasonably necessary to keep its Equipment in good repair and condition and in good working order, ordinary wear and tear excepted; (k) will promptly pay when due all license fees, registration fees, taxes, assessments and other charges which may be levied upon or assessed against the ownership, operation, possession, maintenance or use of its Equipment and other Goods; (l) will, upon request of Lender, (i) cause to be noted on the applicable certificate, in the event any of its Equipment is covered by a certificate of title, the security interest of Lender in the Equipment covered thereby, and (ii) deliver all such certificates to Lender or its designees; (m) will take all steps reasonably necessary to protect, preserve and maintain all of its rights in the Collateral; (n) will keep all of the tangible Collateral in the United States; (o) will reimburse Lender for all expenses, including reasonable attorney's fees and charges (including time charges of attorneys who are employees of Lender), incurred by Lender in seeking to collect or enforce any rights in respect of Debtor's Collateral; and (p) will promptly notify Lender of its acquisition of any motor vehicle or Commercial Tort Claim not listed, from time to time, on any Schedule hereto.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne by Debtor. Whenever an Event of Default shall be existing, Lender shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event Debtor shall at the request of Lender do any and all lawful acts and execute any and all proper documents required by Lender in aid of such enforcement and Debtor shall promptly, upon demand, reimburse and indemnify Lender for all costs and expenses incurred by Lender in the exercise of its rights under this <u>Section 6</u>. Notwithstanding the foregoing, Lender shall have no obligation or liability regarding the Collateral or any portion thereof by reason of, or arising out of, this Agreement.

7.    <u>Event of Default</u>. Whenever an Event of Default shall be existing, Lender may exercise from time to time any right or remedy available to it under applicable law. Debtor agrees, in case of an Event of Default, (i) to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) at a convenient place or places acceptable to Lender, and (ii) at Lender's request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable Lender or its nominee to be registered as owner of the Intellectual Property with any competent registration authority. Any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least ten days before such disposition. Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to payment of expenses in connection with the Collateral, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender), and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

8.    <u>General</u>. Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as any Debtor requests in writing, but failure of Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Lender to preserve or

FILED DATE: 11/23/2020 4:20 PM    2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtor, shall be deemed of itself a failure to exercise reasonable care in the custody or preservation of such Collateral.

Any notice from Lender to Debtor, if mailed, shall be deemed given five days after the date mailed, postage prepaid, addressed to Debtor either at Debtor's address shown on <u>Schedule I</u> hereto or at such other address as Debtor shall have specified in writing to Lender as its address for notices hereunder.

Debtor agrees to pay all expenses, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender) paid or incurred by Lender in endeavoring to collect the Liabilities of Debtor, or any part thereof and in enforcing this Agreement against Debtor, and such obligations will themselves be Liabilities.

No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Security Agreement shall remain in full force and effect until all Liabilities have been paid in full and all Commitment has terminated.  If at any time all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including the insolvency, bankruptcy or reorganization of Debtor), such Liabilities shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Liabilities, all as though such application by Lender had not been made.

This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

The rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.  At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Lender a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery.  Immediately upon such execution and delivery (and

FILED DATE: 11/23/2020 4:20 PM   2020L012546

without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, TO THE ADDRESS SET FORTH ON SCHEDULE I HERETO (OR SUCH OTHER ADDRESS AS IT SHALL HAVE SPECIFIED IN WRITING TO LENDER AS ITS ADDRESS FOR NOTICES HEREUNDER) OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS.  DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**EACH OF DEBTOR AND LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the day and year first above written.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**DEBTOR:**

ML FASHION, LLC,
a Delaware limited liability company

By: _____
Name: Stephanie Menkin
Title:   President


**LENDER:**

ML RETAIL LLC,
a Delaware limited liability company

By: _____
Name:  Marcus Lemonis
Title:   CEO

[SIGNATURE PAGE TO SECURITY AGREEMENT]

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**Schedule I**
**To Security Agreement**

**Principal Place of Business**
**and Jurisdiction of Organization**

Principal Place of Business:

38 E. 29th Street
New York, New York 10016

Jurisdiction of Formation:

Delaware

25738943.1

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**Schedule II**
**To Security Agreement**

**Addresses**

Denim & Soul
348 Jericho Turnpike
Syosset, NY 11791

Runway
85 Greenwich Ave.
Greenwich, CT 06830

Runway
7125 Bethesda Ln.
Bethesda, MD 20814

Runway
325 Worth Ave.
Palm Beach, FL 33480

Denim & Soul
4742 River City Drive, Unit #113
Jacksonville, FL 32246

Denim & Soul
2210 N. Halsted St.
Chicago, IL 60614

Denim & Soul
267 East Westminster Ave.
Lake Forest, IL 60045

Runway
720 Waukegan Rd.
Deerfield, IL 60015

Denim & Soul
6810 Snider Plaza
Dallas, TX 75205

Runway
205 South Mill Street
Aspen, CO 81611

Denim & Soul
1827 Union Street
San Francisco, CA 94123

25738943.1

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**Schedule III**
**To Security Agreement**

**Intellectual Property**

| MARK | APP./REG. NO. | FILING/REG/ DATE | GOODS/SERVICES |
|------|---------------|------------------|----------------|
| FSALE (Stylized) | 87218904 | 10/28/2016 | Retail and online retail store services featuring clothing and fashion accessories |

25738943.1