Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOWARD NOURIELI, an individual, and BOWERY
KITCHEN SUPPLIES, INC., a New York corporation,

                                        Plaintiffs,

                    -v-

MARCUS LEMONIS, an individual, MARCUS
LEMONIS, LLC, a Delaware limited liability company,
CAMPING WORLD HOLDINGS, INC., a Delaware
corporation, MACHETE CORPORATION d/b/a
MACHETE PRODUCTIONS, a California corporation;
and DOES 1 through 10, inclusive,

                                        Defendants.

20-CV-8233 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

In a typical episode of the CNBC reality show *The Profit*, host Marcus Lemonis buys a stake in a struggling enterprise and spearheads a business makeover. In 2016, the show featured a store called Bowery Kitchen Supplies. True to form, the episode shows Lemonis buying a 33% stake and engineering a business facelift. But co-owner Howard Nourieli tells a different story: The on-air deal was just for show and Lemonis's check was just a prop. And while Bowery Kitchen did sign a term sheet with Lemonis later, Nourieli claims that it was just a preliminary sketch rather than a binding contract. Thus, when a Lemonis-affiliated store later sold Bowery-Kitchen-branded products, it allegedly infringed Bowery Kitchen's trademark.

Nourieli and Bowery Kitchen bring a host of claims against Lemonis and several entities. Defendants move to dismiss the claims. For the reasons that follow, the trademark-related claims survive while all other claims are dismissed. The trademark claims turn on whether the term sheet was a binding contract, and the complaint plausibly alleges that there was no meeting of the minds, thus no contract, and thus no permission to use Bowery Kitchen's trademark.

## I.    Background

*The Profit* is a CNBC reality show.  It portrays Lemonis as business turnaround specialist.  Each episode features a different fixer-upper business.  As Lemonis explains in the show's introduction:

> My name is Marcus Lemonis, and I fix failing businesses.  I make the tough decisions, and I back them up [by] spending my own money.  It's not always pretty, but this is business.  I do it to save jobs, and I do it to make money.  This is *The Profit*.

(Dkt. No. 23 ("Compl.") ¶ 40.)[1]

Bowery Kitchen Supplies, Inc. was a retail store in the Chelsea neighborhood of Manhattan.  It was featured in a 2016 episode of *The Profit*.  Bowery Kitchen sold knives, glassware, and other kitchen accessories under the trademarked Bowery Kitchen Supplies brand.  Howard Nourieli owns half of the company; Robyn Coval, his former spouse, owns the other half.  (Compl. ¶ 3.)  Nourieli and Bowery Kitchen (but not Coval) are the plaintiffs here.

*The Profit*'s key motif is that Lemonis puts his money where his mouth is.  Instead of just offering advice, he actually buys a stake in the companies that he rehabilitates.  One of the show's producers described to Nourieli the on-air process by which Lemonis negotiates his investments:

> The offer process is a true negotiation.  What you see on [television] is the actual offer and counter . . . The deal is made there and then and like in business, there is no going back once you reach an agreement.  There is no sleeping on it.

(Compl. ¶ 61.)

---

[1] The facts in this section are taken from the First Amended Complaint (the "Complaint") and are presumed true at this stage.  The releases attached to the declaration at Docket No. 46, which are extensively referenced in the Complaint, are likewise considered for the purposes of resolving the motions to dismiss.  *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).

But the fine print said otherwise.  The show's producers asked Bowery Kitchen to sign a "Reality Participant Agreement," which Nourieli did.  (Compl. ¶ 63; Dkt. No. 46-2.)  The section titled "Simulated Investment" provides that the on-air negotiation is just for show:  "[Bowery Kitchen] acknowledges [that] Lemonis will perform [a] Simulated Investment transaction on-air . . . for the purposes of portraying a dramatic moment" and may "present [Bowery Kitchen] with a prop check."  (Dkt. No. 46-2 at 3.)  The real action happens off-air, as laid out in the section titled "Actual Investment/Equity Stake/Loan Transaction."  It provides that the parties "shall negotiate in good faith, in private and off camera, with respect to a potential separate agreement . . . which may differ from the Simulated Investment."  (*Id.*)

*The Profit* filmed at Bowery Kitchen from June through August of 2016.  (Compl. ¶ 65.) The episode aired on CNBC in October 2016.  (Compl. ¶ 66.)  The episode follows a familiar arc: Lemonis encounters a cluttered store and a flailing business; Lemonis dispenses tough love and blunt advice; Lemonis buys a 33% stake in the business for $350,000; Lemonis spearheads a bold redesign of the store and its operations; Lemonis reopens the store; the end.

But the Complaint alleges that the on-air deal was a sham.  Lemonis made Nourieli and Coval an on-air offer of $350,000 for a 40% stake in the business.  Nourieli and Coval turned him down and proposed that Lemonis receive a 33% stake for the same $350,000.  Lemonis accepted their counteroffer on air.  (Compl. ¶ 68.)  But Lemonis gave them nothing other than a prop check. (Compl. ¶ 69.)  And even that was taken away by a producer once the cameras were off.  (Compl. ¶ 70.)  Lemonis did, however, advise Nourieli and Coval (or, per the Complaint, pressured them) to sell off the entire inventory and to renovate the store.  The Complaint implies that Lemonis paid for these renovations.  (Compl. ¶¶ 80, 112.)  But Lemonis never bought—or even tried to buy— an actual ownership stake.

Instead, two months later and toward the end of filming, Marcus Lemonis LLC—a Lemonis-owned company—made a very different offer to Nourieli and Coval off air. The one-page document reads, in its entirety:

> Marcus Lemonis LLC has agreed to pay Bowery Kitchen Supply of $200,000 for working capital, 82k for payroll and rent, and 176k for It infrastructure, and $18,000 for credit cards, and $18,000 to pay down Chase Bank Loan, and renovation etc. in exchange for:
>
> 1. Robin and Howard are exempt from having to turn over any equity of bowery Chelsea market
>
> 2. Robin and Howard are not obligated to pay back any of the above said monies
>
> 3. Robin and Howard are entitled to 10% of all web net revenue not including shipping, taxes or returns but are not obligated to provide any capital but are provided to help with vendor lineup and department expertise
>
> 4. Robin and Howard are entitled to 3% of all revenue from any bowery store opened up globally but are not required to provide any capital and have no liability for anything.
>
> 5. Robin and Howard are entitled to receive 5% of any bowery branded products sold in the marketplace outside of the stores, ie qvc, bed bath and beyond.

(Compl. ¶¶ 88–90; Dkt. No. 23-2.) Nourieli and Coval signed the document, with the following handwritten note: "We discussed rights we keep to N.Y., Miami, Amsterdam." (Dkt. No. 23-2.) Lemonis paid Nourieli and Coval around $290,000, far less than the cumulative $494,000 payment described in the term sheet. (Compl. ¶ 91.)

Lemonis exited the scene after filming wrapped, leaving the particulars of the business relationship to his employees. Lemonis's employees asked Nourieli and Coval to sign agreements allowing Lemonis to use Bowery Kitchen's trademarks. Nourieli and Coval refused. There were negotiations through August 2017, but no agreements were reached. (Compl. ¶¶ 94–104, 116–17.)

Sometime in 2017, the Complaint alleges, Lemonis and his companies began selling products bearing the Bowery Kitchen name and logo in a store called Camping World. (Compl. ¶ 105.) Lemonis is the CEO of Camping World; its stock is publicly traded. (Compl. ¶ 19.) These products were allegedly of inferior quality and sold without Nourieli's and Coval's knowledge or permission. Bowery Kitchen received complaints from customers about the allegedly shoddy products being sold under its brand name. (Compl. ¶ 106.) When Nourieli protested to Lemonis, Lemonis told him that he would change the branding to "Bowery Supplies and Accessories," but the Complaint alleges that this never happened. (Compl. ¶ 110.) Three years later, in March 2020, Bowery Kitchen permanently closed its doors. (Compl. ¶ 118.)

Nourieli and Bowery Kitchen filed this suit after Bowery Kitchen's closing. The complaint names the following defendants: (1) Lemonis, (2) Marcus Lemonis, LLC, or "Lemonis LLC," a company alleged to be controlled by Lemonis; (3) Machete Corporation, a production company that arranged Bowery Kitchen's appearance on *The Profit*; and (4) Camping World, the retail company that allegedly sold the infringing products. (Compl. ¶¶ 16–19.)

The Complaint asserts 16 causes of action: (a) six trademark and unfair-competition counts for the Bowery-Kitchen-branded merchandise allegedly sold by Camping World; (b) New York state law claims for unfair business practices, tortious interference with business relations, and unjust enrichment relating to the same; (c) five fraud counts for allegedly false statements and omissions in the course of the filming; (d) a federal civil RICO claim; and (e) a request for a declaratory judgment voiding the term sheet.

All of the Defendants now move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

## II.     Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if the well-pleaded factual allegations of the complaint, presumed true, permit the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III.    Discussion

The plaintiffs' claims fall into three categories: (1) the trademark-related claims, (2) the fraud claims, and (3) the RICO claim.

### A.      Trademark-Related Claims

The trademark-related claims boil down to the following theory:  Though the term sheet appears to provide that Lemonis LLC may sell "bowery branded products," it was a non-binding preliminary agreement rather than a binding contract, and Lemonis and his companies thus had no right to use the Bowery Kitchen trademark.  Defendants proffer a competing theory:  The term sheet was a binding contract and consent is an absolute defense to infringement claims.  So the key question is whether the term sheet is a binding contract under New York law.[2]

Under New York law, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract."

---

[2] The term sheet contains no choice-of-law provision, and the parties appear to assume that New York law governs the claims.  Application of New York law is therefore appropriate.  *See Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008).  Plaintiffs and Machete disagree on whether the two pre-taping releases (which are separate from the term sheet) are governed by New York or California law, but since all claims against Machete are dismissed on other grounds, the Court need not resolve that issue.

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). But this is not a bright-line rule. Preliminary agreements can be binding "where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities." *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996).

The Second Circuit categorizes preliminary agreements into two types. "Type I" agreements are:

> fully binding preliminary agreements, which are created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. Agreements of this type render the parties fully bound to carry out the terms of the agreement even if the formal instrument is never executed.

*Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008) (cleaned up).

"Type II" agreements are:

> binding preliminary commitments that are binding only to a certain degree because the parties agree on certain major terms, but leave other terms open for further negotiation. These agreements do not commit the parties to their ultimate contractual objective. Rather, they bind the parties to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework. If the parties fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.

*Id.* (cleaned up).

The Second Circuit has identified a list of factors to help determine in which category a particular agreement falls:

> When considering whether an agreement is a type I preliminary agreement, we analyze: (i) whether there is an expressed reservation of the right not to be bound in the absence of a writing; (ii) whether there has been partial performance of the contract; (iii) whether all of the terms of the alleged contract have been agreed upon; and (iv) whether the agreement at issue is the type of contract that is usually committed to writing.

> And when considering whether an agreement is a type II preliminary agreement, we analyze: (i) whether the intent to be bound is revealed by the language of the agreement; (ii) the context of the negotiations; (iii) the existence of open terms; (iv) partial performance; and (v) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Id.* at 124 n.2 (cleaned up).

It is unnecessary to delve too deeply into these factors because the Complaint alleges enough facts that—when accepted as true—could tip the term sheet into the non-binding Type II category.

First, the handwritten note that "[w]e discussed rights we keep to N.Y., Miami, [and] Amsterdam" implies that Nourieli and Coval—the only signatories to the term sheet—intended the term sheet to simply serve as a waypoint for further negotiations and had not assented to all of its terms. *See Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc.*, No. 17-CV-882, 2020 WL 9214290, at *7 (S.D.N.Y. Nov. 4, 2020).

Second, the fact that Lemonis LLC later tried to get Bowery Kitchen to sign away its trademark rights implies that the parties understood that the term sheet did not already do so. *See LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360, 2017 WL 1162181, at *12 (E.D.N.Y. Mar. 27, 2017) (collecting cases).

Last, and most important, many of the terms in the term sheet are vague.  For example, while it provides that Nourieli and Coval would receive 10% of "web net revenue," 3% of "globa[l]" Bowery Kitchen stores, and 5% of "bowery branded products sold in the marketplace outside of the stores," it says nothing about who gets the remaining 90%, 97%, and 95%.  (Dkt. No. 23-2.)  Indeed, the plain text of the term sheet does not say that Lemonis LLC gets anything.  Nor, for that matter, does it expressly say that Lemonis LLC may use Bowery Kitchen's trademark.  It is hard to believe that a sophisticated business intended a vague one-page document, with hand-

written modifications, to serve as the only memorialization of a half-million-dollar transaction. *See Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 419 (S.D.N.Y. 2011).

Lemonis responds that the on-air deal, when combined with the term sheet, evinces an intent to be bound. Lemonis points to the pre-taping email from a producer to Nourieli that "[t]he offer process is a true negotiation. What you see on tv is the actual offer and counter . . . The deal is made there and then like in business, there is no going back once you reach an agreement. There is no sleeping on it." (Compl. ¶ 61.) But the pre-taping release—which talks of "simulated" transactions, "prop checks," and "dramatic moments"—undermines this narrative. (Dkt. No. 46-2 at 3.) It shows quite clearly that the offer process is *not* "a true negotiation," that what is seen on TV is *not* "the actual offer and counter," and that the deal is *not* "made there and then." And of course, the on-air deal was entirely different from the term sheet: The former gave Lemonis an equity stake, while the latter disclaimed any equity stake; the former spoke of a $350,000 payment, the latter of $494,000; and—most relevant here—the on-air deal said nothing about intellectual property rights. The on-air deal, if anything, supports *Nourieli's* narrative that there was no meeting of the minds on the key terms.

To be sure, other facts point in the direction of a binding Type I agreement. The term sheet does not expressly contemplate any further writing, which could imply that the parties intended to be bound by the term sheet itself. This is reinforced by the fact that Lemonis paid Nourieli and Coval $290,000, which might be construed as partial performance. And the Complaint quotes a 2017 email from Nourieli stating that "we agreed to the sales of our marks" in the term sheet. (Compl. ¶ 102.) But these fact-bound considerations are more appropriately raised at summary judgment or trial, not on a motion to dismiss. And indeed, the key precedents on Type I versus

Type II agreements arose in the summary judgment context, not the motion-to-dismiss context. *See, e.g.*, *Vacold*, 545 F.3d at 120; *Brown v. Cara*, 420 F.3d 148, 150 (2d Cir. 2005); *Adjustrite*, 145 F.3d at 545. So the trademark claims—and the related declaratory judgment claim—survive.

For the same reason, the deceptive-trade-practices claim also survives. The Complaint alleges that Lemonis, Lemonis LLC, and Camping World deceived their customers by selling fake Bowery-Kitchen-branded products, in violation of New York General Business Law § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." To assert a § 349 claim, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012) (cleaned up). Some federal district courts have held that ordinary trademark disputes do not implicate § 349 because they do not "pose a significant risk of harm to the public health or interest." *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) (collecting cases and quoting *DePinto v. Ashley Scott, Inc.*, 635 N.Y.S.2d 215, 217 (1st Dep't 1995)). But here, the Complaint contains specific allegations that consumers complained to Nourieli that they were misled by the allegedly fake Bowery Kitchen products sold at Camping World. (Compl. ¶ 106.) Thus, if the trademark-related claims are viable, so might be the claim that consumers were deceived and that the Plaintiffs were harmed.

The same goes for the unjust enrichment claims. The elements of unjust enrichment under New York law are "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch, Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). While the Plaintiffs may be precluded from simultaneous *recovery* for their overlapping claims, they are not

necessarily precluded from *pleading* claims in the alternative.  This is especially true here, where the Complaint disavows the existence of any contract.  *See IMG Universe, LLC v. Diamonds Int'l Corp.*, No. 17-CV-3673, 2017 WL 4797902, at *1 (S.D.N.Y. Oct. 23, 2017).  The unjust enrichment claims thus survive the pleading stage, though they might be dismissed as duplicative later.  *See Int'l Council of Shopping Ctrs., Inc. v. Glob. Infotech LLC*, No. 18-CV-8856, 2019 WL 2004096, at *4 (S.D.N.Y. May 7, 2019).

In contrast, the tortious-interference-with-business-relations claims fail even if the trademark claims are viable.  The elements of this claim are (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship.  *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000).  The Complaint alleges that, by selling fake Bowery-Kitchen-branded products, Defendants interfered with Bowery Kitchen's business relations with its customers.  But these types of generalized allegations about hypothetical business relations are not enough.  *See, e.g.*, *Universal Marine Med. Supply, Inc. v. Lovecchio*, 8 F. Supp. 2d 214, 221 (E.D.N.Y. 1998) (dismissing claim that "defendants [interfered] with business relations between [plaintiff] and 'its customers'" because the complaint did not allege "any specific business relations with a third party" or "any harm to such a relationship").

In sum, the six trademark/unfair competition claims, the GBL § 349 claim, the unjust-enrichment claim, and the declaratory judgment claim—all of which depend on the validity of the term sheet—are not suitable for resolution at this stage.  Dismissal is thus denied as to counts 1–7, 14, and 16.

### B.     Fraud Claims

Plaintiffs allege that Lemonis, Lemonis LLC, and Machete Corp. (a production company that arranged Bowery Kitchen's appearance on *The Profit*) made fraudulent representations to induce them into appearing on the show and to sign the term sheet.  The Complaint thus asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, and promissory fraud.  All of these claims are variations on the same theme, largely sharing the core elements of fraud claims: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."  *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).

The fraud claims do not meet Federal Rule of Civil Procedure 9(b)'s requirement to "state with particularity the circumstances constituting fraud."  Most glaring is the lack of provably false statements or omissions.  The Complaint points to various statements that Lemonis would be "equal business partners" with Nourieli and Coval, that Lemonis would take Bowery Kitchen "to the next level," and that they should "trust the process."  (*See* Compl. ¶¶ 77, 206–207, 219, 227, 236–37, 246–47 (listing alleged fraudulent misrepresentations and omissions).)  But hazy aspirational statements are not fraud.  *See Sidamonidze v. Kay*, 757 N.Y.S.2d 560, 560 (1st Dep't 2003) (holding that "mere puffery, opinions of value or future expectations" do not support fraud claim).  The same goes for "forward-looking statement[s] of opinion."  *Glidepath Holding B.V. v. Spherion Corp.*, No. 04-CV-9758, 2010 WL 1372553, at *9 (S.D.N.Y. Mar. 26, 2010).  The closest that the Complaint comes to alleging a concrete false statement is the pre-taping email from a Machete producer to Nourieli that the on-air negotiation process is real and binding.  But any reliance on that statement was unreasonable given the clear language in the release about the illusory nature of the "simulated" on-air deal.  *See Kosaraju v. Gordon*, No. 17-CV-00383, 2018

WL 1382405, at *4 (S.D.N.Y. Mar. 15, 2018) (collecting cases).  In any event, the Complaint does not quite allege that Nourieli and Coval were unaware of the illusory nature of the on-air deal when they shook Lemonis's hand and took his prop check, nor does it seek to enforce the on-air deal.

Nor does the Complaint specify how Bowery Kitchen was harmed by the alleged fraud. The Complaint admits that Lemonis gave Nourieli and Coval $290,000, spearheaded a renovation that Lemonis paid for, and gave Bowery Kitchen national television publicity.  The only concrete harms alleged in the Complaint are that Lemonis gave Nourieli and Coval bad business advice (which is not actionable[3]) and that Camping World sold Bowery-Kitchen-branded products without permission (which is the subject of the trademark claims).  The Complaint makes no real connection between the one arguably false statement—that the on-air negotiation was real—and any damages suffered by Plaintiffs.  And the Complaint makes no connection at all between the events of 2016 and Bowery Kitchen's closing in March 2020.

To be fair, the Complaint makes a strong case that Lemonis and Machete's contracting practices are far from exemplary.  But the Complaint falls short of pleading fraud.  The fraud claims might have been closer to viable if Lemonis were asking the Plaintiffs for money or laying claim to an equity stake in Bowery Kitchen, but there is no allegation that this has occurred or will occur.[4]   At worst, this is a case of empty rhetoric, sloppy contracting, and trademark infringement—not fraud.

---

[3] Though the Complaint alleges that Nourieli and Coval "did not necessarily agree with [Lemonis's] changes" to the store, it does not allege that Lemonis did anything without their permission or contrary to an express instruction.  (*See* Compl. ¶¶ 73, 80.)

[4] The Complaint alleges that Lemonis threatened to file an IRS Form 1099 for the nearly $600,000 in free "services" that Lemonis claims to have provided to Bowery Kitchen.  But this allegation implies only that Bowery Kitchen might then have had to pay a large tax bill, not that Lemonis was demanding any payment to him.  (*See* Compl. ¶¶ 112, 114–16.)

### C.        Civil RICO Claims

The civil RICO claims are without merit.  The Complaint does not adequately allege a "pattern of racketeering activity" (*i.e.*, two predicate acts of racketeering activity) by an enterprise comprising Lemonis, Lemonis LLC, Machete, Camping World, and their employees.  *See* 8 U.S.C. §§ 1961(5), 1962(c); *see also Rosenson v. Mordowitz*, No. 11-CV-6145, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012) (listing RICO elements).  The alleged fraud predicates are not adequately pleaded for the reasons discussed above.  *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) (holding that fraud-based RICO predicates must meet Rule 9(b)'s pleading standard).  And while the Complaint alleges an additional predicate of trafficking in counterfeit marks, *see* 18 U.S.C. § 2320, the Plaintiffs' opposition brief does not defend this alleged predicate, thus abandoning it.  *See also Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 630 & n.141 (S.D.N.Y. 2006) (collecting cases for proposition that garden-variety trademark infringement is not a RICO predicate).  Nor does the Complaint adequately allege that the Plaintiffs were harmed by the alleged fraud, as explained above.

"[C]ourts have an obligation to scrutinize civil RICO claims early in the litigation—to separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud."  *Rosenson*, 2012 WL 3631308, at *5.  The Complaint here states neither claim.

### D.        Leave to Amend

The Plaintiffs' opposition brief contains a general request for leave to amend.  Since the Plaintiffs have already amended their complaint once, and since the Plaintiffs provide no details on what they wish to add in any amended complaint, leave to amend the dismissed claims is denied. *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011).

**IV.    Conclusion**

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in part and DENIED in part.  All claims against Machete are dismissed; and all claims against the other Defendants are dismissed except counts 1–6 (trademark and unfair competition), count 7 (deceptive business practices), count 14 (unjust enrichment), and count 16 (declaratory judgment).

The remaining Defendants shall file answers to the surviving claims within 21 days after the date of this Opinion and Order.

The Clerk's office is directed to close the motions at Docket Nos. 39, 42, and 44.

SO ORDERED.

Dated:  August 6, 2021
        New York, New York

_____
                        J. PAUL OETKEN
                United States District Judge