UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NICOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of GOOBERRY CORP., a New York corporation,<br><br>        Plaintiffs,<br><br>  v.<br><br>MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, and MARCUS LEMONIS, LLC, a Delaware limited liability company,<br><br>        Defendants,<br><br>and<br><br>GOOBERRY CORP., a New York corporation,<br><br>        Nominal Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.  1:20-cv-04691 |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR LEAVE
TO FILE THEIR SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

THE UNDERLYING INVESTIGATION TO DATE ........................................................................3

THE COURT SHOULD GRANT THE REQUESTED LEAVE .....................................................8

    I.    Applicable Standard ...............................................................................................8

    II.   There Is No Undue Prejudice or Undue Delay.......................................................9

    III.  The Proposed Amendments Are Not Futile .........................................................11

        A.  Additional Allegations Further Supporting Existing Claims............................12

        B.  NBC as the Additional Party ........................................................................17

CONCLUSION ..........................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*99 Com. St., Inc. v. Goldberg*,
   811 F. Supp. 900 (S.D.N.Y. 1993) ...................................................................................21

*Affiliated FM Ins. Co. v. Liberty Mechanical Contractors, Inc.*,
   2013 WL 4526246 (S.D.N.Y. Aug. 27, 2013)................................................................10

*Allen v. WestPoint-Pepperell, Inc.*,
   945 F.2d 40 (2d Cir. 1991) ...........................................................................................15

*Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*,
   2000 WL 815894 (S.D.N.Y. June 23, 2000) ................................................................12

*Am. Soc. of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) .....................................................................................................20

*American Medical Ass'n v. United Healthcare Corp.*,
   2006 WL 3833440 (S.D.N.Y. Dec. 29, 2006)...............................................................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87, 108 (2d Cir. 2007) ...................................................................................11

*Ballard v. Parkstone Energy, LLC*,
   2008 WL 4298572 (S.D.N.Y. Sept. 28, 2008) ...............................................................9

*Bellere v. Gerics*,
   759 N.Y.S.2d 105 (2d Dep't 2003) ...............................................................................24

*Blaskiewicz v. County of Suffolk*,
   29 F. Supp. 2d 134 (E.D.N.Y. 1998) ............................................................................12

*Carpenter v. United States*,
   484 U.S. 19 (1987) .......................................................................................................20

*Chubb INA Holdings Inc. v. Chang*,
   2016 WL 6841075 (D.N.J. Nov. 21, 2016) ...................................................................11

*Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statute of Liberty Ferry, Inc.*,
   2003 WL 253094 (S.D.N.Y. Feb. 4, 2003) ...................................................................12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ..........................................................................12

*Commander Oil Corp. v. Barlo Equip. Corp.*,
   215 F.3d 321 (2d Cir. 2000) ...........................................................................................8

*De Ponceau v. Bruner*,
   2012 WL 1030415 (N.D.N.Y. Feb. 21, 2012)...............................................................10

*Dilworth v. Goldberg*,
    914 F. Supp. 2d 433 (S.D.N.Y. 2012) ...................................................................10

*EBC I, Inc. v. Goldman, Sachs & Co.*,
    5 N.Y.3d 11 (N.Y. 2005) .....................................................................................15

*Env't Sols. Assocs. Grp., LLC v. Conopoco, Inc.*,
    2021 WL 2075586 (S.D.N.Y. May 24, 2021) ...............................................8, 9, 11

*Foman v. Davis*,
    371 U.S. 178 (1962) ...........................................................................................8, 9

*Gitchell v. Corby*,
    881 N.Y.S.2d 783 (4th Dep't 2009) .....................................................................22

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999) ..................................................................................11

*Hoffman v. Verizon Wireless, Inc.*,
    5 N.Y.S.3d 123 (2d Dep't 2015) ..........................................................................23

*IBJ Schroder Bank & Tr. Co. v. Resol. Tr. Corp.*,
    26 F.3d 370 (2d Cir. 1994). ..................................................................................21

*In re "Agent Orange" Prod. Liab. Litig.*,
    220 F.R.D. 22 (E.D.N.Y. 2004) ...........................................................................11

*In re Madison Asset LLC*,
    2021 WL 1894032 (S.D.N.Y. May 11, 2021) ..............................................passim

*Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*,
    450 F. Supp. 3d 358 (S.D.N.Y. 2020) ..................................................................11

*Laurent v. Town of Oyster Bay*,
    79 N.Y.S.3d 638 (2d Dep't 2018) ........................................................................25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ...................................................................................9

*Mandelblatt v. Devon Stores, Inc.*,
    521 N.Y.S.2d 672 (1st Dep't 1987)......................................................................15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*,
    634 N.Y.S.2d 469 (N.Y. 1995)............................................................................13

*Mirand v. City of New York*,
    84 N.Y.2d 44 (N.Y. 1994)...................................................................................25

*Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Ent. Servs.*,
    1996 WL 263008 (S.D.N.Y. May 17, 1996) ........................................................21

*New Oriental Enter., PTE, Ltd. v. Mission Critical Sols. LLC*,
    2021 WL 930616 (S.D.N.Y. Mar. 11, 2021)....................................................8, 9, 11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................12

*Pettaway v. Nat'l Recovery Sols., LLC*,
  955 F.3d 299 (2d Cir. 2020) .................................................................................11

*Powers v. Brit. Vita, P.L.C.*,
  57 F.3d 176 (2d Cir. 1995) ...................................................................................13

*Randolph-Rand Corp. v. Tidy Handbags, Inc.*,
  2001 WL 1286989 (S.D.N.Y. Oct. 24, 2001) .........................................................9

*Richardson Greenshields Sec., Inc. v. Lau*,
  825 F.2d 647 (2d Cir. 1987) .................................................................................10

*Ronzani v. Sanofi S.A.*,
  899 F.2d 195 (2d Cir. 1990) .................................................................................11

*Sachs v. Cantwell*,
  2012 WL 3822220 (S.D.N.Y. Sept. 4, 2012) .........................................................22

*Schmuck v. United States*,
  489 U.S. 705 (1989) .............................................................................................20

*Securities and Exchange Commission v. DCI Telecommunications, Inc*.,
  207 F.R.D. 32 (S.D.N.Y. 2002) .............................................................................10

*Sheridan Drive-In, Inc. v. State*,
  228 N.Y.S.2d 576 (4th Dep't 1962) ......................................................................12

*Soroof Trading Dev. Co. v. GE Microgen, Inc*.,
  283 F.R.D. 142 (S.D.N.Y. 2012) .......................................................................9, 10

*Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*,
  2018 WL 1027754 (S.D.N.Y. Feb. 20, 2018) .........................................................15

*Steinbeck v. Steinbeck Heritage Foundation*,
  400 Fed. Appx. 572 (2d Cir. 2010).......................................................................20

*Szymczak v. Nissan N. Am., Inc.*,
  2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) .........................................................13

*United States v. Clemente*,
  640 F.2d 1069 (2d Cir. 1981) ...............................................................................15

*United States v. Rastelli*,
  551 F.2d 902 (2d Cir. 1977) .................................................................................15

*Williams v. Sidley Austin Brown & Wood, L.L.P.*,
  832 N.Y.S.2d 9 (1st Dep't 2007)...........................................................................12

**Statutes**

18 U.S.C. § 1951 .................................................................................................15

iv

**Rules**

Fed. R. Civ. P. 15 ....................................................................................................................8, 9

Fed. R. Civ. P. 9 ....................................................................................................................11, 12

"Where the proposed amendment requires leave of court, the ***preferred*** course is to grant leave to amend even if doing so renders moot the motion to dismiss, rather than granting the motion to dismiss and rendering moot the motion for leave." *In re Madison Asset LLC*, 2021 WL 1894032, at *1 (S.D.N.Y. May 11, 2021) (Vyskocil, J.).[1]   Here, a lot has changed since Plaintiffs opposed Defendants' motions to dismiss eight months ago.   At least fifty other businesses have come forward claiming they fell victims to the expansive racketeering ring that is behind *The Profit*.   All of these small businesses, most of which are family-run, have been ruined by their experience on the show through an orchestrated, repeated and consistent pattern of misconduct undertaken by Defendants here for more than a decade now, including lies, self-dealing, cover up and intimidation.   And, as it turns out, it is not only Defendants that form this vast conspiracy but also one of the largest most-trusted public broadcasting companies in the country—none other than NBCUniversal Media, LLC ("NBC"), which lured the contestants in with its name-recognition and trusted reputation of a serious business network—only to ruin them in the end by purposefully feeding them into the well-oiled self-dealing and cheating machine that is "CNBC's Marcus Lemonis" and his cronies.[2]

The facts that have been uncovered in the space of the past eight months are numerous and compelling.   The proposed amendment complaint submitted with this motion sets forth not only the newly uncovered evidence but also makes clear that the misconduct alleged exposes the culprits to multiple serious federal and state criminal charges (in addition to the civil claims asserted at bar), including federal tax offenses and state larceny offenses, as well as the vast criminal enterprise that is subject to federal RICO charges.   Indeed, the vast number of complaints, and the strikingly similar accounts provided by the small business owners who are spread across the country and come from a

---

[1]     All internal alterations, quotation marks, footnotes and citations herein are omitted, and all emphasis is added unless otherwise noted.
[2]     NBCUniversal News Group, a division of NBCUniversal, owns and runs CNBC, a television business news channel that created and aired *TheProfit*.   Accordingly, NBC and CNBC are used interchangeably throughout this motion.

wide variety of different industries, supports the conclusion that Defendants, along with NBC, engaged in profoundly unethical and unlawful conduct that harmed dozens of innocent victims appearing on the show. These small business owners were fed false, misleading, and material promises that they and their business would benefit from engaging with the show in several concrete and material ways, but instead had their businesses and livelihoods destroyed while Lemonis and his enablers were enriched at the expense of the very businesses they had promised to preserve and promote. And if they dared to speak up, they were silenced by a remarkably consistent pattern of threats and intimidation, which included purposefully disparaging "review" episodes that NBC aired without blinking an eye. In fact, the combined effect of the nationwide disparagement (which resulted in hate mail, nasty internet reviews, destruction of vendor relationships and ruined reputations—in fact, one of the former participants was driven to suicide), extensive cover up, as well as threats of and actual litigation, silenced many former participants until now. But numbers drive courage, and these former participants are now fifty-plus strong. The time for justice has come.

While the wolf-in-sheep's-clothing may be an overused metaphor, here it fits to the tee—and, remarkably, it was NBC that clothed the wolf here, extensively promoting his legitimacy and making him a household name, luring in more victims in the process. Indeed, NBC originated the show, and it was its role to select and approve businesses to appear on the show and provide initial inducements to such prospective contestants. NBC was also involved in the production of the show, such as, *inter alia*, editing and finalizing episodes of the show, as well as creating the contractual paper trail that covered up the knowing misrepresentations made to lure the victims in and make them stay. NBC also reimbursed Lemonis and his related entities for the funds expended on the show, even though Lemonis used these expenditures to convince the businesses that they were indebted to him and use that debt as a threat to extort an ownership interest in their business. Despite receiving the past participants' complaints as early as 2015, as well as being on notice of the various litigations spanned

by the show and the negative publicity accusing Lemonis of cheating and self-dealing, NBC continued preying on small businesses by extensively promoting "CNBC's Lemonis," thus contributing its name and reputation to his growing legitimacy.

As set forth below, here the newly discovered evidence translates into stronger fraud, fiduciary and RICO allegations, among others, since the criminal enterprise is now well-defined and concrete, given the repeated scheme of luring the victims in and taking them apart, where each Defendant played a long-defined role.  Moreover, it translates into new claims and new parties, all based on the widespread investigation and settlement talks conducted in the past eight months in an effort to move the fifty-one heartbreaking stories of loss and betrayal toward a global resolution.  It is that continuously moving investigation, which brings forward more evidence on a daily basis, combined with the promise of a global resolution, that have precluded Plaintiffs from amending their complaint until now to avoid the disfavored practice of "serial" amendments and, as set forth below, now provide compelling reasons for the requested leave to amend.

## THE UNDERLYING INVESTIGATION TO DATE

Plaintiffs assume the Court's familiarity with the facts at issue and will not belabor them herein.  Plaintiffs initiated this action on June 18, 2020.  (Dkt. No. 1) On the same day, Plaintiffs filed a related action in the Delaware Chancery Court, which focused on the alleged harms that Defendants' inflicted on ML Fashion, a Delaware entity, which was formed by Plaintiffs with Defendant Lemonis after Plaintiffs' appearance on *The Profit*.  By contrast, the action at bar concerned Gooberry Corp, a New York entity, which was Plaintiffs' family business that they brought on the show.  On August 17, 2020, Plaintiffs here amended their complaint in this action, as of right and on their own, without any benefit of the Court's guidance as to the claims pending at bar.  (Dkt. No. 24.)  Defendants responded with motions to dismiss, which have been fully submitted since December 18, 2020.  As the parties advised this Court (Dkt. Nos. 57-58), on March 30, 2021, the Delaware court ruled that

3

the claims concerning ML Fashion should be litigated in this court.  (*See* Dkt. No. 57 at Ex. A (the "Delaware Order').)  Yet, by that point, Plaintiffs' counsel has been apprised of the additional victims of the same pattern of misconduct alleged herein and was in the middle of the ongoing attempts to bring justice to Plaintiffs and the additional victims, now numbered at more than fifty, to a global resolution.  (*See generally* Affidavit of Gerard P. Fox ("Fox Aff."), submitted herein.)  As more victims continued to come forward and more evidence emerged with each day, it took all the time from then until now to set forward a truly comprehensive pleading that avoids the disfavored practice of "serial" amendments.

Although addressed in further detail in connection with the proposed amended pleading below, as well as in the proposed amendment complaint itself (*see* SAC at ¶¶ 42-211), the new evidence overall demonstrates the following scheme underlying the common enterprise of fraudulent and racketeering activities by the existing and new proposed defendants:

**The Hook.**  Each and every one of the small business owners were initially convinced to appear on *The Profit* as a result of factual representations by the representatives of NBC, Lemonis and Machete that appearing on the show would materially assist their businesses to, among other things:

• "Take the company to the next level,"
• "Get out of debt and grow the business,"
• "Expand into retail locations,"
• "Invest in the business" and "save jobs,"
• "Help the brand to grow and to become nationally recognized,"
• "Bring in new ideas,"
• "Help transform [the] business to run more efficiently, be more profitable and ultimately more successful,"
• Connect the business to other "wholesalers and distributors,"
• "Help the family business expand and provide much needed support," and
• "Help [the owner] become a millionaire."

The small businesses were assured that they would be "in good hands and not to worry" and that the show would be "great for their business."  These material "pretenses, representations, or

promises," along with the allure of appearing on a network television program seen across the country, were the hook that initially lured the small business owners into defendants' scheme.  One small business owner was even told that appearing on the show would be "life-changing" and akin to "winning the lottery."

These business owners were then strong-armed to acquiesce to draconian contractual paperwork without seeking legal advice by defendants' employment of high-pressure sales tactics, such as they must "urgently sign the documents in order to secure their spot on the show" or to "not miss out on this once in a lifetime opportunity," or they were told that the contract was a "take it or leave it" situation.  In the alternative, the small business owners were reassured that the language in the contract was "boilerplate" and "did not apply to them or the show."  Not one of the small business owners who expressed reservations was encouraged to seek independent legal advice, even though they were typically unsophisticated and without in-house legal guidance and were interacting with a well-represented, major television network.  Instead, the small business owners were told to "trust the process" as if the process had been designed to protect their interests, rather than the interests of the network and its star, Marcus Lemonis.

The high-pressured tactics were necessary because defendants knew that the "hook" representations were a lie and needed to cover up their tracks with boilerplate unknowing releases.  Indeed, defendants made these representations knowing they were a lie because they knew that the past contestants were actually harmed (and many destroyed) by the show.  Tellingly, of the fifty-one small businesses that have come forward, none improved their business circumstances following the appearance on *The Profit*, and a substantial percentage of them became insolvent, forced to close their businesses, or faced dramatically reduced profitability.  Others saw their owners forced out of their own companies.  And these profoundly negative consequences were all in the service of ensuring that "CNBC's Lemonis" enriched himself as a result of preying on the businesses he promised to protect.

**The Switch.**   Virtually every episode of *The Profit* begins with an initial on-air agreement that involves Lemonis purporting to make a substantial financial investment in the small business owner's company in exchange for an interest in the business.  The initial agreements follow a familiar pattern: they are always oral agreements and are never promptly formalized into a binding contract.  Lemonis once bragged that he "never signs a contract right away," as if declining to sign an enforceable contract in advance of exercising power over one's counterparty is something to be avoided at all costs, as opposed to how all honest business people conduct their business affairs.  Often, during the initial episode, Lemonis presents the small business owners with an oversized check in the amount of the promised investment, only for the Machete staff to take the check back from the small business owner once the cameras are no longer running.  The full promised investment virtually never materializes.

Even though no legally binding contract exists, Lemonis decisively declares on air that he is "100% in charge" and effectively takes over the business, overcoming any lingering reluctance or trepidation by encouraging contestants to "trust the process," which is uttered as a solemn incantation that disarms the small business owners into believing that they are in the hands of an expert who will deliver on all of his promises.  The problem, of course, is that once disarmed, the small business owners find themselves increasingly underequipped to defend themselves against Lemonis' single-minded efforts to create a television program with conflict and drama, and to enrich himself and his own companies at the expense of the small business owners who appear on the show.

Following the initial on-air phony agreement and Lemonis' declaration that he is "100% in charge," Lemonis unilaterally orders significant and costly changes to the small business that invariably causes the business to go deeply into debt, leaving them highly vulnerable to and dependent

on Lemonis' help.[3]  Along the way, Lemonis almost always lines his own pockets through a variety of means.  Many of these changes had serious side effects, in addition to increased debt, that negatively impacted the small businesses.  For example, in connection with ordering some of the small businesses to relocate offices, stores, or warehouse space, Lemonis sometimes directed the small business owners to stop paying the business' current mortgage or rent, ultimately leading to foreclosures and/or evictions.  In other cases, Lemonis directed the small business owners to stop paying vendors and suppliers, ultimately leading to the loss of valuable business relationships and irreparably damaged reputations.  Other changes put unusual strains on relationships within the businesses, resulting in resignations, firings, untimely departures, and ruined personal relationships.

Once the businesses are thus weakened, they are ready to be preyed on.  At this point, Lemonis pressures them into changing the agreement aired during the show to include terms more favorable to him, but which the small business owners feel compelled to accept because of their increased dependence on Lemonis. In the alternative, Lemonis simply fails to fulfil his commitments under the

---

[3]       The changes Lemonis ordered on the shows depicting the fifty-one small businesses that have come forward include:

  • Costly and unnecessary store or warehouse renovations, often using companies controlled by Lemonis to profit off the renovations.  The cost of the renovations and the interruption of business activity caused by the store or warehouse closures, forces the small businesses into debt and into becoming more deeply dependent on Lemonis' assistance;

  • The closures for renovations are often accompanied by the sale of current inventory at steep discounts to allow the renovations to proceed, again making the businesses financially vulnerable and dependent on Lemonis;

  • Closing low-cost warehouse arrangements (often owned by the business) and costly moves to new expanded spaces often requiring renovations;

  • Re-branding or brand redesign, often of a profitable and popular brand without a clearly articulated business rationale, resulting in the undermining of the brand;

  • Switching to more expensive vendors or vendors with a relationship with Lemonis;

  • Re-formulation of recipes, ingredients, or changes in manufacturing processes or materials, undermining the uniqueness of the product and the reason for its success;

  • Forcing the company to purchase costly new equipment;

  • Hiring new staff loyal to Lemonis, and firing of long-time staff loyal to the business owner;

  • Directing the small business owners to work on projects for the benefit of other Lemonis entities or other companies appearing on *The Profit*, without any or insufficient benefit to the owners and their companies;

  • Purchase of new inventory before expanding the customer base, where the new inventory often is not what the business owner's customers want, resulting in the business ultimately being forced to sell the new inventory at a deep discount, causing deeper debt;

  • Expanding the number of stores (often requiring renovations) without appropriate due diligence to ensure the business need, as well as changing the business' core business model, switching to a new, inferior manufacturer, adding a new product line, incurring unnecessary business expenses, and forcing the business to work with a competitor.

agreement while holding the small businesses to their commitments.  Many businesses are thereafter

unable to recover and fail.  To the extent they complain, Lemonis and other defendants unleash threats

to demand immediate payment of the expenses incurred for the renovations, or to foreclose on the

debts Lemonis caused the businesses to incur, and to take control of the companies.  The businesses

are also threatened with litigation and "review" episodes that further disparage them across the

country.  It is unsurprising that many of the business that have come forward still want to remain

confidential and are acting as such for purposes of the motion at bar, since Lemonis unleashes a flurry

of lawsuits against anyone that publicly comes forward, as he did with Plaintiffs here, having sued

them on three sperate occasions since they filed the action at bar (two separate cases in Illinois, which

are now dismissed, and a currently pending lawsuit in the federal court in Connecticut).

## THE COURT SHOULD GRANT THE REQUESTED LEAVE

## I.     Applicable Standard

This Court's "***preferred*** course is to grant leave to amend even if doing so renders moot the

motion to dismiss, rather than granting the motion to dismiss and rendering moot the motion for

leave."[4]  This is because "[c]ourts should freely give leave [to amend] when justice so requires."[5]

"Amendments are generally favored because they tend to facilitate a proper decision on the merits,"

and "[l]eave to amend should be freely given absent 'undue delay, bad faith or dilatory motive on the

part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment,

[or] futility of amendment.'"[6]

Where, as here, Plaintiffs "seek to amend to add new substantive allegations that go to the

---

[4]        *Madison*, 2021 WL 1894032, at *1-2 (electing "to grant Plaintiff leave to amend and to deny the pending motion
to dismiss as moot.  As noted, this is the preferred course where the amended complaint requires leave of court."); *see
also Env't Sols. Assocs. Grp., LLC v. Conopoco, Inc.*, 2021 WL 2075586, at *2 (S.D.N.Y. May 24, 2021) (Vyskocil, J.)
(same); *New Oriental Enter., PTE, Ltd. v. Mission Critical Sols. LLC*, 2021 WL 930616, at *2 (S.D.N.Y. Mar. 11, 2021)
(Vyskocil, J.) (same)
[5]        *Madison*, 2021 WL 1894032, at *1, citing Fed. R. Civ. P. 15(a); *see also Commander Oil Corp. v. Barlo Equip.
Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) ("[I]t is rare for an appellate court to disturb a district court's discretionary
decision to allow amendment.").
[6]        *Madison*, 2021 WL 1894032, at *1, citing, *inter alia*, *Foman v. Davis*, 371 U.S. 178, 182 (1962).

heart of their claim—allegations to which Defendant[s] ha[ve] not had an opportunity to respond in [their] motion," this Court follows the "preferred" course of action of granting leave to amend and rendering pending motion to dismiss moot.[7]   This is especially so where, as here, the proposed amended complaint seeks to add new parties.[8]   Indeed, this Court's practice is entirely "consistent with the liberal standard of Rule[ ] 15 ..., and with the Second Circuit's '**strong preference** for resolving disputes on the merits.'"[9]

## II.   There Is No Undue Prejudice or Undue Delay

"The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial."[10]   Defendants cannot satisfy it here.   The case at bar is in its infancy.   There has been no discovery and no scheduling conferences—indeed, there have only been the complaint, Plaintiffs' amendment of the complaint, and Defendants' motions to dismiss, which have been briefed and submitted.   "[A]t this early stage in the litigation," this Court usually finds "no undue delay by Plaintiffs and prejudice to Defendant[s] from permitting amendment …."[11]   Notably, to the extent Defendants take issue with the amendment based on any increased costs of responding to the new evidence, that is not cognizable "undue" prejudice.[12]

Similarly, there is no "undue" delay.   As discussed, Plaintiffs have noticed their intent to amend the complaint as soon as the Delaware court stayed the related action before it and ordered

---

[7]   *Madison*, 2021 WL 1894032, at *2; *accord Env't Sols.*, 2021 WL 2075586, at *2.

[8]   *See New Oriental*, 2021 WL 930616, at *2 (electing to grant leave to amend and render pending motion to dismiss moot where plaintiff sought "leave to amend to add two new parties, who have not yet been afforded an opportunity to respond to the alleged claims").

[9]   *Madison*, 2021 WL 1894032, at *2, citing, *inter alia, Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

[10]   *Ballard v. Parkstone Energy, LLC*, 2008 WL 4298572, *5 (S.D.N.Y. Sept. 28, 2008); *see also Randolph-Rand Corp. v. Tidy Handbags, Inc.*, 2001 WL 1286989, *3 (S.D.N.Y. Oct. 24, 2001) ("Prejudice alone … is insufficient to justify denial of leave to amend; rather the necessary showing is *undue* prejudice to the opposing party.") (original emphasis), citing *Foman*, 371 U.S. at 182.

[11]   *Madison*, 2021 WL 1894032, at *2 (finding that "[t]here is no undue prejudice because the parties are far from trial, no Defendant has answered, no Rule 16 conference has been held, and no discovery deadlines have been established"); *accord Env't Sols.*, 2021 WL 2075586, at *2; *New Oriental*, 2021 WL 930616, at *2.

[12]   *See Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 152-153 (S.D.N.Y. 2012) ("To the extent that [defendant] complains about added time and cost, [a]llegations that an amendment will required the expenditure of some additional time, effort, or money do not constitute undue prejudice.").

Plaintiffs to litigate the claims asserted in Delaware in this Court instead.  Yet while Plaintiffs were in the middle of preparing an amended pleading to account for their Delaware claims, the underlying investigation of the experiences of the fifty other small businesses that were demolished by Lemonis and his cronies continued to produce additional evidence in support of Plaintiffs' claims here—and that evidence kept coming with more businesses joining each passing month.  Rather than waste this Court's valuable resources by engaging into the disfavored practice of "serial amendments,"[13] Plaintiffs elected to amass as much information as possible to bring it all together in one amended pleading.[14]  In fact, Plaintiffs' requested amendment is proper even where based on their preexisting knowledge (if any).[15]

.      Moreover, as this Court recently confirmed, "mere delay, absent bad faith or undue prejudice, is not alone grounds to deny leave to amend."[16]  There is certainly no evidence of bad faith here, since Plaintiffs' counsel have been pursuing global resolution through a series of settlement communications with NBC, keeping the latter appraised of the new evidence being developed.  Plaintiffs' counsel also have been informed that Mr. Lemonis is in continuous communication with NBC concerning the developing evidentiary record.   In fact, as outlined in Plaintiffs' recent communications with the Court (*see* Dkt. No. 63), Mr. Lemonis has recently instructed his legal counsel to seek a global stay of all the *Profit*-related litigation, especially where Mr. Lemonis and his

---

[13]      *De Ponceau v. Bruner*, 2012 WL 1030415, at *15 (N.D.N.Y. Feb. 21, 2012).

[14]      *See Soroof*, 283 F.R.D. at 152-153 (granting leave to amend "approximately one year and seven months from the deadline for amendment" where the delay was caused by discovery of new facts underlying the proposed amendment); *cf. Richardson*, 825 F.2d at 653 n.6 (citing cases where parties "have been permitted to amend their pleadings to assert new claims long after they acquired the facts necessary to support those claims").  *See also American Medical Ass'n v. United Healthcare Corp.*, 2006 WL 3833440, at *4 (S.D.N.Y. Dec. 29, 2006) (finding no undue delay where party moved to amend several months after learning relevant facts in discovery); *Securities and Exchange Commission v. DCI Telecommunications, Inc.*, 207 F.R.D. 32, 34-35 (S.D.N.Y. 2002) (allowing amendment where plaintiff obtained discovery supporting amendment a few months before filing motion).

[15]      *See Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 460 (S.D.N.Y. 2012) ("[T]he motion to amend will not be denied by reason of plaintiffs' delay in alleging facts that were previously within their knowledge."); *see also Affiliated FM Ins. Co. v. Liberty Mechanical Contractors, Inc.*, 2013 WL 4526246, *5 (S.D.N.Y. Aug. 27, 2013) (allowing amendment after nine months despite movant's knowledge of relevant information at time of initial pleading because party "need not prove that they uncovered new facts or law" to receive leave to amend).

[16]      *Madison*, 2021 WL 1894032, at *2, citing *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting cases).

related entities are defendants, as they are here.  Plaintiffs understood the instruction to be in furtherance of the parties' efforts to achieve global resolution in the face of the mounting evidence involving fifty other small businesses that have been harmed in the same way as Plaintiffs here.  Given that the new evidence underlying much of the proposed amended allegations is of recent vintage, there is no "undue" delay.[17]

This is especially so given that this "Court is also mindful of judicial economy and preserving the parties' resources."[18]  As this Court observed, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint," and [g]ranting leave to amend the complaint after granting a motion to dismiss is particularly appropriate where, as here, the heightened pleading standard for fraud under Rule 9(b) applies."[19]  As such, just like this Court found on previous occasions, "[i]t is in the interest of judicial economy for Plaintiffs to amend now rather than after a ruling of Defendants' motion to dismiss.[20]

## III.    The Proposed Amendments Are Not Futile

As this Court has observed, "[i]n the interests of judicial economy and in the absence of undue prejudice, the Court may decline to engage in a detailed futility analysis where the Court finds that these arguments are better suited for consideration in the context of a motion to dismiss."[21]  There are no reasons to depart from that precedent here.  Should the Court choose to engage into the futility analysis at this point, Defendants will be unable to satisfy their burden on demonstrating futility,[22] as

---

[17]    *See Madison*, *Madison*, 2021 WL 1894032, at *2 (concluding there was no undue delay where the amendment was based on recently uncovered deposition testimony, which existence defendant previously denied).
[18]    *Madison*, 2021 WL 1894032, at *2, citing *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020), and *In re "Agent Orange" Prod. Liab. Litig.*, 220 F.R.D. 22, 25 (E.D.N.Y. 2004) (considering "impact of granting leave on judicial economy").
[19]    *Madison*, 2021 WL 1894032, at *2, citing, *inter alia*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007), *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999), and *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990).
[20]    *Madison*, 2021 WL 1894032, at *2; *accord Env't Sols.*, 2021 WL 2075586, at *2.
[21]    *Madison*, 2021 WL 1894032, at *2 (concluding that the Court "declines to consider Defendants' futility arguments at this juncture"), citing *Chubb INA Holdings Inc. v. Chang*, 2016 WL 6841075, at *6 (D.N.J. Nov. 21, 2016) (collecting cases); *accord Env't Sols.*, 2021 WL 2075586, at *2; *New Oriental*, 2021 WL 930616, at *2.
[22]    *See Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 377 (S.D.N.Y. 2020) (party opposing motion bears the burden of establishing futility).

shown below.  This is because the proposed amendments "set[] forth facts and circumstances which may entitle the plaintiff to relief," which is all that required to support the proposed amendment.[23]

### A.      Additional Allegations Further Supporting Existing Claims

To the extent the proposed amendments seek to add greater specificity to the existing claims, they cannot render them futile; rather, they will make the claims stronger.  Back in June 2020, when the case at bar was initiated, Plaintiffs lacked the collective knowledge of the past contestants that they are in possession now.  It took time for the past contestants to come forward, and many still wish to remain anonymous for fear of retribution.  That collective knowledge, which underlies many of the allegations of the proposed amended complaint, may be properly considered as further strengthening Plaintiffs' claims, especially their fraud allegations.[24]

**Fraud-Based Claims.**  As Plaintiffs have now learned, Defendants' "hook and bait" to lure Plaintiffs on the show by representing the past contestants' purported success stories and Lemonis' purported investment as seen on TV to help the featured businesses was false, and Defendants knew it.  Even if there were past successes, Defendants cannot speak in half-truths and conceal that many businesses were actually destroyed.[25]  In fact, Defendants' suppression of information concerning part contestants' failures amounts to Defendants' actual concealment.  Indeed, "[t]he suppression of

---

[23]      *See Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statute of Liberty Ferry, Inc.*, 2003 WL 253094, at *1 (S.D.N.Y. Feb. 4, 2003) ("Even where the possibility of relief is remote, amendment must be permitted because 'it is the possibility of recovery, not its likelihood, that guides the court's analysis.'"); *see also Blaskiewicz v. County of Suffolk*, 29 F. Supp. 2d 134, 138 (E.D.N.Y. 1998) (holding that if the movant has at least colorable grounds for relief, justice requires that the court grant leave to amend a complaint).

[24]      *See, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405-06 (S.D.N.Y. 2020) (approving plaintiffs' reliance on accounts of multiple confidential witnesses for purposes of particularized pleading under Rule 9(b) as long as the sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"), citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

[25]      *See, e.g., Williams v. Sidley Austin Brown & Wood, L.L.P.*, 832 N.Y.S.2d 9, 11 (1st Dep't 2007); *Sheridan Drive-In, Inc. v. State*, 228 N.Y.S.2d 576, 585 (4th Dep't 1962); *accord Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*, 2000 WL 815894, at *4 (S.D.N.Y. June 23, 2000) (collecting New York authorities to demonstrate that "[f]raud in the inducement occurs when the victim of the fraud is aware that a contract is in contemplation, but his or her consent to the bargain is obtained by lies or half-truths").  Plaintiffs will assume application of New York law for purposes of this motion only.  While there are contractual documents in the record mandating application of California law, Plaintiffs have also alleged that those contracts were fraudulently induced.  Plaintiffs reserve their rights to argue application of California law should they find it applicable in the future.

material facts which a person is in good faith bound to disclose is evidence of and equivalent to a false representation."[26]   The alleged concealment is now further strengthened by Plaintiffs' allegations of fiduciary breaches, in addition to the already existing obligation based on Defendants' superior knowledge.[27]

While Plaintiffs could only suspect that other businesses must have been similarly harmed based on their own experience on the show,[28] now they know that at least fifty other businesses were actually harmed, and many destroyed.  (*See* SAC at ¶¶ 42 & 94.)  In fact, none of these businesses improved their circumstances in any way, and a substantial percentage of them became insolvent, forced to close their businesses, or faced dramatically reduced profitability, while others saw their owners forced out of their own companies.  (*See id*. at ¶ 94.)  Moreover, the "hook and bait" concerning purported success stories is only a half-truth considering Defendants' non-disclosure of Lemonis' extensive history of self-dealing in connection with the show by, *inter alia*, (1) causing participating companies to contribute funds to Lemonis' owned companies, and (2) making participating companies incur substantial expenses, or to lose clients, so that the company's owners would be left with no other choice but to agree to surrender to Lemonis an equity stake in return for financial assistance.  (*See id*. at ¶ 95.)

The proposed amendment also strengthens Plaintiffs' allegations that Defendants representation that "as shown on TV" investments were real was based on knowingly false information.  This is because it is now clear that Defendants purposefully suppressed the reality that

---

[26]     *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*, 634 N.Y.S.2d 469, 470 (N.Y. 1995).

[27]     *See Powers v. Brit. Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995) ("A fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information; unique access to information can also trigger such a duty.").

[28]     Notably, courts allow fraudulent omission claims to proceed despite "sparse" allegations where "plaintiffs' allegations rely on information that is more likely in the possession of defendants than plaintiffs," *see, e.g., Szymczak v. Nissan N. Am., Inc*., 2011 WL 7095432, at *19 (S.D.N.Y. Dec. 16, 2011).  The information concerning past contestants that were harmed by their appearance on the show was in Defendants' possession at the time they made their representations to Plaintiffs.

the actual deals in the past were regularly, in fact usually, different from the deals shown on the show, such that the participants did not get the net infusion of capital once the costs required from them during Lemonis' consultancy were taken into account.  (*See* SAC at ¶ 102.)  Defendants also failed to disclose that: (1) Lemonis planned to cause their company to incur substantial expenditures that could not be deemed an effort to "improve [the] Company's business or property" because the expenses would leave the company in financial extremis unless the owners accepted Lemonis' deal; (2) that Lemonis' regularly used his consultancy to cause companies to incur debts that exceeded the amount that he later offered to invest; and (3) that he was not simply acting for their best interest because he regularly caused contestants to incur substantial expenditures to his own companies.  (*See id*.)  In fact, one of Lemonis' former accountants testified that Lemonis told him it was never his intention to provide any funding but rather claim investment through renovations and equipment purchases done on the show as a capital contribution.  (*See id*.)

**RICO.**  In similar vein, the proposed amendments supply further specificity as to Plaintiffs' other claims, such as Plaintiffs' RICO claims.  This is so because the other contestants' experiences strengthen allegations of the vast cohesive enterprise, wherein each group of Defendants (Machete, Lemonis and his entities, and now the new proposed party, NBC) played its own well-rehearsed designated role—from Machete's "hook and bait," which the other Defendants directed and controlled, to Lemonis' provision of his personality, fame, purported business acumen and fraudulent misrepresentations to further lure potential contestants, his entities' provision of corporate vehicles and purported financing, and NBC's lending its name recognition and serious reputation of a business network to the whole enterprise, while also contributing coordination of the whole enterprise and promotion thereof.  (*See* SAC at ¶¶ 592-594.)  The repetitive scenario of the techniques used to lure in and then destroy these businesses (by, *inter alia*, drowning them in debt that was often owed to Lemonis-related entities, underselling their inventory and destroying their vendor relationships)—all

so that Lemonis could take advantage of them for his own benefit—provide further specificity and detail supporting Plaintiffs' RICO claims.  (*See id.* at ¶¶ 601-606.)

In this connection, the new allegations also lend support for the additional predicate allegations, such as extortion under the Hobbs Act, 18 U.S.C. § 1951.  (*See id.* at ¶¶ 598-600.) Extortion "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force or fear," which includes fear of economic loss.[29]  It has now become clear that Lemonis' threats to foreclose on Plaintiffs' debt, which he saddled them to begin with, were part and parcel of the similar pattern of threats used to intimidate other contestants.  This is extortion, which fits into the pattern of the enterprise alleged based on the past participants' experiences that are now known to Plaintiffs and that include similar pattern of misconduct.

**Fiduciary Breaches.**  Finally, Plaintiffs' additional allegations expand the alleged fiduciary duties owed to them by Lemonis based on the mutual agreement between them that he would act on Plaintiffs' behalf.[30]  In fact, this need not be a formalized relationship to give rise to fiduciary obligations.[31]  As the additional allegations show, the alleged fiduciary relationship began before the show and continued throughout its course.  This is because contestant companies were recruited to go on the show (by Machete, Lemonis, and NBC) through the statements that Lemonis would act in their best interests during the show.  (*See* SAC at ¶¶ 68-69 & 74-75.)  Moreover, they were also told he would act in good faith during the deal negotiation stage.  (*See id.* at ¶ 69.)  Lemonis thus offered

---

[29]     *United States v. Clemente*, 640 F.2d 1069, 1076 (2d Cir. 1981); *United States v. Rastelli*, 551 F.2d 902, 904 (2d Cir. 1977).

[30]     *See Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*, 2018 WL 1027754, at *4 (S.D.N.Y. Feb. 20, 2018) (finding similar allegations sufficient to establish a basis for fiduciary duty), citing, *inter alia, Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."); *see also EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19-20 (N.Y. 2005) (finding allegations of "advisory relationship" sufficient to support a pleading of fiduciary duty: "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.  Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions.").

[31]     *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (fiduciary obligations properly arise from "informal relations which exist whenever one [person] trusts in, and relies upon, another") (original alteration).

15

to provide advice for their benefit, and the structure of the show assured contestants that he was acting on their behalf and placed them in a position of reliance on him, as they were obligated to act in good faith to take his advice. This combination of an agreement to act on another's behalf and the understanding that the other is relying on the person imposes on that person fiduciary duties, including a duty of care, good faith, and a duty of loyalty. This is especially so given that Lemonis also took full control over a participating company's business during his consultancy, acting on its behalf.

As the proposed complaint's allegations further show, Lemonis has developed a consistent pattern of fiduciary breaches as to Plaintiffs and other contestants by, *inter alia*, causing a contestant company to incur expenditures that put the company in a vulnerable position, or advising a company to take actions—such as to not pay a mortgage, move to new office space that it turns out is occupied, or not honor other contracts—that he knew would leave the company less well off, either absolutely or absent an intervention by the fiduciary. (*See* SAC at ¶ 74.) He also acted in bad faith by giving advice designed to cause the owners to sell either an ownership interest in the company or their intellectual property at an unfair price—such as a price they would not have accepted prior to accepting his advice. (*See id.* at ¶¶ 130 & 133.) Specifically, as to Plaintiffs here, Lemonis consistently drowned the company in debt to make it beholden to him based on the loans extended through his corporate vehicles and caused them to undersell expensive inventory that he hoisted upon them in the first place. (*See id.* at ¶¶ 272, 315-319, 331 & 333-339.) Furthermore, Lemonis' fiduciary breaches included extensive self-dealing, such as, *inter alia*, (1) causing companies to purchase goods or services from, or in any way become indebted to, Lemonis or a company he owned; (2) advising one contestant to move out of its office space in Miami and into office space in New York that he showed them, representing them as empty, knowing that the offices were occupied by a Lemonis-owned company; and (3) selling another company's branded goods (and goods of other contestants) at stores that he owned without obtaining uncoerced informed voluntary consent. (*See id.* at ¶¶ 131-

133.)[32]

**B.      NBC as the Additional Party**

The proposed amended complaint also seeks to bring direct and secondary liability claims against NBC that developed, promoted and supervised the show through its network, CNBC, as addressed below.

**Direct Liability.**  NBC is directly liable because it is an important participant in hooking in potential victims.  To do so, NBC extensively promotes the show and touts Lemonis as the savior of small businesses, all the while lending its reputation as the serious business network to the whole operation.  In fact, as part of NBC's promotional tour in 2017, Lemonis expressly touted the past participants' "success on the Profit."  In other words, NBC provides the platform and credibility for the whole scheme to work.  In fact, many of the past participants stated that they would not have even considered getting involved with the show was it not for the fact that it was on CNBC, a serious established business channel with its long-standing wide-ranging reputation.  (*See* SAC at ¶¶ 152-156.)

But NBC's role does not stop with mere promotion and aura of credibility.  As it has become clear based on the past participants' consistent accounts, NBC, through its network, CNBC, was intimately involved in creating and producing the show.  Even prior to Machete's involvement in the production of *The Profit* when NBC worked with a different production company in 2013, NBC used its reputation and prestige as a news network to convince businesses that Marcus Lemonis was a trusted business advisor who would transform their businesses.  In fact, CNBC's website refers to *The Profit* as its "***original*** series."  From the first season, CNBC itself emailed potential participants, most of which were thriving but looking to expand, to appear on the show.  These emails emphasized

---

[32]      Plaintiffs' proposed amended complaint includes additional new claims, yet, since the futility burden is on the Defendants, it is beyond the scope of this motion to address all the proposed claims.  In this connection, the claims included in the proposed amended complaint under the Delaware order are similarly not futile, as Plaintiffs demonstrated through briefing before the Delaware court, which is incorporated fully herein.  (*See* Fox Aff., Exs. 1-3.)

that it was "a new ***CNBC*** Television show" that was looking for business participants, and that the new program would be a "New ***CNBC*** Reality Show" that would provide a "top BUSINESS EXPERT" to "help transform your business to run more efficiently"—indeed, the email expressly promised that the expert "***is going to invest at least $2,000,000 of his own money*** … to help small to mid-size businesses ***become more successful***." In fact, those emails repeated the CNBC signage at least four times throughout those emails to drive home the point that the offer is real and serious, as it had the backing of the trusted network to support it. (*See id.* at ¶¶ 45-48.)

NBC did not stop there either. It followed up with targeted letters promising that the show was designed to "help make you money," while stamping the CNBC signage all over the letters once again and touting the same "***at least $2,000,000 investment of [Lemonis'] own money*** … to ***help businesses across America become more successful***." (*See id.* at ¶ 50.)

As it turns out, NBC was so heavily involved in getting the show on the road because it originated it. Indeed, it did not simply buy it from Machete. Instead, Jim Ackerman, Executive Vice President of CNBC, was heavily involved in its creation and production. Mr. Ackerman repeatedly approached Amber Mazzola, Executive Producer at Machete, with the opportunity to produce the show for CNBC, as confirmed by Ms. Mazzola herself during a podcast that aired on June 10, 2020. (*See id.* at ¶¶ 45-46.) This means that the show originated at CNBC and not with Machete. As Ms. Mazzola confirmed, ""I started the very first season of *The Profit*. It was not my show as a company owner. I was the showrunner on it. I was an executive producer still helped with casting, the budget, and did everything. Actually, I ***even formatted the show you know with Marcus and the network***, and it didn't work out with the production company with the network, … so Jim [Ackerman] gave the show to me into my company [after the first season]." (*Id.* at ¶ 47.)

But even after Machete took over production, NBC remained heavily involved in the final details regarding production of the show, providing notes to Machete and directing edits for it to make

to the episodes.  (*See id.* at ¶¶ 58 & 173.)  In Lemonis' own words, "CNBC runs the show" (*id.*).  NBC was also heavily involved in the selection of the businesses that would appear on the show.  When asked how the businesses that appear on the show are selected, Ms. Mazzola explained that Machete looks through thousands of applications, and then they "present it to Marcus [Lemonis] ***and the network***, and you know everyone sort of weighs in what they like."  (*Id.* at ¶ 216.)  Indeed, many of the past participants recall conversations with Kimberly Donnan, the supervising producer on "*The Profit*/CNBC," and Alex Anam, the senior producer on "*The Profit*/CNBC," wherein they conveyed the network's approval of these particular businesses' participation.  (*See id.* at ¶ 174.)  Indeed, the very titles of these producers convey the network's omnipotent presence.  Moreover, NBC required approval of media requests after filming and received such approvals where appropriate.  (*See id.* at ¶ 175.)

Finally, NBC is also instrumental in perpetuating the lie that the show helps businesses.  Indeed, on CNBC's own website, it depicts only allegedly positive experiences and does not discuss the businesses that were harmed and destroyed.  (*See id.* at ¶ 87.)  In fact, it even depicts certain of the fifty businesses that are acting as confidential witnesses in support of the proposed amended complaint as if their experience on the show was a success, even if the business has since closed due to Lemonis' involvement.  NBC expressly boasted about the "incredible results" the businesses in the first six episodes of the show obtained (*id.* at ¶ 66), yet those businesses are now among the fifty past participants that have come forward and having been harmed and/or completely destroyed by the show.  NBC has also hosted events throughout the country that feature past businesses from the show, and NBC promotes these events, and the show itself, as part of ***CNBC***'s pursuit of its "continuous goal to help small businesses become successful."  (*Id.* at ¶ 173.)

Notably, CNBC expressly promises to "provide you with the life line to save your business" through the show, despite NBC's knowledge that the show often leaves the participants worse off and

actually destroys them.   (*Id.* at ¶ 209.)   NBC's misrepresentations continue with statements that Lemonis "successfully turned around over 100 companies," "[is] putting his own money directly into the failing businesses" and "has invested nearly $50 million of his own money in the companies featured on the series."   (*Id.* at ¶ 49.)   Plaintiffs and the other fifty businesses attest that those statements are misleading because they fail to account for their ruinous experiences on the show.

From start to finish of each episode and beyond, NBC was directly involved in the creation and production of *The Profit*, making it an integral part of the RICO enterprise (in addition to facing direct liability for all of the other Defendants' conduct), since it was the one that, *inter alia*, aired the show to induce participants to join and turn over control to Lemonis because participants saw other companies shown as benefitting from the show.[33]

**Vicarious/Secondary Liability**.   NBC is also liable for Plaintiffs' losses based on several theories of vicarious and/or secondary liability.

**(1)**   **Agency**.   NBC is liable as Defendants' principal in both an actual and apparent agency relationship.   NBC's liability as the principal extends to the torts and unlawful conduct committed by Defendants.[34]   An agency relationship "results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act."[35]   There are two types of authority, actual authority and apparent authority:

> An agent enjoys implied authority to enter into a transaction when verbal or other acts by a principal reasonably give the appearance of authority to the agent.   In apparent authority cases, the words or conduct are communicated to a third party so as to lead the third party to believe that the agent acts with authority granted by the principal. Reliance on implied or apparent authority is acceptable so long as it is reasonable from

---

[33]   *Cf. Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) ("It is sufficient for the [broadcast] to be incident to an essential part of the scheme, or a step in [the] plot [to qualify for RICO]."); *see also Carpenter v. United States*, 484 U.S. 19, 28 (1987) (finding circulation of the Wall Street Journal in a scheme involved trading on nonpublic information to subscribers qualified as "not only anticipated but an essential part of the [RICO] scheme").

[34]   *See, e.g., Am. Soc. of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("[P]rincipal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority.").

[35]   *Steinbeck v. Steinbeck Heritage Foundation*, 400 Fed. Appx. 572, 575 (2d Cir. 2010).

the circumstances surrounding the transaction.[36]

Here, the facts will show that it was reasonable for Plaintiffs and other past participants to rely on Defendants' apparent authority based on, *inter alia*: (1) NBC's statements on its website that "The Profit is produced for CNBC by Machete Productions with Amber Mazzola serving as executive producer.  Marcus Lemonis, Mike Riley, Deirdre Bianchi and James Bolosh are the executive producers for CNBC" (SAC at ¶ 170); (2) the various contractual documents that Plaintiffs and past participants were forced into, which were drafted by and required by the network as a condition of being on its show—in fact, they specifically referred to the network as responsible for the exhibition of the show and expressly conveyed that the network had the right to control the production, including giving directions and removing contestants, as well as the right to undertake certain other production-related activities, including filming and photography (*see id*. at ¶¶ 175-177); and (3) NBC's continued promotion of Lemonis and the show as its own show, creating the impression that Defendants were authorized to act on behalf of the network—indeed, Lemonis is often referred to as "CNBC's Marcus Lemonis."  (*See id*. at ¶ 42 (also summarizing extensive similar social media branding).)  This branding speaks for itself, and it speaks volumes to potential participants.

Finally, NBC's ratification of Defendants' conduct by approving the footage and thereafter broadcasting it as part of the show also supports apparent authority.[37]  This is despite the fact that many of the past participants have written to NBC repeatedly, specifically by the past individual participants in 2014 and 2015 and by a group letter in 2018, complaining about the harm inflicted upon them on the show and providing specific details of the misconduct.  (*See* SAC at ¶ 59.)  The 2018 Inc. Magazine article placed NBC on further public notice of the misconduct claimed by the

---

[36]    *99 Com. St., Inc. v. Goldberg*, 811 F. Supp. 900, 906 (S.D.N.Y. 1993) (collecting state law precedent); *see also Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Ent. Servs*., 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996) ("Where reliance on apparent authority is reasonable in light of the circumstances surrounding the transaction, a principal is barred from disavowing obligations assumed by its agent.").

[37]    *See, e.g., IBJ Schroder Bank & Tr. Co. v. Resol. Tr. Corp*., 26 F.3d 370, 375 (2d Cir. 1994).

show's past participants.  (*See id.* at ¶¶ 194-196.)  In fact, in that article, NBC executives continued to perpetuate the lies that "[t]he checks [given on the show] are legit" and "[t]he deals that are made on the show are legit."  (*Id.* at ¶ 210.)  NBC was further on notice of the multiple litigations that followed the show; indeed, it is publicly available information through, *inter alia*, Camping World's SEC filings.  (*See id.* at ¶ 183.)[38]  When past participants try to fight back, they are silenced by threats and intimidation.  (*See id.* at ¶ 150.)  When they do not comply, Lemonis creates special recap shows that disparage them even more, and NBC airs those shows.  (*See id.* at ¶ 149.)  As such, NBC's continuous ratification supports claims based on apparent agency.

**(2)   Actual/Apparent Employment Relationship**.  Relatedly, NBC's above-described actions support its holding out of the Defendants as NBC's employees.  To determine whether there is an employment relationship, which is a type of an agency relationship, "the critical factor is the degree of the employer's '[c]ontrol of the method and means by which the work is to be done.'"[39]  As discussed, NBC manifested that Defendants were its employees by creating the clear public impression that the profit was NBC's show, and that Lemonis was hired by NBC as the host of its show and Machete was hired by NBC to produce its show.  In fact, given the degree of control exercised by NBC over the recruiting (including through direct contact through casting agency and multiple events across the country), production and airing of the show, the facts establish that there

---

[38]     Even without that evidence, however, as discussed above, NBC is involved in the show's editing; as such, it is complacent in the consistent false portrayals of these business owners as incompetent, rude or unethical and the harm inflicted on these businesses by destroying their reputations, vendor relationships and any hope for future success  As one poignant instance demonstrates (*see* SAC at ¶ 58), in an episode that aired in early 2014, the past participant that owned a toy company confirms that lines were dubbed, images were doctored, and edits were maliciously constructed in order to make the company's management look idiotic, rude, and deplorable.  For example, during the filming of the show, Lemonis asked a woman at a local toy dealer to be difficult with the owner.  The woman frustrated him to a point where he pointedly asked the woman, "can you read?"  The show used that dialogue to insert it into a completely different scenario where the same owner was doing a focus group with small children.  The episode falsely made it seem as though the past participant in question snapped at a little girl asking her, "can you read?"  As a result, this past participant received numerous threats from shocked and angry parents.  Each time NBC airs the episode, this past participant receives another wave of hate, and each NBC's re-air causes new injuries and damages.  Other contestants report similar experiences.
[39]     *Sachs v. Cantwell*, 2012 WL 3822220, at *18 (S.D.N.Y. Sept. 4, 2012), citing *Gitchell v. Corby*, 881 N.Y.S.2d 783, 785 (4th Dep't 2009).

was an actual employment relationship between NBC and Defendants—or, at the very least, it was reasonable for participants to so conclude.  This is further confirmed by CNBC hosting a full bio of Lemonis on its website and devoting pages of content to promoting his persona, which it also does through extensive social media campaigns.  (*See* SAC at ¶ 164.)  CNBC's website at one point refers to him as an "executive producer ***for*** CNBC."  (*See id.*)  The impression that Lemonis is CNBC's employee is further strengthened by the exclusivity of the relationship—after becoming the star of *The Profit*, Lemonis only provided hosting services to CNBC.  (*See id.* at ¶ 172.)  He did not work for other networks.  Similarly, CNBC's website continues advising that the show is "produced ***for*** CNBC by Machete Productions," and many Machete employees involved in the show, such as its executive producers, are listed with titles that include CNBC branding.  (*See id.* at ¶ 170.)  As discussed, the contractual documentation contestants were forced to sign also stated that the show was prepared for CNBC.  The combined impression that these statements create is that Defendants work for CNBC.

As the allegations further show, Defendants' conduct was within the scope of their apparent employment by NBC, making the latter liable for Defendants' tortious conduct.[40]  This is because Machete's representations about the nature of the show, such as that the deals are real and that Lemonis helps businesses, are within producers' scope of apparent employment.  Lemonis, as a host, similarly acted within the scope of his apparent employment when he made the same misrepresentations.  In fact, Lemonis' statements about the show are all over CNBC's website, signifying the latter's endorsement thereof.  Similarly, Lemonis' self-dealing transactions perpetrated as part of the show also appeared to be within the scope of his apparent employment because these dealings were fed to the participants as part of Lemonis' advice and strategy, for which NBC hired

---

[40]      *See, e.g., Hoffman v. Verizon Wireless, Inc.*, 5 N.Y.S.3d 123, 125 (2d Dep't 2015) ("Pursuant to the doctrine of respondeat superior, an employer can be held vicariously liable for torts committed by an employee acting within the scope of employment.  Intentional torts as well as negligent acts may fall within the scope of employment.").

him in the first place and promoted him thereafter.

In fact, Lemonis' self-dealing appears to have been ***presupposed*** by NBC.  The deals, and Lemonis' willingness in them, was integral to *The Profit*.  Lemonis' appeal as a host stemmed in part from his ability to benefit while appearing to help the contestant companies.  NBC understood that Lemonis was motivated, in part, by desire for personal gain.  Such transactions do not appear to have been prohibited.  And he did not have to tell NBC what he did.  Lemonis' gain from this conduct thus most likely ***lowered the amount that NBC would need to pay for his services.***  (*See* SAC at ¶ 180.) It also was part of the benefit that enabled CNBC to keep him interested in this highly profitable show.  Thus, while Lemonis did benefit directly from the self-dealing, his ability to engage in self-dealing transactions also operated to NBC's benefit, making it an assumed part of his employment.

**(3)**     **Negligent Supervision**.  To the extent any of Defendants' actions were not within their scope of employment, NBC is still liable for negligent selection, retention, supervision or otherwise failing to control Defendants as its agents.[41]  Here, NBC had notice of the potential for the tortious conduct at issue because the show was structured to prove Lemonis with unfettered ability to control the companies in a context where he would benefit form either self-dealing or undermining the participants' financial situation such that they could not refuse his control.  This should have alerted NBC to exert (at least) some degree of oversight over the transactions on the show.  But instead of asserting oversight, NBC provided contractual framework to enable it even further.  Moreover, NBC had actual notice of the misconduct once complaints came pouring in, and the participants troubles became publicized through, for example, the Inc.com article.  There were at least three lawsuits stemming from the show, which placed NBC on further notice.

NBC could have responded to this notice by implementing several low-cost but essential

---

[41]     *See, e.g., Bellere v. Gerics*, 759 N.Y.S.2d 105 (2d Dep't 2003) (observing that liability depends on whether the principal "knew or should have known of the [agent]'s propensity for the conduct which caused the injury").

changes to its supervision practices over Defendants, such as requiring Lemonis not to self-deal on the show, to provide contestants with full disclosure of his past dealings, to accurately depict the offers made on the show, including the actual costs incurred by the contestants, or to disclose to NBC's compliance office the proposed actions that he recommended to the contestants.  But NBC did nothing; instead, it chose to amass substantial profits from Defendants' misconduct on the show. NBC's failure to undertake these simple oversight steps is causally linked to the participants' harms because those steps could have prevented them.[42]

**(4)** **Aiding and abetting**.  Finally, the above-recited evidence also supports aiding and abetting liability by NBC, since its actions satisfy the "substantial assistance" element required by the claim, including the actual/constructive knowledge underlying the required assistance.[43]  Even if the past participants' emails and letters, in addition to prior litigations and articles, did not provide actual knowledge, NBC knew there was high probability that the actual deals differed materially from the ones showed on the show and that Lemonis was self-dealing, yet it continued its active role in the scheme by continuing to promote and air *CNBC*'s *The Profit* despite the consistent misconduct and abuses on the show so that NBC could continue ripping substantial benefits built on the scores of destroyed small family-owned businesses that trusted NBC with their very livelihoods.

Accordingly, there are several grounds for NBC's liability that demonstrate the proposed claims against it are not futile.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the requested leave to amend and deny pending motions to dismiss as rendered moot thereby.

---

[42]     *See, e.g., Mirand v. City of New York,* 84 N.Y.2d 44, 50-51 (N.Y. 1994) (upholding jury verdict on negligent supervision where defendant was on notice of prior violent behavior yet failed to institute measures to prevent the injury); *Laurent v. Town of Oyster Bay*, 79 N.Y.S.3d 638, 640 (2d Dep't 2018) (same where owners of skating ring could have prevented the injury by appropriate supervisory measures).

[43]     *See, e.g., Sayles v. Ferone*, 26 N.Y.S.3d 527, 528 (1st Dep't 2016); *see also In re Nine W. LBO Sec. Litig.*, 505 F. Supp. 3d 292, 315 (S.D.N.Y. 2020) (accepting "actual or constructive knowledge" allegations in support of the aiding and abetting claim); *cf. In re Kingate Mgmt. Ltd. Litig.*, 2016 WL 5339538, at *27 (S.D.N.Y. Sept. 21, 2016) (accepting allegations of willful blindness to support an aiding and abetting claim), *aff'd*, 746 F. App'x 40 (2d Cir. 2018).

Dated: August 20, 2021                    **GERARD FOX LAW P.C.**


_/s/ Gerard P. Fox_

Gerard P. Fox (_admitted pro hac vice_)
Marina V. Bogorad (_pro hac vice forthcoming_)
1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
gfox@gerardfoxlaw.com

26