UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NICOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of GOOBERRY CORP., a New York corporation and ML FASHION, LLC, a Delaware limited liability company, | : : : : : : | Civil Action No. 1:20-cv-04691 |
| Plaintiffs, | : : | |
| v. | : : | **SECOND AMENDED COMPLAINT** |
| MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, and MARCUS LEMONIS, LLC, a Delaware limited liability company, and ROBERTA RAFFEL aka Bobbi Lemonis, an individual, and MLG RETAIL, LLC, a Delaware Limited Liability Company, and MACHETE CORPORATION d/b/a/ MACHETE PRODUCTIONS, a California corporation, NBCUniversal Media, LLC, a Delaware corporation, | : : : : : : : : : : : | **DEMAND FOR JURY TRIAL ON ALL CLAIMS SO TRIABLE** |
| Defendants, and | : : | |
| GOOBERRY CORP., a New York corporation, and ML Fashion, LLC, a Delaware limited liability company, | : : : | |
| Nominal Defendants. | : : : : | |

Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin") (collectively, "Plaintiffs"),

by and through their undersigned counsel, individually and on behalf of Gooberry Corp.

("Gooberry") and ML Fashion, LLC ("ML Fashion"), bring this action against Defendants Marcus

Lemonis ("Lemonis"), ML Retail, LLC ("ML Retail"), Marcus Lemonis, LLC ("ML, LLC")

(collectively "Lemonis Entities"), Roberta Raffel aka Bobbi Lemonis ("Raffel"), and MLG Retail, LLC ("MLG Retail"), Machete Corporation dba Machete Productions ("Machete") and NBCUniversal Media, LLC ("NBCUniversal"), (collectively "Defendants") and allege as follows:

## INTRODUCTION

1.    This amended complaint is the result of a recent eight-month investigation, now involving a former district attorney and a top law school professor, and a world renown psychiatrist that was spurred by the coming forward of no less than seventy (70) family businesses that have been (and in streaming still are) tragically depicted falsely in an unforgiveable manner by NBCUniversal Universal Media, LLC ("NBC") and it's network CNBC on *The Profit*, and destroyed through the forced and fraudulent indebtedness and crafty theft of the trusted advisor host, Marcus Lemonis.[1]  The show that has run for seasons on national television and streamed internationally by NBC and CNBC is not only false in its premise and in the story told to viewers, but it is the vehicle through which black owned businesses started out of poor neighborhoods, and Latino owned businesses started through generations, and women owned businesses and LGBT businesses were seduced onto a TV show where false promises were made in writing and in the adds, and in the very documents they use to try to gain a release that is not enforceable under the law, and then they used "counselors" and the detailed financial information given in trust as tools to embarrass, manipulate and psychologically fully destroy, cripple or set back as many as 70 companies, and for sure and at least 51 who have presented their hellish nightmare to Comcast and NBC openly, honestly, and again, with trust.  Those companies don't exist today for the most part, as is the case with Plaintiff Gooberry and so many others, and Marcus Lemonis is left holding the

---

[1] NBCUniversal News Group, a division of NBCUniversal, owns and runs CNBC, a television business news channel that created and aired *The Profit*. Accordingly, NBCUniversal, NBC and CNBC are used interchangeably herein.

assets and the most important ones, after stealing and leveraging away inventory, key employees, money, intellectual property, trade secrets, and more – and the soul of each of these people. One victim on the show later killed themselves in large part on account of the ugly and false way the family was portrayed. Several have contemplated it, and they have formed a victims' network to try to support each other through a process of depression, humiliation, embarrassment, and anger. A former key NBC executive who ran the show not surprisingly told the principal of Gooberry at Marcus Lemonis' own lavish wedding that it weighed on his mind that the "fraud would get out." It is out now. This case seeks careful and firm justice, and no matter how many big firm lawyers come at these already destroyed and humiliated and defamed victims and the clients in this case, justice is the only thing these poor small businesses and in many cases minority owners have left to seek.

2.      This action also arises from the fraudulent scheme, bad faith actions, and breaches of the fiduciary duties of, Defendant Marcus Lemonis via the entities he controls, including ML Retail, LLC, a shareholder of Gooberry Corp. and Marcus Lemonis, LLC, a partial owner of ML Fashion, LLC.

3.      Defendants Lemonis, ML Retail, LLC and ML, LLC have knowingly and purposefully mismanaged Gooberry Corp. and ML Fashion, LLC and used them solely for their own personal gain. Defendants are siphoning money from these companies, actively preventing them from meeting their obligations, and lootings their assets, and commingling their assets.

4.      Defendant Marcus Lemonis is a wolf in sheep's clothing, and a false prophet who uses his fame and fortune to steal small businesses from everyday Americans. Through NBC's television show, *The Profit,* Lemonis presents himself as a savior of struggling small business owners, all the while preying on the business he purports to be saving. Lemonis strategically and

deliberately drowns these businesses in debt to him and his entities in order to foreclose on them and take their assets and intellectual property to expand his own empire.

5.     Plaintiffs Goureau and Menkin's family-owned high-end women's clothing store, Courage.B, was featured on a 2014 episode of *The Profit*. Courage.B began business in 2008 and was owned and operated by Neomi Goureau and her children, Plaintiffs Goureau and Menkin, through their entity Gooberry Corporation ("Gooberry") which owned the Courage.B brand and stores.

6.     Over the next six years, Plaintiffs' family business, Courage.B, became very successful. In 2014, Courage.B had seven different retail stores around the country, including locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA, and was valued at over $2.6M based on Lemonis' own investment.

7.     In their episode of *The Profit*, Lemonis agreed to invest in Courage.B by acquiring a 30% interest in Gooberry for $800,000. That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 whose use was to be determined.

8.     However, while the show was filming, and before the deal was finalized, Lemonis spent millions of dollars to do an unnecessary and shabby remodel of its stores. Lemonis represented to Plaintiffs that he was taking care of the associated costs, that Plaintiffs did not have to worry about the costs involved, and that they should "trust the process." Plaintiffs had no idea that Lemonis was vastly exceeding the stated $200,000 renovations budget.

9. When Plaintiffs received the exorbitant bills for the renovations and questioned the costs being incurred on Gooberry's behalf, Lemonis said if they no longer wanted to do the deal, they would have to pay him back the millions he allegedly spent on Gooberry—a demand that was impossible for Plaintiffs to meet. No backup for this exorbitant bill was ever provided.

10. Thus, the parties moved forward. On November 18, 2014, the deal reached on the show was memorialized and Lemonis purchased his stake in Gooberry through Defendant ML Retail, LLC.

11. As detailed below, Lemonis was sure to give himself unbridled control over Gooberry by allowing himself, as owner CEO of ML Retail, to make any and all business decisions for Gooberry without the consent of Goureau or Menkin.

12. Once Lemonis had control of Gooberry, he began to use it for his personal gain. Time and time again, as set forth below, Lemonis forced Gooberry to become further indebted to him by unnecessarily renovating and rebranding stores, buying inventory above what Gooberry could afford, and buying inventory that was not needed for Gooberry.

13. These debts often forced Gooberry to obtain loans from one of Lemonis' controlled entities to meet its payment obligations such as payroll and rent.

14. Eventually, Lemonis needed more control over the women's fashion business he entered into with Plaintiffs. By March 2016, Lemonis had destroyed Gooberry's profit margins and saddled it with debt owed to himself and his entities that neither Gooberry nor the Plaintiffs could every repay. Lemonis represented to Plaintiffs that the only way they could make money from their business ventures now was to join him in investing in other businesses.

15.     Thus, Lemonis convinced Goureau and Menkin to start a new entity with him, ML Fashion.  Lemonis represented to Plaintiffs that ML Fashion would be the umbrella entity through which the parties would invest in various retail clothing and fashion businesses, brands, and stores.

16.     As detailed below, Lemonis was sure to give himself unbridled control over ML Fashion as its Manager, Chairman/CEO, and owner of ML Retail, LLC, a part owner of ML Fashion.  Lemonis discouraged Plaintiffs from having independent attorneys review the documentation by having attorneys that were supposedly representing ML Fashion draft the documents.  These attorneys, however, represented Lemonis in a variety of other businesses and personal matters and hid their unethical conflicts of interest and never secured a waiver.

17.     Lemonis used his unchecked control over ML Fashion for his personal gain to the detriment of ML Fashion and Plaintiffs.  Time and time again, Lemonis forced ML Fashion to take on unnecessary debts in order to force ML Fashion to obtain loans from another entity controlled by Lemonis, often ML, LLC, to meet its obligations, such as payroll and rent.  Whenever Plaintiffs questioned his decisions, Lemonis would respond with threats to either foreclose on ML Fashion, fire their mother Neomi, or fire Plaintiffs themselves.  ML Fashion was now Plaintiffs' livelihood, and they had no choice but to fall in line.

18.     In 2016, Lemonis met Defendant Raffel at a trade show in New York City.  Raffel wanted Lemonis to invest in her business, Runway Boutique ("Runway"), which operated a store in Deerfield, Illinois.  Lemonis was smitten with Raffel and forced Gooberry to purchase her business, renovate her store, and buy new product for the store.  With their romance in full swing, Lemonis and Raffel then decided to use ML Fashion, and its infrastructure built by Plaintiffs, to grow their personal fashion brand and retail concept, MARCUS, instead of Plaintiffs' brand, Courage.B.

19.     Recently, Lemonis has taken his misconduct, mismanagement, and misuse of power over Gooberry and ML Fashion to the next level. Lemonis is actively using the global pandemic to further loot the companies and remove money from their bank accounts so that their debts – which debit automatically from their bank accounts – cannot be paid. Lemonis has unilaterally closed Gooberry's retail stores and is in the process of doing the same for ML Fashion, and is moving inventory, furniture, fixtures, and equipment to other entities and/or businesses owned or controlled by Lemonis.

20.     As discussed below, Defendants used the television show, *The Profit*, to bait small business owners into Defendants' web. Defendants made fraudulent representations that Defendants would be helping the small businesses, when in reality, they were setting them up to fail so that Defendants could take the businesses for themselves. Defendants' fraudulent and deceptive scheme violates the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

21.     Without the Court's intervention, Gooberry and ML Fashion will be irreparably harmed. Through this Complaint, Plaintiffs seek redress for Lemonis' mismanagement of Gooberry and ML Fashion, the appointment of a receiver to prevent Lemonis from further harming Gooberry and ML Fashion, and to hold Defendants accountable for their RICO violations, for breaching their fiduciary duties, the ML Fashion LLC Agreement (defined and described below), wasting corporate assets, and operating Gooberry and ML Fashion as a self-enrichment vehicle for Lemonis and the Lemonis Entities.

## PARTIES

22.     Plaintiff Goureau is an individual, a resident of Florida, and co-founder and a majority shareholder of Gooberry Corp. Goureau is an entrepreneur and clothing and retail

executive. He is a signatory to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 34% of the shares of the Company. Together with his sister, Plaintiffs Goureau and Menkin own 56% of the shares of Gooberry, a majority interest in the Company.

23.　　Plaintiff Menkin is an individual, a resident of New York County, and co-founder and a minority shareholder of Gooberry Corp. Menkin is an entrepreneur and clothing and retail executive. Menkin is a signatory to the Shareholder Agreement (defined and described below) and owns 22% of the shares of the Company. Together with her brother, Plaintiffs Menkin and Goureau own 56% of the shares of Gooberry, a majority interest in the Company.

24.　　Nominal Defendant Gooberry Corp. is a privately held New York corporation. Gooberry has its principal place of business in New York, New York and owned and operated a number of fashion brands and retail stores that have included Runway, Denim & Soul and Courage.B.

25.　　Nominal Defendant ML Fashion is a privately held Delaware limited liability company. ML fashion has its principal place of business in New York, New York and owns and operates a number of fashion brands and retail stores across the country.

26.　　Defendant Marcus Lemonis is an individual domiciled in Illinois and is the owner of ML, LLC and ML Retail, LLC. Lemonis is an investor and featured business fiduciary advisor of CNBC's reality show, *The Profit*. Lemonis signed the Stock Purchase Agreement (defined and described below) on behalf of ML Retail, LLC. Upon information and belief, Lemonis also signed the Shareholder Agreement (defined and described below) on behalf of ML Retail, LLC. Lemonis is the Manager and Chairman/CEO of ML Fashion and owns a 33.34% membership interest in ML Fashion through his entity ML Retail, LLC. Lemonis signed the Limited Liability Company on

behalf of ML Retail, LLC He is also chairman and CEO of Camping World, Good Sam Enterprises, Gander Outdoors, and The House Boardshop.

27.     Defendant ML Retail, LLC ("ML Retail") is a Delaware limited liability company with its principal place of business in Illinois. ML Retail is a party to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 32% of the shares of the Company. Lemonis is the sole member of ML Retail and has complete control over ML Retail. ML Retail is the alter ego or agent of Lemonis, and ML, LLC and operates as Lemonis' personal holding company.

28.     Defendant Marcus Lemonis, LLC ("ML, LLC") is Delaware a limited liability company with its principal place of business in Illinois. The sole member of ML, LLC is Marcus Lemonis Enterprises, LLC, whose sole member is the Marcus Lemonis Revocable trust, whose trustee is Marcus Lemonis. ML, LLC is the alter ego or agent of Lemonis, and ML Retail operates as Lemonis' personal holding company.

29.     Defendant Roberta Raffel aka Bobbi Lemonis ("Raffel") is an individual residing in Illinois.

30.     Defendant MLG Retail, LLC ("MLG Retail") is a Delaware limited liability company. MLG Retail has its principal place of business in New York, New York. MLG Retail's sole member is ML Fashion.

31.     Defendant Machete Corporation dba Machete Productions ("Machete") is a corporation organized and existing under the laws of California with a principle place of business in the State of California.

32.     Defendant NBCUniversal Media, LLC ("NBCUniversal") is a Delaware corporation with its principal place of business in New York, New York. NBCUniversal is a mass

media and entertainment conglomerate and owner of CNBC. Thus, all acts by, and liability incurred by, CNBC, constitutes acts of, and liability incurred by, NBCUniversal. NBCUniversal does business throughout New York and across the United States.

33. Plaintiffs are informed and believe, and based thereon allege that, at all times herein mentioned, Defendants Lemonis and Machete were the agents and/or employees of NBCUniversal, and at all times herein mentioned, were acting within the scope of such agency and/or employment and represented they had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified such action to take place.

34. At all times relevant to this action, Defendant Lemonis has had exclusive and complete dominion and control over ML Retail and ML, LLC, such that these entities were his alter egos and the acts of ML Retail and ML, LLC as set forth in this Complaint are also the acts of Defendant Lemonis.

35. There is such a unity of interest and ownership between Defendant Lemonis on one hand and ML Retail and ML, LLC on the other hand, that the individuality of ML Retail and ML, LLC or their separateness from Defendant Lemonis have ceased because, upon information and belief:

    a.    ML Retail and ML, LLC are completely influenced and governed by Defendant Lemonis, the sole natural person involved in each entity;

    b.    Defendant Lemonis completely controls ML Retail and ML, LLC;

    c.    Defendants Lemonis, ML Retail, and ML, LLC share the same address as their principal place of business;

    d.    ML Retail and ML, LLC were at all times material to this matter, instrumentalities used for the benefit of Defendant Lemonis;

    e.    ML Retail and ML, LLC are, and at all times herein mentioned were, kept under-capitalized by Defendant Lemonis, in relation to the reasonable needs of their businesses;

f.   The corporate forms of ML Retail and ML, LLC are a mere façade for the operation of Defendant Lemonis;

g.   The corporate form, entity, and structure of ML Retail and ML, LLC were at all times disregarded by Defendant Lemonis;

h.   The assets of ML Retail and ML, LLC were or are intermingled with the assets of Defendant Lemonis, or transferred without consideration, to Defendant Lemonis in disregard of the purported separate corporate form, entity and structure of ML Retail and ML, LLC, so as to make it impossible to separate from individual liabilities;

i.   The business and corporate affairs of ML Retail and ML, LLC are intermingled with those of Defendant Lemonis;

j.   ML Retail and ML, LLC have failed to abide by corporate formalities; and

k.   Defendant Lemonis uses his control over ML Retail, ML, LLC and their assets to further his own personal interest.

36.   Upon information and belief, Defendants ML Retail and ML, LLC were never intended to have, and have never had, any true existence as a corporation.  Indeed, ML Retail and ML, LLC are and were organized and designed to act as devices by which Defendant Lemonis could evade his obligation, responsibility, and liability to third parties, including Plaintiffs, by engaging in unlawful activity without personal liability.

37.   Continued adherence to the fiction of the separate existence of ML Retail and ML, LLC would sanction fraud and promote injustice, in that Defendant Lemonis is attempting to escape liability for his unlawful activity, as set forth below, by hiding behind ML Retail and ML, LLC and manipulating assets and liabilities to avoid responsibility for the unlawful acts that he directed and caused for his own benefit.

**JURISDICTION AND VENUE**

38.   This action arises under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and under the common law of the State of

New York. This Court has subject matter jurisdiction over the RICO claims pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331. The Court has subject matter jurisdiction over the related New York state law claims pursuant to 28 U.S.C. § 1367.

39. Additionally, as stated above, Plaintiff Goureau is domiciled in the State of Florida and Plaintiff Menkin is domiciled in the State of New York. No non-nominal defendant is a citizen of the States of New York or Florida or domiciled in the States of New York or Florida. Defendant Lemonis is domiciled in Illinois, Defendant ML Retail is a citizen of Illinois, Defendant ML, LLC is a citizen of Illinois, and Defendant Machete is a citizen of California. Defendant NBCUniversal is a citizen of New York.

40. This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 because all Plaintiffs are residents of different states than the non-nominal Defendants and the amount in controversy exceeds $75,000. As set forth below, Plaintiffs claim well over $10 million dollars in damages.

41. Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district and because Defendants have extensive contacts with, and conduct business within this judicial district and have caused injuries to Plaintiffs, as described herein, in this judicial district.

## FACTUAL ALLEGATIONS

42. At least fifty other businesses have come forward claiming they fell victims to the expansive racketeering ring that is behind *The Profit*. All of these small businesses, most of which are family-run, have been ruined by their experience on the show through an orchestrated, repeated and consistent pattern of misconduct undertaken by Defendants here for more than a decade now, including lies, self-dealing, cover up and intimidation. And, as it turns out, it is not only

Defendants that form this vast conspiracy but also one of the largest most-trusted public broadcasting companies in the country—none other than NBCUniversal, which lured the contestants in with its name-recognition and trusted reputation of a serious business network—only to ruin them in the end by purposefully feeding them into the well-oiled self-dealing and cheating machine that is "CNBC's Marcus Lemonis" and his cronies.

## A. NBCUniversal Was Intimately Involved in Creating *The Profit* And Consistently Lemonis as a Successful, Trusted Business Advisor

43. Among the financial and business-themed documentaries and reality shows it airs, CNBC airs *The Profit* featuring Marcus Lemonis as its business expert and trusted business advisor.

44. The show is produced by NBCUniversal's/CNBC's production company, Machete.

45. Indeed, Jim Ackerman, Executive Vice President of CNBC, was heavily involved in the show's creation and production. Mr. Ackerman repeatedly approached Amber Mazzola ("Mazzola"), Executive Producer at Machete, with the opportunity to produce the show for CNBC. In the *Rock Your Brand Podcast*, which aired on June 10, 2020,[2] [Mazzola] said, "[Jim Ackerman] went to oversee [C]NBC Prime and said you know I want to bring you over here. I have this show I would love for you know to be the showrunner for it." At the time, Mazzola explained that she was no longer a showrunner and that she owned her own production company, which was currently working on a different show. When that show was canceled, Mr. Ackerman reached back out to Mazzola and asked whether she would "run the show for [him]." When she declined again, he said, "Come work with me. Help me launch this network into a show as a producer, and I will help you build your own company again. I'll help you like rebuild your company."

---

[2] *See* https://www.youtube.com/watch?v=Op2uXkeNTyM&ab_channel=BrandCreators.

46.     Mr. Ackerman told her, "[NBCUniversal/CNBC] has this great piece of talent, and we have a production company that brought [Lemonis] you know us but we don't really know the company that well they're not really vetted. We've never worked with them. They're sort of this new company."

47.     Mazzola further explained, "I started the very first season of *The Profit*. It was not my show as a company owner. I was the showrunner on it. I was an executive producer still helped with casting, the budget, and did everything. Actually, I even formatted the show you know with Marcus and the network, and it didn't work out with the production company with the network, . . . so Jim [Ackerman] gave the show to me into my company. So from Season 2 on, I was the company behind the show."

48.     Prior to Machete's involvement, NBCUniversal worked with a different production company and used CNBC's reputation and prestige as a business news network to convince businesses that Marcus Lemonis would be a trusted business advisor who could transform their businesses.

49.     From the first season, CNBC itself reached out to businesses, most of which were thriving but looking to expand, to appear on the show. These businesses received emails that stated:

> I'm a casting producer working on a new CNBC Television show looking to feature interesting businesses. I'd love to speak with you about it. Below is some brief information on the show. Please call and I'd be happy to tell you more - my contact info is below.
>
> **Casting SMALL to MID-SIZE COMPANIES to work with top BUSINESS EXPERT on New CNBC Reality Show.**
>
> CNBC and Iconic Casting are searching for small to mid-size companies to appear on CNBC's new reality show, *THE BIG FIX (working title) with Marcus Lemonis*.
>
> **Would YOU and YOUR Company benefit from the expert advice and**

**financial investment from one of America's top CEO's????**

Producers are searching for ALL types of businesses (20+ employees) that would benefit from working with a top Business Advisor.

On this new CNBC reality show, Marcus Lemonis, CEO of Camping World and one of America's foremost business experts, will be doing something no one has ever done on TV before. He is going to invest at least **$2,000,000** of his own money and lend his expert advice to help small to mid-size businesses become more successful.

In one week, Marcus will help transform your business to run more efficiently, be more profitable and ultimately more successful.

Marcus Lemonis has built a national empire of over 100 companies worth $2.2B and now he's paying America back by helping one small business at a time. In fact, Marcus, as you can read in the below **Chicago Tribune article**, on Christmas eve this past year saved a bakery with a personal $250,000 dollar investment. To read the article click on the following link: Chicago Tribune Article

50. CNBC did not stop there. It followed up with targeted letters promising that the show was designed to "help make you money," while stamping the CNBC signage all over the letters once again and touting the same "***at least $2,000,000 investment of [Lemonis'] own money*** … to ***help businesses across America become more successful***."

51. *The Profit* has aired for roughly seven years and has featured around one hundred businesses. But from the outset, NBC has promoted Lemonis as a trusted advisor and savvy businessman.

52. The introduction to the show finds Lemonis speaking to the public viewer, stating:

My name is Marcus Lemonis, and I fix failing businesses. I make the tough decisions, and I back them up spending my own money. It's not always pretty, but this is business. I do it to save jobs, and I do it to make money. This is *The Profit*

53. During commercial breaks in the episodes, Lemonis invites struggling businesses to apply for his help, stating, "If your business is in trouble and you need my help, log on to theprofitcasting.com."

54. The website where businesses are directed (https://www.theprofitcasting.com/) to apply to appear on *The Profit* states, "If you are in over your head and feel your business is drowning, CNBC can provide you with the life line to save your business. . . . Apply now for a chance to save your business."

55. On that page, business owners can read a statement claiming that Lemonis "has been called America's number one business turnaround artist. He will do whatever it takes to fix YOUR failing business. When Marcus Lemonis isn't running his multi-billion dollar company, Camping World, he is on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In the past 10 years, he's successfully turned around over 100 companies. Now he's bringing those skills to CNBC and doing something no one has ever done on TV before… he's putting his own money directly into the failing businesses." *Id*

56. NBC's website for *The Profit* (https://www.cnbc.com/the-profit-about/) explains that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In each one-hour episode of *The Profit*, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."

57. While he pretends to be savior on TV to save businesses, Lemonis actually and purposefully sets out to acquire them for himself and ruin them financially. Worse yet, Lemonis uses his CNBC show and his subsequent fame to gain access to susceptible business owners and mislead them into despair and often bankruptcy. Lemonis has a long history of highly questionable business practices that usually follow a similar pattern: offer to invest, misrepresent intentions, and then, ask for reimbursement for unnecessary expenses that the business undoubtably doesn't have.

Then, Lemonis forces the business owners to sign-away their life's work or he saddles them with more debt.[3]

58.     For its part, NBC is heavily involved in the production of the show, such as, *inter alia*, editing and finalizing episodes of the show, as well as creating the contractual paper trail that covered up the knowing misrepresentations made to lure the victims in and scare them from coming forward.  In Lemonis' own words, "CNBC runs the show."

59.     NBC reimburses Lemonis and his related entities for the funds expended on the show, even though Lemonis used these expenditures to convince the businesses that they were indebted to him and use that debt as a threat to extort an ownership interest in their business.  And yet, despite receiving past participants' complaints in as early as 2015, as well as being on notice of the various litigations spanned by the show and the negative publicity accusing Lemonis of cheating and self-dealing, CNBC has continued preying on small businesses by extensively promoting "CNBC's Lemonis," thus contributing its name and reputation to his growing legitimacy.

---

[3] A case in point involves respected entrepreneur and CEO of TV Sales of Broward, Gigi Stetler. A decade ago, Lemonis attempted to acquire RV Sales of Broward, a direct competitor to his RV company, Camping World.  After declining his offer, Ms. Stetler because a victim of Lemonis' vindictive tactics.  Ultimately, the actions taken by Lemonis and is partners undermined her strong and profitable business, resulting in Ms. Stetler being stuck with $11.5 million dollars in debt. Fortunately, despite Lemonis' efforts, Ms. Stetler was able to financially recover and now runs a very successful TV business and online platform for TV enthusiasts.  However, most other businesses falling victim to Lemonis' predatory behavior have not survived.

In yet another clear example of Lemonis' fraudulent and criminal conduct, Lemonis and officials at his company, Camping World, were accused of misrepresenting financials while selling off more than $530 million in the company's shares.  The lawsuit alleges that investors suffered hundreds of millions of dollars in losses when the stock fell sharply due to the misleading and false statements and actions by Lemonis and Camping World.

60. NBC's own website (https://www.cnbc.com/the-profit-effect/) certainly paints a rosy picture – full of success stories scrubbed clean of the truth. Worse yet, it even depicts businesses—that have since closed due to Lemonis' involvement—as success stories.

61. There can be no doubt that CNBC's online presence misrepresents the efficacy of Lemonis' performance and fails to provide accurate reviews of his services by omitting all negative reviews.

62. Indeed, when testimonials and reviews tout the sort of remarkable turnaround as CNBC and Lemonis portray, they are required to include a disclaimer that such results are not typical. CNBC and Machete's websites include no such disclaimer, nor do the episodes of *The Profit* themselves include any such disclosure.[4]

63. CNBC has constituently stood by their guy, promoting Lemonis as a business expert who could be a trusted advisor, thus playing an integral role in a vast conspiracy to defraud small business owners across the country. Indeed, CNBC's website proclaims:

> There is no secret as to why self-made millionaire and serial entrepreneur Marcus Lemonis continues to make his mark on the business world. He leaves not just an impression, but an imprint on everyone he meets, and Lemonis has that charisma, if you will, that few possess.
>
> On CNBC's "The Profit," Lemonis lends his expertise to struggling businesses in various industries across the country while using his famous People/Process/Product principle. Through his "Three P mantra," he analyzes every business by the quality of people, whether they have an excellent and relevant product, and the best possible process for creating, delivering, and selling that product. Since "The Profit" first premiered in July of 2013, Lemonis has invested nearly $50 million of his own money in the companies featured on the series.
>
> As a result of successful partnerships on CNBC's "The Profit," Lemonis

---

[4] This is readily distinguishable from CNBC's program *Shark Tank*, which includes the following disclaimer with each episode: "The following are actual negotiations between entrepreneurs and investor 'Sharks.' The Sharks are investing their own money at their discretion. No Offer is being made to, or solicited from, the viewing audience. Please enjoy the show."

has added a variety of new product lines and services to his holding company, Marcus Lemonis Enterprises LLC. . . .

Lemonis was recognized for having "more impact on the industry than any single individual or company in recent memory as an agent of change and retail consolidation," when RV Business Magazine named him their 2007 Newsmaker of the Year. In addition, Crain's Chicago Business featured him in their 2005 edition of "40 under 40"; and in 2008, Ernst & Young named him Entrepreneur of the Year." . . . .

Lemonis drives results through collaborations, partnerships and relationships. His advice for aspiring entrepreneurs is simple: know your numbers, trust the process, and remember that he's 100 percent in charge! (https://www.cnbc.com/marcus-lemonis-bio/)

64.    Yet, hidden behind the curtain of fame and fortune is a vast cohesive enterprise, wherein each group of Defendants – Machete, Lemonis and his entities, and NBCUniversal – played a well-rehearsed and designated role – from Machete's "hook and bait," which the other Defendants directed and controlled, to Lemonis' provision of his personality, fame, purported business acumen and fraudulent misrepresentations to further lure potential contestants, his entities' provision of corporate vehicles and purported financing, and NBC's lending its name recognition and serious reputation of a business network to the whole enterprise, while also contributing coordination of the whole enterprise and promotion thereof.

65.    The repeated scenarios play out through Defendants' methods of luring in and destroying these businesses (by drowning them in inflated debt that is often owed to Lemonis-related entities, underselling their inventory and destroying their vendor and customer relationships) all so that Lemonis can take advantage of them, line his pockets, and promote his brand.

   B.    **CNBC, Lemonis and Machete Lure Small Businesses to Appear on *The Profit***

      1.    ***The Hook***

66.     Lemonis, Machete and CNBC used a variety of misrepresentations during the course of their scheme to get participants to go on The Profit, sign fraudulently induced and illegal release agreements, and allow Lemonis into their business.

67.     Their attempt to convince small businesses to come on the show in one of two ways: either a person applies to appear on the show, or Lemonis and Machete seek out a family business for the show.  The common theme running through both of these recruiting efforts is a web of lies and fraudulent misrepresentations promoted by CNBC, Machete and Lemonis working in concert to portrayal of Lemonis as a business expert, fiduciary, and investor who works in good faith to successfully helps the businesses featured on the show grow their businesses.  The material misrepresentations made by CNBC, Machete and Lemonis induce contestants to go onto the show and give Lemonis unilateral right to cause their companies to incur unlimited expenses and follow his advice.

68.     Indeed, during this recruitment stage, companies are told that appearing on *The Profit* will materially help their businesses to, among other things:

- "Take the company to the next level,"

- "Get out of debt and grow the business,"

- "Expand into retail locations,"

- Invest in the business" and "save jobs,"

- "Help the brand to grow and to become nationally recognized,"

- "Bring in new ideas,"

- "Help transform [the] business to run more efficiently, be more profitable and ultimately more successful,"

- Connect the business to other "wholesalers and distributors,"

- "Help the family business expand and provide much needed support," and

- "Help [the owner] become a millionaire."

69.     They are assured that they will be in "good hands and not to worry" and that the show would be "great for their business." One business owner was even told that appearing on the show would be "life-changing" and akin to "winning the lottery."

70.     For those reluctant to appear on a reality television show or potentially hand over a piece of their business to a stranger, Machete representatives are often deployed to convince them otherwise. For example, Mazzola and Kimberley Donnan ("Donnan"), Co-Executive Vice President of the show and Executive Vice President at Machete set up calls, video conferences, and sometimes in-person meetings to induce reluctant business owners to appear on *The Profit*, stating that the show would depict participants as wholesome family-run businesses and using the perceived honorability and reputation of NBC to portray Machete and *The Profit* as principled purveyors that would never distort the truth.

71.     In order to induce participants to come on the show, Lemonis and Machete have also represented that Lemonis' purpose was to act in the best interests of the companies on the show.

72.     Moreover, they were also told he would act in good faith during the deal negotiation stage.

73.     For example, in addition to all the claims made at the recruitment stage, the Reality Participation Agreement concludes the following language:

> Company acknowledges that *Lemonis' consultation is a good faith attempt to rehabilitate the Company* beyond the Company's involvement with the Series and Company agrees to use its best efforts to adhere to Lemonis' advice during the Episodes.[5]

---

[5] Exh. P, Reality Participant Agreement, Release, & Arbitration Provision—Business at ¶ 1(b)(i).

74.     This is materially misleading because they did not disclose several facts that materially alter the total mix of information conveyed by the claim that Lemonis is acting in good faith in the best interests of the companies.

75.     First, they did not disclose that the deals shown on the show can differ materially from the actual deals offered to such a degree that, rather than resulting in a net infusion of capital, appearance on the show could leave the company in more debt than it could afford.  Often, this debt was inflated and was a false number provided without backup.

76.     Second, they did not disclose that Lemonis could—and indeed regularly did—take actions on behalf of companies that benefitted himself directly (and not the company).

77.     Third, they also did not disclose that Lemonis regularly used both the Consultancy Period and his advice to induce the owners to take actions that Lemonis understood would place the company in a more vulnerable position than it was prior to joining the show, thereby putting pressure on the company's owners to enter into a deal with Lemonis that was far more favorable to Lemonis than any deal they would have agreed to prior to the show. These actions included incurring substantial expenditures, failing to pay a mortgage or to honor other contractual commitments, taking to actions that enabled Lemonis to misappropriate the company's intellectual property, and other misconduct.

78.     Fourth, Machete's fraudulent statements also included the language in the Reality Participation Agreement that Lemonis would use the full control granted to him during the Consultation Period for the company's benefit.

> during the Consultation Period, Lemonis may at his sole discretion elect to incur expenses to improve Company's business or property, including without limitation making an out-of-pocket discretionary purchase for the benefit of Company or making a capital contribution and/or loan to the Company independent from the Simulated Investment and/or the Actual

Investment and/or Loan Transaction as defined below ("Discretionary Improvement(s)").[6]

79.     It explicitly states that he will incur expenses only "to improve Company's business or property," "for the benefit of Company" (Reality Participant Agreement, § 1.B(iii) emphasis added). The clause does not include several material facts that would have altered the total mix of information available to the potential contestants, and would have affected their willingness to sign the deal: (1) Lemonis planned to cause their company to incur substantial inflated expenditures that could not be deemed an effort to "improve [the] Company's business or property" because the expenses would leave the company in financial extremis unless the owners accepted Lemonis' new, self-serving deal; (2) that Lemonis' regularly used the Consultancy Period to cause companies to incur debts that exceeded the amount that he later offered to invest; and (3) that he was not simply acting for their best interest because he regularly caused contestants to incur substantial expenditures to companies in whom he had a financial interest.   A company contemplating signing the contract would view the terms of the deal in a materially different—and more negative—light if the company's owners were informed of these facts. These material omissions suffice to establish fraud under the right to control theory.

80.     Finally, in light of the statements that Lemonis would act in good faith in the best interests of the companies, and the marketing statements that the show was intended to benefit the companies, it was materially misleading for Lemonis and Machete not to disclose that the show might present doctored footage that distorted the facts in a way that put the company in a bad (and false) light. The statements made by Machete and Lemonis that Lemonis (and the producers) would act in good faith implied that they would not doctor material to put the company in a falsely

_____

[6] Exh. P, Reality Participant Agreement at ¶ 1.B(iii) (emphasis added).

negative light. Thus, the portions of the Reality Participation Agreement that give the producer the right to fictionalize and dub material (¶ 7(b)) does not suffice to inform the contestants that Lemonis and Machete might dub or fictionalize material in a way that presented false facts that would harm the company's business. A reasonable interpretation of that clause—given that this was a "reality TV show" was that it gave the producers permission to dub to improve sound quality or to fictionalize a scene in order to recreate an event that actually happened. Given their other representations, Lemonis and Machete were obligated to informed contestants that they reserved the right to dub, alter, or fictionalize material in a way that could harm the companies or their owners.

81.     Lemonis and Machete also represent to potential contestants that the deals shown on the show are real.

82.     These statements are false because they did not disclose that the offers shown on the shows were simulated and that the actual offers were materially different from the depicted offers. Moreover, the investments shown on the show presented a misleading view of Lemonis contribution because they did not clearly show all the expenses, he caused the companies to incur or other losses to the companies that resulted from his involvement.

83.     The materially misleading statements that the deals were real were not corrected by later disclosures, contained in the Reality Participation Agreement, that the actual investments shown on TV were simulated:

> ii) Simulated Investment: Subject to the Company's compliance with the terms set forth above in Section 1B(i), Lemonis shall have the right to make a simulated capital investment in or loan to the Company during the applicable Episode, in an amount to be determined by Lemonis in his sole discretion (the "Simulated Investment"). Company acknowledges Lemonis will perform the Simulated Investment transaction on-air during such applicable Episode for the purposes of portraying a dramatic moment. By

way of example, and without limiting the foregoing sentence, Lemonis may present Company with a prop check during the applicable Episode.

84.     This disclosure does not suffice to negate the prior statements of Lemonis, Machete, and CNBC that the deals shown on the show were real because the statement that what was shown on TV was simulated did not negate the understanding that Lemonis, Machete, and CNBC had caused contestants to have that the actual deals would not differ materially from the deals shown on TV. Moreover, the Reality Participation Agreement contained language, in the section discussing the simulated investment, that reinforced this idea:

> Lemonis shall thereafter promptly enter into good faith negotiations with Company off-air regarding any Actual Investment and/or Loan Transaction (as defined below) following the Consultation Period and may present a term sheet setting forth the anticipated terms of the Actual Investment and/or Loan Transaction ("Term Sheet") during the Consultation Period, which Term Sheet may set forth the terms of the on air Simulated Investment and/or Loan Transaction and which may be binding if specifically set forth therein.

85.     While the clause does say "may," contestants would reasonably interpret the clause against the backdrop of the regular assurances that the deals shown on the show were real.  In order to make those prior statements not materially misleading the contestants would need to have been informed that the actual deals regularly—indeed usually—do differ from the deals shown on the show and that in multiple occasions participants on the show did not get a net infusion of capital once the costs of the Consultancy Period were taken into account.

86.     Witting and unwitting participants have agreed to come on the show given Lemonis' business expertise, as advertised and promoted by a major television network, which adds further credibility to Lemonis, in the hope and promise of taking their businesses to the next level.

87.     Many others were persuaded by false representations that Lemonis was a successful businessman with a proven record of success for businesses that appeared on the show.  NBC's own website (https://www.cnbc.com/the-profit-effect/) depicts only allegedly positive experiences and does not discuss unsuccessful deals.  Worse yet, it even depicts businesses—that have since closed due to Lemonis' involvement—as success stories.  Indeed, and since the show's inception, NBCUniversal executives have consistently promoted the false idea that the show has actually helped people.  In July 2013, Mark Hoffman, President of NBC, boasted about the "incredible results" the businesses in the first six episodes of the show obtained.[7]  Of course, many of the businesses to come forward recently paint a different picture, and confirm that the show did not bring these so-called incredible results to even one participant.  Instead, it devastated dozens and dozens of those victim businesses.

88.     Following the initial *hook*, these business owners participate in at least one Skype interview with a Machete representative, typically Mazzola and/or Donnan, during which time, the producers further praise Lemonis and his ability to turn around struggling businesses, all the while concealing the fact that Lemonis had actually destroyed businesses that previously appeared on the show.

89.     Potential show participants also undergo extensive background checks and provide producers and the network a slew of confidential and private information about the company's financial affairs.  Further, Machete and NBC unethically used counselors they required participants to speak to, who mined and secured details about the business owners' personal lives, relationships and dynamics with one another, only to be used later to embarrass and humiliate the business

---

[7]     https://speedwaymedia.com/2013/07/14/marcus-lemonis-turns-the-profit-at-newhampshire-motor-speedway/.

owners on an international television program. Lemonis and his cohorts to extracted valuable information about key business assets that were most valuable to Lemonis and later used this information to leverage the companies, making them dependent and indebted to Lemonis.

90.     Once approved to appear on the show, the participants are sent a number of documents to sign by Machete, including the Reality Participant Agreement and various releases.[8] At no point are they advised by Lemonis, Machete or Machete representatives to have an attorney review these agreements with them prior to signing or inform them about the rights they purport to waive.

91.     On those occasions when some of the business owners pause before signing the agreements out of concerns that they should obtain legal advice to protect their interests, they are told to "trust the process" and/or are met with high pressure sales tactics, like telling them to "urgently sign the documents in order to secure their sport on the show" and "not miss out on this once in a lifetime opportunity," as the agreements were a "take it or leave it" situation.

92.     Some business owners were reassured that the language in the contracts is "boilerplate" and "did not apply to them or the show." Others met or spoke with Machete producers (usually Donnan and/or Mazzola) who again explained their vision for the show to assuage their fears, reinforcing the false promise that they were producing an honest portrayal of an American family business for a reputable, highly regarded national news network. And despite the language in the agreements, participants are assured that neither Machete nor NBC had

---

[8] The release agreements are governed by California law, which provides that an agreement is void and unenforceable because it violates public policy prohibiting a party for allowing itself freedom to intentional acts with impunity. It is undisputed that advance waivers or releases of intentional tort claims such as those in the releases signed by *The Profit* participants are void as against public policy and unenforceable under Cal. Code §1668. *See e.g.*, *Fernham v. Superior Court*, 60 Cal. App. 4th 69, 71 (1997).

anything but the best intentions for the businesses, reinforcing what a once-in-a-lifetime opportunity it was to acquire an invaluable partner like Lemonis and put their company on a path to a new echelon. Throughout the whole recruitment process, Machete producers used their status as a program featured on a nationally recognized news network to induce, fraudulently, these people to hand their life work and company over to this scam.

93. Throughout the process, none of the small business owners were encouraged to seek independent legal advice, even though they were typically unsophisticated, without in-house legal guidance and were interacting with a well-represented, major television network. In other cases, the business owners were provided attorneys which turned out to be paid by Lemonis himself because they were his attorneys, presenting a clear conflict of interest that they were not aware of, much less asked to waive.

94. Instead, they were repeatedly told by Lemonis and his co-conspirators to "trust the process" as if the process had been designed to protect *their* interests, rather than the interests of the network and its star, Lemonis.[9]

95. NBC, Machete and Lemonis also falsely promised that these companies and their families would be presented on the show in a favorable light. They were told, among other things, that:

- They would appear in "the feel-good episode of the year,"

- "Everyone would win" and "we won't do anything to make you look bad,"

- The episode would be a "great part of your growth and story,"

---

[9] A particularly offensive tactic taken by Machete representatives in several cases involved them persuading small businesses to forgo favorable sales of their companies or safer investments in their businesses and instead opt to appear on *The Profit* on the false promise that Lemonis would help their companies.

- "Being on the show would help [them] gain fame and exposure," and they would be "presented in a positive manner,"

- It would be a "really fun experience,"

- The show would be edited to "make everything look authentic," and

- Lemonis was "not in the business of making people look bad on camera."

96. In every case, however, the factual representations regarding the business' portrayal on the show were patently false and misleading.

97. Rather than appearing in "feel good episodes" that gave a "favorable presentation" of their businesses, they and their businesses were ridiculed; falsely depicted as incompetent, rude, mean or unethical; and their products and services were poorly presented and in a negative light for the purpose of manufacturing a fake story line being pushed by Lemonis on the show for fun and giggles and ratings.

98. Defendants' concerted effort to lure small businesses to appear on *The Profit* included representing past contestants' purported success stories and Lemonis' purported investment as seen on TV to help the featured businesses. These representations were false, and Defendants knew it.

99. Indeed, out of businesses to come forward to date to report the fraudulent scheme detailed herein, not a single one improved their circumstances following their appearance on *The Profit*, and a substantial percentage of them became insolvent, forced to close their businesses, or faced dramatically reduced profitability. Others saw their owners forced out of their own companies. And these profoundly negative consequences were all in the service of ensuring that *The Profit* was an entertaining program with conflict and drama – albeit false and manufactured – and the financial interests of the show's star were advanced.

100. The touting of these purported success stories is even more egregious given Defendants' failure to disclose Lemonis' extensive history of self-dealing with the show by, among other things, causing participating companies to contribute funds to Lemonis' own companies and making participating companies incur substantial expenses and/or lose clients so that the company's owners would be left with no other choice but to agree to surrender to Lemonis an equity stake in return for financial assistance.

101. These material pretenses, representations, or promises, along with the allure of appearing on a network television program seen across the country, were *the hook* that initially lured the small business owners onto the show.

## 2. Once Filming Begins, Lemonis Starts To Slowly Destroy The Businesses

102. As soon as filming began, participants quickly realized that while the show is promoted as a "business" show that portrays reality, *their* reality was anything but that, with nearly every scene staged for undisclosed purposes, and every promise turning out to be a lie.

### a. *The Initial On-Air Agreement*

103. Virtually every episode of *The Profit* begins with an initial on-air agreement that involves Lemonis purporting to make a substantial financial investment in the small business owner's company in exchange for an interest in the business.

104. Each one of these initial agreements follows a similar pattern: they are always oral agreements and are never promptly formalized into a binding contract.

105.     Lemonis even once bragged that he "never signs a contract right away," as if declining to sign an enforceable contract in advance of exercising power over one's own counterparty is something to be avoided at all costs, as opposed to how all honest businesspeople conduct their business affairs.

106.     Often, during the initial episode, Lemonis presents participating business owners with an oversized check in the amount of the promised investment, only for Machete producers to take the check back from participants once the cameras are no longer running.

107.     The full promised investment virtually never materializes.[10]   However, the show participants were told prior to filming and thus believed that the handshake on-air deal reached with Lemonis was real and that Lemonis was investing in their business as an equal partner. Defendants purposefully suppressed the reality the actual deals in the past were regularly, in fact usually, vastly different from the deals shown on the show, such that the participants did not get the net infusion of capital once the costs imposed upon them during Lemonis' consultancy were considered.

108.     Lemonis then decidedly declares on air that he is "100% in charge" and effectively takes over the business, overcoming any lingering reluctance on the part of the small business owners by encouraging them once again to "trust the process," which is uttered as a solemn incantation that disarms the small business owners into believing that they are in the hands of an expert who will deliver on all of his promises.

---

[10] The presentation of the phony checks on air often triggered a reasonable expectation by the small business owner's creditors that debts would now be promptly paid, and when they were not, since Lemonis had not in fact funded the business, important business relationships with suppliers and other creditors, as well as the business owner's reputation, were damaged.

109.    The problem, of course, is that once disarmed, participating businesses find themselves increasingly underequipped to defend themselves against Lemonis' single-minded efforts to create a television program with conflict and a horrid false narrative, and to enrich himself and his own companies at the expense of the small business owners who appear on the show.

### b.    Lemonis Unilaterally Orders Significant and Costly Changes to the Business.

110.    Following the initial on-air phony agreement and Lemonis' declaration that is "100% in charge," Lemonis unilaterally orders significant and costly changes to participating businesses that invariably causes the business to go deeply into debt, leaving them highly vulnerable to Lemonis.

111.    When the business owners protest that the amount of debt Lemonis is saddling their company with (which in turn is owed to Lemonis and his entities), is unacceptable, Lemonis tells them they can only back out of the deal if they pay him back the undocumented, often falsified debt.  Unable to do so, the business owners are left with no other choice but to continue under Lemonis' draconian terms.

112.    Along the way, Lemonis almost always lines his own pockets through a variety of means such as causing the companies to borrow money from Lemonis' other entities, threating to foreclose if they defaulted.  All the while, Lemonis drives down profits, forcing the businesses to incur even more debt just to stay afloat.  Then, while these businesses are under his thumb, Lemonis leverages their businesses for his personal gain, enriching himself and boosting his personal brand at the businesses' expense.  Often, Lemonis then removes the business owners from their salaried employment positions and loots their businesses, and he often comingles these companies in a ML group wherein the owner loses everything.

113.    The changes Lemonis ordered on the shows depicting many of the small businesses include:

- **Costly and unnecessary store or warehouse renovations**, often using companies controlled by Lemonis to profit off the renovations. The cost of the renovations and the interruption of business activity caused by the store or warehouse closures, forces the small businesses into debt and into becoming more deeply dependent on Lemonis[11];

- The closures for renovations are often accompanied by the **sale of current inventory at steep discounts** to allow the renovations to proceed, again making the businesses financially vulnerable and dependent on Lemonis;

- **Closing low-cost warehouse arrangements** (often owned by the business) and **costly moves to new expanded spaces** often requiring renovations;

- **Relocating to new offices**;

- **Re-branding or brand redesign**, often of a profitable and popular brand without a clearly articulated business rationale, resulting in the undermining of the brand;

- Switching to **more expensive vendors or vendors with relationships with Lemonis**;

- **Re-formulation of recipes, ingredients, or changes in manufacturing processes or materials** undermining the uniqueness of the product and the reason for its success;

---

[11] On *The Profit*, renovations are done during the filming of the episode so that the episode can show the supposedly great improvements that Lemonis makes to the businesses.  The owners are told that the renovations would be short-term and are purposefully kept in the dark about how much the renovations are costing and who ultimately will be paying for them.  Lemonis' timeline was always a lie, forcing the business to remain closed for the duration of the renovations, precluding the companies from generating income.  When the business owners questioned the fees spent on what largely unnecessary renovations were, Lemonis threatened to back out of the deal he made with them and demanding that they pay him back for the costs spent thus far.  More often than not, these businesses were not able to pay the large costs already spent, leaving them with no other choice by to continue under Lemonis' reign of terror.  This was all part of Defendants' fraudulent pattern and practice in the dealings with businesses that appeared on *The Profit*. Lemonis would spend money on the businesses making it seem like the money he spent would either be part of his investment or otherwise covered by him, only to present them with a bill that would automatically give him a debt position over the company that he would then use to try to strong-arm the deal or take the business.

- Forcing the company to **purchase costly new equipment;**

- **Hiring new staff** loyal to Lemonis, and firing of long-time staff loyal to the business owner;

- Directing the small business owners to **work on projects for the benefit of other Lemonis entities** or other companies appearing on *The Profit*, without any or insufficient benefit to the owners and their companies;

- **Purchase of new inventory** before expanding the customer base, where the new inventory often is not what the business owner's customers want, resulting in the business ultimately being forced to sell the new inventory at a deep discount, causing deeper debt;

- **Expanding the number of stores** (often requiring renovations) without appropriate due diligence to ensure the business need;

- **Changing the business' core business model;**

- Switching to a **new, inferior manufacturer;**

- Adding a **new product line;**

- Incurring **unnecessary business expenses**; and

- Forcing the business to **work with a competitor**.

114.    Many of these changes had serious side effects, in addition to increased debt, that negatively impacted and, in most cases, these small businesses.

115.    For example, in connection with ordering some of the businesses to relocate offices, stores, or warehouse space, Lemonis often directed business owners to stop paying the business' current mortgage or rent, ultimately leading to foreclosure and/or evictions.

116.    In other cases, they were instructed by Lemonis to stop paying vendors and suppliers, ultimately leading to the loss of valuable business relationships and irreparably damaged reputations.

117.    Other changes put unusual strains on relationships with the businesses, resulting in resignations, firings, untimely departures, and ruined personal relationships.

118.    While many were wary of the significant, and oftentimes unnecessary changes they were being strong-armed to make to their companies, many acquiesced believing that Lemonis was their partner, fiduciary, advisor, and the business expert he was touted to be by NBC and Machete.  Many were just extorted by Lemonis and his fake or inflated debt.

### c.    The Agreement Changes

119.    After Lemonis causes the small business owners to incur significant debt resulting from the changes he ordered, he pressures them into changing the agreement aired during the show to include terms more favorable to him, but which the small business owners feel compelled to accept because of their increased dependence on Lemonis.

120.    For many, Lemonis simply fails to fulfill his commitments under the agreement while holding the small businesses to their commitments.

### 3.    Once In Control, Lemonis Destroys the Businesses, Often Taking The Assets For Himself And Drowning The Companies In Debt

121.    Unfortunately, Lemonis is all too successful in luring small business to let him "invest" in their business in exchange for a percentage of the company; typically, this results in Lemonis taking complete charge.  He doesn't achieve this on his own – by the time participating business owners appear to film the show and meet Lemonis, they have been groomed by producers who repeatedly misrepresent what awaits them, their families, their companies and their livelihoods.  These falsehoods are repeated on a national television network, reinforcing Lemonis' persona.

122.    The agreements that Lemonis uses to formalize his investment allow him to take complete control over the company. For many businesses on the show, Lemonis creates a new limited liability company that is supposed to run their joint business venture. These limited liability company agreements are all induced by fraud and give Lemonis complete and unfettered control

to run the business. In conjunction with these agreements, Lemonis forces the companies to enter into credit agreements with Lemonis. Lemonis then furnishes his "investment" in the companies in the form of a loan pursuant to the credit agreement. These agreements force the companies to draw on their line of credit from Lemonis any time they need funding. Of course, Lemonis runs these businesses in a way that purposely increases their debt to Lemonis through the lines of credit.

123.    Throughout this, or any, phase of the fraudulent scheme, company owners are never advised to consult with an attorney before signing these agreements and are left to deal with Lemonis' lawyers under pressure to sign quickly.

124.    For many businesses featured on *The Profit*, Lemonis continues expensive and time-consuming renovations, buying far more inventory than their stores could even carry, and forcing companies to buy inventory and products from other businesses that were featured in *The Profit* regardless of whether such purchases made sense for the businesses.

125.    When it comes time to pay regular business expenses, such as rent or payroll, the companies are forced to draw from their loan from Lemonis. Over time, the businesses become so indebted to Lemonis that there was no way out. Lemonis then uses the debts he created to leverage his taking of the business, or its key assets, for himself.

126.    For the participants that give Lemonis an ownership stake in their businesses, he eventually works to separate the participants from the businesses they worked so hard to create, forcing them to work for his other entities or driving them out altogether. Lemonis uses the control he gains over these businesses to force them to buy services and products from companies in which Lemonis has an ownership stake.

127.    Often, Lemonis also steals assets from the businesses for his own use. Typically, this is done through his vast interconnected web of related entities. Lemonis forces participating

business to use companies he has a financial interest in, or is in charge of all together, so that his pockets are lined when the invoices are inflated. He comingles the funds not only between his own entities but businesses he works with on the show, diverting expenses from Lemonis' companies to small businesses on the show, and/or arranges for his personal credit card bills to be paid from the company's accounts.

128.    Camping World and ML, LLC – both run by Lemonis - are almost always brought in to either handle (and get paid for) often unnecessary remodels or to provide any other services Lemonis deems necessary for participating companies.  Employees are frequently transferred between his various entities without the necessary paperwork and without ensuring that they were being paid out of the entity they were working for.  Instead, for instance, Camping World employees were retained to work on oftentimes unnecessary renovations for the show, leaving participating business owners saddled with the bill for an inflated amount they would owe back to Lemonis and his entities.

129.    Commingling of assets and paying bills from another entity's accounts can result in illegally reducing the taxable income of the company paying the bill by inflating its expenses, and correspondingly reducing the taxable income of the company receiving the benefit of the payment but not declaring the benefit as income.

130.    In some of these commingling schemes, Lemonis created new entities to divert company assets and payments to the new entity under Lemonis' control.

131.    Indeed, one former CFO at ML, LLC, who wishes to remain anonymous, recently confirmed, they were not using generally accepted accounting principles [GAAP] at ML, LLC and "***Lemonis was comingling funds between the various different business entities that were under the ML, LLC umbrella and other business that Lemonis was involved with***."

132.    Yet another came forward, while wishing to remain anonymous, and stated that he "was aware that Lemonis was comingling funds between the various different business entities that were under the ML, LLC umbrella" and "***fail[ed] to comply with the terms of deals that he reached with business owners that appeared on The Profit.***"   Moreover, when business owners asked when their promised investment would be coming, Lemonis "would say that ***he's not providing the funding and would say that his investment was made through the renovations and equipment purchases, etc. done on the show as a capital contribution.  This was <u>always different from what the business owners were originally told</u>***." This was yet another lie fed to small business owners in order to lure them into giving up a stake in their businesses and control over their company to Lemonis based on Lemonis, Machete's and then networks repeated and false representations that the show, and the deal on the show was real.[12]

133.    Many of the small businesses were the victims of Lemonis' theft of their assets, including his draining their bank accounts or preventing them from accessing funds in the accounts to pay legitimate bills, or taking without authorization their valuable intellectual property for his own uses.[13]

134.    In one case, for example, without authority or permission, Lemonis took the designs and drawings of one small business and sent them to a competitor to produce for Lemonis' companies.  This conduct was part and parcel of the scheme to defraud discussed above.

---

[12] Indeed, in an interview in August 2020, Jim Ackerman stated that the show was "completely real" saying "I never believed creating storylines for shows would be more compelling than the truth.  [At CNBC] we don't manipulate shit – we stay true to our character and their journey." (https://www.noblesavages.com/close-up-with-joe-livecchi/cnbcs-jim-ackerman.)

[13] Lemonis effectively took valuable intellectual property either by taking control of the companies or he simply stole the intellectual property for his own uses, as he did with Plaintiffs herein.

135.     More often than not, Lemonis walks away with valuable assets of the business, or funds, monies or inventory taken or earned by other businesses he controls, and then weaponizes the show to severely damage anyone who dares challenge him or who might try to expose the truth.

136.     Lemonis and his co-conspirators often moved through elaborate schemes to take the intellectual property or successful business ideas for himself, wrestle it from the client, and then sell it for his own profit.

### 5.     Lies and Fabricated Storylines Are Used To Defame The Show's Participants

137.     While openly false claims and statements of fact are not permitted on a show of this nature which is presented as a documentary style program, it became clear from the first day of filming that Lemonis and Machete were intent on fabricating story lines, and defaming and portraying families and their businesses in a false light to boost *The Profit*'s ratings and line Lemonis' pockets.

138.     That is because the show has always been about ratings and not about actually helping businesses.  According to Lemonis, when they were creating the show, Mr. Hoffman told him that "nobody watches [CNBC's] programs at night" and Mr. Hoffman's goal was for *The Profit* to "fix that."[14]  In a June 11, 2017 interview with Advisors Magazine, Lemonis explained the importance of ratings stating, "[a]nd in the end, if the reality of what is happening isn't entertaining, the viewers are going to tell us and they're not going to watch.  If it is entertaining, they're going to watch and keep on watching.  They're going to want more, the thing is going to go viral, and its going to be fantastic."[15]

---

[14]         https://www.inc.com/magazine/201410/david-whitford/marcus-lemonis-the-profit-turnsaround-failing-businesses.html.

[15] https://www.linkedin.com/pulse/pulling-nighttime-viewers-cnbc-erwin-kantor.

139.     Moreover, and as set forth above, participating business owners signed on to appear on *The Profit* based on representations and assurances by Machete producers that Lemonis only wanted the best for their business.  Lemonis said over and over that he would treat the patriarch of the family business like his own father and would portray the business and its owners in a favorable light.  Unfortunately, the reality was nothing like what Machete and Lemonis promised it would be.  They simply lied.

140.     When their episodes aired on CNBC, participants found that lines were dubbed, images were doctored, and edits were maliciously constructed in order the make the business' management look idiotic, rude and deplorable, resulting in disgust and threats directed at the business owners from shocked customers and viewers.  Scenes were consistently edited to make the business owners appear uncooperative, rude, inept, greedy, entitled, self-centered and short-fused.  For many, *The Profit* went out of its way to distort the scenes with business owners to cast them as villains and dictators to their employees, simply to ridicule them and help boost the series' ratings, coming at the cost of participants' business reputations.  These false portrayals subjected countless participating business owners to ridicule and embarrassment, causing damages to the reputation of their businesses – businesses that *The Profit* contractually agreed to further and use a "good faith" attempt to expand or rehabilitate.  *The Profit* episodes are republished many times to different audiences and through different media platforms in different languages both in the U.S. and around the world, constantly and through this filing.  And each time the episodes air, these business owners receive yet another wave of hate, and each re-air caused new injuries and damages.

141.     Indeed, the entire show, *The Profit: Inside Look*, details Lemonis' involvement in the creation, production, and editing of the show, where he discusses a tactic of showing up late to

the set and encouraging fighting. Lemonis recently lied about this under oath in a Federal Court hearing, showing his propensity to lie extends to a federal courtroom. Lemonis explained that he purposefully creates drama to make the business struggle and accelerate its failure. In the episode, Lemonis and Mazzola openly discuss editing footage together at the end of filming and choosing what to include in the episode and what not to include. They even discussed how the timeline shown on the show is different than what occurred in real life.[16]

142.    Another lie perpetrated on the show to make participating businesses look bad for ratings involves focus groups that are brought on the show and used to discredit the business owners and tarnish their brands. While focus group participants are brought in to purportedly review the business' products and provide feedback, their comments are staged by Machete producers and Lemonis, written out and given to the focus group members ahead in advance. The focus groups are typically fake.

143.    Lemonis was always intent on boosting his persona on *The Profit* by dragging participants through the mud to put them at his mercy. Lemonis and Machete producers often pitted family members against one another by "producing" the family members into fighting on air. Indeed, as one former show participant found out when a discarded call sheet was discovered in the trash[17], Lemonis, Machete, and CNBC knew and intended for the show to manufacture a false narrative, disseminate falsehoods, and in fact enjoyed portraying the victims in a negative and false light.

---

[16] It should be noted that during these *Inside Look* episodes, Lemons and Mazzola repeatedly state that the check the victims receive on the show is real. These assertions are not only blatantly false but are an essential element of the fraudulent scheme to get businesses to agree to appear on the show.

[17] The call sheet asked producers to "produce" the two business owners "to fight without apologizing to each other or backing down[.] Anything with a bit more energy."

144.     Thus, despite their promises and repeated assurances, Lemonis, Machete and CNBC consistently embarrass participating businesses and their families by fabricating drama for the show and ruining these companies.  The blatantly false editing, lies, and attempts to fuel fake fiction and drama during filming is the antithesis of how Lemonis, Machete and CNBC seek to portray the show and its featured, expert advisor to his fans and the media.

145.     The vitriol these business owners have received as a direct result from their involvement on the show has torpedoed their businesses.  This negative impact can continue for years.  Seven years after another participant's episode aired, that business' online reviews are still distorted by tons and tons of negative reviews received across the United States and abroad as a result from the airing of their episode and the false statements made therein.  Over half of its reviews are one-star reviews from people who are not actual clients of the business in question, but who only heard the defamatory lies broadcast by Lemonis and CNBC on *The Profit.*

146.     In addition to receiving hate mail from the general public, the defamatory statements and outright lies portrayed on *The Profit* have destroyed client and vendor relationships for several show participants.  Some lost long-time vendors based on the lies and defamatory statements made about them on the show.  Others lost vendors because the show made it appear as though the business had received a substantial investment to use to pay its vendors when in reality it had not.  Based on what they had seen on the show, those companies' vendors thought they were lying about not being able to pay.  Many businesses featured on *The Profit* lost vendors and sales accounts when Lemonis took over those companies and delayed or refused to pay their vendors, keep up with payroll or timely fulfill merchandise orders.

147.     While *The Profit* portrays a false narrative to the world that Lemonis does not fail, in reality, the businesses are torched, the owners' reputations utterly destroyed, and then they are

left as roadkill on the side of the road.  In all, there can be no doubt that CNBC created a show, gave Lemonis the power of a national news network, allowed him to manufacture and create false shows for ratings, promoted Lemonis as a trusted business expert, and turned a blind eye to the trail of destruction left in Lemonis and *The Profit*'s wake

      **5.**     recap **dation, Extortion and Retaliation Are Used To Keep Participants In Line and Muzzled**

148.    By this point in the horrid scam, reality is likely settling in to some participating business owners, who were fed false, misleading, and material promises that they and their business would benefit from coming onto to the show in several concrete and material ways, and, instead, are at risk of having their companies destroyed or taken away from them while Lemonis and his enablers enrich themselves at the expense of the very businesses they had promised to preserve and promote.

149.    And yet, most who dare question Lemonis' business strategy, expenditure or anything else, they are typically silenced by a remarkably consistent pattern of threats and intimidation, like being featured on NBC's "review" or "recap" episodes. These "looking back" specials are advertised as a way for the audience to catch up with a previous contestant and see how their business is progressing.  More often than not, they are used as a sword by Lemonis to get back at a business owner who Lemonis feels has done him wrong.  Typically, these disparaging episodes, broadcast nationally, result in hate mail, poor online reviews, destruction of vendor relationships and ruined reputations for the featured businesses—with a former participant being driven to suicide.  Many former contestants who dare to voice their concerns about the show and how their how their businesses are depicted by NBC encounter an extensive cover up as well as threats of and actual litigation.

150.     Machete and Lemonis use the power of NBC to silence participants who want to speak out against *The Profit*.  After one participant posted a rebuttal to the show's mean and false portrayal of her family and their business on social media, which described how her family had been treated by Lemonis, Mazzola called and informed her that "the CNBC lawyers had seen the post and were not happy."  Mazzola threatened that "if she did not take down the post the network's attorneys would sue [her] for breach of contract."

151.     Lemonis and Machete consistently use the power of NBC reputation as a national news network to continue their malicious and oppressive conduct and are weaponizing the show in a malicious, oppressive, and fraudulent manner.

152.     Lemonis often and explicitly extorts participating businesses either to obtain an larger ownership stake in their business or coerce an agreement to a business proposal.  For example, for many small business owners objecting to unnecessary and costly renovations, Lemonis simply threatens a demand immediate payment of the expenses incurred thus far – expenses which most business cannot afford - or to foreclose on the debts he caused the businesses to incur, and to take control of the companies.

153.     For example, when one business owner objected to Lemonis' unauthorized use of the company's trademark in Lemonis' own stores, Lemonis threatened to issue a federal tax form 1099 to the business putting the owner in fear that he would owe taxes on the investment Lemonis made in the business, which Lemonis recharacterized as a non-equity contribution. In all of these instances, Lemonis made threats with serious financial consequences putting the unsophisticated small business owners in fear under circumstances that were "wrongful" and thus criminal.

154.     The common tales and pattern of fraudulent practice set forth above paints a clear picture of a vast cohesive enterprise, wherein each group of Defendants (NBC, Machete, Lemonis

and his entities) played its own well-rehearsed designated role—from their "hook and bait," which the other Defendants directed and controlled, to Lemonis' provision of his personality, fame, purported business acumen and fraudulent misrepresentations to further lure potential contestants, his entities' provision of corporate vehicles and purported financing, and NBC's lending its name recognition and serious reputation of a business network to the whole enterprise, while also contributing coordination of the whole enterprise and promotion thereof. Each member of the criminal enterprise is liable for an undeniably vast conspiracy to defraud small business owners across the country and, worst yet NBC ignored complaints and strong-armed victims.

**B      NBCUniversal is Liable for Machete and Lemonis' Tortious Conduct**

155.     As the creator and producer of *The Profit*, NBCUniversal is liable for Machete and Lemonis' fraudulent conduct.

156.     Moreover, it is an important participant in hooking in potential victims.

157.     To do so, NBCUniversal extensively promotes the show and touts Lemonis as the savior of small businesses, all the while lending its reputation as the serious business network to the whole operation.

158.     In fact, as part of NBC's promotional tour in 2017, Lemonis expressly touted the past participants' "success on the Profit."

159.     In other words, NBC provides the platform and credibility for the whole scheme to work.   In fact, many of the past participants stated that they would not have even considered getting involved with the show was it not for the fact that it was on CNBC, a serious established business channel with its long-standing wide-ranging reputation

> **1.      NBCUniversal is Vicariously Liable for Lemonis and Machetes' Misconduct Because Lemonis and Machete Were Apparent Employees of CNBC**

160.    NBCUniversal is liable for Lemonis' misconduct to the participating businesses because CNBC's manifestations to the companies caused them to reasonably believe that Lemonis, Machete and Machete's representatives were employees of CNBC in serving as the host and producers of the show, respectively.

161.    The tortious acts described above that Lemonis and Machete engaged in during the show were all within the scope of their employment as CNBC employees and/or agents.

<em><strong>a.      Manifestations that Lemonis and Machete Were CNBC Employees</strong></em>

162.    CNBC led contestants to conclude that Lemonis and Machete (and by extension, Machete's employees) were CNBC employees by creating the clear public impression that *The Profit* was CNBC's show, and that Lemonis was hired by CNBC as the host of its show and Machete was hired by CNBC as an employee to produce its show.

163.    Indeed, *The Profit* is CNBC's show. CNBC originated the show, owns the show, and owns all the trademarks and intellectual property.  CNBC's website refers to the show as CNBC's *The Profit*, and states that *The Profit* is the #1 *original series* on CNBC.[18]  Contestants interested in appearing on *The Profit* are directed to a website that displays CNBC's logo and states: If you are in over your head and feel your business is drowning, *CNBC* can provide you with the lifeline to save your business."  (Emphasis added.)

164.    CNBC's website describes Lemonis as the host of CNBC's show.[19]  At one point, the website even refers to him as an "executive producer *for* CNBC." Indeed, CNBC repeatedly

---

[18]    *See*  https://www.cnbc.com/2019/10/14/business-is-personal-on-an-all-new-season-ofcnbcshit-series-the-profit-premiering-tuesday-november-5-at-10pm-et.html.

[19]    https://www.cnbc.com/marcus-lemonis-bio/.

refers to him as "CNBC's Marcus Lemonis."[20]  CNBC further indicated that Lemonis worked for them by hosting a full bio on him.

165.  *The Profit* has aired for roughly seven years and has featured around one hundred businesses.  On each episode of the show, Lemonis visits a purportedly ailing business and offers his business acumen and a financial investment in exchange for an ownership interest in the entity

166.  The introduction to the show finds Lemonis speaking to the public viewer, stating:

> My name is Marcus Lemonis, and I fix failing businesses.  I make the tough decisions, and I back them up spending my own money.  It's not always pretty, but this is business.  I do it to save jobs, and I do it to make money. This is *The Profit*.

167.  During commercial breaks in the episodes, Lemonis invites struggling businesses to apply for his help, stating, "If your business is in trouble and you need my help, log on to theprofitcasting.com."

168.  CNBC's website for *The Profit* (https://www.cnbc.com/the-profit-about/) promotes Lemonis' tactics, stating that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal.  In each one-hour episode of *The Profit*, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."

169.  NBCUniversal's website also claims that in the show Lemonis "will do almost anything to save the business."[21]  The website further claims that, "Lemonis lends his expertise to struggling businesses in various industries across the country while using his famous

---

[20]                                                                              https://www.youtube.com/watch?v=d6q7kcRyMZs; https://www.youtube.com/watch?v=fQLlD6KRJwI; https://ew.com/article/2016/02/16/the-profit-marcus-lemonis-interview/; https://ceoworld.biz/2015/11/13/marcuslemonis-host-of-cnbcs-the-profit-is-putting-hisbusiness-acumenup-for-auction-to-benefit-chicago-nonprofitsupporting-people-withdevelopmental-disabilities/.

[21] *See* https://www.nbc.com/the-profit.

People/Process/Product principle… As a result of successful partnerships on CNBC's 'The Profit,' Lemonis has added a variety of new product lines and services to his holding company, Marcus Lemonis Enterprises LLC … Lemonis drives results through collaborations, partnerships and relationships."[22]

170.    As for Machete, CNBC's website goes on to state that *The Profit* is produced for CNBC by Machete Productions with Amber Mazzola serving as executive producer.[23]  It appears that Machete employees involved in the show, such as the Executive Producers, had titles that include "CNBC," manifesting that they worked for CNBC.  Contestants properly viewed Machete as an agent producing *The Profit* for CNBC.   It was an apparent employee of CNBC.

171.    Furthermore, CNBC provided contestant companies with participation agreements and releases as a condition of being on the show.  The documents stated that the show was being prepared for CNBC.[24]  The Reality Participant Agreement refers to Machete as "the Producer" of *The Profit*, and not the owner.   A television producer is a person who oversees one or more aspects of video production for a television program.  They are often employed by the company that owns the show.  The term does not convey independent contractor status.[25]  The repeated references to "CNBC's *The Profit*" indicates that Machete is a producer for CNBC.

172.    In addition, and consistent with an employment relationship, Lemonis, Machete, and CNBC has a long-run relationship.  After becoming the star of *The Profit*, Lemonis only provided hosting services to CNBC.  He did not work for other networks.  The fact that Lemonis

---

[22] *See* https://www.cnbc.com/marcus-lemonis-bio/.

[23] *See id*.

[24] *See* Exh. P, Reality Participant Agreement, Release, & Arbitration Provision—Business.

[25] For example, Mark Harmon, star of the series NCIS, is also one of the show's producers as is Clare Danes, the star of Homeland. Yet both of them are clearly employees of their respective networks for purposes of those shows.

only hosted such shows for CNBC is also indicative of an employee-employer relationship. Machete also had a long-run relationship with CNBC; indeed, not only was NBCUniversal intimately involved in creating and producing *The Profit,* but it also brought Machete in specifically to produce *The Profit* for CNBC.

173.    CNBC further manifested that Lemonis, and Machete were its employees through its multiple manifestation that it had a right of control over the manner of production through both actions it took and contract clauses it provided to consultant companies.  Indeed, CNBC hired Ionic Casting, the casting firm that reached out to several contestants on behalf of CNBC to induce them to appear on the show. In addition, CNBC, in concert with Comcast, hosted events across the country that were designed to recruit contestants for *The Profit.* CNBC's website promotes these events, and *The Profit* itself, as part of its "continuous goal to help businesses become successful."[26]  All of these actions conveyed that the show was being produced by CNBC, through its employee, Machete.

174.    Moreover, a number of contestants directly interacted with agents apparently working for CNBC who were to be their main contact person for the show.  For example, Donnan, supervising producer with *The Profit*/CNBC told one participating business owner that she would be their main contact person because the network had approved the business to appear on the show. Another small business that appeared on *The Profit* directly dealt with Alex Anam, a senior producer for *The Profit*/CNBC about their business and filming.  The titles given to these producers, and their involvement, constituted a manifestation by CNBC that the show is CNBC's show and that the people the contestants were interacted with were CNBC employees.

---

[26] *CNBC's 'The Profit' and Comcast Business to Hold Panel, Networking and Casting Events During Small Business Week* (May 2, 2017) (https://www.cnbc.com/2017/05/02/cnbc-the-profit-comcast-small-businessweek.Html).

175.     Contestants were also given a Reality Participant Agreement, which, on information and belief, was drafted by CNBC and included multiple clauses that manifest that CNBC had the right to make decisions relating to an episode before and during filming, consistent with a right to control the manner of performance.[27]   For example, the Reality Participant Agreement contains the following clauses:

> Company shall follow and obey all rules, *instructions, directions*, and requirements of Producer and *the Network* [CNBC] in connection with the Series, and shall participate in any and all activities required by Producer or the *Network* in connection with the Series, whether *before, during*, or after production of the Series, on such dates and at such locations as Producer or *the Network* shall reasonably designate (collectively with any other locations in connection with the Series, the "Locations.").[28]

176.     Both of these clauses manifest CNBC's view that it has a right to exert control over the manner in which the show is made, including giving directions and removing contestants.  The following clause manifests CNBC's view that it had the right to undertake production related activities as part of the show, including filming and photography:

> … the Network shall have the right to videotape, audiotape, film, portray, photograph and otherwise record Company, its owner(s), employees (subject to obtaining the required releases) and the location (as set forth in Exhibit A attached hereto and incorporated by reference) in connection with the Series, as often and for such periods of time as they may require (whether before, during and/or after the date of this Agreement).
>
> … the Network shall have the right to place canceled cameras and other devices on the Location and record the Company using such cameras and devices.

---

[27] What matters for the existence of an employee-employer relationship is CNBC's manifestation of its apparent right to exert control over the manner of the production, regardless of whether (1) on any given episode, CNBC appeared on the set to exert control, or (2) its agreement with Lemonis and Machete gave it the right to control the manner of the work.

[28] Exh. P, Reality Participant Agreement, Release, & Arbitration Provisions—Business) at § 1 (emphasis added).

177.     All of these manifestations also conveyed CNBC's right to be involved in the manner of the show's production.  This would be in keeping with CNBC's public position that *The Profit* was its show and would create a reasonable belief that Lemonis and Machete were CNBC employees.

178.     Thus, CNBC manifested that it had the requisite control over the manner in which the show to cause Claimants to have a reasonable belief that Lemonis and Machete were employees of CNBC (and thus and NBCUniversal),

>    **b.      *Machete and Lemonis' Conduct Was In The Apparent Scope Of Employment***

179.     Machete, as producer, acted in the scope of its apparent employment when making representations to participating business owners about the nature of the show, including claims that Lemonis would act in good faith on their behalf.  As discussed above, these statements constitute fraud because Machete knew that Lemonis regularly and knowingly took actions that harmed companies and their owners while benefiting him, and that the fraudulent editing of the show defamed, denigrated and often destroyed the owners of the companies on the show.

180.     Lemonis as host also was acting in the scope of his apparent employment when he made representations that the deals were real and that he would act in good faith on behalf of the contestant companies.  As host, Lemonis, had apparent authority to speak on behalf of CNBC about the nature of the show.  Indeed, CNBC placed statements made by Lemonis about *The Profit* on its website.  Lemonis certainly knew that these statements were materially misleading because he knew he was successfully using his role as host to cause companies to take actions that harmed them and enabled him to obtain ownership interests in companies or intellectual property that he could not have otherwise obtained on such favorable terms or stolen.  He also knew that he

regularly engaged in self-dealing transactions without owners' uncoerced and informed consent—which constitutes bad faith.

181.     Lemonis also was acting in the scope of his employment as host of the show in all the actions he took during the show that breached his fiduciary duty to the contestant companies and their owners. As show's host, his job was to cause the contestant companies to incur expenses to improve themselves, to offer advice, and negotiate for deals with companies.

182.     Lemonis and Machete were also producers of the show. Their job thus included making decisions about what material would be filmed, and what would be included in an episode. They were thus each acting in the scope of their apparent employment with respect to all acts of bad faith that presented doctored or fictionalized footage that put a contestant in a bad light or that knowingly breached an agreement not to display a contestant's customer's name and all defamatory actions taken in creating or showing the show's episodes.

183.     Lemonis was motivated to participate on *The Profit* by the outsized profits he could earn through his tortious dealings with the companies. This opportunity for personal gain was understood by CNBC. CNBC also had notice once the participating businesses sent them emails and letters detailing the misconduct. NBC was further on notice of the multiple litigations that followed the show; indeed, it is publicly available information through, *inter alia*, Camping World's SEC filings. Lemonis gain from this conduct could be expected to lower the amount that CNBC would need to pay for his services. It also was part of the benefit that enabled NBC to keep him interested in this highly profitable show. Thus, while he did benefit directly from the self-dealing, his ability to engage in self-dealing transactions also operated to the benefit of *The Profit* and CNBC.

       ***c.***      ***The Show's Participants Relied on Lemonis and Machete's Relationship to CNBC***

184. *The Profit* required companies to put enormous trust in its host—turning over full control to someone who could harm them. It is clear that these business owners would not have agreed to be on the show if it was produced by Machete as a stand-alone entity to stream, for example, on YouTube. They were willing to give Lemonis the keys to their future because he was draped with the institutional legitimacy conferred on him by the fact that *The Profit* was CNBC's show and CNBC appeared to be integrally involved in it. Accordingly, participating businesses trusted CNBC would not allow one of its shows to be used to harm or defraud small business-owners.

### 2. NBC is Vicariously Liable for Lemonis and Machete's Misconduct Because They Acted With Apparent Authority When Engaging In Their Tortious Conduct

185. CNBC manifested that Lemonis had apparent authority to contract on behalf of, advise, or contract with the contestant companies in the scope of his agency relationship with NBC and on CNBC's behalf.

186. CNBC held Machete and Lemonis out to the world as its agents with authority to act on its behalf to host and produce its show, *The Profit*. Their duties included helping to recruit companies for the show (and thus making statements to potential contestants about the nature of the show), and filming and editing material for the show. Lemonis was hired to undertake investments for the contestant companies, to advise them, and to negotiate deals with them

187. Thus, all the tortious conduct that they engaged with, or on behalf of, contestant companies was conduct that NBC manifested that they had authority to undertake as part of their duties as host and producer of *The Profit*—conduct that was part of making the show and thus was on behalf of NBC. NBC, in giving them apparent authority to recruit contestants, act for their businesses, and enter into business negotiations and deals with contestants for purposes of the

show— NBC's show—gave Lemonis and Machete apparent authority to engage in the conduct described above.

188.    Thus, for example, when Lemonis decided to use the authority granted him as host of the show to enter into self-dealing transactions for the participating businesses, that conduct was undertaken with apparent authority.  Similarly, when he used his host position to cause a company to incur debts or other liabilities in bad faith, either to serve one of his businesses or in order to leave the company strapped for cash, these actions also were within the scope of the apparent authority granted to him by CNBC to exercise authority over the companies' business.

189.     Similarly, the materially misleading statements in Lemonis' and Machete's actions to recruit for the show that Lemonis would act in good faith on the companies' behalf also were made in these agents' roles as host and producer, acting on CNBC's behalf.

### 3.    NBCUniversal Is Directly Liable For Lemonis and Machete's Misconduct Because CNBC Negligently Supervised Them After Learning About Their Tortious Conduct

190.    Lemonis and Machete were agents of NBC in hosting and producing *The Profit*, respectively. This agency relationship enabled them to get companies to go on the show and to hand-over to Lemonis complete control of their businesses who would not have done so if NBC was not standing behind the show.

191.    CNBC had actual knowledge of Lemonis' potential for fraud and breaches of fiduciary duty as of the date the Reality Participant Agreement was drafted, which gave Lemonis unfettered ability to control other people's companies in a context where he could benefit from either self-dealing or from undermining their finances such that they had to accept any offer he proposed.  Moreover, CNBC knew that Lemonis could engage in misconduct without fear of harming his reputation because the Reality Participant Agreement it drafted allowed him to pretend

to make offers that he did not make and enabled him not to publicly reveal his true impact on the companies that appeared on the show. *The Profit* was structured as an ideal environment for enabling fraud, breaches of fiduciary duty and other misconduct.

192. This context alone provided sufficient notice to CNBC of the possibility of fraud or other misconduct that it should have exercised some oversight over the financial transactions that Lemonis engaged in with, and on behalf of, the contestant companies. But instead of asserting oversight, NBC drafted a contract that allowed Lemonis to do whatever he wanted in total secrecy.[29] His desire for secrecy was itself a red flag – one CNBC negligently chose not to respond to.

193. Moreover, CNBC had actual knowledge of Lemonis breaches of fiduciary duty and Lemonis and Machete's fraud many years ago. CNBC and NBC received numerous letters and emails from participating businesses over the years informing them about these problems. Moreover, prior to 2017, Lemonis was involved in at least three lawsuits resulting from dealings on the show.[30] These lawsuits alleged facts of misconduct that put CNBC on sufficient notice that Lemonis' was engaging in such oppressive misconduct such that it should have investigated to ensure it was not empowering Lemonis to engage in fraud and other torts against small businesses.

194. In addition, in 2017, *Inc. Magazine* ("*Inc.*") ran a story detailing 20 contestants' claims about misconduct by Lemonis.[31] The article made clear that Lemonis engaged in breaches

---

[29] *See* Exh. P, Reality Participant Agreement, Release & Arbitration Provisions – Business.

[30] Will Yakowicz, Exclusive: *20 Business Owners Claim There's a Dark Side to Marcus Lemonis' Reality TV Show "The Profit,"* Inc.com (Aug. 13, 2017) (https://www.inc.com/will-yakowicz/dark-side-of-marcus-lemonis-reality-tv-show-the-profit.html).

[31] *Id.*

of fiduciary duties, fraud and a variety of other torts. The description of Lemonis' conduct with respect to several businesses provided clear evidence of bad faith—in contradiction of all of CNBC's assurances to contestants. Lemonis gave them a handshake deal and told them to stop making mortgage payments because he would take them over. He failed to do so and once the companies were in trouble, he reneged on the original handshake deal and offered to buy out the companies for a fraction of the original offer.[32]

195.    The Inc. article also explicitly describes Lemonis' strategy of acting in bad faith to use the Consultancy Period to burden participating businesses with so much debt that the companies either will be in financial extremis or the owners will have to give Lemonis control in order to have him assume liabilities that he caused them to incur.[33] Not only is this clear notice of bad faith but it is also the exact kind of bad faith one would expect given the way CNBC structured their agreements with participants.

196.    The *Inc.* article detailed numerous other breaches of Lemonis' duty of loyalty, as well as material misrepresentations and other torts. In addition, NBC received numerous emails and letters from contestants. All of this provided enough notice that CNBC had a duty to exercise reasonable care either in retaining or supervising Lemonis.

197.    Notwithstanding this notice, neither CNBC nor NBCUniversal exercised due care. CNBC could have protected the existing show participants. As a publicly held firm, NBCUniversal is fully aware of these techniques as they form the backbone of a standard compliance program.

---

[32] *Id.*

[33] *Id*.

198. To prevent fraud, defamation, and bad faith, CNBC should have required *The Profit* to accurately depict the offers that Lemonis made—including any costs he had the contestants incur. Accuracy in public presentation is important as a guard against both misrepresentations to contestants and bad faith on the show. The public reporting should state the net effect on the company of appearing on *The Profit* — including the expenses it incurred as a result.

199. CNBC's failure to undertake basic steps to prevent Lemonis' self-dealing and defrauding and defaming the businesses appearing on *The Profit* was the actual and proximate cause of their harm. To the extent Lemonis was required, but refused, to do the show if full disclosures were required, none of the participating businesses would have suffered any losses because he would not have been the show's host. If Lemonis chose to participate, the disclosures and prohibition on self-dealing would have prevented many of the excessive expenditures detailed above. Public disclosure of the actual deals in question and a prohibition on showing companies and contestants in a false light would have also prevented harms described herein. Oversight of the deals offered also would have prevented Lemonis from placing companies in financial distress in order to misappropriate their business and/or intellectual property at a discounted price.

### 4. CNBC Knowingly Aided and Abetted Lemonis' Fraud and Machete's Tortious Conduct

200. CNBC knew, or should have known, that its agents were engaging in misconduct because it knowingly aided and abetted Lemonis' breaches of fiduciary duty and Lemonis' and Machete's fraud and other misconduct.

#### a. CNBC's Knowledge of Lemonis' Misconduct

201.    CNBC knew that the representations that it and Lemonis made to lure contestants onto the show—specifically that the offers portrayed on the show were real—were materially misleading. It knew that the actual offers differed materially from the ones shown on the show. Indeed, the Reality Participant Agreement drafted by CNBC states that the investments shown on the show were not real:

> ii) Simulated Investment: Subject to the Company's compliance with the terms set forth above in Section 1B(i), Lemonis shall have the right to make a simulated capital investment in or loan to the Company during the applicable Episode, in an amount to be determined by Lemonis in his sole discretion (the "Simulated Investment"). Company acknowledges Lemonis will perform the Simulated Investment transaction on-air during such applicable Episode for the purposes of portraying a dramatic moment. By way of example, and without limiting the foregoing sentence, Lemonis may present Company with a prop check during the applicable Episode. Lemonis shall thereafter promptly enter into good faith negotiations with Company off-air regarding any Actual Investment and/or Loan Transaction (as defined below) following the Consultation Period and may present a term sheet setting forth the anticipated terms of the Actual Investment and/or Loan Transaction ("Term Sheet") during the Consultation Period, which Term Sheet may set forth the terms of the on air Simulated Investment and/or Loan Transaction and which may be binding if specifically set forth therein.[34]

202.    Thus, when it marketed a show and used past episodes to show future contestants the benefits they could hope to reap, it knew that the investments it was presenting to future contestants as having occurred were false and had not actually occurred.

203.    Moreover, while the agreement lulled contestants into believing that the simulated investments they had seen on past shows did not differ materially from the actual investments by noting "[n]otwithstanding such Simulated Investment, Company acknowledges it is Lemonis' good faith intention to actually invest in and/or loan funds to the Company,"[35] and CNBC's

---

[34] Exh. P, Reality Participant Agreement, Release, & Arbitration Provisions—Business at § 1B(ii).
[35] *Id.*

repeated assurances that the investments shown on the show were real, CNBC knew otherwise from complaints from previous show participants and the *Inc.* article, detailing problems faced by those contestants.

204.    CNBC and NBCUniversal also knew about the breaches of fiduciary duty. CNBC and NBCUniversal received emails and letters from certain of the show's prior participants. For example, around the same time as the Inc. article, a group of former contestants from "The Profit" sent a letter directly to CNBC executives and confirmed the facts set forth in the Inc. article and detailed Lemonis' fraudulent and self-dealing conduct. These articles and letters also informed CNBC that its claims—and Lemonis' claims—that he was acting in good faith to improve the companies was materially misleading.[36]

205.    CNBC's knowledge also can be established through circumstantial evidence through the doctrine of willful blindness. CNBC knew that there was a high probability that (1) the actual deals different materially from the ones shown on the show and that (2) Lemonis used his power over the companies in bad faith to benefit himself—rather than them—by self-dealing and by placing them in a vulnerable financial position that would necessitate their accepting a deal that they never would have be willing to accept had he not materially undermined the company's welfare during the Consultancy Period. CNBC clearly knew that there was a high probability of this because it knew that Lemonis benefitted considerably more from participating in *The Profit* if the actual deals were less favorable than the ones shown and if he could use his control during the Consultancy Period to induce companies to accept offers that were favorable to him. Moreover,

---

[36] Yakowicz, *supra* note 32.

CNBC had received notice from past contestants and from the Inc.com article, that this was exactly what he was doing.[37]

206.    Aware of the high probability of misconduct, CNBC took deliberate action to avoid learning about either the actual deals or Lemonis' behavior during the Consultancy Period and afterwards.  It included a clause in the Reality Participant Agreement that ensured that it would know whether Lemonis made an investment but would not be given any details about his expenditures during the Consultancy Period or the actual deal offered to the contestant companies:

> All terms (including without limitation, acquiring entity, amounts of investment, mode of investment, percentage of ownership, amount and terms of the loan(s) etc.) applicable to the Actual Investment and Equity Stake and/or Loan Transaction *shall be strictly a matter of agreement between the Company and Lemonis* (or any entity owned and controlled by Lemonis) and *neither Producer nor Network shall have (a) any involvement therein, control or right of control thereof*; or (b) any obligations to Company in connection therewith; *provided, however, that Network shall be provided with a statement from Lemonis as to whether an Actual Investment/Equity Stake and/or Loan Transaction was made.*[38]

### b.    CNBC's Substantial Assistance with the Fraud and Breach of Fiduciary Duty

207.    Lemonis' scheme to defraud contestants and obtain unjust benefits from them through self-dealing depended critically on the appearance that he is acting in good faith to benefit businesses. It also depended on the public display of episodes on CNBC which showed companies receiving substantial infusions of capital.  The episodes also would have allayed any concern about whether contestants were harmed in turning over control to Lemonis because the shows were

---

[37] *Id.*

[38] Exh. P, Reality Participant Agreement, Release, & Arbitration Provisions—Business at § 1B(iii) (emphasis added).

marketed as depicting the real deals and real events and did not show any evidence of his breaches of fiduciary duty, and massive fraud and extortion.

208.     CNBC was an active participant in the effort to portray *The Profit* as an opportunity for businesses to improve themselves, and to portray Lemonis as a man acting in good faith for their benefit. CNBC actively recruited contestants for the show, including through events with CNBC Business. CNBC's contestant-sign up website states: "If you are in over your head and feel your business is drowning, CNBC can provide you with the life line to save your business." CNBC on its website also states that once Lemonis is "inside these companies, he'll do almost anything to save the business and make himself a profit."

209.     In addition, CNBC's Reality Participant Agreement repeated the claim that Lemonis was acting on the contestant's behalf:

> Company acknowledges that Lemonis' consultation is a good faith attempt to rehabilitate the Company beyond the Company's involvement with the Series and Company agrees to use its best efforts to adhere to Lemonis' advice during the Episodes.[39]

210.     Moreover, CNBC regularly repeated the claim that the offers made on the show are real. Indeed, in the *Inc.* article, former Executive Vice President of Primetime Alternative Programming at CNBC, stated that "[t]he checks are legit" and "[t]he deals that are made on the show are legit."[40] CNBC also directly recruited contestants by telling them the show is real and touting Lemonis as someone who would help the contestants.

211.     Furthermore, CNBC gave substantial assistance to Lemonis through the structure of the contracts that it had contestants sign. CNBC gave him substantial assistance by creating contracts that allowed Lemonis to go on television and pretend to do a deal that he never did. The

---

[39] Exh. P, Reality Participant Agreement, Release, & Arbitration Provisions—Business at § 1B(i).
[40] *See* Yakowicz, *supra* note 32.

clauses in the contracts that allowed him to seize full control over their businesses during the Consultancy Period also enabled him to engage in gross misconduct. CNBC knew he was engaging in gross misconduct. They enabled this no doubt because it made for a popular show with considerable drama. Lemonis in the Inc.com article claimed no knowledge of the contents of the contracts. The contracts were created by CNBC.

212. CNBC also gave knowing and substantial assistance by participating in the editing and showing of shows that put companies in a false light and undermined their financial health to the point where they could not stand up to Lemonis.

213. Given CNBC's knowing of Lemonis and Machete's misconduct, it is liable for aiding and abetting Lemonis and Machete's unlawful activity.

**5. NBCUniversal's Vicarious Liability for Lemonis and Machete's Tortious Conduct**

214. On information and belief, Lemonis and Machete were actual employees of CNBC. This provides an additional basis for holding NBCUniversal vicariously liable for all torts in the scope of Lemonis' or Machete's employment.

215. *The Profit* was CNBC's show and CNBC had a sufficient right to control the manner in which it was made.

216. As such, Lemonis and Machete, as host and producers of the show, were employees of CNBC. They were not independent contractors who had a complete right to control the manner in which the show was cast, filmed, and produced, because, as set forth above:

- CNBC originally owned *The Profit* and originated the idea for the show;

- CNBC sought out Machete and Lemonis to do the show on its behalf;

- Ackerman was directly involved in the creation and production of *The Profit*, and approached Machete to offer it the opportunity to produce the show;

- Machete was contracted to produce the show for CNBC;

- CNBC was directly involved in obtaining participant companies for the show by (i) directly reaching out to businesses seeking participants on the show's first season; (ii) on subsequent seasons, organizing events that combined the host and former contestants from *The Profit* with a reporter from CNBC Business to bring businesses to a live event, partly to help recruit for *The Profit*;[41] and (iii) Mazzola said that when businesses apply to be on the show, Machete presents the prospective companies to Lemonis and the network, "and you know everyone sort of weighs in on what they like"[42];

- CNBC was involved in the production of the show, including by providing notes to Machete and directing false edits for Machete to make after the episodes;

- CNBC exercised contracts over a variety of aspects of the production from its inception and the Reality Participant Agreement expressly requires the contestant companies to take direction from CNBC and gives CNBC the right to remove companies;

- Lemonis, in his capacity as a television host, was in a long-run relationship with CNBC;

- Lemonis appeared to provide his "business show hosting" services primarily, if not exclusively, to CNBC; and

- Lemonis and Machete did not supply all of the instrumentalities that went into the show; rather, CNBC was directly involved in casting, both through its marketing department and by hiring casting companies, CNBC supplied the contracts, and CNBC offered advice and input during production; and

- The agents' work was part of CNBC's regular business.

217. Significantly, NBCUniversal has earned and continues to earn significant revenue from *The Profit*.

---

[41] *CNBC's 'The Profit' and Comcast Hold Business Panel, Networking and Casting Events During Small Business Week* (May 2, 2017) (http://www.cnbc.com/2017/05/02/cnbc-the-profit-comcast-small-business-week.html).

[42] *See* https://www.youtube.com/watch?v=Op2uXkeNTyM&ab_channel=BrandCreators.

218.     NBCUniversal sells advertising during the show, earns monies from airing and re-airing the show, and earns revenues from streaming and digital sales of the show throughout the world.

219.     According to Comcast's 2020 Annual Report, NBCUniversal's cable networks raked in $10.8 billion in revenue in 2020.[43]     The report also indicates that CNBC is NBCUniversal's sixth most popular cable network.

220.     CNBC's website also states that *The Profit* is the #1 original series on CNBC.[44]

**C.     Plaintiffs Are Victims of Defendants' Fraudulent Scheme to Defraud**

      **1.     Courage.B is a Successful Business**

221.     Along with their mother Neomi Goureau ("Neomi"), Plaintiffs Goureau and Menkin began the luxury women's fashion line and retail stores, Courage.B, in 2008. The brand focused on high-end garments and accessories, inspired by the family's French roots.

222.     Plaintiffs' retail stores and Courage.B brand were owned by the trio's corporation called Gooberry Corporation.  Goureau owned 100% of the stock of Gooberry and was its CEO, Menkin was Gooberry's President, and Neomi was the Chief Designer for the brand.

223.     The story of Courage.B began over twenty years ago, in 1987, when Neomi and her husband Patrick began the family interest in owning and operating retail stores when they opened up Fopp's in New York City.  However, Patrick sadly passed away just a year later after losing the fight to cancer, leaving Neomi to continue the business while raising Goureau and Menkin who were young children at the time.

---

[43] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/1166691/000116669121000008/cmcsa-20201231.htm.

[44] *See*     https://www.cnbc.com/2019/10/14/business-is-personal-on-an-all-new-season-of-cnbcs-hit-series-the-profit-premiering-tuesday-november-5-at-10pm-et.html.

224. Over time, Goureau and Menkin became more involved in Fopp's so that Noemi could focus on her passion—designing the upscale clothing their retail stores would sell. As an adult, Goureau took the reins of managing the business, and eventually began Courage.B.

225. Courage.B's first store opened in Greenwich, Connecticut on November 4, 2008. The store was featured on several local news publications when it opened.

226. The business was a success and began to do $6.5 Million in sales within the first twenty months of opening. Through their hard work over the next six years, the three were able to grow their company and expand to seven different retail boutiques across the country, including store locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA.

227. The Courage.B stores carried their exclusive Courage.B label clothing and items which were designed by Noemi. This created a loyal customer base that was interested in the Courage.B label. Often, Courage.B customers would shop in various Courage.B locations in order to shop the exclusive Courage.B line. For example, Plaintiffs had customers that lived in Greenwich, visited family in New York City, wintered in Palm Beach, and summered in Aspen shopping at each Courage.B store along the way.

228. Courage.B's success continued, and the company was doing roughly $5.5 Million in sales each year. As a result of their success, Plaintiffs and their mother, Noemi were ready to take their business to the next level. Plaintiffs developed a growth plan and began meeting with potential investors. In or around 2014, Plaintiffs began looking for an investor or consultant who understood family businesses, had experience in retail stores and could take their business to the next level. Unfortunately, Lemonis represented himself as the perfect investor for Plaintiffs' business.

## 2. "The Profit" Comes to Help Courage.B

229. Goureau first learned about *The Profit* when he saw an episode on television. The episode featured a company called Sweet Pete's, a small family run candy shop in Florida. On the episode, Lemonis was portrayed as a business expert, fiduciary, and investor who successfully helped the business featured on that episode.

230. The episode convinced Goureau that Lemonis could be exactly who his business needed. Thus, Goureau e-mailed the television show and applied for Courage.B to appear on *The Profit*.

231. Around spring 2014, Machete, *The Profit*'s production company, reached out to Goureau about Courage.B's application for the show. Shortly thereafter, Plaintiffs each had a Skype interview Kimberley Donnan ("Donnan"), Co-Executive Vice President of the show and Executive Vice President at Machete, to further discuss their potential involvement.

232. During his Skype call, Goureau told Donnan that he was in the process of securing an outside investor for Courage.B. Donnan convinced Goureau to forego that potential deal in order to be featured on the show. Donnan represented to Goureau that the show was an incredible opportunity for his family business to acquire an invaluable partner who can help his family business grow to next levels and reinforced that the deal reached on the show is real.

233. Donnan also suggested that Plaintiffs get a sense of the show's prior "success" stories by speaking with former show participants. Similarly, Donnan told Menkin during Menkin's Skype interview that if Lemonis was interested in investing, they would make a deal while the show was being filmed and that deal would be real.

234. Following their initial Skype calls, Plaintiffs had to undergo background checks and provide a slew of private and confidential information about their company's business,

finances and employees, as well as information about their personal lives, including, but not limited to, home ownership details and family dynamics. Again, counselors were unethically used by the Defendants to mine personal details to be used to defame and embarrass them.

235. Like most family businesses to appear on the show, Plaintiffs' confidential and private information was later used, not to help their business expand and grow, but for dramatic effect on TV in order to increase the show's ratings.

236. Once Plaintiffs' background checks cleared, Plaintiffs were induced to sign a number of documents in order to appear on the show. No one from Machete or NBC went through the substance of the documents or informed them of what they were supposedly agreeing in these documents. They were never advised to have an attorney sit with them to review the documents prior to signing. Instead, they were pressured to sign quickly or risk losing their spot on the show.

237. In June 2014, after Plaintiffs were selected to appear, filming began.

238. From the outset of filming, Machete producers created a story for Plaintiffs to follow and present on the show. Even though Courage.B was already a successful business, averaging $5 million in sales per year, Lemonis and Machete wanted to portray Plaintiffs' business as one that was struggling and in need for Lemonis' help. Producers also consistently told Plaintiffs that their mother Neomi was a problem, that she didn't know what she was doing, and that Goureau had to fix what she was doing. This, of course, was not the reality for Plaintiffs' business.

239. During the filming of the episode, Lemonis spoke to Plaintiffs and explained, "[a]nd you know what's even more amazing to me? You're doing $5 million with this product. Can you imagine what you would do if your product was right?" He further explained his belief in the company, and that it was close to where it needed to be already, stating to Plaintiffs, "[t]his

has the makings of being something great, but the business needs money, and all I have to get my head around is, we're talking about changing the product and changing the process, and it's extreme, and putting money in at the same time."[45]

240.     In fact, Lemonis doubled-down on his belief that Courage.B was not far off from obtaining even greater success when he stated, during a cut-scene, that, "[t]he real problem is, the company doesn't have the right product on the ground and if I can fix the product going forward and then merchandise it in a creative way, I know I can make money immediately."

241.     Despite these beliefs, when the time came to make his offer his Plaintiffs, Lemonis first offered $800,000 for full control of Courage.B and 50% of the stock, after which he chimed in "and before you answer, just know that if you don't do a deal with me, you may not make it."

242.     In what has since turned out to be a prophetic statement, after having his first offer rejected by Goureau, Lemonis responded to Goureau's counterproposal of $800,000 for 10% of the company's stock stating, "I'll give you a half-a-million-dollar loan and take the stock of the company as collateral. I mean, if you default, I'll take the business. So you don't want that option. The option you want is you want me to be just as excited as you are."  What Lemonis failed to mention is that he would run the business in a way which overloaded it with debt allowing him to foreclose on a whim.

243.     Plaintiffs and Lemonis reached a handshake agreement for Lemonis to invest in Courage.B and Gooberry.  As discussed on the show, Lemonis was to purchase a 30% stake in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital,

---

[45] While Lemonis repeatedly stated on the show that the company's problem was that their expenses exceeded their profits, he nevertheless proceeded to spend a lot of it as soon as he was "100% in control."

$200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 whose use was to be determined. This all constituted a set of false promises. Defendants' real plan was concealed.

244. During filming, Lemonis pushed the company to undergo expensive renovations, starting with the Gooberry store in Greenwich, Connecticut. On *The Profit,* renovations are done during the filming of the episode so that the episode can show the supposedly great improvements that Lemonis makes to the businesses. The owners are purposefully kept in the dark about how much the renovations are costing and who ultimately will be paying for them.

245. Lemonis and Machete made several misrepresentations and false promises to Plaintiffs about their company store renovations. They told Plaintiffs not to worry about the costs of the renovations and that they should "trust the process." On information and belief, Plaintiffs were purposefully kept in the dark about the costs of the renovations, about who will have to pay for the renovations, and what the actual renovations were. Plaintiffs were told they could not visit the stores during the renovations but were told by Lemonis "not to worry" about the renovations and that they "didn't have to deal with them."

246. Lemonis consistently misrepresented the renovation costs to Plaintiffs during filming. He told Plaintiffs that a portion of his investment would go towards renovating the stores. Of the $800,000 Lemonis agreed to invest during filming, for a 30% stake in their business, $200,000 was earmarked for renovations. Lemonis led Plaintiffs to believe that the renovations done while the show was filming would be covered as part of the $200,000. The costs turned out to be far more than Plaintiffs could ever imagine.

247. Lemonis made other representations to Plaintiffs during the filming of the show that later turned out to be false. For example, Lemonis told Plaintiffs that they would have access

to his executive team that consisted of retail experts to assist with human resources, finance, business operations and marketing. In one scene, Lemonis says that "Neomi is the face of the brand, and it's still her eye that I trust. But in order to make sure that she's successful, I'm gonna hire legitimate designers with legitimate track records." He also told viewers that he was hiring "professional visual merchandisers to come in and assist in the renovations of the show."

248. In reality, these executives were either employees of Camping World or other companies in which Lemonis had an ownership stake in, often making purchases on behalf of Gooberry, leaving Plaintiffs to foot the bill. Plaintiffs were also charged for Lemonis' Camping World employees' time and fees even though this was represented as a part of the Lemonis expertise package.

### 3. Lemonis Takes Over and Drowns the Company in Debt

249. After filming, but before the documents memorialized the investment were complete, Lemonis continued renovating Courtage.B stores.

250. Plaintiffs allowed Lemonis to make these renovations only because they believed – based on Machete's representations – that the deal reached during the show was real and, as such, the renovations would cost $200,000.

251. John Sirpilla[46], one of Lemonis' associates and Vice President of Camping World at the time, completely controlled renovations made to other Courtage.B stores and did not allow Plaintiffs to have any input, to review decisions made, or to review information on the costs of the renovations. The bill submitted for the renovations was falsified and no backup was ever given.

---

[46] In the end, Plaintiffs had to cover the costs of renovating their stores and were instructed to make the checks payable to Mr. Sirpilla and Renea Sirpilla, his sister and a Camping World employee.

252.     Eventually, before the final papers were signed finalizing Lemonis' investment in their company, Plaintiffs learned that Lemonis had spent over $2 million – ten times more – renovating their stores, which did not need to be renovated in the first place.

253.     When they confronted Lemonis about the astronomical costs, Lemonis told them that if they wanted to back out of the deal, they would have to repay him that $2 million, and he would sue them to collect it.  Of course, Plaintiffs could not do that and felt that they had no other choice but to move forward.  This was extortion.

254.     Indeed, Lemonis repeatedly berated Plaintiffs for questioning the ongoing renovations and increasing costs, calling them ungrateful, and threatening to back out of the deal and sue for reimbursement for the costs he unilaterally imposed upon them.  At that point, of course, Plaintiffs were not able to repay Lemonis the over $2M he had unilaterally decided to spend on the renovations—despite telling Plaintiffs that they would only cost $200,000.  Plaintiffs felt trapped and, with no other options, moved forward with Lemonis.

255.     Plaintiffs later learned that this was all part of Defendants' fraudulent pattern and practice in his dealings with businesses that appeared on *The Profit*.  Lemonis would spend money on the businesses making it seem like the money he spent would either be part of his investment or otherwise covered by him, only to present them with a bill that would automatically give him a debt position over the company that he would then use to try to strong-arm the deal or take the business.

256.     On or around November 18, 2014, the parties executed the paperwork memorializing Lemonis' investment.  Gooberry, Goureau, and Lemonis' entity, Defendant ML Retail, entered into a Stock Purchase Agreement (the "Stock Purchase Agreement").  (*See* Exh.

A.)  Defendant ML Retail purchased 32 shares of Gooberry (a 32% ownership interest) for $800,000.  (*Id.* at § 2. 2.)

257.    At the same time, Gooberry's shareholders, Goureau, Menkin, Neomi, and ML Retail, entered into a Shareholder Agreement ("Shareholder Agreement").  (*See* Exh. B.)  According to the Shareholder Agreement, up to four Directors were allowed on the Board, and each shareholder was given the right to appoint one Director.  (*Id.* at § 3.)  Lemonis, Goureau, Menkin, and Neomi appointed themselves.   Accordingly, the Gooberry Board of Directors consisted of the four shareholders:  Lemonis, Goureau, Menkin and Neomi.

258.    Concerningly, the Shareholder Agreement gave ML Retail broad power over Gooberry.  (*Id.*  at § 2.)  For example, Gooberry needs ML Retail's "affirmative shareholder vote" in order to make any fundamental business decisions:

> **2.1.1** the following actions shall not be taken without the affirmative vote of the ML Shareholder:
>
> (a)  enter into any transaction outside the ordinary course of business of the Company;
> (b)  A merger, consolidation, stock exchange, or similar transaction involving the Company;
> (c)  Any contract or transaction, or amendment to any existing contract or transaction, with any Shareholders, Directors, or affiliates of any of them;
> (d)  The admission of new Shareholders;
> (e)  The dissolution of liquidation of the Company;
> (f)  Amendment of the Article of this Agreement;
> (g)  Incurrence of any Indebtedness of issuance of any guarantee or indemnity of any obligation of any other Person or entity if the aggregate amount of the principal amount…shall exceed $25,000;
> (h)  Make any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;
> (i)  Make any Distributions or Shareholders, other than a Tax Distribution;
> (j)  Increase or modify compensation plans to senior executives of the Company of pay bonuses or other amounts outside of approved compensation plans;

      (k)   Hire, remove or otherwise replace any of the senior executive team of the Company…

(*Id.* at § 2.1.1.)

259.    Essentially, Gooberry needs ML Retail's affirmative shareholder vote in order to, among other things: (1) enter into any contract outside of normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, and (4) hire or replace any member of Gooberry's executive team, and (5) dissolve or liquidate the Company.

260.    Moreover, Section 2 of the Shareholder Agreement also gives ML Retail "the sole and absolute discretion over" the financials and operation of the Company:

> **2.2**    Notwithstanding anything to the contrary contained herein, the ML Shareholder shall have the sole and absolute discretion over:
>
> > **2.2.1**    All financial and accounting functions, controls, decisions and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for store expansions, remodels and new locations; and
> >
> > **2.2.2**    Tax matters, including, without limitation, causing the Company to make an election to be treated as a Subchapter S corporation under the Internal Revenue Code.

(*Id.* at § 2.2.)

261.    Not only did the agreement give ML Retail the sole power to manage and control Gooberry's bank accounts, but also the power to open certain retail locations and control Gooberry's revolving line of credit with the Lemonis Entities. (*Id.* at §§ 2.1.2, 2.3 and 2. 4.) Under Section 2.3, Gooberry's line of credit accrued interest at 5 percent per annum. (*Id.* at § 2.3.)

262.    Lemonis represented that the line of credit would be used to provide the capital for his $800,000 investment. Lemonis did not tell Plaintiffs that he would use the line of credit to make Gooberry insurmountably indebted to him and Lemonis, ML Retail and LM, LLC.

263.     Lemonis also made clear that if Plaintiffs didn't sign the purchase and shareholder agreements, he would force them to repay the money that he had put into the renovations – which would wipe them out – and take their business from them.  He sent lawyers he controlled and paid to represent them in the negotiations, and those lawyers hid their conflicts.

264.     Not long after the deal was finalized, Lemonis sent IT personnel from Camping World to the Gooberry offices to upgrade their e-mail and computing systems.  During the process, the IT technicians, allegedly on accident, deleted all of the e-mails from Gooberry's system.  This meant that years and years of Gooberry's e-mail records were now gone.

265.     Plaintiffs were then given new @courageb e-mail addresses.  Eventually, Plaintiffs' e-mails were transitioned to @marcuslemonis e-mail addresses.  Plaintiffs used these e-mails to conduct the business of Gooberry and eventually ML Fashion.  However, as discussed below, one by one, Plaintiffs, and their mother Neomi, were removed from the business venture and lost access to their @marcuslemonis e-mail accounts.

266.     Lemonis used the power bestowed upon him, through his entity ML Retail, in the formation documents to make good on his promise that he was "100 percent in charge" and took over Gooberry and Courage.B.  ML Retail, through Lemonis, had all of Gooberry's retail stores renovated and changed the product that the stores were selling.  However, despite making these changes himself, Lemonis later determined that he did not like the changes he had implemented or the new products he had added.  Lemonis then forced the Gooberry to sell old inventory at a steep discount and purchase new inventory.

267.     The new inventory did not appeal to Courage.B's loyal customer base.  Several customers came to Courage.B to shop their exclusive fashion line.  The products Lemonis forced the stores to carry waas often purchased at trade shows and widely available at department stores

and boutiques. This type of product brought in price comparison shoppers who were looking to get the best deal on this type of clothing. Courage.B was often unable to compete against department stores carrying the same clothes and offering various friends and family, VIP and rewards programs. In addition, the inventory Lemonis purchased was often from a previous season and was not appealing to Courage.B's fashion savvy customer base.

268. As the inventory did not work for the stores, Lemonis forced Gooberry to sell the new inventory that he had previously forced the company to acquire at a steep discount, decided he now wanted the stores to carry younger and hipper brands. While on the show Lemonis represented that all Gooberry needed to do to take its business to the next level was get the proper inventory, Lemonis' new inventory tanked the business' margins. Indeed, this change in inventory reduced Gooberry's typical profit margins from 73% to 52%.

269. Lemonis continued to make decisions that negatively impacted Gooberry's profit margins. For example, Courage.B had a lucrative and very successful handbag line. On one occasion, Lemonis purchased over $150,000 in handbags from a factory in Milan in styles and colors that the stores had not carried before. Shortly thereafter, Lemonis determined that he did not like the order and forced the stores to sell the items for pennies on the dollar. This ultimately destroyed Gooberry's legacy handbag line.

270. All of the renovations, inventory purchases, and other large expenses Lemonis insisted on were funded through Gooberry's line of credit with ML Retail or another Lemonis entity. By making these large purchases, reducing Gooberry's profit margins, and forcing the company to sell inventory at a loss, Lemonis ensured that Gooberry would need to rely on its revolving line of credit with Lemonis' entities to meet its normal financial obligations, like payroll and rent. This practice insured that Gooberry was always heavily indebted to Lemonis giving him

the power to convert on its assets at any time. Lemonis repeatedly used the threat of foreclosing on his loans to Gooberry to keep Plaintiffs in line.

271. When it came to running the business, Lemonis was mostly concerned with building his television persona on *The Profit.* To that end, Lemonis would boost his image on the show and add debt to Gooberry by forcing Gooberry to take on fledgling brands, businesses, and products featured on *The Profit*.

272. For example, in 2015, a retail concept called Blues Jean Bar was featured on an episode of *The Profit*. Lemonis unilaterally determined that Gooberry would purchase the Blues Jean Bar business and its three stores. Lemonis rebranded the Blues Jean Bar stores and two Courage.B locations as Denim & Soul. He then renovated all of the stores, including the Gooberry stores he had just renovated for hundreds and hundreds of thousands of dollars, on Gooberry's tab. He then comingled the assets and monies of these two businesses.

273. That same year, a candle business called Wick'ed was featured on an episode of *The Profit*. On the show, Lemonis agreed to invest $200,000 for 33% of the business. In reality, and not depicted on the show, Lemonis forced Gooberry to buy thousands of candles from Wick'ed in order to get cash into the Wick'ed owners' hands. Gooberry stores did not sell candles, so the purchase did not make sense for Gooberry's brands. Eventually, as is often the case, Lemonis' relationship with the Wick'ed owners soured, and the deal fell through. Gooberry was left holding the bag and had to liquidate the candles at a huge loss.

274. In 2016, a t-shirt business called DiLascia was featured on an episode of *The Profit*. On the show, the parties agreed that Lemonis would invest $200,000 for 50% of the business. Lemonis produced tons of tee-shirts with the original owners and then, once again, had a falling out with them. Lemonis then forced Gooberry to purchase the shirts and sell them in Goodberry

stores despite being completely off brand. Eventually, Gooberry was forced to liquidate its inventory of the shirts at a loss.

### 4. Lemonis Wants More and Insists on the Formation of ML Fashion

275. Despite wielding an incredible amount of control over Gooberry, Lemonis wanted more. In the beginning of 2016, Lemonis began selling Plaintiffs on starting a new business venture with Lemonis.

276. Lemonis represented that Plaintiffs would be able to make more money in this new business venture than they were making with Gooberry. Of course, this was after Lemonis had already slashed Gooberry's profit margins.

277. During this time, Lemonis told Plaintiffs that he wanted to be equal partners in the business with them. Lemonis praised Menkin, telling her that she would take on a larger management role in the new business venture and that her equity share should be equal to his and Goureau's. Lemonis sold Menkin on ML Fashion by representing that she would be its President and would be heavily involved in running the business.

278. However, in order to make Plaintiffs own a roughly equal membership interest with him, Lemonis removed Neomi's equity and placed it with Menkin. This was the start of Lemonis trying to build a wedge between Plaintiffs and their mother in order to boost his control of the business.[47]

279. Lemonis also represented that he and Plaintiffs would work to grow a fashion empire with ML Fashion that they would eventually be able to sell for millions in profit. Lemonis

---

[47] Over time, Lemonis repeatedly tried to build a wedge between Goureau and Menkin, as he has done with so many family-owned businesses that appeared on his show. Lemonis would often isolate Goureau from Menkin, and vice versa, from certain projects, telling one that they should keep the other in the dark. This was yet another way that Lemonis could wield his control over Plaintiffs and their company.

represented that Plaintiffs and Lemonis would split any such profits equally – after his debts were repaid. Over time, however, Lemonis drowned ML Fashion in so much debt that Plaintiffs' equity in the company eventually became meaningless. This meant that Plaintiffs had to keep working for Lemonis in order to derive any value from the business they started and be able to support their families.

280. Lemonis represented to Plaintiffs that ML Fashion would be an umbrella entity to hold their other business ventures. Lemonis wanted to help Plaintiffs grow their business, he claimed, and thought they could build something special together. He also represented that a limited liability company, as opposed to a corporation, would be beneficial to everyone.

281. ML Fashion was formed on March 29, 2016, as a Delaware limited liability company. On March 29, 2016, the Limited Liability Company Agreement of ML Fashion, LLC ("LLC Agreement") was entered into among the members, Goureau, Menkin, and ML Retail. (*See* Exh. C.)

282. Like all other business and legal documents, the formation documents for ML Fashion were drafted by Lemonis' lawyers. Lemonis told Plaintiffs that his lawyer now represented all three of them to deter Plaintiffs from seeking independent counsel. Based on these representations, Plaintiffs did not seek independent legal counsel and relied on Lemonis' attorneys in entering into the deal and signing the ML Fashion contracts. Over time, Lemonis' lawyers would often send Menkin troves of legal and business documents on short notice, always adding several more and saying, "[a]s long as you're signing a bunch of stuff, could you please sign this as well?" Nevertheless, when Lemonis' lawyers presented the formation documents to Plaintiffs for their signature, Plaintiffs believed that they, and Lemonis, had their best interests in mind and signed on the dotted line.

283. Although Goureau and Menkin were given 33.33% membership interest in ML Fashion, Lemonis was sure to give himself the controlling 33.34.

284. Exhibit A of the LLC Agreement lists ML Fashion's members and membership interests:

| Member | Membership Interest |
|--------|---------------------|
| ML Retail, LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |
| Total | 100% |

285. Lemonis made himself Chairman and CEO of ML Fashion, with ML Retail as its Manager. (*See* Exh. C at § 6.1(b).) This meant he was able to find ML Fashion to any and all agreements. Eventually, Lemonis began running Plaintiffs' business through the ML Fashion entity instead of Gooberry.

286. The LLC Agreement gives ML Retail the sole power to remove a manager and appoint any successor. (*Id.*)

287. The LLC Agreement also gives the following broad powers to the Manager:

> **6.1** **Manager (a).** The management of the Company shall be vested entirely and exclusively in the Manger. Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company. No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

(*Id.* at § 6.1(a).)

288.     It gives the Manager the power to appoint and remove officers of ML Fashion and to determine when to make distributions to members.  (*Id.* at §§ 5 and 6.1(c).)

289.     The LLC Agreement then limits the powers of the individual members:

> **7.1**     **Rights or Powers**. The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way. Notwithstanding the foregoing, the Members have all the rights and powers.

(*Id.* § 7.1.)

290.     The LLC Agreement further limits the members' voting rights:

> **7.2**     **Voting Rights.** No Member has any voting rights except as otherwise provided in this Agreement with respect to the following, which shall require the Approval of the Members:
>
> (a)     any conversion of the Company to any other debt; or
>
> (b)     any merger of the Company with or into any other entity that is subject to a Drag Transaction; and
>
> in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

(*Id.* § 7.2.)

291.     The LLC Agreement discusses the duties and obligations of the Manager, stating:

> **6.2**     **Duties and Obligations of the Manager; Discretion.**
>
> (a)     In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating

thereto, except where the claim at issue is based on the Misconduct of such Person.

(b) Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision to take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

(*Id.* § 6.2.)

292. The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct." (*Id.* at p. 5.)

293. When it comes to limiting the duties of the officers of ML Fashion, the agreement is silent and has no such limiting language.

294. The LLC Agreement lists the officers of ML Fashion as follows:

| Office | Name |
|---|---|
| Chairman/CEO | Marcus Lemonis |
| President | Stephanie Melkin |
| Chief Financial Officer | Manish Karna |

(*Id.*, Schedule A.)

295.     The LLC Agreement selected ML Retail as the "tax matters partner," and gave it the sole power to "make any and all elections for federal, state, local, and foreign tax purposes…" (*Id.* at § 8.)  Indeed, under Section 8, ML Retail has sole and broad power over ML Fashion's tax matters pursuant to Section 8.  (*Id.*)

296.     Lemonis as the Manager and Chairman/CEO of ML Fashion and ML Retail formed a control group due to their significant voting power coupled with their formidable power ("ML Control Group").

297.     By virtue of being a control group, the ML Control Group owes fiduciary duties to ML Fashion, Goureau and Menkin.

### 5.      Lemonis Mismanages Gooberry and Uses ML Fashion For Personal Gain

298.     As detailed above, the LLC Agreement gave Lemonis enormous power over ML Fashion.  Lemonis used this power to mismanage ML Fashion in order to benefit himself and his entities, ML Retail and ML, LLC, and a new venture of his called MARCUS.

299.     Lemonis' misconduct often related to credit agreements and loans he made to Gooberry and ML Fashion through the other entities he controlled.  Indeed, the very day that ML Fashion was formed, it entered into a Credit Agreement with ML Retail ("ML Fashion Credit Agreement").  (*See* Exh. D.)  Under the ML Fashion Credit Agreement, ML Fashion could receive up to $30,000,000 in loans from ML Retail at a rate of 6 percent interest per annum.  In order to induce Plaintiffs to enter into the Credit Agreement, Lemonis represented to the Credit Agreement would provide ML Fashion with a reliable source of capital that would be used to fund the company.

300.     While the agreement is signed by Menkin, the decision for ML Fashion to enter into the ML Fashion Credit Agreement was solely Lemonis' decision.  Lemonis often used Menkin

to sign documents on ML Fashion's behalf to, on information and belief, add legitimacy to his actions. However, his attorneys always drafted and sent the agreements to Menkin to sign, often in a package with hundreds of pages and several documents with the instruction to sign quickly. Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

301. Concurrent with the execution of the ML Fashion Credit Agreement, ML Fashion and ML Retail entered into a Security Agreement ("ML Fashion Security Agreement"). (*See* Exh. E.) The ML Fashion Security Agreement gave ML Retail a continuing security interest in essentially all of ML Fashion's assets. (*Id*.)

302. Also on March 29, ML Retail entered into a Credit Agreement and a Security Agreement with ML, LLC (collectively, the "ML, LLC Credit Agreements"). (*See* Exhs. F and G.) These agreements mirrored the ML Fashion Credit Agreement and Security Agreement entered into with ML Retail only now ML Retail was the borrower and ML, LLC was the lender. (*Id.*) Thus, whenever ML Fashion drew on its line of credit with ML Retail, it was in reality drawing from ML, LLC, a Lemonis controlled non-member.

303. This arrangement gave Lemonis the power to funnel his predatory lending practices through ML, LLC who was not a member of ML Fashion or a signatory of the ML Fashion LLC Agreement. Lemonis attempted to shield his lending from the fiduciary duties that an ML Fashion member and LLC Agreement signatory would have otherwise had. Lemonis could now foreclose on ML Fashion, through ML Retail, without regard to any membership obligations ML Retail may have had.

304. There can be no doubt that this funding arrangement was set up to thwart fiduciary duties, obligations under the ML Fashion LLC Agreement, and potential creditors. This is just

one example of Defendants using the fraudulent corporate structure to perpetrate fraud against Plaintiffs.

305. Together, these agreements combined gave Defendants Lemonis and his related entities the unfettered ability to misuse the assets of ML Fashion. Again, the ML Fashion LLC Agreement gave Lemonis the sole power to run the operations of ML Fashion. Thus, Lemonis forced ML Fashion to buy assets, leaving it unable to meet its current obligations, and then forced ML Fashion to take a loan from ML Retail, which would then take a loan from ML, LLC. Eventually, he could render ML Fashion insolvent such that ML, LLC could foreclose on all of the assets owned by ML Fashion.

306. Indeed, as of February 2020, ML Fashion's line of credit with ML Retail had an outstanding balance of nearly Twelve Million Dollars, far exceeding ML Fashion's assets of roughly Five Million Dollars. Further, as of 2018, ML Retail had made nearly $500,000 in interest from its loans to ML Fashion.

307. Lemonis set up a similar fraudulent corporate structure with Gooberry. On or around October 1, 2016, Lemonis executed a credit agreement between Gooberry and ML Fashion (the "Gooberry Credit Agreement"). (*See* Exh. H.) Under the Gooberry Credit Agreement, Gooberry could receive up to $10,000,000 in loans from ML Fashion at a rate of 7.5 percent per annum.

308. Notably, while the ML Fashion and Gooberry Credit Agreements are signed by Menkin, the decision for Gooberry and ML Fashion to enter into their respective credit agreements was solely Lemonis' decision. Lemonis often used Menkin to sign documents on Gooberry and ML Fashion's behalf to, on information and belief, add legitimacy to his actions. However, his attorneys always drafted and sent the agreements to Menkin to sign, often in a package with

hundreds of pages and several documents with the instruction to sign quickly. Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

309. Concurrently with the execution of the Gooberry Credit Agreement, Gooberry and ML Fashion entered into a Security Agreement (the "Gooberry Security Agreement"). (*See* Exh, I.) The Security Agreement gave ML Fashion a continuing security interest in all of Gooberry's assets. (*Id.*)

310. These agreements gave Lemonis unfettered ability to misuse the assets of Gooberry. Again, the Gooberry Shareholder Agreement gave Lemonis as owner and CEO of ML Retail, the sole power to bind Gooberry. Thus, Lemonis forced Gooberry to buy assets, leaving it unable to meet its current obligations, and then force Gooberry to take a loan from ML Fashion. Eventually, he could render Gooberry insolvent such that ML Fashion could foreclose on all of the assets owned by Gooberry.

311. Moreover, while ML Fashion was owned by Lemonis and Plaintiffs, ML Fashion's funding came from the ML, LLC Credit Agreement. (*See* Exh. F.) Thus, whenever ML Fashion lent money to Gooberry, those funds were actually coming from Lemonis through ML, LLC. As such, loans between ML Fashion and Gooberry gave Lemonis the ability to kill two birds with one stone and increase his debt position in both companies at one time.

312. That was not the only way in which Lemonis gained control over Gooberry's assets. Lemonis transferred promissory notes issued by Gooberry to Lemonis Entities. For example, Gooberry issued a $7.9M promissory note to ML, LLC. Then, on or around December 2016, the note was purchased by ML Retail LLC and on the same day sold to ML Fashion. Lemonis engaged in this practice of forcing Gooberry to take on more debt in order to gain control over the Company's assets in the process.

313.    Lemonis also used his power to grow ML Fashion's debt.  As Lemonis was only interested in growing his personal brand and his television show, he often used the businesses featured on *The Profit* to boost his image and add debt to ML Fashion.

314.    Often, *The Profit* would show Lemonis helping needy business owners by renovating their stores or finding buyers for their products.  However, improving those businesses was not Lemonis' intention, rather he was using ML Fashion to pay for those renovations and large purchases as a means to strap it with more debt.

315.    Lemonis represented to Plaintiffs that the businesses they were investing in through ML Fashion were making money and would be good investments for ML Fashion.  Lemonis represented to Plaintiffs that the strategy he was employing for ML Fashion (which was essentially a vehicle for him to commingle assets between all of his entities) was how he built Camping World, and that his methods would help make ML Fashion become as successful as Camping World.  However, as discussed herein, the businesses Lemonis forced ML Fashion to invest in were often failing[48] and Lemonis used ML Fashion to provide an influx of capital to those businesses by forcing ML Fashion to purchase their inventory and hire their personnel.  Indeed, a former ML, LLC employee, who would prefer to remain anonymous, confirmed Lemonis' practice of using Camping World employees for ML, LLC projects and often transferring employees between his various businesses.

316.    For example, a November 2016 episode of the show featured the brand Susan Monaco, and on the show, the parties reached a deal where Lemonis would invest $600,000 for 50% of the business.  However, Susan Monaco ended up being a huge loss on the ML Fashion books.  In order to put the money in the Susan Monaco business, ML Fashion had to buy all of

---

[48] Amber Mazzola was well-aware of these businesses' failures and discussed it with Menkin.

Susan Monaco's old inventory. That inventory was a loss for ML Fashion because they had to sell what they could at a Street Sale for negligible profits and donate the rest. Often when ML Fashion had to donate excess product Lemonis had forced on it, Lemonis made sure that he got the tax write-off for the donation personally.

317.    A June 2017 episode feature a brand called Swim by Chuck Handy. Once again, the show touts a deal where Lemonis would invest $600,000 for 55% of the business. However, it was ML Fashion that produced hundreds of thousands of dollars of product before the deal was finalized.[49] The deal with the owners of Swim by Chuck Handy fell through, and it was ML Fashion that was left holding the bag. ML Fashion was forced to donate all of the product it produced, taking a complete loss.[50]

318.    Similarly, a June 2018 episode feature the brand Ellison Eyewear that produced sunglasses in Greece. According to the show, Lemonis would invest $350,000 for 50% of the business. Once again, ML Fashion spent hundreds of thousands of dollars producing inventory in Greece. Then, the deal fell through, and ML Fashion was forced to try to sell the inventory in its retail stores. The inventory is still on ML Fashion's books as a loss.

---

[49] By this time, although Plaintiffs' business was riddled with debt, they continued to play an integral part in the show and its production. For example, Plaintiff Menkin's office became the equivalent of an NBC studio, equipped for filming scenes for the show. Menkin was told to hang large TV screens on the walls and play episodes of *The Profit* on loop, further promoting the show and Lemonis. The "set" was changed every time a new business was cast on the show – the goal was for viewers to believe the illusion that Lemonis was visiting the office of a new business in need. But like so many aspects of *The Profit*, this too was a lie. When Menkin objected to the TV screen displays, Lemonis threatened to stop paying rent for the office (or threatened her with something else, typically something the business could not afford to lose), leaving her with no other choice.

[50] Like so many businesses appearing on *The Profit*, Mr. Handy voiced his frustrations over *The Profit*'s false depiction of his business and, specifically, his son. When he raised his concerns over a promo for the Swim episode, Lemonis denied his involvement, telling Plaintiff Menkin that CNBC was responsible and not him.

319. Many of these businesses struggled after appearing on *The Profit* and Lemonis pushed the costs they could not cover onto Plaintiffs, including basic expenses and payroll. In turn, Plaintiffs became even more indebted to Lemonis, ML Retail and ML, LLC.

320. Several times, ML Fashion was forced to hire the business owners and employees featured on *The Profit* solely because their own business could not afford to pay them. These persons primarily worked on their own business while Menkin was forced to find special projects at ML Fashion for them to work on. This happened with the production manager of the Susan Monaco brand featured in season four, the owner of Ben Garden's featured in season six, the owners of Flex Watches featured in season four, and with the winner of another Lemonis television show program called "The Partner."

321. Lemonis used constant brand acquisition, store openings, store closings, personnel changes, and inventory changes to distract Plaintiffs from the mismanagement and misconduct he was orchestrating as the Manager of ML Fashion. He purposefully kept Plaintiffs overworked and overextended so that all they could focus on was the ground level ML Fashion work that Lemonis was having them do. Plaintiffs knew that if they were not able to keep up with the workload, Lemonis would threaten to give the work opportunity to someone else, fire them, or foreclose on their business.

322. Time and time again, Lemonis used *The Profit*, to bolster his own image as a small business savior when in reality the deals being made on the show were being used to force debt upon ML Fashion. This debt not only forced ML Fashion to continually take loans from Lemonis and his entities, but it also allowed Lemonis to write-off income he made as the CEO of Camping World and income from his other personal endeavors.

323.     At the end of the year, his accountants would use the debts incurred by ML Fashion as tax write-offs to help offset his personal income.  Indeed, on or around April 16, 2018, Lemonis expressly instructed Menkin on the write-off telling her to "[d]rive the number as high as you can," and confirming that he wanted the tax benefit for himself. (*See* Exh. J.)  By keeping ML Fashion saddled in debt, Lemonis was consistently able to lower his personal tax liability.  Moreover, because the write-offs decreased ML Fashion's indebtedness to ML Retail and ML, LLC, Lemonis often represented to Plaintiffs that he was taking the write-offs as a favor to them.

324.     Additionally, Lemonis represented that ML Fashion would purchase retail stores, renovate them, and flip them for a profit.  Lemonis represented that Plaintiffs and Lemonis would split these profits evenly, after Lemonis' debts were repaid.  While ML Fashion purchased and opened around thirty stores, they would spend exorbitant amounts of money to renovate and swap out the store inventories.  These upfront costs meant that the stores could never be sold for a profit due to how far in debt each venture was to Lemonis.

325.     Once the stores failed, ML Fashion would be forced to liquidate the stores at a huge loss.  This meant hiring a close down crew, paying for staff termination and severance packages, and often paying each buy out charges on the stores' leases.

326.     Forcing debt onto ML Fashion was not the only way in which Defendants engaged in misconduct.  Lemonis and ML Retail used promissory notes that his entities had from other businesses to make sham contributions to ML Fashion on behalf of ML Retail.

327.     One such sham contribution related to the assets of a shoe company, Inkkas.  Inkkas was featured on an episode of *The Profit* on January 19, 2016.

328.     As part of the deal from the show, Gooberry purchased the company's assets.  Then, through a string of fraudulent transactions, the Inkkas assets became owned by an entity called

Inkkas, LLC. On or around June 6, 2017, ML Retail purchased the assets of Inkkas, LLC for $428,937.34. In agreements dated that same day, ML Retail transferred the assets of Inkkas, LLC to ML Fashion as a membership contribution ***then*** transferred those very assets from ML Fashion to a company called ML Footwear, LLC. Essentially, Lemonis and ML Retail used assets that were already owned by the joint business venture as a contribution by ML Retail to ML Fashion, then transferred the assets out of ML Fashion.

329. Contributions like this ensured that ML Retail was first in line if ML Fashion ever issued distributions. Under the ML Fashion LLC Agreement, distributions are made "first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions." (Exh. C at § 5.1(b).) This allowed ML Retail to receive distributions for purporting to contribute assets that already belonged to the joint business venture. Between sham contributions and Lemonis' debt position, Lemonis made sure that any monies coming out of ML Fashion were owed to him first.

330. Eventually, Lemonis sought to transfer the assets of Gooberry to an entity called MLG Retail, LLC ("MLG Retail"). MLG Retail is owned by ML Fashion and ML Fashion is MLG Retail's manager. Transferring the assets and operations of Gooberry to MLG Retail would have finally given Lemonis complete, unfettered control over Gooberry that he wanted. In the end, Lemonis was successful in transferring all but one of Gooberry's assets into MLG.

331. Lemonis treated the bank accounts of MLG Retail and ML Fashion as his own personal piggy bank. He used his personal American Express card to make purchases for ML Fashion; however, Lemonis also used this card to make personal and non-business-related purchases.

332.     Lemonis would then take money directly from MLG Retail bank accounts to pay off his American Express card. The funds taken from MLG Retail to pay the card were not correlated to the amount of actual business expenses that Lemonis put on the card.  Instead, Lemonis would see how much money was in the MLG Retail account, then take whatever he could and put it towards his personal card.  Lemonis made payments to his personal American Express card from MLG Retail's bank accounts several times a year.  Lemonis took up to $100,000 at a time to pay off his card.

333.     Between March 2019 and February 2020, Lemonis took $3,023,004.47 from MLG Retail's bank account to make payments to his personal credit card.  In addition, Lemonis benefited by keeping the American Express rewards points from these payments and using them for his personal gain.

334.     There were times where, as a result of Lemonis taking money from ML Fashion's bank accounts to pay, at least in part, his personal obligations, MLG Retail and ML Fashion could not pay its vendors.  Then, as always, ML Fashion would have to borrow money from other Lemonis entities to pay those vendors.

335.     Another example of Lemonis using ML Fashion for personal gain related to the retail boutique Runway.  In early 2016, Lemonis met Defendant Raffel, owner of Runway, at a trade show in New York City.  Raffel approached Lemonis and Menkin because she wanted Lemonis to purchase her Runway store in Deerfield, Illinois.

336.     Shortly thereafter, Lemonis visited Runway and decided that Gooberry would purchase the store and on March 23, 2016, Gooberry purchased Runway.

337.     On information and belief, Lemonis wanted Gooberry to acquire Runway because Lemonis was romantically interested in its owner Raffel, not because he believed the acquisition would help Gooberry or ML Fashion.

338.     Shortly thereafter, Lemonis visited Runway and decided ML Fashion would purchase the store.  On March 26, 2016, Gooberry purchased Runway.  In May 2016, Gooberry and ML Fashion paid to completely renovate the Runway store and stock it with new inventory. Once again, these expenditures forced the companies to take on additional debt from Lemonis to meet its basic expenses.

339.     Not long after Gooberry acquired Runway, Lemonis began courting Raffel.  As part of their courtship, Lemonis allowed Raffel to make business decisions for Gooberry and ML Fashion.  Raffel was buying inventory for ML Fashion's other retail stores despite not having a position with ML Fashion.  Indeed, on or around March 24, 2016, the day after the acquisition closed on March 23, 2016, Raffel purchased inventory for non-Runway stores.

340.     Soon, Lemonis and Raffel began buying inventory together and spending far more than Gooberry's or ML Fashion's allocated budget on inventory. Again, overspending on inventory forced Gooberry and ML Fashion further into debt.

341.     There can be no doubt that Lemonis and Raffel knew they were exceeding ML Fashion budget for purchasing inventory because ML Fashion's controller prepared detailed monthly budgets and a quarterly purchasing budget for future inventory orders called an open-to-buys.  Lemonis and Raffel were sent these budgets.

342.     Further, every day, the controller informed Lemonis of the status of ML Fashion's debt to ML Retail and ML, LLC and ML Fashion's daily sales, cash, and payable positions.  The

report also included Lemonis and Raffel's inventory orders so they could see how much they were buying compared to ML Fashion's ability to purchase inventory.

343.  Despite having all of this information showing that ML Fashion could not afford the inventory the two were purchasing, Lemonis and Raffel continued to overspend without regard to ML Fashion's financial abilities.  The more Lemonis and Raffel overspent, the more indebted ML Fashion would become to Lemonis and his entities.

344.  At one point in 2018, Lemonis and Raffel were over-buying inventory at a rate of approximately $1M per quarter. Indeed, some of the stores did not even have the physical space to receive the inventory that Lemonis and Raffel were purchasing.  Stores complained to both Lemonis and Raffel that they did not have the space for any more inventory, yet Lemonis and Raffel continued their purchasing unabated.

345.  Lemonis forced ML Fashion to open liquidation stores in order to sell the excess inventory that he and Raffel were buying for ML Fashion. Once again, ML Fashion incurred debt to open these Sample Sale stores, but the stores had no chance of making enough revenue to stay afloat as they were selling inventory at liquidation prices. These Sample Sale stores only added to ML Fashion's indebtedness with Lemonis.

346.  Whenever Plaintiffs complained about Lemonis and Raffel's overspending, Lemonis would threaten to foreclose on ML Fashion because of the huge debt it owed to ML Retail and ML, LLC, Plaintiffs knew that if they did not play ball, Lemonis would foreclose on the debt and take the company they worked so hard to build from them.

347.  Indeed, Plaintiffs witnessed Lemonis do this with several entities he encountered on *The Profit*.  For example, on the January 19, 2016 episode featuring Inkkas, the parties agreed on the show to a deal where Lemonis would invest $750,000 for 51% of the business.

348. After the episode aired, but before the acquisition was completed under the ML Fashion umbrella, Lemonis forced Inkkas to hold a sale called a "Free Shoe Friday." Lemonis tweeted a code which allowed shoppers to buy shoes from Inkkas website for zero dollars. This led to $200,000 of inventory being given away in six hours.

349. Lemonis used this and other tactics to force debt on Inkkas and a few months later, foreclosed on the business, took its assets, and removed the original owners.

350. Similarly, a September 2016 episode of *The Profit* featured the brand Flex Watches based in Los Angeles, California. During the episode, Lemonis agreed to invest $400,000 in exchange for 40% of the business. This gave Flex Watches, Inc., the company running the brand, a valuation of $1,000,000.

351. Lemonis had ML Fashion open a Los Angeles office for Flex Watches, forcing ML Fashion to incur debt. Lemonis also forced debt on Flex Watches, Inc. By September 2016, Lemonis saddled Flex Watches, Inc. with over $300,000 in debt. When it came time to formalize his investment in Flex Watches, Lemonis used that debt to offset the $400,000 purchase price and was able to move the assets for Flex Watches, Inc. to a company called Flex Watches, LLC, which was wholly owned by ML Fashion.

352. As to be expected, the Flex Watches brand floundered under Lemonis' control and its debts grew unsurmountable. In August 2019, almost three years after their episode aired, Lemonis sold Flex Watches back to one of the original owners for $10 plus $52,175 in inventory, $13,437.63 in the company's cash accounts, and $128,231.95 in accounts payable – a tiny fraction of Flex Watches' $1,000,000 valuation prior to Lemonis' involvement.

353. This happened again with a business called Ben's Garden that was featured on *The Profit* in January 2019. Ben's Garden produced home and gift items like greeting cards,

paperweights, and picture frames. On the show, Lemonis agreed to invest $400,000 for 40% of the business. Ben's Garden needed an influx of cash to pay unpaid bills, so Lemonis funded the company by forcing MLG Retail—one of ML Fashion's biggest assets—to purchase its old inventory and put it into its retail stores. ML Fashion and MLG Retail had not been in the home good market before, so the sudden addition of home goods to their stores did not go well. The product did not sell and ended up being a loss on ML Fashion's books.

354. As seems to always happen, by June 2019, Lemonis and the owner of Ben's Garden had a falling out. After that, Lemonis, just as he had tried to do with Plaintiffs before the Gooberry deal was signed, told the Ben's Garden owner that he had to repay Lemonis for all of the money he put into his business on the show or else Lemonis would take the business from him.

355. Lemonis used the new businesses, new retail stores, and constant acquisitions to keep Plaintiffs distracted from what he was doing with the ML Fashion assets. Lemonis was constantly having Plaintiffs open new retail locations, change retail locations to different brands, close new locations, and clean up after Raffel's messes to create a fog where Plaintiffs were too overworked to closely examine the wellbeing of ML Fashion. Whenever Plaintiffs did question what Lemonis was doing with ML Fashion, Lemonis would respond with threats to either fire their mother Neomi, foreclose on his debt and take their company from them, or fire them all. Lemonis made it clear that they had no power to prevent him from doing as he pleased with ML Fashion. Again, after watching Lemonis do this with other business owners they knew he would make good on his threats.

356. Indeed, Lemonis often used Plaintiffs' mother, Neomi, as a pawn to keep Plaintiffs in line. Whenever Menkin or Goureau questioned Lemonis, he would threaten to fire Neomi and remove her from the business.

### 6. Lemonis Uses ML Fashion to Grow His Personal Brand

357.     It became clear that Lemonis was not actually interested in growing the Courage.B brand or any of the other brands ML Fashion acquired, including Denim & Soul.     Instead, Lemonis, together with Raffel, his new wife, sought to use ML Fashion's assets and Plaintiffs' know-how to grow his new retail concept MARCUS.

358.     On information and belief, Lemonis and Raffel wanted to grow MARCUS and have a venture together, further promoting Lemonis' personal brand and the couple's image.  Lemonis and Raffel married in February of 2017 in Los Angeles.[51]

359.     In 2017, Lemonis wanted to open a store in downtown Chicago.  At the time, Menkin and Goureau advised that opening a retail store in that location would be extremely expensive.  Despite their concern, Lemonis opened a retail store branded MARCUS.

360.     Once the new MARCUS store was opened, around fall 2017, Lemonis renovated and rebranded ML Fashion's other retail locations from Courage.B, Denim & Soul and Runway as MARCUS stores.  For the most part, these were stores that the ML Fashion had recently spent hundreds of thousands of dollars renovating and now had to spend even more money to renovate and change branding and inventory to become MARCUS stores.

361.     In addition, the stores had to purchase new signage, websites, and branded material such as shopping bags, tissue bags, displays, etc. All of the old signage and branded materials had to be thrown out. Again, the renovations and rebranded forced ML Fashion to take on more loans from Lemonis to cover its expenses.

---

[51] Notably, it was at Lemonis and Raffel's wedding when Jim Ackerman and Amber Mazzola admitted that none of businesses to have appeared on *The Profit* were doing well with many no longer in business, with Mr. Ackerman adding that "[at] some point, it's going to get out."

362.     Then, on information and belief, on or around July 31, 2018, Lemonis applied to trademark the word MARCUS for the products sold under the brand, such as handbags, clothing and footwear.  However, instead of applying for the mark under ML Fashion, the company that was running MARCUS retail stores, Lemonis tried to obtain the trademark for MARCUS under ML Creative, LLC, an entity which Plaintiffs have no ownership interest in and, under the circumstances, upon information and belief, is owned and controlled solely by Lemonis.

363.     Additionally, Lemonis sought to build strife between Plaintiffs and their mother, Neomi.  After the creation of ML Fashion, Neomi continued to earn a salary from ML Fashion, like she did from Gooberry, as a management fee. However, after about a year, Lemonis told Neomi that he had all of her designs and that Neomi should just let Lemonis and Plaintiffs do all of the work for the company.

364.     Lemonis attempted to pit Plaintiffs against their mother by consistently telling Plaintiffs that they would make more money if the company was not paying their mother.[52]

365.     Lemonis also used Neomi as a pawn to ensure that Plaintiffs did not question how much influence over the company he had given Raffel.  Raffel did not have experience buying inventory for a multi-store chain, did not understand the different markets and needs of the stores, and was unfamiliar with the software systems ML Fashion used to manage its inventory.  This forced ML Fashion to fix errors and mistakes that she made, costing the company time and money.

366.     When Plaintiffs questioned why Raffel was making purchases for ML Fashion, Lemonis would tell them that they had to deal with Raffel being involved because Lemonis was

---

[52] As set forth herein, pitting family members against one another was a common tactic used by Lemonis, usually in an effort to convince one of the family members to leave the business, thereby increasing Lemonis' ownership stake.  Other times, he simply wanted to exert control over the family members, as was the case here.

keeping their mother Neomi on the payroll. Lemonis often threatened to fire Neomi whenever Plaintiffs questioned Lemonis' business decisions or did not simply fall in line.

### 6. Lemonis Removes Plaintiffs From Their Business

367. In September 2019, Lemonis made good on his threats to remove Neomi and abruptly terminated her employment with the company. Giovanni Senafe, one of Lemonis' agents, called Neomi to tell her that she was terminated, effective immediately, that she would receive no further compensation moving forward, and that her health insurance was being cut off. As a result, Neomi lost access to her company files and e-mails.

368. Indeed, one by one, Lemonis has sought to cut Plaintiffs out of the business they created with their family. In March 2016, when Goureau started questioning decisions Lemonis was making for Gooberry and ML Fashion, and in an attempt to drive a rift between Goureau and Menkin, Lemonis moved Goureau from ML Fashion to ML, LLC. Lemonis had Goureau work on other businesses that Lemonis invested in through *The Profit* but that did not fall under the ML Fashion umbrella. As part of the transition, Lemonis prohibited Goureau from entering the stores owned by ML Fashion or having any opinion or influence in a company he created. Goureau knew if he pushed back, Lemonis would fire his sister, Menkin, and his mother, Neomi, who relied on ML Fashion and Gooberry to make a living.

369. Then in May 2017, Lemonis moved Goureau from ML, LLC to Camping World. Lemonis represented that working at Camping World would be beneficial for Goureau because it was a publicly traded company. He also suggested that Camping World could offer Goureau stock vesting and other employee benefits. While at Camping World, Goureau witnessed first-hand how Lemonis used Camping World as a fraudulent instrumentality. He also became aware of a slew of lawsuits by RV owners who bought their RVs from Camping World and claimed that they were

sold used RVs instead of new ones. Goureau became increasingly uncomfortable about every aspect of Lemonis' business world and worried about being involved. Eventually, Lemonis fired Goureau from Camping World in December 2018.[53]

370.    On or around December 2019, Lemonis and Menkin discussed how she could separate from the company and Lemonis' businesses. The two discussed the terms of a departure, however, once the COVID-19 pandemic started around April 2020, Lemonis suddenly cut off Menkin and removed her access to her company e-mail and all of her company files.

371.    Further, ML Fashion has not paid Menkin since the end of March 2020. As the President of ML Fashion, Menkin received compensation of $11,558 on the first and fifteenth of each month. Menkin's compensation came from an account in the name of MLG Retail but was for her work as the President of ML Fashion.

372.    Thus, in six years, Lemonis effectively separated all three founders of Courage.B from their business and from the company that he was supposed to be helping and growing.

### 7.    Lemonis Seeks to Benefit from the Pandemic

373.    While the entire world was dealing with the devastating COVID-19 pandemic, Lemonis was actively using the pandemic and related shutdown to continue to loot Gooberry. Lemonis has been unilaterally closing its retail stores and moving Gooberry's inventory to other entities and/or businesses owned or controlled by Lemonis.

374.    On or around May 8, 2020, Lemonis flew employees out to close on one of Gooberry's retail stores in Greenwich, Connecticut and ship out all product and inventory in the store. The employees took roughly $148,313 worth of inventory and $89,056 in furniture, fixtures,

---

[53] Goureau's termination in December 2018 is the subject of an active arbitration proceeding filed by Goureau with the American Arbitration Association for wrongful termination.

and equipment ("FFE") from the store.  Like all past actions taken by Lemonis, Goureau and Menkin were not made aware of these plans, nor do they have any knowledge of what Lemonis did with the store's inventory and FFE.

375.    From June 2014 to present, with Lemonis' "help", Gooberry has gone from a valuation of roughly $2.6 million to being practically insolvent.  Without Lemonis' involvement, Gooberry would have continued to thrive and likely would be worth several million dollars.  Given Lemonis' recent activity, it is clear that he is planning on foreclosing on Gooberry and even further removing Plaintiffs from the fashion and retail business they worked so hard to build.

376.    Without the Court's intervention, the company will be irreparably harmed. Plaintiffs seek redress for Lemonis' mismanagement of the company, the appointment of a receiver to prevent Lemonis from further harming the company, and to hold Lemonis and Lemonis' other entities accountable for breaching their fiduciary duties, wasting the company's corporate assets, and operating the company as a self-enrichment vehicle for themselves.

377.    Similarly, Lemonis has been actively using the pandemic and related shutdown to further loot ML Fashion.

378.    Starting in April 2020, Lemonis began shutting down some ML Fashion retail stores and sending employees across the country to take the assets and inventory from the stores. On or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store in Glencoe, Illinois where MLG Retail is the lessee of the store and ML Fashion is the guarantor. Lemonis had the employees remove roughly $110,034 worth of inventory and $60,772 worth of FFE from the Glencoe location.  Plaintiffs do not know what Lemonis has done with the inventory or FFE that was removed.

379.    Lemonis has continued closing stores—and taking their assets—all over the country during the pandemic.  Also, on or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store located in Dallas, Texas owned and operated by ML Fashion.  Closing this store was directly against ML Fashion's interest because this location was one of ML Fashion's strongest performing stores.  Lemonis removed roughly $149,215 worth of inventory and $75,451 worth of FFE from the Dallas location.

380.    Lemonis is also looting the assets of one of ML Fashion's biggest assets, MLG Retail.  On May 1, 2020, Lemonis sent employees to close a MARCUS location in Palm Beach, Florida and remove its inventory and FFE.  Those employees removed roughly $118,128.00 in inventory and $61,032 in FFE.  The lease for that Palm Beach location is personally guaranteed by Goureau, yet Lemonis did not tell Goureau he was shutting down the stores and taking its inventory and FFE.  Again, Plaintiffs do not know what Lemonis is doing with the assets he took.

381.    On or around August 13, 2020, Lemonis closed on of ML Fashion's MARCUS branded stores in Newtown, Massachusetts.  Once again, Lemonis has taken hundreds of thousands of dollars in inventory and FFE from that location and Plaintiffs are in the dark as to the current location of those assets.

382.    Moreover, starting on April 27, 2020, Lemonis, or someone acting at his direction, began systematically moving funds out of the MLG Retail account that was used to automatically pay several of MLG Retail's debts.  Importantly, the account was used to pay a payment plan for the Company's corporate American Express credit card that is tied to Goureau personally.

383.    This American Express corporate card was ML Fashion and MLG Retail's regular business credit card which employees in the company used to purchase inventory, office supplies,

and other business goods.  American Express requirements meant that an individual had to be tied to the card, and in this case the individual tied to the card was Goureau.

384.    Starting around 2018, Lemonis began using this credit card for larger company purchases.  Previously, the card had a standing balance of around $200,000.  Through 2018 and 2019, Lemonis increased the balance to over $600,000.  On information and belief, this was done because the card was tied to Goureau personally which allowed Lemonis to use the threat of defaulting on the card, and triggering hundreds of thousands of personal liability for Goureau, to keep Menkin from questioning his decisions.

385.    On or around April 4, 2019, MLG Retail entered into a payment plan with American Express and agreed to pay the balance due, roughly $688,762, in monthly installments of $18,696.  (*See* Exh. K.)  Lemonis expressly approved this payment plan.  (*Id*. at p. 2.)  Under the agreement, the installment payments were drawn directly out of one of MLG Retail's bank accounts.

386.    While Lemonis has no problem making regular payments of several thousands of dollars to his personal American Express card, he made sure that the corporate American Express card tied to Goureau had a payment plan where any missed payments triggered the entire amount due.  Lemonis often used the threat of stopping the automatic payments—which would automatically make Goureau personally liable for hundreds of thousands of dollars—to keep Menkin in line, either forcing her hand to sign contracts she objected to or otherwise.  This was part and parcel for Lemonis, and the type of abuse Plaintiffs endured for years under Lemonis.

387.    On or around March 17, 2020, ML Fashion and MLG Retail confirmed that the companies would continue to pay the amount due on the American Express account.  However,

Lemonis has been purposefully depleting the account used for the automatic payments so that there are no funds in the account when American Express attempts to debit the automatic payments.

388.     Again, under the payment plan, the entire amount outstanding becomes due upon a default.  Thus, Lemonis is forcing MLG Retail to default on the payments, triggering not only the entire debt for the company, but also for Goureau as the credit card is in his name.  After the initial filing of Plaintiffs' complaint, Defendants had left funds in the account for the Amex payments to draw on.  This allowed the American Express card payments to become current.  However, on or around August 4, 2020, Lemonis and his agents reversed roughly $94,049 in payments on the American Express card.

389.     Goureau was informed by American Express that if payments were not made soon, it would begin collections proceedings against Goureau personally for the entire balance amount. This would have had an extremely negative impact on Goureau's credit and personal finances.

390.     On June 18, 2020, Plaintiffs filed an action with the Court of Chancery if the State of Delaware, which focused on the harms that Defendants inflicted on ML Fashion, a Delaware entity.[54]   Plaintiffs also sought the Court's immediate intervention related to the outstanding American Express card balance.

391.     On September 8, 2020, the Chancery Court ordered Lemonis to pay the full balance of the American Express card, which included Lemonis' personal expenses.  (*See* Exh. L.) Specifically, the Court ordered Lemonis "either individually or through a legal entity that he wholly owns to loan ML Fashion sufficient money to pay in full the current balance of the

---

[54] On March 30, 2021, the Court of Chancery stayed its proceedings pending the outcome of the instant case, determining that that the issues in the Delaware Action overlapped with the issues raised herein and that this Court is in a better position to resolve the dispute between the parties to the extent possible.

American Express card," within 10 days of the Court's order. (*See Id.* at ¶ 2(a).) Lemonis has failed to comply.

392. Lemonis has further benefited from the pandemic through the government's Paycheck Protection Program ("PPP"). Without Plaintiffs' consent or knowledge, Lemonis applied for a PPP loan and on May 1, 2020, the Company received $818,394 in PPP funds.

393. Upon information and belief, on or around May 22, 2020, Lemonis, or someone acting at his direction, transferred all funds (roughly $601,324.02) in the ML Fashion and MLG Retail bank accounts into a new bank account under the name of MLG Retail. The new bank account was not tied to any of ML Fashion or MLG Retail's other accounts, and Menkin, a signatory on all of the bank accounts for both companies, does not have access to the account and cannot see any transactions being done in that account.

394. Defendants have continued to deplete the assets of ML Fashion. Defendants have held several fire sales liquidating the inventory of ML Fashion by selling it at up to 90% off.

395. Further, despite the fact that several retail stores are closed due to the pandemic and stay at home orders are in effect, Defendants have hosted private liquidation events at the Company's store in Deerfield, Illinois, where Defendants invited Camping World employees and gave them massive discounts. Even more, holding these large private events during a pandemic, in violation of state and local rules about large gatherings and retail stores, creates potential liability for ML Fashion.

396. Based on all of Lemonis' recent actions, it is clear that he is planning on rendering ML Fashion and its asset, MLG Retail, insolvent so that he can foreclose on the companies, remove Plaintiffs from the business, and use the assets to continue his MARCUS brand.

397. While setting up ML Fashion and MLG Retail, the parties worked to register the Company to do business in several states. As part of the process, Menkin and/or Goureau were listed as the individuals associated with ML Fashion and MLG Retail in several states including Illinois, Connecticut, Minnesota, and Florida. Now, Defendants have failed to make ML Fashion's required annual payments to those states, leaving Menkin and/or Goureau personally responsible for the payments. For example, on August 5, 2020, the Minnesota Department of Revenue sent a letter to Goureau explaining that MLG Retail had missed the deadline to file and pay its taxes and stating that if the return was not filed, and taxes not paid, before September 4, 2020, that there would be additional penalties. (*See* Exh. M.) These outstanding debts have hindered Plaintiffs' ability to start separate businesses in Illinois, Connecticut, Minnesota, and Florida.

## DERIVATIVE ACTION ALLEGATIONS

### A. Gooberry's Derivative Action

398. Plaintiffs bring this action derivatively in the right of and for the benefit of Gooberry to redress injuries suffered, and to be suffered, by Gooberry as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, and use of Gooberry as a vehicle for personal gain at the detriment of the Company.

399. Gooberry is named as a Nominal Defendant in this case solely in a derivative capacity. Plaintiffs are shareholders of Gooberry at the time of the transgressions of which they complain and continue to be shareholders of the Company.

400. Plaintiffs will adequately and fairly represent the interests of Gooberry and its members in prosecuting and enforcing their rights. Prosecution of this action is in the best interests of the Company.

401.    The wrongful acts complained of herein subject, and will continue to subject, Gooberry to continuing harm because the adverse actions are continuing, and the consequences of those actions are still in effect and ongoing.

### B.    Gooberry's Derivative Demand Futility

402.    Plaintiffs have not made any demand to the Gooberry' Board of Directors to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.  A pre-suit demand for the allegations alleged herein would be futile because in entering into the Gooberry Shareholder Agreement, Lemonis, as owner and CEO of ML Retail, was given complete dominion and control over the assets and operation of the Company, thus a demand would require Lemonis to essentially sue himself.

403.    As the Chairman and CEO of ML Retail, Lemonis is the only controlling shareholder that has the "sole and absolute discretion over all financial and accounting functions, controls, decisions, and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for the store expansions, remodels and new locations." (*See* Exh. C, § 2.2.)  Moreover, according to the Gooberry Shareholder Agreement, the affirmative vote of the ML Shareholder, Lemonis, is needed for Gooberry to: "…enter into any transaction outside of the ordinary course of business of the Company;…[make] any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors of affiliates or any of them;…[admit] new Shareholders;…[t]he dissolution or liquidation of the Company;…[m]ake any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;…[h]ire, remove or otherwise replace any of the senior executive team of the Company; …" (*Id.* at § 2.1.1.)

404.     Lemonis suffers from a patent conflict of interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein. Stated differently, a demand for Lemonis to bring this suit and assert the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself; and, in that regard, potentially subject himself to personal liability.   The extraordinary personal gains and profits that Lemonis has been able to extract from Gooberry at the expense of Gooberry and its other shareholders renders him too self-interested to independently evaluate the merits of the claims asserted against him herein.

405.     As President and CEO of ML Retail, and Director of Gooberry, Lemonis used Gooberry's assets to enrich himself and the Lemonis entities by, among other things, taking actions that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of Gooberry to the detriment of the other shareholders.

406.     Further, Lemonis used his control of Gooberry via ML Retail to force the Gooberry to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on Gooberry at any time.  Lemonis also benefited from his use of Gooberry to acquire the fledgling brands, business, and products featured on the "Profit" to boost his own image at the expense of Gooberry.   Moreover, Lemonis has since removed assets of Gooberry and transferred them to other entities and/or businesses owned or controlled by Lemonis.

407.     In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced the Company to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment.  As President and CEO of ML Retail, and Director of Gooberry, Lemonis consistently mismanaged Gooberry's assets and pursued a business strategy that was so reckless and vastly against

Gooberry's interests that his decisions could not have been the products of sound business judgment. Lemonis' actions include: (1) saddling Gooberry with expensive inventory then forcing Gooberry to sell the inventory at a loss; (2) purposefully decreasing Gooberry's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of Gooberry and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying Gooberry's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of Gooberry to the direct detriment of the other shareholders of Gooberry; (6) using the assets of Gooberry to grow Lemonis' personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing Gooberry's retail stores and removing its inventory, furniture, fixtures, and equipment; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

408.    Even if Lemonis acceded to a demand from Plaintiffs and pursued litigation against himself on behalf of Gooberry, there is no reason to believe that he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies.

409.    In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

## C.    ML Fashion's Derivative Action

410.    Plaintiffs also bring this action directly and derivatively in the right of and for the benefit of ML Fashion to redress injuries suffered, and to be suffered, by ML Fashion as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, breach of the LLC

Agreement, and use of ML Fashion solely as a vehicle for personal gain at the detriment of ML Fashion.

411.     ML Fashion is named as a Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiffs were members of ML Fashion at the time of the transgressions of which they complaint and continue to be members of ML Fashion.

412.     Plaintiffs will adequately and fairly represent the interests of ML Fashion and its members in prosecuting and enforcing their rights.  Prosecution of this action, independent of the current Manager, is in the best interests of ML Fashion.

413.     The wrongful acts complained of herein subject, and will continue to subject, ML Fashion to continuing harm because the adverse actions are continuing, and the consequences of those actions are still in effect and ongoing.


**D.     ML Fashion's Derivative Demand Futility**

414.     Plaintiffs have not made any demand to Lemonis as ML Fashion's Manager to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.

415.     As ML Fashion's sole Manager and sole owner of ML Retail, the only member that can remove a manager, Lemonis obviously suffers from a patent conflict of interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein.  Stated differently, a demand for Lemonis to bring this suit and assert

the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself and, in that regard, potentially subject himself to personal liability.

416. As the manager of ML Fashion, Lemonis used ML Fashion's assets to enrich himself and the Lemonis entities by, among other things, taking actions that financially favored the members of ML Retail, LLC, while decreasing the value of ML Fashion to the detriment of the other shareholders.

417. Further, Lemonis used his control of ML Fashion to force ML Fashion to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on ML Fashion at any time. Lemonis also benefited from his use of ML Fashion to acquire the fledging brands, businesses, and products featured on *The Profit* to boost his own image at the expense of ML Fashion. Moreover, Lemonis has since removed assets of ML Fashion and transferred them to other entities and/or businesses owned or controlled by Lemonis.

418. In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced ML Fashion to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment. As a manager of ML Fashion, Lemonis consistently mismanaged ML Fashion's assets and pursued a business strategy that was so reckless and vastly against ML Fashion's interests that his decisions could not have been the product of sound business judgement. Lemonis' actions include: (1) saddling ML Fashion with expensive inventory then forcing ML Fashion to sell that inventory at a loss, (2) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from ML Fashion so that its debts could not be paid, (4) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis and/or other companies owned and/or controlled by him, in order to meet its financial obligations,

(5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of other members of ML Fashion, (6) using the assets of ML Fashion to grow Lemonis' personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud to foreclose ML Fashion's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,342.02 from ML Fashion's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay persona, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

419.     Even if Lemonis acceded to a demand from Plaintiffs and pursued litigation against himself on behalf of ML Fashion, there is no reason to believe he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies.

420.     In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: FRAUDULENT INDUCEMENT
**[By Plaintiffs Against Defendants NBCUniversal, Lemonis,
ML Retail, ML, LLC and Machete]**

421.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

422.     As set forth above, at all times herein mentioned, Defendants Lemonis and Machete were the agents and/or employees of NBCUniversal and were acting within the scope of such agency and/or employment and represented they had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

423.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

424.     NBCUniversal, Machete and Lemonis knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs and in order to induce Plaintiffs into signing applications and releases to be on *The Profit*, inducing Plaintiffs into allowing Lemonis to invest in Gooberry, and inducing Plaintiffs into giving Lemonis control over Gooberry.

425.     NBCUniversal, Machete and Lemonis' false material misrepresentations and/or failures to disclose include but are not limited to: (1) representing to Plaintiffs that Lemonis helps small businesses and that Lemonis would help Gooberry by appearing on *The Profit*; (2) representing to Plaintiffs that Lemonis was a trusted business advisor; (3) representing to Plaintiffs that the deals with Lemonis portrayed on *The Profit* were real; (4) representing that the results the small businesses featured on *The Profit* achieved with Lemonis' help were real, (5) representing that the entire premise of *The Profit* and Lemonis' role was to make a good faith effort to grow the company, increase its sales and improve its brand reputation; (6) represented that the  benefit to be gained would also be gained by Plaintiffs and their business and not exclusively by Lemonis, CNBC, and Lemonis; (7) representing that Plaintiffs should forgo their other potential investors and go on the show; (8) representing to that Lemonis wanted to help Plaintiffs expand their business through Gooberry and not saddle it with debt in order to take its assets; (9) representing that Plaintiffs and Lemonis would be treated as partners and equals in running Gooberry; (10) representing that the Lemonis would run Gooberry in a way that would benefit Plaintiffs and Gooberry; (11) representing that Lemonis cared for Plaintiffs' family and their business and that

Lemonis would take care of Plaintiffs' mother Noemi; (12) representing that renovating Plaintiffs' stores would cost $200,000 and would be part of Lemonis' overall $800,000 investment; (12) representing that Gooberry would invest in other business and to help grow and develop the businesses in their profile; and (14) representing that if Plaintiffs did what Lemonis demanded with a gun to their head and trust him in starting a new venture called ML Fashion, that there would be significant rewards realized by them, economically or otherwise, that they had not realized and that this would be a different type of experience.

426.    At all times, NBCUniversal, Machete and Lemonis knew these representations were false and that the true nature and intention of the show was to defame and denigrate Plaintiffs, depicting them in a false light, and to allow Lemonis to take over their company and commingling their assets.

427.    Furthermore and at all times mentioned, Lemonis material misrepresentations and/or failures to disclose material information include but are not limited to: (1) representing that the Lemonis wanted to help Plaintiffs expand their business through ML Fashion; (2) representing that Plaintiffs and Lemonis would be treated as equals in running ML Fashion; (3) representing that Lemonis would run ML Fashion in a way that would benefit Plaintiffs and ML Fashion; (4) representing that ML Fashion would invest in other businesses to and help and develop the business in their profile; and (5) representing that ML Fashion's Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide ML Fashion with cost-effective capital not the make ML Fashion insurmountably indebted to ML Retail and ML, LLC.

428.    At all times, Lemonis knew these representations were false and that Lemonis intended to use Gooberry ML Fashion as a vehicle for self-enrichment at the detriment of Plaintiffs

and their business. Lemonis further knew that he would use credit agreements to force debt upon Gooberry and ML Fashion, allowing him to foreclose on the companies on a whim, and that he would use Gooberry and ML Fashion to defraud other small business owners Lemonis purported to save.

429. NBCUniversal, Machete and Lemonis intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

430. Plaintiffs were ignorant of the falsity of the representations set forth above and justifiably relied on the misrepresentations and fraudulent omissions of material facts and allowed Lemonis to invest in their business, entered into the Shareholder Agreement, Stock Purchase Agreement and LLC Agreement, gave ML Retail and Lemonis control and ownership interest in Gooberry, and refrained from moving forward with a different investor for their business. Plaintiffs would not have entered into the Shareholder Agreement, Stock Purchase Agreement and LLC Agreement, given ML Retail and Lemonis' control and ownership interest in Gooberry and refrained from moving forward with a different investor for their business, put their time and energy into ML Fashion and away from their brand Courage.B and original company, Gooberry, continued the business venture with Lemonis and used the corporate American Express card, tied to Goureau personally, to make corporate purchases, if they knew NBCUniversal, Machete and Lemonis' representations were false.

431. NBCUniversal, Machete and Lemonis' actions were willful, wanton, malicious and oppressive.

432. As a direct and proximate result of NBCUniversal, Machete and Lemonis' fraud, Plaintiffs have been harmed in an amount to be proven at trial, but at least millions of dollars.

## SECOND CAUSE OF ACTION: AIDING AND ABETTING FRAUDULENT INDUCEMENT

**[By Plaintiffs Against Defendant NBCUniversal]**

433.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

434.    NBCUniversal knowingly aided and abetted Lemonis in providing  material misrepresentations and/or failing to disclose material facts to Plaintiffs by: (1) publicly displaying episodes of *The Profit* which showed companies obtaining substantial infusions of capital; (2) marketing and repeating the claim that the offers made on show are real; (3) failing to publicize evidence of Lemonis' breaches of fiduciary duties; (4) actively participating in an effort to portray that the entire premise of *The Profit* and Lemonis' role was to make a good faith effort to grow the company, increase its sales and improve its brand reputation; and (5) portraying Lemonis as man acting in good faith for Plaintiffs' benefit.

435.    As a direct and proximate cause of NBCUniversal's conduct, Plaintiffs have been harmed in an amount to be proven at trial.

## THIRD CAUSE OF ACTION: FRAUD
**[By Plaintiffs Against Defendants NBCUniversal, Lemonis,
ML Retail, ML, LLC and Machete]**

436.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

437.    As set forth above, at all times herein mentioned, Defendants Lemonis and Machete were the agents and/or employees of NBCUniversal and were acting within the scope of such agency and/or employment and represented they had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

438.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

439.    NBCUniversal, Lemonis and Machete knowingly made numerous misrepresentations of material facts to Plaintiffs and/or failed to disclose material information to Plaintiffs which rendered the representations to Plaintiffs false, as this is part of their pattern and overall scheme with businesses that appear on *The Profit.*

440.    NBCUniversal, Lemonis and Machete' false material misrepresentations and/or failures to disclose include but are not limited to: (1) representing that Gooberry was investing in stores, brands, and retail businesses in order to further grow those businesses and Gooberry; (2) representing that purchases made for Gooberry were done to benefit the brand and not increase Lemonis' debt position in Gooberry; (3) representing that Plaintiffs would have access to Lemonis' team of experts in the retail industry, not Lemonis' employees at Camping World; (4) representing that this team of experts was part of the Lemonis expertise package, not that Plaintiffs would have to pay for their fees and services; (5) representing that Lemonis would be investing in Plaintiffs' business in order to help grow their business not to saddle it with debt in order to remove its assets; (6) representing that ML Fashion was investing in stores, brands, and retail businesses in order to further grow those businesses and ML Fashion; (7) representing that purchases made for ML Fashion were done for the benefit of the brand and not to increase ML Retail and ML, LLC's debt position in ML Fashion; (8) representing that ML Fashion and MLG Retail would make payments toward the American Express credit card balance on the account in Goureau's name; (9) representing to Plaintiffs that ML Fashion would make required company state tax payments in the states where Plaintiffs were made personally liable; and (10) representing that funds ML

Fashion obtained through its Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide ML Fashion with cost-effective capital not to make ML Fashion insurmountably indebted to ML Retail and ML, LLC.

441.    Defendants NBCUniversal, Lemonis and Machete intended Plaintiffs to rely on these representations; however, none of these statements were true when made. Defendants NBCUniversal, Lemonis and Machete knew these misrepresentations were false and that Lemonis intended to use Gooberry and ML Fashion as vehicles for self-enrichment at the detriment of Plaintiffs, Gooberry and ML Fashion. Defendants NBCUniversal, Lemonis and Machete further knew that Lemonis would use credit agreements to force debt upon Gooberry and ML Fashion, allowing Lemonis, through his alter ego entities ML Retail and ML, LLC, to foreclose on Gooberry and ML Fashion on a whim and that Lemonis would use ML Fashion to defraud other small business owners Lemonis purported to save. Lemonis further had no intention of fully paying the American Express card balance in Goureau's name and intended to use the balance as a sword over Plaintiffs to keep them in line.

442.    Defendants NBCUniversal, Lemonis and Machete knew or should have known that Plaintiffs would rely upon representations that Lemonis would grow the Gooberry and ML Fashion businesses and brands because this is what Lemonis said he would do.

443.    Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts. Plaintiffs relied on Defendants' representations by such things as, including but not limited to, continuing the business venture with Lemonis and using the American Express card, tied to Goureau personally, to make ML Fashion purchases, and continuing to run Gooberry with Lemonis and his entities.

444. Upon information and belief, Defendants NBCUniversal, Lemonis and Machete intended that Plaintiffs rely on their misrepresentations and fraudulent omissions of material facts.

445. Upon information and belief, the sole purpose of Lemonis' misrepresentations to Plaintiffs was to defame and denigrate Plaintiffs and depict them in a false and allow Lemonis to take over their business and commingle its assets.

446. Upon information and belief, the sole purpose for Lemonis' misrepresentations to Plaintiffs was to take their money and Gooberry and ML Fashion and make a profit, without regard to the consequences that Plaintiffs would have to be left with, such as debt and no assets.

447. As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least millions of dollars. Furthermore, as a result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been prevented from starting new business ventures, and Goureau's ability to obtain financing has been hindered due to the American Express debt.

448. In committing the above-described acts, Defendants NBCUniversal, Lemonis and Machete acted with fraud, oppression, and malice. Given Defendants NBCUniversal, Lemonis and Machete' conduct that was willfully and wantonly reckless or malicious and Defendants' high degree of moral culpability, punitive damages are appropriate and warranted.

## FOURTH CAUSE OF ACTION: AIDING AND ABETTING FRAUD
### [By Plaintiffs Against Defendants NBCUniversal]

449. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

450. Defendant NBCUniversal knowingly aided and abetted Lemonis in providing material misrepresentations and/or failing to disclose material facts to Plaintiffs by: (1) representing that Gooberry was investing in stores, brands, and retail businesses in order to further

grow those businesses and Gooberry; (2) representing that purchases made for Gooberry were done to benefit the brand and not increase Lemonis' debt position in Gooberry; (3) representing that Plaintiffs would have access to Lemonis' team of experts in the retail industry, not Lemonis' employees at Camping World; (4) representing that this team of experts were part of the Lemonis expertise package, not that Plaintiffs would have to pay for their fees and services; (5) representing that Lemonis would be investing in Plaintiffs' business in order to help grow their business not to saddle it with debt in order to remove its assets.

451.     As a direct and proximate cause of Defendant NBCUniversal's conduct, Plaintiffs have been harmed in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT
**[By Plaintiffs Against Defendants NBCUniversal, Lemonis, ML Retail and ML, LLC]**

452.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

453.     As set forth above, at all times herein mentioned, Defendant Lemonis was the agent and/or employee of NBCUniversal and was acting within the scope of such agency and/or employment and represented he had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

454.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

455.     Lemonis owed fiduciary duties of care, loyalty and good faith to Plaintiffs throughout the course of the show by virtue of the mutual agreement between the parties that Lemonis would act on Plaintiffs' behalf.  The fiduciary relationship began before the show and continued throughout its course.  This is because contestant companies were recruited to go on the

show (by Machete, Lemonis, and NBC) through the statements that Lemonis would act in their best interests during the show. Moreover, they were also told he would act in good faith during the deal negotiation stage. Lemonis thus offered to provide advice for their benefit, and the structure of the show assured contestants that he was acting on their behalf and placed them in a position of reliance on him, as they were obligated to act in good faith to take his advice. This combination of an agreement to act on another's behalf and the understanding that the other is relying on the person imposes on that person fiduciary duties, including a duty of care, good faith, and a duty of loyalty. This is especially so given that Lemonis also took full control over a participating company's business during his consultancy, acting on its behalf. Because of this fiduciary relationship, Lemonis had a duty not to conceal material information from Plaintiffs.

456. Lemonis failed to disclose and concealed material facts described above including but not limited to: (1) failing to disclose that the true nature and intention of the show was to defame and denigrate Plaintiffs, depicting them in a false light, and to allow Lemonis to take over their company and commingling their assets; (2) failing to disclose his ulterior motive, that is, to force Plaintiffs to become substantially indebted to him; and (3) failing to disclose that it was not Lemonis' true intention to be a fiduciary or equal partner in the business as promised to Plaintiffs but instead to destroy the company as part of the scheme and to try to push Plaintiffs out of their own business. These misrepresentations and omissions were material because of revealed to Plaintiffs, Plaintiffs would not have entertained Lemonis' offers to become "business partners" thereby giving him control and access to the business.

457. Lemonis concealed these material facts so that Plaintiffs would agree to be featured on the show and allow Lemonis to gain control and access to their business. Lemonis' misrepresentations and omissions were false and Lemonis knew these misrepresentations and

omissions were false and he intended to use Gooberry and later ML Fashion to enrich himself at the detriment of Plaintiffs, as this is part of his pattern and overall scheme with businesses who have appeared on the show. Lemonis further knew his omissions were false and instead of acting in the best interests of Plaintiffs, he was forcing debt upon Gooberry and ML Fashion and left Plaintiffs to deal with the consequences.

458.   Upon information and belief, Lemonis intended that Plaintiffs rely on his fraudulent omissions of material facts.

459.   The sole purpose of Lemonis' omissions to Plaintiffs was to get them to appear on the show and go along with the filming and the actions on *The Profit*, take their corporate assets, and take their business to enrich himself and build other brands and entities without regard to the consequences that Plaintiffs would be left with.

460.   Plaintiffs believed and justifiably relied on those misrepresentations and omissions in continuing to film the show, allowing Lemonis control over and access to their business and continuing to do business with Lemonis all to Plaintiffs' detriment. Their belief in Lemonis' misrepresentations and omissions were based, in part, due to Lemonis' own statements, Lemonis' false image expressed on *The Profit*, Machete and NBC's portrayal of Lemonis as a trusted business advisor, and the show's portrayal of part applicant's success in working with Lemonis and going on the show.

461.   As a direct and proximate result of Lemonis' actions described above, Plaintiffs have suffered actual damages in an amount to be proven at trial but at least millions of dollars.

462.   In committing the above-described acts, Lemonis acted with fraud, oppression, and malice. Given Lemonis' conduct was willfully and wantonly reckless and malicious and his high degree of moral culpability, punitive damages are appropriate and warranted.

## SIXTH CAUSE OF ACTION: AIDING AND ABETTING
## FRAUDULENT CONCEALMENT
### [By Plaintiffs Against Defendant NBCUniversal]

463.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

464.     Defendant NBCUniversal knew that Defendant Lemonis owed fiduciary duties to Plaintiffs by virtue of the structure of *The Profit*.

465.     Defendant NBCUniversal knowingly aided and abetted Defendant's breaches of his fiduciary duties by: (1) publicly displaying episodes of *The Profit* which showed companies obtaining substantial infusions of capital; (2) marketing and repeating the claim that the offers made on show are real; (3) failing to publicize evidence of Lemonis' breaches of fiduciary duties; (4) actively participating in an effort to portray *The Profit* as an opportunity for businesses to improve themselves; (5) portraying Lemonis as man acting in good faith for Plaintiffs' benefit; nd (6) directly recruiting contestants by telling them the show is real and touting Lemonis as someone who would help Plaintiff; and (7) .failing to disclose that the true nature and intention of the show was to defame and denigrate Plaintiffs, depicting them in a false light, and to allow Lemonis to take over their company and commingling their assets.

466.     As a direct and proximate cause of Defendant NBCUniversal's conduct, Plaintiffs have been harmed in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY
### [By Plaintiffs, directly and derivatively on behalf of Gooberry Against
### Defendants NBCUniversal, Lemonis, ML Retail and ML, LLC]

467.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

468. As set forth above, at all times herein mentioned, Defendant Lemonis was the agent and/or employee of NBCUniversal and was acting within the scope of such agency and/or employment and represented he had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

469. Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

470. Lemonis currently serves as a Director of Gooberry. As a Director of Gooberry, Lemonis owes Gooberry fiduciary duties of care, loyalty and good faith.

471. Separately, Lemonis owed fiduciary duties of care, loyalty and good faith to Plaintiffs and to Gooberry by virtue of Lemonis obtaining an ownership interest in Gooberry following filming of *The Profit* and by virtue of his ability to exercise managerial authority over Gooberry.

472. Separately, Lemonis owed fiduciary duties of care, loyalty and good faith to Plaintiffs throughout the course of the show by virtue of the mutual agreement between the parties that Lemonis would act on Plaintiffs' behalf. The fiduciary relationship began before the show and continued throughout its course. This is because contestant companies were recruited to go on the show (by Machete, Lemonis, and NBC) through the statements that Lemonis would act in their best interests during the show. Moreover, they were also told he would act in good faith during the deal negotiation stage. Lemonis thus offered to provide advice for their benefit, and the structure of the show assured contestants that he was acting on their behalf and placed them in a position of reliance on him, as they were obligated to act in good faith to take his advice. This combination of an agreement to act on another's behalf and the understanding that the other is

relying on the person imposes on that person fiduciary duties, including a duty of care, good faith, and a duty of loyalty. This is especially so given that Lemonis also took full control over a participating company's business during his consultancy, acting on its behalf.

473. Lemonis engaged in misconduct and breached his fiduciary duty to Gooberry and to Plaintiffs by doing the following, among other things: (1) saddling Gooberry with expensive inventory then forcing Gooberry to sell that inventory at a loss; (2) purposefully decreasing Gooberry's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of Gooberry and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying Gooberry's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of Gooberry to the direct detriment of the other shareholders of Gooberry; (6) using the assets of Gooberry to grow Lemonis' personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing Gooberry's Greenwich, Connecticut store and removing roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; (10) mismanaging Gooberry's corporate assets and funds; (11) causing Gooberry to incur expenditures that put the company in a vulnerable position; (12) advising Plaintiffs to take actions that he knew would leave their company less well off, either absolutely or absent an intervention by the fiduciary; (13) consistently drowning Gooberry in debt to make it beholden to him based on the loans extended through his corporate vehicles; (14) causing Plaintiffs them to undersell expensive inventory that he hoisted upon them in the first place; and (15) causing Gooberry to

purchase goods or services from, or in any way become indebted to, Lemonis or another entity he owned

474.     As a direct and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and Gooberry have been harmed in an amount to be proven at trial, but at least millions of dollars.

**EIGHTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY**
**[By Plaintiffs, Direct and Derivatively on behalf of ML Fashion**
**Against Defendant Lemonis]**

475.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

476.     As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent Lemonis currently serves as the Manager of ML Fashion. Under the LLC.

477.     Lemonis currently serves as the Manager of ML Fashion.  Under the LLC Agreement, a Manager can be liable to the Company when he engages in what the LLC Agreement describes as Misconduct.  (*See* Exh. C § 6.2.)  Such Misconduct includes breach of fiduciary duty. By including a breach of fiduciary duty as Misconduct, the LLC Agreement contemplates and authorizes claims for breach of fiduciary duty as separate claims from breaches of the LLC Agreement.

478.     Lemonis currently serves as Chairman/CEO of ML Fashion, and, as an officer of ML Fashion, Lemonis owes ML Fashion the fiduciary duty of care, loyalty and good faith.  The fiduciary duties that Lemonis owes ML Fashion as an officer, are separate and apart from, and in addition to, the fiduciary duties he owes to ML Fashion as its Manager.

479. By virtue of Lemonis' ownership interest in ML Fashion, Lemonis similarly owed duties of care, loyalty, and good faith to ML Fashion and Plaintiffs.

480. Moreover, as a control group wielding unbridled power to control ML Fashion, the ML Control Group owes a fiduciary duty to ML Fashion and Plaintiffs. The ML Control Group is connected by common ownership, as Lemonis is the only natural person with an interest in ML Retail and ML, LLC, and worked together towards their shared goal of running ML Fashion to benefit themselves to the detriment of ML Fashion and Plaintiffs. The fiduciary duties owed to ML Fashion and to Plaintiffs by the Control Group do not arise from the LLC Agreement.

481. The fiduciary duties that Lemonis owed to ML Fashion and to Plaintiffs as a result of being in the ML Control Group are separate and apart from, and in addition to, the fiduciary duties he owes to ML Fashion as its Manager and an officer.

482. Lemonis engaged in misconduct and breached his fiduciary duty to ML Fashion, as described above, by doing the following, among other things: (1) saddling ML Fashion with expensive inventory, then forcing ML Fashion to sell that inventory at a loss, (2) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from ML Fashion so that its debts could not be paid, (4) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of the other members of ML Fashion, (6) using the assets of ML Fashion to grow Lemons' personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing ML Fashion's retail stores

and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from ML Fashion's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments from Defendants' benefit, and (12) preventing ML Fashion from paying the business American Express card tied to Goureau personally.

483. As a direct result and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## NINTH CAUSE OF ACTION: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### [By Plaintiffs Against Defendant Raffel]

484. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

485. Defendant Raffel knew that Lemonis owed fiduciary duties to ML Fashion.

486. Defendant Raffel knowingly aided and abetted Lemonis' breaches of their fiduciary duties by: (1) working with Lemonis to buy products for ML Fashion's retail stores far above ML Fashion's budget for product thus forcing ML Fashion to incur more debt from Lemonis so it was not able to cover its normal expenses, such as payroll and rent, (2) making business decisions that were outside of her understanding such a managerial, staffing, discounting, and merchandising decisions, knowing that ML Fashion would have to expand time and resources to correct and redo her work, and (3) working with Lemonis to make ML Fashion insolvent and indebted to ML Retail

and ML, LLC so that they could use the assets of ML Fashion to grow Lemonis and Raffel's MARCUS brand.

487.   As a direct and proximate cause of Defendant Raffel's conduct, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial.

## TENTH CAUSE OF ACTION: ADDING AND ABETTING BREACH OF FIDUCAIRY DUTY
### [By Plaintiffs Against Defendant NBCUniversal]

488.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

489.   Defendant NBCUniversal knew that Defendant Lemonis owed fiduciary duties to Plaintiffs and Gooberry.

490.   Defendant NBCUniversal knowingly aided and abetted Defendant's breaches of his fiduciary duties by: (1) publicly displaying episodes of *The Profit* which showed companies obtaining substantial infusions of capital, (2) marketing and repeating the claim that the offers made on show are real, (3) failing to publicize evidence of Lemonis' breaches of fiduciary duties, (4) actively participating in an effort to portray *The Profit* as an opportunity for businesses to improve themselves, (5) portraying Lemonis as man acting in good faith for Plaintiffs' benefit, and (6) directly recruiting contestants by telling them the show is real and touting Lemonis as someone who would help Plaintiffs.

491.   As a direct and proximate cause of Defendant NBCUniversal's conduct, Plaintiffs have been harmed in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### [By Plaintiffs, Direct and Derivatively on behalf of ML Fashion Against Defendants Lemonis, ML Retail and ML, LLC]

492.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

493.     The LLC Agreement contains an implied covenant and good faith and fair dealing. The implied covenant of good faith and fair dealing attaches whenever an LLC Agreement gives a party the ability to take an action in their "sole discretion."  As discussed above, the LLC Agreement gave Lemonis the sole discretion to manage the day to day affairs of ML Fashion, gave ML Retail the sole discretion to manage the day to day affairs of ML Fashion, gave ML Retail the sole discretion to change ML Fashion's manager, and have ML Retail the sole discretion to handle ML Fashion's tax matters.

494.     The implied covenant of good faith and fair dealing applies to an LLC agreement that, like the LLC Agreement here, attempts to limit the liability of its managers and members.

495.     Defendants breached this covenant by abusing, unreasonably and in bad faith and for their own interests and to the detriment of ML Fashion, the managerial power over ML Fashion provided to them in the LLC Agreement.  Actions which breached the covenant, described above, including, but not limited to:  (1) saddling ML Fashion with expensive inventory then forcing ML Fashion to sell that inventory at a loss, (2) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from ML Fashion so that its debts could not be paid, (4) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member of ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of the other personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small

business owners Lemonis was purporting to save, (9) closing ML Fashion's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the sores, (10) improperly removing at least $601,324.02 from ML Fashion's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from these payments from Defendants' benefit.

496. As a direct and proximate result of Defendants' breaches of the implied duty of good faith and fair dealing, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## TWELFTH CAUSE OF ACTION: BREACH OF
## ML FASHION LLC AGREEMENT
**[By Plaintiffs, Direct and Derivatively on behalf of ML Fashion, Against
Defendants Lemonis, ML Retail and ML, LLC]**

497. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

498. This is a direct and derivative action for money damages arising out of Defendants' breach of the duties and obligations owed to ML Fashion and ML Fashion's members under the LLC Agreement, and the resulting damages that were incurred.

499. At all times material to this action, Defendant Lemonis was the Manager and Chairman/CEO of ML Fashion, Defendant ML Retail owned the largest and powerful membership interest in ML Fashion, and ML, LLC was an agent and alter ego of both Lemonis and ML Retail. As such, Defendants agreed to fulfill and discharge certain managerial duties and obligations that were expressly set forth in the LLC Agreement.

500.     Specifically, under Section 2.8 of the LLC Agreement, Defendants agreed that "[t]he Company's credit and assets shall be used solely for the benefit of the Company."  (*See* Exh. C at § 2.8.)

501.     Defendants materially breached Section 2.8 of the LLC Agreement, by removing the assets of ML Fashion, including money in its bank accounts and inventory in its stores, and using the assets of ML Fashion to promote Lemonis' personal brand MARCUS, thus clearly not using them solely for the benefit of ML Fashion.  Indeed, the removal of these assets have prevented ML Fashion from being able to satisfy its financial obligations.

502.     Lemonis breached this provision of the LLC Agreement by improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments from Defendants' benefit.

503.     Further, Section 6.2(b) required Lemonis to act in good faith and to take actions for the benefits of all of the members as a whole:

**6.2     Duties and Obligations of the Manager; Discretion:**

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager of an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

(*See* Exh. C at § 6.2(b).)

504.     Lemonis materially breached Section 6.2 by taking actions that failed to take into account "the interests of the Members as a whole" and failing to act in good faith.  Specifically,

Lemonis made ML Fashion take on debt and forced ML Fashion to take loans from ML Retail in transactions that solely benefit ML Retail and harmed ML Fashion and its other members.

505.     Moreover, Lemonis' actions of draining ML Fashion's bank accounts and transferring funds to MLG Retail so that ML Fashion could not pay its debt clearly were not done in good faith.

506.     The LLC Agreement prohibits the Manager from engaging in Misconduct.  The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct."  (*See* Exh. C at p. 5.).

507.     Lemonis' Misconduct as the manager of ML Fashion includes, but is not limited to: (1) forcing ML Fashion to take on debt making it reliant on credit from Lemonis and his entities to meet its regular obligations, such as payroll, and allowing Lemonis to further encumber ML Fashion, (2) using ML Fashion as a vehicle to defraud and foreclose upon the businesses Lemonis was purporting to save, (3) removing funds from ML Fashion's bank accounts in order to ensure that its automated payments could not be made out of the account forcing ML Fashion to become delinquent on its debts, (4) closing ML Fashion's retail stores during a global pandemic and converting at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (5) moving all of the funds out of ML Fashion's bank accounts (roughly $601,324.02) and transferring them to a different company and making a new account invisible to the other owners and signatories on ML Fashion's, and (6) improperly taking at least #3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.*

508.    Further, the LLC Agreement limits the Manager's and Member's ability to take assets and distributions from ML Fashion.  Section 2.7 confirms that "no Member shall have ownership interest" in ML Fashion's property as all of it belongs to ML Fashion itself.  (*See* Exh. C at § 2.7.)  Section 3.4 prevents Members from seeking capital of ML Fashion in return of contributions "prior to termination of the Company."  (*Id.* at § 3.4.)

509.    Similarly, no cash distributions are allowed where, as here, ML Fashion's trade accounts are past due.  *Id.* at § 5.1(a).  Even if the trade accounts were not past due, however, the distributions can be made only within the Manager's "reasonable business judgment" and only to ***all*** the Members pursuant to the specific mechanism set forth in the LLC Agreement.  (*Id.* at § 5.1(b).)

510.    An additional limitation on cash distributions is that they cannot be made at all if the effect of the distributions is for all of ML Fashion's liabilities to exceed the fair value of its assets.  (*Id.* at ¶ 5.4.)

511.    Defendants have breached these provisions of the LLC Agreement by removing cash from ML Fashion's bank accounts and removing inventory from ML Fashion's retail stores to the benefit of Defendants and detriment of ML Fashion and Plaintiffs.

512.    As a direct and proximate result of Defendants' material breaches of the LLC Agreement, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, at least $4,198,960.49.

### THIRTEENTH CAUSE OF ACTION: BREACH OF CONTRACT
**[By Plaintiff Menkin Against Defendants ML Fashion and MLG Retail]**

513.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

514.    Since its inception, Plaintiff Menkin served Defendants ML Fashion and MG Retail as their President.  In exchange for her services, Menkin and ML Fashion and MLG Retail agreed

that she would receive bimonthly payments of $11,558. Those bimonthly payments were made on the 1st and 15th of every month.

515. Thus, a valid and enforceable contract exists between Menkin and MLG Retail where Menkin received compensation of bimonthly payments of 11,558 in exchange for serving as the President of both companies.

516. Beginning on April 1, 2020, ML Fashion and MLG Retail ceased paying Menkin the compensation due under the agreement. By failing pay Menkin, ML Fashion and MLG Retail have breached the agreement between it and Menkin.

517. As a direct and proximate result of Defendants' actions, Plaintiff Menkin has been harmed in an amount to be proved at trial, but not less than $69,348.

### FOURTEENTH CAUSE OF ACTION: UNJUST ENRICHMENT
**[By Plaintiffs, Direct and Derivatively on behalf of Gooberry,
Against Defendants Lemonis, ML Retail and ML, LLC]**

518. Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

519. Plaintiffs bring this claim for Unjust Enrichment in the alternative to their contract-based claims. Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the Shareholder Agreement and Stock Purchase Agreement through their claim for Fraudulent Inducement.

520. Plaintiffs allege that the Company has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

521. By their wrongful acts and omissions, as alleged herein, the Defendants were unjustly enriched at the expense of, and to the detriment of, the Company. The Defendants used the Company as a self-enrichment vehicle while forcing the Company to take actions counter to the Company's interests and to assume increasing debt.

522. As President and CEO of ML Retail, and Director of Gooberry, Lemonis used Gooberry's assets to enrich himself and his entities by, among other things: (1) decreasing Gooberry's profit margins in order to make it dependent on loans from Lemonis and his entities; (2) purposefully increasing the debt of Gooberry and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of Gooberry to the detriment of the other shareholders; (4) using the assets of Gooberry to grow Lemonis' personal brand MARCUS; (5) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save on his television show; and (6) forcing Gooberry to acquire Runway and thereby incur more debt.

523. Further, upon information and belief, Defendants have continued to enrich themselves at Gooberry's expense and have been closing Gooberry's store in Greenwich, Connecticut and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store.

524. Defendants had knowledge of the benefits conferred upon them by Gooberry.

525. Plaintiffs, as shareholders of Gooberry, seek restitution from the Defendants to disgorge all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct and fiduciary breaches.

526. Further, it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used Gooberry assets to enrich themselves at the expense of Gooberry and its other shareholders. There is no justification for Defendants' actions.

**FIFTEENTH CAUSE OF ACTION: UNJUST ENRICHMENT**
**[By Plaintiffs, Direct and Derivatively on behalf of ML Fashion, Against Defendants Lemonis, ML Retail and ML, LLC]**

527. Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

528. Plaintiffs bring this claim for Unjust Enrichment in the alternative to their claim for their breach of contract claim above. Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the LLC Agreement through their claim for Fraudulent Inducement.

529. Plaintiffs allege that ML Fashion has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

530. By their wrongful acts and omissions, as alleged herein, Defendants were unjustly enriched at the expense of, and to the detriment of, ML Fashion. Defendants used ML Fashion as a self-enrichment vehicle while forcing ML Fashion to take actions counter to ML Fashion's interests and to assure increasing debt.

531. As the manager of ML Fashion, Lemonis use ML Fashion's assets and to enrich himself and his entities by, among other things: (1) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (2) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis, and/or other companies owed and/or controlled by him, in order to meet its financial obligations, (3) taking actions that financially favored member of ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of the other members of ML Fashion, (4) using the assets of ML Fashion to grown Lemonis' personal brand MARCUS, (5) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (6) closing ML Fashion's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment form the stores, (7) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related expenses that Defendants put on Defendant Lemonis' personal

credit and keeping and/or using the rewards points from those payments for Defendants' benefit, (9) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, and (1) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS.

532.    Plaintiffs, as members and representatives of ML Fashion, seek restitution from Defendants, and seek an order form this Court requiring Defendants to disgorge all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

533.    Further, as it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used ML Fashion's assets to enrich themselves at the expense of ML Fashion and its other members. There is no justification for Defendants' actions.

## SIXTEENTH CAUSE OF ACTION:
## CORPORATE MISMANAGEMENT AND WASTE
**[By Plaintiffs, Direct and Derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

534.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

535.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis grossly mismanaged the Company and its assets by, for example: (1) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (4)

using the assets of the Company to grow Lemonis' personal brand MARCUS; (5) closing the Company's Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store, and (6) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save.

536.    As a direct and proximate result of Defendants' malfeasance, acts or omissions, the Company and Plaintiffs have been harmed in an amount to be proven at trial, but at least millions of dollars.

### SEVENTEENTH CAUSE OF ACTION:
### CORPORATE MISMANAGEMENT AND WASTE
**[By Plaintiffs, Direct and Derivative, on behalf of ML Fashion, Against Defendants Lemonis, ML Retail, and ML, LLC]**

537.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

538.    As the manager of ML Fashion, Lemonis has grossly mismanaged the Company and its assets. Lemonis' gross mismanagement, described above, includes, but is not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts, including the American Express payment plan, could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud

and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, (12) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, (13) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS, and (14) creating personal liability for Plaintiffs due to the failure to pay the American Express and failure to pay required tax and business fees in Illinois, Connecticut, Minnesota, Florida.

539.    As a direct and proximate result of Defendants' gross mismanagement, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49. Plaintiff Goureau has been harmed by Defendants' gross mismanagement as Defendants' failure to pay the American Express debt triggers' Goureau's personal obligation to pay the outstanding amount.    Plaintiff Menkin has been harmed by Defendants' gross mismanagement by being personally liable for state tax and business fees in Illinois, Connecticut, Minnesota, and Florida, thus hindering her ability to start separate businesses in those states

### EIGHTEENTH CAUSE OF ACTION:
### MISAPPROPRIATION OF CORPROATE ASSETS
**[By Plaintiffs, Derivative on behalf of Gooberry, Against
Defendants Lemonis, ML Retail, and ML, LLC]**

540.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

541.    This is an action for relief arising out of the mismanagement and waste of corporate assets caused solely by Defendants Lemonis, ML Retail and ML, LLC's malfeasance, acts or omissions, to the detriment of the Company.

542.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis has grossly mismanaged the Gooberry by, for example: (1) forcing the Gooberry to spend hundreds of thousands of dollars renovating its stores only to then rebrand and spend additional hundreds of thousands of dollars on rebranding those stores; (2) decreasing the Gooberry margins from 73% to 52%; (3) saddling the Gooberry with expensive inventory then forcing the Gooberry to sell that inventory at a loss; (4) destroying the Gooberry's legacy handbag line; (5) closing the Gooberry's Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; and (6) getting rid of all but one Courage.B retail store and destroying the Courage.B brand.

543.    Beginning in May 2020, Defendants Lemonis, ML Retail and ML, LLC have been closing retail stores owned and/or operated by Gooberry and have removed the Gooberry's inventory and assets from those stores.

544.    These actions by Defendants Lemonis, ML Retail and ML, LLC amount to waste and mismanagement of corporate assets.

545.    As a result of their mismanagement and waste of corporate assets, Defendants Lemonis, ML Retail and ML, LLC are liable to the Company and Plaintiffs under common law and New York Bus. Corp. Law § 720.

546.    As a direct and proximate result of the foregoing, the Gooberry and Plaintiffs have been injured in an amount to be determined at trial in an amount to be proven at trial, but at least millions of dollars.

## NINETEENTH CAUSE OF ACTION:
## MISAPPROPRIATION OF CORPORATE ASSETS
### [By Plaintiffs, Derivative on Behalf of ML Fashion, Against
### Defendants Lemonis, ML Retail and ML, LLC]

547.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

548.    This is an action for relief arising out of the waste of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

549.    Defendants Lemonis, ML Retail and ML, LLC have taken at least $3,023,004.47 in funds from ML Fashion and MLG Retail's bank accounts to pay personal, non-Company related, expenses that Defendants Lemonis, ML Retail and ML, LLC put on Defendant Lemonis' personal credit card.

550.    Since April 2020, Defendants have been closing retail stores all over the country owned and/or operated by either ML Fashion or MLG Retail and have removed ML Fashio's assets from those stores.  In total, Defendants Lemonis, ML Retail and ML, LLC have removed at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas.  Defendants Lemonis, ML Retail and ML, LLC have also taken hundreds of thousands of dollars from the Company's Newtown, Massachusetts store.

551.    On or around May 22, 2020, Defendants Lemonis, ML Retail and ML, LLC moved roughly $601,324.02 out of ML Fashion's bank accounts and transferred the funds to an account in the name of MLG Retail that was not tied to either company's other accounts preventing the accounts' other signatory, Plaintiff Menkin, from being able to access or view the account.

552.     Since the filing of Plaintiffs' initial Complaint on June 18, 2020, Defendants Lemonis, ML Retail and ML, LLC have held fire sales selling large portions of ML Fashions inventory for up to 90% off forcing the Company to take huge losses on that inventory.

553.     These actions by Defendants Lemonis, ML Retail and ML, LLC amount to a waste and misappropriation of corporate assets.

554.     As a direct and proximate result of Defendants Lemonis, ML Retail and ML, LLC' malfeasance, acts or omissions, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## TWENTIETH CAUSE OF ACTION: CONVERSION
**[By Plaintiffs Derivative on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

555.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

556.     Gooberry has a property interest in the assets and inventory in its retail stores and a right to possess those assets and inventory and have them used for legitimate business purposes.

557.     Defendants Lemonis, ML Retail and ML, LLC converted roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from Gooberry's Greenwich, Connecticut store for no legitimate business purpose.

558.     Without Plaintiffs' knowledge or consent, Defendants Lemonis, ML Retail and ML, LLC took possession of the assets and inventory of ML Fashion, in derogation of Gooberry's rights.

559.     Defendants Lemonis, ML Retail and ML, LLC' acts were willful, wanton, malicious, and oppressive.

560.     As a result of Defendants Lemonis, ML Retail and ML, LLC' conversion, Plaintiffs have been damaged in an amount to be proven at trial, but at least $237,369.

### TWENTY-FIRST CAUSE OF ACTION: CONVERSION
**[By Plaintiffs, Derivative on behalf of ML Fashion, Against Defendants Lemonis, ML Retail and ML, LLC]**

561.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

562.     ML Fashion had a property interest in the funds in its bank accounts and inventory and furniture, fixtures, and equipment in its retail stores and a right to possess those funds and inventory and have them utilized for legitimate business purposes.

563.     Defendants Lemonis, ML Retail and ML, LLC converted these funds by removing such funds from ML Fashion's bank accounts for no legitimate business purpose, including removing roughly $601,324.02 from the Company's bank accounts.

564.     Defendants Lemonis, ML Retail and ML, LLC additionally converted ML Fashion's property by taking at least $3,023,004.47 from ML Fashion and MLG Retail's bank accounts to pay personal, non- ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card.

565.     To the extent that any of the $3,023,004.47 was used towards legitimate business expenses, Defendants Lemonis, ML Retail and ML, LLC converted the American Express rewards points associated with those credit card payments.

566.     Defendants Lemonis, ML Retail and ML, LLC converted ML Fashion's inventory by removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas

for no legitimate business purpose. Defendants Lemonis, ML Retail and ML, LLC have also taken hundreds of thousands of dollars from ML Fashion's Newtown, Massachusetts store.

567.    On information and belief, Defendants Lemonis, ML Retail and ML, LLC are converting ML Fashion's inventory and FFE, at least in part, to support Lemonis and Raffel's MARCUS brand and move the brand from ML Fashion to ML, LLC.

568.    Defendants Lemonis, ML Retail and ML, LLC' actions were willful, wanton, malicious and oppressive.

569.    As a direct and proximate result of Defendants Lemonis, ML Retail and ML, LLC' actions, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## TWENTY-SECOND CAUSE OF ACTION: ACCOUNTING
### [By Plaintiffs, Direct and Derivative on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]

570.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

571.    As detailed above, by diverting and misusing corporate funds for Defendants Lemonis, ML Retail and ML, LLC own benefit, and by engaging in the other misconduct described above, the Defendants Lemonis, ML Retail and ML, LLC are guilty of mismanagement and waste under New York Bus. Corp. Law § 720.

572.    According to the Shareholder Agreement, Lemonis, as President and CEO of ML Retail, was given the sole and absolute discretion over financial and accounting functions, controls, decisions, and procedures for the Company. Further, as a Director of Gooberry, Lemonis owed a fiduciary duty to act in the best interests of Gooberry. Thus, Gooberry is entitled to an accounting from Defendants Lemonis, ML Retail and ML, LLC.

573. Plaintiffs, as shareholders, are entitled to commence an action to compel Defendants to account for their failure to perform their duties and their waste of corporate assets.

574. In view of the foregoing, Gooberry is entitled to an accounting of all transactions, receipts, and disbursements undertaken by Gooberry and by the Defendants Lemonis, ML Retail and ML, LLC, purportedly on its behalf.

575. Gooberry is entitled to an accounting from the Defendants Lemonis, ML Retail and ML, LLC as to all sums they have received from Gooberry, as compensation or any other form of disbursement, regardless of whether the funds went directly to Defendants Lemonis, ML Retail and ML, LLC or to third parties.

576. Such an accounting is necessary to determine the rights of Gooberry and Plaintiffs to funds that have been improperly in Defendants' possession and control because Gooberry and Plaintiffs have an interest in these funds.

577. Given that Defendants Lemonis, ML Retail and ML, LLC have failed, neglected, or refused to account to Gooberry and Plaintiffs, proper accounting is both appropriate and necessary.

578. Plaintiffs have no adequate remedy at law.

**TWENTY-THIRD CAUSE OF ACTION:**
**APPOINTMENT OF A TEMPORARY RECEIVER**
**[By Plaintiffs Against Defendants]**

579. Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

580. Given Defendants Lemonis, ML Retail and ML, LLC' abuse of power by misappropriating and mismanaging the Gooberry's assets and engaging in other criminal conduct, as detailed above, there is an imminent danger that corporate assets will continue to be improperly

diverted and misused by the Defendants Lemonis, ML Retail and ML, LLC for their personal benefit.

581.    Although Plaintiffs are co-founders and shareholders of Gooberry, the Shareholder Agreement gives Lemonis, as CEO and President of ML Retail, all financial power, accounting, and business control over Gooberry.

582.    Lemonis is actively removing assets from Gooberry, purposefully rendering it unable to meet its current obligations.  As of the filing of this Complaint, Lemonis has closed one of the remaining two stores and removed all of the store's assets.  As for the remaining store, it is only a matter of time before Lemonis takes action.

583.    Lemonis' conduct has and is causing significant financial harm to the Gooberry and has exposed it to potential insolvency.  There is a significant risk that if Lemonis is allowed to remain in control of the Gooberry and its finances, the corporate assets will continue to be diverted to his pockets and the Gooberry will be run into the ground.

584.    To prevent the Gooberry and Plaintiffs, as shareholders, from suffering serious and irreparable harm, it is both necessary and appropriate for a temporary receiver to be instated to control the Company's finances and preserve its assets.

585.    As a result of Lemonis' misappropriation of the Gooberry's funds and assets, the appointment of a custodian or receiver to direct and supervise Gooberry's business and affairs pending a decision on the merits of Plaintiffs' claims is necessary and appropriate to avoid irreparable harm to the Company and its shareholders.

586.    Plaintiffs have no adequate remedy at law.

**TWENTY-FOURTH CAUSE OF ACTION: PERMANENT INJUNCTION RESTRAINING DEFENDANTS FROM CONTINUING TO MAINTAIN CONTROL OVER THE COMPANY'S FINANCES AND ASSETS**
**[By Plaintiffs Against Defendants Lemonis, ML, LLC and ML Retail]**

587.     Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

588.     As stated above, Lemonis continues to maintain exclusive control over the finances, accounting, and business decisions of the Company.  If Defendants are permitted to continue to exert such wrongful control over the Company, Gooberry and Plaintiffs will suffer serious and irreparable harm, because the Company will be rendered insolvent.

589.     By purposefully rendering Gooberry unable to pay its debts, closing its stores and removing its assets, and seeking to misappropriate Gooberry's funds for their personal benefit, Defendants' actions threaten to cause irreparable harm to Plaintiffs and the Company.  Such harm can only be prevented by an Order removing Defendants from positions of influence or authority over the Company's finances and assets.

590.     To preserve the status quo and prevent damage to Gooberry, Plaintiffs seek an order immediately restraining and enjoining Defendants, or those acting in privity with them, from (or as appropriate, requiring them to take the following action):

    a.  Spending, transferring or dissipating any funds of Gooberry except as absolutely necessary in the ordinary course of business for Gooberry, and including specifically that no funds will be expended for:

        i.  Any payments whatsoever to Defendants or their affiliates, for any purpose, including bonuses; or

        ii.  Any payments whatsoever to Defendants' personal attorney from the Company's funds.

    b.  Entering into any banking, borrowing and/or investment arrangements on behalf of the Company.

c.  Closing any retail stores of Gooberry and/or moving, or removing any of the assets located in such stores.

d.  The issuance of a temporary restraining order will prevent further harm to the Company until a preliminary injunction hearing is held and will not unduly prejudice Defendants.

591.  Plaintiffs have no adequate remedy at law.

## TWENTY-FIFTH CAUSE OF ACTION: RICO § 1962
**[By Plaintiffs Against Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC, Machete and DOES 1 through 5]**

592.  Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

593.  This cause of action asserts claims against Defendants, NBCUniversal, Machete, Lemonis, ML Retail, ML, LLC and DOES 1 through 5 for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "Lemonis Enterprise" described herein, through the "pattern of racketeering activity" described herein.

594.  At all relevant times, Plaintiffs, Defendants, NBCUniversal, Machete, Lemonis, ML Retail, ML, LLC and DOES 1 through 5 are "persons" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

595.  Plaintiffs are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

596.  At all relevant times, Defendants, NBCUniversal, Machete, Lemonis, ML Retail, ML, LLC and DOES 1 through 5 were, and are, a "person" who conducted the affairs of the "Profit Enterprise" described below, through the "pattern of racketeering activity" described below. While each Defendant participates in the Profit Enterprise, it has an existence separate and distinct

from the enterprise. Further, the Profit Enterprise is separate and distinct from the "pattern of racketeering activity" in which each Defendant has engaged and is engaging.

597. At all relevant times, Defendants, NBCUniversal, Machete, Lemonis, ML Retail, ML, LLC and DOES 1 through 5 were associated with, operated or controlled, the Profit Enterprise, and each Defendant participated in the operation and management of the affairs of the Profit Enterprise, through a variety of actions described herein. Each Defendant's participation in the Profit Enterprise is necessary for the successful operation of the Defendants' scheme.

### The Profit Enterprise

598. Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

599. The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "Profit Enterprise:"

  a.  Defendant Marcus Lemonis;

  b.  Defendant ML Retail;

  c.  Defendant ML, LLC;

  d.  Defendant Machete; and

  e.  Defendant NBCUniversal

600. The RICO "enterprise" was an association-in-fact Enterprise, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete, and their respective agents and employees, who associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein. The

Profit Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern Profit Enterprise was used as a tool to effectuate the pattern of racketeering activity.

601.    Each Defendant was responsible for and carried out separate roles in pursuit of the common purpose of the Enterprise:

a. Marcus Lemonis' role in the Profit Enterprise was to use his personality, fame, purported business acumen, and fraudulent representations to bait Plaintiffs, and the other businesses he encountered through *The Profit* to allow him to invest and obtain equity in their businesses. Lemonis represented to Plaintiffs, and other participants on *The Profit* that he was there to help their business and that he had their best interest in mind. Lemonis' role in the enterprise also included keeping Plaintiffs, and other business owners, in line by threatening to foreclose on their businesses and take their assets from them.

b. ML Retail's role in the Profit Enterprise was to act as the corporate vehicle through which the Lemonis Enterprise invested in Plaintiffs' business and, on information and belief, the other businesses that the Profit Enterprise baited through *The Profit*. Thus, ML Retail was used to represent the Profit Enterprises' equity in these businesses. In the agreements with Plaintiffs, ML Retail was given broad management power over Gooberry which it used to run the Company to Defendants' benefit, to the detriment of Plaintiffs and the Company.

c.  ML, LLC's role in the Profit Enterprise was to act as the financing behind the enterprise.  Part of the Profit Enterprise's fraudulent conduct was making Plaintiffs' business, Gooberry, and the other businesses the Profit Enterprise encountered through "*The Profit,* insurmountably indebted to the Profit Enterprise.  The funding to make the unnecessary inventory purchases, renovations, and other fraudulent capital expenditures came from ML, LLC.

d.  Machete's role in the Profit Enterprise was to provide initial inducements to prospective businesses and business owners in order for them to appear on "*The Profit.* Machete would use Skype and other electronic means to communicate to small businesses and their owners telling them that appearing on *The Profit* and making a deal with Lemonis would save their business and/or help successfully expand their business.  In addition, Machete produced the show *The Profit* which the Profit Enterprise used to advertise and sell their fraudulent scheme.  Further, Machete used the Internet and television to make representations about the success the businesses featured on the show had achieved when in reality most of the business that appeared on the show are  no longer in business, were severely damaged by the show, or insurmountably saddled with debt to the Profit Entities.

e.  NBCUniversal's role in the Profit Enterprise was to select and approve businesses to appear on the show and provide initial inducements to prospective businesses and business owners in order for them to appear on *The Profit*.  NBCUniversal oversaw Machete's work in inducing small businesses to appear on the show and was involved in editing and finalizing episodes of the show,

which defame participants.  NBCUniversal would also reimburse Lemonis and his related entities for monies that they spent renovating and improving businesses that appeared on the show all the while Lemonis represented to the business owners that they were indebted to him for those improvements and use that debt as a threat to extort an ownership interest in their business. NBCUniversal continued its involvement in the Profit Enterprise despite being made aware that the show was defrauding its participants.

 f. The Profit Enterprise is an ongoing enterprise which engages in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. § 1962(c), by, among other things, marketing and advertising *The Profit* television show and Defendants' purported ability to save family business and small fledgling businesses through television, media, and Internet outlets, and using the instrumentalities of interstate commerce to make fraudulent representations to Plaintiffs and others as part of a scheme to defraud.  The Profit Enterprise began by at least July 2013 and presently continues to operate as a single unit.

602. The overarching purpose of the Profit Enterprise is for each of its members to profit from defrauding small, often family owned, businesses across the Country, primarily through the guise of the television show *The Profit*.  Lemonis, ML Retail, ML, LLC, Machete and NBCUniversal accomplished the purpose of the Profit Enterprise by

 a. Falsely representing Lemonis as a business savior who helps failing small businesses,

b. Targeting small family run businesses without general counsel or independent attorneys,

c. Using means of mail and wire (defined below), such as the Internet and television, to make representations that induce small businesses, including Plaintiffs, to appear on the television show *The Profit*,

d. Using means of mail and wire (defined below), such as the Internet and television, to represent to each business that Lemonis will help the business, make the businesses profitable, and provide marketing and publicity by virtue of being on the show and part of the Lemonis family of businesses,

e. Using means of mail and wire (defined below), such as the Internet and television, to represent to each business that the deals Lemonis makes on the show and the help he provides the companies on the show are real,

f. Using means of mail and wire (defined below), such as the Internet and television, to represent that Lemonis has helped and improved the small businesses featured on the show when, in reality, the majority of businesses featured on the show are either now closed, severely damaged by the show, or insurmountably indebted to Lemonis and his related entities,

g. Saddling the business with debt to the Lemonis and his related entities, both prior to finalizing the Lemonis' investment and after, in order to give the Profit Enterprise leverage over the business and its owners,

h. Obtaining an ownership interest in the business that gave Lemonis and his entities complete control over the business, its finances, and its line of credit those entities,

i. Mismanaging the business in a way that benefited the Profit Enterprise, to the detriment of the business and its owners, and in a way that make it insurmountably indebted to Lemonis and his related entities,

j. Eventually foreclosing on the debt in order to take the business from its original owners and fold it into the Lemonis Enterprise and its various related companies,

k. Forcing participants to provide goods to Lemonis at severely discounted margins so that the goods could be sold through Lemonis' entities,

l. Defaming and portraying participants in a false light on the episodes of the show in order to destroy the businesses' relationships giving them no other option but to continue to rely on Lemonis and his related entities, and

m. Threatening business owners that appeared on the show that if they did not allow Lemonis to invest in their business that would force them to pay back the money that was spent renovating the business during the show, despite the fact that Lemonis was being reimbursed by NBCUniversal for these expenses.

n. Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud).

603. As set forth below, to carry out, or attempt to carry out its scheme to defraud, NBCUniversal, Lemonis, ML, LLC and Machete have engaged in, and continues to engage in, the affairs of the Profit Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud):

a. The Profit Enterprise used the mail and wire, including television, media, Skype, and the Internet, as follows:

   i. Using the Internet and Skype to make fraudulent representations to small businesses, that Lemonis would help their business through *The Profit* and running advertising and maintaining a website including false representations portraying Lemonis as a savior of small businesses and representing that Lemonis helps small businesses. Using the Internet and television to make fraudulent representations that Lemonis has helped and improved the small businesses featured on the show when, in reality, the majority of businesses featured on the show are either now closed, severely damaged by the show, or insurmountably indebted to the Profit Enterprise. In Plaintiffs case, using Skype around spring 2014 to make representations that Lemonis could help their business move to the next level, that the deals Lemonis makes on the show are real, and that the businesses Lemonis helps on the show. These representations are made to induce small businesses to be on the show *The Profit* and provide Defendants the opportunity to invest in the targeted small business.

   ii. Using the Internet to transmit documents used to give the Profit Enterprise equity positions in these businesses. In Plaintiffs' case, using the Internet in or around October and/or November 2014 to transmit the Shareholder Agreement and Stock Purchase Agreement that gave Defendants an equity interest in and control over Gooberry.

iii. Using the Internet and telephone to make fraudulent representations after the Lemonis Entities invested that the Profit Enterprise was helping these businesses while they were actually mismanaging them to the detriment of the business, including Plaintiffs' business, to make loans to Plaintiffs and the other businesses that made them insurmountably indebted to the Profit Enterprise, and to foreclose on these businesses whenever Lemonis and his related entities wanted to get rid of the original owners.

iv. The fraud would not have been possible had the Profit Enterprise, their entities, and their authorized agents used the mail and wire, as described above, to send and receive the communications throughout the Country.

v. Defendants conducted exchanges, payments, and monetary transfers using the wires concerning the receipt and distribution of the proceeds of Defendants' improper racketeering enterprise.

604. Defendants' misrepresentations and acts were knowing and intentional, and made with the intent to defraud, primarily through the show *The Profit,* its marketing, website, and promotional materials.

605. Plaintiffs reasonably relied on Defendants' false representations by, among other things, allowing Defendants to invest in their company Gooberry, allowing Defendants to obtain control of Gooberry, and allowing to Defendants to control Gooberry's line of credit with the Profit Entities.

606.     These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

## Predicate Acts (Hobbs Act Extortion)

607.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of 18 U.S.C. § 1951(a) (Hobbs Act Extortion).

608.     Extortion under the Hobbs Act exists when a defendant (1) obtains, or attempts to obtain, property, (2) from another, (3) with his consent, and (4) induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.  18 U.S.C. § 1951(a).

609.     As set forth below, to carry out, or attempt to carry out its scheme to defraud, Lemonis, ML, LLC, ML Retail, Machete, and NBCUniversal have engaged in, and continue to engage in, the affairs of the Profit Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1951(a):

    a.   On several occasions, Lemonis attempted to obtain ownership interests in the businesses that appeared on the show by threatening that if they did not allow Lemonis to obtain an ownership stake in their business, through one if his related entities, including ML, LLC, and ML Retail, that he would force them to pay him back for the money spent on the business during the production of the show, even though the business owners had consistently been told that they would not be charged for such expenditures;

    b.   On several occasions, Lemonis attempted to obtain ownership interests in the businesses that appeared on the show by threatening that if they did not allow

Lemonis to obtain an ownership stake in their business, through one if his related entities, including ML, LLC, and ML Retail, that he would issue a 1099 for money spent on the business during of the production of the show to fraudulently create a tax liability that the business owner could not afford to pay.

c. These acts constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs Act violation, in that, *inter alia*, they exploited participant's fears of economic harm and substantial tax liabilities to obtain equity in the participant's businesses to which they were not legally entitled. Moreover, Defendants thereby affected and intended to affect interstate commerce.

## Pattern of Racketeering Activity

610. As set forth herein, Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past ten years.

611. Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete have engaged in a scheme to defraud small business owners, including Plaintiffs and Gooberry, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact in their television show *The Profit,* which has run for seven seasons, and upon information and belief, will continue for an eighth season, and featured approximately 100 businesses, e-mail and other communications, marketing materials, on their website, and in other advertisements, with

the use of United States mail or interstate telecommunication systems for the purpose of executing its scheme.

612.    Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiffs.

613.    Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' scheme to defraud was made with intent to induce reliance by Plaintiffs upon such misrepresentations, concealments, suppressions, or omissions.

614.    Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' scheme to defraud was made with the purpose of gaining millions of dollars in equity, assets, trade secrets, inventory, good will, loan interest, monies, and profits from Plaintiffs, and other small businesses, that would not have been gained but for Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' acts and omissions alleged herein.

615.    But for Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' scheme to defraud, Plaintiffs would not have permitted Lemonis to invest in Gooberry, preventing Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' ability to harm Gooberry from the harms alleged herein.  The harms that took place would not have occurred if Plaintiffs had proceeded to operate Gooberry in the absence of Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete as they would have either obtained financing from another source or would have continued to operate as they previously were, where they were selling over $5 million in revenue in a year without the added debts brought about by Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' fraudulent scheme and conspiracy.

616.    As detailed below, Defendants NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete' long running fraudulent scheme and conspiracy consisted of, among other things:

a.  Falsely representing Lemonis as a business savior who helps failing small businesses,

b.  Targeting small family run businesses without general counsel or independent attorneys,

c.  Using means of mail and wire (defined below), such as the Internet and television, to make representations that induce small businesses, including Plaintiffs, to appear on the television show *The Profit*,

d.  Using means of mail and wire (defined below), such as the Internet and television, to represent to each business that Lemonis will help the business, make the businesses profitable, and provide marketing and publicity by virtue of being on the show and part of the Lemonis family of businesses,

e.  Using means of mail and wire (defined below), such as the Internet and television, to represent to each business that the deals Lemonis makes on the show and the help he provides the companies on the show are real,

f.  Using means of mail and wire (defined below), such as the Internet and television, to represent that Lemonis has helped and improved the small businesses featured on the show when, in reality, the majority of businesses featured on the show are either now closed, severely damaged by the show, or insurmountably indebted to Lemonis, and his related entities, including ML, LLC, ML Retail, and Camping World,

g. Saddling the business with debt to Lemonis and his related entities, including ML, LLC, ML Retail and Camping World, both prior to finalizing Lemonis' investment and after, in order to give the Profit Enterprise leverage over the business and its owners,

h. Obtaining an ownership interest in the business that gave ML Retail and ML, LLC complete control over the business, its finances, and its line of credit with ML Retail and ML, LLC,

i. Mismanaging the business in a way that benefited the Profit Enterprises, to the detriment of the business and its owners, and in a way that make it insurmountably indebted to Lemonis and his related entities, including ML, LLC, ML Retail and Camping World,

j. Eventually foreclosing on the debt in order to take the business from its original owners and fold it into ML Retail and ML, LLC and its various companies,

k. Using Lemonis' access to participant businesses trademarks, trade secrets, and proprietary information to steal those trademarks and apply to unlicensed sold through Camping World,

l. Stealing inventory from participant businesses and selling the stolen goods through Camping World,

m. Forcing participants to provide goods to Lemonis at severely discounted margins so that the goods could be sold through Camping World, and

n. Setting up a point-of-sale software to siphon monies and revenues from participant businesses without their knowledge or consent,

o.  Defaming and portraying participants in a false light on the episodes of the show in order to destroy the business' relationships giving them no option but to continue to rely on Lemonis and his related entities, and

p.  Threatening business owners that have appeared on *The Profit* that if they did not allow Lemonis to invest in their business, he would force them to pay back the money that was spent renovating the business during the show, despite the fact that Lemonis was being reimbursed by NBC for these expenses.

617.    The above-described racketeering activities amount to a common course of conduct intended to deceive and harm Plaintiffs and other small business owners.  Each such racketeering activity is related, has a similar purpose, involves the same or similar participants and methods of commission, and has similar results affecting similar victims, including Plaintiffs.  These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

### Injury to Plaintiffs

618.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the ML Retail and ML, LLC, Gooberry and, consequently, Plaintiffs derivatively, have been injured in their property within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial, but not less than twelve million dollars.

619.    Under the provisions of 18 U.S.C. § 1964(c), ML Retail and ML, LLC are liable to Gooberry for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### TWENTY-SIXTH CAUSE OF ACTION: DECLARATORY JUDGEMENT

620.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

621.     There is a substantial controversy and a live dispute between the parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgement. The dispute, therefore, between Plaintiffs and Defendants is a justiciable controversy appropriate for declaratory judgement under the Declaratory Judgement Act, 28 U.S.C. §§ 2201, 2202.

622.     The Reality Participant Agreements entered into by Plaintiffs Goureau, Menkin and Gooberry (*see* Exhs. N-P) are invalid and void for a number of reasons.

623.     *First*, the agreements were obtained by fraudulent inducement as a result of material misrepresentations made to Plaintiffs to induce them to appear on the show including, but not limited to that the deals reached on the show were real and *The Profit* and Lemonis actually helped the businesses that appeared on the show, all the while concealing the fact that countless participants on the show had their businesses ruined by the show and were defamed and defrauded by the show.

624.     *Second*, the releases and waivers included several unenforceable and illegal provisions under California law which explicitly prohibits releasing claims for fraud and other intentional acts.  Yet, these agreements attempted to do exactly that. Indeed, the entire purpose of these agreements was for Plaintiffs to waive certain non-waivable rights to insulate NBCUniversal and Machete from liability based on their intentional torts.  Because this is the central purpose of the agreements, the entire agreements are void as against public policy.

625.     *Third*, any arbitration clause or mediation clause in the release and waiver agreements are unenforceable due to unconscionability. "To defeat an arbitration clause, the

litigant must show both procedural and substantive unconscionability." *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010). "Procedural unconscionability involves oppression or surprise due to unequal bargaining power while substantive unconscionability focuses on overly harsh or one-sided results." *Id.* Both exist her.

626. Therefore, the Reality Participant Agreements executed by Plaintiffs were invalid.

627. Accordingly, Plaintiffs are entitled to a declaration that the Reality Participant Agreements are null and void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants, as follows:

1. For monetary damages in an amount to be determined at trial;

2. For treble damages and reasonable attorneys' fees under 18 U.S.C. 1964(c);

3. For an accounting under Court supervision of the money owed/due for all assets Defendants misappropriated from the Company, as well as any benefits they have realized from those assets;

4. For disgorgement from the Defendants all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

5. For rescission of the Shareholder Agreement and Stock Purchase Agreement as they were obtained through fraud;

6. For rescission of the LLC Agreement as it was obtained through fraud

7. The appointment of a receiver;

8. A temporary, preliminary, and permanent injunction;

9. An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses;

10. For punitive damages;

11. For a declaratory judgement that Plaintiffs' Reality Participant Agreements are null and void; and

12. For such further relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE

Dated: August 20, 2020           **GERARD FOX LAW P.C.**

_/s/ Gerard P. Fox_

Gerard P. Fox (_admitted pro hac vice_)
1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
gfox@gerardfoxlaw.com