EXHIBIT A

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement"), is made and entered effective as of November *11*, 2014 (the "Effective Date"), between GOOBERRY CORP., a New York corporation (the "Company"), NICOLAS GOUREAU ("Shareholder"), an individual and owner of all of the issued and outstanding shares of the stock of the Company, and ML RETAIL LLC (the "Purchaser").

Capitalized terms used in this Agreement and not otherwise defined are defined in Section 1 of this Agreement.

### PRELIMINARY STATEMENT

A.  Shareholder is the owner of one hundred percent of the issued and outstanding Common Stock of the Company.

B.  In connection with the Company's ongoing operation of its business, Shareholder and the Company have determined it is necessary, desirable and in each of their best interests to further capitalize the Company.

C.  The Company is willing to issue and sell to the Purchaser, and the Shareholder is willing to cause the Company to issue and sell to the Purchaser, shares of Common Stock in consideration of capital contributions to the Company and the Purchaser is willing to purchase shares of the Common Stock and make a capital contribution to the Company pursuant to the term and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual representations and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company, Shareholder and the Purchaser hereby agree as follows:

**Section 1.    DEFINITIONS.**

1.1    As used in this Agreement, the following terms shall have the following meanings:

(a)    "Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature (civil, criminal, administrative, regulatory or otherwise), whether at law or in equity.

(b)    "Board" means the Board of Directors of the Company.

(c)    "Charter" means the Articles of Incorporation of the Company attached to this Agreement as Exhibit A.

(d)    "Closing" is defined in Section 2.2 of this Agreement.

(e)    "Common Stock" means the common stock of the Company.

(f)    "Disclosure Schedules" shall collectively refer to all schedules attached hereto, including those in response to the representations, warranties and disclosures made in Section 5 of this Agreement.

*Stock Purchase Agreement*

(g)    "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

(h)    "Indemnifying Party" is defined in Section 8.4 of this Agreement.

(i)    "Knowledge," "Knowledge of the Company," or similar terms with respect to the Company, means the actual knowledge of the Company and/or Shareholder.

(j)    "Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any Governmental Authority.

(k)    "Loss" means any losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorney's fees and the cost of enforcing any right to indemnification hereunder and the reasonable cost of pursuing any insurance providers.

(l)    "Management Agreement" shall mean the agreement to be entered into between the Management Company and the Company, pursuant to which the Management Company shall provide certain management services to the Company, the terms of which shall be mutually agreed upon between the Shareholder, the Purchaser and the Company.

(m)    "Management Company" shall mean ECONOLUX360 Inc.

(n)    "Notice of Claim" is defined in Section 8.4 of this Agreement.

(o)    "Outstanding Shareholder Loan" shall mean that certain loan by the Shareholder with a current outstanding principal balance (including all accrued and unpaid interest) of $140,000.00, prior to the $40,000 payment contemplated pursuant to Section 2.2 hereof.

(p)    "Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities.

(q)    "Permitted Encumbrances" is defined in Section 5.13 of this Agreement.

(r)    "Preemptive Rights" is defined in Section 5.3 of this Agreement.

(s)    "Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

(t)    "Purchase Price" is defined in Section 2.1 of this Agreement.

(u)    "Purchaser Indemnitees" is defined in Section 8.2 of this Agreement.

(v)    "Reference Balance Sheets" is defined in Section 5.4 of this Agreement.

(w)    "Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing, or allowing

to escape or migrate into or through the environment (which includes, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface, or subsurface strata or within any building, structure, facility or fixture). "Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

(x)    "Shareholder Agreement" shall mean the form of Shareholder Agreement to be executed at Closing in a form mutually acceptable to the Company, the Purchaser, the Shareholder, Menkin and Goureau.

## Section 2.    PURCHASE AND SALE OF STOCK.

2.1    Sale and Issuance of Common Stock. Subject to the terms and conditions of this Agreement, and upon the basis of the representations and warranties contained in this Agreement, at the Closing (as hereinafter defined) the Company shall issue and sell to the Purchaser effective as of the Effective Date free and clear of any liens, claims, charges, and encumbrances whatsoever (except those imposed by this Agreement or securities laws generally), and the Purchaser agrees to purchase and accept from the Company effective as of the Effective Date, shares of Common Stock representing thirty-two percent (32%) of the issued and outstanding Common Stock (the "ML Shares").

2.2    Purchase Price. The consideration for the ML Shares (the "Purchase Price") shall be $800,000.00 which shall be contributed by the Purchaser to the Company. $602,000.00 of the Purchase Price has been paid and contributed to the Company, or paid to third parties on behalf of the Company, by the Purchaser prior to the date hereof and the remaining $198,000.00 (the "Closing Contribution") of the Purchase Price shall be paid and contributed to the Company or paid to third party vendors on behalf of the Company simultaneously with the issuance and transfer of the ML Shares. The Closing Contribution shall be used for (a) the payment of a $40,000 principal payment to the Shareholder on the Outstanding Shareholder Loan, (b) general working capital purposes and (c) capital improvements and expenditures by the Company. Notwithstanding anything to the contrary contained on the Reference Balance Sheet, the Company and Shareholder represent and warrant that the outstanding principal amount under the Outstanding Shareholder Loan immediately prior to the Closing is $140,000.00 and following the $40,000.00 principal payment to the Shareholder the outstanding principal amount together with all accrued and unpaid interest shall be $100,000.00 [

2.3    Closing, Payment and Delivery. Payment for and delivery of the certificates evidencing the Common Stock to be issued and sold to the Purchaser pursuant to this Agreement (the "Closing") shall take place simultaneously with the execution of this Agreement. At the Closing, the Company shall issue a stock certificate to the Purchaser evidencing the ML Shares.

2.4    Transfer to Menkin and Goureau. At or prior to the Closing, the Shareholder shall transfer to each of Stephanie Menkin ("Menkin") and Noemi Goureau ("Goureau") shares of Common Stock of the Company whereby at Closing Menkin shall own twenty-two percent (22%) of the issued and outstanding Common Stock of the Company (the "Menkin Shares") and Goureau shall own twelve percent (12%) of the issued and outstanding Common Stock of the Company (the "Goureau Shares" and together with Menkin Shares and the ML Shares the "Shares").

## Section 3.    CONDITIONS OF SHAREHOLDER'S OBLIGATIONS AT CLOSING. The obligation of the Company to consummate the issuance and conveyance of the ML Shares to the Purchaser at the Closing is subject to the satisfaction of the following conditions, any of which may be waived by the Company in writing:

*Stock Purchase Agreement*

3.1    Representations and Warranties True at Closing. The representations and warranties made by the Purchaser in Section 6 of this Agreement shall be true, correct, and complete as of the Closing.

3.2    Closing Contribution to the Company. The Purchaser shall pay and make a capital contribution to the Company in an amount equal to the Closing Contribution.

3.3    Management Agreement. The Management Agreement shall be executed and delivered.

3.4    Shareholder Agreement. The Purchaser, Shareholder, Menkin and Goureau shall have entered into the Shareholder Agreement.

**Section 4.    CONDITIONS OF PURCHASER'S OBLIGATIONS AT CLOSING.** The obligation of the Purchaser to purchase ML Shares under this Agreement at the Closing is subject to the satisfaction of the conditions described in this Section 4. Except as otherwise expressly set forth below, the satisfaction of such conditions will be determined, and any such condition may be waived in writing, by the Purchaser.

4.1    Corporate Proceedings. All corporate and other proceedings required to be taken by the Company and Shareholder in connection with the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchaser, and the Purchaser shall have received all such counterpart originals or certified or other copies of such documents as it shall reasonably request.

4.2    Closing Certificate. At the Closing, the Company shall have delivered a copy, certified as of the date of the Closing by the Secretary of the Company, of the resolutions of the Board authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby, and the issuance and sale of the Shares pursuant to this Agreement at such Closing.

4.3    Corporate Standing. The Company shall be in good standing in the State of New York, and the Company shall have delivered to the Purchaser a copy of its current good standing certificate certified by the Secretary of State of the State of New York.

4.4    Consents. The Company and Shareholder shall have obtained all consents necessary for the issuance and conveyance of the Shares under this Agreement.

4.5    Management Agreement. The Management Agreement shall be executed and delivered.

4.6    Representations and Warranties True at Closing. The representations and warranties made by the Company and Shareholder in Section 5 of this Agreement shall be true, correct and complete in all material respects as of the Closing.

4.7    Shareholder Agreement. The Purchaser, Shareholder, Menkin and Goureau shall have entered into the Shareholder Agreement

**Section 5.    REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER AND THE COMPANY.** The Company and Shareholder represent and warrant to the Purchaser that:

5.1    Organization and Qualification. The Company is a corporation duly organized and validly existing in good standing under the laws of the State of New York, with the requisite legal and corporate power to own its property and to carry on its business as currently conducted. The Company is in good standing and is

*Stock Purchase Agreement*

ML
nb

duly qualified to transact business as a foreign corporation in each jurisdiction in which the failure to qualify would have a material adverse effect on its business, properties, prospects, or financial condition.

    5.2    <u>Power</u>. The Company has all requisite legal power to enter into this Agreement and to carry out and perform its obligations under the terms hereof and thereof. The Company has all requisite legal power to issue the Shares.

    5.3    <u>Capitalization</u>.

    (a)    The Shareholder is the owner of one hundred percent (100%) of the issued and outstanding Common Stock all of which (i) has been duly authorized, validly issued, and is fully paid and nonassessable, (ii) has not been issued in violation of preemptive rights, voting agreements, or rights of first offer or refusal applicable to the Common Stock (collectively, "<u>Preemptive Rights</u>"), and (iii) has been offered, issued, and sold by the Company in compliance with all applicable federal and state securities laws. Attached hereto as Schedule 5.3(a) is a complete and accurate list of the shareholders of the Company, with the number of shares and percentage interest of the Company's Common Stock.

    (b)    Other than pursuant to this Agreement (i) there are no subscriptions, warrants, options, convertible securities (including convertible debt), participation rights or other rights (contingent or otherwise) to purchase or acquire any Common Stock, (ii) the Company has no obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security (including convertible debt) or other such right, or to issue or distribute to shareholders any evidences of indebtedness or assets of the Company, (iii) the Company has no obligation (contingent or otherwise) to purchase, redeem, or otherwise acquire any Common Stock or to pay any dividend or to make any other distribution in respect thereof, (iv) there are no outstanding or authorized stock appreciation, phantom stock, or similar rights with respect to the Company, and (v) there are no agreements, written or oral, between the Company and any holders of its securities relating to Preemptive Rights or the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag-along" rights), registration under the Securities Act, or voting, of the Common Stock.

    5.4    <u>Financial Statements</u>.

    (a)    Shareholder and the Company have delivered to the Purchaser the financial statements identified on <u>Schedule 5.4(a)</u> hereto, copies of which are attached as <u>Schedule 5.4(a)</u> hereto (said financial statements and information are collectively referred to as the "Financial Statements. The Financial Statements are true, correct and complete, have been prepared in accordance with the generally accepted accounting principles consistently applied and fairly present the financial position of the Company on the dates indicated and the results of its operations for the periods then ended. The Company has recorded and the Financial Statements reflect true and accurate allocations of expenses and revenues.

    (b)    Schedule 5.4(b) sets forth the Company's unaudited balance sheet as of September 30, 2014 (the "Reference Balance Sheet") and its unaudited statements of operations for the year to date. Such financial statements (including in all cases the notes thereto, if any) are accurate and complete in all material respects. Such unaudited financial statements present fairly the financial position of the Company as of the date indicated.

    (c)    The Company has no Knowledge of an event or condition of any type that has materially and adversely affected or is likely to affect materially and adversely the business, condition, affairs, operations, properties, or assets of the Company.

    5.5    <u>Accounts Receivable</u>. The accounts receivable reflected on the Reference Balance Sheets and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by

*Stock Purchase Agreement*

the Company involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice, and (b) constitute only valid, undisputed claims of the Company not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice.

5.6    Liabilities. The Company has no liabilities, actual or contingent, except (a) liabilities fully reflected on the Reference Balance Sheets, (b) liabilities disclosed on the Disclosure Schedule, (c) liabilities incurred in the ordinary course of business since the date of the Reference Balance Sheet, and (d) liabilities incurred for services provided incident to the transactions contemplated by this Agreement.

5.7    Company Authorizations. All corporate action on the part of the Company and its directors and shareholders necessary for the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and for the authorization, issuance (or reservation for issuance), and delivery of the Shares has been taken. This Agreement is the legal, valid, and binding obligation of the Company, enforceable in accordance with its terms, except (a) as limited by bankruptcy, insolvency, or other Laws affecting the enforcement of creditors rights generally, and (b) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies or equitable principles of general applicability (the "Standard Exceptions").

5.8    Validity of Shares. The Shares, when issued, sold, and delivered to the Purchaser by the Company in accordance with the terms of this Agreement, will be duly and validly issued, fully paid, non-assessable, and free and clear of all liens, charges, claims, and encumbrances (except those imposed by this Agreement or securities laws generally).

5.9    Collective Bargaining Agreements; Employment Agreements and Benefit Plans; ERISA Matters; Employee Compensation. Except as set forth on Schedule 5.9, the Company (i) has no collective bargaining agreement, employment agreement or any incentive compensation, deferred compensation, profit sharing, or other benefit (including hospitalization, disability insurance, vacation or death benefit) plan or arrangement with or for the benefit of any officer, employee or other person, and (ii) does not maintain or sponsor and is not required to make contributions to, any pension, profit sharing, thrift or other retirement plan, whether or not such plan is or is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1954, as amended (the "Code") (the "Plans"), including, without limitation, any employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Company does not participate in or contribute to any multi-employer pension plan. The Company is not a party to any collective bargaining agreement. Schedule 5.9 also sets forth the name, title, length of service and current compensation of each employee of the Company as of the date hereof. Except as otherwise set forth on Schedule 5.9, all employees of the Company are employed "at will." To the best of each Seller's knowledge after due inquiry, within the 12-month period preceding the date of this Agreement, there have been no actions relating to or attempts at organizing any unions for the Company, and the Company's relations with its employees have been good in all material respects.

5.10    Other Authorizations. No approval or consent of any Person is required by law, by the Charter, or by any indenture, instrument, or other agreement to which the Company is a party, or by any holder of indebtedness of the Company in connection with the issuance and sale of the Shares pursuant to this Agreement and the performance by the Company of its obligations hereunder.

5.11    Adequacy of Rights; Trade Names and Trademarks. The Company owns or possesses adequate franchises, permits, licenses or other rights to use all trade names, trademarks, patents, copyrights, warranty rights and intangible assets necessary to conduct its business in the manner heretofore conducted. Schedule 5.11 attached hereto sets forth all registered trademarks, trademark registrations, service marks, service mark registrations and

*Stock Purchase Agreement*

applications therefor and trade names (the "Trade Names and Trademarks") owned, used or held by the Company. The Company owns the entire right, title and interest in and to the Trade Names and the Trademarks and to the Company's knowledge the same do not infringe upon or conflict with any trade name, trademark or service mark of any other person.

5.12    Compliance with Laws. The business of the Company is being conducted in compliance in all material respects with the applicable federal, state or local law, ordinance or regulation. All governmental approvals, permits and licenses required by the Company to conduct its business have been obtained and are in full force and effect and are being complied with in all material respects.

5.13    Other Agreements. The execution and delivery of this Agreement, the consummation of the other transactions contemplated herein, the carrying on of the business as currently conducted by the Company, and compliance with the terms and provisions of this Agreement will not conflict with or result in a breach of the terms and conditions of, or constitute any default under, the Charter, or of any provision of (a) any indebtedness of the Company, (b) any contract, covenant, or instrument under which the Company is bound, or (c) any judgment, order, ruling, injunction, or decree of any court or administrative agency affecting the Company.

5.14    Intentionally Omitted.

5.15    Litigation. There is no action, suit, proceeding, or investigation pending or, to the Company's Knowledge, currently threatened against the Company that questions the validity of this Agreement or any agreement executed and delivered in connection with the consummation of the other transactions contemplated herein, or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that might result, either individually or in the aggregate, in any material adverse changes in the assets, condition, or affairs of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing.

5.16    Intentionally Omitted.

5.17    Transactions with Related Parties. Except for the Outstanding Shareholder Loan and the Management Agreement (to be executed at Closing), neither Shareholder, any affiliate of Shareholder nor any present or former officer, director or employee of the Company or any of their respective affiliates is a party to any transaction with the Company, including, without limitation, any guaranty by the Company of the obligations of such persons or any contract, agreement or other arrangement providing for the employment of, furnishing of services by, rental of real or personal property from or otherwise requiring payments to or any loan to or by Shareholder, any affiliate of Shareholder or any such officer, director, key employee, shareholder or other affiliate. For the purpose of this Section 5.17, the term "affiliate" means any member of a person's or his or her spouse's family and any entity which is controlled by such person or any such family member or members.

5.18    Liability Insurance. The Company has procured insurance against loss or damage with respect to the Company's properties and assets.

5.19    Tax Matters. (a) The Company has filed all tax returns that it is required to file under applicable Law, (b) all such returns are complete and correct, and to the extent returns were filed and there were amounts shown thereon to be due and payable by the Company, such amounts have been paid in full except as set forth on Section 5.19 of the Disclosure Schedule or, if payable with respect to any period ending on or before the date of a Reference Balance Sheet, adequate provisions therefor have been included on such Reference Balance Sheet, or if payable with respect to any period beginning after such date, adequate provision therefor has been reflected on the books of the Company, (c) the Company has withheld all taxes which it is or was obligated to withhold from amounts paid or owing to any employee, shareholder, member, creditor, or other third party, and have paid over

*Stock Purchase Agreement*

the withheld amounts to such party or to the applicable taxing authority if so required by law, (d) the Company is not liable, whether directly or indirectly, contingently or secondarily, for any sales, use, excise, or similar taxes arising from the operation of their respective businesses through the date hereof, and (e) the Company has not waived any statute of limitations or agreed to the extension of time with respect to a tax assessment or deficiency.

5.20    Guaranties. The Company is not a guarantor or otherwise liable for any liability or obligation (including indebtedness) of any other Person or entity.

Section 6.    **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.** The Purchaser represents and warrants to the Company that the Purchaser has full power and authority and full legal capacity to enter into this Agreement and any other agreements entered into by the Purchaser as of the date hereof or otherwise in connection herewith with the Company or Shareholder.

Section 7.    **INTENTIONALLY OMITTED.**

Section 8.    **INDEMNIFICATION.**

8.1    Survival. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months following the Closing; provided, that the representations and warranties in Section 5.1, Section 5.2, Section 5.3 shall survive indefinitely, and the representations and warranties in Section 5.20 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof). All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty, and such claims shall survive until finally resolved.

(a)    Indemnification by the Company and Shareholder. Subject to the other terms and conditions of this Section 8, the Company and Shareholder, jointly and severally, shall indemnify and defend each of the Purchaser and its Representatives (collectively, the "Purchaser Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, with respect to, or by reason of any inaccuracy in or breach of any of the representations or warranties of the Company contained in this Agreement; or

(b)    any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Company pursuant to this Agreement.

(c)    Indemnification by Purchaser. Subject to the other terms and conditions of this Section 8, Purchaser shall indemnify and defend the Company and the Shareholder and each of their respective Representatives (collectively, the "Company and Shareholder Indemnitees") against, and shall hold it harmless from and against, and shall pay and reimburse it for, any and all Losses incurred or sustained by, or imposed upon, the Company and Shareholder Indemnitees based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any of the representations or warranties of Purchaser contained in this Agreement.

*Stock Purchase Agreement*

8.2    Notice of Claims. Any person seeking indemnification (the "Indemnified Party") hereunder shall give to the Person obligated to provide indemnification to such Indemnified Party (the "Indemnifying Party") prompt written notice of any written claim, demand, assessment, action, suit or proceeding to which the indemnity set forth in this Section 8 applies ("Notice of Claim"). If the document evidencing such claim or demand is a court pleading, the Indemnified Party shall give such notice to the Indemnifying Party within fifteen (15) days of receipt of such pleading; otherwise, the Indemnified Party shall give such Notice of Claim within thirty (30) days of the date it received written notice of such claim, provided that the failure to notify the Indemnifying Party will not relieve the Indemnifying Party of any liability that it may have to the Indemnified Party. The Indemnified Party will have the exclusive right at its own expense to assume the defense thereof using counsel acceptable to the Indemnified Party in its reasonable discretion and to settle such claims solely involving the payment of money. In connection with any claim, action, or proceeding, the parties hereto shall cooperate with each other and provide each other with access to relevant books and records in their possession.

Section 9.    **MISCELLANEOUS.**

9.1    Amendment and Waiver.

(a)    Any term, covenant, agreement, or condition contained in this Agreement may be amended with, and only with, the consent of all of the parties to this Agreement. Compliance by the Company, on the one hand, or Purchaser, on the other, with any such term, covenant, agreement, or condition may be waived (either generally or in a particular instance and either retroactively or prospectively), by written instruments signed by the by the other party or parties, as the case may be, hereto pursuant to the terms hereof.

(b)    This Agreement shall not be altered, amended, or supplemented except by written agreement in accordance with Section 9.1(a) above. Any waiver of any term, covenant, agreement, or condition contained in this Agreement shall not be deemed a waiver of any other term, covenant, agreement, or condition, and any waiver of any default in any such term, covenant, agreement, or condition shall not be deemed a waiver of any later default thereof or of any default of any other term, covenant, agreement, or condition.

9.2    Electronic Signature. This Agreement shall be deemed duly executed by either Party hereto upon the delivery of their executed signature page by facsimile transmission or other commonly accepted electronic means, including a transmission of the signature page as a Portable Document Format ("PDF") to counsel for the other Party.

9.3    Severability. The invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity, legality, or enforceability of the remainder hereof in such jurisdiction, or the validity, legality, or enforceability hereof, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

9.4    Successors and Assigns. All representations, warranties, covenants, and agreements of the parties contained in this Agreement or made in writing in connection herewith, shall, except as otherwise provided herein, be binding upon and inure to the benefit of their respective successors heirs and permitted assigns.

9.5    Notices. All communications in connection with this Agreement shall be in writing and shall be deemed properly given if hand delivered or sent by e-mail (provided that such communication is acknowledged electronically as received by the recipient), telecopier (provided that such communication is confirmed by same-day deposit in the United States mail first class postage prepaid) or pre-paid nationally recognized overnight

*Stock Purchase Agreement*

courier with adequate evidence of delivery, or sent by registered or certified mail, postage prepaid and return receipt requested and:

if to the Company, to the Company's offices at:

38 East 29th Street, 6th Floor
New York, NY 10016
Attn: Nicolas Goureau

With a copy to:

James Rieger, Esq.
Tannebaum Helpern Syracuse & Hirschritt, LLP
900 Third Avenue
New York, NY 10022sch

if to the Purchaser, to the Purchaser's offices at:

250 Parkway Drive, Suite 270
Lincolnshire, IL 60069
Attn: Marcus Lemonis

With a copy to:

250 Parkway Drive, Suite 270
Lincolnshire, IL 60069
Attn: Tom Newell

or such other addresses or persons as the recipient shall have designated to the sender by a written notice given in accordance with this Section 9.5. Any notice called for hereunder shall be deemed delivered when received.

9.6    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Illinois without regard to its conflicts or choice of law provisions.

9.7    Waiver of Jury Trial. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ANY OF THE PARTIES HERETO ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

9.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same Agreement.

*Stock Purchase Agreement*

9.9     Further Assurances. Each party agrees to execute and deliver such documents or other instruments and to take such other actions as may be necessary or appropriate to effect the intent and purposes of this Agreement.

9.10    Headings. The headings used herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the sections at the beginning of which they appear.

9.11    Construction and Representation. The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution, and delivery of this Agreement. This Agreement shall not be construed against any party for having drafted it.

*[Signatures on following page]*

*Stock Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Stock Purchase Agreement to be executed on the day first above written.

COMPANY:                    GOOBERRY CORP.

                            By:

                            Name: *Nicolas Goureau*

                            Its: *Cheif Executive officer*


PURCHASER:                  ML RETAIL LLC

                            By:

                            Name:  Marcus Lemonis

                            Its: Chief Executive Officer




SHAREHOLDER:

                            NICOLAS GOUREAU




*Stock Purchase Agreement*

## EXHIBIT A

Certified Articles of Incorporation

*Stock Purchase Agreement*

DISCLOSURE SCHEDULES TO

STOCK PURCHASE AGREEMENT

by and among

ML RETAIL LLC,

GOOBERRY CORP.

and

NICOLAS GOUREAU

Unless otherwise defined in these disclosure schedules (each a "Schedule" and, collectively, the "Schedules"), all capitalized terms herein shall have the meaning ascribed to them in the Stock Purchase Agreement, dated as of _____, 2014 (the "Agreement"), by and among ML Retail LLC (the "Purchaser"), Gooberry Corp. (the "Company") and Nicolas Goureau (the "Shareholder").

In no event shall the inclusion of any such additional matters in these Schedules be deemed or interpreted to broaden or otherwise amplify any of the Company's representations, warranties, covenants or agreements contained in the Agreement or to be an admission that any such matter is material. Disclosures in one section of the Disclosure Schedule are incorporated by reference into each other relevant section of the Disclosure Schedule for which applicability of such information and disclosure is reasonably apparent on its face.

The attachments hereto form an integral part of these Schedules and are incorporated by reference for all purposes as if set forth fully herein.

[1004785-1]

Schedule 5.3(a)

Class and Number of Shares

| Stockholder | Class of Shares | Number of Shares |
|---|---|---|
| Nicolas Goureau | Common Stock | 34 |
| Noemi Goureau | Common Stock | 12 |
| Stephanie Menkin | Common Stock | 22 |

[1004785-1]

Schedule 5.4(a)

Financial Statements

See attached.

[1004785-1]

Schedule 5.4(b)

Reference Balance Sheet

See attached.

[1004785-1]

5:17 PM
11/06/14
Accrual Basis

# Gooberry Corp.
# Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| **Checking/Savings** | | | | |
| Bank of America {SH} | 3,321.30 | | | 3,321.30 |
| Cash in Drawer | 1,000.00 | | | 1,000.00 |
| Fopps, Inc. #6388 | 13,641.92 | | | 13,641.92 |
| Gooberry Corp - #6826 | 143,509.12 | (130,000.00) | | 13,509.12 |
| Gooberry Corp - #8168 | 791.55 | | | 791.55 |
| Wells Fargo - #0694 {AS} | 3,573.80 | | | 3,573.80 |
| **Total Checking/Savings** | 165,837.69 | (130,000.00) | - | 35,837.69 |
| | | | | |
| **Accounts Receivable** | | | | |
| Accounts Receivable | 80.18 | | | 80.18 |
| **Total Accounts Receivable** | 80.18 | - | - | 80.18 |
| | | | | |
| **Other Current Assets** | | | | |
| **Inventory Asset** | | | | |
| Inventorry South Hampton | 20,899.00 | | | 20,899.00 |
| Inventory Aspen | 20,422.00 | | | 20,422.00 |
| Inventory Back Stock | 70,611.00 | | | 70,611.00 |
| Inventory Bethesda | 20,517.00 | | | 20,517.00 |
| Inventory Fopps | 95,379.00 | | | 95,379.00 |
| Inventory Greenwich | 31,762.00 | | | 31,762.00 |
| Inventory Mosaic | 41,401.00 | | | 41,401.00 |
| Inventory Palm Beach | 8,152.00 | | | 8,152.00 |
| Inventory Storage | 246,500.00 | | | 246,500.00 |
| Inventory XX-1 - Showroom | 274,153.00 | 158,013.98 | | 432,166.98 |
| **Total Inventory Asset** | 829,796.00 | 158,013.98 | - | 987,809.98 |
| | | | | |
| Prepaid Childsu | 750.00 | | | 750.00 |
| | | | | |
| Planned Capital Expenditures | | | 158,424.00 | 158,424.00 |



5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
# Balance Sheet
## As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| Undeposited Funds | 15,217.96 | | | 15,217.96 |
| Total Other Current Assets | 845,763.96 | 158,013.98 | 158,424.00 | 1,162,201.94 |
| | | | | |
| Total Current Assets | 1,011,681.83 | 28,013.98 | 158,424.00 | 1,198,119.81 |
| | | | | |
| **Fixed Assets** | | | | |
| Accumulated Depreciation | -59,350.00 | | | -59,350.00 |
| Furniture & Equipment | 420.00 | | | 420.00 |
| Furniture & Equipment 2013 | 7,514.72 | | | 7,514.72 |
| Furniture & Equipment BE 2013 | 8,572.86 | | | 8,572.86 |
| Leasehold Improvements | 89,897.47 | | | 89,897.47 |
| LHI - Bethesda 2013 | 13,974.91 | | | 13,974.91 |
| LHI - Greenwich 2013 | 1,814.85 | | | 1,814.85 |
| LHI - NYC 2013 | 8,845.60 | | | 8,845.60 |
| Signs | 1,800.00 | | | 1,800.00 |
| Leasehold Improvements & Furniture | | | 501,576.00 | 501,576.00 |
| Total Fixed Assets | 73,490.41 | - | 501,576.00 | 575,066.41 |
| | | | | |
| **Other Assets** | | | | |
| Security Deposits | | | | |
| Security Deposit - Mosaic | 13,268.13 | | | 13,268.13 |
| Security Deposit - Office | 35,433.17 | | | 35,433.17 |
| Security Deposits Asset - Fopps | 16,878.00 | | | 16,878.00 |
| Security Deposits Asset - Goobe | 82,666.00 | | | 82,666.00 |
| Security Deposits - Other | 375.00 | | | 375.00 |
| Total Security Deposits | 148,620.30 | - | - | 148,620.30 |
| | | | | |
| Total Other Assets | 148,620.30 | - | - | 148,620.30 |
| | | | | |
| **TOTAL ASSETS** | 1,233,792.54 | 28,013.98 | 660,000.00 | 1,921,806.52 |



5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| **LIABILITIES & EQUITY** | | | | |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| **Credit Cards** | | | | |
| **Credit Cards** | | | | |
| Amex #23002  Plum | 475.88 | | | 475.88 |
| Amex #61003 Corporate Card | 395.00 | | | 395.00 |
| Amex #71004 Jet Blue | 40.00 | | | 40.00 |
| Amex #83005/84003/85000 Platnum | 81,480.12 | | | 81,480.12 |
| Mileage United #8038 | 19,925.92 | | | 19,925.92 |
| Visa Signature #8117 | 7,588.76 | | | 7,588.76 |
| Credit Cards - Other | 70.00 | | | 70.00 |
| **Total Credit Cards** | 109,975.68 | - | - | 109,975.68 |
| | | | | |
| **Total Credit Cards** | 109,975.68 | - | - | 109,975.68 |
| | | | | |
| **Other Current Liabilities** | | | | |
| Customer Deposits | 264.22 | | | 264.22 |
| **Lines of Credit** | | | | 0.00 |
| Wells Fargo | 20,458.54 | | | 20,458.54 |
| **Total Lines of Credit** | 20,458.54 | - | - | 20,458.54 |
| | | | | |
| **Loans to Gooberry** | | | | |
| David Turgeman | 60,000.00 | (60,000.00) | | 0.00 |
| Helpern Tannabaum | 70,000.00 | (70,000.00) | | 0.00 |
| **Total Loans to Gooberry** | 130,000.00 | (130,000.00) | - | 0.00 |
| | | | | |
| **Sales Tax Payable** | | | | |
| Sales Tax Aspen | 10,373.00 | | | 10,373.00 |
| Sales Tax Fopps | 2,784.00 | | | 2,784.00 |

5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
# Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| Sales Tax Gooberry | 5,066.00 | | | 5,066.00 |
| Sales Tax Greenwich | 2,623.00 | | | 2,623.00 |
| Sales Tax Maryland | 1,602.00 | | | 1,602.00 |
| Sales Tax Palm Beach | 2,196.00 | | | 2,196.00 |
| Sales Tax Virgina | 1,429.00 | | | 1,429.00 |
| Total Sales Tax Payable | 26,073.00 | - | - | 26,073.00 |
| | | | | |
| Shareholder Loans | | | | |
| Loan - Neomi | -10,050.65 | 10,050.65 | | 0.00 |
| | | | | |
| Shareholder Loans - Other | 392,716.28 | (10,050.65) | (282,665.63) | 100,000.00 |
| Total Shareholder Loans | 382,665.63 | - | (282,665.63) | 100,000.00 |
| | | | | |
| Unbilled Purchases (AP) | 158,013.98 | | | 158,013.98 |
| Total Other Current Liabilities | 717,475.37 | (130,000.00) | (282,665.63) | 304,809.74 |
| | | | | |
| Total Current Liabilities | 827,451.05 | (130,000.00) | (282,665.63) | 414,785.42 |
| | | | | |
| Total Liabilities | 827,451.05 | (130,000.00) | (282,665.63) | 414,785.42 |
| | | | | |
| Equity | | | | |
| Addition Paid in Capital | 45,000.00 | | | 45,000.00 |
| | | | | |
| Capital Stock | 9,000.00 | | 242,665.63 | 251,665.63 |
| Capital Stock - Lemonis | 100,000.00 | | 700,000.00 | 800,000.00 |
| Retained Earnings | 216,657.79 | | | 216,657.79 |
| | | | | |
| Net Income | 35,683.70 | 158,013.98 | | 193,697.68 |



5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| **Total Equity** | 406,341.49 | 158,013.98 | 942,665.63 | 1,507,021.10 |
| **TOTAL LIABILITIES & EQUITY** | 1,233,792.54 | 28,013.98 | 660,000.00 | 1,921,806.52 |
| Check figure, balance | 0.00 | – | – | 0.00 |



Schedule 5.9

Employees

See attached.

[1004785-1]

COURAGE b
Employee Roster
As of Sept 11th 2014

| LAST NAME | FIRST NAME | TITLE/RESPONSIBILITY | LOCATION | FT/PT | SALARY/HOURLY | $ Amount |
|---|---|---|---|---|---|---|
| Goureau | Nicolas | CEO | NYC-Office | FT | SALARY | $108,000/yr |
| Goureau | Neomi | Chief Designer | NYC- Office | FT | SALARY | $160,000/yr |
| Menkin | Stephanie | President | NYC- Office | FT | SALARY | $93,000/yr |
| Agberebissi | Akouavi | Seamstress/Stock | NYC-Office | PT | HOURLY | $15/hr |
| Sforza | Jessica | Web/Graphic Designer | NYC- Office | PT | HOURLY | $15/hr |
| Nunekpeku | Kwabla | Warehouse Manager | NYC- Office | FT | SALARY | $55,000/yr |
| Bartella | Nichelie | Boutique Manager | Aspen, CO | FT | SALARY | $50,000/yr |
| Chi | Linda | Sales Associate | Aspen, CO | PT | HOURLY | $17.50/hr |
| New | Kori | Sales Associate | Aspen, CO | PT | HOURLY | $19/hr |
| Van Woerkom | Jackie | Sales Associate | Aspen, CO | FT | HOURLY | $19/hr |
| Rizov | Jolanta | Assistant Manager | Palm Beach, FL | FT | HOURLY | $17.50/hr |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jacob | Sheila | VP Retail | Palm Beach, FL/ Southampton, NY/ Bethesda, MD/ Fairfax, VA | FT | SALARY | $73,000/yr |
| Flynn | Giulia | Boutique Manager | Greenwich, CT | FT | HOURLY | $20/hr |
| Epifano | Gina | Sales Associate | Greenwich, CT | FT | HOURLY | $15/hr |
| Monteiro | Carla | Sales Associate | Southampton, NY | FT | HOURLY | $17.50/hr |
| Murray | Alissa | Sales Associate | Southampton, NY | Seasonal FT | HOURLY | $12/hr |
| Edewor | Joyce | Acting Boutique Manager | Bethesda, MD | FT | SALARY | $45,000 |
| Setlur | Abhilasha | Sales Associate | Bethesda, MD | PT | HOURLY | $15/hr |
| Cordes | Margaret | Sales Associate | Bethesda, MD | PT | HOURLY | $15/hr |
| Ziama | Kolu | Sales Associate | Bethesda, MD / Fairfax, VA | FT | HOURLY | $13/hr |
| Vucetic | Iva | Sales Associate | Fairfax, VA | FT | HOURLY | $13/hr |
| Kyoungok | Kim | Sales Associate | Fairfax, VA | FT | HOURLY | $12/hr |
| Cheng | Ying | Sales Associate | Fairfax, VA | FT | HOURLY | 10/hr |
| Salonga | Raquel | Boutique Manager | New York, NY | FT | SALARY | $52,000/yr |
| Diop | Diarra | Sales Associate | New York, NY | FT | HOURLY | $19/hr |
| Nagrani | Sarit | Sales Associate | New York, NY | PT | HOURLY | $24/hr |

| COMMISSION | % Amount | Additional benefits |
|---|---|---|
| | | Aspen Ski Pass, Health |
| N | | Insurance |
| N | | Health Insurance |
| | | Health Insurance, $200/mo |
| | | toward car, $1400/mo partial |
| N | | child care |
| N | | |
| N | | FIT Course $1475 |
| N | | |
| | | Medical Reimbursement |
| | | $718.65/mo, Skip Pass |
| | | $1,200/yr, Clothing allowance |
| Y | 1.5% of Aspen Sales | $3,000/yr, 4 wks paid Vacation |
| Y | 1% of partial Sales | |
| Y | .5% of partial Sales | Ski Pass $1,200/yr |
| Y | 1% of partial Sales | |
| Y | 1.2% of partial Sales | 2 wks paid Vacation |

|   |   | Medical Reimbursement $455/mo, Cell Phone reimbursement $120/mo, $3000/yr CB Clothing |
|---|---|---|
| Y | 2.3% of PB, SH, BR, MO Sales | allowance, 4 wks Paid Vacation |
| Y | 2% of Greenwich Sales | 2 Wks Paid Vacation |
| Y | 1% of partial Sales |   |
| Y | 1% of partial Sales |   |
| N |   |   |
|   |   | Parking Pass $120/mo, 2 wks |
| Y | 1% of partial Sales | Paid vacation |
| N |   |   |
| Y | 1% of partial Sales |   |
| Y | 1% of partial Sales |   |
| Y | 1% of partial Sales |   |
| Y | 1% of partial Sales |   |
| Y | 1% of partial Sales |   |
| Y | 1.3% of NYC Sales | 2 Wks Paid vacation |
| Y | 1% of partial Sales |   |
| Y | 1% of partial Sales | Paid Parking $19/day |



<u>**NOTES**</u>

Wife of Ernest
CB currently paying a portion of FIT course in IN Design, Illustrator,
Photoshop etc.
Known as "Ernest"

Problematic, clash with Sheila

Was given warning last week b/c of Alcohol on breath

To discuss, but nothing pressing

Being Promoted to Boutique Manager in September

Excellent potential for Manager. Wants to relocate with company.

Problematic drama. Clash with Sheila

Incredible at sales, merchandising and management. Lives 1 hour
outside of city. Would give her Manager role in NYC in a sec if
could make the commute worth it.



Schedule 5.11

Trade Names and Trademarks

o       Trademarks COURAGE B
o       Service Marks I BELIEVE NONE
o       Copyrights NONE
o       Domain Names www.courageb.com

[1004785-1]

Schedule 5.13(b)

**No Conflicts**

Consents may be required pursuant to the terms of the Company's leases of real property.

[1004785-1]

## Schedule 5.19

### Taxes

None.