EXHIBIT – C –

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ML FASHION, LLC

**The interests evidenced by this Agreement have not been registered under the Securities Act of 1933, as amended, or applicable state securities laws. The interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws and in accordance with the provisions of this Agreement.**

# TABLE OF CONTENTS

**Page**

SECTION 1      DEFINITIONS ........................................................................................ 1

SECTION 2      THE COMPANY .................................................................................. 7

2.1    Formation of the Company ................................................................. 7

2.2    Name .................................................................................................. 7

2.3    Purpose; Powers ................................................................................. 7

2.4    Principal Place of Business ................................................................ 7

2.5    Term ................................................................................................... 7

2.6    Registered Agent and Registered Office ........................................... 7

2.7    Title to Property ................................................................................. 7

2.8    Payments of Individual Obligations ................................................... 7

2.9    Independent Activities; Transactions with Affiliates ........................ 8

2.10    Override of Certain Statutory Defaults .............................................. 8

SECTION 3      INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS ........... 8

3.1    Capital Contributions ........................................................................ 8

3.2    Additional Capital Contributions ...................................................... 8

3.3    Additional Members .......................................................................... 8

3.4    Limitation on Withdrawal of Capital ................................................ 9

SECTION 4      CAPITAL ACCOUNTS; PROFITS AND LOSSES ....................................... 9

4.1    Capital Accounts ............................................................................... 9

4.2    Allocation of Profits and Losses ....................................................... 9

SECTION 5      DISTRIBUTIONS ............................................................................. 11

5.2    Amounts Withheld ........................................................................... 12

5.3    Tax Distributions ............................................................................. 12

5.4    Limitations on Distributions ............................................................ 13

5.5    Certain Liquidity Events ................................................................. 13

SECTION 6      MANAGEMENT ............................................................................... 13

6.1    Manager ........................................................................................... 13

6.2    Duties and Obligations of the Manager; Discretion ........................ 14

6.3    Reimbursements ............................................................................... 14

6.4    Indemnification of the Manager and Officers .................................. 14

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| SECTION 7 | ROLE OF MEMBERS | 15 |
| 7.1 | Rights or Powers | 15 |
| 7.2 | Voting Rights | 15 |
| 7.3 | Member Liability | 16 |
| 7.4 | Partition | 16 |
| 7.5 | Transactions Between a Member and the Company | 16 |
| 7.6 | Other Instruments | 16 |
| 7.7 | Non-Solicitation and Non-Competition | 16 |
| 7.8 | Investment Representations and Warranties | 17 |
| SECTION 8 | ACCOUNTING, BOOKS AND RECORDS | 18 |
| 8.1 | Bank Accounts; Accounting, Books and Records | 18 |
| 8.2 | Tax Matters | 19 |
| 8.3 | Certificates | 21 |
| SECTION 9 | AMENDMENTS | 21 |
| 9.1 | Amendments Generally | 21 |
| 9.2 | Amendments by the Manager | 21 |
| SECTION 10 | TRANSFERS; DRAG-ALONG RIGHTS | 21 |
| 10.1 | Restrictions on Transfers | 21 |
| 10.2 | Permitted Transfers | 21 |
| 10.3 | Conditions to Permitted Transfers | 22 |
| 10.4 | Prohibited Transfers | 22 |
| 10.5 | Rights of Unadmitted Assignees | 23 |
| 10.6 | Admission of Substituted Members | 23 |
| 10.7 | Distributions in Respect of Transferred Membership Interests | 23 |
| 10.8 | Sale of the Company; Drag-Along Rights | 24 |
| SECTION 11 | REDEMPTION | 24 |
| SECTION 12 | DISSOLUTION AND WINDING UP | 24 |
| 12.1 | Dissolution Events | 24 |
| 12.2 | Winding Up | 25 |
| 12.3 | Liquidating Trust; Reserves | 26 |

**TABLE OF CONTENTS**
(continued)

**Page**

12.4    Rights of Members ................................................................................. 26

12.5    Notice of Dissolution/Termination ...................................................... 26

12.6    Character of Liquidating Distributions ............................................... 26

12.7    The Liquidator .................................................................................... 27

12.8    Form of Liquidating Distributions ...................................................... 27

SECTION 13      MISCELLANEOUS ............................................................... 27

13.1    Notices ................................................................................................ 27

13.2    Binding Effect .................................................................................... 27

13.3    Effect of Consent or Waiver .............................................................. 27

13.4    Construction ....................................................................................... 28

13.5    Time .................................................................................................... 28

13.6    Headings and References .................................................................... 28

13.7    Severability ........................................................................................ 28

13.8    Incorporation by Reference ................................................................ 28

13.9    Governing Law ................................................................................... 28

13.10   Waiver of Jury Trial .......................................................................... 28

13.11   Specific Performance ......................................................................... 28

13.12   Counterparts; Signatures .................................................................... 29

13.13   Trustee Exculpation ........................................................................... 29

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## ML FASHION, LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT OF ML FASHION, LLC**, a Delaware limited liability company (the **"Company"**), is entered and effective as of March 29, 2016 (the **"Effective Date"**), and is entered into by and among the Persons identified as Members on <u>Exhibit A</u> hereto, and such additional Persons as are hereinafter admitted as Members.  Capitalized terms and phrases not otherwise defined herein shall have the meanings ascribed to them in <u>Section 1</u> hereof.

**WHEREAS**, the Company is organized as a limited liability company under and pursuant to the Limited Liability Company Act of the State of Delaware, as amended; and

**WHEREAS**, the Members desire to set forth the terms and conditions in which the Company shall be operated, all as more particularly set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## SECTION 1

## DEFINITIONS

In addition to terms defined elsewhere in this Agreement, the following capitalized words and phrases used in this Agreement shall have the following meanings:

**"2015 Budget Act"** means the Bipartisan Budget Act of 2015 (Pub. L. 114-74).

**"2015 Budget Act Audit Rules"** means the provisions of Subchapter C of Chapter 63 of the Code, as revised by Section 1101 of the 2015 Budget Act, as such provisions may thereafter be amended and including Treasury regulations or other guidance issued thereunder.

**"Act"** means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, *et seq.*, as amended from time to time (or any corresponding provisions of succeeding law).

**"Additional Member"** shall have the meaning set forth in <u>Section 3.3</u> hereof.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the applicable fiscal year after (a) crediting thereto any amounts which such Member is, or is deemed to be, obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) debiting such Capital Account by the amount of the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**"Affiliate"** means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any Person who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence.  For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or

1

indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person or entities.

"**Agreement**" or "**Limited Liability Company Agreement**" means this Limited Liability Company Agreement of ML Fashion, LLC, including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"**Approval of the Members**" means the written consent of Members holding, in the aggregate, more than fifty percent (50%) of the Percentage Interests.

"**Business**" shall have the meaning set forth in Section 2.3(a) hereof.

"**Business Day**" means a day of the year on which banks are not required or authorized to close in Chicago, Illinois.

"**Capital Account**" means, with respect to each Member, the Capital Account maintained for such Member in accordance with Section 4.

"**Capital Contributions**" means, with respect to any Member, the amount of money and the initial net fair market value of any Property (other than money) contributed to the Company with respect to the Membership Interests in the Company held or purchased by such Member.

"**Carrying Value**" means, with respect to any Company asset, the asset's adjusted basis for U.S. federal income tax purposes, except as otherwise provided in this definition. The Carrying Value of an asset contributed to the Company shall be equal to its Fair Market Value at the time of contribution. The Carrying Values of all Company assets shall be adjusted to equal their respective Fair Market Values in accordance with the rules set forth in Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, in connection with (a) the acquisition of any additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution of more than a de minimis amount of Company Property to a Member as consideration for an interest in the Company; (c) the distribution of Company Property (other than money) to a Member; (d) the grant of any Membership Interest or other equity interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company within the meaning of Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iii); or (e) the issuance by the Company of a noncompensatory option (a "warrant") (other than a warrant for a de minimis Company interest); provided, that, in the case of an exercise of a warrant to acquire Membership Interests, the adjustment of Carrying Values shall also take account of Regulations Section 1.704-1(b)(2)(iv)(s); and, provided further that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager in good faith determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Carrying Value of any Company asset other than cash denominated in Dollars distributed to any Member shall be adjusted immediately prior to such Distribution to equal its Fair Market Value. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits" and "Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes.

"**Certificate of Cancellation**" means a certificate filed in accordance with 6 Del. C.§ 18-203.

"**Certificate of Formation**" means the certificate filed pursuant to 6 Del. C.§ 18-201 of the Act to form the Company.

"**Change in Control**" means the following and shall be deemed to occur if any of the following events occur:

(a)    Any Person becomes, after the date of this Agreement, the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the combined fair market value of the Company's then outstanding Membership Interests or the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of managers, except that any change in the ownership of the Membership Interests of the Company as a result of a private financing of the Company that is approved by the Manager will not be considered a Change in Control unless the Manager specifically states that such change is a Change in Control for purposes of this Agreement;

(b)    Consummation by the Company of a Reorganization; or

(c)    Approval by the Manager and the Voting Members of the Company or any order by a court of competent jurisdiction of a plan of liquidation of the Company.

Notwithstanding the foregoing, unless determined otherwise by the Manager, a Change in Control shall not be deemed to occur solely on account of any of the following:

(i)    a Reorganization that would result in the voting securities of the Company outstanding immediately prior thereto (or, in the case of a Reorganization that is preceded or accomplished by an acquisition or series of related acquisitions by any Person, by tender or exchange offer or otherwise, of voting securities representing 5% or more of the combined voting power of all securities of the Company, immediately prior to such acquisition or the first acquisition in such series of acquisitions) continuing to represent, either by remaining outstanding or by being converted into voting securities of another entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such other entity outstanding immediately after such Reorganization (or series of related transactions involving such a Reorganization);

(ii)    a Reorganization effected to implement a recapitalization or reincorporation of the Company (or similar transaction) that does not result in a material change in beneficial ownership of the voting securities of the Company or its successor;

(iii)    any acquisition by a lender of the Company pursuant to a debt restructuring thereof; or

(iv)    any acquisition by, or consummation of a Reorganization with, an Affiliate of the Company.

(d)    A Change in Control of the type described in paragraph (a)(ii), (b) or (c) shall be deemed to be completed on the date it occurs, and a Change in Control of the type described in paragraph (a)(i) shall be deemed to be completed as of the date the entity or group attaining 50% or greater ownership has elected its representative(s) as the managers of the Company and/or caused its nominees to become Officers with the authority to terminate or alter the terms of employees' employment.

"**Code**" means the United States Internal Revenue Code of 1986, as amended from time to time.

"**Company Minimum Gain**" shall have the same meaning attributed to "partnership minimum gain" as set forth in Regulations Section 1.704-2(b)(2) and Section 1.704-2(d).

"**Dissolution Event**" shall have the meaning set forth in Section 12.1(a) hereof.

"**Distribution**" means any distributions by the Company to the Members with respect to their Membership Interests in accordance with this Agreement.

"**Drag-Along Members**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Dragging Member**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Drag Notice**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Drag Transaction**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"**Fair Market Value**" means, with respect to any asset, the fair market value of such asset, as reasonably determined by the Manager, except as otherwise expressly provided herein.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America from time to time.

"**Liquidator**" has the meaning set forth in Section 12.7(a) hereof.

"**Manager**" means, at any point in time, the Person then serving the Company as Manager pursuant to Section 6 hereof.

"**Member**" means any Person (i) who is referred to as such on Exhibit A to this Agreement, or who has become a Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member pursuant to the terms of this Agreement. "**Members**" means all such Persons.

"**Member Nonrecourse Debt**" shall have the meaning attributed to "partner nonrecourse debt" as set forth in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount with respect to each Member Nonrecourse Debt equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability (as defined in Regulations Section 1.752-1(a)(2)) determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" shall have the meaning attributed to "partner nonrecourse deductions" as set forth in Regulation Section 1.704-2(i)(2).

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, the Percentage Interest of such Member, as well as any and all other rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds arising under this Agreement, and management rights, voting rights or rights to consent by a Member arising hereunder.

"**Misconduct**" means fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct.

"**ML Retail**" means ML Retail LLC, a Delaware limited liability company, and its successors and assigns.

"**Net Cash Flow**" means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments (including debt payments to Members or their Affiliates), capital improvements, replacements, and contingencies, all as determined by the Manager. "**Net Cash Flow**" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

"**Nonrecourse Deductions**" has the meaning set forth in Regulation Sections 1.704-2(b)(1).

"**Officers**" has the meaning set forth in Section 6.1(c) hereof.

"**Partnership Representative**" has the meaning set forth in Section 8.3(d)(iii) hereof.

"**Percentage Interest**" means, with respect to any Member as of any date, the percentage of Membership Interests held by such Member set forth on Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to Section 9.2.

"**Permitted Transfer**" has the meaning set forth in Section 10.2 hereof.

"**Person**" means any individual, limited liability company, corporation, general partnership, limited partnership, trust, estate, governmental agency, cooperative, association, nominee or other entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person, as the context may require.

"**Profits**" and "**Losses**" means, for each fiscal year of the Company or other period, the Company's taxable income or loss for such year or period, or particular items thereof, determined in accordance with the accounting method used by the Company for U.S. federal income tax purposes and in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), which are not deductible in computing taxable income or loss, not properly capitalizable, and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be treated as deductible items and shall be subtracted from such taxable income or loss;

(c)    If the Carrying Value of any Company asset is adjusted pursuant to the definition of "Carrying Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)      Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Carrying Value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Carrying Value in accordance with Regulations Section 1.704-1(b)(2)(iv);

(e)      If the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Profits and Losses shall be an amount which bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided, that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the Manager may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and

(f)      Notwithstanding anything to the contrary herein, items that are specially allocated pursuant to Section 4.2(b) shall not be taken into account in computing Profits and Losses.

"**Property**" means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"**Reconstitution Period**" has the meaning set forth in Section 12.1(b) hereof.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"**Reorganization**" means any merger, consolidation, sale or other disposition of all or substantially all of the assets of the Company or other reorganization.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors, managers, general partners or persons exercising similar authority are owned, directly or indirectly, by the Company.

"**Tax Distributions**" has the meaning set forth in Section 5.3(a) hereof.

"**Tax Matters Member**" has the meaning set forth in Section 8.3(d)(i) hereof.

"**Third Party Purchaser**" means, with respect to a proposed sale of Membership Interests pursuant to Section 10.8, a Person, other than an Affiliate or Permitted Transferee of any Member, who offers to purchase outstanding Membership Interests pursuant to a bona fide written offer.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of (including in each case, without limitation, by way of merger, consolidation, reorganization, forced sale or otherwise).

"**Unreturned Capital Contributions**" means, with respect to any Member, the difference between (a) the sum of (i) such Member's initial Capital Contribution plus (ii) any subsequent Capital Contribution(s) made by such Member, less (b) any distributions previously made to such Member pursuant to Sections 5.1(b)(i) and 12.2(c).

6

## SECTION 2

## THE COMPANY

**2.1    Formation of the Company**. The Company shall operate as a Delaware limited liability company under and pursuant to the Act, and pursuant to the terms of this Agreement. A Certificate of Formation was filed on March 29, 2016, with the Office of the Delaware Secretary of State by the organizer of the Company acting as agent for the Company. The Members shall be the "members" of the Company within the meaning of the Act, and except as expressly provided herein to the contrary, the rights and obligations of the Members shall be as provided in the Act.

**2.2    Name**. The name of the Company shall be "ML Fashion, LLC" and all business of the Company shall be conducted in such name. The Manager may change the name of the Company at any time.

**2.3    Purpose; Powers**.

(a)    The purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the "**Business**").

(b)    The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 2.3(a) hereof.

**2.4    Principal Place of Business**. The principal place of business of the Company shall be located at such place as the Manager may determine from time to time. The initial principal place of business of the Company shall be at 38 E. 29th Street, New York, New York 10016.

**2.5    Term**. The term of the Company commenced on the date the Certificate of Formation was filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 12 hereof.

**2.6    Registered Agent and Registered Office**. The registered agent and registered office of the Company in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, or any successor as appointed by the Manager.

**2.7    Title to Property**. All Property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in his or its individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**2.8    Payments of Individual Obligations**. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

**2.9    Independent Activities; Transactions with Affiliates**.

(a)    The Manager shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that such Manager may deem appropriate in his, her or its discretion.

(b)    Except as otherwise set forth in Section 7.7 and insofar as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager or their Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member or the Manager or its Affiliates to participate in any such activities.

(c)    To the extent permitted by applicable law and subject to the provisions of this Agreement, the Manager is hereby authorized to cause the Company to purchase Property from, sell Property to or otherwise deal with any Member, acting on its own behalf, or any Affiliate of any Member on terms that are arms' length market terms or are more favorable to the Company than arms' length market terms.

**2.10    Override of Certain Statutory Defaults**.  To the extent permitted by law, the provisions of this Agreement shall govern over all provisions of the Act which would apply but for (and that are inconsistent with) this Agreement.  For each issue (a) with respect to which the Act provides a rule (a **"default rule"**) but permits a limited liability company's operating agreement to provide a different rule and (b) which is addressed by this Agreement, the default rule shall not apply to the Company.  Without limiting the generality of the foregoing, except as expressly provided in this Agreement, the following provisions of the Act shall not apply to the Company: Section 18-604 (Distribution upon Resignation), Section 18-801 (Dissolution) and Section 18-804 (Distribution of Assets).

## SECTION 3

## INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS

**3.1    Capital Contributions**.  Each Member has made such Capital Contributions as are set forth in the books and records of the Company.

**3.2    Additional Capital Contributions**.  No Member shall be required to make any additional Capital Contribution.

**3.3    Additional Members**.  By approval of the Manager and the Approval of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an **"Additional Member"**).  In connection with the admission of an Additional Member, the Manager shall agree with the Person to be admitted as an Additional Member as to what Capital Contribution, if any, such Additional Member shall make to the Company.  The Percentage Interest to be issued to any Additional Member shall represent the value of the Capital Contribution made by such Additional Member relative to the value of the Company at the time of such Capital Contribution and shall dilute all existing Members' Percentage Interests proportionately unless otherwise agreed by the Members.  Each Person admitted as an Additional Member will be deemed admitted at the time such Person (a) executes this Agreement or a counterpart of this Agreement and such other documents as are requested by the Manager and (b) is named as a Member on Exhibit A hereto.  In the event any Additional Members are admitted to the Company, the Manager shall cause Exhibit A to be updated to accurately reflect the

Additional Member and the related changes in the Members' Percentage Interests. The legal fees and expenses associated with such admission shall be borne by the Company.

  **3.4**  **Limitation on Withdrawal of Capital**. Except as expressly provided in this Agreement, no Member (a) shall have the right to withdraw or receive any return on such Member's Capital Contributions (including any part of its Capital Account) or a claim to any Company capital prior to termination of the Company pursuant to Section 12 hereof, (b) shall have any right to demand and receive property other than cash in return for such Member's contributions to the capital of the Company, or (c) shall be liable to any other Member for the return of such other Member's contributions to the capital of the Company, or any portion thereof (except as otherwise expressly required under the Act), it being expressly understood that such return shall be made solely from Company assets.

**SECTION 4**

**CAPITAL ACCOUNTS; PROFITS AND LOSSES**

  **4.1**  **Capital Accounts**. The Company shall establish and maintain a separate Capital Account for each Member in accordance with Regulations Section 1.704-1(b).

  **4.2**  **Allocation of Profits and Losses**.

    (a)  Profits and Losses. After giving effect to the special allocations in Section 4.2(b) and after adjusting for all Capital Contributions and Distributions made during such taxable year, Profits and Losses (and, if necessary, individual items of gross income or loss) shall be allocated annually (and at such other times in which it is necessary to allocate Profits or Losses) in a manner such that, after such allocations have been made, the balance of each Member's Capital Account shall, to the extent possible, be equal to (i) an amount that would be distributed to such Member if (A) the Company were to sell its assets for their Carrying Values, (B) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Values of the assets securing such liability), (C) the Company were to distribute the proceeds of sale pursuant to Section 12.2 and (D) the Company were to dissolve pursuant to Section 12, minus (ii) the sum of (1) such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, and (2) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company, computed immediately prior to the hypothetical sale of assets.

    (b)  Special Allocations.

      (i)  Nonrecourse Deductions. Notwithstanding the general rule on allocation of Losses stated in Section 4.2(a), Nonrecourse Deductions will be allocated to and among the Members in accordance with their respective Percentage Interests, and Member Nonrecourse Deductions will be allocated to and among those Members bearing the economic risk of loss for such debt in accordance with each Member's share of such risk. The allocation of liabilities to a property, the determination of Nonrecourse Deductions and Member Nonrecourse Deductions, the effect of property revaluations and all other issues affecting the allocation of such items will be determined in accordance with the Regulations under Code Section 704(b).

      (ii)  Minimum Gain Chargeback. Notwithstanding the general rule on allocation of Profits stated in Section 4.2(a), if there is a net decrease in Company Minimum Gain for any fiscal year, each Member will be allocated items of Company income or gain for such year equal to such Member's share of the net decrease in Company Minimum Gain. If there is a net decrease in Member Nonrecourse Debt Minimum Gain for any fiscal year, each Member

9

having a share of such Member Nonrecourse Debt Minimum Gain will be allocated items of Company income or gain equal to such Member's share of such net decrease in Member Nonrecourse Debt Minimum Gain. The determination of net decreases in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, allocations of such net decreases, exceptions to minimum gain chargebacks and all other issues affecting the minimum gain chargeback requirements will be determined in accordance with the Regulations under Code Section 704(b).

(iii)    Qualified Income Offset.    If a Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases an Adjusted Capital Account Deficit with respect to such Member, items of Company gross income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.

(iv)    Section 754 Adjustments.    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts in accordance with Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(v)    Loss Limitation.    Losses allocated pursuant to Section 4.2(a) hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have or increase an Adjusted Capital Account Deficit at the end of any fiscal year of the Company or other allocation period in which any other Member does not have an Adjusted Capital Account Deficit. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 4.2(a), the limitation set forth in this Section 4.2(b)(v) shall be applied on a Member by Member basis and Losses not allocable to a Member as a result of such limitation shall be allocated proportionately to the other Members without an Adjusted Capital Account Deficit so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

(vi)    Interpretation.    The foregoing provisions of this Section 4.2(b) ("**Regulatory Allocations**") are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently with this intention. Any terms used in such provisions that are not specifically defined in this Agreement shall have the meaning, if any, given such terms in such Regulations. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to this Section 4.2(b) shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (e) of the definition of "Profits" and "Losses" in Section 1.1.

(vii)    Curative Allocations.    If any allocation of gain, income, loss, expense or any other item is made pursuant to the Regulatory Allocations with respect to one or more Members, then the balance of such items for the current and all subsequent fiscal years shall be allocated among the Members so that, to the extent possible and without requiring further Regulatory Allocations, the Members receive aggregate net allocations under Section 4.2 equal to the net allocations that would have been made to the Members if the Regulatory Allocations had

not occurred. This Section 4.2(b)(vii) is intended to minimize to the extent possible and to the extent necessary any economic distortions which may result from application of Regulations Section 1.704-1(b) and shall be interpreted in a manner consistent therewith.

4.3    **Tax Allocations.**  For income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided, that in the case of any Company asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any reasonable manner determined by the Manager) so as to take account of the difference between the Carrying Value and adjusted basis of such asset.

4.4    **Other Allocation Provisions.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. Sections 4.1 to and including Section 4.4 hereof may be amended at any time by the Manager if, in the opinion of tax counsel to the Company, it is necessary to comply with Regulations Section 1.704-1(b), so long as any such amendment does not change the relative economic interests of the Members.

4.5    **Authority to Withhold; Treatment of Withheld Tax.**  Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other Taxes payable by the Company with respect to such Member or as a result of such Member's participation in the Company.  If and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes with respect to a Member, such Member shall be deemed for all purposes of this Agreement to have received a Distribution from the Company as of the time such withholding or other tax is required to be paid.  In the event that the Company receives a payment in respect of which Tax has been withheld, the Company shall be deemed to have received cash in an amount equal to the amount of such withheld Tax, and each Member shall be deemed to have received as a Distribution the portion of such amount that is attributable to such Member's interest as equitably determined by the Manager.  Any Distribution deemed made to a Member pursuant to this Section 4.5 shall reduce the amounts the Member would otherwise be entitled to receive pursuant to Section 5.1(a).

## SECTION 5

## DISTRIBUTIONS

5.1    **Distributions of Net Cash Flow.**

(a)    Conditions to Cash Distributions to Members.  No Distributions may be made to the Members unless (i) the Company is current on all payments of interest due and payable by the Company to any Member that has made a loan to the Company (each, a **"Member Loan"**), and (ii) the Company has no trade accounts payable in excess of sixty (60) days past due.  Further, at any time any amount is due and owing under any Member Loan, no Distributions may be made to the Members unless an amount equal to the Distribution is used to pay down the principal balance and any related accrued and unpaid interest of such loan, pro rata to and among the Members holding Member Loans in accordance with the relative remaining balances of their respective Member Loans.

(b)    <u>Cash Distributions to Members</u>.  Subject to the requirements and limitations of this <u>Section 5.1(a)</u> and <u>5.4</u>, the timing and amount of Distributions shall be determined by the Manager in his reasonable business judgment.  Except as set forth in <u>Section 5.3</u> and <u>Section 12.2</u> and subject to the requirements and limitations of this <u>Section 5.1(a)</u> and <u>5.4</u>, the Manager, in his discretion, may distribute Net Cash Flow to and among the Members, provided that any such Distribution shall be made as follows:

(i)    first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(ii)    second, pro rata among the Members, provided that any such distribution shall be made pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

**5.2    Amounts Withheld**.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this <u>Section 5.2</u> for all purposes under this Agreement but only to the extent such amounts are paid by the Company to such taxing authority.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld and paid to the taxing authority.

**5.3    Tax Distributions**.

(a)    If the distributions to the Members pursuant to <u>Section 5.1</u> above (exclusive of Tax Distributions) for a taxable year are not expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income for such taxable year, then the Company shall be required to make additional distributions pursuant to this Section (**"Tax Distributions"**) to the Members in accordance with their Percentage Interests in such amount as determined pursuant to <u>Section 5.3(b)</u> below, to the extent the Company has sufficient Net Cash Flow.  If the distributions to the Members during the taxable year pursuant to <u>Section 5.1</u> above (exclusive of Tax Distributions) are expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income, then no distributions shall be made pursuant to this <u>Section 5.3</u>.    Any distribution deemed made to a Member pursuant to this <u>Section 5.3</u> shall reduce the amounts the Member would otherwise be entitled to receive pursuant to <u>Section 5.1(b)(i)</u> or <u>5.1(b)(ii)</u>.

(b)    The aggregate amount of the Tax Distributions shall be determined by the Manager and shall equal the amount of cash the Manager deems necessary to enable each Member to pay its federal and state taxes on its distributive share of the Company's taxable income for the taxable year, taking into account the distributions expected to be received from the Company (exclusive of Tax Distributions) during the taxable year.  To the extent the Company has sufficient Net Cash Flow, the Manager shall attempt to make the Tax Distributions on a quarterly basis to enable the Members to make their quarterly state and federal estimated tax payments.  In any event the Manager shall, to the extent the Company has sufficient Net Cash Flow, cause the Company to make the Tax Distribution no later than the April 10 following the taxable year to which the Tax Distribution relates.  The Manager shall be entitled to make reasonable assumptions concerning Member's tax rates and, when making quarterly Tax Distributions, the Company's ultimate taxable income for the entire taxable year.

**5.4    Limitations on Distributions**.

(a)    The Company shall make no Distributions to the Members except (i) as provided in this <u>Section 5</u> and in <u>Section 12</u> hereof, or (ii) as determined by the Manager.

(b)    The Company shall not make, and a Member may not receive, a Distribution from the Company to the extent that, after giving effect to the Distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions and liabilities for which the recourse of creditors is limited to specific property of the Company, would exceed the fair value of the Company's assets.

**5.5    Certain Liquidity Events.**  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Members dispose of all Membership Interests in the Company (whether in a merger or sale of all of the equity of the Company), the Members agree and acknowledge that the consideration paid to each Member for their Membership Interests shall be redistributed among them to equal that which each Member would have received if the Company had sold all of its assets for an amount equal to the aggregate consideration payable under such transaction plus all Company liabilities (including transaction expenses, brokers' commissions, attorney's and accountants' fees, debt repayment and other similar charges), and the sales proceeds (net of such liabilities) were distributed in accordance with <u>Section 12.2</u>.  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Company disposes of assets, with proceeds from such transaction received by the Company, then the Distribution of any such proceeds to the Members shall be made in accordance with <u>Section 12.2</u>.

## SECTION 6

## MANAGEMENT

**6.1    Manager**.

(a)    The management of the Company shall be vested entirely and exclusively in the Manager. Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company.  No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

(b)    The Manager need not be a Member of the Company.  The initial Manager of the Company as of the Effective Date shall be Marcus Lemonis.  The Manager shall serve as the Manager until his or its death, dissolution, voluntary resignation, or appointment of a successor Manager.  ML Retail shall have the sole power to remove a Manager and to appoint any successor Manager.

(c)    The Company may, but shall not be required to, have officers (the **"Officers"**), who shall be appointed by the Manager and may include a President, a Vice President, a Secretary and a Treasurer or Chief Financial Officer.  The Manager may also appoint a Chairman, more than one Vice President, and one or more Assistant Secretaries and Assistant Treasurers.  The Manager may appoint such other Officers and agents as he shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. Any number of offices may be held by the same Person.  The Manager may, in his own

discretion, fix the salaries of all Officers and agents of the Company, in their capacity as such. Each of the Officers of the Company shall hold office until such Officer's successor is appointed or until such Officer's earlier death, resignation or removal. Any Officer may be removed at any time by the Manager. Any vacancy occurring in any office of the Company may be filled by the Manager. The initial officers of the Company shall be the persons identified as such on the attached <u>Schedule A</u>.

(d)    The Manager may engage on behalf of, and at the expense of, the Company, such Persons as the Manager in his judgment shall deem advisable for the conduct and operation of the business of the Company.

(e)    The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

(f)    Instruments and documents of the Company shall be valid and binding upon the Company if executed by the Manager or a duly designated officer by the Manager, and Persons dealing with the Company shall be entitled to rely conclusively on such power and authority of the Manager and such officers.

(g)    The Manager is hereby authorized to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company. The Manager may authorize any Officer or agent of the Company to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

**6.2    Duties and Obligations of the Manager; Discretion**.

(a)    In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b)    Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

**6.3    Reimbursements**. The Company may reimburse the Manager for all expenses incurred and paid in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

**6.4    Indemnification of the Manager and Officers**.

(a)    Unless otherwise provided in <u>Section 6.4(c)</u> hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Property) shall indemnify, save harmless, and pay all judgments and claims against the Manager, any former Manager, Officer, former

14

Officer or any agent of the Company (each such Person, a **"Covered Person"**) relating to any liability or damage incurred by reason of any act performed or omitted by the Covered Person in connection with the Company, including reasonable attorneys' fees and expenses incurred by the Covered Person in connection with the defense of any action based on any such act or omission, which attorneys' fees and expenses may be paid as incurred.

(b)    Unless otherwise provided in <u>Section 6.4(c)</u> hereof, in the event of any action by a Member against the Covered Person including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Covered Person, including reasonable attorneys' fees and expenses incurred in the defense of such action.

(c)    Notwithstanding the provisions of <u>Sections 6.4(a)</u> and <u>6.4(b)</u> above, such Sections shall be enforced only to the maximum extent permitted by law and the Covered Person shall only be indemnified (i) if such Person acted in good faith and without Misconduct and in a manner that he or it reasonably believed to be in or not opposed to the best interests of the Company, and (ii) with respect to any criminal action or proceeding, if such Person had no reasonable cause to believe his or its conduct was unlawful, unless the conduct in question involved actual (rather than simply alleged) criminal conduct, fraud, willful and wanton misconduct or gross negligence.

(d)    The obligations of the Company set forth in this <u>Section 6</u> are expressly intended to create third party beneficiary rights of the Covered Person and any Manager, any Member, or any Officer is authorized, on behalf of the Company, to give written confirmation to the Covered Persons of the existence and extent of the Company's obligations to the Covered Persons hereunder.

(e)    The provisions of this <u>Section 6.4</u> shall survive the dissolution, liquidation, winding up and termination of the Company.

### SECTION 7

### ROLE OF MEMBERS

**7.1    Rights or Powers**.  The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.  Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act.

**7.2    Voting Rights**.  No Member has any voting rights except as otherwise provided in this Agreement and with respect to the following, which shall require the Approval of the Members:

(a)    any conversion of the Company to any other entity; or

(b)    any merger of the Company with or into any other entity that is not subject to a Drag Transaction; and

in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

15

**7.3    Member Liability**.  No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the debts or any other obligations or liabilities of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, *provided* that a Member may be required to repay distributions made to it as provided in 6 Del. C.§ 18-607 of the Act. No Manager shall have any personal liability for the repayment of any Capital Contributions of any Member.

**7.4    Partition**.  While the Company remains in existence, each Member agrees and waives its rights to have any Property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

**7.5    Transactions Between a Member and the Company**.  Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a Person who is not a Member. A Member, any Affiliate thereof or an employee, stockholder, member, manager, agent, director or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

**7.6    Other Instruments**.  Each Member shall execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement, so long as any such documents do not materially or substantially change the rights of a Member under this Agreement.

**7.7    Non-Solicitation and Non-Competition**.

(a)    While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to), directly or indirectly (including, without limitation, through any of his, her or its Affiliates or immediate family members, i.e., spouse and unemancipated children), in any capacity: (i) employ any employee of the Company or a Subsidiary; or (ii) solicit or induce any employee of the Company or a Subsidiary to cease employment with the Company or any Subsidiary.

(b)    While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to) directly or indirectly (including, without limitation, through any of his or its Affiliates or immediate family members, i.e., spouse and unemancipated children), anywhere in the United States, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, independent contractor, stockholder or in any other capacity of any company or entity, engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that

16

engages in or competes, directly or indirectly, with the Business; provided, however, that the ownership by any Person of not more than five percent (5%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 7.7(b).

(c)    If a Member or Manager breaches any obligation under Section 7.7(a) or 7.7(b), such breach will suspend and toll the running of the restrictive period for such obligation for such Member or Manager from the date of breach until such time as such violation ceases.

(d)    Each Member and the Manager agrees that any violations of Section 7.7(a) or 7.7(b) would be highly injurious and cause irreparable harm to the Company and its Members. Therefore, each Member and the Manager consents and agrees that if the terms of Section 7.7(a) and/or 7.7(b) are violated, the Company shall be entitled, in addition to any other rights and remedies that it may have (including monetary damages), to apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any continuing or threatened violation of, the provisions of Section 7.7(a) and/or 7.7(b) by such Member, Manager, or any of their respective Affiliates. If the Company shall institute any action or proceeding to enforce the provisions of Section 7.7(a) and/or 7.7(b), each Member and the Manager hereby irrevocably waives any claim or defense that such Member or Manager may have that an adequate remedy at law is available, and each Member and each Manager hereby agrees not to interpose in any such action or proceeding any claim or defense that a remedy exists at law. Notwithstanding the foregoing provisions, the Manager in his sole discretion may waive or otherwise modify the restrictions set forth in Section 7.7(a) and/or 7.7(b) pursuant to a written agreement with any Member (or their Affiliate), as applicable. Further, if any Member (or their Affiliate) or Manager is subject to a separate written agreement with the Company containing similar restrictive covenants, then the terms of such other agreement shall govern and these restrictive covenants shall not apply to such Person.

(e)    It is the Members' and the Manager's intent that each of the restrictive covenants contained in Section 7.7(a) and/or 7.7(b) be read and interpreted with every reasonable inference given to its enforceability. However, it is also the Members' and the Manager's intent that if any term, provision or condition of such restrictive covenants is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Further, it is also the Members' and the Manager's intent that if a court should determine any of such restrictive covenants are unenforceable because of over-breadth, then the court shall modify said covenant to the minimum extent possible so as to make it enforceable under the circumstances.

(f)    Notwithstanding the foregoing subsections (a) through (e) of this Section 7.7, neither Marcus Lemonis nor ML Retail or any other entity controlled by Marcus Lemonis is subject to the restrictions set forth in this Section 7.7.

**7.8    Investment Representations and Warranties**. Each Member executing this Agreement hereby represents and warrants to the Company and each other Member that: (a) if such Member is not a natural person, that it is organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder; (b) such Member is acquiring his, her or its Membership Interests in the Company for such Member's own account as an investment and without an intent to distribute the Membership Interests; (c) such Member acknowledges that the Membership Interests have not been registered under federal securities laws, or any state securities laws, and may not be resold or transferred by such Member without appropriate registration or the availability of an exemption from such requirements; (d) such Member has such knowledge and experience in financial and business matters so

17

that such Member is capable of evaluating the merits and risks of an investment in the Company; and (e) such Member has been given the opportunity to ask questions of and receive information from the Company.

**SECTION 8**

**ACCOUNTING, BOOKS AND RECORDS**

**8.1    Bank Accounts; Accounting, Books and Records.**

(a)    All funds of the Company shall be deposited in its name in accounts designated by the Manager.  The Manager, the Chief Financial Officer of the Company, if any, and such person or persons as the Manager may designate shall have the right to draw checks thereon and make, deliver, accept and endorse negotiable instruments in connection with the Company business.

(b)    The Company shall keep on site at its principal place of business each of the following:

(i)    Separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, and all income derived in connection with the conduct of the Company in accordance with this Agreement;

(ii)    A current list of the full name and last known business, residence, or mailing address of each Member and Manager;

(iii)    A copy of the Certificate of Formation and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v)    Copies of this Agreement;

(vi)    Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

(vii)    Unless contained in this Agreement, a statement prepared and certified as accurate by the Manager of the Company which describes:

(A)    The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

(B)    The times at which or events on the happening of which any additional Capital Contributions agreed to be made by each Member are to be made;

(C)    If agreed upon, the time at which or the events on the happening of which a Member may terminate its Membership Interests in the Company and

18

the amount of, or the method of determining, the distribution to which he may be entitled respecting its Membership Interests and the terms and conditions of the termination and distribution;

(D)    Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution; and

(viii)    Any written consents obtained from Members pursuant to 6 Del. C.§ 18-302 of the Act regarding action taken by Members without a meeting.

(c)    Any Member or its designated representative has the right to have reasonable access to and inspect the books and records of the Company to the extent required by law. The rights granted to a Member pursuant to this <u>Section 8.1</u> are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

**8.2    Tax Matters**.

(a)    **Tax Elections**.  ML Retail shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law: (i) to adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with Transfers of Membership Interests and Company distributions; (ii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and (iii) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

(b)    **Tax Information**.  Necessary tax information shall be delivered to each Member as soon as practicable after the end of each taxable year of the Company but not later than five (5) months after the end of each taxable year.

(c)    **Tax Classification**.

(i)    The Manager shall take such action as may be required under the Code and the Regulations to cause the Company to be taxable as a partnership for Federal income tax purposes.

(ii)    To the extent <u>Section 8.2(c)(i)</u> does not govern the state and local tax classification of the Company, the Manager shall take such action as may be required under any state and/or local law applicable to the Company to cause the Company to be taxable as, and in a manner consistent with, a partnership (or the functional equivalent thereof under applicable law) for state and/or local income tax purposes.

    (d)    **Tax Matters Member and 2015 Budget Act Audit Rules**.

    (i)    *Tax Matters Member*.  ML Retail shall be the "tax matters partner" of the Company within the meaning of Code § 6231(a)(7) as in effect immediately prior to the effective date of its amendment by the 2015 Budget Act (the **"Tax Matters Member"**) for any period during which the Company is permitted or required to have such a tax matters partner, and shall serve as such until its successor is duly designated by the Manager.  The Tax Matters Member shall have authority to take any action that may be taken by a "tax matters partner" under Code §§ 6221 through 6234.  The Company shall indemnify and hold harmless the Tax Matters Member for any liabilities and all reasonable and documented costs and expenses incurred by the Tax Matters Member in its capacity as such.  Notwithstanding any other provision of this Agreement, the Tax Matters Member, in its capacity as Tax Matters Member, shall have no authority with respect to matters subject to the 2015 Budget Act Audit Rules.

    (ii)    *No Early Election into the 2015 Budget Act Audit Rules*.  The Company shall not elect, under Section 1101(g)(4) of the 2015 Budget Act or otherwise, for any portion of the 2015 Budget Act Audit Rules to apply to the Company for any taxable years beginning before January 1, 2018.

    (iii)    *Partnership Representative*.  ML Retail shall be the "partnership representative" of the Company within the meaning of Code § 6223 (as amended by the 2015 Budget Act) (the **"Partnership Representative"**) for any period during which the Company is permitted or required to have a Partnership Representative and shall serve as such until its successor is duly designated by the Manager.  The Partnership Representative shall have authority to take any action that may be taken by a "partnership representative" under the 2015 Budget Act Audit Rules.  The Company shall indemnify and hold harmless the Partnership Representative for any liabilities, costs and expenses reasonably incurred by the Partnership Representative in its capacity as such.

    (iv)    *Notification of Members*.  The Partnership Representative shall, on a timely basis, provide the Company with copies of all notices received by the Partnership Representative in connection with any proceeding or potential adjustment relating to the Company that is subject to the 2015 Budget Act Audit Rules.  With respect to any proceeding or potential adjustment subject to the 2015 Budget Act Audit Rules, the Company shall, on a timely basis, provide each Member with copies of all notices received by the Company or the Partnership Representative from the Internal Revenue Service.

    (v)    *Election Out of Imputed Underpayment*.  To the maximum extent permitted under the 2015 Budget Act Audit Rules, the Company shall elect, and each Member shall cooperate in electing, under Code § 6226(a) (as amended by the 2015 Budget Act) or otherwise, for Code § 6225 (as amended by the 2015 Budget Act) not to apply, and for each Member to take any adjustment into account as provided in Code § 6226(a) (as amended by the 2015 Budget Act).

    (vi)    *Survival*.  The provisions of this <u>Section 8.2</u> shall survive the termination of the Company or the termination of any Membership Interests and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members (relating to the operations of the Company).

**8.3    Certificates**.  No certificates or other evidence of ownership shall be issued in respect of the Membership Interests in the Company except this Agreement.

## SECTION 9

## AMENDMENTS

**9.1    Amendments Generally**.    Except as otherwise provided in <u>Section 9.2</u>, and notwithstanding any contrary provision of the Act, any amendments to this Agreement may be adopted with the Approval of the Members; <u>provided</u>, <u>however</u>, that no part of <u>Section 6</u> may be amended without the approval of the Manager.

**9.2    Amendments by the Manager**.  Without limiting the power to amend this Agreement granted by <u>Section 9.1</u> hereof, this Agreement may be amended by the Manager (a) to effect changes of a ministerial nature that do not materially and adversely affect the rights, duties or obligations of the Members; (b) to amend <u>Exhibit A</u> to add, remove or change any Member and/or Percentage Interests held by a Member, in accordance with the terms hereof; (c) to conform the terms of this Agreement with any Regulations, *provided* that, in the opinion of counsel to the Company, such amendment does not adversely affect the rights or interests of any of the Members; (d) with respect to the Company's status as a partnership (and not as an association taxable as a corporation) for federal tax purposes, (i) to comply with the requirements of the Regulations, or (ii) to ensure the continuation of partnership status, <u>provided</u>, <u>however</u>, that, in the opinion of counsel of the Company, such amendment does not adversely affect the rights or interests of any of the Members; and (e) to change the name of the Company.

## SECTION 10

## TRANSFERS; DRAG-ALONG RIGHTS

**10.1    Restrictions on Transfers**.  Except as otherwise permitted by this Agreement, including <u>Section 10.8</u>, no Member shall Transfer all or any portion of its Membership Interests without the approval of the Manager.  In the event that any Member pledges or otherwise encumbers all or any part of its Membership Interests as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this <u>Section 10</u>.  Each Member hereby acknowledges the reasonableness of the restrictions on the Transfer of Membership Interests imposed by this Agreement in view of the Company's purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

**10.2    Permitted Transfers**.  Subject to the conditions and restrictions set forth in <u>Section 10.3</u> hereof, (a) a Member may at any time Transfer all or any portion of its Membership Interests to the Company pursuant to <u>Section 11</u>; and (b) with respect to ML Retail, ML Retail may Transfer all or any part of its Membership Interests to Affiliates of ML Retail (any such Transfer described in (a) or (b) being referred to in this Agreement as a **"Permitted Transfer"**).  **"Permitted Transfer"** shall also include, any Transfer by a Member to a Person that is (i) a trust, estate, guardianship or custodianship, including those established under any of the Uniform Gifts to Minors Act of any state, established for such Member or one or more of such Member's spouse and/or natural or adoptive lineal ancestors or descendants, (ii) an entity in which all of the equity interests are beneficially owned by such Member and/or its Permitted Transferees, and (iii) if such Member is an entity, the holders of its equity securities in a liquidating distribution of such entity's assets in proportion to their ownership thereof.  The subsequent Transfer of any Membership Interests by a Permitted Transferee shall be subject to the same restrictions of this <u>Section 10</u> in the same manner as if the Membership Interests to be Transferred were still owned by the

Member from whom such Permitted Transferee acquired such Membership Interests; and for this purpose, references herein to a Transfer by a Member shall include any Transfer by the Permitted Transferee(s) that acquired such Member's Membership Interests, and references to a Member in the context of Transfer restrictions and related provisions shall include its Transferees. If at any time a Member is required to Transfer its Membership Interests pursuant to this Agreement, such Transfer shall include or be applicable to all Membership Interests owned by such Member's Permitted Transferees and other Transferees.

**10.3    Conditions to Permitted Transfers**. Except for a Transfer to the Company, a Transfer shall not be treated as a Permitted Transfer under Section 10.2 hereof unless and until the following conditions are satisfied:

(a)    Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer. In the case of a Transfer of Membership Interests involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interests transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interests until it has received such information.

(c)    In addition to the foregoing, each Transfer of Membership Interests shall satisfy the following conditions: (i) the Transfer will not require registration of Membership Interests under the Securities Act or any state securities laws and (ii) if requested by the Manager, the transferor delivers to the Company an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

**10.4    Prohibited Transfers**. Any purported Transfer of Membership Interests that is not a Permitted Transfer shall be null and void and of no force or effect whatever; *provided* that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Manager approves a Transfer that is not a Permitted Transfer pursuant to Section 10.1 hereof), the Membership Interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company.

In the case of a Transfer or attempted Transfer of Membership Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

22

**10.5    Rights of Unadmitted Assignees**.  A Person who acquires Membership Interests but who is not admitted as a substituted Member pursuant to <u>Section 10.6</u> hereof shall be entitled only to allocations and distributions with respect to such Membership Interests in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

**10.6    Admission of Substituted Members**.  Subject to the other provisions of this <u>Section 10</u>, a transferee of Membership Interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this <u>Section 10.6</u>:

(a)    The Membership Interests with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer or a Transfer otherwise approved by the Manager;

(b)    The transferee of Membership Interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Agreement, including this <u>Section 10</u> and (ii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Membership Interests.  The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement, (y) in the case of a Transfer to any Person other than a Member or any of its Affiliates, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer, and (z) in the case of a Transfer to any of its Affiliates, any Capital Contribution or other financing obligation of the transferor Member under this Agreement;

(c)    The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Membership Interests; and

(d)    Except in the case of a Transfer involuntarily by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer.

**10.7    Distributions in Respect of Transferred Membership Interests**.  If any Membership Interests are Transferred during any taxable year in compliance with the provisions of this <u>Section 10</u>, all distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, *provided* that, if the Company is given notice of a Transfer at least five (5) Business Days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer.  If the Company has not received notice of a Transfer prior to a distribution date, all distributions shall be made to the Person who, according to the books and records of the Company, was the owner of the Membership Interests on the record date of such distribution.  Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of this <u>Section 10.7</u>, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Membership Interests.

23

**10.8    Sale of the Company; Drag-Along Rights**.

(a)    Notwithstanding any Transfer restrictions contained in this Section 10, in the event that ML Retail (the **"Dragging Member"**) proposes to sell all of its Membership Interests to a Third Party Purchaser, whether by merger or otherwise (the **"Drag Transaction"**), the Dragging Member may elect to require all other holders of Membership Interests, including unadmitted assignees (the **"Drag-Along Members"**), to sell to the Third Party Purchaser their Membership Interests on the same terms and conditions (including, without limitation, making customary representations, warranties and indemnification covenants applicable to the ownership of the Membership Interests of such Drag-Along Members) upon which the Dragging Member sells, transfers or assigns its Membership Interests.  The Dragging Member shall cause the Drag Transaction to be reduced to writing and shall provide a written notice (the **"Drag Notice"**) of the Drag Transaction to the Drag-Along Member at least thirty (30) days prior to the anticipated closing of the Drag Transaction.  The Drag Notice shall contain written notice of the exercise of rights pursuant to this Section 10.8 and shall set forth the consideration to be paid by the Third Party Purchaser and the other material terms and conditions of the Drag Transaction.  If, prior to the closing of the Drag Transaction, the terms of the Drag Transaction change from those set forth in the original Drag Notice, the Dragging Member shall issue a revised Drag Notice stating such revised terms.

(b)    Each holder of Membership Interests agrees to (i) use commercially reasonable efforts, in good faith and in a commercially prompt manner, to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable, under applicable laws and regulations (including, without limitation, to ensure that all appropriate legal and other requirements are met and all consents of third persons are obtained), to consummate the Drag Transaction, (ii) vote all of its Membership Interests in favor of the Drag Transaction (if necessary, depending on the form of the transaction and the voting rights of such Membership Interests) and (iii) raise no objection to, bring no claim against and not contest such Drag Transaction.  Execution of this Agreement or a joinder hereto constitutes each holder of Membership Interests' (and its Transferees') binding agreement to sell all his, her or its Membership Interests on the same terms and conditions set forth in the Drag Notice, as adjusted in accordance with this Section 10.8.  Upon the closing of a Drag Transaction, such Third Party Purchaser shall pay to each holder of Membership Interests his, her or its share of the proceeds thereof.

# SECTION 11

# REDEMPTION

The Company shall redeem, and any Member shall sell to the Company, any of the Member's Membership Interests pursuant to the terms and provisions of any agreement binding upon the Company and such Member.

# SECTION 12

# DISSOLUTION AND WINDING UP

**12.1    Dissolution Events**.

(a)    **Dissolution**.  The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a **"Dissolution Event"**):

(i)    The written consent of the Manager and the Approval of the Members to dissolve, wind up, and liquidate the Company; or

(ii)    The entry of a decree of judicial dissolution under Section 18-802 of the Act.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)    **Reconstitution**.  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the **"Reconstitution Period"**), the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on terms identical to those set forth in this Agreement.  Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 12.2 hereof.  If such an election is made within the Reconstitution Period, then:

(i)    The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in Section 12.1(a);

(ii)    Unless otherwise agreed to by the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests, the Certificate of Formation and this Agreement shall automatically constitute the Certificate of Formation and Agreement of such new Company.  All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company.  No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided, that the right of the Members to select  a successor manager and to reconstitute and continue the Company's business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

**12.2    Winding Up**.  Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 12.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided, that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Certificate of Formation has been canceled pursuant to the Act.  The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 12.1(b) hereof.  The Liquidator shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 12.7 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)    First, to the payment of the debts and liabilities of the Company (including any loans or advances made by any of the Members to the Company or any of its Subsidiaries), and the expenses of liquidation;

(b)    Second, to the creation of any reserves which the Manager deems reasonably necessary for the payment of any contingent, unliquidated or unforeseen liabilities or obligations of the Company or any of its Subsidiaries or the Members (to the extent the Company is liable therefor) arising out of or in connection with the business and operations of the Company and its Subsidiaries;

(c)    Third, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(d)    Finally, the balance, if any, to the Members, pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 12.2.

12.3    **Liquidating Trust; Reserves**.  In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

(a)    Distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 hereof; or

(b)    Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, *provided* that such withheld amounts shall be distributed to the Members as soon as practicable.

12.4    **Rights of Members**.  Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for the return of its Capital Contribution and has no right or power to demand or receive Property other than cash from the Company.  If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

12.5    **Notice of Dissolution/Termination**.

(a)    In the event a Dissolution Event occurs, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager).

(b)    Upon completion of the distribution of the Company's Property as provided in this Section 12, the Company shall be terminated, and the Liquidator shall cause the filing of the Certificate of Cancellation pursuant to Section 18-203 of the Act and shall take all such other actions as may be necessary to terminate the Company.

12.6    **Character of Liquidating Distributions**.  All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

26

**12.7    The Liquidator**.

(a)    **Definition**.  The **"Liquidator"** shall mean the Manager or a Person appointed by the Manager to oversee the liquidation of the Company.

(b)    **Fees**.  The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this <u>Section 12</u> and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    **Indemnification**.  The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

**12.8    Form of Liquidating Distributions**.  For purposes of making distributions required by <u>Section 12.2</u> hereof, the Liquidator may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

## SECTION 13

## MISCELLANEOUS

**13.1    Notices**.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed, (ii) on the date sent by e-mail of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (iii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members and the Manager:

(a)    If to the Company, to the address determined pursuant to <u>Section 2.4</u> hereof;

(b)    If to the Manager, at the same address of the Company;

(c)    If to a Member, to the address of such Member according to the Company's books and records;

or at such other address of a Person as such Person may furnish to the Company from time to time.

**13.2    Binding Effect**.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, legal representatives, administrators, successors, transferees, and assigns.

**13.3    Effect of Consent or Waiver**.  No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member (or Transferee) in the performance by such other

Member (or Transferee) of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any breach or default by such other Person in the performance by such other Person of the same or any other obligations of such Person hereunder. Failure on the part of any Member to object to or complain of any act or failure to act of any of the other Members (or Transferees) or to declare any of the other Members (or Transferees) in default, regardless of how long such failure continues, shall not constitute a waiver by any such Member of its rights hereunder.

13.4    **Construction**. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

13.5    **Time**. In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

13.6    **Headings and References**. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof. References herein to the singular shall include the plural and to the plural shall include the singular, and references to one gender shall include the other, except where inappropriate.

13.7    **Severability**. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 13.7 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

13.8    **Incorporation by Reference**. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

13.9    **Governing Law**. The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder. To the extent this Agreement is inconsistent with the Act, this Agreement shall govern (to the maximum extent permitted by the Act).

13.10    **Waiver of Jury Trial**. Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement.

13.11    **Specific Performance**. Because Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

28

**13.12   Counterparts; Signatures**.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same document.  This Agreement may be executed and delivered by electronic mail in portable document format (.pdf) and, if executed and delivered in such manner, shall be binding as though an executed original shall have been delivered by hand.

**13.13   Trustee Exculpation**.  When and if this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually but solely as trustee in the exercise of and under the power and authority conferred upon and invested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any party which is a trust to the Company or another party shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

{Remainder of page intentionally left blank.}

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

MEMBERS:

ML RETAIL LLC

By: _____

Marcus Lemonis, Authorized Person

_____

Nicolas Goureau

_____

Stephanie Menkin

THE COMPANY:

ML FASHION, LLC

By: _____

Marcus Lemonis, Manager

30

## EXHIBIT A

### MEMBERS

| Members | Percentage Interest |
|---|---|
| ML Retail LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |
| **Total** | 100.0% |

<u>SCHEDULE A</u>
<u>Officers</u>

Chairman/CEO:                    Marcus Lemonis

President:                       Stephanie Menkin

Chief Financial Officer:         Manish Karna

24649273.3