# EXHIBIT – P –

# REALITY PARTICIPANT AGREEMENT,
# RELEASE & ARBITRATION PROVISIONS - BUSINESS

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including the potential opportunity to appear as a participant in a television series, the selected company *Gooberry Corp.* having its principal place of business at *38 East 29 street NYNY* (the "Company") hereby enters into this Reality Participant Agreement, Release & Arbitration Provisions (the "Agreement") with Machete Corporation("Producer"), in connection with the television series/entertainment production currently titled "THE PROFIT" (the "Series"), which is tentatively scheduled for initial exhibition on one or more television networks or cable platforms of NBCUniversal Media, LLC (the "Network"). In connection therewith, Company represents, warrants and agrees as follows:

1. Company shall follow and obey all rules, instructions, directions, and requirements of Producer and the Network in connection with the Series, and shall participate in any and all activities required by Producer or the Network in connection with the Series, whether before, during, or after production of the Series, on such dates and at such locations as Producer or the Network shall reasonably designate (collectively with any other locations in connection with the Series, the "Locations"). Without in any way limiting the foregoing, Company shall participate in all advertising, publicity and other activities (including, but not limited to, strategic social media campaigns (including but not limited to Facebook, Twitter, etc.), the creation of blogs, vlogs, video diaries, webisodes, e-mails, text/picture messages, and promotional/advertising spots for the Series, tradeout or product integration partners, the exhibitor of the Series, its advertisers and sponsors and any of their respective products and services) in and in connection with the Series as requested by Producer or the Network.

1A. Company hereby acknowledges and agrees it is not under any obligation to any television network, producer, or other party which would in any way prohibit or restrict Company from participating in the Series as contemplated hereunder. Company's participation in the Series (if any) and the use of the Material (as defined in Paragraph 7(a) below) by Producer or anyone else will not violate or infringe upon any rights of any third party and will not cause Company to be in breach or violation of any agreements to which Company is a party.

The following are ALL of the television shows on which Company has EVER participated or appeared: **(Please include any appearances that have been recorded, but have not been exhibited. If none, please state "None" in the space below.)**

| Name of Show | Tape Date | Air Date |
|---|---|---|
| THE PROFIT | | |
| | | |

1B.

(i) Company Participation: Company acknowledges and agrees that its participation is conditioned upon verification of its representations and warranties as set forth in "The Profit Application" executed on [Insert Date] (the "Application"), to which reference is hereby made, and to which Company attests is a clear and accurate representation of its legal and financial position. For the applicable episode(s) of the Series featuring Company ("Episode(s)"), Company hereby grants Producer and Marcus Lemonis ("Lemonis") and any of Lemonis's authorized representatives ("Lemonis Representatives") access to the business, its books and records and its personnel in accordance herewith and in connection with Lemonis' potential provision of his consulting and management services to and potential investment in the Company (as more thoroughly described and defined herein below). Company further agrees to grant Lemonis the irrevocable right during the Episodes to advise and counsel Company by providing suggestions and any other general consultation to Company about its business and other matters through principal photography of the applicable Episode(s) ("Consultation Period"), which is currently estimated to be a seven (7) day period. Company acknowledges that Lemonis' consultation is a good faith attempt to rehabilitate the Company beyond the Company's involvement with the Series and Company agrees to use its best efforts to adhere to Lemonis' advice during the Episodes. In addition, Producer, directly or through others (including, without limitation, Lemonis), may provide advice and suggestions to Company and others about the operations of Company's business and other matters. Notwithstanding the foregoing, any reliance by Company on the advice or

Page 1

Initialed: ML

suggestions provided to it by Producer and/or Lemonis (directly or indirectly and whether before, during or after the Episodes) in connection with the Series shall be at Company's own risk. Company further acknowledges that there are no warranties or guarantees of any kind from anyone (including, without limitation, Producer and Lemonis) regarding such advice and suggestions and Company assumes all risks (including, without limitation, Company or Company's employees' or contractors' demotion, transfer, promotion, suspension, termination, and any change in said role or compensation/wages) in the event that Company or any its owners, employees, agents or other individual or entity chooses to follow or act upon such suggestions or advice (if at all). Upon completion of the Consultation Period, Company shall enter into good faith negotiations with Lemonis regarding a potential Actual Investment and Equity Stake (as defined and further set forth below in Section 1B(iii)) and Lemonis shall relinquish his involvement in the Company except in connection with any such Actual Investment and Equity Stake.

(ii) Simulated Investment: Subject to the Company's compliance with the terms set forth above in Section 1B(i), Lemonis shall have the right to make a simulated capital investment in or loan to the Company during the applicable Episode, in an amount to be determined by Lemonis in his sole discretion (the "Simulated Investment"). Company acknowledges Lemonis will perform the Simulated Investment transaction on-air during such applicable Episode for the purposes of portraying a dramatic moment. By way of example, and without limiting the foregoing sentence, Lemonis may present Company with a prop check during the applicable Episode. Lemonis shall thereafter promptly enter into good faith negotiations with Company off-air regarding any Actual Investment and/or Loan Transaction (as defined below) following the Consultation Period and may present a term sheet setting forth the anticipated terms of the Actual Investment and/or Loan Transaction ("Term Sheet") during the Consultation Period, which Term Sheet may set forth the terms of the on air Simulated Investment and/or Loan Transaction and which may be binding if specifically set forth therein Notwithstanding such Simulated Investment, Company acknowledges it is Lemonis' good faith intention to actually invest in and/or loan funds to the Company; provided, however, that Company's receipt of any Actual Investment and/or Loan Transaction (as defined below) is pursuant to the terms and conditions of Section 1(B)(iii) below. Without limiting the foregoing regarding such Simulated Investment, during the Consultation Period, Lemonis may at his sole discretion elect to incur expenses to improve Company's business or property, including without limitation making an out-of-pocket discretionary purchase for the benefit of Company or making a capital contribution and/or loan to the Company independent from the Simulated Investment and/or the Actual Investment and/or Loan Transaction as defined below ("Discretionary Improvement(s)"). Any Discretionary Improvement(s) made by Lemonis, unless otherwise set forth in the Term Sheet, shall become the sole property of the Company and is non-refundable.

(iii) Actual Investment/Equity Stake/Loan Transaction: Following the Consultation Period, Lemonis and Company shall negotiate in good faith, in private and off camera, with respect to a potential separate agreement between Lemonis (or any entity owned and controlled by Lemonis) and Company with respect to the amount and mode of any applicable actual investment (which may differ from the Simulated Investment and/or Term Sheet (the "Actual Investment")) in exchange for Lemonis (or any entity owned and controlled by Lemonis) taking an equity stake of ownership in the Company ("Equity Stake") and/or loan transaction whereby Lemonis (or any entity owned and controlled by Lemonis) shall loan sums of money to the Company upon terms and conditions mutually agreeable with the Company and Lemonis (or any entity owned and controlled by Lemonis) (the "Loan Transaction"). For the purposes of clarification and by way of example, such modes of Actual Investment or Loan Transaction, as the case may be, of cash or a cash equivalent may include but are not limited to cash investment, debt acquisition or loan etc., as determined by Lemonis and Company in that separate agreement. All terms (including without limitation, acquiring entity, amounts of investment, mode of investment, percentage of ownership, amount and terms of the loan(s) etc.) applicable to the Actual Investment and Equity Stake and/or Loan Transaction shall be strictly a matter of agreement between the Company and Lemonis (or any entity owned and controlled by Lemonis) and neither Producer nor Network shall have (a) any involvement therein, control or right of control thereof; or (b) any obligations to Company in connection therewith; provided, however, that Network shall be provided with a statement from Lemonis as to whether an Actual Investment/Equity Stake and/or Loan Transaction was made.

2. Neither Producer nor anyone else will provide Company with any compensation for Company's participation in and in connection with the Series unless otherwise agreed in writing between Producer and Company. Company acknowledges and agrees that a significant element of the consideration Company is receiving under this Agreement is the publicity Company may receive if Producer includes Company or the Material (defined below) in the Series and/or the

Page 2

Initialed: _NM_

Advertisements. To the extent that Company receives any consideration or payment of any kind, which may include, but not be limited to, goods or services, in connection with the Series, it shall be responsible for all taxes and other obligations that are or may become due based on its receipt of such consideration or payment.

3. Producer and the Network are not obligated to have Company appear on the Series. To the maximum extent permitted by law, Producer and the Network may remove or replace Company for any reason whatsoever, or for no reason, as determined in Producer's or Network's sole discretion. Producer and the Network are not obligated to broadcast, exhibit or otherwise use or exploit all or any part of the Series. Producer and the Network may delay, suspend, terminate or abandon production of the Series at any time, for any reason or for no reason, as determined in Producer's or Network's sole discretion without any obligation to Company whatsoever, other than as may be expressly set forth in this Agreement, or in any other agreement Company may execute with Producer or the Network in connection with the Series.

4. Company shall not mention or "plug" any product, service, venture or thing on the Series whatsoever, other than the Company's business and products as shown in context of the Series. Company has not given or agreed to give anything of value to anyone to be a participant in the Series, has not accepted or agreed to accept anything of value to promote any products, services or ventures in connection with the Series, and shall not do any of the foregoing in the future. Company hereby acknowledges that Producer and the Network do not permit any such conduct, and that it may be a federal offense to withhold such information from Producer and/or the Network if Company has done so.

5. Company shall not use, nor shall it authorize any others to use, any of Producer's, the Network's or Lemonis's names, logos, trade names or trademarks (including the title of the Series), or those of any of Producer's, the Network's or Lemonis's related or affiliated companies, for any purpose or in any manner whatsoever at any time, without Lemonis's, Producer's and the Network's advance written consent.

6. Company hereby represents, warrants and covenants the following:

(a) Company is duly authorized to execute this Agreement and grant the rights granted hereunder;

(b) No other person or entity, including without limitation any owner, equity holder, debt holder, board member, principal or government entity, has the right to prevent Company from entering into this Agreement or participating in the Series or to prevent Company from granting the rights granted herein;

(c) Company owns and controls all rights in and to the ideas, products, services or businesses that Company presents in the course of its participation in the Series;

(d) The consent of no other person or entity is required to enable Producer to use Company's intellectual property (including without limitation any applicable copyrights, trademarks, trade names, logos or any other identifying insignia) (the "Intellectual Property") as described herein;

(e) Producer and/or Network's use of Company's Intellectual Property hereunder will not violate the rights of any third party;

(f) Producer and/or Network shall have the right to use Company's Intellectual Property free and clear of any claims for royalties, residuals or other compensation, either by virtue of this Agreement or any applicable guild or union agreement, which Company acknowledges does not govern its relationship with Producer;

(g) Company and each of its owners and employees who may participate in the Series has answered any and all questionnaire and application questions in connection with their involvement, completely, honestly and accurately;

(h) Company will follow and obey all local, city, state and federal laws, including those governing the standards and practices of Company's industry (e.g., requirement of a license), if any, and those governing the activities in which Company will participate in connection with the Series;

(i) Company has all necessary licenses (if any) required to perform the activities in which Company will participate in connection with the Series and it will provide Producer with a copy of any such license and any other proof that Producer may require upon Producer's request; and

(j) Company will conduct itself at all times before, during, and after its participation in the Series in compliance with all applicable federal, state and local laws, and Company is responsible for any violation due to its actions or omissions.

Page 3

Initialed: _MM_

(k) Company is a __C Corp.__ (insert type of entity), duly formed and authorized by the State of __New York__.
(l) Company is owned by the following individual(s) __Nicolas Goreau 100%__

7. In consideration of Producer's considering Company for inclusion as a participant in the Series, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Company irrevocably grants, assigns and conveys the following rights, regardless of whether it appear in the Series:

(a) Producer and the Network shall have the right to videotape, audiotape, film, portray, photograph and otherwise record Company, its owner(s), employees (subject to obtaining the required releases) and the location (as set forth in Exhibit A attached hereto and incorporated by reference) in connection with the Series, as often and for such periods of time as they may require (whether before, during and/or after the date of this Agreement). Any such recordings, and all information Company has supplied in its representations, disclosures, application (if any) and agreements or otherwise, all materials it has provided or may provide, all other information Producer has received or will receive from other sources about Company, the results and proceeds of its participation in the Series, and any reproductions or recordings of any nature of any of the foregoing, in whole or in part, are collectively referred to herein as the "Material."

(b) Producer shall be the sole and exclusive owner of all rights (including, without limitation, copyrights and rights of publicity) in and to the Material. Any and all such Material is copyrightable and shall be deemed "works made for hire" specially ordered as part of a motion picture or other audio-visual work. To the extent Company retains any interest in the Material, Company hereby grants and assigns to Producer all rights of any nature in and to all such Material. These rights include, but are not limited to, the rights to use, broadcast, exhibit, distribute, advertise, publicize, promote or otherwise exploit the Series (including the Material) and all subsidiary, allied and ancillary rights in or related to the Series (including, without limitation, remake, sequel, theatrical, digital, television, radio, publishing, merchandising, soundtrack album and other similar rights), for any purpose, by and in any and all media whether now known or hereafter devised, throughout the universe, in perpetuity, whether as part of the Series or otherwise. The rights granted to Producer also include, but are not limited to, the rights to edit, cut, rearrange, adapt, dub, revise, modify, fictionalize, or otherwise alter the Material, and Company hereby waives the exercise of any "moral rights," "*droit moral*," and any analogous rights, however denominated, in any jurisdiction of the world, which it has. Furthermore, the rights granted to Producer include any so-called "rental and lending" or similar rights.

(c) Producer and the Network shall have the perpetual and worldwide right to use any and all of Company's Intellectual Property in and in connection with the development, production, exhibition, advertising, publicity, promotion, merchandising and any other exploitation of the Series, including without limitation in the exercise of all subsidiary, allied and ancillary rights (including, without limitation, remake, sequel, theatrical, digital, television, radio, publishing, merchandising, soundtrack album and other similar rights), for any purpose, by and in any and all media whether now known or hereafter devised, throughout the universe, in perpetuity, whether as part of the Series or otherwise.

(d) Producer and the Network shall have the right to place concealed cameras and other devices on the Location and record the Company using such cameras and devices. Company hereby consents to any such recordings made using concealed cameras or any other devices. Company need not be given any further notice of the use of concealed or hidden cameras and other devices being used to record its actions and statements.

(e) To the maximum extent permitted by law, Producer and the Network shall have the right to use all information obtained about Company in connection with the Series or otherwise. Without in any way limiting the foregoing, Company and others may reveal or relate information of a personal, private, surprising, defamatory, disparaging, embarrassing or unfavorable nature, and Company's actions and the actions of others appearing in the Series may be embarrassing or of an otherwise unfavorable nature that may be factual or fictional. Company understands that Company's business's appearance, depiction, and portrayal in connection with the Series or otherwise, may be disparaging, defamatory, embarrassing or of an otherwise unfavorable nature, may expose Company to public ridicule, humiliation or condemnation, and may portray Company in a false light. Company understands and acknowledges that while such conduct might otherwise constitute an actionable tort, it has freely and knowingly consented to such conduct. Notwithstanding the foregoing, Producer shall have no right to use any information that Company discloses with regards

Page 4

Initialed: ____

to the confidential Settlement Agreement and Mutual General Release, dated as of July 1, 2013, by and among Olivier Goureau and Olivier Goureau, Inc., on one side, and Sacha Goureau, Nicolas Goureau, Noemi Goureau, Gooberry Corp. and Fopps, Inc., on the other side, in connection with the Series or otherwise.

(f) Producer shall have the exclusive and irrevocable option to film or tape one or more additional episodes, including, without limitation, a follow up episode, a "making of," or casting program or series (the "Special Episodes"), to be produced within three (3) years after the initial exhibition of the final episode of the Series (the "Special Episodes Option"). Producer shall exercise the Special Episodes Option, if at all, in writing at least ten (10) days prior to the commencement date of principal photography or taping of the Special Episodes. In the event that Producer exercises the Special Episodes Option, Company shall participate in production of the Special Episodes for a period to be determined by Producer, at one or more Locations, and shall participate in the Special Episodes to the same extent and degree that it has agreed to participate in the Series. Company grants Producer all rights in the Special Episodes as if the same had been included in the Material, and all other provisions of this Agreement, as well as all other documents and agreements that Company has executed or that it may execute in connection with the Series, shall apply equally to Company's participation, if any, in and in connection with any Special Episodes.

(g) Company agrees to concurrently execute the Location Contract, attached hereto as <u>Exhibit A</u> and incorporated by reference herein, which shall grant Producer and the Network the right (without limitation) to enter upon and the business (the "Property") for the purpose of photographing, filming, and recording the Series, as further detailed in such Location Contract.

(h) Company agrees to use its best efforts to assist Producer in obtaining appearance releases from all owners, employees and independent contractors working in the business in connection with the Series and acknowledges that Producer may elect at any time to discontinue Company's participation in the Series in the event any of the foregoing individuals do not sign the required appearance release.

8. If Company appears in the Series, the Network shall have the right and option to require Company to participate in any future unscripted, "reality-based" programs in which Company appears conducting its business operations (the "Reality Hold"), according to the following terms and conditions:

(a) From the date of this Agreement through twelve (12) months after the initial exhibition of the final episode of the cycle of the Series in which Company appears (the "Reality Hold Period"), Company shall be exclusively available to the Network to participate, and shall participate as reasonably required, in any unscripted, "reality-based" programs in which Company appears conducting its business operations, as designated by the Network and pursuant to the terms of this Agreement.

(b) During the Reality Hold Period Company shall not participate in any unscripted, "reality-based" program in which Company appears conducting its business operations without the Network's written consent.

9. Company authorizes Producer and the Network to, in accordance with applicable law, investigate, access and collect information about Company and any of the statements made by it in this Agreement or otherwise in connection with Company's application (if any) to participate in the Series. Without in any way limiting the foregoing, any such information may be used, broadcast, exhibited, distributed, advertised, publicized, promoted or otherwise exploited as part of the Series or otherwise, to the maximum extent permitted by law.

10. Producer, directly or through others, may provide various services and equipment in connection with the Series. No one has made any warranties whatsoever with respect to any such equipment and services, including, but not limited to, instruments or tools used in Company's business or in executing Company's services and there are no warranties of any kind from anyone regarding fitness or suitability for use of any such equipment and services for any purpose in connection with the Series. Company waives any right it otherwise might have to warnings or instructions regarding any aspect of the Series or any equipment or services utilized in connection with the Series.

11. <u>RELEASE AND AGREEMENT NOT TO SUE.</u> TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY IRREVOCABLY RELEASES EACH OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, ACTIONS,

Page 5

Initialed: _____

DAMAGES, LIABILITIES, LOSSES, COSTS AND EXPENSES OF ANY KIND (INCLUDING ATTORNEYS' FEES AND COSTS) (COLLECTIVELY, "CLAIMS") ARISING OUT OF, RESULTING FROM, OR BY REASON OF COMPANY'S PARTICIPATION IN CONNECTION WITH THE SERIES OR THE EXERCISE OF ANY RIGHT GRANTED HEREIN, ON ANY LEGAL OR EQUITABLE THEORY WHATSOEVER (INCLUDING WITHOUT LIMITATION, PERSONAL INJURY, PROPERTY DAMAGES, NEGLIGENCE, RIGHTS OF PRIVACY AND PUBLICITY, DEFAMATION, FALSE LIGHT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, BREACH OF CONTRACT, DISCRIMINATION, AND COPYRIGHT INFRINGEMENT) (COLLECTIVELY, THE "RELEASED CLAIMS"). TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY ALSO AGREES NOT TO SUE OR INSTITUTE ANY OTHER LEGAL PROCEEDINGS AGAINST ANY OF THE RELEASED PARTIES BASED ON ANY OF THE RELEASED CLAIMS HEREUNDER. Without limiting the foregoing in any way, the Released Claims shall include any Claims arising out of any advice provided to Company by Lemonis or Producer, directly or through others or relied upon by Company, in whole or in part, or actions taken by Lemonis or any of his Representatives during the Consultation Period about the operations of Company's business or otherwise, including, without limitation, any advice or suggestions or reliance thereon or actions concerning the dismissal, transfer, demotion, promotion, suspension or termination of any employee or independent contractor in Company's business or any change in their role or compensation/wages or the actual dismissal, transfer, demotion, promotion suspension or termination (if any) of any employee or independent contractor or any change in their role or compensation/wages. The Released Claims shall also include, without limitation, any Claims arising out of any changes (whether physical or non-physical) made by Producer and/or Lemonis to Company's business (which it hereby authorizes Producer and/or Lemonis to make in Producer's and Marcus Lemonis' sole discretion). As used above, the term "Released Parties" shall mean and refer to Producer, the Network, CNBC Media Productions LLC, CNBC LLC, NBC Universal Media LLC, Lemonis, all television stations and channels, cable networks and satellite networks that broadcast or otherwise exhibit the Series, the other participants in the Series, all sponsors, product integration partners, tradeout partners and advertisers connected with the Series, all other persons and entities connected with the Series, the respective parents, subsidiaries, affiliates, related entities, licensees, successors and assigns of each of the foregoing, each of their respective directors, officers, employees, agents, contractors, partners, shareholders, representatives and members, and each of their respective heirs, next of kin, spouses, guardians, legal representatives, executors, administrators, successors, licensees and assigns.

12. THERE IS A POSSIBILITY THAT AFTER THE EXECUTION OF THIS AGREEMENT, COMPANY MAY DISCOVER FACTS OR INCUR OR SUFFER CLAIMS THAT WERE UNKNOWN OR UNSUSPECTED AT THE TIME COMPANY EXECUTED THIS AGREEMENT, AND WHICH, IF KNOWN BY COMPANY AT THAT TIME, MAY HAVE MATERIALLY AFFECTED COMPANY'S DECISION TO EXECUTE THIS AGREEMENT. BY REASON OF THIS AGREEMENT AND THE RELEASES CONTAINED HEREIN, COMPANY HAS ASSUMED ANY RISK OF SUCH UNKNOWN FACTS AND SUCH UNKNOWN AND UNSUSPECTED CLAIMS. COMPANY IS AWARE OF THE EXISTENCE OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

NOTWITHSTANDING THIS PROVISION, THIS RELEASE SHALL CONSTITUTE A FULL, FINAL, AND COMPLETE RELEASE, ACCORD AND SATISFACTION OF EACH AND EVERY OF THE RELEASED CLAIMS THAT COMPANY HAVE OR MAY HAVE, AT ANY TIME, AGAINST ANY OF THE RELEASED PARTIES. TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY KNOWINGLY AND VOLUNTARILY WAIVES THE PROVISIONS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, AS WELL AS ANY OTHER STATUTE, LAW OR RULE OF SIMILAR EFFECT OF ANY OTHER JURISDICTION THROUGHOUT THE WORLD, AND ACKNOWLEDGES AND AGREES THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS RELEASE. COMPANY UNDERSTANDS THE SIGNIFICANCE AND CONSEQUENCE OF THE RELEASES IT HAS MADE HEREIN, AND OF COMPANY'S WAIVER OF ANY RIGHTS IT MAY HAVE UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE AND ANY OTHER SIMILAR STATUTES, LAWS AND RULES.

13. To the maximum extent permitted by law, Company shall defend, indemnify and hold free and harmless each of the Released Parties from and against any and all Claims caused by or arising out of Company's participation in connection with the Series, including, without limitation, any one or more of the following (a) any statement made or action taken by Company or anyone else during or in connection with Company's participation on the Series, whether or not authorized by Producer or the Network; (b) following or refusing to follow the advice or suggestions of Producer, Lemonis or anyone connected with the Series, including without limitation, any Claims by Company's employees or independent contractors related to their dismissal, transfer, demotion, promotion, suspension or termination or any change

Page 6

Initialed: _MDL_

in their role or compensation/wages (if at all); (c) any actions taken or inaction by Lemonis during the Consultation Period, including without limitation, any Claims by Company employees or independent contractors related to their dismissal, transfer, demotion, promotion, suspension or termination or any change in their role or compensation/wages (if at all), (d) any loss of clients, negative business impact, or compensation/wages or damage to Company's reputation or image or damage to Company's business reputation or image arising under Company's participation in the Series or adherence to any advice, directly or indirectly, provided by Lemonis to the Company during the Consultation Period; (e) Company's breach of this Agreement or any other agreements related to the Series; (f) Company's receipt, possession or use of any consideration received in connection with the Series, or Company's failure to pay taxes with respect to any such consideration; (g) Company's violation of any applicable state laws, federal laws or local municipal ordinances, whether civil or criminal, in connection with the Series; (h) Company's violation or infringement upon the rights of any third party; and (i) any claims or damages arising from the breach of this Agreement or Company's breach of any other agreements to which it is a party.

    14. All publicity in connection with the Series is under the sole control of the Network and subject to the following terms and conditions of publicity and confidentiality:

    (a) EXCEPT AS OTHERWISE PERMITTED BY THE NETWORK, COMPANY SHALL NOT USE OR DISCLOSE TO ANY PARTICIPANT OR ANY OTHER PARTY AT ANY TIME (INCLUDING, WITHOUT LIMITATION, OTHER PARTICIPANTS OR POTENTIAL PARTICIPANTS IN THE SERIES) (I.E., PRIOR TO, DURING, OR AFTER THE TAPING OR EXHIBITION OF ANY EPISODE OF THE SERIES), AND SHALL KEEP IN THE STRICTEST CONFIDENCE, ANY INFORMATION THAT COMPANY MAY READ, HEAR OR OTHERWISE ACQUIRE OR LEARN AS A RESULT OF COMPANY'S PARTICIPATION IN CONNECTION WITH THE SERIES (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH THE PRODUCTION OF THE SERIES) (COLLECTIVELY, THE "CONFIDENTIAL INFORMATION") UNLESS AND UNTIL SUCH CONFIDENTIAL INFORMATION IS SPECIFICALLY DISCLOSED IN THE BROADCAST OR OTHER EXHIBITION OF THE SERIES, IF EVER. THE CONFIDENTIAL INFORMATION IS THE EXCLUSIVE PROPERTY OF PRODUCER OR THE NETWORK. COMPANY SHALL NOT AT ANY TIME, DIRECTLY OR INDIRECTLY, DIVULGE IN ANY MANNER, OR USE OR PERMIT OTHERS TO USE, ANY OF THE CONFIDENTIAL INFORMATION, INCLUDING WITHOUT LIMITATION, THE TERMS AND CONDITIONS OF THIS AGREEMENT, UNLESS EXPRESSLY PERMITTED BY THE NETWORK, IN WRITING.

    (b) From the date of this Agreement through one (1) year after the initial exhibition of the final episode of the Series in which Company appears, it shall not grant any interviews or participate in any publicity activities, nor shall Company participate in any way in any other television or radio programming, commercials or advertisements, or in any print media, Internet/on-line services, or any other media outlet, whether now known or hereafter devised, in connection with the Series or otherwise, other than on the Network (or any media outlet owned or operated by the Network), without the Network's prior written approval. Notwithstanding the foregoing, the Special Episodes Option and the Reality Hold, as set forth above, shall govern any participation by Company in any other unscripted, "reality-based" programs.

    (c) Except as otherwise required or permitted by the Network, Company shall not advertise or promote its participation in the Series or receive or generate any monetary advantage from Company's participation in the Series, nor shall Company authorize any others to do so. Without in any way limiting the foregoing, Company shall not at any time prepare or assist in the preparation of any written, audio or visual work (including, without limitation, any book, blog, vlog, video on YouTube, or post or message on Facebook, Twitter, MySpace, Vimeo, etc.) or participate in any social media that depicts, concerns or relates in any way to Company's participation in or in connection with the Series. In addition, Company shall not consent to any publicity relating in any way to its involvement in or appearance on the Series, without the prior written approval of the Network.

    (d) Company recognizes and acknowledges that given the unique nature of the Series, its success depends upon confidentiality. As a result, any actual or anticipated breach by Company of subsections (a), (b) or (c) of this paragraph would cause Producer and the Network irreparable injury and damage that cannot be reasonably or adequately compensated by money damages in an action at law. Therefore, Producer and the Network shall be entitled to injunctive and other equitable relief (without posting bond) to prevent or cure any such breach or threatened breach. Company also recognizes that proof of damages suffered by Producer and the Network in the event of any such breach would be extremely costly, difficult and inconvenient. Accordingly, in the event that Company breaches subsection (a), (b) or (c) of this paragraph before the initial exhibition of the final episode of the Series, Company shall pay Producer and the Network

Page 7

Initialed: *MX*

the sum of One Million U.S. Dollars ($1,000,000.00) for each such breach, plus disgorgement of any income that I Company receives in connection with any such breach, as liquidated damages. This amount is a reasonable estimate of the amount of damages Producer and the Network are likely to suffer in the event of any such breach before the initial exhibition of the final episode of the Series, considering all of the circumstances existing as of the date of this Agreement. In the event that Company breaches subsection (a), (b) or (c) of this paragraph after the initial exhibition of the final episode of the Series, Company shall pay Producer and the Network the sum of One Hundred Thousand U.S. Dollars ($100,000.00) for each such breach, plus disgorgement of any income that Company may receive in connection with any such breach, as liquidated damages. This amount is a reasonable estimate of the amount of damages Producer and the Network are likely to suffer in the event of any such breach after the initial exhibition of the final episode of the Series, considering all of the circumstances existing as of the date of this Agreement.

(e) Company's obligations with respect to confidentiality and publicity as set forth in this paragraph shall continue in perpetuity, or until terminated by the Network in writing. In no event shall Company have the right to terminate Company's confidentiality obligations under this Agreement.

15. This Agreement is personal to Company and is not assignable by it, and any purported assignment by Company shall be null and void *ab initio*.

16. This Agreement, and the benefits and rights granted hereunder, are freely assignable by Producer, the Network, the Released Parties and any of their respective assignees and licensees.

17. The Network is a party to this Agreement to the extent that it is entitled to any benefits or rights hereunder. In addition, to the extent that the Network is not a party to any provisions of this Agreement, it is an express, intended third party beneficiary of this Agreement, with full standing to enforce each, every, any and all of its provisions as if it was an express party thereto. Lemonis is a party to this Agreement to the extent that he is entitled to any benefits or rights hereunder, In addition, to the extent that Lemonis is not a party to any provisions of this Agreement, he is an express, intended third party beneficiary of this Agreement, with full standing to enforce each, every, and any and all of its provisions to which he is an intended beneficiary as if he was an express party thereto.

18. Nothing contained in this Agreement shall be deemed to constitute an employment relationship, joint venture, or partnership between Producer and Company, or between the Network and Company, or between Lemonis and Company nor shall Company be deemed Lemonis's, Producer's or the Network's agent for any purpose.

19. This Agreement is intended to operate and be construed as broadly as possible under applicable law. Accordingly, to the extent applicable law would limit this Agreement in any way, or invalidate any provisions hereof, any such limitations or invalid provisions shall not operate to invalidate this Agreement in its entirety. Rather, in any such instance, this Agreement shall be deemed to operate and to be effective to the maximum extent permitted by law, provided, however, that the Agreement shall be voidable at the sole discretion of Producer or the Network should the aggregate of all such provisions found to be invalid or unenforceable materially affects the benefits and obligations of the parties to this Agreement as a whole. All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be in addition to, and shall not limit, any other remedies, rights, undertakings, obligations or agreements of either party. In addition, the promises, agreements, obligations and releases made in this Agreement shall be in addition to, and shall not be limited in any way by, any agreements Company may sign with any outfitters, contractors, suppliers or other third parties in connection with Company's participation in the Series. No waiver of any breach of or default under any provision hereof shall be deemed a waiver of such provision, or of any subsequent breach or default.

20. Company has had the opportunity to review this Agreement before signing it. This Agreement shall not be construed in favor of or against any party by reason of the drafting of all or any part of this Agreement.

21. No one has made any promise, representation or warranty whatsoever that is not contained in this Agreement to induce Company to execute this Agreement, whether express or implied, oral or written. Company has not executed this Agreement in reliance on any promise, representation, or warranty not contained herein. Company further acknowledges that it shall not rely on any verbal or written promises, agreements, or understandings made by the production team or the host of the Series or others, which are not set forth in this Agreement or a written amendment hereto. This Agreement, the exhibits and attachments hereto (including, without limitation, Exhibits A), Company's applications, and any other agreements or documents that Company has executed or that it may execute at the request of

Page 8

Initialed: _MSG_

Producer or the Network in connection with the Series constitute the entire agreement and understanding between Company, Producer and the Network concerning the subject matter of this Agreement, supersede and replace all prior negotiations, proposed agreements and agreements, written and oral, relating thereto, and cannot be changed or terminated except by a written instrument signed by Company and Producer. Any verbal or written promises, agreements, or understandings made by the production team or the host of the Series or others, including Lemonis, shall not be binding unless set forth in writing in an amendment to this Agreement which is signed by a duly authorized representative of Producer and/or Lemonis, as the case may be. In the event of any inconsistency between the terms, conditions and obligations set forth in any applications, agreements or other documents Company have or may complete or execute at the request of Producer or the Network, on the one hand, and this Agreement, on the other hand, the terms, conditions and obligations set forth in this Agreement shall govern unless otherwise provided.

22. This Agreement shall bind and inure to the benefit of Company, Producer, the Network, the Released Parties, each of Company's and their respective parent, subsidiary and affiliated companies, and each of Company and their respective successors, assigns, licensees, heirs, next of kin, spouses, legal representatives, administrators, executors, and guardians.

23. Company shall execute and deliver to Producer or the Network any other documents that Producer or the Network consider necessary or desirable to evidence, effectuate or enforce the terms, conditions, intent or purpose of this Agreement.

24. This Agreement shall be deemed to be entered into in Los Angeles County, California, and shall be governed by and interpreted in accordance with the substantive laws of the State of California without regard to that state's choice of law provisions. Company consents to the exclusive personal jurisdiction and venue of any state or federal court located in the County of Los Angeles, California to the extent that any court proceedings are commenced; provided, however, that the foregoing shall not in any way diminish or limit the mediation and arbitration provisions set forth below.

25. Company certifies that it has made such an investigation of the facts pertinent to this Agreement and of all the matters pertaining thereto as it has deemed necessary, that it fully understands the contents of this Agreement and that it intend to be legally bound by this Agreement.

26. All statements and representations made by Company in this Agreement are true. The legal entity given below is its current legal entity, any other names it has used in the past are also noted below, and all other information furnished below is current and accurate. If Company's name, address, telephone numbers, or email addresses change at any time, it shall immediately notify Producer in writing.

27. Company has the full right, power and authority to grant the rights granted in this Agreement. This Agreement may be executed by original, facsimile or electronic signatures. Any signed copy of this Agreement delivered by facsimile or electronic transmission shall for all purposes be treated as if it had been delivered containing Company's original signature, and shall be binding upon Company in the same manner as though an original signed copy had been delivered.

28. Notwithstanding anything to the contrary set forth above, Company shall have the right to revoke this Agreement, in its entirety, by so notifying Producer in writing by certified mail, return receipt requested, addressed to Machete Corporation, Attn: Jessica Bergman, Myman Greenspan, Fineman Fox Rosenberg & Light LLP, 11601 Wilshire Blvd, Suite 2200, Los Angeles, CA 90025, and postmarked not later than three business days after the date of Company's execution of this Agreement. In the event of such revocation, this Agreement shall be null and void; however, any other agreements executed by Company shall remain in full force and effect.

## MEDIATION, ARBITRATION & LIMITATION OF REMEDIES.

29. MEDIATION. THE PARTIES AGREE THAT IF ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE BREACH OF ANY TERM HEREOF, OR COMPANY PARTICIPATION IN OR IN CONNECTION WITH THE SERIES CANNOT BE SETTLED THROUGH DIRECT DISCUSSIONS, THE PARTIES AGREE TO ENDEAVOR FIRST TO SETTLE THE CONTROVERSY OR CLAIM BY MEDIATION CONDUCTED IN THE COUNTY OF LOS ANGELES AND ADMINISTERED BY JAMS OR ITS SUCCESSOR ("JAMS") UNDER ITS APPLICABLE RULES, BEFORE COMMENCING ANY PROCEEDINGS UNDER THE PROCEDURES SET FORTH IN PARAGRAPH 32 BELOW. NOTWITHSTANDING THE FOREGOING, IF ANY PARTY FILES SUIT IN COURT, THE OTHER PARTY OR PARTIES NEED NOT

Initialed: _____

DEMAND MEDIATION TO ENFORCE THE RIGHT TO COMPEL ARBITRATION.

30. **ARBITRATION.** THE PARTIES AGREE THAT IF ANY CONTROVERSY OR CLAIM IS NOT OTHERWISE RESOLVED THROUGH DIRECT DISCUSSIONS OR MEDIATION, AS SET FORTH ABOVE, THEN THE PARTIES AGREE THAT THE CONTROVERSY OR CLAIM, INCLUDING THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, SHALL BE RESOLVED BY BINDING ARBITRATION CONDUCTED IN THE COUNTY OF LOS ANGELES, AND ADMINISTERED BY JAMS IN ACCORDANCE WITH ITS STREAMLINED ARBITRATION RULES AND PROCEDURES OR SUBSEQUENT VERSIONS THEREOF, INCLUDING THE OPTIONAL APPEAL PROCEDURE (THE "JAMS RULES", INCLUDING, WITHOUT LIMITATION, THE RULES PROVIDING FOR LIMITED DISCOVERY AND OTHER EXCHANGE OF INFORMATION). THE JAMS RULES ARE AVAILABLE AT WWW.JAMSADR.COM AND WILL BE PROVIDED TO COMPANY BY PRODUCER UPON COMPANY'S REQUEST. THE JAMS RULES FOR SELECTION OF AN ARBITRATOR SHALL BE FOLLOWED, EXCEPT THAT THE ARBITRATOR SHALL BE AN ARBITRATOR EXPERIENCED IN THE ENTERTAINMENT INDUSTRY AND LICENSED TO PRACTICE LAW IN CALIFORNIA OR A RETIRED JUDGE. PRODUCER SHALL PAY ALL TYPES OF COSTS THAT ARE UNIQUE TO ARBITRATION. ANY APPELLATE PANEL SHALL CONSIST OF THREE NEUTRAL MEMBERS, SUBJECT TO THE FOREGOING REQUIREMENTS. UPON CONCLUSION OF ANY ARBITRATION PROCEEDINGS HEREUNDER, THE ARBITRATOR SHALL RENDER FINDINGS OF FACT AND CONCLUSIONS OF LAW AND A WRITTEN OPINION SETTING FORTH THE BASIS AND REASONS FOR ANY DECISION HE OR SHE HAS REACHED AND SHALL DELIVER SUCH DOCUMENTS TO EACH PARTY TO THE AGREEMENT ALONG WITH A SIGNED COPY OF THE AWARD IN ACCORDANCE WITH SECTION 1283.6 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.

31. **CONFIDENTIALITY OF PROCEEDINGS.** THE PARTIES AGREE THAT ANY MEDIATION OR ARBITRATION PROCEEDINGS, TESTIMONY, OR DISCOVERY, ALONG WITH ANY DOCUMENTS FILED OR OTHERWISE SUBMITTED IN THE COURSE OF ANY SUCH PROCEEDINGS (AND INCLUDING THE FACT THAT THE MEDIATION OR ARBITRATION IS EVEN BEING CONDUCTED) SHALL BE CONFIDENTIAL AND SHALL NOT BE DISCLOSED TO ANY THIRD PARTY EXCEPT TO THE MEDIATORS OR ARBITRATORS AND THEIR STAFF, THE PARTIES' ATTORNEYS AND THEIR STAFF AND ANY EXPERTS RETAINED BY THE PARTIES, OR AS REQUIRED BY LAW. NOTWITHSTANDING THE FOREGOING, A PARTY MAY DISCLOSE LIMITED INFORMATION IF REQUIRED IN ANY JUDICIAL PROCEEDING BROUGHT TO ENFORCE THESE ARBITRATION PROVISIONS OR ANY AWARD RENDERED HEREUNDER.

32. **LIMITATION OF REMEDIES.** THE PARTIES AGREE THAT REMEDIES FOR ANY BREACH OF THIS AGREEMENT, OR ANY OTHER CLAIMS CONCERNING OR RELATING TO THE SERIES, SHALL BE LIMITED TO ACTUAL DAMAGES, AND IN NO EVENT SHALL ANY PARTY BE ENTITLED TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES OR TO RESCIND THIS AGREEMENT OR SEEK OR OBTAIN INJUNCTIVE OR ANY OTHER EQUITABLE RELIEF, EXCEPT THAT PRODUCER AND THE NETWORK SHALL HAVE THE RIGHT TO DO SO AS PROVIDED IN PARAGRAPH 14(D). NOTWITHSTANDING THE FOREGOING, IF AND TO THE EXTENT REQUIRED BY LAW, THE PARTIES AGREE THAT WITH RESPECT TO THE ARBITRATION OF ANY CLAIM NOT OTHERWISE WAIVED HEREIN AND BROUGHT UNDER ANY FEDERAL OR STATE STATUTE THAT MANDATES SPECIFIC TYPES OF UNWAIVABLE REMEDIES, THE ARBITRATOR MAY AWARD ANY REMEDY MANDATED BY SUCH STATUTE.

33. **PROTECTION OF CONFIDENTIALITY AND INTELLECTUAL PROPERTY.** NOTWITHSTANDING PARAGRAPH 34 AND NOTWITHSTANDING THE REQUIREMENTS SET FORTH IN PARAGRAPHS 31 AND 32 ABOVE, COMPANY RECOGNIZES AND ACKNOWLEDGES THAT GIVEN THE UNIQUE NATURE OF THE SERIES AND THE COMMERCIAL REALITIES OF THE ENTERTAINMENT INDUSTRY, WHICH RELY UPON CONFIDENTIALITY AND INTELLECTUAL PROPERTY RIGHTS, ANY ACTUAL OR ANTICIPATED BREACH OF COMPANY'S PUBLICITY OR CONFIDENTIALITY OBLIGATIONS PURSUANT TO THIS AGREEMENT, OR ANY INFRINGEMENT BY COMPANY OF PRODUCER'S OR THE NETWORK'S INTELLECTUAL PROPERTY RIGHTS WOULD CAUSE PRODUCER AND THE NETWORK IRREPARABLE INJURY AND DAMAGE THAT CANNOT BE REASONABLY OR ADEQUATELY COMPENSATED BY MONEY AND, THEREFORE, COMPANY HEREBY AGREES THAT PRODUCER AND THE NETWORK SHALL ALSO BE ENTITLED TO SEEK AND OBTAIN INJUNCTIVE AND OTHER EQUITABLE RELIEF FROM ANY COURT OF COMPETENT JURISDICTION FOR ANY SUCH BREACH OR INFRINGEMENT.

34. **SEVERABILITY.** IF ANY PORTION OF THE DISPUTE RESOLUTION MECHANISM SET FORTH IN PARAGRAPHS 29 THROUGH 34 IS FOUND TO BE INVALID, ILLEGAL OR UNENFORCEABLE FOR ANY REASON, THAT PORTION SHALL BE SEVERED FROM THE REST AND SHALL NOT AFFECT THE PARTIES' AGREEMENT TO RESOLVE ALL CONTROVERSIES AND CLAIMS THROUGH MEDIATION AND ARBITRATION.

Page 10
Initialed: _____

COMPANY HAS HAD AMPLE OPPORTUNITY TO READ, AND HAS IN FACT READ, THIS ENTIRE AGREEMENT. COMPANY HAS ALSO HAD AN OPPORTUNITY TO REVIEW IT WITH AN ATTORNEY OF COMPANY'S CHOICE SHOULD IT ELECT TO DO SO. COMPANY FULLY UNDERSTAND ALL OF ITS RIGHTS, OBLIGATIONS, PROMISES AND AGREEMENTS. IN PARTICULAR, IT UNDERSTANDS THAT IT IS GIVING UP CERTAIN LEGAL RIGHTS UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ITS RIGHT TO FILE A LAWSUIT IN COURT WITH RESPECT TO ANY CLAIM ARISING IN CONNECTION WITH THIS AGREEMENT.

SIGNED: [signature]   DATED: 6-3-14

Gooberry Corp.
Print Company name

38 East 29 Street New York NY 10016
Print Company address

NICOLAS GOUREAU
Print signatory's name and title

646-823-9895
Print all of your telephone numbers

Nicolas@courageb.com
Print all of your email addresses

262023967
Print Federal Tax I.D. #

COURAGE.b
Print all other Company names and Fictitious Business Names or d/b/a's (doing business as)

YOU **MUST** KEEP PRODUCER ADVISED **IN WRITING** OF ANY CHANGES TO YOUR NAME, ADDRESS, TELEPHONE NUMBERS AND EMAIL ADDRESSES.

Page 11
Initialed: [initials]