# EXHIBIT – B –

# SHAREHOLDER AGREEMENT
# OF
# GOOBERRY CORP.

THIS SHAREHOLDER AGREEMENT (this "Agreement") is made and entered into as of this /8 day of November, 2014 (the "Effective Date") by and between GOOBERRY CORP., a New York corporation (the "Company"), NICOLAS GOUREAU ("Nicolas"), STEPHANIE MENKIN ("Stephanie"), NOEMI GOUREAU ("Noemi" and together with Nicolas and Stephanie, the "Family Shareholders") and ML RETAIL LLC, a Delaware limited liability company ("ML Shareholder" and together with the Family Shareholders, the "Shareholders").

## RECITALS

WHEREAS, the parties hereto, other than the Company, together own, directly or indirectly, all of the issued and outstanding shares in the capital of the Company as of the date hereof; and

WHEREAS, the parties hereto wish to record their agreement as to the manner in which the Company's affairs are to be conducted.

NOW, THEREFORE, in consideration of the mutual covenants of the parties hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1   "Act" means the New York business corporations act, as amended from time to time.

1.2   "Agreement Year" shall mean each consecutive twelve month period during the term of this Agreement, with the first Agreement Year commencing on the Effective Date and each subsequent Agreement Year commencing on the annual anniversary of (a) the Effective Date or, (b) if the Effective Date is other than the first day of a calendar month, the annual anniversary of the first day of the next succeeding calendar month.

1.3   "Affiliate" of a Person shall mean any other Person which owns, is owned by or is under common ownership with such Person.

98192/1

1.4 "Agreement" means this Agreement, as amended, modified or supplemented from time to time.

1.5 "Articles" mean the Articles of Incorporation of the Company, as amended in accordance with the Act.

1.6 "Board of Directors" shall mean the Directors appointed by the Shareholders from time to time.

1.7 "Bona Fide Offer" means a writing setting forth the bona fide good faith intention of a qualified buyer delivering such writing to purchase Shares stating the consideration to be paid therefor, the method of payment and all other material terms and conditions of the offer to purchase such Shares.

1.8 "Book Value" means the total assets less the total liabilities of the Company as of the end of the month immediately preceding the Triggering Event. The independent accountants for the Company shall, at the Company's expense, determine Book Value based on the Company's financial statements and using generally accepted accounting principles consistently applied.

1.9 "Book Value Per Share" means the Book Value, divided by the total number of shares of the Shares that were outstanding as of the end of the month immediately preceding the Triggering Event.

1.10 "Common Stock" shall mean the issued and outstanding common stock of the Company.

1.11 "Director" means such Person or Persons as the Shareholders shall at any time or from time to time designate as a Director, and "Directors" means all Persons designated as Directors.

1.12 "Indebtedness" means, without duplication, the sum of: (a) all principal and accrued (but unpaid) interest owing by the Company for debt for borrowed money owed to any third party; plus (b) all obligations of the Company under leases that have been recorded as capital leases under GAAP; plus (c) Indebtedness of any person other than the Company that is guaranteed by the Company; provided, however, that Indebtedness shall not include trade payables or amounts due on credit cards.

1.13 "Liquidity Ratio" shall mean, at the end of any applicable calendar month, the ratio of current assets to current liabilities. As used in the foregoing sentence, current assets and current liabilities shall mean assets and liabilities of the Company, which would be characterized as a current asset or current liability, as applicable, on a balance sheet prepared in accordance with generally accepted accounting principals.

1.14 "Required Liquidity Ratio" shall mean a Liquidity Ratio of 1.20 to 1.0 or greater.

1.15 "Shareholders" means Nicolas, Stephanie, Noemi and ML Shareholder and any other Person who hereafter becomes an additional or substituted Shareholder of

the Company for as long as each such Person continues to be a Shareholder of the Company, and "Shareholders" means the Persons who are at any one time Shareholders of the Company.

1.16 "Shares" shall mean all shares of the Common Stock owned by the Shareholders, either directly or beneficially, together with any securities of any class of the Company issued in respect of such shares of Common Stock (whether by reason of stock split, stock dividend, recapitalization or otherwise) or for which such shares of Common Stock may be exchanged. Exhibit "A" attached hereto sets for the number of Shares owned by each Shareholder as of the date hereof.

1.17 "Permitted Transfer" shall mean a transfer of shares to an Affiliate.

1.18 "Person" means an individual, a general partnership, a limited partnership, a limited liability company, a trust, an estate, an association, a corporation or any other legal or commercial entity.

1.19 "Triggering Event" means the occurrence of an event giving rise to the right and option of the Remaining Shareholders (as defined below) to purchase any Shares under Section 6 or Section 7 below.

In addition to the terms defined in this Section 1, other terms used in this Agreement identified by the capitalization of the initial letter thereof will have the definitions provided elsewhere in this Agreement.

## SECTION 2
## SHAREHOLDERS/SPECIAL APPROVAL PROVISIONS

2.1 The Shareholders, in their capacity as shareholders, shall not participate in the business affairs of the Company, transact any business on behalf of the Company, or have any power or authority to bind or obligate the Company. The Shareholders shall, however, be entitled to vote on those matters requiring Shareholder approval as set forth in this Agreement, the Articles or the Act. Except as set forth below, actions by the Shareholders may be taken with the affirmative vote of Shareholders representing a majority of the total Percentage Interests. Notwithstanding anything to the contrary contained herein:

2.1.1 the following actions shall not be taken without the affirmative vote of the ML Shareholder:

(a) enter into any transaction outside of the ordinary course of business of the Company;

(b) A merger, consolidation, stock exchange, or similar transaction involving the Company;

(c)     Any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors or affiliates of any of them;

(d)     The admission of new Shareholders;

(e)     The dissolution or liquidation of the Company;

(f)     Amendment of the Articles or this Agreement;

(g)     Incurrence of any Indebtedness or issuance of any guarantee or indemnity of any obligation of any other Person or entity if the aggregate amount of the principal amount of all Indebtedness of the Company and its subsidiaries and the principal amount of all Indebtedness guaranteed or indemnified by the Company and its subsidiaries shall exceed $25,000;

(h)     Make any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;

(i)     Make any Distributions to Shareholders, other than a Tax Distribution;

(j)     Increase or modify compensation plans to senior executives of the Company or pay bonuses or other amounts outside of approved compensation plans;

(k)     Hire, remove or otherwise replace any of the senior executive team of the Company; and

2.1.2   Business development and store expansion plans for the Company, including, without limitation, identifying new markets and/or store locations and causing the Company to take all necessary actions to open stores in such new markets and/or locations shall not be taken without the affirmative vote of the ML Shareholder and Nicolas; provided, however, the ML Shareholder shall have the sole right to cause the Company to open not less than two (2) new retail stores, on a cumulative basis, during each Agreement Year. For purposes of clarity, if the Company opens three (3) new retail stores during the first Agreement Year, the ML Shareholder shall only have the right to cause the Company to open one (1) new retail store during the second (2nd) Agreement Year.

2.2     Notwithstanding anything to the contrary contained herein, the ML Shareholder shall have sole and absolute discretion over:

2.2.1   All financial and accounting functions, controls, decisions and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for store expansions, remodels and new locations; and

2.2.2   Tax matters, including, without limitation, causing the Company to

98192/1                                         4

make an election to be treated as a Subchapter S corporation under the Internal Revenue Code.

2.3   If the Company, during any fiscal year, exceeds $4,700,000 in gross revenues (the "Revenue Target"), for every $1,000,000 of gross revenue in excess of such Revenue Target (each such additional $1,000,000 of gross revenue in excess of the Revenue Target referred to herein as a "Revolving Loan Tranche"), the ML Shareholder shall make available to the Company a revolving line of credit in the amount of $250,000 (each, a "Revolving Loan") for the Revolving Loan Tranche; provided, however once a Revolving Loan Tranche has been obtained in any fiscal year a new Revolving Loan shall not be provided for obtaining the same Revolving Loan Tranche in any subsequent fiscal year. Such line of credit, when drawn, shall accrue interest at 5% per annum and shall be paid from available cash flow from the Company and shall be evidenced by mutually acceptable loan documents.

2.4   In the event the Company fails to meet the Required Liquidity Ratio at the end of any calendar month the ML Shareholder shall have the right to loan funds to the Company in an amount sufficient to cause the Liquidity Ratio to be equal to the Required Liquidity Ratio (each such loan, individually, a "ML Shareholder Loan" and, collectively, the "ML Shareholder Loans"), whereby the cash loaned by the ML Shareholder would be considered a current asset and the ML Shareholder Loan would be considered a long term liability. Additionally, in the event of new store openings caused by the ML Shareholder pursuant to Section 2.1.2 above whereby the pro forma balance sheet of the Company following such new store opening would result in a Liquidity Ratio below the Required Liquidity Ratio, as a condition to the ML Shareholder causing such new store opening, the ML Shareholder shall agree to make a ML Shareholder Loan to the Company following such store opening to cause the Liquidity Ratio to equal the Required Liquidity Ratio. The ML Shareholder Loans shall accrue interest at 5% per annum, shall be paid from available cash flow from the Company and shall be evidenced by mutually acceptable loan documents. In the event of ML Shareholder Loans, the Company shall have the right to cause all, but not less than all, ML Shareholder Loans to be refinanced with Indebtedness incurred by the Company on terms more favorable than the ML Shareholder Loans.

### SECTION 3
### DIRECTORS

The Board of Directors shall consist of up to four (4) Directors and each Shareholder shall have the right to appoint one (1) Director. In the event one Shareholder elects not to appoint a Director, the Board of Directors shall consist of the Directors appointed by the other Shareholder(s). A Shareholder may elect to remove and/or replace a Director appointed by such Shareholder.

## SECTION 4
## DISTRIBUTIONS

4.1   Distributions. Subject to payment of Tax Distributions, the Shareholders shall be entitled to receive Distributions, including Distributions in connection with a Liquidation Event, when and as determined by the Board of Directors, subject to approval of the Shareholders as set forth herein, out of assets of the Company legally available therefor payable in cash or in-kind on such payment dates to Shareholders on such record date as shall be determined by the Board of Directors.

4.2   Tax Distributions.

4.2.1   At such time as the Company shall elect to be taxed as a Sub-Chapter S corporation under the Internal Revenue Code the Board of Directors shall cause the Company to distribute to the Shareholders, on a quarterly basis on or prior to the 15th (or next succeeding business day) of each March, June, September and December of each Fiscal Year, an amount designed to assist the Shareholders (and their equity holders) in satisfying their respective tax liabilities arising from allocations of income, gain, loss, deduction and credit attributable to such Shareholders' interests in the Company in any taxable quarter (or other applicable period) for which such an allocation is required (each, a "Tax Distribution").

4.2.2   Unless the Board of Directors determines in good faith that a Tax Distribution referred to in this Section 4.2.2 would be prohibited under the Act, or under any other law, statute, rule or regulation applicable to or binding on the Company or any of its Subsidiaries, the Company shall make a Tax Distribution to the Shareholders entitled thereto not later than the date specified in Section 4.2.2.

4.3   Non-Cash Distributions. Subject to the Shareholder consent rights provided for herein, the Board of Directors is authorized to make distributions to the Shareholders in the form of securities, notes or other property received or otherwise held by the Company; provided, however, that, in the event of any such non-cash distribution, such non-cash distribution shall be valued at the fair market value as determined by the Board of Directors.

4.4   Loan from Nicolas. The loan from Nicolas to the Company of $100,000 as of the date hereof (the "Nicolas Loan") is acknowledged and begins to accrue interest at the rate of five percent (5%) per annum as of the date of the this Agreement. Such loan shall be paid from the available cash flow of the Company. Except for the Nicolas Loan, Nicolas represents and warrants that that the Company is not indebted to Nicolas and any prior loans have been paid in full or converted to equity prior to the date hereof.

## SECTION 5
## RESTRICTIONS ON TRANSFER

5.1   Prohibition on Transfer. None of the Shares may be conveyed, pledged, assigned, transferred, hypothecated, encumbered or otherwise disposed of by a Shareholder, and no Shareholder may permit or suffer there to exist any lien or security interest on such Shareholder's Shares, except in accordance with the terms of this

Agreement or with the prior written consent of the Company and all of the Shareholders.

5.2     Encumbrance. If any Shares are subject to any lien or encumbrance of a Shareholder and the debt or obligation secured by such lien or encumbrance is in default, the Company and, alternatively, the other Shareholders, shall have the right (in addition to all other rights hereunder) to pay the holder of the obligation (the "Secured Party") the amount of the debt so as to release the Shares from the lien or encumbrance. The Company or the other Shareholders shall be subrogated to all of the legal rights and privileges of the Secured Party (including any other collateral, security interests or right of guarantee) and may enforce payment in the same manner as the Secured Party.

5.3     Additional Shares. Any additional Shares issued by the Company shall be subject to the provisions of this Agreement, and the Company shall require each recipient of such newly-issued additional Shares who is not already a party to this Agreement to execute a copy hereof or an acknowledgment hereof as an additional agreeing Shareholder prior to registering any such Shares in the name of such recipient.

## SECTION 6
## RIGHT OF FIRST REFUSAL

Except for a Permitted Transfer, any voluntary transfer of any Shares shall first be subject to the following:

6.1     Notice of Intended Transfer. Each Shareholder shall promptly advise the Company and the other Shareholders in writing of the existence of all serious negotiations with any Person for the transfer of any Shares held by such Shareholder. In the event any Shareholder desires to transfer all or a portion of such Shareholder's Shares pursuant to a Bona Fide Offer, then such Shareholder becomes a "Transferring Shareholder" and the other Shareholders become the "Remaining Shareholders" for the purposes of this Agreement with respect to such proposed transfer. The Transferring Shareholder shall promptly give written notice (the "Option Notice") to the Company and the Remaining Shareholders of such proposed transfer stating (i) the Transferring Shareholder's intention to make such transfer, (ii) the number of Shares intended to be transferred (the "Offered Shares"), (iii) the identity and relevant background of the person making the Bona Fide Offer and (iv) a copy of the Bona Fide Offer. Except for Permitted Transfers and transfers pursuant to this Section 6, no Shareholder may voluntarily transfer any of the Shares owned by such Shareholder.

6.2     For a period of forty-five (45) days after the last date that on which the Company and all of the Remaining Shareholders shall have received the Option Notice, the Remaining Shareholders shall have and are hereby granted the right, privilege and option to elect to purchase all or a portion of the Offered Shares owned by the Transferring Shareholder that are subject to the Option Notice. The purchase price for the Offered Shares shall be the purchase price payable for the Offered Shares in accordance with the Bona Fide Offer as delivered to the Company and the Remaining Shareholders with the Notice of Bona Fide Offer. In the event the purchase price is not in cash or a deferred payment of cash, then the Board of Directors of the Company shall determine the present, realizable cash value of such other consideration and such determination shall be final and

binding on all parties and shall determine the purchase price for the Offered Shares. The purchase price shall be paid in cash or in deferred payments of cash as stated in the Bona Fide Offer subject to the Company's Board of Directors determining the present, realizable cash value of any other consideration proposed in the Bona Fide Offer. Each Remaining Shareholder shall have the initial right to purchase that portion of the Offered Shares of the Transferring Shareholder equal to the ratio which the number of Shares owned by such Remaining Shareholder on the date of the Option Notice bears to the total number of Shares owned by all Remaining Shareholders on the date of the Option Notice. A Shareholder may exercise the right and option granted in this Section 6.2 by providing written notice to the Transferring Shareholder, the Company and the Remaining Shareholders within the period described in this Section 6.2 containing a statement of such Remaining Shareholder's election to exercise such option and the number of Offered Shares which such Remaining Shareholder elects to acquire. Failure to provide a timely written election shall constitute the election of a Remaining Shareholder not to exercise such right and option.

      6.3    In the event that one or more of the Remaining Shareholders do not exercise fully their initial right and option under Section 6.2 above, the Transferring Shareholder shall notify in writing (the "Secondary Option Notice") all other Remaining Shareholders and the Company of that fact within five (5) days after the expiration of the initial option period specified in Section 6.2. Each Remaining Shareholder who has fully exercised his, her or its initial right and option to purchases Offered Shares under Section 6.2 shall thereafter have a secondary right and option to purchase all of the Offered Shares of the Transferring Shareholder which the Remaining Shareholders have not theretofore elected to purchase under this Agreement in the ratio which such Remaining Shareholder's existing number of Shares owned on the date of the Option Notice (exclusive of Shares acquired by reason of the exercise of Remaining Shareholder's exercise of the right and option under Section 6.2 and Section 6.3) bears to the total number of Shares owned on the date of the Option Notice by all other Remaining Shareholders who have fully exercised their initial right and option under Section 6.2 and the secondary right and option under this Section 6.3 (exclusive of Shares acquired by reason of the exercise of Remaining Shareholder's exercise of the right and option under Section 6.2 and Section 6.3). Such secondary right may be exercised by providing written notice to the Transferring Shareholder, the Company and the Remaining Shareholders who have fully exercised their initial rights under Section 6.2 within ten (10) days after receipt by such Remaining Shareholder of the Secondary Option Notice. The purchase price and terms of the secondary right shall be identical to those described in Section 6.2. The secondary right provided under this Section 6.3 shall be renewed in the same manner until all of the Transferring Shareholder's Offered Shares have been purchased or until no Remaining Shareholder desires to purchase any of the Offered Shares of the Transferring Shareholder which the Remaining Shareholders have not theretofore elected to purchase under this Agreement.

      6.4    In the event all of the Offered Shares subject to the Option Notice and the Secondary Option Notice are not purchased by the Remaining Shareholders, the Transferring Shareholder may transfer such Offered Shares for which the Remaining Shareholders have not exercised their rights and options to purchase under Section 6.2 and Section 6.3 in the manner described in the Option Notice and Bona Fide Offer during the

period ending sixty (60) days following the expiration of the rights and options set forth in Section 6.3 hereof, but only to the person and upon the terms set forth in the Option Notice and Bona Fide Offer, and subject to the conditions set forth in the next sentence. Such transferee shall receive and hold the Shares subject to all of the provisions and restrictions herein contained and, as a condition to the effectiveness of any such transfer of the Shares, such transferee shall enter into a written agreement with the Company to that effect in a form reasonably acceptable to the Company prior to the transfer of such Shares to such transferee.

6.5     During any period in which the Shareholder has given the Option Notice and the Secondary Option Notice, the Transferring Shareholder shall refrain from participating as an officer, director or shareholder of the Company in connection with any determination by the Company's Board of Directors with respect to such proposed transfer unless requested to do so by the Company's Board of Directors in which event the Transferring Shareholder shall cooperate and vote as directed by the Company's Board of Directors to effectuate the purposes of this Agreement.

## SECTION 7
## INVOLUNTARY TRANSFERS

The Shares shall not be assignable or transferable involuntarily by a Shareholder or otherwise by operation of law, except as subject to the provisions of this Agreement. In the event of any purported or claimed involuntary assignment or transfer of any Shares by a Shareholder or otherwise by operation of law, each such event shall entitle the other Shareholders to exercise their rights and options provided in Section 6.2 and Section 6.3 above. For the purpose of applying the rights and options under Section 6.2 and Section 6.3 to this Section 7, the Shareholder whose shares are subject to any involuntary assignment or transfer or any assignment or transfer by operation of law shall be considered the "Transferring Shareholder," the other Shareholders shall be the "Remaining Shareholders," the "Offered Shares" shall be the Shares subject to such involuntary assignment or transfer or such assignment or transfer by operation of law and the purchase price for the Offered Shares shall be the Book Value Per Share as of the end of the month immediately preceding the Triggering Event. For the purposes of applying the rights and options under Section 6.2 and Section 6.3 to this Section 7, the Option Notice and Secondary Option Notice may be given by the Company, the Remaining Shareholders or the Transferring Shareholder. In the event of the holder of any Shares is adjudicated a bankrupt or insolvent or makes an assignment for the benefit of creditors or if a writ of attachment or execution or any other order be levied on the interest of any Shareholder in the Shares and is not released or satisfied within thirty (30) days thereafter, or if a receiver, trustee, conservator or any other person in a representative capacity be appointed in a proceeding or action against any Shareholder with authority to take possession or control of any of the Shares and such authority is not revoked within thirty (30) days after such appointment, each such event shall entitle the Remaining Shareholders to exercise their rights and options provided in Section 6.2 and Section 6.3 as provided in this Section 7. In the event all of the Offered Shares are not purchased by the Remaining Shareholders under the rights and options pursuant to this Section 7, the remaining Offered Shares may be assigned or transferred by reason of such involuntary assignment or transfer or such assignment or transfer by operation of law;

provided that any subsequent transfer of such Shares shall be subject to the terms and conditions of this Agreement.

## SECTION 8
## TERMS OF PURCHASE

8.1  The Remaining Shareholders who exercise any of their rights and options under Section 6 or Section 7 shall tender the purchase price for the Offered Shares that such Remaining Shareholder is purchasing pursuant to this Agreement within ten (10) business days after the expiration of the last option period under Section 6 or Section 7. Subject to Section 8.2 below, such Remaining Shareholder shall pay the purchase price for the Shares being purchased in immediately available funds to the record holder(s) of such Shares or, in the case of a deferred cash purchase price in the Bona Fide Offer, a promissory note for deferred cash purchase price against delivery and surrender to such Remaining Shareholder of the Offered Shares so purchased, properly endorsed so as to vest good and valid title thereto in such Remaining Shareholder, free and clear of all liens and encumbrances (other than this Agreement); provided that failure of the record holder(s) of such Offered Shares to deliver and surrender such Offered Shares shall not affect the rights of such Remaining Shareholder under this Agreement and the record holder(s) of such Offered Shares shall cease to have any equity interest whatsoever in the Company with respect to such Offered Shares but such Remaining Shareholder shall have all equitable and beneficial rights with respect to such Offered Shares. In the event the proviso to the immediately preceding sentence applies, such Remaining Shareholder shall pay the purchase price for such Offered Shares when the record holder delivers and surrenders such Offered Shares to the Remaining Shareholder in accordance with this Section 8.1.

8.2  There shall be deducted from the purchase price for the Offered Shares to be paid by any Remaining Shareholder pursuant to Section 8.1 above and paid by such Remaining Shareholder to the Company all sums due and owing to the Company by the Transferring Shareholder whose Offered Shares are being purchased by such Remaining Shareholder which amount shall be applied to reduce such indebtedness and the balance of the purchase price for the Offered Shares purchased by such Remaining Shareholder shall be paid in the manner provided in Section 8.1.

## SECTION 9
## NOTICES

All notices and other communications required or permitted under this Agreement shall be in writing and may be sent by certified U.S. mail, return receipt requested, postage prepaid, overnight air courier, facsimile, or personal delivery to the Shareholders at their addresses as shown from time to time on the records of the Company. Any Shareholder may specify a different address by notifying the Company in writing of such different address. Such notices shall be deemed given (i) three days after mailing, (ii) the day after deposit with an overnight air courier, or (iii) when delivered in person or transmitted by fax machine (confirmation of transmission received), as the case may be.

## SECTION 10
## FINANCIAL REPORTING

10.1  Daily Reporting.  On a daily basis, the Company shall provide the ML Shareholder with total sales for the immediately preceding day on a consolidated and store by store basis, with comparative figures for the corresponding period in the previous fiscal year.

10.2  Monthly Reporting.  For each monthly period, no later than the last fifteenth (15th) day of the month following the end of each monthly period the Company shall provide the ML Shareholder with the following:

10.2.1 Company prepared unaudited consolidated balance sheet of the Company as at the end of such month with comparative figures for the corresponding period in the previous fiscal year; and

10.2.2 Company prepared unaudited consolidated statements of income and changes in shareholders' equity of the Company for such month and (in the case of each month during the fiscal year except the first and last month) for the portion of the fiscal year ending with such month, with comparative figures for the corresponding periods in the previous fiscal year.

## SECTION 11
## MISCELLANEOUS

11.1  Inurement.  This Agreement shall be binding upon, and inure to the benefit of, all parties hereto, their personal representatives, heirs, successors and assigns, to the extent, but only to the extent, that assignment is made in accordance with, and permitted by, the provisions of this Agreement.

11.2  Entire Agreement.  This Agreement constitutes the entire agreement among the parties relating to the subject matter hereof. It supersedes any prior agreement or understandings between or among any of them relating to the subject matter hereof.

11.3  Governing Law.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the internal laws of the State of Illinois without regard to principles of conflict of law.

11.4  Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

11.5  **Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

11.6  **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

11.7  **Waiver.** No consent or waiver, express or implied, by any Shareholder to or of any breach or default by the other in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of such Shareholder hereunder. Failure on the part of any Shareholder to complain of any act or failure to act of any other Shareholder or to declare any other Shareholder in default, irrespective of how long such failure continues, shall not constitute a waiver by such Shareholder of his, her or its rights hereunder.

*[Signatures on following page]*



IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Agreement as of the day and year first above written.

GOOBERRY CORP.

By: _____
Its: _Chief Executive Officer_

SHAREHOLDERS:

ML RETAIL LLC

By: _____
Its: _Chief Executive Officer_

_____
Nicolas Goureau

_____
Stephanie Menkin

_____
Noemi Goureau

## EXHIBIT "A"
## Existing Shares by Shareholders

**Ownership as of Date of Agreement**

| | |
|---|---|
| ML Retail LLC | 32 shares |
| Nicolas Goureau | 34 shares |
| Stephanie Menkin | 22 shares |
| Noemi Goureau | 12 shares |