# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x  :

NICOLAS GOUREAU, STEPHANIE
MENKIN, GOOBERRY CORPORATION,  and
derivatively on behalf of ML FASHION, LLC, a
Delaware limited liability company,

                    Plaintiffs,

        v.

NBCUNIVERSAL MEDIA LLC, a Delaware
limited liability company dba
NBCUNIVERSAL; MACHETE
CORPORATION, a California corporation dba
Machete Productions;  MARCUS LEMONIS, an
individual; ML RETAIL, LLC, a Delaware
limited liability company; MARCUS
LEMONIS, LLC, a Delaware limited liability
company; ROBERTA RAFFEL aka BOBBI
LEMONIS, an individual,
                   Defendants,

    -and-

ML FASHION, LLC, a Delaware limited liability
company,

              Nominal Defendant.

-----------------------------------------------------------------x

Index No.: _____

<u>SUMMONS</u>

Plaintiffs designate New York County
as the place of trial.

The basis of venue is CPLR §503

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer to the complaint, or if the complaint is not served with this summons, to
serve a notice of appearance, on the undersigned attorneys within 20 days after the service of this
Summons, exclusive of the day of service (or within 30 days after the service is complete if this
Summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, Judgment will be taken against you by default for the relief
demanded herein.

Dated: New York, New York
November 18, 2021

                        GERARD FOX LAW P.C.

                        By: <u>/s/ Ryan Dolan_____</u>
                        Ryan Dolan
                        Prachi Ajmera

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 3 of 176

1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
pajmera@gerardfoxlaw.com
rdolan@gerardfoxlaw.com

*Attorneys for Plaintiffs,*
Nicolas Goureau
Stephanie Menkin
Gooberry Corporation

TO:

NBCUNIVERSAL MEDIA, LLC
30 ROCKEFELLER PLAZA
NEW YORK, NY 10112

MACHETE CORPORATION
16255 VENTURA BLVD, SUITE 1240
ENCINO, CA 91436

MARCUS LEMONIS, AN INDIVDUAL
250 PARKWAY DRIVE
LINCOLNSHIRE, IL 60069

ML RETAIL, LLC
38 E 29TH ST
NEW YORK, NY 10016

MARCUS LEMONIS, LLC
250 PARKWAY DRIVE
LINCOLNSHIRE, IL 60069

ROBERTA RAFFEL, AN INDIVIDUAL
77 E WALTON ST #21C
CHICAGO, IL 60611

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 4 of 176

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x  :

NICOLAS GOUREAU, STEPHANIE
MENKIN,  GOOBERRY CORPORATION,
and derivatively on behalf of ML FASHION,
LLC, a Delaware limited liability company,

                        Plaintiffs,

          v.

NBCUNIVERSAL MEDIA LLC, a Delaware
limited liability company dba
NBCUNIVERSAL; MACHETE
CORPORATION, a California corporation dba
Machete Productions;  MARCUS LEMONIS,
an individual; ML RETAIL, LLC, a Delaware
limited liability company; MARCUS
LEMONIS, LLC, a Delaware limited liability
company; ROBERTA RAFFEL aka BOBBI
LEMONIS, an individual,
                      Defendants,

      -and-

ML FASHION, LLC, a Delaware limited
liability company,

             Nominal Defendant.

------------------------------------------------------------x  :

Index No.: _____

COMPLAINT


## **COMPLAINT**

      Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin") , and Gooberry Corp.

("Gooberry"), by and through their undersigned counsel, individually and on behalf of ML

Fashion, LLC ("ML Fashion"), bring this action against Defendants Marcus Lemonis

("Lemonis"), ML Retail, LLC ("ML Retail"), Marcus Lemonis, LLC ("ML, LLC") (collectively

"Lemonis Entities"), Roberta Raffel aka Bobbi Lemonis ("Raffel"), and MLG Retail, LLC

("MLG Retail"), Machete Corporation dba Machete Productions ("Machete") and NBCUniversal

Media, LLC ("NBCUniversal"), (collectively "Defendants") and allege as follows:

1

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 5 of 176

## INTRODUCTION

1.      Courage.B was a high-end women's retail store, which opened in 2008. From the beginning, it was a family owned and run operation, with Noemi Goureau, and her children, Plaintiffs Goureau and Menkin in charge. Under the family's leadership, Courage.B proved itself to be a highly desired and competitive brand, succeeding in the hyper competitive world of women's luxury retail.

2.      By 2014, the Courage.B brand had taken off. The company operated seven different stores across the country, including highly competitive high-end markets such as Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA. The company was bringing in approximately $5 million a year in sales revenue.

3.      At this point, Courage.B was looking to take the next step as a company. As with nearly every highly successful business, this next step would require a large influx of capital, beyond what the company was capable of obtaining on their own. They would need an outside investor.

4.      Courage.B began seeking outside investors. In fact, they had even engaged in serious discussions with several interested parties about possible investments into the company. However, it was around this time that Plaintiff Goureau also learned about a show called *The Profit*. After viewing false episodes and hearing the way CNBC, the most reputable business network in the United States, held up and glorified Lemonis' business acumen and his ability to take successful businesses to the next level, Goureau decided to apply to be on the show. He had no idea this decision would cost his family their business, their personal relationships, and their overall mental well-being.

5.     *The Profit* was a show conceived by CNBC executive Jim Ackerman, who was recruited by NBCUniversal to improve the falling primetime ratings of CNBC. The show purported to put small, struggling businesses in touch with a business guru who could change their lives. However, the show did anything but. While the show, which was designed and overseen by Ackerman, did boost the primetime ratings of CNBC, it did so at the cost of destroying the participating businesses, most of whom were successful and simply in need of capital rather than "small and struggling," with fraudulent lies, inducements, and a complex scan.

6.     NBCUniversal created a mob-style scam that took companies, such as Courage.B, and provided written and oral promises to act in the best interests of the companies if they participated on the show. However, NBCUniversal never intended to fulfill these promises. Instead, as they intended to do all along, it used the show to disparage, denigrate, and falsely portray the businesses they promised to help. Ackerman's playbook (which it is known as by many former NBC producers) included a plan to use the show's producers and Lemonis, their lead conman masquerading as a business guru, to create chaos and confusion on the set, divide business owners and families against each other, and falsely portray Lemonis as the white knight, using his expertise and personality to personally grow the companies. Ackerman's vision for the show was to use these businesses, all of which were too small to have a legal team within their ranks, as fodder for ratings. This NBCUniversal contrived scam destroyed the reputation of the business' owners and their products to the point where, like Menkin and Goureau, they still receive traumatic ridicule and negative feedback from complete strangers, all of whom are within NBC's worldwide audience basing these perceptions on the show's falsely depicted mob-style shows.

7.     Ackerman's playbook did not stop with simply humiliating hardworking businesses and their owners on national television. Indeed, it included a deal with an expert conman: Marcus

Lemonis. As part of the playbook, Lemonis would be allowed to use a mob-style debt bust out, product theft, insane giveaways, comingling of assets, and self-dealing during the period of absolute control of the company, a period which went on for months and months and years (this period was secured for NBCUniversal and Lemonis through draconian documents participants were rushed to sign). During this time, Lemonis would drown the companies in massive amounts of debt, steal from the, comingle assets and money, self-deal, and compromise the companies' stability. Then, while the owners were traumatized and choking on the bad faith tactics of NBCUniversal and Lemonis, NBCUniversal's post-production team would defame the company and their owners by using false editing tactics. The participating businesses were often left with virtually no options, typically deciding between bankruptcy, or submitting to Lemonis' will. Often times Lemonis used this leverage he created to harvest the remains of these companies for his benefit. The destruction of participant businesses, the turning of their owners lives into a living hell, and Lemonis' personal enrichment at their downfall, were blatantly concealed from the viewing audience by NBCUniversal.

8.    Ackerman, an NBCUniversal executive, and Lemonis, his employee and agent, were a team throughout the process. They were both conmen in the fullest sense of the word. Ackerman wanted to use these victim companies to create a false storyline that would make them look horrid, mean, incompetent, and despicable, causing Lemonis to look like he was their savior. These portrayals, both of the businesses and Lemonis, could not have been further from the truth. NBCUniversal employed casting agents and producers, and taught them to lie through their teeth about what was really going to happen to these poor people and their companies. Ackerman further used CNBC's production and postproduction people to carry out the con, falsely editing every single show so that ratings went through the roof. They did so without a care in the world about

4

how they were ruining otherwise successful businesses run by normal, everyday, hardworking Americans. They meant nothing to them, they were simply a resource to be input into a machine that devoured them for ratings and avarice. Even worse, they knew they were committing outright fraud. Ackerman even said as much to Goureau and Lemonis' wedding, telling him "this is going to get out at some point, that it's all a scam."

9.      In the case of Courage.B, the con worked to perfection. Nicolas Goureau and Stephanie Menkin chose to forego other investment opportunities for the chance to appear on *The Profit*. Based on NBCUniversal's portrayal of Lemonis, they truly believed that he was everything CNBC said he was. It was not until it was too late that they learned the truth of who Lemonis was and what he and NBCUniversal intended for the companies they solicited to be on the show.

10.     The demise of Courage.B followed the Ackerman playbook to perfection. Lemonis used the guise of a false investment offer, which Goureau and Menkin, like so many other companies on the show, believed to be real, to secure his "100% in control" period. During this period, Lemonis racked up nearly $2 million in debt on Courage.B's behalf, all payable to Lemonis or Lemonis controlled companies. When confronted about the absurd amount of debt Lemonis had accrued without even mentioning a single charge to Goureau or Menkin, the conversation escalated, and Lemonis gave Goureau and Menkin two options: pay him back in full, on the falsely inflated and unsubstantiated invoice, or he would take over the company. Indeed, the members of Courage.B were out of options: they were now under the control of Lemonis.

11.     Given the inability of Goureau and Menkin to repay the extraordinary debt Lemonis had falsely accrued to himself, the parties proceeded and Lemonis purchased his stake in Gooberry, Courage.B's operating company, through ML Retail, LLC. This memorialized deal once again gave Lemonis 100% control, which he continued to use for his own personal gain and massive

5

self-dealing. This manifested in Lemonis unnecessarily renovating existing stores, buying inventory beyond what the company could afford, and buying inventory that in no way coincided with the customer base the business had established. All of these purchases and expenses were charged by Lemonis controlled entities, further indebting the company to him.

12.      Once Lemonis had gained complete control of Gooberry, he, along with Ackerman, began to use the company as NBCUniversal's private stable for businesses appearing on *The Profit*. Time and time again, businesses who appeared on the show were placed under the Gooberry umbrella, their employees placed on Gooberry's payroll, their renovations charged to Gooberry, and their inventory sent to Courage.B stores, regardless of whether or not the products fit their clientele. The defendants comingled, siphoned off and stole assets of Gooberry until there was no longer a company left that resembled the one entrusted to them. It had vanquished. Lemonis and NBCUniversal did not care how detrimental this was to Gooberry and the people who founded it: it was good for the show and good for NBCUniversal. The playbook was being executed to perfection.

13.      After Gooberry was stretched to its limits, Lemonis represented that the only way for Menkin and Goureau to recoup their money and reclaim their destroyed company Gooberry, was to join him in investing in other businesses. To do so, Lemonis created ML Fashion as an umbrella entity. Although Goureau, Menkin, and Lemonis were technically each one third owners in ML Fashion, Lemonis again gave himself absolute authority over all of the company's decisions and actions as the Manager of the company. However, despite Lemonis' representations, ML Fashion had one purpose and one purpose only: to be another vehicle in which Lemonis and Ackerman could funnel new, unsuspecting victim businesses appearing on *The Profit*. Lemonis

gave Menkin and Goureau lawyers to represent them. In truth, these lawyers were reporting to him, working for him, and violated the rules of professional ethics by hiding their conflict.

14.     The laws violated on this con job NBCUniversal deemed a show alone are countless. The Plaintiff's come to this court now for fair, full, and proper compensation and justice, and the need for the judge assigned to this case to dispense justice fairly, without any concern for the power NBCUniversal wields, its connections, or those of Lemonis, and without any ties to NBC or a former law firm that worked for NBC. This court needs to be the first step in enforcing the laws and not the last step of the illegal wipe out and theft of what was a thriving business before the actions of NBCUniversal and Lemonis. Plaintiffs stand ready to prove their case once NBCUniversal and Lemonis produce their contracts with each other, their emails with each other, their full set of notes on the story line, and the full set of edits made in post-production. Once that takes place promptly, and some depositions are taken, Plaintiff will answer ready to try this case and carry their burden of proof.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper under New York Civil Practice Law and Rule § 301 because NBCUniversal has its principal place of business in New York. Jurisdiction is further proper under New York Civil Practice Law and Rule § 302, as defendants NBCUniversal, Machete, Marcus Lemonis, ML Retail, and ML, LLC transacted business in and committed tortious acts within the state.

16.     Venue is proper under New York Civil Practice Law and Rule § 503 as a substantial part of the events giving rise to the claim occurred in New York.

///

///

Case 1:20-cv-04691-MKV Document 94-1 Filed 11/19/21 Page 11 of 176

## PARTIES

17. Plaintiff Goureau is an individual, a resident of Florida and co-founder and a majority shareholder of Gooberry Corp. Goureau is an entrepreneur and clothing and retail executive. He is a signatory to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 34% of the shares of the Company. Together with his sister, Plaintiffs Goureau and Menkin own 56% of the shares of Gooberry, a majority interest in the Company.

18. Plaintiff Menkin is an individual, a resident of New York County, and co-founder and a minority shareholder of Gooberry Corp. Menkin is an entrepreneur and clothing and retail executive. Menkin is a signatory to the Shareholder Agreement (defined and described below) and owns 22% of the shares of the Company. Together with her brother, Plaintiffs Menkin and Goureau own 56% of the shares of Gooberry, a majority interest in the Company.

19. Plaintiff Gooberry Corp. is a privately held New York corporation. Gooberry has its principal place of business in New York, New York and owned and operated a number of fashion brands and retail stores that have included Runway, Denim & Soul and Courage.B.

20. Nominal Defendant ML Fashion is a privately held Delaware limited liability company. ML fashion has its principal place of business in New York, New York and owns and operates a number of fashion brands and retail stores across the country.

21. Defendant Marcus Lemonis is an individual domiciled in Illinois and is the owner of ML, LLC and ML Retail, LLC. Lemonis is an investor and featured business fiduciary advisor of CNBC's reality show, *The Profit*. Lemonis signed the Stock Purchase Agreement (defined and described below) on behalf of ML Retail, LLC. Upon information and belief, Lemonis also signed the Shareholder Agreement (defined and described below) on behalf of ML Retail, LLC. Lemonis

8

is the Manager and Chairman/CEO of ML Fashion and owns a 33.34% membership interest in ML Fashion through his entity ML Retail, LLC. Lemonis signed the Limited Liability Company on behalf of ML Retail, LLC He is also chairman and CEO of Camping World, Good Sam Enterprises, Gander Outdoors, and The House Boardshop.

22.     Defendant ML Retail, LLC ("ML Retail") is a Delaware limited liability company with its principal place of business in Illinois. ML Retail is a party to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 32% of the shares of the Company. Lemonis is the sole member of ML Retail and has complete control over ML Retail. ML Retail is the alter ego or agent of Lemonis, and ML, LLC and operates as Lemonis' personal holding company.

23.     Defendant Marcus Lemonis, LLC ("ML, LLC") is Delaware a limited liability company with its principal place of business in Illinois. The sole member of ML, LLC is Marcus Lemonis Enterprises, LLC, whose sole member is the Marcus Lemonis Revocable trust, whose trustee is Marcus Lemonis. ML, LLC is the alter ego or agent of Lemonis, and ML Retail operates as Lemonis' personal holding company.

24.     Defendant Roberta Raffel aka Bobbi Lemonis ("Raffel") is an individual residing in Illinois.

25.     Defendant MLG Retail, LLC ("MLG Retail") is a Delaware limited liability company. MLG Retail has its principal place of business in New York, New York. MLG Retail's sole member is ML Fashion.

26.     Defendant Machete Corporation dba Machete Productions ("Machete") is a corporation organized and existing under the laws of California with a principal place of business in the State of California.

Case 1:20-cv-04691-MKV Document 94-1 Filed 11/19/21 Page 13 of 176

27.     Defendant NBCUniversal Media, LLC ("NBCUniversal") is a Delaware corporation with its principal place of business in New York, New York. NBCUniversal is a mass media and entertainment conglomerate and owner of CNBC. Thus, all acts by, and liability incurred by, CNBC, constitutes acts of, and liability incurred by, NBCUniversal. NBCUniversal does business throughout New York and across the United States.

28.     Plaintiffs are informed and believe, and based thereon allege that, at all times herein mentioned, Defendants Lemonis and Machete were the agents and/or employees of NBCUniversal, and at all times herein mentioned, were acting within the scope of such agency and/or employment and represented they had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified such action to take place.

### ML Retail and ML, LLC Were Lemonis' Alter Egos, and Thus Lemonis Can Not Hide Behind Their Corporate Structure

29.     At all times relevant to this action, Defendant Lemonis has had exclusive and complete dominion and control over ML Retail and ML, LLC, such that these entities were his alter egos and the acts of ML Retail and ML, LLC as set forth in this Complaint are also the acts of Defendant Lemonis.

30.     There is such a unity of interest and ownership between Defendant Lemonis on one hand and ML Retail and ML, LLC on the other hand, that the individuality of ML Retail and ML, LLC or their separateness from Defendant Lemonis have ceased because, upon information and belief:

    a.     ML Retail and ML, LLC are completely influenced and governed by Defendant Lemonis, the sole natural person involved in each entity;
    b.     Defendant Lemonis completely controls ML Retail and ML, LLC;
    c.     Defendants Lemonis, ML Retail, and ML, LLC share the same address as their principal place of business;

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 14 of 176

d.   ML Retail and ML, LLC were at all times material to this matter, instrumentalities used for the benefit of Defendant Lemonis;

e.   ML Retail and ML, LLC are, and at all times herein mentioned were, kept under-capitalized by Defendant Lemonis, in relation to the reasonable needs of their businesses;

f.   The corporate forms of ML Retail and ML, LLC are a mere façade for the operation of Defendant Lemonis;

g.   The corporate form, entity, and structure of ML Retail and ML, LLC were at all times disregarded by Defendant Lemonis;

h.   The assets of ML Retail and ML, LLC were or are intermingled with the assets of Defendant Lemonis, or transferred without consideration, to Defendant Lemonis in disregard of the purported separate corporate form, entity and structure of ML Retail and ML, LLC, so as to make it impossible to separate from individual liabilities;

i.   The business and corporate affairs of ML Retail and ML, LLC are intermingled with those of Defendant Lemonis;

j.   ML Retail and ML, LLC have failed to abide by corporate formalities; and

k.   Defendant Lemonis uses his control over ML Retail, ML, LLC and their assets to further his own personal interest.

31.   Upon information and belief, Defendants ML Retail and ML, LLC were never intended to have, and have never had, any true existence as a corporation. Indeed, ML Retail and ML, LLC are and were organized and designed to act as devices by which Defendant Lemonis could evade his obligation, responsibility, and liability to third parties, including Plaintiffs, by engaging in unlawful activity without personal liability.

32.   Continued adherence to the fiction of the separate existence of ML Retail and ML, LLC would sanction fraud and promote injustice, in that Defendant Lemonis is attempting to escape liability for his unlawful activity, as set forth below, by hiding behind ML Retail and ML, LLC and manipulating assets and liabilities to avoid responsibility for the unlawful acts that he directed and caused for his own benefit.

**Coconspirators and Agents**

33.   NBCUniversal, Machete and Lemonis, through their contractual relationships and actions on *The Profit*, are coconspirators in a massive scheme to defraud business owners seeking

11

to advance their business to the next level and viewers around the world. NBCUniversal serves as the parent entity for its cable broadcast network CNBC. CNBC hired Machete to produce *The Profit*. Machete – through their relationship with CNBC and NBCUniversal – is an actual or ostensible agent of NBCUniversal. Together, NBCUniversal and Machete conspired to create a show wherein they direct their employee, Marcus Lemonis, to run roughshod over unsuspecting business owners. NBCUniversal and Machete specifically placed Lemonis in a position of trust and power through illegal and one-sided contracts that require the participating business to comply with Lemonis' demands. Then, NBCUniversal and Machete cut up, edit, and manipulate the production of the television show to make Lemonis look like a business guru – when he is actually a misleading conman in khakis – and air the event in prime time.

34.     To pull off the coconspirators' end goal (the total destruction of successful and growing businesses for self-gain), NBCUniversal, Machete, and Lemonis uses a network of entities Lemonis owns and exercises complete control over: in this case, ML Retail, ML, LLC, and MLG, LLC. This was a key component of NBCUniversal's fraud playbook. It allowed NBCUniversal and Machete to direct Lemonis to destroy companies, such as Gooberry, on television and broadcast and stream it to the world. Each entity is working for the benefit of the other. NBCUniversal and Machete conspire with Lemonis and Lemonis, ML Retail, ML, LLC, and MLG, LLC conspired with NBCUniversal and Machete. The conspiracy requires the complicity of each Defendant to play their roll to ultimately serve each other.

## STATEMENT OF RELEVANT FACTS

35.     This action arises out of Defendants NBCUniversal Media, LLC's ("NBCUniversal"), Marcus Lemonis ("Lemonis"), Machete Production ("Machete"), ML Retail, LLC ("ML Retail"), and MLG Retail, LLC's ("MLG Retail") fraudulent conduct in connection

with Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin"), Gooberry Corp ("Gooberry"), and ML Fashion, LLC, ("ML Fashion") including their solicitation to appear on, appearance during filming of, and being defrauded and defamed on *The Profit*.

36.     As explained in great detail below, NBCUniversal created the concept of the show *The Profit*, through their cable broadcast network CNBC. NBCUniversal hired Jim Ackerman – who served as Executive Vice President of Primetime Alternative Programing for CNBC – to turn around CNBC's dismal primetime ratings.  As CNBC's profile of Ackerman states, "he is responsible for CNBC's strategy, development and production of new reality formats."[1]

37.     Ackerman (and thus NBCUniversal) created *The Profit*, a show designed to take smaller, less sophisticated businesses and disparage, exploit, and harvest them for ratings. Ackerman and NBCUniversal knew that a show depicting a reasonable businessman helping relatively successful business owners grow their businesses was not going to move the ratings needle.  Instead, Ackerman created a situation where NBCUniversal and their producers made hardworking proprietors look like fools, sowed dissension and disharmony among employees, and portrayed a White Knight (Lemonis) as saving the business.  Almost nothing on air in *The Profit* was the truth.  NBCUniversal employees and agents deceived, bullied, and defamed nearly every participant on the show.  NBCUniversal did not care: the network had its ratings monster.

38.     NBCUniversal and their production company, Machete, lured unsuspecting businesses into the arms of a modern-day conman, Marcus Lemonis. Under the guise of being a successful business consultant, and with the backing of NBCUniversal and their cable network CNBC, Lemonis gutted rows of successful businesses for his own gain through self-dealing, theft of intellectual property, and conversion of assets through forcing liquidation of assets and

---

[1] https://www.cnbc.com/2017/11/14/jim-ackerman.html

bankruptcy. This all put hundreds of millions of dollars in the bank accounts of NBCUniversal and Machete through advertising revenue, television ratings, and self-promotion.

39. NBCUniversal has touted their relationship with Marcus Lemonis, presented him as "CNBC's Marcus Lemonis," paraded him around on Comcast media tours, and accepted every benefit conveyed to the network based on the success of the fake and fraudulent television show *The Profit*. He is their employee and they stood to gain from the relationship. NBCUniversal not only reaped the benefits from their promotion, association, and partnership with Lemonis, the network actually expanded the relationship into two additional series, *The Partner* and *Street of Dreams*.

40. NBCUniversal recruited, encouraged, manipulated, and induced entrepreneurs into working with their allegedly ingenious business guru, Lemonis. What happened next ended in humiliation and ruin for these companies. While NBCUniversal aired this entire scam – inaccurately portraying Lemonis as a White Knight and defaming the victim business and its owners – the company banked massive profits through advertising and distribution.

41. NBCUniversal was on notice regarding Lemonis' tactics and the blatantly false and abusive way business owners were portrayed as early as 2014. When former participants began to complain to NBCUniversal that Lemonis and NBCUniversal's fraudulent actions towards the business and the portrayals of the participants and their business on television were ruing the companies and reputations of the participants, NBCUniversal executives did not care. *The Profit* continues to air new false episodes to this day through streaming deals all over the world.

42. Publicly available information makes it clear that Lemonis is not and was not the business savoir that NBCUniversal portrayed. Defendant NBCUniversal broadcast the well-spun lie. Lemonis is the Chairman and CEO of Defendant Camping World, a publicly traded company.

The company is embroiled in legal issues, allegations of fraud, and engages in businesses which Lemonis holds a majority interest. Publicly available information shows that Lemonis is accused of abhorrent actions such as of selling elderly patrons used RVs while attempting to pass the vehicles off as brand new, insider trading, and accounting fraud. Camping World's financials are so dicey that Camping World's own accountants refused to sign off on financial statements because they could not ensure accuracy. All of this information was available to NBCUniversal had they done any due diligence.

43.     In 2018, Inc. Magazine ran an article detailing "the dark side" of *The Profit*. The article profiled Lemonis' tactics.[2] The article quotes a former NBC executive calling Lemonis a "Vulture Capitalist" and relaying that "[Lemonis] looks for companies that are desperate, flies in, and picks at the bones. At some point, you realize this guy on TV who says he's helping companies isn't the real deal." In response, Ackerman defended Lemonis stating "he operates with transparency, he's an honest guy" and "the checks are legit . . . the deals that are made on the show are legit." Every word from Ackerman is a lie. Indeed, Ackerman even admitted so, speaking with Goureau at Lemonis' wedding, stating "this is going to get out, that it's all a scam" when referencing *The Profit* and Lemonis' business tactics. Despite knowing so, NBCUniversal went right on to fraudulently produce, advertise, and distribute additional seasons of *The Profit*, which continues to air today.

44.     As another former production executive put it in a recent nationwide Forbes article, "The mob has this thing called a bust out – if you owe them money, they take over your business

---

[2] *See* Exhibit A: Will Yakowicz "Exclusive: 20 Business Owners Claim There's a Dark Side to Marcus Lemonis' Reality TV Show '*The Profit*'"

and they put a lot of debt on it . . . your business is decimated, your credit is decimated."[3] Looking back at Lemonis' history on *The Profit* the same executive said, "It's a version of a bust out, is what he's done." Indeed, *The Profit*'s Playbook invokes mob-style tactics to accomplish NBC's' goals. NBCUniversal executed a crucial true fraud playbook and engineered the defamatory and mob-style shows.

45.     NBCUniversal, Machete, and Lemonis worked together to destroy successful businesses and profit from their downfall, greatly defaming the proprietors along the way. NBCUniversal, Machete, and Lemonis worked together to defraud and pillage participating businesses, while NBCUniversal approved of and directed the plot.

46.     What happened to Nicolas Goureau, Stephanie Menkin, and Gooberry was no accident.  Everything went exactly according to NBCUniversal's fraud playbook.

**<u>Gooberry was a Successful Family Business Ready to Take the Next Step</u>**

47.     Gooberry, which was the operating company for a luxury women's fashion line and retail stores under the name Courage.B, was owned and operated by Nicolas Goureau and Stephanie Menkin, alongside their mother Noemi Goureau ("Noemi"). The brand, started in 2008, and focused on high-end garments and accessories, inspired by the family's French roots.

48.     Goureau owned 100% of the stock in Gooberry and operated as the company's CEO. Menkin operated as the company's president, while Noemi held the title of Chief Designer for the brand Courage.B.

49.     While Courage.B did not open until 2008, its story stretches all the way back to 1987, when Noemi and her husband Patrick opened Fopp's, a retail store in New York City. Sadly,

---

[3] Exhibit B: Will Yakowicz "False Prophet Lawsuit Claims '*The Profit*'s' Marcus Lemonis Preyed On and Destroyed 50 Small Businesses"

Patrick lost his battle with cancer, and passed away just one year after opening the store. Noemi was left to run the family business alone, while also raising her two young children, Goureau and Menkin.

50.     Over time, Goureau and Menkin became more involved in Fopp's, allowing Noemi to focus on her true passion – designing the upscale clothing their retail stores would sale. Goureau took this experience and continued the family business, eventually opening Courage.B.

51.     The first Courage.B store opened in Greenwich, Connecticut on November 4, 2008. The store received immediate attention, being featured on several local news publications when it opened.

52.     The business was an immediate success. Within the first twenty months of opening, the store did $6.5 million in sales. Over the next six years, the family poured their blood, sweat, and tears into the brand, allowing it to expand to seven locations across the country, including Greenwich, CT, New York, NY, Southampton, NY, Aspen, CO, Bethesda, MD, and Fairfax, VA.

53.     Courage.B carried their exclusive Courage.B label clothing and items, which were designed by Noemi. The success and popularity of these items allowed Courage.B to build a loyal customer base who enjoyed Courage.B labeled products. For example, Courage.B had repeat customers who lived in Greenwich, visited family in New York City, wintered in Palm Beach, and summered in Aspen, making frequent stops at Courage.B in each location.

54.     The success continued, and Courage.B had annual sales of roughly $5.5 million. As a result of this national success, Goureau and Menkin were ready to take their business to the next level. Gourea and Menkin developed a growth plan and began meeting with potential investors. In or around 2014, Goureau and Menkin began looking for an investor or consultant who understood family businesses, had experience in retail stores, and could take their business to

the next level. Indeed, conversations with one potential investor had reached the point where the parties were discussing the proper valuation of the company.

55.     Despite interest from other investors, Goureau believed there was one person who would be the perfect partner for Gooberry. As a fan of *The Profit*, Goureau believed Lemonis to be a successful investor who had the ability to take businesses to the next level. Goureau and Menkin knew CNBC to be an extremely reputable business network, and after watching several false and misleading episodes on the network, combined with CNBC's constant portrayal of Lemonis as a business guru and expert, they were convinced they had found their guy.

56.     Goureau and Menkin would soon learn that NBCUniversal and their portrayals of Lemonis were anything truthful. Indeed, it was the intent of Defendants to prey on vulnerable, less sophisticated businesses and their owners to exploit and destroy the company for their own wealth. NBCUniversal did not care what Lemonis did with these success stories, which were the true essence of the American dream, once Defendants had ruined and slaughtered them. NBCUniversal was an evil corporate citizen, not a thought leader, and counted the hundreds of millions the show continued to make to the detriment of entrepreneurs such as Goureau and Menkin. NBCUniversal could have stopped this blatantly illegal scheme, yet chose not to. Rather, NBCUniversal was the one who hired an executive who engineered and orchestrated the entire conspiracy. Thus, Goureau, Menkin, and Gooberry fell victim to *The Profit* Fraud Playbook.

### *The Profit* **Fraud Playbook**

57.     *The Profit* operates more akin to a quincentennial mob shakedown than a business advisory show.   Defendants NBCUniversal, Machete, and Lemonis consistently used a combination of strong-arm tactics to bully and intimidate business owners into accepting terms with them.  In addition to the mob-style shakedown, NBCUniversal, Machete, and Lemonis would

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 22 of 176

plot to destroy the business through false editing of the show at the most damaging level.

58.     From the outset, NBCUniversal and Machete assisted Lemonis with the shakedown.  Potential participants on *The Profit* were forced to disclose all potential assets including information on bank accounts, inventory, and intellectual property.  Participant owners and employees were interviewed by psychologists or counselors at the behest of NBCUniversal and Machete to gain valuable insight into the vulnerabilities, psychological issues, and health issues of the owners and employees.  Producers from Machete acted to convince business owners to "trust the process" and encouraged participants to "open up" to Lemonis so they could "help." They promised to act in good faith on behalf of these companies as they required that the owner turn the business over to them to run entirely (and ultimately ruin entirely, all for a nice ratings boost).

59.     NBCUniversal, Machete, and Lemonis used the information from the financial forms, psychological interviews, and conversations with Lemonis to destroy and rape the participating company.  NBCUniversal planned *The Profit* storylines that thrive on chaos, often manufactured by NBCUniversal and Machete to make a company look dysfunctional, portraying it, as it did with Goureau, Menkin, and Gooberry, in a defamatory manner.  Employees were promised increased pay or ownership stakes to cooperate with the NBCUniversal created fictional storylines, which almost always made the participating business owner look incompetent or arrogant, and in fact always defamed, disparaged, and falsely portrayed the business, its products and services, its history, and the people running the business. Defendants blatantly breached the confidential nature of the private financial psychological information and medical history given to them in complete trust.

60.     *The Profit* consistently falsely portrays business owners as dishonest, abusive,

19

and/or inexperienced. Often, NBCUniversal, Machete, and Lemonis would pit partners against each other. And, where possible, NBCUniversal, Machete, and Lemonis did everything in their power to drive a wedge between spouses and siblings. Defendants – including the producers for NBCUniversal and Machete – created chaos where none existed before. Defendants destroyed lives, families, and close friendships for nothing other than this concocted misery NBCUniversal distributes to the masses. The defendants care not for the lives they destroyed.

61.     Defendants used the terms of the of the Participant Agreement and the Consultation Period to engage in conduct that would leave business owners with no choice but to cooperate, as Goureau and Menkin did, or so burden the business with debt that they could bankrupt the company and obtain all the assets through this injection of debt into the victim businesses.

62.     This is really where all Defendants worked in concert together. NBCUniversal and producers from Machete used lies to get businesses to cooperate with Lemonis. They told participants "trust the process," "Lemonis has your best interest at heart," "he's an honest guy," and "you'll be part of a feel-good story." These statements were designed to gain the trust and participation of the business owners, not only to agree to do the show in the first place, but to also cooperate with Lemonis when participants started to notice red flags. Once NBCUniversal and Machete gained a participant's cooperation for Lemonis, he used his own personal entities – in this case ML Retail – to forcibly take control of anything of value.

63.     Lemonis burdened a participating business with debt before any actual deal was consummated to leverage a complete takeover. In a classic "debt trap" tactic, Defendants saddled the businesses with substantial debt, conveniently serviced by an entity owned and controlled by Lemonis, without input from the business owners. Then, only Lemonis could "rescue" the business from insolvency by taking control of the business. Of course, if Lemonis did not get his way he

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 24 of 176

could force bankruptcy as the senior debt holder of the business. Lemonis, an employee of and directed by NBCUniversal, was repeatedly checking back in with Ackerman, ensuring his actions were in line with NBCUniversal's fraud playbook. If not for the veneer of NBCUniversal and Machete's Participant Agreement, Lemonis' fraudulent tactics would be better described as loan sharking.

64. Participating businesses have no recourse against *The Profit* Fraud Playbook because NBCUniversal, Machete, through their agents and employees control the narrative. They actively protect Lemonis and his affiliated businesses from being exposed and thus allow the scheme to repeat. Defendants use CNBC's credibility to market and reinforce the false portrayal of the businesses and their owners. Meanwhile, business owners were improperly muzzled by illegal, oppressive, and improper Non-Disclosure Agreements, prevented from having their grievances heard in open forums through bullying tactics, and threatened with countersuits by entities with significantly more resources than the owners of the participating businesses.

65. Control of the narrative by NBCUniversal, Machete, and Lemonis is the essential element that allowed the mob-style playbook to be repeated time and time again. NBCUniversal is heavily involved in the production of the show, such as editing and finalizing episodes of the show, as well as creating a contractual paper trail that covered up the knowing misrepresentations made to lure the victims in and scare them from coming forward. In Lemonis' own words, "***CNBC runs the show.***"

66. The playbook includes NBCUniversal's reimbursements to Lemonis and his related entities for funds expended on the show, even though Lemonis used these expenditures to convince businesses that they were indebted to him and used that debt as a threat to extort the business. And yet, despite receiving complaints from past participants as early as 2014, as well as being on notice

21

of various litigations spurred by the show and negative publicity accusing Defendants of massive fraud, cheating, and victim level corporate rape, NBCUniversal has continued the shakedown by extensively promoting "CNBC's Lemonis," covering up for him, and running interference for his wrongful conduct, thus contributing its name and reputation to his faux legitimacy.

<u>**NBCUniversal and Machete Lure Successful Businesses Looking for Capital to Appear on *The Profit***</u>

67.     NBCUniversal News Group, a division of NBCUniversal owns and operates CNBC, a television business news channel.  NBCUniversal is owned by Comcast Corporation.  At the end of the business day and on non-trading days, CNBC's programming focuses primarily on financial and business-themed documentaries and reality shows.

68.     Among the financial and business-themed documentaries it airs, CNBC airs *The Profit* featuring Marcus Lemonis as its business expert and trusted business advisor.

69.     The show is produced by NBCUniversal's/CNBC's production company, Machete, distributed by NBCUniversal, and further distributed by NBCUniversal through worldwide streaming deals and NBCUniversal's streaming platform, Peacock.

**A.     NBCUniversal Was Intimately Involved in Creating *The Profit* and Consistently Falsely Promoted Lemonis as a Successful, Trusted Business Advisor.**

70.     From day one, NBCUniversal consistently used the reputation of CNBC as a boon to the legitimacy for Defendant Lemonis.  NBCUniversal went out of its way to promote Lemonis as a business sage and guru when there was little evidence to support this representation.

71.     Prior to Machete's involvement, NBCUniversal worked with a different production company and used CNBC's reputation and prestige as a business news network to convince businesses that Marcus Lemonis would be a trusted business advisor who could transform their businesses.  From the first season, CNBC itself reached out to businesses, most of which were

thriving but looking to expand, to appear on the show. These businesses received emails that stated:

> I'm a casting producer working on a new CNBC Television show looking to feature interesting businesses. I'd love to speak with you about it. Below is some brief information on the show. Please call and I'd be happy to tell you more - my contact info is below.
>
> **Casting SMALL to MID-SIZE COMPANIES to work with top BUSINESS EXPERT on New CNBC Reality Show.**
>
> CNBC and Iconic Casting are searching for small to mid-size companies to appear on CNBC's new reality show, *THE BIG FIX (working title) with Marcus Lemonis*.
>
> **Would YOU and YOUR Company benefit from the expert advice and financial investment from one of America's top CEO's????**
>
> Producers are searching for ALL types of businesses (20+ employees) that would benefit from working with a top Business Advisor.
>
> On this new CNBC reality show, Marcus Lemonis, CEO of Camping World and one of America's foremost business experts, will be doing something no one has ever done on TV before. He is going to invest at least **$2,000,000** of his own money and lend his expert advice to help small to mid-size businesses become more successful.
>
> In one week, Marcus will help transform your business to run more efficiently, be more profitable and ultimately more successful.
>
> Marcus Lemonis has built a national empire of over 100 companies worth $2.2B and now he's paying America back by helping one small business at a time. In fact, Marcus, as you can read in the below **Chicago Tribune article**, on Christmas eve this past year saved a bakery with a personal $250,000 dollar investment. To read the article click on the following link: Chicago Tribune Article.[4]

72.     Jim Ackerman, Executive Vice President of CNBC, was put in charge of this mob-style production. He was the mob-boss for NBCUniversal. Ackerman repeatedly approached Amber Mazzola, Executive Producer at Machete, with the opportunity to produce the show for

---

[4] *See* Exhibit C: Marketing Email

CNBC.  In the *Rock Your Brand Podcast*, which aired on June 10, 2020,[5] Amber Mazzola said, "[Jim Ackerman] went to oversee [C]NBC Prime and said you know I want to bring you over here. I have this show I would love for you know to be the showrunner for it."  At the time, Mazzola explained that she was no longer a showrunner and that she owned her own production company, which was currently working on a different show.[6]  When that show was canceled, Ackerman reached back out to Mazzola and asked whether she would "run the show for [him]."[7]  When she declined again, he said, "Come work with me.  Help me launch this network into a show as a producer, and I will help you build your own company again.  I'll help you like rebuild your company."[8]

73.     Ackerman told her, "[NBCUniversal/CNBC] has this great piece of talent, and we have a production company that brought [Lemonis] you know us but we don't really know the company that well they're not really vetted. We've never worked with them. They're sort of this new company."[9]

74.     Mazzola further explained, "I started the very first season of *The Profit*.  It was not my show as a company owner.  I was the showrunner on it.  I was an executive producer still helped with casting, the budget, and did everything.  Actually, I even formatted the show you know with Marcus and the network, and it didn't work out with the production company with the network, . . . so Jim [Ackerman] gave the show to me into my company.  So, from Season 2 on, I was the company behind the show."[10]

---

[5] *See* https://www.youtube.com/watch?v=Op2uXkeNTyM&ab_channel=BrandCreators.
[6] *Id.*
[7] *Id.*
[8] *Id*.
[9] *Id*.
[10] *Id*.

75.     While Machete and Lemonis were involved, NBCUniversal was the final word in the selection of the businesses that would appear on the show.  When asked how the businesses that appear on the show are selected, Mazzola explained that Machete looks through thousands of applications, and then they "present it to Marcus [Lemonis] and the network, and you know everyone sort of weighs in what they like."[11] In other words, NBCUniversal helps Lemonis cherry pick the victim companies.

76.     During the show, Lemonis and NBCUniversal were in constant contact regarding Lemonis' actions and intentions during the show.  Ackerman and Lemonis regularly met and discussed the day-to-day actions of Lemonis with respect to victims of *The Profit*.  Not only did Ackerman – and thus NBCUniversal – fail to stop Lemonis' mob-style tactics, he knew about the vulture-capitalist              actions              and              approved              of Lemonis' conduct.

77.     After filming concludes, Machete, Lemonis, and NBCUniversal edit the footage into episodes that defame participants, portray them in a false light, and often include outright falsehoods about the participants and their businesses.  The impact of these defamatory portrayals was catastrophic for the businesses featured on the show.  In other instances, NBCUniversal, Machete, and Lemonis edited the footage to make it appear as if Lemonis' advice saved the business by making changes to the business plan and introducing the business to national buyers. Most – if not all – of those portrayals are false.

/ / /

/ / /

/ / /

---

[11] *Id.*

**B.      NBCUniversal Falsely Promoted Marcus Lemonis as a Successful, Trusted Business Advisor.**

78.     *The Profit* has aired for roughly eight years and has featured around one hundred businesses.  On each episode of the show, Lemonis visits a purportedly ailing business and offers his business acumen and a financial investment in exchange for an ownership interest in the entity.

79.     From the outset, NBCUniversal has falsely promoted Lemonis as a trusted advisor and savvy businessman.  The introduction to the show finds Lemonis speaking to the public viewer, stating:

> My name is Marcus Lemonis, and I fix failing businesses.  I make the tough decisions, and I back them up spending my own money.  It's not always pretty, but this is business.  I do it to save jobs, and I do it to make money.  This is *The Profit*.

80.     During commercial breaks in the episodes, Lemonis invites businesses to apply for his help, stating, "If your business is in trouble and you need my help, log on to theprofitcasting.com."  However, these were not the types of businesses Defendants chose to depict on the show.  Rather, Defendants chose solid and successful businesses who were simply in need of more capital and who were often small enough not to have legal support in the form of general counsel.  These were the types of businesses Defendants sought out to victimize and defraud for their own purposes and personal gain.

81.     In addition to using CNBC's logo, the website where businesses are directed (https://www.theprofitcasting.com/) to apply to appear on *The Profit* states, "If you are in over your head and feel your business is drowning, CNBC can provide you with the lifeline to save your business. . . . Apply now for a chance to save your business."

82.     On that page, business owners can read a statement claiming that Lemonis "has

been called America's number one business turnaround artist.  He will do whatever it takes to fix YOUR failing business.  When Marcus Lemonis isn't running his multi-billion-dollar company, Camping World, he is on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In the past 10 years, he's successfully turned around over 100 companies.  Now he's bringing those skills to CNBC and doing something no one has ever done on TV before… he's putting his own money directly into the failing businesses." *Id.* Almost all of this is false.

83.     CNBC's website for *The Profit* (https://www.cnbc.com/the-profit-about/) reiterates this and promotes Lemonis' tactics, stating that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal.  In each one-hour episode of *The Profit*, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of *The Profit*s."  This is all too telling.  While Lemonis indeed "hunt[s] for businesses that are desperate for cash and ripe for a deal," the entire plot is designed so Lemonis can use the businesses' needs for his own gain.

84.     NBCUniversal led businesses to believe that Lemonis was a successful businessman with a proven track record of success for businesses that appeared on the show. CNBC's own website (https://www.cnbc.com/the-profit-effect/) depicts only allegedly positive experiences and does not discuss unsuccessful deals.  Worse yet, it even depicts businesses—that have since closed due to Lemonis' involvement—as success stories.

85.     Throughout      its      website      (https://www.cnbc.com/marcus-lemonis-bio/), NBCUniversal endorses and continues to depict Lemonis as a successful businessman.  Businesses that applied reasonably relied on these representations that this was a real opportunity with a business advisor/business expert to take their business to the next level.  CNBC's website states:

> There is no secret as to why self-made millionaire and serial entrepreneur
> Marcus Lemonis continues to make his mark on the business world. He

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 31 of 176

leaves not just an impression, but an imprint on everyone he meets, and Lemonis has that charisma, if you will, that few possess.

On CNBC's "*The Profit*," Lemonis lends his expertise to struggling businesses in various industries across the country while using his famous People/Process/Product principle. Through his "Three P mantra," he analyzes every business by the quality of people, whether they have an excellent and relevant product, and the best possible process for creating, delivering, and selling that product. Since "*The Profit*" first premiered in July of 2013, Lemonis has invested nearly $50 million of his own money in the companies featured on the series.

As a result of successful partnerships on CNBC's "*The Profit*," Lemonis has added a variety of new product lines and services to his holding company, Marcus Lemonis Enterprises LLC. . ..

Lemonis was recognized for having "more impact on the industry than any single individual or company in recent memory as an agent of change and retail consolidation," when RV Business Magazine named him their 2007 Newsmaker of the Year. In addition, Crain's Chicago Business featured him in their 2005 edition of "40 under 40"; and in 2008, Ernst & Young named him Entrepreneur of the Year." . . . .

Lemonis drives results through collaborations, partnerships and relationships. His advice for aspiring entrepreneurs is simple: know your numbers, trust the process, and remember that he's 100 percent in charge!

86.     NBCUniversal has continuously promoted Lemonis and *The Profit*, often referring to Lemonis as "CNBC's Marcus Lemonis."

87.     CNBC's website states: "'*The Profit*' is produced for CNBC by Machete Productions with Amber Mazzola serving as executive producer.  Marcus Lemonis, Mike Riley, Deirdre Bianchi and James Bolosh are the executive producers for CNBC."  Lemonis likewise lists *The Profit* on CNBC under his experience in his LinkedIn profile.

88.     This endorsement of Lemonis extends to social media as well. CNBC featured Lemonis live on Instagram with "CEO Gives Small Business Owners Coronavirus Advice in Real-Time."  CNBC promoted the "opportunity" as follows:

     "CNBC featured CEO of Camping World, Marcus Lemonis, gives advice

FILED: NEW YORK COUNTY CLERK 11/18/2021 10:01 PM
NYSCEF DOC. NO. 1    Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 32 of 176    RECEIVED NYSCEF: 11/18/2021

INDEX NO. 160490/2021

to small business owners as they navigate the professional world amidst the Coronavirus pandemic. Tune in to Lemon-aid with @MarcusLemonis Tuesday & Saturdays at 9P ET on Instagram Live."

89.    On Instagram, the show's handle is "theprofitcnbc." The biography states,

CNBC's *The Profit*
@marcuslemonis is #TheProfit!
Watch Full Episodes! @peacocktv

90.    The account, believed to be run by NBCUniversal/CNBC, even reposts posts from Marcus Lemonis' personal account. Other posts include images with the CNBC logo. Likewise, on Twitter, the handle is @TheProfitCNBC. On these platforms, NBCUniversal continues to falsely depict Lemonis as a business expert who has successfully transformed over 100 companies.

91.    Indeed, *The Profit* often features family-owned businesses where the family members are often overworked and fulfilling multiple roles in the company. These business owners do not have formal business training. Even more, these companies often do not have general counsel or independent advisors.

C.    **NBCUniversal and Machete used Fraud, Misrepresentations, and Deception to Convince Unwitting Business Owners to Appear on *The Profit*.**

92.    NBCUniversal, Machete, and Lemonis used a variety of misrepresentations during the course of their scheme to get participants to go on *The Profit*, sign fraudulently induced and illegal release agreements, and allow Lemonis to control and destroy their businesses.

93.    They convince businesses to come on the show in one of two ways: either a person applies to appear on the show, or Lemonis and Machete seek out a family business for the show. The common theme running through both of these recruiting efforts is a web of lies and fraudulent misrepresentations promoted by NBCUniversal, Machete and Lemonis working in concert to portray Lemonis as a business expert, fiduciary, and investor who works in good faith to

29

successfully help the businesses featured on the show grow their businesses. The material misrepresentations made by NBCUniversal, Machete and Lemonis induce participants to go onto the show and give Lemonis unilateral right to force their companies to incur unlimited expenses and follow his advice.

94.    The material lies include promises by NBCUniversal employees and Machete employees who interview those selected for the show. They tell the victim owners that their private financial information will be used to only make their company look good. They represent that their personal psychological information or family history or medical information will be held in confidence. They affirmatively represented over and over that a truthful, strong, and financially successful picture of the victim's company would be presented to the public to improve the brand. They promised to improve the company's sales, grow the business, and take it to a higher level. All along they hide their mob-style plan and bad faith intent. All the statements to induce the victims' companies to appear on a show are a lie.

95.    Indeed, during this recruitment stage, companies are told that appearing on *The Profit* will materially help their businesses. Among other things that they are assured is that they will be in "good hands and not to worry" and that the show would be "great for their business." False promises were often made about partnerships with other companies. Or that Lemonis would make a far better offer than any other potential investor. None of this was even close to true.  All of these lies are told by employees of NBCUniversal and Machete to get business owners to expose themselves to the embarrassment, shame, and humiliation that comes with participating on *The Profit*.  Each lie is in furtherance of NBCUniversal's bottom line.

96.    For those reluctant to appear on a national television show or potentially hand over a piece of their business to a stranger, Machete representatives are often deployed to convince

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 34 of 176

them otherwise. For example, Mazzola and Kimberley Donnan ("Donnan"), Co-Executive Vice President of the show and Executive Vice President at Machete set up calls, video conferences, and sometimes in-person meetings to fraudulently induce reluctant business owners to appear on *The Profit*, stating that the show would depict participants as wholesome family-run businesses and using the perceived honorability and reputation of NBC to portray Machete and *The Profit* as principled purveyors that would never distort the "truth." These statements were all virtually false. They are all designed to gain participation and boost ratings.

97.     In order to induce participants to come on the show, NBCUniversal and Machete have also represented that Lemonis' purpose was to act in the best interests of the companies on the show. This was put in writing. This was utterly false.  This inducement to participate and appear on the show was done with the intent to defame, humiliate, and ruin the businesses, all distributed to viewers around the world.

98.     Moreover, they were also told Lemonis would act in good faith during the deal negotiation stage. This, too, was entirely false.

99.     For example, in addition to all the claims made at the recruitment stage, the Participant Agreement from June 03, 2014, includes the following language:

> Company acknowledges that Lemonis' consultation is a good faith attempt to rehabilitate the Company beyond the Company's involvement with the Series and Company agrees to use its best efforts to adhere to Lemonis' advice during the episodes[12]

100.     This is materially misleading because they did not disclose several facts that materially alter the total mix of concealed and false information conveyed by the claim that Lemonis is acting in good faith to "rehabilitate the Company."

---

[12] *See* Exhibit D: Participant Agreement Release & Arbitration Provisions – Business section 1.B(i)

101.     First, they did not disclose that the deals shown on the show can differ materially from the actual deals offered to such a degree that, rather than resulting in a net infusion of capital, appearance on the show often leaves the company in more debt than it can afford. Often, this debt was inflated and was a false number provided without backup.

102.     Second, they did not disclose that Lemonis could—and indeed regularly did—take actions on behalf of companies that benefitted himself directly (and not the company). NBCUniversal and Machete knew that Lemonis often brokered "deals" with companies he controls, in this case ML Retail.  NBCUniversal knew that this self-dealing provided an incentive for Lemonis to act in ways that were in conflict with the interest of the participating business.

103.     Third, they also did not disclose that Lemonis regularly used both the Consultation Period and his advice to induce the owners to take actions that Lemonis understood would place the company in a more vulnerable position than it was prior to joining the show, thereby putting pressure on the company's owners to enter into a deal with Lemonis that was far more favorable to Lemonis than any deal they would have agreed to prior to the show. These actions by Lemonis, as directed by NBCUniversal, included incurring substantial expenditures, failing to pay a mortgage or to honor other contractual commitments, taking actions that enabled Lemonis to misappropriate the company's intellectual property, and other misconduct.

104.     Fourth, they actively concealed and/or did not disclose that most businesses on *The Profit* failed after Defendants' involvement.  NBCUniversal, Machete, and Lemonis had sole knowledge of and access to these material facts and knew that such facts were not known to or reasonably discoverable by Plaintiff.

105.     Fifth, Machete's fraudulent statements also included the language in the Participant Agreement that Lemonis would use the full control granted to him during the Consultation Period

for the company's benefit:[13]

> Company further agrees to grant Lemonis the irrevocable right during the Episodes to advise and counsel Company by providing suggests and any other general consultation in a good faith attempt to rehabilitate the Company beyond the Company's involvement with the Series and Company agrees to use its best efforts to adhere to Lemonis' advise during the Episodes.

106.    It explicitly states that Lemonis will make "a good faith attempt to rehabilitate the Company."[14] The hook, however, is that no matter what advice is given, the Company is required to enter into good faith negotiations with Lemonis while Lemonis has no obligation to make an actual investment in the Company.  In other words, the Company must do what Lemonis wants to even have the **_possibility_** of a partnership.  Of course, once a participant realizes the damage done during the Consultation Period, most businesses have no choice but to pursue a deal no matter how bad the deal would be for the company or the proprietors.

107.    Further, the Agreement states:

> [D]uring the Consultation Period, Lemonis may at his sole discretion elect to incur expenses to improve Company's business or property, including without limitation making out-of-pocket discretionary purchase for the benefit of Company or making capital contribution and/or loan to the Company independent from the Simulated Investment or the Action Investment . . .[15]

108.    These clauses do not include several material facts that would have altered the total mix of information available to the potential participants, and would have affected their willingness to sign the deal: (1) Lemonis planned to cause their company to incur substantial inflated expenditures that could not be deemed an effort to "improve [the] Company's business or

---

[13] *See* Exhibit D: Participant Agreement Release & Arbitration Provisions – Business section 1.B(i)

[14] *Id* § 1.B(i).

[15] *See* Exhibit D: Reality Participant Agreement Release & Arbitration Provisions – Business section 1.B(ii)

property" because the expenses would leave the company in financial extremis unless the owners accepted Lemonis' new, self-serving deal; (2) that Lemonis regularly used the Consultation Period to cause companies to incur debts that exceeded the amount that he later offered to invest; and (3) that he was not acting for their best interest at all, because he regularly caused participants to incur substantial expenditures to companies in whom he had a financial interest. A company contemplating signing the contract would view the terms of the deal in a materially different—and more negative—light if the company's owners were informed of these facts. These material omissions suffice to establish fraud under the right to control theory.

109.    Finally, in light of the statements that Lemonis would act in good faith, and the marketing statements that the show was intended to benefit the companies, it was materially misleading for Lemonis and Machete not to disclose that the show would present doctored and patently false footage that distorted the facts in a way that put the company in a bad (and false) light. The statements made by Machete and NBCUniversal that Lemonis (and the producers) would act in good faith implied that they would not doctor material to put the company in a falsely negative light. Thus, the portions of the Participant Agreement that give the producer the right to fictionalize and dub material (¶ 7(b)) does not suffice to inform the participants that Lemonis and Machete might dub or fictionalize material in a way that presented false facts that would harm the company's business. A reasonable interpretation of that clause was that it gave the producers permission to dub to improve sound quality or to fictionalize a scene in order to recreate an event that actually happened. Given their other representations, all the Defendants were obligated to inform participants that they reserved the right to dub, alter, or fictionalize material in a way that would intentionally harm the companies or their owners. None of the Defendants were honest. They concealed information and lied to induce businesses to appear on the show.

110.    NBCUniversal, Machete and Lemonis also represented to potential participants that the deals shown on the show are real. They are not even close to real.

111.    This of course was false. While the illegal Participant Agreement mentions a simulated investment, the did not disclose that the actual offers were materially different from the depicted offers. Moreover, the investments shown on the episodes presented a misleading view of Lemonis' contribution because they did not clearly show all the expenses he caused the companies to incur or other losses to the companies that resulted from the Defendants' mob-style playbook.

112.    The materially misleading statements that the deals were real were not corrected by later disclosures, contained in the Participant Agreement, that the actual investments shown on TV were simulated:

> ii) Simulated Investment: Subject to the Company's compliance with the terms set forth above in Section 1B(i), Lemonis shall have the right to make a simulated capital investment in or loan to the Company during the applicable Episode, in an amount to be determined by Lemonis in his sole discretion (the "Simulated Investment"). Company acknowledges Lemonis will perform the Simulated Investment transaction on-air during such applicable Episode for the purposes of portraying a dramatic moment. By way of example, and without limiting the foregoing sentence, Lemonis may present Company with a prop check during the applicable Episode.[16]

113.    This disclosure does not suffice to negate the prior statements of Lemonis, Machete, and CNBC that the deals shown on the episodes were real because the statement that what was shown on TV was simulated did not negate the understanding that Lemonis, Machete, and CNBC had caused participants to believe that the actual deals would not differ materially from the deals shown on TV.  It is only after the filming that participants realize that the offers not only differ from what is shown, but they are often entirely fake.

---

[16] *See* Exhibit D: Reality Participant Agreement Release & Arbitration Provisions – Business section 1.B(ii)

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 39 of 176

114.   Moreover, the Participant Agreement contained language, in the section discussing the simulated investment, which reinforced this idea:

> Lemonis shall thereafter promptly enter into good faith negotiations with Company off-air regarding any Actual Investment and/or Loan Transaction (as defined below) following the Consultation Period and may present a term sheet setting forth the anticipated terms of the Actual Investment and/or Loan Transaction ("Term Sheet") during the Consultation Period, which Term Sheet may set forth the terms of the on air Simulated Investment and/or Loan Transaction and which may be binding if specifically set forth therein.[17]

115.   While the clause does say "may," participants would reasonably interpret the clause against the backdrop of the regular assurances that the deals shown on the show were real. In order to make those prior statements not materially misleading, the participants would need to have been informed that the actual deals regularly—indeed usually—do materially differ from the deals portrayed on the show and that on multiple occasions, participants on the show did not get a net infusion of capital once the costs of the Consultation Period were taken into account.

116.   Witting and unwitting participants have agreed to come on the show given Lemonis' supposed business expertise, as advertised and promoted by a major television network, which adds further credibility to Lemonis, in the hope and promise of taking their businesses to the next level.

117.   Others were persuaded by false representations that Lemonis was a successful businessman with a proven track record of success for businesses that appeared on the show. NBC's own website (https://www.cnbc.com/the-profit-effect/) depicts only allegedly positive experiences and does not disclose any unsuccessful deals. Worse yet, it even depicts businesses— that have since closed due to Lemonis' involvement—as success stories. Indeed, and since the

---

[17] *See* Exhibit D: Reality Participant Agreement Release & Arbitration Provisions – Business section 1.B(ii)

show's inception, NBCUniversal executives have consistently promoted the false idea that the show has actually helped people. In July 2013, Mark Hoffman, President of NBC, boasted about the "incredible results" the businesses in the first six episodes of the show obtained. This was a fatal lie. Of course, many of the businesses paint a different picture and confirm that the show did not bring these so-called incredible results to even one participant. Instead, it devastated dozens and dozens of those victim businesses.

118.    Following the initial hook, these business owners participated in at least one Skype interview with a Machete representative, typically Mazzola and/or Donnan, during which time, the producers further praised Lemonis and his ability to take businesses to the next level, all the while concealing the fact that Lemonis had actually destroyed businesses that previously appeared on the show. It is in these interviews that the aforenamed false statements of material fact were told to the selected victim companies' owners.

119.    Potential show participants also undergo extensive background checks and provide producers and the network a slew of confidential and private information about the company's financial affairs. Further, Machete and NBC required participants to speak to c counselors, who Machete and NBCUniversal were unethically using to mine and secure details about the business owners' personal lives, relationships and dynamics with one another, and mental and physical health issues, only to be used later to embarrass and humiliate the businessowners on an international television program. Lemonis and his cohorts extracted valuable information about key business assets that were most valuable to Lemonis and later used this information to leverage the companies, making them dependent and indebted to Lemonis, so these assets could be taken by Lemonis.

120.    Once approved to appear on the show, the participants are sent a number of

documents to sign by Machete, including the Participant Agreement and various other documents. This is a very large stack of CNBC's legal counsel's, one-sided, illegal, and in-part fraudulent contracts. At no point were participants advised by Lemonis, NBCUniversal or Machete agents or employees to have an attorney review these agreements with them prior to signing or inform them about the rights they purport to waive.

121.    On those occasions when some of the business owners pause before signing the agreements out of concerns that they should obtain legal advice to protect their interests, they are told to "trust the process" and/or were met with high pressure sales tactics, like being told to "urgently sign the documents in order to secure their spot on the show" and to "not miss out on this once in a lifetime opportunity," as the agreements were a "take it or leave it" situation.

122.    Some business owners were reassured that the language in the contracts is "boilerplate" and "did not apply to them or the show." Even after the fact, NBCUniversal's Jim Ackerman continues to claim these CNBC documents were just "boilerplate."[18]

123.    Others met or spoke with Machete producers (usually Donnan and/or Mazzola) who again explained their falsely stated vision for the show to assuage their fears, reinforcing the false promises that they were producing an honest portrayal of an American family business for a reputable, highly regarded national news network. Participants are assured that neither Machete nor NBCUniversal had anything but the best intentions for the businesses, reinforcing what a once-in-a-lifetime opportunity it was to acquire an invaluable partner like Lemonis who could raise their company to a new echelon. Throughout the whole recruitment process, producers played up their status as a program featured on a nationally recognized news network to fraudulently induce these people to hand their life work and company over to this mobster style scam.

---

[18] *See* Exhibit A.

38

124.     Throughout the process, none of the business owners were encouraged to seek independent legal advice, even though they were typically unsophisticated, without in-house legal guidance and were interacting with a well-represented, major television network. In other cases, the business owners were provided attorneys which turned out to be paid by Lemonis himself because they were his attorneys, presenting a clear conflict of interest that participants were not aware of, much less asked to waive.

125.     Instead, they were repeatedly told by Lemonis and his co-conspirators to "trust the process" as if the process had been designed to protect their interests, rather than the interests of the network and its star, Lemonis.[19]

126.     NBCUniversal, Machete and Lemonis also falsely promised that these companies and their families would be presented on the show in a favorable light.  These representations regarding the business' portrayal on the show were patently false and misleading.

127.     Rather than appearing in "feel good episodes" that gave a "favorable presentation" of their businesses, they and their businesses were ridiculed; falsely depicted as incompetent, rude, mean or unethical; and their products and services were poorly presented and in a negative light for the purpose of manufacturing a fake story line created by NBCUniversal for the show for giggles and ratings, and to weaken the company so Lemonis could take it over.

128.     Defendants' concerted effort to lure successful businesses to appear on *The Profit* included representing past participants' purported success stories and Lemonis' purported investment as seen on TV to help the featured businesses. These representations were false, and

---

[19] A particularly offensive tactic taken by Machete representatives in several cases involved them persuading businesses to forgo favorable sales of their companies or safer investments in their businesses and instead opt to appear on *The Profit* on the false promise that Lemonis would help their companies.

Defendants knew it.

129.    Indeed, it is hard to find one business, not weakened by Defendants, who improved their circumstances following their appearance on *The Profit*. Many became insolvent, were forced to close their businesses, or faced dramatically reduced profitability. Others saw their owners forced out of their own companies. And these profoundly negative consequences were all in the service of ensuring that *The Profit* was an entertaining program with conflict and drama – albeit false and manufactured – and the financial interests of the show's star were advanced.

130.    The touting of these purported success stories is even more egregious given Defendants' failure to disclose Lemonis' extensive history of self-dealing within the show by, among other things, causing participating companies to contribute funds to Lemonis' own companies and making participating companies incur substantial expenses and/or lose clients so that the company's owners would be left with no other choice but to agree to surrender most or all of the key assets of their companies to Lemonis.

131.    These material, false pretenses, false representations, or false promises, along with the allure of appearing on a network television program seen across the country, were the hook that initially lured the business owners onto the show.

132.    As Goureau and Menkin would soon learn, Defendants used the show to prey upon vulnerable and often less sophisticated business owners to build their own individual wealth at the expense of the businesses they were purportedly helping. Defendants reaped the rewards by depicting Goureau, Menkin, and Gooberry in a defamatory manner.

**Once Filming Begins, Defendants Start to Slowly Destroy the Business**

133.    As soon as filming began, participants quickly realized that while the show is promoted as a "business" show that portrays reality, their reality was anything but that, with nearly

every scene staged for undisclosed purposes, and nearly every promise turning out to be a lie.

### A.     The Initial On-Air Agreement.

134.    As shared by CNBC/NBCUniversal former top executive Jim Ackerman, virtually every episode of *The Profit* includes an initial on-air agreement that involves Lemonis purporting to make a substantial financial investment in the business owner's company in exchange for an interest in the business.

135.    Each one of these initial agreements follows a similar pattern: they are always oral agreements and are never promptly formalized into a binding contract.

136.    Lemonis even once bragged that he "never signs a contract right away," as if declining to sign an enforceable contract in advance of exercising power over one's own counterparty is something to be avoided at all costs, in stark contrast to how all honest businesspeople conduct their business affairs.

137.    Often, during the episode, Lemonis presents participating business owners with a check in the amount of the promised investment, only for producers to take the check back from participants once the cameras are no longer running.

138.    The full promised investment virtually never materializes.[20] However, the show participants were told prior to filming and thus believed that the handshake, on-air deal reached with NBCUniversal's and/or CNBC's employee Lemonis was real and that Lemonis or NBCUniversal/CNBC were investing in their business as an equal partner.[21] Defendants purposefully suppressed the fact the reality of the actual deals in the past were in fact regularly

---

[20] The presentation of the phony checks on air often triggered a reasonable expectation by the business owner's creditors that debts would now be promptly paid, and when they were not, since Lemonis had not in fact funded the business, important business relationships with suppliers and other creditors, as well as the business owner's reputation, were damaged.
[21] Exhibit E: Charly Himmel "Restaurateurs Sue Lemonis of '*The Profit*.'"

vastly different from the deals shown on national television, such that the participants did not get the net infusion of capital once the debts imposed upon them during Lemonis' consultancy were put in place.

139.    Lemonis then decidedly declares on air that he is "100% in charge." In fact, this declaration may be the only truth in NBCUniversal's *The* Profit. Lemonis effectively takes over the business, overcoming any lingering reluctance on the part of the business owners by encouraging them once again to "trust the process." The phrase is uttered as a solemn incantation that disarms the business owners into believing that they are in the hands of a fiduciary who will deliver on all of his promises.

140.    The problem, of course, is that once disarmed, participating businesses find themselves increasingly underequipped to defend themselves against Defendants' single-minded efforts to create a television program with conflict and a horridly false narrative, designed to enrich their own companies at the expense of the business owners who appear on the show.

> **B.    With the Script from CNBC and Machete, NBCUniversal and Lemonis Unilaterally Orders Significant, Damaging, and Costly Changes to the Business.**

141.    Following the initial on-air phony agreement and Lemonis' declaration that he is "100% in charge," Lemonis unilaterally orders significant, damaging, and costly changes to participating businesses that invariably causes the business to go deeply into debt, leaving them highly vulnerable to Defendants and their malicious intent.

142.    When the business owners protest that the amount of debt Lemonis is saddling their company with (which, in turn, is owed to Lemonis and his entities), is unacceptable, Lemonis tells them they can only back out of the deal if they pay him back the undocumented, often falsified debt. Unable to do so, the business owners are left with no other choice but to continue under

Defendants' mob-style plan.

143.     Along the way, Lemonis almost always lines his own pockets through a variety of means such as causing the companies to borrow money at very high interest rates from Lemonis' other entities and threatening to foreclose if they default. All the while, Lemonis drives down profits, forcing the businesses to incur even more debt just to stay afloat. Then, while these businesses are under his thumb, Lemonis leverages their businesses for his personal gain, enriching himself and boosting his personal brand at the businesses' expense. Often, Lemonis then removes the business owners from their salaried employment positions and loots their businesses, and he often comingles these companies with his own businesses, wherein the owner loses everything. Lemonis charges excessively high interest rates to add to the leverage.  Defendants' script: a mob-style bust out.

144.     The changes Lemonis ordered on the shows depicting many of the businesses include:

- Costly and unnecessary store or warehouse renovations, often using companies controlled by Lemonis to profit off the renovations. The cost of the renovations and the interruption of business activity caused by the store or warehouse closures, forces the businesses into debt and into becoming more deeply dependent on Lemonis;

- The closures for renovations are often accompanied by the sale of current inventory at steep discounts to allow the renovations to proceed, again making the businesses financially vulnerable and dependent on Lemonis;

- Closing low-cost warehouse arrangements (often owned by the business) and costly moves to new expanded spaces often requiring renovations;

43

- Relocating to new offices or comingling the assets with other businesses controlled by Lemonis;

- Re-branding or brand redesign, often of a profitable and popular brand without a clearly articulated business rationale, resulting in the undermining of the brand;

- Switching to more expensive vendors or vendors with relationships with Lemonis;

- Re-formulation of recipes, ingredients, or changes in manufacturing processes or materials undermining the uniqueness of the product and the reason for its success;

- Forcing the company to purchase costly new equipment;

- Hiring new staff loyal to Lemonis, and firing of long-time staff loyal to the business owner;

- Directing the business owners to work on projects for the benefit of other Lemonis entities or other companies appearing on *The Profit*, without any or insufficient benefit to the owners and their companies, and often in violation of Labor Laws;

- Purchase of new inventory before expanding the customer base, where the new inventory often is not what the business owner's customers want, resulting in the business ultimately being forced to sell the new inventory at a deep discount, causing deeper debt;

- Expanding the number of stores (often requiring renovations) without appropriate due diligence to ensure the business need;

44

- Changing the business' core business model;

- Switching to a new, inferior manufacturer;

- Adding a new product line;

- Incurring unnecessary business expenses; and

- Forcing the business to work with a competitor.

145. Many of these changes had serious side effects, in addition to increased debt, that negatively impacted any victim business falling victim to Defendants' mob-style playbook.

146. For example, in connection with ordering some of the businesses to relocate offices, stores, or warehouse space, Lemonis often directed business owners to stop paying the business' current mortgage or rent, ultimately leading to foreclosure and/or evictions.[22]

147. In other cases, they were instructed by Lemonis to stop paying vendors and suppliers, ultimately leading to the loss of valuable business relationships and irreparably damaged reputations.

148. Other changes put unusual strains on relationships with the businesses, resulting in resignations, firings, untimely departures, and ruined personal relationships.

149. While many were wary of the significant, and often unnecessary changes they were being strong-armed into, many acquiesced believing that Lemonis was their partner, fiduciary, advisor, and the business expert he was falsely touted to be by NBCUniversal and Machete. Many were just extorted by Lemonis and his fake or inflated debt.

## C. The Agreement Changes.

150. After Lemonis causes the business owners to incur significant debt resulting from the changes he ordered at the direction of NBCUniversal and/or CNBC, he pressures them into

---

[22] Exhibit A.

accepting a different agreement than aired during the show to include terms more favorable to him, but which the business owners felt compelled to accept because of their increased dependence on Defendants.

151.    For many, Defendants simply fail to fulfill their commitments under the agreement while holding the businesses to its commitments.

152.    Unfortunately, Lemonis is all too successful in luring business to let him "invest" in their business in exchange for a percentage of the company; typically, this results in Lemonis taking complete charge. He doesn't achieve this on his own – by the time participating business owners appear to film the show and meet Lemonis, they have been groomed by NBCUniversal controlled producers who repeatedly misrepresent what awaits them, their families, their companies, and their livelihoods. These falsehoods are repeated on CNBC, a national television network, reinforcing Lemonis' persona, and baking in the lie: the massive scam of fraud

153.    The agreements that Lemonis uses to formalize his investment are drawn up by his own lawyers to allow him to take complete control over the company through their fraudulent scheme. For many businesses on the show, Lemonis creates a new limited liability company that is supposed to run their joint business venture. These limited liability company agreements are all induced by fraud and give Lemonis complete and unfettered control to run the business. In conjunction with these agreements, Lemonis forces the companies to enter into credit agreements with Lemonis. Lemonis then furnishes his "investment" in the companies in the form of a loan at very high, and often illegal rates, pursuant to the credit agreement. These agreements force the companies to draw on their line of credit from Lemonis any time they need funding. Of course, Lemonis runs these businesses in a way that purposely increases their debt to Lemonis through the lines of credit.

154.    Throughout this, or any, phase of the fraudulent scheme, company owners are never advised to consult with an attorney before signing these agreements and are left to deal with Lemonis' lawyers under pressure to sign quickly.

155.    For many businesses featured on *The Profit*, Lemonis continues expensive, sloppy, and time-consuming renovations (often failing to pass code compliance), buying far more inventory than their stores could even carry, and forcing companies to buy inventory and products from other businesses that were featured in *The Profit* regardless of whether such purchases made sense for the businesses at hand.

156.    When it comes time to pay regular business expenses, such as rent or payroll, the companies are forced to draw from their mob-style loan from Lemonis. Over time, the businesses become so indebted to Lemonis that there is no way out.  This was the NBCUniversal/Ackerman playbook. Lemonis then uses the debts he created to leverage his taking of the business, or its key assets, for himself.  Ackerman, and hence NBCUniversal, knew of this stealing of the assets of the participant companies and did nothing to stop it.  They – NBCUniversal and/or CNBC – allowed this to happen.

157.    For certain participants that give Lemonis an ownership stake in their businesses, he eventually works to separate the participants from the businesses they worked so hard to create, forcing them to work for his other entities or driving them out altogether. Lemonis uses the control he gains over these businesses to force them to buy services and products from companies in which Lemonis has an ownership stake.

158.    Often, Lemonis also steals assets from the businesses for his own use. Typically, this is done through his vast interconnected web of related entities. Lemonis forces participating businesses to engage with companies Lemonis has a financial interest in, or is in charge of all

together, so that his pockets are lined when the invoices are inflated. He comingles the funds not only between his own entities but businesses he works with on the show, diverting expenses from Lemonis' companies to businesses on the show, and/or arranges for his personal credit card bills to be paid from the company's accounts.

159.     Camping World (or other ML Controlled entities) are almost always brought in to either handle (and get paid for) often unnecessary remodels or to provide any other services deemed necessary for participating companies. Employees are frequently transferred between his various entities without the necessary paperwork and without ensuring that they were being paid out of the entity for which they were working. Instead, for instance, Camping World employees have been retained to work on unnecessary, sloppy, and non-code compliant renovations for the show, leaving participating business owners saddled with the bill for an inflated amount they would owe back to Lemonis and his entities.

160.     Commingling of assets and paying bills from another entity's accounts can result in illegally reducing the taxable income of the company paying the bill by inflating its expenses, and correspondingly reducing the taxable income of the company receiving the benefit of the payment but not declaring the benefit as income.

161.     In some of these commingling schemes, Lemonis created new entities to divert company assets and payments to the new entity under Lemonis' control.   Lemonis and NBCUniversal perfected this tactic with Gooberry, and subsequently ML Fashion.

162.     A former Lemonis employee recently stated that he "was aware that Lemonis was comingling funds between the various different business entities that were under the ML, LLC umbrella" and "*fail[ed] to comply with the terms of deals that he reached with business owners that appeared on The Profit*." Moreover, when business owners asked when their promised

investment would be coming, Lemonis "would say that *he's not providing the funding and would say that his investment was made through the renovations and equipment purchases, etc. done on the show as a capital contribution. This was <u>always different from what the business owners were originally told</u>*." This was yet another lie fed to certain business owners in order to lure them into giving up a stake in their businesses and control over their company to Lemonis based on Lemonis, Machete, and NBCUniversal's repeated and false representations that the show, and the deal on the show was real. As Ackerman put it, "we don't manipulate shit."[23] That was a lie.

163.    Many of the businesses were the victims of Lemonis' theft of their assets, including his draining their bank accounts or preventing them from accessing funds in the accounts to pay legitimate bills, or taking without authorization their valuable intellectual property for his own uses. [24]

164.    In one case, for example, without authority or permission, Lemonis took the designs and drawings of one business and sent them to a competitor to produce for Lemonis' other owned and controlled companies.   This conduct was part and parcel of NBCUniversal, CNBC, and Ackerman's scheme to defraud discussed above.

165.    More often than not, Lemonis walks away with valuable assets of the business, or funds, monies and inventory taken by other businesses he controls, and then, acting with the other defendants, weaponizes the show to severely damage anyone who dares challenge him or who might try to expose their truth.

---

[23] Indeed, in an interview in August 2020, Jim Ackerman stated that the show was "completely real" saying "I never believed creating storylines for shows would be more compelling than the truth. [At CNBC] we don't manipulate shit – we stay true to our character and their journey." (https://www.noblesavages.com/close-up-with-joe-livecchi/cnbcs-jim-ackerman.)
[24] Lemonis effectively took valuable intellectual property either by taking control of the companies or he simply stole the intellectual property for his own uses, as he is attempting with Plaintiffs herein.

166.    Lemonis and his co-conspirators often moved through elaborate schemes to take the intellectual property or successful business ideas for himself, wrestle it from the client, and then sell it for his own profit.

167.    While openly false claims and statements of fact are not permitted on a show of this nature, which is presented as a documentary style program, it became clear from the first day of filming that Lemonis, NBCUniversal, and Machete were intent on falsifying story lines, and defaming and portraying families and their businesses in a false light to boost *The Profit*'s ratings for NBCUniversal and to line Lemonis' pockets.

168.    That is because the show has always been about ratings and not about actually helping businesses. According to Lemonis, when they were creating the show, Hoffman told him that "nobody watches [CNBC's] programs at night" and Hoffman's goal was for *The Profit* to "fix that."[25] In a June 11, 2017 interview with Advisors Magazine, Lemonis explained the importance of ratings stating, "[a]nd in the end, if the reality of what is happening isn't entertaining, the viewers are going to tell us and they're not going to watch. If it is entertaining, they're going to watch and keep on watching. They're going to want more, the thing is going to go viral, and it's going to be fantastic."[26]

169.    Moreover, and as set forth above, participating business owners signed on to appear on *The Profit* based on false representations and assurances by NBCUniversal and Machete producers that Lemonis, NBCUniversal, and Machete only wanted the best for their business. Defendants said over and over that they would portray the business and its owners in a favorable light. Unfortunately, the reality was nothing like what NBCUniversal, Machete, and Lemonis

---

[25] https://www.inc.com/magazine/201410/david-whitford/marcus-lemonis-the-profit-turnsaround-failing-businesses.html
[26] https://www.linkedin.com/pulse/pulling-nighttime-viewers-cnbc-erwin-kantor

promised it would be. They all lied repeatedly and intentionally.

170.     When their episodes aired on CNBC, participants found that lines were dubbed, images were doctored, and edits were maliciously constructed in order to make the business' management look idiotic, rude and deplorable, resulting in disgust and threats directed at the business owners from shocked customers, vendors, strategic partners, and viewers. Scenes were consistently edited to make the business owners appear uncooperative, rude, inept, greedy, entitled, self-centered, and short-fused. For many, *The Profit* went out of its way to distort the scenes with business owners to cast them as villains and dictators to their employees, simply to ridicule them and help boost the series' ratings, coming at the cost of participants' business reputations. These false portrayals subjected certain participating business owners to ridicule and embarrassment, causing damages to the reputation of their businesses – businesses that *The Profit* contractually agreed to further and use a "good faith" attempt to expand and grow.  *The Profit* episodes are republished many times to different audiences and through different media platforms in different languages both in the U.S. and around the world, constantly and through today. And each time the episodes air, these business owners receive yet another wave of hate, and each re-air causes new injuries and damages.

171.     Indeed, the entire show, *The Profit*: *An Inside Look*, details Lemonis' involvement in the creation, production, and editing of the show, where he discusses a tactic of showing up late to the set and causing fighting.  Lemonis explained that he purposefully creates drama to make the business struggle and accelerate its failure.  In one episode, Lemonis and Mazzola openly discuss editing footage together at the end of filming and choosing what to include in the episode and what not to include. They even discussed how the timeline from the show is different than what occurred in real life.  They admitted the show was a lie. Lemonis lied under oath in one Federal Court that

he had no involvement in the editing. A lie – under oath.

172.    During these Inside Look episodes, Lemonis and Mazzola repeatedly state that the check the victims receive on the show is real. These assertions are blatantly false. The assertions are an essential element of the fraudulent scheme to get businesses to agree to appear on the show.

173.    Another lie perpetrated on the show to make participating businesses look bad for ratings involves focus groups that are brought on the show and used to discredit the business owners and tarnish their brands. While focus group participants are brought in to purportedly review the business' products and provide feedback, their comments are staged by Defendants, and their employees and agents, written out and given to the focus group members ahead in advance. The focus groups are typically fake.  In this case, almost every customer shown on screen or providing feedback to cameras was fake.

174.    Lemonis was always intent on boosting his persona on *The Profit* by dragging participants through the mud to put them at his mercy. The producers often pitted family members against one another by "producing" the family members into fighting on air. The CNBC call sheets used to support their pre-planned scam[27] proves Lemonis, Machete, and NBCUniversal knew and intended for the show to manufacture a false narrative, disseminate falsehoods, and in fact enjoyed portraying the victims in a negative and defamatory manner.

175.    Thus, despite their promises and repeated assurances, Lemonis, Machete and NBCUniversal consistently embarrassed certain businesses and their families by fabricating false scenes for the show and ruining these companies. The blatantly false editing, lies, and attempts to fuel fake fiction and drama during filming is the antithesis of how NBCUniversal, Lemonis, and

---

[27] The call sheet asked producers to "produce" the two business owners "to fight without apologizing to each other or backing down[.] Anything with a bit more energy."

Machete and CNBC seek to portray the show and its expert advisor to his fans and the media.

176.   The vitriol these business owners have received as a direct result from their involvement on the show has torpedoed their businesses. This negative impact can continue for years. Seven years after another participant's episode aired, that business' online reviews are still distorted by tons and tons of negative reviews received across the United States and abroad as a result from the airing of their episode and the false statements made therein. Over half of its reviews are one-star reviews from people who are not actual clients of the business in question, but who only heard the defamatory lies broadcast by NBCUniversal and CNBC on *The Profit*. NBCUniversal is directly involved in the airing of these episodes, despite knowing they are utterly false.

177.   In addition to receiving hate mail from the general public, the defamatory statements and outright lies portrayed on *The Profit* have destroyed client and vendor relationships for several show participants. Some lost long-time vendors based on the lies and defamatory statements made about them on the show. Others lost vendors because the show made it appear as though the business had received a substantial investment to pay its vendors when in reality it had not. Many businesses featured on *The Profit* lost vendors and sales accounts when Lemonis took over those companies and delayed or refused to pay their vendors, keep up with payroll, or timely fulfill merchandise orders.

178.   While *The Profit* portrays a false narrative to the world that Lemonis has the "Midas touch," in reality, certain businesses are torched, the owners' reputations utterly destroyed, and they are left as roadkill on the side of the road. In all, there can be no doubt that NBCUniversal created a show, gave Lemonis the power of a national news network, and directed the entire scam from start to finish, all for ratings. NBCUniversal promoted Lemonis as a trusted business expert

and turned a blind eye to the trail of destruction left in *The Profit*'s wake.

179. By this point in the horrid scam, reality is likely settling in for some participating business owners, who were fed false, misleading, and material promises that they and their business would benefit from coming onto to the show in several concrete and material ways. Instead of being treated in good faith, they are being defrauded and they begin to realize they are at risk of having their companies destroyed or taken away from them while Lemonis and his enablers enrich themselves at their expense.

180. And yet, individuals who dare question Lemonis' business strategy, expenditures, or anything else are typically silenced by a remarkably consistent pattern of threats and intimidation, like being featured on NBCUniversal's "review" or "recap" episodes. These "looking back" specials are advertised as a way for the audience to catch up with a previous participant and see how their business is progressing. More often than not, they are used as a sword by Defendants to get back at a business owner who they feel is pushing back. Typically, the disparaging episodes, broadcast nationally, result in hate mail, poor online reviews, destruction of vendor relationships and ruined reputations for the featured businesses. Many former participants who dare to voice their concerns about the show and how their how their businesses are depicted by NBCUniversal encounter an extensive cover up as well as threats of litigation or actual litigation.

181. Machete and Lemonis used the power of NBCUniversal to silence participants who want to speak out against *The Profit*.

182. Lemonis and Machete consistently used the power of NBCUniversal's reputation as a national news network to continue their malicious and oppressive conduct and were weaponizing the show in a malicious, oppressive, and fraudulent manner.

183. Lemonis often and explicitly extorts participating businesses either to obtain a

larger ownership stake in their business or coerce an agreement to a business proposal. This all comes out of NBCUniversal's playbook created by Ackerman. Lemonis often made costly and unnecessary renovations without input from the participating business. When certain business owners objected, Lemonis simply threatened to demand immediate payment for the inflated and fraudulent expense. Since most of the businesses could not afford unplanned and unnecessary expenses, they had no choice but to acquiesce to Lemonis' extortionate demands.

184.    The mob-style playbook outlined above paints a clear picture of a vast cohesive enterprise, wherein each of Defendants (NBCUniversal, Machete, Lemonis and his entities) played its own well-rehearsed designated role, from their "bait and hook," which the other Defendants directed and controlled, to Lemonis' extortionate and mob-style debt bust out, to all the agents' fraudulent misrepresentations to further lure potential participants. Each member of the fraudulent enterprise is liable for an undeniably vast conspiracy to defraud certain victims and, worst yet NBCUniversal ignored complaints and strong-armed victims.

### NBCUniversal is Liable for Machete and Lemonis' Tortious Conduct

185.    As the creator and producer of *The Profit*, NBCUniversal is liable for Machete's and Lemonis' fraudulent conduct.

186.    Moreover, NBCUniversal is an important participant in luring in potential victims.

187.    To do so, NBCUniversal extensively promotes the show and touts Lemonis as the savior of businesses, all the while lending its reputation as the serious business network to the whole operation, knowing the entire show is fraud and a trap and was designed by their executive, Jim Ackerman.

188.    In fact, as part of NBC's promotional tour in 2017, Lemonis expressly touted past participants' "success on *The Profit*." None of this was true.

189.     In other words, NBCUniversal provides the platform and credibility for the whole scheme to work. In fact, many victims would not have even considered getting involved with the show was it not for the fact that it was on CNBC, a serious, established business channel with its long-standing wide-ranging fake reputation.

<strong>A.     NBCUniversal is Vicariously Liable for Lemonis' and Machete's Misconduct Because Lemonis and Machete Were Agents of NBCUniversal.</strong>

190.     NBCUniversal is liable for Lemonis' misconduct to the participating businesses because CNBC's manifestations to the companies caused them to reasonably believe that Lemonis, Machete and Machete's representatives were employees and agents of CNBC in serving as the host and producers of the show, respectively.

191.     The tortious acts described above that Lemonis and Machete engaged in during the show were all within the scope of their employment as NBCUniversal employees and/or agents. NBCUniversal directed their conduct.

192.     NBCUniversal led participants to conclude that Lemonis and Machete (and by extension, Machete's employees) were NBCUniversal's employees and agents by creating the clear public impression that *The Profit* was NBCUniversal's show (because it is NBCUniversal's show), and that Lemonis was hired by NBCUniversal as the host of its show and Machete was hired by NBCUniversal as an employee to produce its show.

193.     Indeed, *The Profit* is NBCUniversal's show. NBCUniversal originated the show, owns the show, and owns all the trademarks and intellectual property. NBCUniversal airs and promotes the show through CNBC television network. CNBC's website refers to the show as

CNBC's *The Profit*, and states that *The Profit* is the #1 *original series* on CNBC.[28] Participants interested in appearing on *The Profit* are directed to a website that displays CNBC's logo and states: If you are in over your head and feel your business is drowning, *CNBC* can provide you with the lifeline to save your business." (Emphasis added.)

194.    CNBC's website describes Lemonis as the host of CNBC's show.[29] At one point, the website even refers to him as an "executive producer for CNBC." Indeed, CNBC repeatedly refers to him as "CNBC's Marcus Lemonis."[30] CNBC further indicated that Lemonis worked for them by hosting a full bio on him.

195.    During commercial breaks of the show, Lemonis encourages businesses to go to theprofitcasting.com.  Of course, CNBC's logo is all over the website.  The website also states that "CNBC can provide you with the lifeline to save your business."[31]   Lemonis literally has NBCUniversal's stamp of approval.

196.    CNBC's website for *The Profit* (https://www.cnbc.com/the-profit-about/) promotes Lemonis' tactics, stating that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In each one-hour episode of *The Profit*, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."

197.    CNBC's website also claims that in the show Lemonis "will do almost anything to save the business."[32] The website further claims that "Lemonis lends his expertise to struggling

---

[28] *See* https://www.cnbc.com/2019/10/14/business-is-personal-on-an-all-new-season-ofcnbcshit-series-the-profit-premiering-tuesday-november-5-at-10pm-et.html
[29] https://www.cnbc.com/marcus-lemonis-bio/.
[30] https://ceoworld.biz/2015/11/13/marcuslemonis-host-of-cnbcs-the-profit-is-putting-hisbusiness-acumenup-for-auction-to-benefit-chicago-nonprofitsupporting-people-withdevelopmental-disabilities/
[31] https://theprofitcasting.com/
[32] *See* https://www.nbc.com/the-profit.

businesses in various industries across the country while using his famous People/Process/Product principle… As a result of successful partnerships on CNBC's '*The Profit*,' Lemonis has added a variety of new product lines and services to his holding company, Marcus Lemonis Enterprises LLC … Lemonis drives results through collaborations, partnerships and relationships."[33] These representations are patently false as presented to the public.   In fact, most of the businesses were far from "struggling."  As with any successful, growing business, these companies were all merely at the point where, for various reasons, they needed a new round of financing, and typically were about to nail that financing down through others when Defendants got their hooks into them with their bait, lie, and harvest scam.

198.    As for Machete, CNBC's website goes on to state that *The Profit* is produced for CNBC by Machete Productions with Amber Mazzola serving as executive producer among CNBC's executive producers, like James Bolosh and Jim Ackerman.[34] It appears that Machete employees involved in the show, such as the Executive Producers, had titles that include "CNBC," manifesting that they worked for CNBC. A participant, such as Nicolas Goureau or Stephanie Menkin properly viewed Machete as an agent producing *The Profit* for CNBC. It was an apparent employee and agent of NBCUniversal.

199.    CNBC's employees and agents were part of the crew for production of *The* Profit.

200.    Furthermore, NBCUniversal provided participant companies with participation agreements and releases as a condition of being on the show. The documents stated that the show was being prepared for NBCUniversal.[35] The Participant Agreement refers to Machete as "the Producer" of *The Profit*, and not the owner. A television producer is a person who oversees one or

---

[33] *See* https://www.cnbc.com/marcus-lemonis-bio/.
[34] *See Id*.
[35] *See* Exhibit. D: Reality Participant Agreement, Release, & Arbitration Provision—Business

more aspects of video production for a television program. They are often employed by the company that owns the show. The term does not convey independent contractor status.[36] The repeated references to "CNBC's *The Profit*" indicates that Machete is a producer for NBCUniversal.

201. In addition, and consistent with an employment/agent relationship, Lemonis, Machete, and NBCUniversal have a long-run relationship. After becoming the star of *The Profit*, Lemonis provided hosting services exclusively to CNBC. He did not work for other networks. The fact that Lemonis only hosted such shows for CNBC is also indicative of an employee-employer relationship. Machete also had a long-run relationship with NBCUniversal; indeed, not only was NBCUniversal intimately involved in creating and producing *The Profit*, but it also brought Machete in specifically to produce *The Profit* for NBCUniversal and to follow the Ackerman playbook.

202. NBCUniversal further manifested that Lemonis, and Machete were its employees and agents through its multiple manifestations that it had a right of control over the manner of production through both actions it took and contract clauses it provided to consultant companies. Indeed, NBCUniversal hired Ionic Casting, the casting firm that reached out to several participants on behalf of CNBC to induce them to appear on the show. In addition, NBCUniversal hosted events across the country that were designed to recruit participants for *The Profit*. CNBC's website promotes these events, and *The Profit* itself, as part of its "continuous goal to help businesses

---

[36] For example, Mark Harmon, star of the series NCIS, is also one of the show's producers as is Clare Danes, the star of Homeland. Yet both of them are clearly employees of their respective networks for purposes of those shows.

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 63 of 176

become successful."[37] All of these actions conveyed that the show was being produced by CNBC, through its employee, Machete and that all of them, NBCUniversal, Machete and Lemonis were making all the participating companies experience greater success. This was the greatest lie ever told in television history.

203.    Moreover, participants directly interacted with agents apparently working for CNBC who were to be their main contact person for the show.

204.    Goureau and Menkin dealt directly with Donnan and Alex Anam, another senior producer for *The Profit*/CNBC.   The titles given to these producers, and their involvement, constituted a manifestation by CNBC that the show is CNBC's show and the people the participants interacted with were CNBC employees. Thus, NBCUniversal employees.

205.    Participants were also given an agreement to sign (hereinafter "Participant Agreement"), which, on information and belief, was drafted by NBCUniversal (or one of its subsidiaries) and included multiple clauses that manifest that NBCUniversal had the right to make decisions relating to an episode before and during filming, consistent with a right to control the manner of performance.[38] For example, the Participant Agreement contains the following clauses:

> Company shall follow and obey all rules, instructions, directions, and requirements of Producer and the Network [CNBC] in connection with the Series, and shall participate in any and all activities required by Producer or the Network in connection with the Series, whether before, during, or after production of the Series, on such dates and at such locations as Producer or the Network shall reasonably designate (collectively with any other locations in connection with the Series, the "Locations.").

---

[37] CNBC's '*The Profit*' and Comcast Business to Hold Panel, Networking and Casting Events During Small Business Week (May 2, 2017) (https://www.cnbc.com/2017/05/02/cnbc-the-profit-comcast-small-businessweek.Html).

[38] What matters for the existence of an employee-employer relationship is NBCUniversal's manifestation of its apparent right to exert control over the manner of the production, regardless of whether (1) on any given episode, NBCUniversal appeared on the set to exert control, or (2) its agreement with Lemonis and Machete gave it the right to control the manner of the work.

206.     Both of these clauses manifest NBCUniversal's view that it had a right to exert control over the manner in which the show was made, including giving directions and removing participants. The following clause manifests NBCUniversal's view that it had the right to undertake production related activities as part of the show, including filming and photography:

> … the Network shall have the right to videotape, audiotape, film, portray, photograph and otherwise record Company, its owner(s), employees (subject to obtaining the required releases) and the location (as set forth in Exhibit A attached hereto and incorporated by reference) in connection with the Series, as often and for such periods of time as they may require (whether before, during and/or after the date of this Agreement).
> … the Network shall have the right to place concealed cameras and other devices on the Location and record the Company using such cameras and devices

207.     All of these manifestations also conveyed NBCUniversal's right to be involved in the manner of the show's production. This would be in keeping with NBCUniversal's public position that *The Profit* was its show, and all of this would create a reasonable belief that Lemonis and Machete were CNBC employees and/or agents.

208.     Thus, NBCUniversal manifested that it had the requisite control over the show. In point of fact, NBCUniversal directed what happened in all aspect of the production (lie, the scam). This caused Goureau and Menkin to have a reasonable belief that Lemonis and Machete were employees of CNBC (and thus and NBCUniversal).

### B.     Machete and Lemonis' Conduct Was in the Apparent Scope of Their Agency with NBCUniversal.

209.     Machete, as producer, acted in the scope of its apparent employment when making representations to participating business owners like Goureau and Menkin about the nature of the show, including claims that Lemonis would act in good faith on their behalf. As discussed above, these statements constitute fraud because Machete knew that Lemonis knowingly took actions that harmed companies and their owners while benefiting himself and NBCUniversal, and that the fraudulent editing of the show defamed, denigrated, and often destroyed the owners of most

companies on the show.

210.    Lemonis, as host of the show, also was acting in the scope of his apparent employment when he made representations that the deals were real and that he would act in good faith on behalf of the participant companies. As host, Lemonis, had apparent authority to speak on behalf of NBCUniversal about the nature of the show. Indeed, CNBC placed statements made by Lemonis about *The Profit* on its website. Lemonis certainly knew that these statements were materially misleading because he knew he was successfully using his role as host to cause companies to take actions that harmed them and enabled him to obtain ownership interests in companies or intellectual property that he could not have otherwise obtained. He also knew that he regularly engaged in self-dealing transactions without owners' uncoerced and informed consent—which constitutes bad faith.

211.    Lemonis also was acting in the scope of his employment by NBCUniversal under CNBC as host of the show in all the actions he took during the show that breached his fiduciary duty to Goureau, Menkin, and Gooberry. As the host of the show, his job was to cause the participant companies to incur expenses to improve themselves, to offer advice, and negotiate good faith deals with companies.  At the direction of Ackerman of CNBC and NBCUniversal, Lemonis destroyed the companies and defamed them.

212.    Lemonis and Machete were also producers of the show. Their job thus included making decisions about what material would be filmed, and what would be included in an episode and to consult with NBCUniversal through CNBC executives and decision makers. They were thus each acting in the scope of their apparent employment with respect to all acts of bad faith that presented doctored or false footage that defamed a participant or that knowingly breached an agreement not to display a participant's customer's name and all other fraudulent actions taken in

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 66 of 176

creating or showing the show's episodes.

213.     Lemonis was motivated to participate on *The Profit* by the outsized profits he could earn through his tortious dealings with the companies. This opportunity for personal gain was understood by NBCUniversal. NBCUniversal also had notice once the participating businesses sent them emails and letters detailing the fraud and vulture capitalist conduct happening on the show. NBCUniversal was further on notice of the multiple litigations that followed the show; indeed, it is publicly available. Lemonis' gain from this conduct could be expected to lower the amount that NBCUniversal would need to pay for his services. It also was part of the benefit that enabled NBCUniversal to keep him interested in this highly profitable show. Thus, while he did benefit directly from the self-dealing, his ability to engage in self-dealing transactions also operated to the benefit of *The Profit* and NBCUniversal. Indeed, Lemonis was regularly checking in and updating Ackerman as to the progress of Ackerman's fraud playbook.

### C.     After Gaining Their Trust, NBCUniversal, Machete, and Lemonis Breach Their Fiduciary Duties to Participants

214.     *The Profit* required companies to put enormous trust in its host—turning over full control to someone they did not know. It is clear that business owners such as Goureau and Menkin would not have agreed to be on the show if it was produced by Machete as a stand-alone entity to stream, for example, on YouTube. They were willing to give Lemonis the keys to their future because he was draped with the institutional legitimacy conferred on him by the fact that *The Profit* was CNBC's show and CNBC appeared to be integrally involved in it. Accordingly, participants trusted CNBC would not allow one of its shows to be used to harm or defraud business-owners.

215.     NBCUniversal and Machete manifested that Lemonis had apparent authority to contract on behalf of, advise, or contract with companies in the scope of his agency and employment relationship on NBCUniversal's behalf.

216.    NBCUniversal and Machete knew that the representations that it and Lemonis made to lure the likes of Goureau and Menkin onto the show—specifically that the offers portrayed on the show were real—were materially misleading. They all knew that the actual offers differed materially from the ones shown on the show.

217.    Due to the contractual agreement of participants like Goureau, Menkin, and others, Lemonis was exercising control of the company during the Consultation Period.  During that time, and after, Lemonis owed a fiduciary duty to the likes of Goureau, Menkin, and Gooberry. Lemonis, and thus NBCUniversal, and Machete, owed a duty to not use this control to deal unfairly with the participating businesses.  Instead, Lemonis acted in the opposite way, pillaging Gooberry and engaging in self-dealing to the determent of everyone involved . . . except Lemonis, NBCUniversal, and Machete, of course.

218.    NBCUniversal's scheme to defraud the likes of Goureau, Menkin, and Gooberry and obtain unjust benefits from them and Gooberry through allowing Lemonis' self-dealing depended critically on the appearance that he was acting in the best interests of Gooberry. It also depended on the public display of episodes on CNBC which falsely showed companies receiving substantial infusions of capital. The episodes also would have allayed any concern about whether participants were harmed in turning over control to NBCUniversal and their agent/employee Lemonis because the shows were marketed as depicting real deals and real events and did not show any evidence of the breaches of fiduciary duty, and massive fraud and extortion that was taking place.

219.    NBCUniversal was an active participant in the effort to portray *The Profit* as an opportunity for businesses to improve themselves, and to portray Lemonis as a man acting in good faith for their benefit. NBCUniversal actively recruited companies like Gooberry for the show,

including through events with CNBC Business. CNBC's participant-sign up website states: "If you are in over your head and feel your business is drowning, CNBC can provide you with the lifeline to save your business." CNBC on its website also states that once Lemonis is "inside these companies, he'll do almost anything to save the business and make himself a profit." This is entirely false.

220.   In addition, NBCUniversal's Participant Agreement repeated the claim that Lemonis would be acting on Goureau, Menkin, and Gooberry's behalf in good faith.  They were also told he would act in good faith during the deal negotiation stage. Lemonis thus offered to provide advice for their benefit. Moreover, in order to get this advice, he and Machete required them to sign an agreement which obligated them to use their best efforts to adhere to his advice.

221.   The entire scheme of show was to put Lemonis in a position of trust, power, and confidence with participating businesses.  NBCUniversal and Machete assured Goureau and Menkin that Lemonis was acting on their behalf.  Indeed, NBCUniversal, Machete, and Lemonis made sure that the participating businesses were contractually obligated to take his advice.

222.   Thus, Lemonis was required to act on the company's behalf and consistent with a duty of loyalty to them during the Consultation Period, as well as other periods where he was providing advice or otherwise acting on the Company's behalf. The fact that the Participant Agreement gave Lemonis full discretion does not negate that requirement. Instead, his discretion was subject to a requirement, imposed automatically by law, that he act in good faith and consistent with his duty of loyalty.

223.   The duty of good faith requires that the fiduciary act in the best interests of the company.  A fiduciary exerting control also must deal fairly with the other. Lemonis violated his duty to act in good faith when he caused Gooberry to incur expenditures and imposed great debt

subject to nearly illegal interest rates that put the company in a vulnerable and greatly weakened position. He also acted in utter bad faith by saddling Gooberry with massive debt knowing he and others were lying about revenue he promised to deliver to offset what he had done to Gooberry in layering on such massive debt in a mob-style bust out. NBCUniversal was not only complicit, but it was also directing Lemonis' actions through Ackerman.

224. As a fiduciary, Lemonis also owed the participant companies and their owners a duty of loyalty both throughout the show and after he obtained an ownership interest. The duty of loyalty requires that the fiduciary not engage in a self-dealing transaction on behalf of the other, unless the fiduciary obtains the other's consent. The consent must be specific and knowing. Lemonis did not obtain the requisite informed consent. The Participant Agreement did not inform Goureau or Menkin that Lemonis planned to cause the Company to become contractually obligated to companies in which he had a financial interest, as is required by the duty of loyalty. Nor did Lemonis subsequently get the Company's explicit consent to causing them to incur expenses to companies in which he had a material financial interest after fully informing them of the material facts of the transaction, specifically the nature of his interest in the other entities, and the amount of the financial obligation.

225. NBCUniversal and Machete were fully aware that Lemonis was not upholding their collective legal responsibilities to Goureau, Menkin, and Gooberry, because it was directed by NBCUniversal and Ackerman.

### Gooberry Applies to Appear on *The Profit*

226. Nicolas Goureau became a fan of *The Profit* when he first saw an episode on television. The episode featured a company called Sweet Pete's, a family run candy shop in Florida. That episode portrayed Lemonis as a business expert, fiduciary, and investor who

66

successfully helped Sweet Pete's.

227.    Seeing what CNBC portrayed as Lemonis helping a family run business such as his own, Goureau believed that Lemonis was exactly the type of investor who would take Courage.B to the next level. Goureau emailed the produces and applied for Courage.B to appear on *The Profit*.

228.    Almost immediately, Machete, *The Profit*'s production company, followed up with Goureau regarding Courage.B's application for the show. Shortly thereafter, Goureau and Menkin each had a Skype interview with Donnan, Co-Executive Vice President of the show, as well as Machete's Executive Vice President, to discuss Courage.B's potential participation on the show.

### A.    NBCUniversal and Machete Gather the Confidential Ammunition They Would Use Against Goureau and Menkin During Filming

229.    During his call with Donnan, Goureau told her that Courage.B was in the process of securing an outside investor for the company. In fact, Goureau had been involved in serious discussions with a potential investor prior to NBCUniversal and Machete's involvement.  Donnan convinced Goureau to forego that prospective deal, and to appear on the show instead. Donnan represented to Goureau that the show was an incredible opportunity for his family business to acquire an invaluable partner who could help take his family's business to the next level. Donnan also reinforced that the deals reached on the show were real.

230.    Donnan also suggested that the Goureau and Menkin speak with some of the former participants of the show, in order to get a sense of the show's "success" stories. Donnan once again reinforced the idea that the deals reached on the show were real, telling Menkin that if Lemonis was interested in investing, they would make a deal while the show was being filmed.

231.    After the Skype calls, Goureau and Menkin proceeded to the next stage of the application process, which required them to undergo background checks and provide a slew of private and confidential information about their company's business, finances, and employees. It

also required Goureau, Menkin, and Noemi to provide private information about their personal lives, including, but not limited to, home ownership details and family dynamics.

232.    In doing so, Defendants used counselors unethically to mine these personal details, which were later used to defame and humiliate them. Goureau and Menkin opened up about the difficulties of their family's past, such as their father passing at an extremely young age. Told to counselors in confidence, this private and personal information was fed to NBCUniversal and Machete producers, and to Lemonis, and used to catch Goureau, Menkin, and Noemi off guard and stir up drama and controversy while filming

233.    Indeed, like most family businesses who fell victim to Ackerman's Fraud Playbook, Goureau, Menkin and Noemi's confidential and private information was later used, not to help their business grow and expand, but for manipulated dramatic television effect. This manipulation of private, sensitive, personal material was directly from Ackerman's Fraud Playbook, and was key to boosting CNBC's primetime ratings, all without a care in the world about the lives and businesses it would destroy.

## B.    NBCUniversal and Machete Push and Manipulate Goureau and Menkin to Sign Illegal and Abusive Agreements

234.    Once the Goureau and Menkin cleared their background checks, and NBCUniversal and Machete were satisfied they had mined enough confidential information to both loot a successful business and defame innocent people for television ratings, Goureau and Menkin were induced to sign a number of documents in order to appear on the show. No one from Machete or NBCUniversal ever sat down or explained to Goureau or Menkin what the documents were or the substance of what they entailed. Nor did Machete or NBCUniversal ever advise Goureau or Menkin to have the documents reviewed by an attorney. Rather, Machete and NBCUniversal representatives indicated that the documents "were standard releases, most of it

doesn't even apply to you." Producers from Machete and NBCUniversal repeated this blatant lie while pressuring Goureau and Menkin to execute and return the documents as quickly as possible, or risk losing this "once in a lifetime opportunity" of appearing on the show. Believing NBCUniversal's false portrayals about Lemonis, Goureau and Menkin executed these documents and returned them to the show's producers, so as to not risk losing what they believed at the time to be a life-changing opportunity.

235.    These illegal releases and waivers hidden in small print within this so-called "standard form" were invalid and void for a number of reasons. First, they were obtained by fraudulent inducement. *Manderville v. PCG&S Grp., Inc*., 146 Cal. App. 4th 1486, 1501 (2007).[39] NBCUniversal, Machete and Lemonis made several misrepresentations in order to induce Goureau and Menkin into entering into the document with the hidden release and waiver, including that working with Lemonis would be the best opportunity for them, that Goureau and Menkin should "do whatever it takes to appear on the show", and that *The Profit* and Lemonis actually helped the businesses that appeared on the show, all the while concealing the fact that countless participants on the show had their businesses ruined by the show and were defamed and defrauded by the show. The Defendants, through their producers, repeatedly assured Goureau and Menkin that they would all act in the best interest of their successful business, Courage.B. This was a false promise in the textbook sense taught in law school. Defendants' employees and agents were told to induce reliance, and to set up their mob-style scheme to defraud and destroy.

236.    Second, the releases and waivers included several unenforceable and illegal provisions. California law explicitly prohibits releasing claims for fraud and other intentional acts.

---

[39] Paragraph 24 of the Participant Agreement contains a choice of law provision stating "This agreement shall be deemed to be entered into in Los Angeles County, California, and shall be governed by and interpreted in accordance with the substantive laws of the State of California…"

*See* Cal. Civ. Code § 1668 ("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.") Yet, these agreements attempted to do exactly that.

237.     These unenforceable provisions void the entirety of the release contracts, including the mediation and arbitration provisions. Where the unlawful and lawful objects of a contract are "inextricably intertwined" such that the contract is permeated by illegality, a contract may not be severed, and the entire agreement will be void for violating public policy. *Chiba v. Greenwald*, 156 Cal. App. 4th 71, 81 (2007); *Abramson v. Juniper Networks, Inc*., 115 Cal. App. 4th 638, 659 (2004). If the central purpose or object of the contract is tainted with illegality, then the entire contract is invalid and unenforceable on its face. *Armendariz v. Foundation Health Psvchare Services, Inc.,* 24 Cal. 4th 83, 124 (2000). "Contracts contrary to express statutes or to the policy of express statutes are illegal. Such illegality voids the entire contract, including the arbitration clause." *Duffens v. Valenti*, 161 Cal. App. 4th 434, 454 (2008) (emphasis added); *see* also Armendariz, 24 Cal. 4th at 83 (2000) (refusing to compel arbitration where the contract is incapable of severance). Not only is the supposed arbitration clause unlawfully one sided, but it's also vague as to the parties that can enforce it and Lemonis and others freely ignore it and bring lawsuits in federal and state court.

238.     Here, the entire purpose of the release and waiver provisions was for Goureau and Menkin to waive certain non-waivable rights to insulate NBCUniversal, CNBC, and Machete from liability based on their intentional torts and outright, deplorable fraud. Because this is the central purpose of the agreements, the entire set of related agreements are void as against public policy.

239.     Third, any arbitration clause or mediation clause in the release and waiver

agreements are unenforceable due to unconscionability. "To defeat an arbitration clause, the litigant must show both procedural and substantive unconscionability." *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010). "Procedural unconscionability involves oppression or surprise due to unequal bargaining power while substantive unconscionability focuses on overly harsh or one-sided results." Id. Both exist here.

240. "California law treats contracts of adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable." Id. (citing *Armendariz*, 24 Cal. 4th at 114). Here, there is no doubt that these contracts are contracts of adhesion. Participants had no bargaining power and no opportunity to negotiate, and they were rushed into signing the documents and told the terms of the contracts could not be changed. For participants to appear on the show they only had one choice—accept the agreements as-is.

241. Further, "California law holds that mandatory waivers of non-waivable statutory rights . . . are the sort of one-sided and overly-harsh terms that render an arbitration provision substantively unconscionable." *Bridge Fund*, 622 F.3d at 1004; *Wimsatt v. Beverly Hills Weight etc. Internat.*, Inc., 32 Cal. App. 4th 1511, 1521 (1995). Again, the releases included one-sided and harsh waivers of non-waivable rights. For example, the waiver of punitive damages in the releases is unconscionable. *Lange v. Monster Energy Co.,* 46 Cal. App. 5th 436, 449 (2020) ("The waiver of punitive damages as a remedy for all nonstatutory claims, then, is substantively unconscionable regardless of its mutuality.") Additionally, any pre-dispute waiver of the right to a jury trial is unconscionable. *Id.*; *Grafton Partners v. Superior Court*, 36 Cal.4th 944, 961 (2005) ("Resolving any ambiguity in favor of preserving the right to jury trial, as we must, we conclude [Cal. Code of Civil Procedure] section 631 does not authorize pre-dispute waiver of that right"); Cal. Civ. Proc. Code § 631. These waivers render the release agreements substantively

unconscionable.

242. Therefore, the agreements that Goureau and Menkin executed were invalid.

### Goureau and Menkin Relied on NBCUniversal's False Portrayal and Support of Marcus Lemonis as a Successful Business Guru

243. Goureau and Menkin were induced into their application for consideration to be on *The Profit* based on the false portrayal of the show and Lemonis by NBCUniversal.

244. Goureau and Menkin believed that the many "successful" deals they saw on the show were true, and that the offers conveyed on camera were substantially similar to the deals in final form. Ackerman, Lemonis, and producers from NBCUniversal and Machete actively pushed and broadcast this false narrative worldwide. Now, after the Goureau and Menkin traumatic experiences with NBCUniversal and Lemonis, coupled with speaking with many other victims of NBCUniversal, Machete, and Lemonis in lawsuits being prosecuted against these defendants, it is abundantly clear that many of the deals portrayed on *The Profit* are not at all – or even remotely close to – the final agreement. NBCUniversal, Machete, and Lemonis have consistently and repeatedly lied about this element of the show.

245. For instance, the Athens Motors episode and recap episode represent a deal between Pete Athens and Marcus Lemonis. The deal, as Lemonis stated in the recap episode, is "$3.5 million for 50% of [Pete's] company." Lemonis further states he and Pete are 50/50 partners in Auto Match, a new venture arising from the relationship. This was utterly false, presented and broadcast by NBCUniversal to further portray Lemonis as the white knight for businesses. In reality, Pete never received a penny of the $3.5 million Lemonis references, and he is not a partner in any way, shape, or form of Auto Match. Rather, following Ackerman's Fraud playbook, NBCUniversal portrayed Pete as incompetent and brash, falsely editing scenes and misconstruing the financial success of the business. As he does so often, Lemonis then used his period of complete

control to liquidate crucial inventory, pile on massive amounts of debt onto Pete's business, and eventually drive Pete from the company altogether. Obviously, all these facts were concealed from the general public to protect NBCUniversal's primetime ratings and their conman's good reputation.

246.    This is just one example of what happens on most, if not all, episodes of *The Profit*. Indeed, it is the representations that NBCUniversal showed to the public, Lemonis as a business genius helping take businesses to the next level time and time again, coupled with NBCUniversal's repeated portrayal and promoting of their "business guru," that encouraged Goureau to apply to appear on the show. NBCUniversal, Machete, and Lemonis broadcast these lies, falsehoods, and misrepresentations to the world time and time again. They knew and intended that other businesses – such as Courage.B – would see the lies, falsehoods, and misrepresentations, and apply to be on future episodes of *The Profit* in reliance that what NBCUniversal was portraying to the world was the truth. Time and time again businesses fell victim to NBCUniversal's trap, only realizing after it was too late that their appearance on *The Profit* would mean the end of their businesses, and often times their livelihoods, as they knew it.

## Defendants Repeatedly Promised to "Act in the Best Interest of Gooberry" in Exchange for Their Control Over the Business

247.    Time and time again throughout the entire process, NBCUniversal and Machete promised to act in the best interests of Goureau, Menkin, and their company. It was a line repeated by NBCUniversal and Machete producers throughout the process with one goal in mind: get Goureau and Menkin to hand over unfettered control of their company to Defendants.

248.    The main promises made were by NBCUniversal, Machete, Lemonis, and all their agents, in the written agreements between the parties and in oral agreements and promises relied

upon by Goureau and Menkin. These core promises of the agreements were that NBCUniversal and its employees and agents, inducing Lemonis, would act "in the best interests of" Gooberry. This was said dozens of times over and over by producers and casting directors, as well as Lemonis himself, as consideration for Goureau and Menkin to turn over complete control of their national business to NBCUniversal and their chosen advisor. No one would turn over control of a successful, growing company to a network and a stranger without the assurance that they would act "in the best interest of the business" over which they were given control. This lie was made to induce the victims to turn over their life's work to be exploited, ruined, and stolen by Defendants.

### NBCUniversal Films the Courage.B Episode of *The Profit*

249.     After Goureau, Menkin, and Gooberry were selected to appear on the show, filming began in June of 2014.

250.     Immediately, it was clear to Goureau and that the show was more scripted than they were led to believe. From the outset, Machete producers created a story for Goureau and Menkin to follow and present on the show.

251.     Producers consistently tried to create or portray friction within the family. For example, producers at one point told Goureau to go yell at his mother Noemi, to portray Noemi and Goureau's relationship as strained. Of course, none of this was the reality of Goureau, Menkin, and Noemi's business or personal lives.

252.     Despite averaging $5 million a year in sales, NBCUniversal, Machete, and Lemonis wanted to portray Courage.B as a struggling business, desperately in need Lemonis' help.

253.     As a scene in the Courage.B episode, Lemonis explains "[a]nd you know what's even more amazing to me? You're doing $5 million with this product. Can you imagine what you would do if your product was right?" He further stated his belief in the company, stating to

Goureau, Menkin, and Noemi "[t]his has the makings of being something great, but the business needs money. And all I have to get my head around is, we're talking about changing product and changing the process, it's extreme, and putting money in at the same time."[40]

254.    Lemonis doubled-down on his belief that Courage.B was not far off from the success they dreamed of, stating during a cut-scene that "[t]he real problem is, the company doesn't have the right product on the ground and if I can fix the product going forward and then merchandise it in a creative way, I know I can make money immediately."

255.    When it came time for Lemonis' first on film "offer" was for $800,000 in exchange for 50% of the company, and complete and total control. Despite his already stated belief in the company's future, Lemonis immediately followed this "offer" by stating "and before you answer, just know that if you don't do a deal with me, you may not make it."

256.    Goureau rejected this offer, and Goureau countered with an offer for $800,000 for 10% of the company. Lemonis, in what has since turned out to be a prophetic statement, responded with "I'll give you a half-a-million-dollar loan and take the stock of the company as collateral. I mean, if you default, I'll take the business." What was never mentioned to Goureau, Menkin, and Noemi is that this was Lemonis' intent all along, regardless of the terms of any "deal" he made. Like so many of his other victims, Lemonis would eventually carry out his intentions of overloading the company with so much debt that Goureau and Menkin had two options: cooperate with Lemonis or cede control of the company to him.

257.    Lemonis follows up by telling Nicolas that he wants a deal that they are both excited about. He says that he'll do the deal at 30% for $800,000, but he wants everyone to be involved.

---

[40] While Lemonis repeatedly stated on the show that the company's problem was that their expenses exceeded their profits, he had no problem multiplying and racking up unnecessary expenses to the company the moment he was "100%" in control."

This means Goureau gets a 30% stake, and Menkin and Noemi get a 15% stake each, to coincide with Lemonis' 30%. Ultimately, the episode shows the Goureau, Menkin, and Noemi reaching an agreement for Lemonis to receive a 30% stake and 100% control of the company for $800,000. Lemonis proceeds to write a check and provide it to Goureau. Goureau and Menkin believed this investment to be legitimate and were excited to officially be partnered with "CNBC's business expert Marcus Lemonis." However, as soon as the cameras stopped rolling, Machete producers took the check from Goureau. Confused, Goureau and Menkin asked the producers if the investment was real. Producers ensured them that it was, but they would need to speak with Lemonis' people and execute the deal documents. No such conversation ever took place, and Goureau and Menkin were not presented with any documents reflecting the deal.

258.    Despite not yet having memorialized the deal, Lemonis proceeded to take full control of the company. On air, Lemonis breaks down the spending of the $800,000 "investment" as follows: $300,000 in renovations, $300,000 in inventory, $100,000 to pay off existing debt, and $100,000 in working capital. This on-air breakdown of spending was broadcast by NBCUniversal to conceal Defendants' true intentions. They knew it was false when published.

259.    During filming, Lemonis pushed the company to undergo expensive renovations, starting with the Courage.B store in Greenwich, Connecticut.  On *The Profit*, renovations are done quickly during the filming of the episode, to ensure that the episode can show the supposedly remarkable improvements the business has undergone at the hands of Lemonis.

260.    Goureau and Menkin, as is often the case with NBCUniversal and Lemonis' victims, were completely kept in the dark about the renovation process. Instead, Defendants repeated their trusted line told to victim after victim, telling Goureau and Menkin to "trust the process." Goureau and Menkin were not allowed to visit their stores during this renovation period.

Indeed, Lemonis told Goureau and Menkin "not to worry…[you] don't have to deal with them" regarding the renovations. Throughout the renovation process, Goureau and Menkin were purposefully kept in the dark about the cost of the renovations, who will be conducting the renovations, what the actual renovations were, and who would be paying for the renovations. Ultimately, Goureau and Menkin would not have been able to stop Lemonis from creating these massive expenditures even if they wanted to. The illegal participation grants Lemonis full control, stating "Lemonis may at his sole discretion elect to incur expenses to improve the Company's business or property, including without limitation making an out-of-pocket discretionary purchase for the benefit of Company or making or making a capital contribution and/or loan to the company…."[41]

261.    In the few instances Lemonis did communicate with Goureau and Menkin regarding the renovations, he blatantly misrepresented how much they would cost. He initially told Goureau and Menkin that a portion of his "investment" would go towards renovating the store. Specifically, he told Goureau and Menkin that $200,000 of the $800,000 was earmarked for renovations. Lemonis led Goureau and Menkin to believe that this included the renovations being done during filming. As Goureau and Menkin would soon learn, Lemonis intended far exceed this $200,000 budget, and Gooberry would be responsible for every penny he spent, despite them not being involved in the process one single bit.

262.    When Machete producers filmed the reveal of the Greenwich, CT store for the Courage.B episode, the show depicts Goureau, Menkin, and their mother in awe of renovated store and Lemonis' work. However, this was yet another false portrayal by NBCUniversal and Machete. Lemonis had hired Camping World employees, a company which he operated as CEO, to rush the

---

[41] *See* Exhibit D.

renovations to ensure they would be "completed" in time to film for the episode. While Goureau, Menkin, and Noemi acted bewildered for the camera, they knew immediately that the store was nowhere close to being ready to open. Regardless, NBCUniversal portrayed this as a magical transformation at the hands of Lemonis.

263.    Another example of false portrayals on the show is an instance in which Goureau seems to berate his mother in the back of the store. Lemonis appears to walk into the middle of the argument and states "I kind of need to understand what I just walked in to." What follows is an emotional scene, allowing Lemonis to play the compassionate peacemaker and therapist. However, this whole moment was staged. Shortly before the scene, Machete producers went up to Goureau, and encouraged him to go back and yell at his mom. Indeed, the entire episode was cut and edited to make Goureau seem as if he spends his entire day doing nothing but berating his mother and sister, when in fact the family is extremely close knit and gets along a majority of the time. The family, and Goureau especially, have continued to receive negative comments from complete strangers based on how they were portrayed by NBCUniversal.

264.    Indeed, nearly the entire episode filmed and distributed by NBCUniversal and Machete is a fabrication and falsity. At one point, Lemonis pulls off a sweater with a massive hole in it from atop a pile. This sweater was not on the store's shelves in that state, but was rather altered and planted by producers to make Goureau, Menkin, and Noemi appear incompetent. In another scene, while the parties are discussing Courage.b's "pillars", the episode shows Menkin saying "I don't understand how we made any money." However, Menkin never said those words. Instead, NBCUniversal and Machete producers cut and dubbed together other scenes to falsely depict Menkin as saying this. The episode also depicts Lemonis as bringing in an expert designer to assist the company. In reality, this "expert designer" is Laura Sirpilla. Sirpilla is not an expert designer

and holds no qualifications that would even suggest she is. Rather, she is simply the sister of Camping World's Vice President.

265.    All of these actions were taken with Ackerman's knowledge and direction. These are just several examples showing that the Courage.B episode was a complete fabrication, at the direction of Ackerman and his Fraud Playbook.

## Lemonis and Ackerman Execute the Next Step of NBCUniversal's Fraud Playbook: A Mob-Style Debt Bust Out

266.    Using his period of "100%" control that NBCUniversal orchestrated for him, Lemonis began executing the next step of NBCUniversal's Fraud Playbook: forcing Gooberry into a mob-style bust out.

267.    The first step in Lemonis' mob-style bust out was to drown Gooberry in massive amounts of debt, a page straight out of Ackerman's Fraud Playbook. Believing that – based on the representations made by Machete producers – the deal reached while filming was real, Goureau and Menkin believed that Lemonis would be spending $200,000 of an $800,000 investment on renovations. What followed was far beyond what Goureau and Menkin ever imagined when they became involved with NBCUniversal.

268.    Lemonis placed John Sirpilla, Vice President of Camping World at the time, in charge of renovations made to all the Courage.B stores. Sirpilla and Lemonis did not allow Goureau and Menkin to have any input, review of designs, or review of costs associated with the renovations. Goureau and Menkin were wary of these renovations after what happened at the Greenwich, CT store, but they had no power to speak out due to NBCUniversal orchestrating Lemonis to be 100% in control during this period. NBCUniversal had ensured that any victim businesses on the show could not go to the press or warn future potential victims about the fraud they had endured. Indeed, section 14(a) of the illegal Participant Agreement operates as a gag

order, stating:

> Except as otherwise permitted by the network, company shall not use or disclose to any participant or any other party at any time (including, without limitation, other participants or potential participants in the series (i.e. prior to, during, or after the taping or exhibition of any episode of the series), and shall keep in the strictest confidence, any information that company may read, hear, or otherwise acquire or learn as a result of company's participation in connection with the series (including, without limitation, in connection with the production of the series).

269.    Additionally, Goureau and Menkin were repeatedly told to "trust the process" and that Defendants would act "in the best interests of the company." These lines were continuously repeated by Machete and NBCUniversal representatives, even though they knew beyond a doubt that Lemonis was operating a Fraud Playbook designed by Ackerman aimed at destroying businesses and their owners.

270.    After all the Courage.B stores were renovated, Lemonis presented the Goureau and Menkin with a bill. Goureau and Menkin were shocked. They believed, based on what Goureau and Menkin believed was an actual investment by Lemonis and Machete representatives' reassurances, the renovations would be covered by Lemonis' "investment." Not only was this not the case, but Lemonis exceeded his $200,000 budget. In total, Lemonis had racked up $2 million in renovations, all payable to Marcus Lemonis owned or operated entities. Indeed, the fraudulent bill Lemonis provided was falsified and was never backed up. This was all done before Lemonis ever even presented Goureau and Menkin with documents finalizing their partnership. Instantly, without any say in the process, Goureau and Menkin were indebted to Lemonis to the tune of $2 million, just how Ackerman and Lemonis drew it up.

271.    Goureau and Menkin, naturally outraged, confronted Lemonis about the astronomical charges. Lemonis offered to let Goureau and Menkin to back out of the deal. Lemonis had just one condition: "Give me my fucking money." Of course, Goureau, and Menkin did not have $2 million to pay back Lemonis, and told him so. Lemonis' response showed his and Ackerman's true intentions all along: "Then I'll just take your company." Goureau and Menkin had no other options, they had to continue with Lemonis. Ackerman's Fraud Playbook was working, and NBCUniversal and Lemonis were now positioned to extort Goureau and Menkin any way they pleased.

272.    With Goureau and Menkin substantially indebted to Lemonis, he took the opportunity to memorialize his "investment." On November 18, 2014, the parties executed the paperwork. One document executed was a Stock Purchase Agreement (the "Stock Purchase Agreement"), executed between Gooberry, Goureau, and ML Retail, an entity owned and operated by Lemonis.[42] In this agreement, ML Retail purchased 32 shares of Gooberry (a 32% ownership interest) for $800,000.[43]

273.    At the same time, Gooberry's shareholders, Goureau, Menkin, Noemi, and ML Retail, entered into a Shareholder Agreement ("Shareholder Agreement").[44] Under the Shareholder Agreement, four directors were allowed on the Board, and each shareholder was given the right to appoint one director.[45] Naturally, Lemonis, Goureau, Menkin, and Noemi each appointed themselves, making the four of them Gooberry's board of directors.

274.    However, as the Shareholder Agreement makes clear, there is only one position

---

[42] *See* Exhibit F.
[43] *Id.*
[44] *See* Exhibit G.
[45] *Id.*

within the agreement that carries any weight when it comes to company business, and Lemonis made sure that he was in that position. For example, Gooberry needs ML Retail's "affirmative shareholder vote in order to make any fundamental business decisions, such as:

> (a) enter into any transaction outside the ordinary course of business of the Company;
> (b) A merger, consolidation, stock exchange, or similar transaction involving the Company;
> (c) Any contract or transaction, or amendment to any existing contract or transaction, with any Shareholders, Directors, or affiliates of any of them;
> (d) The admission of new Shareholders;
> (e) The dissolution of liquidation of the Company;
> (f) Amendment of the Article of this Agreement;
> (g) Incurrence of any Indebtedness of issuance of any guarantee or indemnity of any obligation of any other Person or entity if the aggregate amount of the principal amount…shall exceed $25,000;
> (h) Make any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;
> (i) Make any Distributions or Shareholders, other than a Tax Distribution;
> (j) Increase or modify compensation plans to senior executives of the Company of pay bonuses or other amounts outside of approved compensation plans;
> (k) Hire, remove, or otherwise replace any of the senior executive team of the Company… [46]

275.    Essentially, Gooberry needs ML Retail's affirmative shareholder vote in order to, among other things: (1) enter into any contract outside the normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, (4) hire or replace any member of Gooberry's executive team, and (5) dissolve or liquidate the Company.

276.    In yet another egregious example of Lemonis imposing his will over the Shareholder Agreement can be seen in section 2, which gives ML Retail "the sole and absolute discretion over" the financials of the Company:

> **2.2**    Notwithstanding anything to the contrary contained herein, the ML Shareholder shall have the sole and absolute discretion over:

---

[46] *Id.*

**2.2.1**  All financial and accounting functions, controls, decisions and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for store expansions, remodels and new locations; and

**2.2.2**  Tax matters, including, without limitation, causing the Company to make an election to be treated as a Subchapter S corporation under the Internal Revenue Code.[47]

277.    The Shareholder Agreement gave ML Retail the sole power to manage and control Gooberry's bank accounts, open certain retail locations, and perhaps most crucially, control Gooberry's revolving line of credit, which was opened with Lemonis entities. The interest on this line of credit accrued at 5% per annum.[48]

278.    Lemonis represented to Goureau and Menkin that this line of credit would be used to provide the capital for his $800,000 "investment." What Lemonis concealed from Goureau and Menkin was that he would use the line of credit to continue the mob-style debt trap designed by Ackerman and Lemonis, increasing the already seemingly insurmountable debt Gooberry owed to Lemonis and his entities.

279.    Lemonis also made clear that if Goureau, Menkin, and Noemi did not sign these agreements, he would foreclose on the $2 million in debt he illegally forced Gooberry into. Lemonis' abhorrent actions didn't end there. Throughout the negotiation process, attorneys informed Goureau and Menkin that they were there to represent Goureau and Menkin in the negotiations, when actually these attorneys were paid for and controlled by Lemonis. This conflict was never revealed to Goureau or Menkin, and a conflict waiver was never obtained.

280.    While shocking to Goureau and Menkin in the moment, it has since become crystal

---

[47] *Id.*
[48] *Id.*

clear that Gooberry was yet another in the long line of victims of Ackerman's Fraud Playbook. Indeed, Ackerman's playbook was run to perfection, placing Gooberry in their mob-style debt trap. Once there, Lemonis was able to extort Gooberry, Goureau, and Menkin, forcing them to do whatever he wished, knowing that if they crossed Lemonis, they would risk losing everything.

281.    Not long after the deal was finalized, Lemonis sent IT personnel from Camping World to the Gooberry offices to upgrade their e-mail and computing systems. During the process, the IT technicians, allegedly on accident, deleted all of the e-mails from Gooberry's system. This meant that years and years of Gooberry's e-mail records were now gone.

282.    Goureau, Menkin, and Noemi were then given new @courageb e-mail addresses. Eventually, Goureau, Menkin, and Noemi's e-mails were transitioned to @marcuslemonis e-mail addresses. Goureau, Menkin, and Noemi used these e-mails to conduct the business of Gooberry and eventually ML Fashion. However, as discussed below, one by one, Goureau, Menkin, and their mother Noemi, were removed from the business venture and lost access to their @marcuslemonis e-mail accounts.

### Defendants Decimate Courage.B Through Defamation, Mismanagement, and Self-Dealing

283.    Lemonis used the power bestowed upon him, through his entity ML Retail, in the formation documents to make good on his promise that he was "100 percent in charge" and took over Gooberry and Courage.B. ML Retail, through Lemonis, had all of Gooberry's retail stores renovated and changed the product that the stores were selling. However, despite making these changes himself, Lemonis later determined that he did not like the changes he had implemented or the new products he had added. Lemonis then forced the Gooberry to sell old inventory at a steep discount and purchase new inventory.

284.    The new inventory did not appeal to Courage.B's loyal customer base. Several

customers came to Courage.B to shop their exclusive fashion line. The products Lemonis forced

the stores to carry were often purchased at trade shows and widely available at department stores

and boutiques. This type of product brought in price comparison shoppers who were looking to

get the best deal on this type of clothing. Courage.B was often unable to compete against

department stores carrying the same clothes and offering various friends and family discounts, VIP

discounts, and rewards programs. In addition, the inventory Lemonis purchased was often from a

previous season and was not appealing to Courage.B's savvy customer base.

285.    As the inventory did not work for the stores, Lemonis forced Gooberry to sell the

new inventory that he had previously forced the company to acquire at a steep discount, decided

he now wanted the stores to carry younger and hipper brands. While on the show Lemonis

represented that all Gooberry needed to do to take its business to the next level was get the proper

inventory, Lemonis' new inventory tanked the business' margins. Indeed, this change in inventory

reduced Gooberry's typical profit margins from 73% to 52%.

286.    Lemonis continued to make decisions that negatively impacted Gooberry's profit

margins. For example, Courage.B had a lucrative and very successful handbag line. On one

occasion, Lemonis purchased over $150,000 in handbags from a factory in Milan in styles and

colors that the stores had not carried before. Shortly thereafter, Lemonis determined that he did

not like the order and forced the stores to sell the items for pennies on the dollar. This ultimately

destroyed Gooberry's legacy handbag line.

287.    All of the renovations, inventory purchases, and other large expenses Lemonis

forced were funded through Gooberry's line of credit with ML Retail or another Lemonis entity.

By making these large purchases, reducing Gooberry's profit margins, and forcing the company

to sell inventory at a loss, Lemonis ensured that Gooberry would need to rely on its revolving line

of credit with Lemonis' entities to meet its normal financial obligations, like payroll and rent. This practice insured that Gooberry was always heavily indebted to Lemonis giving him the power to convert on its assets at any time. Time and time again, Lemonis extorted Goureau and Menkin with threat of foreclosure on its loan to Gooberry, ensuring that Goureau and Menkin would stay in line with his wishes. Goureau and Menkin were powerless to stop Lemonis' devastating actions, not only due to his repeated extortion, but also because Lemonis had granted himself sole discretion to conduct business on Gooberry's behalf.

288.    When it came to running the business, Lemonis was mostly concerned with two things: personally enriching himself at Goureau and Menkin's expense, and building his television persona on *The Profit*. To that end, Lemonis would boost his image on the show and add debt to Gooberry by forcing Gooberry to take on fledgling brands, businesses, and products featured on *The Profit*. Obviously, NBCUniversal aided and abetted this conduct every step of the way. Ackerman saw Gooberry as an opportunity to go beyond their mob-style debt trap, using the company as a vehicle to run the Fraud Playbook on other unsuspecting businesses. Indeed, Menkin was in Ackerman's office with Lemonis several times discussing the business and *The Profit* victims who were now a part of Gooberry.

289.    In 2015, a retail concept called Blues Jean Bar was featured on an episode of *The Profit*. Lemonis unilaterally determined that Gooberry would purchase the Blues Jean Bar business and its three stores. Lemonis rebranded the Blues Jean Bar stores and two Courage.B locations as Denim & Soul. He then renovated all of the stores, including the Gooberry stores he had just renovated for hundreds and hundreds of thousands of dollars, on Gooberry's tab. He then comingled the assets and monies of these two businesses.

290.    That same year, a candle business called Wick'ed was featured on an episode of

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 90 of 176

*The Profit*. On the show, Lemonis agreed to invest $200,000 for 33% of the business. In reality, and not depicted on the show, Lemonis forced Gooberry to buy thousands of candles from Wick'ed in order to get cash into the Wick'ed owners' hands. Gooberry stores did not sell candles, so the purchase did not make sense for Gooberry's brands. Eventually, as is often the case, Lemonis' relationship with the Wick'ed owners soured, and the deal fell through. Gooberry was left holding the bag and had to liquidate the candles at a huge loss.

291.    In 2016, a t-shirt business called DiLascia was featured on an episode of *The Profit*. On the show, the parties agreed that Lemonis would invest $200,000 for 50% of the business. Lemonis produced tons of tee-shirts with the original owners and then, once again, had a falling out with them. Lemonis then forced Gooberry to purchase the shirts and sell them in Gooberry stores, despite being completely off brand. Eventually, Gooberry was forced to liquidate its inventory of the shirts at a loss.

292.    Despite repeated representations by NBCUniversal, Machete, and Lemonis that they would all act in the best interests of Gooberry, their actions show that their intentions were the opposite. Whether it was falsely portraying Goureau and Menkin on national television or Ackerman's perfectly orchestrated mob-style debt trap, each action taken by Defendants was taken for their own personal benefit, and greatly harming both the Goureau and Menkin's business, and their personal lives. NBCUniversal, Machete, and Lemonis simply did not care so long as they continued to get rich.

**Lemonis and NBCUniversal Push the Fraud Playbook to the Limits by Forming ML Fashion**

293.    Despite running Ackerman's Fraud Playbook to perfection, trapping Gooberry and Goureau and Menkin in a mob-style bust out where there seemed to be no escape, Lemonis and NBCUniversal wanted more. With Gooberry so drowned in debt, Lemonis proposed starting a new

business venture with Goureau and Menkin, in what would come be called ML Fashion.

294.    In forcing Goureau and Menkin into this new venture, Lemonis repeatedly and falsely represented to them that they would be able to make more money in this new venture than they were making with Gooberry. Of course, Lemonis had already drowned Gooberry in debt and slashed profit margins.

295.    Lemonis further represented, again falsely, that he wanted to be equal partners in the business with them. Lemonis praised Menkin, telling her that she would be taking on a larger management role in the venture and that her, Goureau, and Lemonis would be equal partners.

296.    In order to make sure of this "equal" partnership, Lemonis removed Noemi's equity stake and placed it with Menkin. This was just another step in Lemonis' many attempts to drive a wedge between the family and further his control of the business.

297.    Under the new venture, Lemonis represented that Goureau, Menkin and himself would all split any profits equally – that is, after all debts owed to Lemonis-controlled entities were paid. Just as Lemonis had done with Gooberry and so many other companies, Lemonis drowned ML Fashion in so much debt that their equity in the company became meaningless. As such, Goureau and Menkin were once again trapped under Lemonis' control, unable to separate themselves from him.

298.    Lemonis represented that the goal of ML Fashion would be to be an umbrella entity to hold all their other business ventures, and that together they would build "something special."

299.    ML Fashion was formed on March 29, 2016, as a Delaware limited liability company. On March 29, 2016, the Limited Liability Company Agreement of ML Fashion, LLC ("LLC Agreement") was entered into among the members, Goureau, Menkin, and ML Retail.[49]

---

[49] *See* Exhibit H ML Fashion LLC Agreement

300.     In drafting the LLC, Lemonis used his own lawyers. Indeed, Lemonis even represented to Goureau and Menkin that Robert Gerber, Lemonis' attorney, represented all three of them to deter Goureau and Menkin from seeking independent counsel. Gerber never counseled Goureau and Menkin on this conflict, and never secured any type of waiver from Goureau and Menkin. Based on Lemonis' representation that Gerber was Goureau and Menkin's lawyer, ML Fashion's operating documents were executed.

301.     Although Goureau and Menkin were given 33.33% membership interest in ML Fashion, Lemonis was sure to give himself the controlling 33.34%.

302.     Lemonis made himself Chairman and CEO of ML Fashion, with ML Retail as its Manager.[50] This meant he was able to find ML Fashion to any and all agreements. Eventually, Lemonis began running Goureau and Menkin's business through the ML Fashion entity instead of Gooberry. It became abundantly clear that ML Fashion was not a new entity meant to make Goureau and Menkin rich, but was simply Gooberry with a different name. Even worse, Goureau and Menkin soon realized that Lemonis intended to continue conducing ML Fashion's business in the same manner he conducted Gooberry's: drowning the company in debt for his own personal benefit and to ensure Goureau and Menkin remained under his control.

303.     The LLC Agreement gives ML Retail the sole power to remove a manager and appoint any successor. (*Id*.)

304.     The LLC Agreement also gives the following broad powers to the Manager:

> **6.1 Manager (a).** The management of the Company shall be vested entirely and exclusively in the Manger. Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company. No Member acting as such shall have any voting, approval, or management rights whatsoever or any

---

[50] *Id.* § 6.1(b)

authority to bind the Company, except as expressly provided for in this Agreement or the Act.[51]

305.    It gives the Manager the power to appoint and remove officers of ML Fashion and to determine when to make distributions to members.[52]

306.    The LLC Agreement then limits the powers of the individual members:

> **7.1    Rights or Powers**. The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way. Notwithstanding the foregoing, the Members have all the rights and powers.[53]

307.    The LLC Agreement further limits the members' voting rights:

> **7.2    Voting Rights**. No Member has any voting rights except as otherwise provided in this Agreement with respect to the following, which shall require the Approval of the Members:
> (a)    any conversion of the Company to any other debt; or
>
> (b)    any merger of the Company with or into any other entity that is subject to a Drag Transaction; and
> in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.[54]

308.    The LLC Agreement discusses the duties and obligations of the Manager, stating:

> **6.2 Duties and Obligations of the Manager; Discretion**.
>
> (a)    In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the

---

[51] *Id*. at § 6.1(a).
[52] *Id*. at §§ 5 and 6.1(c).
[53] *Id*. § 7.1.
[54] *Id*. § 7.2.

terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision to take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.[55]

309.    The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct."[56]

310.    When it comes to limiting the duties of the officers of ML Fashion, the agreement is silent and has no such limiting language.

311.    The LLC Agreement lists the officers of ML Fashion as follows: Chairman/CEO Marcus Lemonis, President Stephanie Menkin, and Chief Financial Officer Manis Karna.

312.    The LLC Agreement selected ML Retail as the "tax matters partner," and gave it the sole power to "make any and all elections for federal, state, local, and foreign tax purposes…"[57]Indeed, under Section 8, ML Retail has sole and broad power over ML Fashion's tax matters pursuant to Section 8.[58]

313.    Lemonis, as the Manager and Chairman/CEO of ML Fashion and ML Retail,

---

[55] *Id.* § 6.2.
[56] *Id.* P.5.
[57] *Id.* at § 8.
[58] *Id.*

formed a control group due to their significant voting power coupled with their formidable power ("ML Control Group").

314.    By virtue of being a control group, the ML Control Group owes fiduciary duties to ML Fashion, Goureau and Menkin.

315.    Although ML Fashion seemed to be a new entity, it became clear that it was simply Gooberry wearing a new name. There were no lines drawn or distinguishing factors between the two, save for the new LLC agreement and a different name. Goureau and Menkin would soon learn this wasn't a new business venture, but simply a continuation of the terror and control by Lemonis.

///

## Lemonis Uses Gooberry and ML Fashion as his Personal Piggy Bank

316.    As detailed above, the LLC Agreement gave Lemonis enormous power over ML Fashion. Lemonis used this power to mismanage ML Fashion in order to benefit himself and his entities, ML Retail and ML, LLC, and a new venture of his called MARCUS.

317.    Lemonis' misconduct often related to credit agreements and loans he made to Gooberry and ML Fashion through the other entities he controlled. Indeed, the very day that ML Fashion was formed, it entered into a Credit Agreement with ML Retail ("ML Fashion Credit Agreement"). [59] Under the ML Fashion Credit Agreement, ML Fashion could receive up to $30,000,000 in loans from ML Retail at a rate of 6 percent interest per annum. In an attempt to induce Goureau and Menkin to enter into the Credit Agreement, Lemonis represented to the Credit Agreement would provide ML Fashion with a reliable source of capital that would be used to fund the company.

318.    Ultimately, the decision for ML Fashion to enter into the ML Fashion Credit

---

[59] *See* Exh. I

Agreement was solely Lemonis' decision. Menkin had no input.  Lemonis often used Menkin to sign documents on ML Fashion's behalf to, on information and belief, add legitimacy to his actions. However, his attorneys always drafted and sent the agreements to Menkin to sign, often in a package with hundreds of pages and several documents with the instruction to sign quickly. Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

319.    Concurrent with the execution of the ML Fashion Credit Agreement, ML Fashion and ML Retail entered into a Security Agreement ("ML Fashion Security Agreement").[60] The ML Fashion Security Agreement gave ML Retail a continuing security interest in essentially all of ML Fashion's assets.[61]

320.    Also on March 29, ML Retail entered into a Credit Agreement and a Security Agreement with ML, LLC (collectively, the "ML, LLC Credit Agreements").[62] These agreements mirrored the ML Fashion Credit Agreement and Security Agreement entered into with ML Retail only now ML Retail was the borrower and ML, LLC was the lender.[63] Thus, whenever ML Fashion drew on its line of credit with ML Retail, it was in reality drawing from ML, LLC, a Lemonis controlled non-member.

321.    This was a brazen example of Lemonis' illegal plan to extort Goureau and Menkin through predatory lending and comingling of businesses for his own personal gain. Lemonis, in an attempt to shield his lending from the fiduciary duties owed to ML Fashion, could now foreclose on ML Fashion through ML, LLC, without regard to any membership obligations of ML Retail. This was just another in the long line of Lemonis' fraudulent actions.

---

[60] *See* Exh. J
[61] *Id.*
[62] *See* Exhs. K and L.
[63] *Id.*

322.     Together, these agreements combined gave Defendants Lemonis and his related entities the unfettered ability to misuse the assets of ML Fashion. Again, the ML Fashion LLC Agreement gave Lemonis the sole power to run the operations of ML Fashion. Thus, Lemonis forced ML Fashion to buy assets, leaving it unable to meet its current obligations, and then forced ML Fashion to take a loan from ML Retail, which would then take a loan from ML, LLC. Eventually, he could render ML Fashion insolvent such that ML, LLC could foreclose on all of the assets owned by ML Fashion.

323.     Lemonis profited greatly from the debt arrangement where Goureau and Menkin did not at all.  As of 2018, ML Retail had made nearly $500,000 in interest from its loans to ML Fashion. This was income for ML Retail and lost revenue for ML Fashion. The situation has only been exacerbated.  As of February 2020, ML Fashion's line of credit with ML Retail had an outstanding balance of nearly Twelve Million Dollars, far exceeding ML Fashion's assets of roughly Five Million Dollars.

324.     Lemonis set up a similar fraudulent corporate structure with Gooberry. On or around October 1, 2016, Lemonis executed a credit agreement between Gooberry and ML Fashion (the "Gooberry Credit Agreement").[64] Under the Gooberry Credit Agreement, Gooberry could receive up to $10,000,000 in loans from ML Fashion at a rate of 7.5 percent per annum.

325.     The decision for Gooberry and ML Fashion to enter into their respective credit agreements was solely Lemonis' decision. Lemonis often used Menkin to sign documents on Gooberry and ML Fashion's behalf to, on information and belief, add legitimacy to his actions. However, his attorneys always drafted and sent the agreements to Menkin to sign, often in a package with hundreds of pages and several documents with the instruction to sign quickly.

---

[64] *See* Exh. M.

Menkin trusted Lemonis and his attorney, who based on direct representations from Lemonis she believed was her attorney as well, and simply signed all of the documents they presented.

326.    Concurrently with the execution of the Gooberry Credit Agreement, Gooberry and ML Fashion entered into a Security Agreement (the "Gooberry Security Agreement").[65] The Security Agreement gave ML Fashion a continuing security interest in all of Gooberry's assets.[66]

327.    These agreements gave Lemonis unfettered ability to misuse the assets of Gooberry. Again, the Gooberry Shareholder Agreement gave Lemonis as owner and CEO of ML Retail, the sole power to bind Gooberry. Thus, Lemonis forced Gooberry to buy assets, leaving it unable to meet its current obligations, and then force Gooberry to take a loan from ML Fashion. Eventually, he could render Gooberry insolvent such that ML Fashion could foreclose on all of the assets owned by Gooberry.

328.    Moreover, while ML Fashion was owned by Lemonis, Goureau, and Menkin, ML Fashion's funding came from the ML, LLC Credit Agreement.[67] Thus, whenever ML Fashion lent money to Gooberry, those funds were actually coming from Lemonis through ML, LLC. As such, loans between ML Fashion and Gooberry gave Lemonis the ability to kill two birds with one stone by increasing his debt position in both companies at one time. Lemonis was now in a position to foreclose on Gooberry through ML Fashion, which in turn could be foreclosed on by ML, LLC.

329.    That was not the only way in which Lemonis gained control over Gooberry's assets. Lemonis transferred promissory notes issued by Gooberry to Lemonis Entities. For example, Gooberry issued a $7.9M promissory note to ML, LLC. Then, on or around December 2016, the note was purchased by ML Retail LLC and on the same day sold to ML Fashion. Lemonis engaged

---

[65] *See* Exh. N.
[66] *Id.*
[67] *See* Exh. K.

in this practice of forcing Gooberry to take on more debt in order to gain control over the Company's assets in the process.

330.    Eventually, the lines became so blurred as a result of Lemonis' comingling of funds and corporate assets, that Goureau and Menkin could not tell which corporate entity was which. They only knew that Lemonis had used his power to put them so deep in debt to entities he controlled, that there seemed to be no way out.

### NBCUniversal and Lemonis Use ML Fashion and Gooberry to Further Benefit Themselves.

331.    Lemonis and Machete were the agents and/or employees of NBCUniversal, and at all times herein mentioned, were acting within the scope of such agency and/or employment and represented they had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified such action to take place.

332.    Indeed, Lemonis was not acting on his own volition in defrauding and destroying Goureau and Menkin and their company. It was all part of a carefully crafted and orchestrated fraud playbook – developed and directed by NBCUniversal's Jim Ackerman.

333.    After Lemonis was in absolute control of Gooberry and ML Fashion, him and Ackerman used these companies to their benefit. Ackerman and Lemonis would use unsuspecting future *The Profit* victims, and cast them on to Gooberry and ML Fashion. Typically, this meant running Ackerman's mob-style debt trap through ML Fashion or Gooberry, forcing the company to pay for the victim company's renovations and large purchases. This was a homerun for Ackerman and Lemonis. In one swing, Ackerman and Lemonis would increase the leverage over Goureau and Menkin, while inflicting Ackerman's mob-style bust out on new victim businesses at the same time. And all the while, the businesses were fodder for NBCUniversal's ratings monster, *The Profit*. The fraud playbook was working perfectly.

334.     Lemonis represented to Goureau and Menkin that the businesses they were investing in through ML Fashion were making money and would be good investments for ML Fashion. Lemonis represented to Goureau and Menkin that the strategy he was employing for ML Fashion (which was essentially a vehicle for him to commingle assets between all of his entities) was how he built Camping World, and that his methods would help make ML Fashion become as successful as Camping World. However, as discussed herein, the businesses Lemonis forced ML Fashion to invest in were often failing[68] and Lemonis used ML Fashion to provide an influx of capital to those businesses by forcing ML Fashion to purchase their inventory and hire their personnel. Indeed, a former ML, LLC employee, who would prefer to remain anonymous, confirmed Lemonis' practice of using Camping World employees for ML, LLC projects and often transferring employees between his various businesses.

335.     For example, a November 2016 episode of the show featured the brand Susan Monaco, and on the show, the parties reached a deal where Lemonis would invest $600,000 for 50% of the business. However, Susan Monaco ended up being a huge loss on the ML Fashion books. In order to put the money in the Susan Monaco business, ML Fashion had to buy all of Susan Monaco's old inventory. That inventory was a loss for ML Fashion because they had to sell what they could at a Street Sale for negligible profits and donate the rest. Often when ML Fashion had to donate excess product Lemonis had forced on it, Lemonis made sure that he got the tax write-off for the donation personally.

336.     A June 2017 episode feature a brand called Swim by Chuck Handy. Once again, the show touts a deal where Lemonis would invest $600,000 for 55% of the business. However, it was ML Fashion that produced hundreds of thousands of dollars of product before the deal was

---

[68] Amber Mazzola was well-aware of these businesses' failures and discussed it with Menkin.

finalized.[69] The deal with the owners of Swim by Chuck Handy fell through, and it was ML Fashion that was left holding the bag. ML Fashion was forced to donate all of the product it produced, taking a complete loss.[70]

337.    Similarly, a June 2018 episode feature the brand Ellison Eyewear that produced sunglasses in Greece. According to the show, Lemonis would invest $350,000 for 50% of the business. Once again, ML Fashion spent hundreds of thousands of dollars producing inventory in Greece. Then, the deal fell through, and ML Fashion was forced to try to sell the inventory in its retail stores. The inventory is still on ML Fashion's books as a loss.

338.    Many of these businesses struggled after appearing on *The Profit* and Lemonis pushed the costs they could not cover onto ML Fashion, including basic expenses and payroll. In turn, Goureau and Menkin became even more indebted to Lemonis, ML Retail and ML, LLC.

339.    Several times, ML Fashion was forced to hire the business owners and employees featured on *The Profit* solely because their own business could not afford to pay them. These persons primarily worked on their own business while Menkin was forced to find special projects at ML Fashion for them to work on. This happened with the production manager of the Susan

---

[69] By this time, although Plaintiffs' business was riddled with debt, they continued to play an integral part in the show and its production. For example, Plaintiff Menkin's office became the equivalent of an NBC studio, equipped for filming scenes for the show. Menkin was told to hang large TV screens on the walls and play episodes of *The Profit* on loop, further promoting the show and Lemonis. The "set" was changed every time a new business was cast on the show – the goal was for viewers to believe the illusion that Lemonis was visiting the office of a new business in need. But like so many aspects of *The Profit*, this too was a lie. When Menkin objected to the TV screen displays, Lemonis threatened to stop paying rent for the office (or threatened her with something else, typically something the business could not afford to lose), leaving her with no other choice.

[70] Like so many businesses appearing on *The Profit*, Mr. Handy voiced his frustrations over *The Profit*'s false depiction of his business and, specifically, his son. When he raised his concerns over a promo for the Swim episode, Lemonis denied his involvement, telling Plaintiff Menkin that CNBC was responsible and not him.

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 102 of 176

Monaco brand featured in season four, the owner of Ben Garden's featured in season six, the owners of Flex Watches featured in season four, and with the winner of another Lemonis television show program called "The Partner", also a NBCUniversal program.

340.    Lemonis used constant brand acquisition, store openings, store closings, personnel changes, and inventory changes to distract Goureau and Menkin from the mismanagement and misconduct he was orchestrating as the Manager of ML Fashion. He purposefully kept Goureau and Menkin overworked and overextended so that all they could focus on was the ground level ML Fashion work that Lemonis was having them do. Goureau and Menkin knew that if they were not able to keep up with the workload, Lemonis would threaten to give the work opportunity to someone else, fire them, or foreclose on their business.

341.    While NBCUniversal falsely portrayed Lemonis as a small business savior, the reality was the deals being made on the show were being used to force debt upon ML Fashion. This debt not only forced ML Fashion to continually take loans from Lemonis and his entities, but it also allowed Lemonis to write-off income he made as the CEO of Camping World and income from his other personal endeavors.

342.    At the end of the year, his accountants would use the debts incurred by ML Fashion as tax write-offs to help offset his personal income. Indeed, on or around April 16, 2018, Lemonis expressly instructed Menkin on the write-off telling her to "[d]rive the number as high as you can," and confirming that he wanted the tax benefit for himself.[71] By keeping ML Fashion saddled in debt, Lemonis was consistently able to lower his personal tax liability. Moreover, because the write-offs decreased ML Fashion's indebtedness to ML Retail and ML, LLC, Lemonis often represented to Goureau and Menkin that he was taking the write-offs as a favor to them.

---

[71] *See* Exh. O.

343.    Additionally, Lemonis represented that ML Fashion would purchase retail stores, renovate them, and flip them for a profit. Lemonis represented that Goureau, Menkin, and Lemonis would split these profits evenly, after Lemonis' debts were repaid. While ML Fashion purchased and opened around thirty stores, they would spend exorbitant amounts of money to renovate and swap out the store inventories. These upfront costs meant that the stores could never be sold for a profit due to how far in debt each venture was to Lemonis.

344.    Once the stores failed, ML Fashion would be forced to liquidate the stores at a huge loss. This meant hiring a close down crew, paying for staff termination and severance packages, and often paying each buy out charges on the stores' leases.

345.    Forcing debt onto ML Fashion was not the only way in which Defendants engaged in misconduct. Lemonis and ML Retail used promissory notes that his entities had from other businesses to make sham contributions to ML Fashion on behalf of ML Retail.

346.    One such sham contribution related to the assets of a shoe company, Inkkas. Inkkas was featured on an episode of *The Profit* on January 19, 2016.

347.    As part of the deal from the show, Gooberry purchased the company's assets. Then, through a string of fraudulent transactions, the Inkkas assets became owned by an entity called Inkkas, LLC. On or around June 6, 2017, ML Retail purchased the assets of Inkkas, LLC for $428,937.34. In agreements dated that same day, ML Retail transferred the assets of Inkkas, LLC to ML Fashion as a membership contribution then transferred those very assets from ML Fashion to a company called ML Footwear, LLC. Essentially, Lemonis and ML Retail used assets that were already owned by the joint business venture as a contribution by ML Retail to ML Fashion, then transferred the assets out of ML Fashion.

348.    Contributions like this ensured that ML Retail was first in line if ML Fashion ever

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 104 of 176

issued distributions. Under the ML Fashion LLC Agreement, distributions are made "first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions."[72] This allowed ML Retail to receive distributions for purporting to contribute assets that already belonged to the joint business venture. Between sham contributions and Lemonis' debt position, Lemonis made sure that any monies coming out of ML Fashion were owed to him first.

349.    Eventually, Lemonis sought to transfer the assets of Gooberry to an entity called MLG Retail, LLC ("MLG Retail"). MLG Retail is owned by ML Fashion and ML Fashion is MLG Retail's manager. Transferring the assets and operations of Gooberry to MLG Retail would have finally given Lemonis complete, unfettered control over Gooberry that he wanted. In the end, Lemonis was successful in transferring all but one of Gooberry's assets into MLG.

350.    Ackerman directed and oversaw Lemonis' fraudulent misconduct and the ruining of Goureau and Menkin. This was an evolution of his Fraud Playbook, an opportunity to use a previous victim to victimize future participating businesses and continue producing and distributing his fraudulent show. With ML Fashion in place, Ackerman had perfected his Fraud Playbook.

**Lemonis Comingles Company Assets**

351.    Lemonis treated the bank accounts of MLG Retail and ML Fashion as his own personal piggy bank. He used his personal American Express card to make purchases for ML Fashion; however, Lemonis also used this card to make personal and non-business-related purchases.

352.    Lemonis would then take money directly from MLG Retail bank accounts to pay

---

[72] Exh. H at § 5.1(b).

off his American Express card. The funds taken from MLG Retail to pay the card were not correlated to the amount of actual business expenses that Lemonis put on the card. Instead, Lemonis would see how much money was in the MLG Retail account, then take whatever he could and put it towards his personal card. Lemonis made payments to his personal American Express card from MLG Retail's bank accounts several times a year. Lemonis took up to $100,000 at a time to pay off his card.

353.   Between March 2019 and February 2020, Lemonis took $3,023,004.47 from MLG Retail's bank account to make payments to his personal credit card. In addition, Lemonis benefited by keeping the American Express rewards points from these payments and using them for his personal gain.

354.   There were times where, as a result of Lemonis taking money from ML Fashion's bank accounts to pay, at least in part, his personal obligations, MLG Retail and ML Fashion could not pay its vendors. Then, as always, ML Fashion would have to borrow money from other Lemonis entities to pay those vendors.

355.   Another example of Lemonis using ML Fashion for personal gain related to the retail boutique Runway. In early 2016, Lemonis met Defendant Raffel, owner of Runway, at a trade show in New York City. Raffel approached Lemonis and Menkin because she wanted Lemonis to purchase her Runway store in Deerfield, Illinois.

356.   Shortly thereafter, Lemonis visited Runway and decided that Gooberry would purchase the store and on March 23, 2016, Gooberry purchased Runway.

357.   On information and belief, Lemonis wanted Gooberry to acquire Runway because Lemonis was romantically interested in its owner Raffel, not because he believed the acquisition would help Gooberry or ML Fashion.

358.    Shortly thereafter, Lemonis visited Runway and decided ML Fashion would purchase the store. On March 26, 2016, Gooberry purchased Runway. In May 2016, Gooberry and ML Fashion paid to completely renovate the Runway store and stock it with new inventory. Once again, these expenditures forced the companies to take on additional debt from Lemonis to meet its basic expenses.

### Lemonis Gets a Partner in Crime: Bobbi Lemonis

359.    Not long after Gooberry acquired Runway, Lemonis began courting Raffel. As part of their courtship, Lemonis allowed Raffel to make business decisions for Gooberry and ML Fashion. Raffel was buying inventory for ML Fashion's other retail stores despite not having a position with ML Fashion. Indeed, on or around March 24, 2016, the day after the acquisition closed on March 23, 2016, Raffel purchased inventory for non-Runway stores.

360.    Soon, Lemonis and Raffel began buying inventory together and spending far more than Gooberry's or ML Fashion's allocated budget on inventory. Again, overspending on inventory forced Gooberry and ML Fashion further into debt.

361.    There can be no doubt that Lemonis and Raffel knew they were exceeding ML Fashion budget for purchasing inventory because ML Fashion's controller prepared detailed monthly budgets and a quarterly purchasing budget for future inventory orders called an open-to-buys. Lemonis and Raffel were sent these budgets.

362.    Further, every day, the controller informed Lemonis of the status of ML Fashion's debt to ML Retail and ML, LLC and ML Fashion's daily sales, cash, and payable positions. The report also included Lemonis and Raffel's inventory orders so they could see how much they were buying compared to ML Fashion's ability to purchase inventory.

363.    Despite having all of this information showing that ML Fashion could not afford

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 107 of 176

the inventory the two were purchasing, Lemonis and Raffel continued to overspend without regard to ML Fashion's financial abilities. The more Lemonis and Raffel overspent, the more indebted ML Fashion would become to Lemonis and his entities.

364.    At one point in 2018, Lemonis and Raffel were over-buying inventory at a rate of approximately $1M per quarter. Indeed, some of the stores did not even have the physical space to receive the inventory that Lemonis and Raffel were purchasing. Stores complained to both Lemonis and Raffel that they did not have the space for any more inventory, yet Lemonis and Raffel continued their purchasing unabated.

365.    Lemonis forced ML Fashion to open liquidation stores in order to sell the excess inventory that he and Raffel were buying for ML Fashion. Once again, ML Fashion incurred debt to open these Sample Sale stores, but the stores had no chance of making enough revenue to stay afloat as they were selling inventory at liquidation prices. These Sample Sale stores only added to ML Fashion's indebtedness with Lemonis.

366.    Whenever Goureau and Menkin complained about Lemonis and Raffel's overspending, Lemonis would threaten to foreclose on ML Fashion because of the huge debt it owed to ML Retail and ML, LLC. Goureau and Menkin knew that if they did not play ball, Lemonis would foreclose on the debt and take the company they worked so hard to build from them.

367.    It is no doubt that this tactic was learned and taught to Lemonis by Ackerman, from NBCUniversal's Fraud Playbook. Indeed, Goureau and Menkin witnessed NBCUniversal and Lemonis do this with several entities he encountered on *The Profit*. On the January 19, 2016 episode featuring Inkkas, the parties agreed on the show to a deal where Lemonis would invest $750,000 for 51% of the business.

368.    After the episode aired, but before the acquisition was completed under the ML
Fashion umbrella, Lemonis forced Inkkas to hold a sale called a "Free Shoe Friday." Lemonis
tweeted a code which allowed shoppers to buy shoes from Inkkas website for zero dollars. This
led to $200,000 of inventory being given away in six hours.

369.    Lemonis used this and other tactics to force debt on Inkkas and a few months later,
foreclosed on the business, took its assets, and removed the original owners.

370.    Similarly, a September 2016 episode of *The Profit* featured the brand Flex Watches
based in Los Angeles, California. During the episode, Lemonis agreed to invest $400,000 in
exchange for 40% of the business. This gave Flex Watches, Inc., the company running the brand,
a valuation of $1,000,000.

371.    Lemonis had ML Fashion open a Los Angeles office for Flex Watches, forcing ML
Fashion to incur debt. Lemonis also forced debt on Flex Watches, Inc. By September 2016,
Lemonis saddled Flex Watches, Inc. with over $300,000 in debt. When it came time to formalize
his investment in Flex Watches, Lemonis used that debt to offset the $400,000 purchase price and
was able to move the assets for Flex Watches, Inc. to a company called Flex Watches, LLC, which
was wholly owned by ML Fashion.

372.    As to be expected, the Flex Watches brand floundered under Lemonis' control and
its debts grew unsurmountable. In August 2019, almost three years after their episode aired,
Lemonis sold Flex Watches back to one of the original owners for $10 plus $52,175 in inventory,
$13,437.63 in the company's cash accounts, and $128,231.95 in accounts payable – a tiny fraction
of Flex Watches' $1,000,000 valuation prior to Lemonis' involvement.

373.    This happened again with a business called Ben's Garden that was featured on *The
Profit* in January 2019. Ben's Garden produced home and gift items like greeting cards,

105

paperweights, and picture frames. On the show, Lemonis agreed to invest $400,000 for 40% of the business. Ben's Garden needed an influx of cash to pay unpaid bills, so Lemonis funded the company by forcing MLG Retail—one of ML Fashion's biggest assets—to purchase its old inventory and put it into its retail stores. ML Fashion and MLG Retail had not been in the home good market before, so the sudden addition of home goods to their stores did not go well. The product did not sell and ended up being a loss on ML Fashion's books.

374.    As seems to always happen, by June 2019, Lemonis and the owner of Ben's Garden had a falling out. After that, Lemonis, just as he had tried to do with Goureau and Menkin before the Gooberry deal was signed, told the Ben's Garden owner that he had to repay Lemonis for all of the money he put into his business on the show or else Lemonis would take the business from him.

375.    Lemonis used the new businesses, new retail stores, and constant acquisitions to keep Goureau and Menkin distracted from what he was doing with the ML Fashion assets. Lemonis was constantly having Goureau and Menkin open new retail locations, change retail locations to different brands, close new locations, and clean up after Raffel's messes to create a fog where Goureau and Menkin were too overworked to closely examine the wellbeing of ML Fashion. Whenever Goureau and Menkin did question what Lemonis was doing with ML Fashion, Lemonis would respond with threats to either fire their mother Noemi, foreclose on his debt and take their company from them, or fire them all. Lemonis made it clear that they had no power to prevent him from doing as he pleased with ML Fashion. Again, after watching Lemonis do this with other business owners they knew he would make good on his threats.

376.    Indeed, Lemonis often used Goureau and Menkin's mother, Noemi, as a pawn to keep Goureau and Menkin in line. Whenever Menkin or Goureau questioned Lemonis, he would

threaten to fire Noemi and remove her from the business.

### Lemonis Launches His Personal Brand MARCUS at Goureau and Menkin's Expense

377.     It became clear that Lemonis was not actually interested in growing the Courage.B brand or any of the other brands ML Fashion acquired, including Denim & Soul. Instead, Lemonis, together with Raffel, his new wife, sought to use ML Fashion's assets and Goureau and Menkin's know-how to grow his new retail concept MARCUS.

378.     On information and belief, Lemonis and Raffel wanted to grow MARCUS and have a venture together, further promoting Lemonis' personal brand and the couple's image. Lemonis and Raffel married in February of 2017 in Los Angeles.[73]

379.     In 2017, Lemonis wanted to open a store in downtown Chicago. At the time, Menkin and Goureau advised that opening a retail store in that location would be extremely expensive. Despite their concern, Lemonis opened a retail store branded MARCUS.

380.     Once the new MARCUS store was opened, around fall 2017, Lemonis renovated and rebranded ML Fashion's other retail locations from Courage.B, Denim & Soul and Runway as MARCUS stores. For the most part, these were stores that the ML Fashion had recently spent hundreds of thousands of dollars renovating and now had to spend even more money to renovate and change branding and inventory to become MARCUS stores.

381.     In addition, the stores had to purchase new signage, websites, and branded material such as shopping bags, tissue bags, displays, etc. All of the old signage and branded materials had to be thrown out. Again, the renovations and rebranded forced ML Fashion to take on more loans from Lemonis to cover its expenses.

---

[73] Notably, it was at Lemonis and Raffel's wedding when Jim Ackerman and Amber Mazzola admitted that none of businesses to have appeared on *The Profit* were doing well with many no longer in business, with Mr. Ackerman adding that "[at] some point, it's going to get out."

382.    Then, on information and belief, on or around July 31, 2018, Lemonis applied to trademark the word MARCUS for the products sold under the brand, such as handbags, clothing and footwear. However, instead of applying for the mark under ML Fashion, the company that was running MARCUS retail stores, Lemonis tried to obtain the trademark for MARCUS under ML Creative, LLC, an entity which Goureau and Menkin have no ownership interest in and, under the circumstances, upon information and belief, is owned and controlled solely by Lemonis.

383.    Additionally, Lemonis sought to create strife between Goureau and Menkin, and their mother, Noemi. After the creation of ML Fashion, Noemi continued to earn a salary from ML Fashion, like she did from Gooberry, as a management fee. However, after about a year, Lemonis told Noemi that he had all of her designs and that Noemi should just let Lemonis, Goureau, and Menkin do all of the work for the company.

384.    Lemonis attempted to pit Goureau and Menkin against their mother by consistently telling Goureau and Menkin that they would make more money if the company was not paying their mother.[74]

385.    Lemonis also used Noemi as a pawn to ensure that Goureau and Menkin did not question how much influence over the company he had given Raffel. Raffel did not have experience buying inventory for a multi-store chain, did not understand the different markets and needs of the stores, and was unfamiliar with the software systems ML Fashion used to manage its inventory. This forced ML Fashion to fix errors and mistakes that she made, costing the company time and money.

---

[74] As set forth herein, pitting family members against one another was a common tactic used by Lemonis, usually in an effort to convince one of the family members to leave the business, thereby increasing Lemonis' ownership stake. Other times, he simply wanted to exert control over the family members, as was the case here.

386.    When Goureau and Menkin questioned why Raffel was making purchases for ML Fashion, Lemonis would tell them that they had to deal with Raffel being involved because Lemonis was keeping their mother Noemi on the payroll. Lemonis often threatened to fire Noemi whenever Goureau and Menkin questioned Lemonis' business decisions or did not simply fall in line.

### Having Maximized Their Use of Goureau and Menkin, and After Stealing and Comingling Their Companies, NBCUniversal and Lemonis Remove Them from Their Business.

387.    In September 2019, Lemonis made good on his threats to remove Noemi and abruptly terminated her employment with the company. Giovanni Senafe, one of Lemonis' agents, called Noemi to tell her that she was terminated, effective immediately, that she would receive no further compensation moving forward, and that her health insurance was being cut off. As a result, Noemi lost access to her company files and e-mails.

388.    Indeed, one by one, Lemonis has sought to cut Goureau and Menkin out of the business they created with their family. In March 2016, when Goureau started questioning decisions Lemonis was making for Gooberry and ML Fashion, and in an attempt to drive a rift between Goureau and Menkin, Lemonis moved Goureau from ML Fashion to ML, LLC. Lemonis had Goureau work on other businesses that Lemonis invested in through *The Profit* but that did not fall under the ML Fashion umbrella. As part of the transition, Lemonis prohibited Goureau from entering the stores owned by ML Fashion or having any opinion or influence in a company he created. Goureau knew if he pushed back, Lemonis would fire his sister, Menkin, and his mother, Noemi, who relied on ML Fashion and Gooberry to make a living. Thus, despite owning one third of the company, Lemonis had successfully banished Goureau from ML Fashion and severed Goureau and Menkin's professional relationship.

389.    Then in May 2017, Lemonis moved Goureau from ML, LLC to Camping World.

Lemonis represented that working at Camping World would be beneficial for Goureau because it was a publicly traded company. He also suggested that Camping World could offer Goureau stock vesting and other employee benefits. While at Camping World, Goureau witnessed first-hand how Lemonis used Camping World as a fraudulent instrumentality. He also became aware of a slew of lawsuits by RV owners who bought their RVs from Camping World and claimed that they were sold used RVs instead of new ones. Goureau became increasingly uncomfortable about every aspect of Lemonis' business world and worried about being involved. Eventually, Lemonis fired Goureau from Camping World in December 2018.[75]

390.    On or around December 2019, Lemonis and Menkin discussed how she could separate from the company and Lemonis' businesses. The two discussed the terms of a departure, however, once the COVID-19 pandemic started around April 2020, Lemonis suddenly cut off Menkin and removed her access to her company e-mail and all of her company files. In the middle of what appeared to be discussions of the parties amicably separating from each other professionally, it became clear that Lemonis had effectively terminated Menkin instead.

391.    Further, ML Fashion has not paid Menkin since the end of March 2020. As the President of ML Fashion, Menkin received compensation of $11,558 on the first and fifteenth of each month. Menkin's compensation came from an account in the name of MLG Retail but was for her work as the President of ML Fashion.

392.    Thus, in six years, Lemonis and NBCUniversal had chewed up and spit out all three founders of Courage.B from their business and from the company that he was supposed to be helping and growing.

---

[75] Goureau's termination in December 2018 is the subject of an active arbitration proceeding filed by Goureau with the American Arbitration Association for wrongful termination.

## Lemonis Takes Advantage of the Global Pandemic

393.    While the entire world was dealing with the devastating COVID-19 pandemic, Lemonis was actively using the pandemic and related shutdown to continue to loot Gooberry. Lemonis has been unilaterally closing its retail stores and moving Gooberry's inventory to other entities and/or businesses owned or controlled by Lemonis.

394.    On or around May 8, 2020, Lemonis flew employees out to close on one of Gooberry's retail stores in Greenwich, Connecticut and ship out all product and inventory in the store. The employees took roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment ("FFE") from the store. Like all past actions taken by Lemonis, Goureau and Menkin were not made aware of these plans, nor do they have any knowledge of what Lemonis did with the store's inventory and FFE.

395.    From June 2014 to present, with Lemonis' "help", Gooberry has gone from a valuation of roughly $2.6 million to being practically insolvent. Without Lemonis' involvement, Gooberry would have continued to thrive and likely would be worth several million dollars. Given Lemonis' recent activity, it is clear that he is planning on foreclosing on Gooberry and even further removing Goureau and Menkin from the fashion and retail business they worked so hard to build.

396.    Without the Court's intervention, the company will be irreparably harmed. Goureau and Menkin seek redress for Lemonis' mismanagement of the company, the appointment of a receiver to prevent Lemonis from further harming the company, and to hold Lemonis and Lemonis' other entities accountable for breaching their fiduciary duties, wasting the company's corporate assets, and operating the company as a self-enrichment vehicle for themselves.

397.    Similarly, Lemonis has been actively using the pandemic and related shutdown to further loot ML Fashion.

398.     Starting in April 2020, Lemonis began shutting down some ML Fashion retail stores and sending employees across the country to take the assets and inventory from the stores. On or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store in Glencoe, Illinois where MLG Retail is the lessee of the store and ML Fashion is the guarantor. Lemonis had the employees remove roughly $110,034 worth of inventory and $60,772 worth of FFE from the Glencoe location. Goureau and Menkin do not know what Lemonis has done with the inventory or FFE that was removed.

399.     Lemonis has continued closing stores—and taking their assets—all over the country during the pandemic. Also, on or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store located in Dallas, Texas owned and operated by ML Fashion. Closing this store was directly against ML Fashion's interest because this location was one of ML Fashion's strongest performing stores. Lemonis removed roughly $149,215 worth of inventory and $75,451 worth of FFE from the Dallas location.

400.     Lemonis is also looting the assets of one of ML Fashion's biggest assets, MLG Retail. On May 1, 2020, Lemonis sent employees to close a MARCUS location in Palm Beach, Florida and remove its inventory and FFE. Those employees removed roughly $118,128.00 in inventory and $61,032 in FFE. The lease for that Palm Beach location is personally guaranteed by Goureau, yet Lemonis did not tell Goureau he was shutting down the stores and taking its inventory and FFE. Again, Goureau and Menkin do not know what Lemonis is doing with the assets he took.

401.     On or around August 13, 2020, Lemonis closed on of ML Fashion's MARCUS branded stores in Newtown, Massachusetts. Once again, Lemonis has taken hundreds of thousands of dollars in inventory and FFE from that location and Goureau and Menkin are in the dark as to the current location of those assets.

112

402.    Moreover, starting on April 27, 2020, Lemonis, or someone acting at his direction, began systematically moving funds out of the MLG Retail account that was used to automatically pay several of MLG Retail's debts. Importantly, the account was used to pay a payment plan for the Company's corporate American Express credit card that is tied to Goureau personally.

403.    This American Express corporate card was ML Fashion and MLG Retail's regular business credit card which employees in the company used to purchase inventory, office supplies, and other business goods. American Express requirements meant that an individual had to be tied to the card, and in this case the individual tied to the card was Goureau.

404.    Starting around 2018, Lemonis began using this credit card for larger company purchases. Previously, the card had a standing balance of around $200,000. Through 2018 and 2019, Lemonis increased the balance to over $600,000. On information and belief, this was done because the card was tied to Goureau personally which allowed Lemonis to use the threat of defaulting on the card, triggering hundreds of thousands of personal liability for Goureau, to keep Menkin from questioning his decisions.

405.    On or around April 4, 2019, MLG Retail entered into a payment plan with American Express and agreed to pay the balance due, roughly $688,762, in monthly installments of $18,696.[76] Lemonis expressly approved this payment plan.[77] Under the agreement, the installment payments were drawn directly out of one of MLG Retail's bank accounts.

406.    While Lemonis has no problem making regular payments of several thousands of dollars to his personal American Express card, he made sure that the corporate American Express card tied to Goureau had a payment plan where any missed payments triggered the entire amount

---

[76] *See* Exh. P.
[77] *Id*. at p. 2.

due. Lemonis often used the threat of stopping the automatic payments—which would automatically make Goureau personally liable for hundreds of thousands of dollars—to keep Menkin in line, either forcing her hand to sign contracts she objected to or otherwise. This was part and parcel for Lemonis, and the type of abuse Goureau and Menkin endured for years under Lemonis.

407.     On or around March 17, 2020, ML Fashion and MLG Retail confirmed that the companies would continue to pay the amount due on the American Express account. However, Lemonis has been purposefully depleting the account used for the automatic payments so that there are no funds in the account when American Express attempts to debit the automatic payments.

408.     Again, under the payment plan, the entire amount outstanding becomes due upon a default. Thus, Lemonis is forcing MLG Retail to default on the payments, triggering not only the entire debt for the company, but also for Goureau as the credit card is in his name. After the initial filing of Goureau and Menkin's complaint, Defendants had left funds in the account for the Amex payments to draw on. This allowed the American Express card payments to become current. However, on or around August 4, 2020, Lemonis and his agents reversed roughly $94,049 in payments on the American Express card.

409.     Goureau was informed by American Express that if payments were not made soon, it would begin collections proceedings against Goureau personally for the entire balance amount. This would have had an extremely negative impact on Goureau's credit and personal finances.

410.     On June 18, 2020, Goureau and Menkin filed an action with the Court of Chancery if the State of Delaware, which focused on the harms that Defendants inflicted on ML Fashion, a

Delaware entity.[78] Goureau and Menkin also sought the Court's immediate intervention related to the outstanding American Express card balance.

411.    On September 8, 2020, the Chancery Court ordered Lemonis to pay the full balance of the American Express card, which included Lemonis' personal expenses.[79] Specifically, the Court ordered Lemonis "either individually or through a legal entity that he wholly owns to loan ML Fashion sufficient money to pay in full the current balance of the American Express card," within 10 days of the Court's order.[80] Lemonis has failed to comply.

412.    Lemonis has further benefited from the pandemic through the government's Paycheck Protection Program ("PPP"). Without Goureau and Menkin's consent or knowledge, Lemonis applied for a PPP loan and on May 1, 2020, the Company received $818,394 in PPP funds.

413.    Upon information and belief, on or around May 22, 2020, Lemonis, or someone acting at his direction, transferred all funds (roughly $601,324.02) in the ML Fashion and MLG Retail bank accounts into a new bank account under the name of MLG Retail. The new bank account was not tied to any of ML Fashion or MLG Retail's other accounts, and Menkin, a signatory on all of the bank accounts for both companies, does not have access to the account and cannot see any transactions being done in that account.

414.    Defendants have continued to deplete the assets of ML Fashion. Defendants have held several fire sales liquidating the inventory of ML Fashion by selling it at up to 90% off.

---

[78] On March 30, 2021, the Court of Chancery stayed its proceedings pending the outcome of the instant case, determining that that the issues in the Delaware Action overlapped with the issues raised herein and that this Court is in a better position to resolve the dispute between the parties to the extent possible.
[79] *See* Exh. Q.
[80] *See Id*. at ¶ 2(a).

415.    Further, despite the fact that several retail stores had closed due to the pandemic and stay at home, Defendants hosted private liquidation events at the Company's store in Deerfield, Illinois, where Defendants invited Camping World employees and gave them massive discounts. Even more, holding these large private events during a pandemic, in violation of state and local rules about large gatherings and retail stores, creates potential liability for ML Fashion.

416.    Based on all of Lemonis' recent actions, it is clear that he is planning on rendering ML Fashion and its asset, MLG Retail, insolvent so that he can foreclose on the companies, remove Goureau and Menkin from the business, and use the assets to continue his MARCUS brand.

417.    While setting up ML Fashion and MLG Retail, the parties worked to register the Company to do business in several states. As part of the process, Menkin and/or Goureau were listed as the individuals associated with ML Fashion and MLG Retail in several states including Illinois, Connecticut, Minnesota, and Florida. Now, Defendants have failed to make ML Fashion's required annual payments to those states, leaving Menkin and/or Goureau personally responsible for the payments. For example, on August 5, 2020, the Minnesota Department of Revenue sent a letter to Goureau explaining that MLG Retail had missed the deadline to file and pay its taxes and stating that if the return was not filed, and taxes not paid, before September 4, 2020, that there would be additional penalties.[81] These outstanding debts have hindered Goureau and Menkin's ability to start separate businesses in Illinois, Connecticut, Minnesota, and Florida.

## DERIVATIVE ACTION ALLEGATION

### ML Fashion's Derivative Action

418.    Goureau and Menkin also bring this action directly and derivatively in the right of and for the benefit of ML Fashion to redress injuries suffered, and to be suffered, by ML Fashion

---

[81] *See* Exh. R.

as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, breach of the LLC Agreement, and use of ML Fashion solely as a vehicle for personal gain at the detriment of ML Fashion.

419.    ML Fashion is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Goureau and Menkin were members of ML Fashion at the time of the transgressions of which they complaint and continue to be members of ML Fashion.

420.    Goureau and Menkin will adequately and fairly represent the interests of ML Fashion and its members in prosecuting and enforcing their rights. Prosecution of this action, independent of the current Manager, is in the best interests of ML Fashion.

421.    The wrongful acts complained of herein subject, and will continue to subject, ML Fashion to continuing harm because the adverse actions are continuing, and the consequences of those actions are still in effect and ongoing.

### ML Fashion's Derivative Demand Futility

422.    Goureau and Menkin have not made any demand to Lemonis as ML Fashion's Manager to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.

423.    As ML Fashion's sole Manager and sole owner of ML Retail, the only member that can remove a manager, Lemonis obviously suffers from a patent conflict of interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein. Stated differently, a demand for Lemonis to bring this suit and assert the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself and, in that regard, potentially subject himself to personal liability.

---

117

424.    As the manager of ML Fashion, Lemonis used ML Fashion's assets to enrich himself and the Lemonis entities by, among other things, taking actions that financially favored the members of ML Retail, LLC, while decreasing the value of ML Fashion to the detriment of the other shareholders.

425.    Further, Lemonis used his control of ML Fashion to force ML Fashion to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on ML Fashion at any time. Lemonis also benefited from his use of ML Fashion to acquire the fledging brands, businesses, and products featured on *The Profit* to boost his own image at the expense of ML Fashion. Moreover, Lemonis has since removed assets of ML Fashion and transferred them to other entities and/or businesses owned or controlled by Lemonis.

426.    In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced ML Fashion to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment. As a manager of ML Fashion, Lemonis consistently mismanaged ML Fashion's assets and pursued a business strategy that was so reckless and vastly against ML Fashion's interests that his decisions could not have been the product of sound business judgement. Lemonis' actions include: (1) saddling ML Fashion with expensive inventory then forcing ML Fashion to sell that inventory at a loss, (2) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from ML Fashion so that its debts could not be paid, (4) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of other members of ML Fashion, (6) using the

assets of ML Fashion to grow Lemonis' personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud to foreclose ML Fashion's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,342.02 from ML Fashion's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay persona, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

427.    Even if Lemonis acceded to a demand from Goureau and Menkin and pursued litigation against himself on behalf of ML Fashion, there is no reason to believe he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies. Lemonis has a history of using his own personal lawyers to self-deal and engineer scenarios that benefit Lemonis personally at the expense of Gooberry.  He would absolutely use these same tactics again.

428.    In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: FRAUD IN THE INDUCEMENT
**[By Plaintiffs Menkin and Goureau against NBCUniversal, Lemonis, ML Retail, ML, LLC and Machete]**

429.    Plaintiffs repeat and allege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

430.    As alleged in detail above, NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC made numerous false representations or misrepresentations of material facts to Plaintiffs and/or failed to disclose material information to Plaintiffs which rendered the representations false. NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC knew that these representations were

false when they were made and intended Plaintiffs rely on these representations and omissions in order to secure Plaintiffs' participation on the show and induce Plaintiffs into incurring substantial debt. Plaintiffs reasonably and justifiably relied on NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC's false representations and took actions Plaintiffs would not have otherwise, such as allowing Lemonis to exercise 100% control of their business and renovate all the Courage.B stores. NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC's false representations were substantial factors in causing harm to Plaintiffs.

431.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

432.     NBCUniversal, Machete, and Lemonis' false material misrepresentations and omissions of fact include but are not limited to: (1) *The Profit* was designed with the purpose of putting Lemonis in position to improve already successful businesses like Gooberry; (2) Plaintiffs should trust Lemonis as a business advisor; (3) Deals with Lemonis portrayed on *The Profit* were real and obtained through a good faith and arm's length negotiation, per the Participant Agreement; (4) Lemonis' role was to make a good faith effort to grow the company, increase its sales, and improve its brand reputation, per the Participant Agreement; (5) Gooberry would benefit from appearing on the show regardless of whether or not a deal was obtained; (6)  Plaintiffs should forgo other potential investors in favor of appearing on the show; (7) Lemonis wanted help Plaintiffs expand their business through Gooberry and not saddle it with debt in order to take its assets; (8) Plaintiffs and Lemonis would be partners and equals in running Gooberry; (9) Lemonis would run Gooberry in a way that would benefit Plaintiffs and Gooberry; (10) Lemonis cared for Plaintiffs' family and their business and that Lemonis would take care of Plaintiffs' mother Noemi; (11) The

cost of renovating Plaintiffs' stores would be $200,000 and would be part of Lemonis' $800,000 investment; (12) Gooberry would invest in other businesses and to help grow and develop the businesses in their profile; (13) ML Fashion would be a beneficial new venture for Plaintiffs; and (14) omitting material information that previous businesses who had appeared on *The Profit* were not improved by Lemonis, but rather drowned in debt to Lemonis owned and operated entities, only to have their assets stolen by Lemonis when the price was driven down to almost nothing.

433.     At all times, NBCUniversal, Machete, and Lemonis knew these representations were false because (1) producers knew that the design of the show was never to benefit Gooberry. Instead, the design was to create a false narrative about Gooberry, its employees and Lemonis' impact on the business for profit; (2) NBCUniversal producers knew that Lemonis was a con man who comingled assets, stole intellectual property and inventory, had a history of shady accounting practices, and worked to the detriment of participant businesses; (3) NBCUniversal put Lemonis in a position of power to make changes to the business, unauthorized expenditures, and strong arm Gooberry into a position of weakness.  They also knew that although the Participant Agreement states the deals shown on TV are "simulated," the Participant Agreement promised Plaintiffs Lemonis would negotiate in good faith, and that Lemonis would not uphold his obligation; (4) Producers knew that Lemonis never acted in good faith and always intended to take advantage of Plaintiffs; (5) NBCUniversal knew they would manipulate Plaintiffs, deceptively edit the footage, and "recreate" scenes to the detriment of Plaintiffs. The entire design of the show was to drive up ratings rather than help Gooberry succeed; (6) NBCUniversal was aware of the potential investment into Gooberry, including the terms, and valuation. NBCUniversal used this information to help Lemonis gain an advantage in negotiating with Plaintiffs; (7) Lemonis always intended to use Gooberry as a parking lot for old inventory and debt; (8) Lemonis manipulated the terms of

121

the agreement – through his personal lawyers – to gain complete and total control over every aspect of the business; (9) Lemonis saddled the company with debt owed to his other entities, enriching himself at the expense of Gooberry; (10) After Lemonis had obtained Noemi's intellectual property and designs, he forced Plaintiffs to fire their own mother;  (11) Lemonis presented Plaintiffs with a falsified $2 million bill for renovations that were wholly unnecessary. The bills provided to Goureau and Menkin were inflated, fraudulent, and did not detail how the $2 million amount was reached. NBCUniversal and Lemonis always intended to spend far more than $200,000 on renovations in order to ensnare Plaintiffs in the mob-style bust out; (12) Lemonis used Gooberry as a parking lot of old inventory and as a vehicle for executing his scam on other businesses that appeared on *The Profit*; NBCUniversal knew Lemonis would take this action and encouraged Lemonis to use Gooberry as a vehicle for his fraud while producers continuously told Plaintiffs to trust Lemonis even years after the relationship started; (13) Lemonis purposefully set up ML Fashion in a way that immediately made the company heavily indebted to ML Retail, an entity wholly owned and operated by Lemonis, and that provided personal financial benefits to himself and not Plaintiffs; and (14) previous businesses who had appeared on *The Profit* were not improved by Lemonis, but rather drowned in debt to Lemonis owned and operated entities, only to have their assets stolen by Lemonis when the price was driven down to almost nothing. NBCUniversal knew Lemonis had eviscerated all value to these companies, yet continued to promote them as "success" stores of *The Profit.*

434.     Furthermore and at all times mentioned, Lemonis, personally and through his alter egos ML Retail, LLC and ML, LLC, made several material misrepresentations and/or failures to disclose material information include but are not limited to: (1) Lemonis wanted to help Plaintiffs expand their business through ML Fashion; (2) Plaintiffs and Lemonis would be treated as equals

in running ML Fashion; (3) Lemonis would run ML Fashion in a way that would benefit Plaintiffs and ML Fashion; (4) ML Fashion would invest in other businesses to and help and develop the business in their profile; and (5) ML Fashion's Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide ML Fashion with cost-effective capital not the make ML Fashion insurmountably indebted to ML Retail and ML, LLC.

435.   At all times, Lemonis knew these representations were false and that Lemonis intended to use Gooberry/ML Fashion as a vehicle for self-enrichment at the detriment of Plaintiffs and their business. Lemonis further knew that he would use credit agreements to force substantial debt, all to companies owned or operated by himself, upon Gooberry and ML Fashion, allowing him to foreclose on the companies on a whim. Lemonis knew this was his intention, and it was a repeated tactic calculated and developed by Jim Ackerman and Lemonis, carried out on numerous businesses appearing on *The Profit*. Lemonis also knew that he would use Gooberry and ML Fashion to defraud other business owners Lemonis purported to save.

436.   NBCUniversal, Machete, and Lemonis knowingly made these false statements of material facts and material, fraudulent omissions of material facts with the intention that Plaintiffs rely on them and to convince Plaintiffs in agreeing to appear on the show and relinquish control of their business to Lemonis.

437.   Plaintiffs were ignorant of the falsity of the representations set forth above and justifiably relied on the misrepresentations and fraudulent omissions of material facts and subsequently participated on *The Profit,* allowed Lemonis to invest in their business, entered into the Shareholder Agreement, Stock Purchase Agreement and LLC Agreement, gave ML Retail and Lemonis control and ownership interest in Gooberry, and refrained from moving forward with a

different investor for their business.  No one would enter into agreements that would turn over control of a growing company to a network and a stranger without the assurance that they would act in the best interest of the business over which they were given control, that Defendants would adhere to the Participant Agreement, and that actions would not be intentionally taken to harm the business. The above fraudulent statements were made specifically to induce Plaintiffs' actions. Plaintiffs would not have entered into the Shareholder Agreement, Stock Purchase Agreement and LLC Agreement, given ML Retail and Lemonis' control and ownership interest in Gooberry and refrained from moving forward with a different investor for their business, put their time and energy into ML Fashion and away from their brand Courage.B and original company, Gooberry, continued the business venture with Lemonis and used the corporate American Express card, tied to Goureau personally, to make corporate purchases, if they knew NBCUniversal, Machete and Lemonis' representations were false.

438.    As a direct and proximate result of NBCUniversal, Machete, and Lemonis' fraud, Plaintiffs have been harmed in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

439.    Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of loading Plaintiffs' business up with debt through Lemonis owned and operated entities so Plaintiffs that Lemonis could profit while Plaintiffs' businesses were smothered. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and

Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

### SECOND CAUSE OF ACTION: AIDING AND ABETTING FRAUDULENT INDUCEMENT
#### [By Plaintiffs Menkin and Goureau Against NBCUniversal and Machete]

440.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

441.    NBCUniversal and Machete knew of and participated in the fraud surrounding *The Profit* and Lemonis' business practices. As owners, producers, and distributors of the show, NBCUniversal and Machete were intimately involved in every step of the way. Indeed, producers working for NBCUniversal and Machete were often tasked with reassuring victim business owners to "trust the process" as they knew Lemonis was defrauding their company. Further, Ackerman, an NBCUniversal executive, was the architect for the Fraud Playbook that Lemonis executed. He knew about and assisted Lemonis in carrying out this fraudulent scheme.

442.    NBCUniversal and Machete knowingly aided and abetted Lemonis in providing material misrepresentations and/or failing to disclose material facts to Plaintiffs by: (1) publicly displaying episodes of *The Profit* which showed companies obtaining substantial infusions of capital; (2) Using the Participant Agreement to falsely represent that deals with Lemonis portrayed on *The Profit* were obtained through a good faith and arm's length negotiation; (3) failing to publicize evidence of Lemonis' breaches of fiduciary duties; (4) actively participating in an effort to portray that the entire premise of *The Profit* and Lemonis' role was to make a good faith effort to grow the company, increase its sales and improve its brand reputation;(5) portraying Lemonis as man acting in good faith for Plaintiffs' benefit, with producers consistently representing the

125

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 129 of 176

same Plaintiffs; (6) forcing Plaintiffs to forgo other potential investors to appear on the show; (7) mining confidential and personal information through a counselor, only to feed that information to Lemonis during filming so that Lemonis could use it to manipulate Plaintiffs; (8) repeatedly reinforcing the idea that Lemonis was a reputable business man working in good faith; (9) repeatedly telling Plaintiffs "trust the process" whenever Plaintiffs would question Lemonis, NBCUniversal, or Machete, knowing full well that "the process" was designed to destroy them; and (10) rushing Plaintiffs to sign illegal releases which they claimed to be standard and allowed Lemonis to take complete, unfettered control of their company, knowing full well that he intended to manipulate, destroy, and self-deal for his own benefit.

443.    NBCUniversal and Machete's lies and misrepresentations provided substantial assistance to advancing Lemonis' fraudulent acts.  The Participant Agreement put Lemonis in a position of trust and power over Plaintiffs, to the point where Lemonis had full control over their business.  Producers from NBCUniversal and Machete consistently lied and misled Plaintiffs about Lemonis' business prowess and his intentions with respect to their livelihoods.  Lemonis would not have been able to execute his plan to ruin Plaintiffs' business and comingle their assets with his own without the assistance of NBCUniversal and Machete.  Plaintiffs never would have entered into any of the agreements and business relationships without the above assurances from NBCUniversal and Machete.

444.    As a direct and proximate result of NBCUniversal and Machete fraud, Plaintiffs have been harmed in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

445.    Plaintiffs further seek punitive damages to deter NBCUniversal and Machete from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business

practices. In committing the above-described acts, NBCUniversal and Machete acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of allowing Lemonis to profit while Plaintiffs' businesses were smothered. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal and Machete's willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

### THIRD CAUSE OF ACTION: FRAUD
**[By Plaintiffs Menkin and Goureau Against NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC]**

446.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

447.     As set forth above, at all times herein mentioned, Defendants Lemonis and Machete were the agents and/or employees of NBCUniversal and were acting within the scope of such agency and/or employment and represented they had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

448.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

449.     NBCUniversal, Lemonis and Machete knowingly made numerous false representations of material facts to Plaintiffs and/or failed to disclose material information to Plaintiffs which rendered the representations to Plaintiffs false, as this is part of their pattern and overall scheme with businesses that appear on *The Profit*.

450.    NBCUniversal, Lemonis and Machete' false material representations and/or failures to disclose include but are not limited to: (1) Lemonis was directing Gooberry to invest in stores, brands, and retail businesses in order to further grow those businesses and Gooberry; (2) purchases Lemonis made for Gooberry were done to benefit the brand and not increase Lemonis' debt position in Gooberry; (3) Plaintiffs would have access to Lemonis' team of experts in the retail industry, not Lemonis' employees at Camping World; (4)  this team of experts was part of the Lemonis expertise package, not that Plaintiffs would have to pay for their fees and services; (5) Lemonis would be investing in Plaintiffs' business in order to help grow their business not to saddle it with debt in order to remove its assets; (6) ML Fashion was investing in stores, brands, and retail businesses in order to further grow those businesses and ML Fashion; (7) purchases made for ML Fashion were done for the benefit of the brand and not to increase ML Retail and ML, LLC's debt position in ML Fashion; (8) ML Fashion and MLG Retail would make payments toward the American Express credit card balance on the account in Goureau's name; (9) ML Fashion would make required company state tax payments in the states where Plaintiffs were made personally liable; and (10) funds ML Fashion obtained through its Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide ML Fashion with cost-effective capital not to make ML Fashion insurmountably indebted to ML Retail and ML, LLC.

451.    Defendants NBCUniversal, Lemonis and Machete intended Plaintiffs to rely on these representations; however, none of these statements were true when made. Defendants NBCUniversal, Lemonis and Machete knew these misrepresentations were false and that Lemonis intended to use Gooberry and ML Fashion as vehicles for self-enrichment at the detriment of Plaintiffs, Gooberry and ML Fashion. Defendants NBCUniversal, Lemonis and Machete further

128

knew that Lemonis would use credit agreements to force debt upon Gooberry and ML Fashion, allowing Lemonis, through his alter ego entities ML Retail and ML, LLC, to foreclose on Gooberry and ML Fashion on a whim and that Lemonis would use ML Fashion to defraud other business owners Lemonis purported to save. Lemonis further had no intention of fully paying the American Express card balance in Goureau's name and intended to use the balance as a sword over Plaintiffs to keep them in line.

452.    Defendants NBCUniversal, Lemonis and Machete knew or should have known that Plaintiffs would rely upon representations that Lemonis would grow the Gooberry and ML Fashion businesses and brands because this is what Lemonis said he would do.

453.    Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts. Plaintiffs justifiably relied on Defendants' representations by such things as, including but not limited to, continuing the business venture with Lemonis and using the American Express card, tied to Goureau personally, to make ML Fashion purchases, and continuing to run Gooberry with Lemonis and his entities.

454.    Upon information and belief, Defendants NBCUniversal, Lemonis and Machete intended that Plaintiffs rely on their misrepresentations and fraudulent omissions of material facts.

455.    NBCUniversal, Machete, and Lemonis' misrepresentations to Plaintiffs were intended to defame and denigrate Plaintiffs and depict them in a false and allow Lemonis to take over their business and commingle its assets.  They further intended Gooberry would be used as a parking lot for Lemonis' fraudulent investments.  NBCUniversal, Machete, and Lemonis knew and intended that Gooberry would be used as Lemonis' personal investment vehicle for future episodes of *The Profit*.

456.     Upon information and belief, another purpose of Lemonis' misrepresentations to Plaintiffs was to take their money, Gooberry, and ML Fashion and personally enrich himself, without regard to the consequences that Plaintiffs would be left with, such as substantial debt and void of assets. Indeed, Lemonis constantly held the substantial debt over plaintiffs' head, repeatedly threatening to foreclose on the debt and take Plaintiffs' mother's house if they did not fall in line. Lemonis' actions and threats show that his true intentions were always to act in a way that would personally benefit him, while also allowing him to maintain control over Plaintiffs, not for their benefit as he repeatedly stated.

457.     As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages. Furthermore, as a result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been prevented from starting new business ventures, and Goureau's ability to obtain financing has been hindered due to the American Express debt.

458.     Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of loading Plaintiffs' business up with debt through Lemonis owned and operated entities so Plaintiffs would fall victim to the mob-style debt trap These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are

130

appropriate and warranted, and must be awarded to stop public companies and their subsidiaries

from continuing to commit fraud on the public at large.

## FOURTH CAUSE OF ACTION: AIDING AND ABETTING FRAUD
### [By Plaintiffs Menkin and Goureau Against Defendants NBCUniversal and Machete]

459.  Plaintiffs repeat and reallege each and every allegation contained in the preceding

paragraphs as if fully set forth herein.

460.  Defendants NBCUniversal and Machete knew about the underlying fraud on *The

Profit*. As the owners, editors, producers, and distributors of the show, Defendants were directly

involved in every step of *The Profit*, including overseeing the destruction of the participant

businesses. Despite knowing the existence of this ongoing fraudulent conduct, Defendants

NBCUniversal and Machete provided Lemonis with substantial assistance in carrying out the

fraud, playing an active role.

461.  Defendant NBCUniversal knowingly aided and abetted Lemonis in providing

material misrepresentations and/or failing to disclose material facts to Plaintiffs by: (1) publicly

displaying episodes of *The Profit* which showed companies obtaining substantial infusions of

capital; (2) Using the Participant Agreement to falsely represent that deals with Lemonis portrayed

on *The Profit* were obtained through a good faith and arm's length negotiation; (3) failing to

publicize evidence of Lemonis' breaches of fiduciary duties; (4) actively participating in an effort

to portray that the entire premise of *The Profit* and Lemonis' role was to make a good faith effort

to grow the company, increase its sales and improve its brand reputation;(5) portraying Lemonis

as man acting in good faith for Plaintiffs' benefit; (6) forcing Plaintiffs to forgo other potential

investors to appear on the show; (7) mining confidential and personal information through a

counselor, only to feed that information to Lemonis during filming so that Lemonis could use it to

manipulate Plaintiffs; (8) repeatedly reinforcing the idea that Lemonis was a reputable business

man working in good faith; (9) repeatedly telling Plaintiffs "trust the process" whenever Plaintiffs would question Lemonis, NBCUniversal, or Machete, knowing full well that "the process" was designed to destroy them; and (10) rushing Plaintiffs to sign illegal releases which they claimed to be standard and allowed Lemonis to take complete, unfettered control of their company, knowing full well that he intended to manipulate, destroy, and self-deal for his own benefit.

462.    As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

463.    Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of allowing Lemonis owned and operated entities to take advantage of Plaintiffs. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

### FIFTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT
**[By Plaintiffs Menkin and Goureau Against Defendants NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC]**

464.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

465.    As set forth above, at all times herein mentioned, Defendant Lemonis was the agent and/or employee of NBCUniversal and was acting within the scope of such agency and/or

employment and represented he had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

466.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

467.    NBCUniversal, Machete, and Lemonis owed fiduciary duties of care, loyalty and good faith to Plaintiffs throughout the course of the show by virtue of the mutual agreement between the parties that Lemonis would act in good faith on Plaintiffs' behalf. The fiduciary relationship began before the show and continued throughout its course. This is because contestant companies were recruited to go on the show (by Machete, Lemonis, and NBC) through the statements that Lemonis would act in their best interests during the show. Moreover, they were also told he would act in good faith during the deal negotiation stage. Lemonis thus offered to provide advice for their benefit, and the structure of the show assured contestants that he was acting on their behalf and placed them in a position of reliance on him, as they were obligated to act in good faith to take his advice. This combination of an agreement to act on another's behalf and the understanding that the other is relying on the person imposes on that person fiduciary duties, including a duty of care, good faith, and a duty of loyalty. This is especially so given that Lemonis also took full control over a participating company's business during his consultancy, acting on its behalf. Because of this fiduciary relationship, Lemonis had a duty not to conceal material information from Plaintiffs.

468.    NBCUniversal, Machete, and Lemonis intentionally failed to disclose material facts known only to Defendants.  The concealed material facts include but are not limited to: (1) NBCUniversal, Machete, and Lemonis would use confidential and privileged financial and mental

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 137 of 176

health records to manipulate, deceive, and self-deal to Plaintiffs detriment; (2) NBCUniversal, Machete, and Lemonis would deliberately edit footage to depict Plaintiffs in a defamatory manner; (3) NBCUniversal, Machete, and Lemonis would deliberately edit footage to depict events on the show as different than they actually occurred, to Plaintiffs detriment; (4) NBCUniversal, Machete, and Lemonis would deliberately edit footage to depict the "deal" between Lemonis and Plaintiffs as real when no deal would ever occur; (5) NBCUniversal and Machete would allow Lemonis to use the Consultation Period to self-deal and act against the best interests of Plaintiffs; (6) the true nature and intention of the show was to defame and denigrate Plaintiffs, depicting them in a false light, and to allow Lemonis to take over the company; (7) Lemonis would use the Consultation Period to load Gooberry with high-interest debt in a mob-style debt trap where the several million dollars in debt would be held by ML Retail or ML, LLC, Lemonis controlled companies; (8) Lemonis would interfere with other potential investors and destroy existing customer accounts; and (9) *The Profit* was part of a fraud playbook designed to destroy, defraud, and humiliate Plaintiffs for the benefit of NBCUniversal, Machete, and Lemonis. Defendants NBCUniversal, Machete, and Lemonis intentionally failed to disclose each of these facts to Plaintiffs.

469.    NBCUniversal, Machete, and Lemonis concealed these material facts so that Plaintiffs would agree to be featured on the show and allow Lemonis to gain control and access to their business. Lemonis' misrepresentations and omissions were false and Lemonis knew these misrepresentations and omissions were false and he intended to use Gooberry and later ML Fashion to enrich himself at the detriment of Plaintiffs, as this is part of his pattern and overall scheme with businesses who have appeared on the show. Lemonis further knew his omissions were false and instead of acting in the best interests of Plaintiffs, he was forcing debt upon Gooberry and ML Fashion and left Plaintiffs to deal with the consequences.

Case 1:20-cv-04691-MKV Document 94-1 Filed 11/19/21 Page 138 of 176

470. NBCUniversal, Machete, and Lemonis intended that Plaintiffs rely on his fraudulent omissions of material facts. The material misrepresentations were all designed to deceive Plaintiffs into signing the Participant Agreement and partnering with Lemonis.

471. The sole purpose of NBCUniversal, Machete, and Lemonis' omissions to Plaintiffs was to get them to appear on the show and go along with the filming and the actions on *The Profit*, take their corporate assets, and take their business to enrich himself and build other brands and entities without regard to the devastating consequences to Plaintiffs.

472. Plaintiffs believed and justifiably relied on those misrepresentations and omissions in continuing to film the show, allowing Lemonis control over and access to their business and continuing to do business with Lemonis all to Plaintiffs' detriment. Their belief in Lemonis' misrepresentations and omissions were based, in part, due to Lemonis' own statements, Lemonis' false image expressed on *The Profit*, Machete and NBC's portrayal of Lemonis as a trusted business advisor, and the show's portrayal of part applicant's success in working with Lemonis and going on the show.

473. As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

474. Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of loading Plaintiffs' business up with debt through Lemonis owned and operated entities so Plaintiffs

135

would fall victim to the mob-style debt trap. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

### SEVENTH CAUSE OF ACTION: BREACH OF FIDICUARY DUTY
### [By Plaintiffs Menkin, Goureau, and Gooberry Against Defendants NBCUniversal, Machete, Lemonis, ML Retail, and ML, LLC]

475.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

476.     As set forth above, at all times herein mentioned, Defendant Lemonis was the agent and/or employee of NBCUniversal and was acting within the scope of such agency and/or employment and represented he had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

477.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

478.     The Gooberry Shareholder Agreement grants Lemonis all relevant powers to conduct the day-to-day business affairs of Gooberry and specifically prevents Plaintiffs from day-to-day business operations.  As a Director of Gooberry, Lemonis owes Gooberry fiduciary duties of care, loyalty, and good faith.

479.     Lemonis owed fiduciary duties of care, loyalty, and good faith to Plaintiffs and to Gooberry by virtue of Lemonis obtaining an ownership interest in Gooberry following filming of *The Profit* and by virtue of his sole ability to exercise managerial authority over Gooberry.

136

480.    Separately, NBCUniversal, Machete, and Lemonis owed fiduciary duties of care, loyalty, and good faith to Plaintiffs throughout the course of the show by virtue of the mutual agreement between the parties that Lemonis would act on Plaintiffs' behalf. The fiduciary relationship began before the show and continued throughout its course. This is because contestant companies were recruited to go on the show (by Machete, Lemonis, and NBC) through the statements that Lemonis would act in their best interests during the show. Moreover, they were also told he would act in good faith during the deal negotiation stage. Lemonis thus offered to provide advice for their benefit, and the structure of the show assured contestants that he was acting on their behalf and placed them in a position of reliance on him, as they were obligated to act in good faith to take his advice. This combination of an agreement to act on another's behalf and the understanding that the other is relying on the person imposes on that person fiduciary duties, including a duty of care, good faith, and a duty of loyalty. This is especially so given that Lemonis also took full control over a participating company's business during his consultancy, acting on its behalf.

481.    NBCUniversal and Machete allowed and encouraged their agent and/or employee Lemonis engaged in misconduct and breached his fiduciary duty to Gooberry and to Plaintiffs by doing the following, among other things: (1) saddling Gooberry with expensive inventory then forcing Gooberry to sell that inventory at a loss; (2) purposefully decreasing Gooberry's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of Gooberry and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying Gooberry's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of Gooberry to the direct detriment of the other shareholders of

Gooberry; (6) using the assets of Gooberry to grow Lemonis' personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon business owners Lemonis was purporting to save; (8) closing Gooberry's Greenwich, Connecticut store and removing roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; (10) mismanaging Gooberry's corporate assets and funds including comingling assets with other entities and using Gooberry for tax evasion; (11) causing Gooberry to incur expenditures that put the company in a vulnerable position; (12) advising Plaintiffs to take actions that he knew would leave their company less well off, either absolutely or absent an intervention by the fiduciary; (13) consistently drowning Gooberry in debt to make it beholden to him based on the loans extended through his corporate vehicles; (14) causing Plaintiffs them to undersell expensive inventory that he hoisted upon them in the first place; and (15) causing Gooberry to purchase goods or services from, or in any way become indebted to, Lemonis or another entity he owned.

482.    As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

483.    Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of enriching Lemonis at the expense of Plaintiffs and Gooberry. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis'

willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

**SEVENTH CAUSE OF ACTION: BREACH OF FIDICUARY DUTY**
**[By Plaintiffs Menkin and Goureau Directly, and Derivatively on Behalf of ML Fashion, Against Defendant Lemonis]**

484.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

485.    As set forth above, at all times herein mentioned, Defendant Lemonis was the agent and/or employee of NBCUniversal and was acting within the scope of such agency and/or employment and represented he had apparent authority to act on NBCUniversal's behalf, and that NBCUniversal allowed and/or ratified the same.

486.    As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

487.    Lemonis currently serves as the Manager of ML Fashion. Under the LLC Agreement, a Manager can be liable to the Company when he engages in what the LLC Agreement describes as Misconduct. (See Exh. H § 6.2.) Such Misconduct includes breach of fiduciary duty. By including a breach of fiduciary duty as Misconduct, the LLC Agreement contemplates and authorizes claims for breach of fiduciary duty as separate claims from breaches of the LLC Agreement.

488.    Lemonis currently serves as Chairman/CEO of ML Fashion, and, as an officer of ML Fashion, Lemonis owes ML Fashion the fiduciary duty of care, loyalty and good faith. The fiduciary duties that Lemonis owes ML Fashion as an officer, are separate and apart from, and in addition to, the fiduciary duties he owes to ML Fashion as its Manager.

489. By virtue of Lemonis' ownership interest in ML Fashion, Lemonis similarly owed duties of care, loyalty, and good faith to ML Fashion and Plaintiffs.

490. Moreover, as a control group wielding unbridled power to control ML Fashion, the ML Control Group owes a fiduciary duty to ML Fashion and Plaintiffs. The ML Control Group is connected by common ownership, as Lemonis is the only natural person with an interest in ML Retail and ML, LLC, and worked together towards their shared goal of running ML Fashion to benefit themselves to the detriment of ML Fashion and Plaintiffs. The fiduciary duties owed to ML Fashion and to Plaintiffs by the Control Group do not arise from the LLC Agreement.

491. The fiduciary duties that Lemonis owed to ML Fashion and to Plaintiffs as a result of being in the ML Control Group are separate and apart from, and in addition to, the fiduciary duties he owes to ML Fashion as its Manager and an officer.

492. Lemonis engaged in misconduct and breached his fiduciary duty to ML Fashion, as described above, by doing the following, among other things: (1) saddling ML Fashion with expensive inventory, then forcing ML Fashion to sell that inventory at a loss, (2) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from ML Fashion so that its debts could not be paid, (4) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of the other members of ML Fashion, (6) using the assets of ML Fashion to grow Lemons' personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon business owners Lemonis was purporting to save, (9) closing ML Fashion's retail stores and

removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from ML Fashion's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments from Defendants' benefit, (12) preventing ML Fashion from paying the business American Express card tied to Goureau personally; and (13) using ML Fashion to continue the success NBCUniversal and Machete's fraudulent show *The Profit*.

493.    As a direct result and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

494.    Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of enriching Lemonis at the expense of Plaintiffs and ML Fashion. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

///

///

## EIGHTH CAUSE OF ACTION: AIDING AND ABETTING BREACH OF FIDICUARY DUTY
### [By Plaintiffs Menkin and Goureau Against Defendant Raffel]

495.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

496.    Defendant Raffel knew that Lemonis owed fiduciary duties to ML Fashion. Raffel knew that Lemonis had sole power and control over Plaintiffs' business based on the structure of the operating agreements. She also knew that Plaintiffs were majority shareholders in ML Fashion. But, that whatever Lemonis said was the final determination.  The LLC Agreement related to these entities contain an implied covenant and good faith and fair dealing. The implied covenant of good faith and fair dealing attaches whenever an agreement gives a party the ability to take an action in their "sole discretion." As discussed above, the LLC Agreement gave Lemonis the sole discretion to manage the day-to-day affairs of ML Fashion. Thus, Lemonis owed fiduciary duties to Plaintiffs.

497.    Defendant Raffel knowingly aided and abetted Lemonis' breaches of their fiduciary duties by: (1) working with Lemonis to buy products for ML Fashion's retail stores far above ML Fashion's budget for product thus forcing ML Fashion to incur more debt from Lemonis so it was not able to cover its normal expenses, such as payroll and rent, (2) making business decisions that were outside of her understanding such a managerial, staffing, discounting, and merchandising decisions, knowing that ML Fashion would have to expand time and resources to correct and redo her work, and (3) working with Lemonis to make ML Fashion insolvent and indebted to ML Retail and ML, LLC so that they could use the assets of ML Fashion to grow Lemonis and Raffel's MARCUS brand.

498.    As a direct and proximate cause of Defendant Raffel's conduct, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

**NINTH CAUSE OF ACTION: AIDING AND ABETTING BREACH OF FIDICUARY DUTY**
**[By Plaintiffs Menkin and Goureau Against NBCUniversal and Machete]**

499.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

500.    Defendants NBCUniversal and Machete knew that Defendant Lemonis owed fiduciary duties to Plaintiffs and Gooberry.

501.    NBCUniversal and Machete knowingly aided and abetted Defendant Lemonis' breaches of his fiduciary duties by: (1) publicly displaying episodes of *The Profit* which showed companies obtaining substantial infusions of capital, (2) marketing and repeating the claim that the offers made on show are real, (3) failing to publicize evidence of Lemonis' breaches of fiduciary duties, (4) actively participating in an effort to portray *The Profit* as an opportunity for businesses to improve themselves, (5) portraying Lemonis as man acting in good faith for Plaintiffs' benefit, (6) directly recruiting contestants by telling them the show is real and touting Lemonis as someone who would help Plaintiffs; and (7) continuously recruiting contestants who Lemonis would then place within the Gooberry corporate structure, adding unwanted inventory, increased payroll Gooberry could not afford, and forcing Gooberry to take on extra debt on behalf of the new participant company's.

502.    NBCUniversal and Machete further aided and abetted Lemonis' breach of fiduciary duties owed to Plaintiffs and Gooberry through the entire design of the show, *The Profit*. NBCUniversal, through Jim Ackerman, specifically designed a show that would denigrate and destroy the participating businesses and benefit Lemonis.  NBCUniversal and Machete's lawyers drafted the Participant Agreement to give Lemonis complete and total control over Gooberry before any investment was made by Lemonis.  Further, producers from NBCUniversal and

143

Machete gave Lemonis confidential and private information and worked to manipulate Plaintiffs for Lemonis' gain.

503. As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

504. Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of putting Lemonis into a position to take advantage of the Participant Agreement to manipulate and destroy Plaintiffs' business. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

### TENTH CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**[By Plaintiffs Menkin and Goureau Directly, and Derivatively on behalf of ML Fashion, Against Defendants Lemonis, ML Retail, and ML, LLC]**

505. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

506. The LLC Agreement contains an implied covenant and good faith and fair dealing. The implied covenant of good faith and fair dealing attaches whenever an LLC Agreement gives a party the ability to take an action in their "sole discretion." As discussed above, the LLC

Agreement gave Lemonis the sole discretion to manage the day-to-day affairs of ML Fashion, gave ML Retail the sole discretion to manage the day-to-day affairs of ML Fashion, gave ML Retail the sole discretion to change ML Fashion's manager, and have ML Retail the sole discretion to handle ML Fashion's tax matters.

507.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

508.    The implied covenant of good faith and fair dealing applies to an LLC agreement that, like the LLC Agreement here, attempts to limit the liability of its managers and members.

509.    Defendants breached this covenant by abusing, unreasonably and in bad faith and for their own interests and to the detriment of ML Fashion, the managerial power over ML Fashion provided to them in the LLC Agreement.  Defendants took actions that are illegal and outside of what was authorized by the agreement, actions which breached the covenant, described above, including, but not limited to: (1) comingling assets in an illegal and inappropriate way, (2) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from ML Fashion so that its debts could not be paid, (4) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member of ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of the other personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon business owners Lemonis was purporting to save, (9) closing ML Fashion's retail stores and removing at least $377,377 worth of inventory and

$197,255 worth of fixtures, furniture, and equipment from the sores, (10) improperly removing at least $601,324.02 from ML Fashion's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from these payments from Defendants' benefit.

510.     As a direct and proximate result of Defendants' breaches of the implied duty of good faith and fair dealing, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

### ELEVENTH CAUSE OF ACTION: BREACH OF ML FASHION AGREEMENT

**[By Plaintiffs Menkin and Goureau Directly, and Derivatively on behalf of ML Fashion, Against Defendants Lemonis, ML Retail, and ML, LLC]**

511.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

512.     This is a direct and derivative action for money damages arising out of Defendants' breach of the duties and obligations owed to ML Fashion and ML Fashion's members under the LLC Agreement, and the resulting damages that were incurred.

513.     At all times material to this action, Defendant Lemonis was the Manager and Chairman/CEO of ML Fashion, Defendant ML Retail owned the largest and powerful membership interest in ML Fashion, and ML, LLC was an agent and alter ego of both Lemonis and ML Retail. As such, Defendants agreed to fulfill and discharge certain managerial duties and obligations that were expressly set forth in the LLC Agreement.

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 150 of 176

514.     Specifically, under Section 2.8 of the LLC Agreement, Defendants agreed that "[t]he Company's credit and assets shall be used solely for the benefit of the Company." (See Exh. H at § 2.8.)

515.     Defendants materially breached Section 2.8 of the LLC Agreement, by removing the assets of ML Fashion, including money in its bank accounts and inventory in its stores, and using the assets of ML Fashion to promote Lemonis' personal brand MARCUS, thus clearly not using them solely for the benefit of ML Fashion. Indeed, the removal of these assets have prevented ML Fashion from being able to satisfy its financial obligations.

516.     Lemonis breached this provision of the LLC Agreement by improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments from Defendants' benefit.

517.     Further, Section 6.2(b) required Lemonis to act in good faith and to take actions for the benefits of all of the members as a whole:

**6.2 Duties and Obligations of the Manager; Discretion:**

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager of an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

(*See* Exh. H at § 6.2(b).

518.     Lemonis materially breached Section 6.2 by taking actions that failed to take into account "the interests of the Members as a whole" and failing to act in good faith. Specifically,

147

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 151 of 176

Lemonis made ML Fashion take on debt and forced ML Fashion to take loans from ML Retail in transactions that solely benefit ML Retail and harmed ML Fashion and its other members.

519.   Moreover, Lemonis' actions of draining ML Fashion's bank accounts and transferring funds to MLG Retail so that ML Fashion could not pay its debt clearly were not done in good faith.

520.   The LLC Agreement prohibits the Manager from engaging in Misconduct. The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct." (See Exh. H at p. 5.).

521.   Lemonis' Misconduct as the manager of ML Fashion includes, but is not limited to: (1) forcing ML Fashion to take on debt making it reliant on credit from Lemonis and his entities to meet its regular obligations, such as payroll, and allowing Lemonis to further encumber ML Fashion, (2) using ML Fashion as a vehicle to defraud and foreclose upon the businesses Lemonis was purporting to save, (3) removing funds from ML Fashion's bank accounts in order to ensure that its automated payments could not be made out of the account forcing ML Fashion to become delinquent on its debts, (4) closing ML Fashion's retail stores during a global pandemic and converting at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (5) moving all of the funds out of ML Fashion's bank accounts (roughly $601,324.02) and transferring them to a different company and making a new account invisible to the other owners and signatories on ML Fashion's, and (6) improperly taking at least #3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

522.    Further, the LLC Agreement limits the Manager's and Member's ability to take assets and distributions from ML Fashion. Section 2.7 confirms that "no Member shall have ownership interest" in ML Fashion's property as all of it belongs to ML Fashion itself. (See Exh. H at § 2.7.) Section 3.4 prevents Members from seeking capital of ML Fashion in return of contributions "prior to termination of the Company." (Id. at § 3.4.)

523.    Similarly, no cash distributions are allowed where, as here, ML Fashion's trade accounts are past due. *Id*. at § 5.1(a). Even if the trade accounts were not past due, however, the distributions can be made only within the Manager's "reasonable business judgment" and only to all the Members pursuant to the specific mechanism set forth in the LLC Agreement. (*Id*. at § 5.1(b).)

524.    An additional limitation on cash distributions is that they cannot be made at all if the effect of the distributions is for all of ML Fashion's liabilities to exceed the fair value of its assets. (*Id*. at ¶ 5.4.)

525.    Defendants have breached these provisions of the LLC Agreement by removing cash from ML Fashion's bank accounts and removing inventory from ML Fashion's retail stores to the benefit of Defendants and detriment of ML Fashion and Plaintiffs.

526.    As a direct and proximate result of Defendants' material breaches of the LLC Agreement, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, at least $4,198,960.49.

/ / /

/ / /

/ / /

/ / /

149

## TWELTH CAUSE OF ACTION: BREACH OF CONTRACT

### [By Plaintiff Menkin Against Defendants ML Fashion and MLG Retail]

527.  Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

528.  Since its inception, Plaintiff Menkin served Defendants ML Fashion and MG Retail as their President. In exchange for her services, Menkin and ML Fashion and MLG Retail agreed that she would receive bimonthly payments of $11,558. Those bimonthly payments were made on the 1st and 15th of every month.

529.  Thus, a valid and enforceable contract exists between Menkin and MLG Retail where Menkin received compensation of bimonthly payments of $11,558 in exchange for serving as the President of both companies.

530.  Beginning on April 1, 2020, ML Fashion and MLG Retail ceased paying Menkin the compensation due under the agreement. By failing pay Menkin, ML Fashion and MLG Retail have breached the agreement between it and Menkin.

531.  As a direct and proximate result of Defendants' actions, Plaintiff Menkin has been harmed in an amount to be proved at trial, but not less than $416,088.

## THIRTEENTH CAUSE OF ACTION: UNJUST ENRICHMENT

### [By Plaintiffs Menkin, Goureau and Gooberry Against Defendants Lemonis, ML Retail, and ML, LLC]

532.  Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

533.  Plaintiffs bring this claim for Unjust Enrichment in the alternative to their contract-based claims. Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the Shareholder Agreement and Stock Purchase Agreement through their claim for Fraudulent Inducement.

534.     Plaintiffs allege that the Company has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

535.     By their wrongful acts and omissions, as alleged herein, the Defendants were unjustly enriched at the expense of, and to the detriment of, the Company. The Defendants used the Company as a self-enrichment vehicle while forcing the Company to take actions counter to the Company's interests and to assume increasing debt.

536.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

537.     As President and CEO of ML Retail, and Director of Gooberry, Lemonis used Gooberry's assets to enrich himself and his entities by, among other things: (1) decreasing Gooberry's profit margins in order to make it dependent on loans from Lemonis and his entities; (2) purposefully increasing the debt of Gooberry and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of Gooberry to the detriment of the other shareholders; (4) using the assets of Gooberry to grow Lemonis' personal brand MARCUS; (5) using Gooberry as a vehicle to defraud and foreclose upon business owners Lemonis was purporting to save on his television show; and (6) forcing Gooberry to acquire Runway and thereby incur more debt.

538.     Further, upon information and belief, Defendants have continued to enrich themselves at Gooberry's expense and have been closing Gooberry's store in Greenwich, Connecticut and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store.

539.    Defendants had knowledge of the benefits conferred upon them by Gooberry.

540.    Plaintiffs, as shareholders of Gooberry, seek restitution from the Defendants to disgorge all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct and fiduciary breaches.

541.    Further, it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used Gooberry assets to enrich themselves at the expense of Gooberry and its other shareholders. There is no justification for Defendants' actions.

### FOURTEENTH CAUSE OF ACTION: UNJSUT ENRICHMENT

**[By Plaintiffs Menkin and Goureau Directly, and Derivatively on Behalf of ML Fashion, Against Defendants Lemonis, ML Retail, and ML, LLC]**

542.    Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

543.    Plaintiffs bring this claim for Unjust Enrichment in the alternative to their claim for their breach of contract claim above. Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the LLC Agreement through their claim for Fraudulent Inducement.

544.    Plaintiffs allege that ML Fashion has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

545.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

546.    By their wrongful acts and omissions, as alleged herein, Defendants were unjustly enriched at the expense of, and to the detriment of, ML Fashion. Defendants used ML Fashion as

a self-enrichment vehicle while forcing ML Fashion to take actions counter to ML Fashion's interests and to assure increasing debt.

547.   As the manager of ML Fashion, Lemonis use ML Fashion's assets and to enrich himself and his entities by, among other things: (1) purposefully decreasing ML Fashion's profit margins making it reliant on loans from Lemonis and his entities, (2) purposefully increasing the debt of ML Fashion and forcing it to take loans from Lemonis, and/or other companies owed and/or controlled by him, in order to meet its financial obligations, (3) taking actions that financially favored member of ML Retail, LLC, decreasing the value and viability of ML Fashion to the direct detriment of the other members of ML Fashion, (4) using the assets of ML Fashion to grown Lemonis' personal brand MARCUS, (5) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (6) closing ML Fashion's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment form the stores, (7) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-ML Fashion related expenses that Defendants put on Defendant Lemonis' personal credit and keeping and/or using the rewards points from those payments for Defendants' benefit, (9) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, and (10) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS.

548.   Plaintiffs, as members and representatives of ML Fashion, seek restitution from Defendants, and seek an order form this Court requiring Defendants to disgorge all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

549.     Further, as it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used ML Fashion's assets to enrich themselves at the expense of ML Fashion and its other members. There is no justification for Defendants' actions.

## FIFTEENTH CAUSE OF ACTION: CORPORATE MISMANAGEMENT AND WASTE

### [By Plaintiffs Menkin, Goureau, and Gooberry Against Defendants Lemonis, ML Retail, and ML, LLC]

550.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

551.     As President and CEO of ML Retail, and Director of Gooberry, Lemonis repeatedly engaged in transactions constituting bad faith and self-dealing on behalf of Gooberry.

552.     Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

553.     Lemonis' bad faith mismanagement and self-dealing actions include, but are not limited to: (1) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (4) using the assets of the Company to grow Lemonis' personal brand MARCUS; (5) closing the Company's Greenwich, Connecticut store and removing $148,313 worth of

inventory and $89,056 in furniture, fixtures, and equipment from the store, and (6) using Gooberry as a vehicle to defraud and foreclose upon business owners Lemonis was purporting to save.

554.    The actions Lemonis took on behalf of Gooberry as Director were wasteful and in blatant bad-faith, and always benefiting Lemonis or Lemonis owned entities at Gooberry's direct expense.

555.    As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

## SIXTEENTH CAUSE OF ACTION: CORPORATE MISMANAGEMENT AND WASTE
### [By Plaintiffs Menkin and Goureau Directly, and Derivatively on behalf of ML Fashion, Against Defendant Lemonis, ML Retail, and ML, LLC]

556.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

557.    Lemonis was the Manager of ML Fashion, giving him sole discretion over the company's business transactions. In carrying out these transactions, Lemonis repeatedly operated in bad faith and took numerous actions in the name of ML Fashion, which in reality benefited him personally at great expense to the company.

558.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

559.    Lemonis' actions that constitute bad faith mismanagement and self-dealing include, but are not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from

the Company so that its debts, including the American Express payment plan, could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, (12) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, (13) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS, and (14) creating personal liability for Plaintiffs due to the failure to pay the American Express and failure to pay required tax and business fees in Illinois, Connecticut, Minnesota, Florida.

560.    As a direct and proximate result of Defendants' gross mismanagement, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49. Plaintiff Goureau has been harmed by Defendants' gross mismanagement as Defendants' failure to pay the American Express debt triggers' Goureau's personal obligation to pay the outstanding

amount. Plaintiff Menkin has been harmed by Defendants' gross mismanagement by being personally liable for state tax and business fees in Illinois, Connecticut, Minnesota, and Florida, thus hindering her ability to start separate businesses in those states.

## SEVENTEENTH CAUSE OF ACTION: MISAPPROPRIATION OF COPORATE ASSETS

**[By Plaintiffs Menkin, Goureau and Gooberry Against Defendants Lemonis, ML Retail, and ML, LLC]**

561.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

562.    This is an action for relief arising out of the mismanagement and waste of corporate assets caused solely by Defendants Lemonis, ML Retail and ML, LLC's malfeasance, acts or omissions, to the detriment of the Company.

563.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

564.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis has grossly mismanaged the Gooberry by, for example: (1) forcing the Gooberry to spend hundreds of thousands of dollars renovating its stores only to then rebrand and spend additional hundreds of thousands of dollars on rebranding those stores; (2) decreasing the Gooberry margins from 73% to 52%; (3) saddling the Gooberry with expensive inventory then forcing the Gooberry to sell that inventory at a loss; (4) destroying the Gooberry's legacy handbag line; (5) closing the Gooberry's Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture,

fixtures, and equipment from the store; and (6) getting rid of all but one Courage.B retail store and destroying the Courage.B brand.

565.    Beginning in May 2020, Defendants Lemonis, ML Retail and ML, LLC have been closing retail stores owned and/or operated by Gooberry and have removed the Gooberry's inventory and assets from those stores.

566.    These actions by Defendants Lemonis, ML Retail and ML, LLC amount to waste and mismanagement of corporate assets. None of these actions had a legitimate business purpose, but were all designed to weaken Plaintiffs and increase Lemonis' control over them.

567.    As a result of their mismanagement and waste of corporate assets, Defendants Lemonis, ML Retail and ML, LLC are liable to the Company and Plaintiffs under common law and New York Bus. Corp. Law § 720.

568.    As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

## EIGHTEENTH CAUSE OF ACTION: MISAPPROPRIATION OF CORPORATE ASSETS
### [By Plaintiffs Menkin and Goureau Directly, Derivatively on Behalf of ML Fashion, Against Defendants Lemonis, ML Retail, and ML, LLC]

569.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

570.    This is an action for relief arising out of the waste of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

571.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 162 of 176

572.    Defendants Lemonis, ML Retail and ML, LLC have taken at least $3,023,004.47 in funds from ML Fashion and MLG Retail's bank accounts to pay personal, non-Company related, expenses that Defendants Lemonis, ML Retail and ML, LLC put on Defendant Lemonis' personal credit card.

573.    Since April 2020, Defendants have been closing retail stores all over the country owned and/or operated by either ML Fashion or MLG Retail and have removed ML Fashion's assets from those stores. In total, Defendants Lemonis, ML Retail and ML, LLC have removed at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas. Defendants Lemonis, ML Retail and ML, LLC have also taken hundreds of thousands of dollars from the Company's Newtown, Massachusetts store.

574.    On or around May 22, 2020, Defendants Lemonis, ML Retail and ML, LLC moved roughly $601,324.02 out of ML Fashion's bank accounts and transferred the funds to an account in the name of MLG Retail that was not tied to either company's other accounts preventing the accounts' other signatory, Plaintiff Menkin, from being able to access or view the account.

575.    Since the filing of Plaintiffs' initial Complaint on June 18, 2020, Defendants Lemonis, ML Retail and ML, LLC have held fire sales selling large portions of ML Fashions inventory for up to 90% off forcing the Company to take huge losses on that inventory.

576.    These actions by Defendants Lemonis, ML Retail and ML, LLC amount to a waste and misappropriation of corporate assets.

577.    As a direct and proximate result of Defendants Lemonis, ML Retail and ML, LLC' malfeasance, acts or omissions, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## NINETEENTH CAUSE OF ACTION: CONVERSION
### [By Plaintiffs Menkin, Goureau, and Gooberry Against Defendants Lemonis, ML Retail, and ML, LLC]

578.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

579.    ML Fashion had a property interest in the funds in its bank accounts and inventory and furniture, fixtures, and equipment in its retail stores and a right to possess those funds and inventory and have them utilized for legitimate business purposes.

580.    Moreover, as the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

581.    Defendants Lemonis, ML Retail and ML, LLC converted these funds by removing such funds from ML Fashion's bank accounts for no legitimate business purpose, including removing roughly $601,324.02 from the Company's bank accounts.

582.    Defendants Lemonis, ML Retail and ML, LLC additionally converted ML Fashion's property by taking at least $3,023,004.47 from ML Fashion and MLG Retail's bank accounts to pay personal, non- ML Fashion related, expenses that Defendants put on Defendant Lemonis' personal credit card.

583.    To the extent that any of the $3,023,004.47 was used towards legitimate business expenses, Defendants Lemonis, ML Retail and ML, LLC converted the American Express rewards points associated with those credit card payments.

584.    Defendants Lemonis, ML Retail and ML, LLC converted ML Fashion's inventory by removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas

160

for no legitimate business purpose. Defendants Lemonis, ML Retail and ML, LLC have also taken hundreds of thousands of dollars from ML Fashion's Newtown, Massachusetts store.

585.    On information and belief, Defendants Lemonis, ML Retail and ML, LLC are converting ML Fashion's inventory and FFE, at least in part, to support Lemonis and Raffel's MARCUS brand and move the brand from ML Fashion to ML, LLC.

586.    Defendants Lemonis, ML Retail and ML, LLC' actions were willful, wanton, malicious and oppressive.

587.    As a direct and proximate result of Defendants Lemonis, ML Retail and ML, LLC' actions, Plaintiffs and ML Fashion have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## TWENTIETH CAUSE OF ACTION: DEFAMTION

### [By Plaintiffs Menkin, Goureau Against Defendants NBCUniversal, Machete, and Lemonis]

588.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

589.    NBCUniversal, Machete, and Lemonis were involved in publishing certain statements and content by airing *The Profit* Season 2 Episode 9 Courage.B and *The Profit* Season 3 Episode 9 Progress Report. These statements were published across NBCUniversal airwaves and broadcast around the world. On information and belief, the episodes have aired multiple times since their initial release. The episodes are currently publicly available for anyone to view on NBCUniversal's streaming service: Peacock

590.    NBCUniversal, Machete, and Lemonis published multiple statements, depictions, and representations to their viewers that were false, defamatory, and had the natural tendency to

Case 1:20-cv-04691-MKV   Document 94-1   Filed 11/19/21   Page 165 of 176

injure Plaintiffs. Any reasonable viewer would understand that these statements were about Plaintiffs. NBCUniversal, Machete, and Lemonis knew these statements were false and/or failed to use care to determine the truth or falsity of the statements when published.

591.    These publications included but were not limited to: (1) editing scenes making it appear that Plaintiffs' business was mismanaged, and the family was constantly fighting; (2) editing scenes to make it appear that Courage.B had faulty inventory on store shelves; (3) editing of a scene where producers forced Goureau to yell at his mother Noemi to simulate a fight; (4) stating that "Courage.B is losing $500,000 per year" as if this happened in multiple years; (5) forcing managers to lie about sales per day being "$1,500;" (6) stating that Courage.B was on the brink of financial ruin that could only be saved by Lemonis; and (7) stating that Courage.B "basically just knocked off everyone else's bags."    Any reasonable viewer understood these publications to be about Plaintiffs and their business.

592.    Plaintiffs have been injured and damaged by the publications repeated airings of the episodes related to them. Plaintiffs have continued to receive negative and derogatory remarks from complete strangers based on Defendants false publications. Plaintiffs made a demand on NBCUniversal to cease airing and streaming the defamatory and denigrating episodes about Plaintiffs. Plaintiffs presented its full set of complaints about this false set of public statements to NBCUniversal, Machete, and Lemonis over the last several months. They refuse to retract anything or stop distributing and streaming the episode. Plaintiffs have been humiliated, and their personal and professional reputations have forever been destroyed.

593.    As a direct and proximate result of Defendants' actions described above, Plaintiffs have suffered damages in an amount to be proven at trial.

594.     Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of loading Plaintiffs' business up with debt through Lemonis owned and operated entities so Plaintiffs would fall victim to the mob-style debt trap These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

### TWENTY-FIRST CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH POTENTIAL ECONOMIC ADVANTAGE
**[By Plaintiffs Menkin, Goureau, and Gooberry, against NBCUniversal, Machete, and Lemonis]**

595.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

596.     Plaintiffs had an economic relationship with potential investors that would have resulted in an economic benefit to Plaintiffs. NBCUniversal, Machete, and Lemonis were aware of these prospective relationships. Their conduct deterred and prevented Plaintiffs from obtaining investments from outside sources. NBCUniversal, Machete, and Lemonis intended to disrupt these prospective relationships. Plaintiffs were harmed by being unable to obtain outside investment, and NBCUniversal, Machete, and Lemonis were a substantial factor in causing said harm.

597.     Plaintiffs had an economic relationship with several potential investors prior to its participation on *The Profit*. Plaintiffs had had advanced discussions with these potential investors

regarding securing a capital investment for there business at or around the time they were in the process of applying for and appearing on the show.

598.    NBCUniversal, Machete, and Lemonis were aware of these relationships. Plaintiffs disclosed the existence of these prospective investors to producers form NBCUniversal and Machete who asked probing questions about all potential investors during the show's interview process. Plaintiffs were contractually obligated to provide the information based on the Participant Agreement. NBCUniversal and Machete induced Plaintiffs to forgo these investments, representing that Lemonis was the best partner for Gooberry, all while knowing that Lemonis intended to destroy the company for his own personal gain.

599.    NBCUniversal, Machete, and Lemonis took intentionally wrongful acts designed to disrupt the prospective economic relationships of Plaintiffs. NBCUniversal, Machete, and Lemonis undermined Plaintiffs' ability to secure investments in their company, which was Plaintiffs entire goal while engaging Defendants. NBCUniversal, Machete, and Lemonis interfered through fraudulent statements and false promises that working with Lemonis would be a great opportunity. NBCUniversal fraudulently induced Plaintiffs to work with Lemonis. NBCUniversal, Machete, and Lemonis sough only to enrich themselves, interfering with Plaintiffs other economic prospects in the process.

600.    Plaintiffs' prospective economic relationships were disrupted. At Defendants insistence, Plaintiffs turned down potential investors in favor of what they believed, based on Defendants fraudulent statements, to be a partnership with Lemonis. However, due to the mob-style debt trap orchestrated and executed by Ackerman and Lemonis, Plaintiffs instead became so indebted to Lemonis they had no choice but to turn control of their company over to Lemonis.

601. Plaintiffs were harmed by being unable to secure potential investors. Plaintiffs were further harmed and damaged by NBCUniversal, Machete, and Lemonis by falling victim to the mob-style debt trap of Defendants instead of securing beneficial outside capital.

602. As a direct and proximate result of Defendants NBCUniversal, Lemonis and Machete' fraud, Plaintiffs have been damaged in an amount to be proven at trial, but at least $18,631,226 as determined by accountants who have calculated the damages.

603. Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal, Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. NBCUniversal, Machete, and Lemonis' fraudulent conduct was taken for the sole purpose of interfering with Plaintiffs' economic opportunities in order to harvest their assets through fraud. These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

## TWENTY-SECOND CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

### [Plaintiffs Menkin and Goureau Against NBCUniversal, Machete, and Lemonis]

604. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein and pleads in the alternative:

605. NBCUniversal, Machete, and Lemonis represented to Plaintiffs that certain facts were true. NBCUniversal, Machete, and Lemonis' representations were not true. NBCUniversal,

Machete, and Lemonis had no reasonable grounds for believing the representations were true when made. NBCUniversal, Machete, and Lemonis intended that Plaintiffs rely on the representations. Plaintiffs' reliance on NBCUniversal, Machete, and Lemonis' representations was a substantial factor in causing harm to Plaintiffs.

606.    NBCUniversal, Machete, and Lemonis' false material misrepresentations and omissions of fact include but are not limited to: (1) *The Profit* was designed with the purpose of putting Lemonis in position to improve already successful businesses like Gooberry; (2) Plaintiffs should trust Lemonis as a business advisor; (3) Deals with Lemonis portrayed on *The Profit* were real and obtained through a good faith and arm's length negotiation, per the Participant Agreement; (4) Lemonis' role was to make a good faith effort to grow the company, increase its sales, and improve its brand reputation, per the Participant Agreement; (5) Gooberry would benefit from appearing on the show regardless of whether or not a deal was obtained; (6) Plaintiffs should forgo other potential investors in favor of appearing on the show; (7) Lemonis wanted help Plaintiffs expand their business through Gooberry and not saddle it with debt in order to take its assets; (8) Plaintiffs and Lemonis would be partners and equals in running Gooberry; (9) Lemonis would run Gooberry in a way that would benefit Plaintiffs and Gooberry; (10) Lemonis cared for Plaintiffs' family and their business and that Lemonis would take care of Plaintiffs' mother Noemi; (11) The cost of renovating Plaintiffs' stores would be $200,000 and would be part of Lemonis' $800,000 investment; (12) Gooberry would invest in other businesses and to help grow and develop the businesses in their profile; (13) ML Fashion would be a beneficial new venture for Plaintiffs; and (14) omitting material information that previous businesses who had appeared on *The Profit* were not improved by Lemonis, but rather drowned in debt to Lemonis owned and operated entities, only to have their assets stolen by Lemonis when the price was driven down to almost nothing.

166

607.     NBCUniversal, Machete, and Lemonis had no reasonable grounds for believing the above representations to be true. Publicly available information and NBCUniversal and Machete's experience working with Lemonis should have informed NBCUniversal and Machete that Lemonis was a con artist.  Lemonis had a history of shady accounting and business practices that were public record.  The smallest amount of due diligence would have uncovered these facts. Further, NBCUniversal and Machete had directed Lemonis' actions throughout the course of the show.  They had no reasonable grounds to believe that Lemonis acted in good faith, helped businesses, or in any way lived up to the reputation that NBCUniversal, Machete, and Lemonis relentlessly represented to Plaintiffs.

608.     NBCUniversal, Machete, and Lemonis made the above representations to induce Plaintiffs' participation on *The Profit* and cooperation with Lemonis.

609.     Plaintiffs was justified in its reliance on representations from seemingly reputable organizations such as CNBC and NBCUniversal.  NBCUniversal's public-relations campaigns and constant advertising of Lemonis as a business guru was intended to give that impression.  In fact, Lemonis' association with NBCUniversal and Machete is the primary factor that led Plaintiffs to participate on *The Profit*.

610.     As a direct and proximate cause of NBCUniversal, Machete, and Lemonis' representations and Plaintiffs' reliance thereupon, Plaintiffs has been harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

167

## <u>TWENTY-THIRD CAUSE OF ACTION: CONSPIRACY</u>

### [Plaintiffs Menkin and Goureau Against NBCUniversal and Machete]

611.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

612.    NBCUniversal Machete were aware that Lemonis through ML Retail intended to defraud, pillage, and otherwise destroy Plaintiffs through participation on *The Profit*. NBCUniversal and Machete agreed with Lemonis' wrongful actions, intended for the wrongful actions to take place, and facilitated the bulk of the wrongful actions.  Of course, all of these actions were part of NBCUniversal's mob-stye fraud playbook.

613.    NBCUniversal created the concept of the show *The Profit*, through their cable broadcast network CNBC.  Jim Ackerman, an employee of NBCUniversal, created *The Profit*, a show designed to take smaller less sophisticated businesses and run them into the ground for ratings. To do so they needed a con man. So, NBCUniversal turned to Marcus Lemonis.

614.    NBCUniversal and Machete were aware of Lemonis' intent to commit fraud and intent to induce Plaintiffs into a disadvantaged negotiating position, interfere with Plaintiffs' prospective business, self-deal to the point of bankrupting the company, and embarrass and humiliate Plaintiffs and its employees.  Lemonis was an employee of NBCUniversal acting with actual or apparent authority on behalf of NBCUniversal.  Further, Lemonis was a co-conspirator in the creation and execution of NBCUniversal's fraud playbook.  CNBC executive Jim Ackerman and Lemonis regularly discussed every aspect of the mob-style debt trap Lemonis executed against Plaintiffs.  At all times, Jim Ackerman – thus, NBCUniversal and Machete – knew and approved of, or ratified, each and every action taken by Lemonis herein.

615.     NBCUniversal and Machete aware of Lemonis' intent to commit tortious acts because NBCUniversal and Machete had assisted and conspired to help Lemonis commit the same acts in prior episodes of *The Profit*. This was all part of the scheme and design of the show, created by NBCUniversal.  In this case, they executed the fraud playbook to perfection.

616.     NBCUniversal and Machete agreed with and assisted Lemonis' tortious conduct by making representations and fraudulent omissions of material facts to Plaintiffs so that it would forgo other investment opportunities, sign releases and applications to be on *The Profit*, agree to be featured on the show, allow Lemonis to invest in and control the business, forego business opportunities on belief that Plaintiffs would partner with Lemonis, and fraudulently induce Plaintiffs to execute high-interest promissory notes from ML Retail for capital and the unfulfilled promise of an investment of $800,000 that was shown on the show.  NBCUniversal knew that their representations related to Lemonis, and his trustworthiness, were untrue.  They lied to gain Plaintiffs' compliance and to assist Lemonis in their mob-style debt trap.

617.     Plaintiffs was harmed and the NBCUniversal and Machete's conscious effort to facilitate and assist Lemonis' fraudulent scheme was a substantial factor in causing the harm.  In fact, Plaintiffs never would have engaged with Lemonis, on such unfair footing without NBCUniversal and Machete's participating in the scheme.  As a result of NBCUniversal and Machete's actions to participate in the conspiracy to defraud and destroy Plaintiffs, Plaintiffs has lost benefits that were obtained by NBCUniversal, Machete, and Lemonis as well as untold economic losses to be determined at trial.

618.     Plaintiffs further seek punitive damages to deter NBCUniversal, Machete, and Lemonis from continuing their fraudulent, wanton, malicious, oppressive, and greatly disingenuous business practices. In committing the above-described acts, NBCUniversal,

Machete, and Lemonis acted with fraud, malice, and moral turpitude, as described in detail herein and incorporated by reference. Defendants' fraudulent conduct was taken for the sole purpose of inducing Plaintiffs to participate on The Profit and subsequently fall victim to Lemonis' web of corporate fraud.  These fraudulent actions were taken with a conscious disregard for Plaintiffs' rights. Given NBCUniversal, Machete, and Lemonis' willful, wanton, reckless, and malicious conduct, and their high degree of moral culpability, punitive damages are appropriate and warranted, and must be awarded to stop public companies and their subsidiaries from continuing to commit fraud on the public at large.

## DECLARATORY JUDGMENT

619.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

620.    There is a substantial controversy and current dispute between the parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgement. The dispute, therefore, between Plaintiffs and Defendants is a justiciable controversy appropriate for declaratory judgement

621.    There is a current controversy and pending dispute regarding the validity of the Participant Agreement.

622.    Plaintiffs take the position that the Participant Agreements entered into by Plaintiffs Goureau, Menkin and Gooberry are invalid and void for a number of reasons.

623.    First, the agreements were obtained by fraudulent inducement as a result of material misrepresentations made to Plaintiffs to induce them to appear on the show including, but not limited (1) *The Profit* was designed with the purpose of putting Lemonis in position to improve already successful businesses like Gooberry; (2) Plaintiffs should trust Lemonis as a business

advisor; (3) Deals with Lemonis portrayed on *The Profit* were real and obtained through a good faith and arm's length negotiation, per the Participant Agreement; (4) Lemonis' role was to make a good faith effort to grow the company, increase its sales, and improve its brand reputation, per the Participant Agreement; (5) Gooberry would benefit from appearing on the show regardless of whether or not a deal was obtained; (6)  Plaintiffs should forgo other potential investors in favor of appearing on the show; (7) Lemonis wanted help Plaintiffs expand their business through Gooberry and not saddle it with debt in order to take its assets; (8) Plaintiffs and Lemonis would be partners and equals in running Gooberry; and (9) Lemonis would run Gooberry in a way that would benefit Plaintiffs and Gooberry. These representations and everything else told to Plaintiffs were absolutely material, abhorrent, and intentional lies. All of these representations were false when made and were scripted and directed by NBCUniversal executive Jim Ackerman.

624.    Second, the releases and waivers included several unenforceable and illegal provisions under California law which explicitly prohibits releasing claims for fraud and other intentional acts. Yet, these agreements attempted to do exactly that. Indeed, the entire purpose of these agreements was for Plaintiffs to waive certain non-waivable rights to insulate NBCUniversal and Machete from liability based on their intentional torts. Because this is the central purpose of the agreements, the entire agreements are void as against public policy.

625.    Third, any arbitration clause or mediation clause in the release and waiver agreements are unenforceable due to unconscionability. "To defeat an arbitration clause, the litigant must show both procedural and substantive unconscionability." *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010). "Procedural unconscionability involves oppression or surprise due to unequal bargaining power while substantive unconscionability focuses on overly harsh or one-sided results." *Id.* Both exist here.

626.    Therefore, the Participant Agreements executed by Plaintiffs were invalid.

627.    Defendants dispute that the Participant Agreement is invalid or obtained by fraud. Defendants believe that no matter how egregious the lies, fraud, and deceit used to gain Plaintiffs signatures on the document, the Participant Agreement survives legal challenge merely because it was executed by Plaintiffs.

628.    The allegations herein constitute actual justiciable controversy.

629.    Plaintiffs seek an order invalidating the Participant Agreement.

630.    Accordingly, Plaintiffs are entitled to a declaration that the Participant Agreements are null and void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants, as follows:

1. For monetary damages in an amount to be determined at trial;

2. For punitive damages;

3. For an accounting under Court supervision of the money owed/due for all assets Defendant misappropriated from the Company, as well as any benefits they have realized from those assets;

4. For disgorgement from the Defendants all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

5. For recission of the Shareholder Agreement and Stock Purchase Agreement as they were obtained through fraud;

6. For the recission of the LLC Agreement as it was obtained through fraud;

7. The appointment of a receiver;

8. A temporary, preliminary, and permanent injunction;

9. An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs, and expenses';

10. For a declaratory judgement that the Participant Agreement is null and void;

11. For such further relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 18, 2021        **GERARD FOX LAW P.C.**

*/s/ Ryan Dolan*
Ryan Dolan
Prachi Ajmera
1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
pajmera@gerardfoxlaw.com
rdolan@gerardfoxlaw.com

*Attorneys for Plaintiffs,*
Nicolas Goureau
Stephanie Menkin
Gooberry Corporation

173