UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NICOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of GOOBERRY CORP., a New York corporation, | : : : | |
| Plaintiffs, | : | |
| v. | : | |
| MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, and MARCUS LEMONIS, LLC, a Delaware limited liability company, | : : : : | Civil Action No.  1:20-cv-04691 |
| Defendants, | : : | |
| and | : | |
| GOOBERRY CORP., a New York corporation, | : | |
| Nominal Defendant. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR CLARIFICATION AND/OR FOR AN ORDER
ALTERING OR AMENDING JUDGMENT UNDER RULE 59(e) OR, IN THE
<u>ALTERNATIVE, FOR RELIEF FROM JUDGMENT UNDER RULE 60(b)</u>**

## <u>TABLE OF CONTENTS</u>

A BRIEF PROCEDURAL INTERLUDE.................................................................................2

ARGUMENT ....................................................................................................................4

  I.   REQUESTED RELIEF IS APPROPRIATE TO ACHIEVE SUBSTANTIAL JUSTICE
       AND/OR TO CORRECT OVERLOOKED MATTERS........................................4

  II.  PLAINTIFFS SATISFY RULE 41(a)(2) FACTORS ..........................................8

  III. ALTERNATIVELY, LEAVE TO AMEND WOULD HAVE BEEN GRANTED IF THE
       COURT STILL HAD JURISDICTION OVER THE AMENDED CLAIMS ....................12

      A.   The New Evidence Uncovered to Date........................................................13

      B.   Leave to Amend Would Have Been Proper....................................................19

          1.   No Undue Prejudice or Undue Delay...............................................20

          2.   No Futility (Aside from the Jurisdictional Problem) ...............................22

  IV. THE OVERLOOKED MATTER CONCERNING THE GOOD FAITH CLAIM ..............25

CONCLUSION ...............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Affiliated FM Ins. Co. v. Liberty Mechanical Contractors, Inc.*,
　2013 WL 4526246 (S.D.N.Y. Aug. 27, 2013)................................................................21

*Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*,
　2000 WL 815894 (S.D.N.Y. June 23, 2000) .................................................................23

*American Medical Ass'n v. United Healthcare Corp.*,
　2006 WL 3833440 (S.D.N.Y. Dec. 29, 2006) ...............................................................21

*Ames v. Clifford*,
　1996 WL 563098 (S.D.N.Y. Oct. 2, 1996)...............................................................11, 12

*ARS Kabirwala, LP v. El Paso Kabirwala Cayman Co.*,
　2017 WL 3396422 (S.D.N.Y. Aug. 8, 2017)................................................................25

*Association. for Retarded Citizens of Conn. v. Thome*,
　68 F.3d 547 (2d Cir. 1995) ...........................................................................................4

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
　493 F.3d 87, 108 (2d Cir. 2007).................................................................................22

*Baker v. Anschutz Expl. Corp.*,
　2016 WL 981858 (W.D.N.Y. Mar. 15, 2016) ...............................................................4

*Baldanzi v. WFC Holdings Corp.*,
　2010 WL 125999 (S.D.N.Y. Jan. 13, 2010) ..................................................................9

*Ballard v. Parkstone Energy, LLC*,
　2008 WL 4298572 (S.D.N.Y. Sept. 28, 2008) .............................................................20

*Benitez v. Hitachi Metals Am., Ltd.*,
　2012 WL 3249417 (S.D.N.Y. Aug. 6, 2012)..............................................8, 9, 10, 11

*Blaskiewicz v. County of Suffolk*,
　29 F. Supp. 2d 134 (E.D.N.Y. 1998) ..........................................................................22

*Br N. 223, LLC v. Glieberman*,
　2016 WL 7411127 (E.D. Mich. Dec. 22, 2016) ..........................................................11

*Camilli v. Grimes*,
　436 F.3d 120 (2d Cir. 2006) ..........................................................................................8

*Caputo v. Pfizer, Inc.*,
　267 F.3d 181 (2d Cir. 2001) ........................................................................................19

*Casault v. Fed. Nat. Mortg. Ass'n*,
　915 F. Supp. 2d 1113 (C.D. Cal. 2012) ......................................................................19

*Casault v. One W. Bank FSB*,
    658 F. App'x 872 (9th Cir. 2016) ..................................................................................19

*Chubb INA Holdings Inc. v. Chang*,
    2016 WL 6841075 (D.N.J. Nov. 21, 2016) ...................................................................22

*Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc.*,
    2003 WL 253094 (S.D.N.Y. Feb. 4, 2003) ...................................................................22

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ..........................................................................23

*Commander Oil Corp. v. Barlo Equip. Corp.*,
    215 F.3d 321 (2d Cir. 2000) ........................................................................................19

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990) .......................................................................................................7

*D'Alto v. Dahon California, Inc.*,
    100 F.3d 281 (2d Cir. 1996). .......................................................................................8, 9

*De Ponceau v. Bruner*,
    2012 WL 1030415 (N.D.N.Y. Feb. 21, 2012) ..............................................................20

*Dilworth v. Goldberg*,
    914 F. Supp. 2d 433 (S.D.N.Y. 2012) ..........................................................................21

*EMI Ent. World, Inc. v. Karen Recs., Inc.*,
    2013 WL 2480212 (S.D.N.Y. June 10, 2013) ................................................................4

*Estate of Sauter v. Citigroup Inc.*,
    2015 WL 3429112 (S.D.N.Y. May 27, 2015) .................................................................7

*Foman v. Davis*,
    371 U.S. 178 (1962) .................................................................................................19, 20

*Gap, Inc. v. Stone Int'l Trading, Inc.*,
    169 F.R.D. 584 (S.D.N.Y.), *aff'd*, 125 F.3d 845 (2d Cir. 1997) ...............................8, 11

*Gibson v. City of Chicago*,
    910 F.2d 1510 (7th Cir. 1990) .......................................................................................7

*Greenidge v. Baya Moving & Storage*,
    2015 WL 6755389 (E.D.N.Y. Nov. 4, 2015) .................................................................5

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999) ..........................................................................................22

*In re "Agent Orange" Prod. Liab. Litig.*,
    220 F.R.D. 22 (E.D.N.Y. 2004) ....................................................................................22

*In re 310 Assocs.*,
    346 F.3d 31 (2d Cir. 2003) .............................................................................................4

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
   297 F.R.D. 90 (S.D.N.Y. 2013) ........................................................................4

*In re Emergency Beacon Corp.*,
   666 F.2d 754 (2d Cir. 1981) ...........................................................................4

*In re M/V Peacock on Complaint of Edwards*,
   809 F.2d 1403 (9th Cir. 1987) ........................................................................4

*In re Madison Asset LLC*,
   2021 WL 1894032 (S.D.N.Y. May 11, 2021) ........................................19, 20, 21, 22

*In re Martino*,
   429 B.R. 66 (Bankr. E.D.N.Y. 2010) ...............................................................7

*ING Glob. V. United Parcel Serv. Oasis Supply Corp.*,
   757 F.3d 92 (2d Cir. 2014) .............................................................................4

*Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*,
   450 F. Supp. 3d 358 (S.D.N.Y. 2020) .............................................................22

*Jones v. Securities & Exchange Commission*,
   298 U.S. 1 (1936) ...........................................................................................8

*King v. City of New York*,
   2014 WL 4954621 (E.D.N.Y. Sept. 30, 2014) ...............................................19

*Koppel v. 4987 Corp.*,
   167 F.3d 125 (2d Cir.1999) .............................................................................7

*Kwan v. Schlein*,
   634 F.3d 224 (2d Cir. 2011) ...........................................................................9

*Lenaghan v. Pepsico, Inc.*,
   961 F.2d 1250 (6th Cir. 1992) ........................................................................8

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ....................................................................19, 22

*Luce v. Edelstein*,
   802 F.2d 49 (2 Cir.1986) ...............................................................................19

*Mar-Cone Appliance Parts Co. v. Mangan*,
   2012 WL 5906874 (W.D.N.Y. Nov. 7, 2012) .................................................10

*McCleary v. Wells Fargo Sec., L.L.C.*,
   2015 IL App (1st) 141287 ..............................................................................25

*Mercado v. Playa Realty Corp.*,
   2005 WL 1594306 (E.D.N.Y. July 7, 2005).....................................................5

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*,
   634 N.Y.S.2d 469 (N.Y. 1995)......................................................................23

iii

*ML Fashion, LLC v. Nobelle GW, LLC*,
    2021 WL 170741 (N.D. Ill. Jan. 19, 2021) ................................................................10

*Munafo v. Metropolitan Transp. Auth.*,
    381 F.3d 99, 105 (2d Cir. 2004) .................................................................................4

*N. Ins. Co. of New York v. Travelers Ins. Co.*,
    2017 WL 747557 (S.D. Ind. Feb. 27, 2017) ...............................................................7

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .....................................................................................23

*Pettaway v. Nat'l Recovery Sols., LLC*,
    955 F.3d 299 (2d Cir. 2020) .....................................................................................22

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993) ...................................................................................................4

*Powers v. Brit. Vita, P.L.C.*,
    57 F.3d 176 (2d Cir. 1995) .......................................................................................23

*Protect-A-Bub USA, LLC v. D'Arcy*,
    2006 WL 1408666 (S.D.N.Y. May 23, 2006) ...........................................................12

*Randolph-Rand Corp. v. Tidy Handbags, Inc.*,
    2001 WL 1286989 (S.D.N.Y. Oct. 24, 2001) ...........................................................20

*Ricciuti v. N.Y.C. Transit Auth.*,
    941 F.2d 119 (2d Cir. 1991) .....................................................................................19

*Richardson Greenshields Sec., Inc. v. Lau*,
    825 F.2d 647 (2d Cir. 1987) .....................................................................................21

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) .................................................................................19, 22

*Rose v. Barnhart*,
    2007 WL 549419 (S.D.N.Y. Feb. 16, 2007) ...............................................................4

*Santiago v. Victim Services Agency*,
    753 F.2d 219 (2d Cir. 1985) .......................................................................................7

*Schwartz v. Liberty Mut. Ins. Co.*,
    539 F.3d 135 (2d Cir. 2008) .......................................................................................4

*Securities and Exchange Commission v. DCI Telecommunications, Inc.*,
    207 F.R.D. 32 (S.D.N.Y. 2002) ................................................................................21

*Sheridan Drive-In, Inc. v. State*,
    228 N.Y.S.2d 576 (4th Dep't 1962) ..........................................................................23

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995) .........................................................................................4

*Soroof Trading Dev. Co. v. GE Microgen, Inc.*,
    283 F.R.D. 142 (S.D.N.Y. 2012) ...................................................................20, 21

*Szymczak v. Nissan N. Am., Inc.*,
    2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) ........................................................24

*Thorp v. Scarne*,
    599 F.2d 1169 (2d Cir. 1979) ..................................................................................7

*United States v. Baker*,
    2011 WL 5121099 (S.D.N.Y. Aug. 23, 2011).........................................................4

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) ..................................................................................19

*Williams v. KFC Nat. Mgmt. Co.*,
    391 F.3d 411 (2d Cir. 2004) ....................................................................................8

*Williams v. Sidley Austin Brown & Wood, L.L.P.*,
    832 N.Y.S.2d 9 (1st Dep't 2007).............................................................................23

**Rules**

Fed. R. Civ. P. 9 ...........................................................................................19, 22, 23

Fed. R. Civ. P. 12 ......................................................................................................7

Fed. R. Civ. P. 15 ....................................................................................................19

Fed. R. Civ. P. 41 ............................................................................................passim

Fed. R. Civ. P. 59 ..............................................................................................1, 4, 7

Fed. R. Civ. P. 60 .........................................................................................1, 4, 7, 8

On November 22, 2021, this Court ruled that since it had granted defendants' motions to dismiss and received no further requests to amend by November 19, 2021, the case should be closed, with the judgment issued accordingly.  (Dkt. No. 98.)[1]  In the same order, however, the Court also noted that Plaintiffs had filed a notice of voluntary dismissal under Rule 41(a)(1)(A)(i).  Later the same day, the Clerk issued a judgment on the terms outlined by the Court.  (Dkt. No. 99.)[2] Accordingly, to ascertain their appellate options, Plaintiffs seek clarification as to whether the claims at issue had been dismissed with or without prejudice.

In the event of the dismissal with prejudice, Plaintiffs seek to alter or amend the judgment under Rule 59(e) or, in the alternative, move for relief from said judgment under Rule 60(b) for the reasons outlined below.  As Plaintiffs advised the Court in their previous application for leave to amend, they had developed a further extensive factual record supporting their claims, and the only reason they could not offer that record for the Court's consideration is that the Court now lacks jurisdiction over the proposed amended claims.   Moreover, Plaintiffs reasonably believed they retained the "as of right" power of voluntary dismissal.  Considering that this Court  had specifically pointed to New York state courts as the correct forum for one of Plaintiffs' claims, and Plaintiffs were (and still remain) under outstanding orders from another court to keep the proposed amended claims together, their only remaining avenue of relief was to pursue the proposed amended claims in state courts.  Accordingly, Plaintiffs seek relief in the form of either an order of dismissal without prejudice under Rule 41(a)(2) or a ruling on the appropriateness of further amendment despite its jurisdictional

---

[1]     All internal alterations, quotation marks, footnotes and citations herein are omitted, and all emphasis is added unless otherwise noted.  All "Ex." references are to the documents submitted with the Affidavit of Gerard P. Fox ("Fox Aff.") submitted herewith unless otherwise noted.

[2]     Although docket descriptions are not binding, Plaintiffs also submit that there is a clerical error in the description of the judgment in Dkt. No. 99 because it describes the judgment as being issued in favor of defendants that had never become parties to these proceedings.  Indeed, the entry lists the judgment as issued in favor of, *inter alia*, NBCUniversal Media, LLC, Roberta Raffel and MLG Retail, LLC, yet those were the parties that had been only **proposed** to be added via Plaintiffs' Proposed Second Amended Complaint (Dkt. No. 70-4), which was never accepted by the Court as an operative pleading in this case.

futility.  As set forth below, Plaintiffs satisfy all the conditions for either form of the requested relief.

## A BRIEF PROCEDURAL INTERLUDE

Plaintiffs assume the Court's familiarity with the facts at issue and will not belabor them herein.  Plaintiffs initiated this action on June 18, 2020, which, among other things, sought an exclusively New York remedy—namely, dissolution of Gooberry Corporation, a New York company. (Dkt. No. 1.)  On the same day, Plaintiffs filed a related action in the Delaware Chancery Court, which focused on the alleged harms that Defendants' inflicted on ML Fashion LLC (a Delaware entity formed by Plaintiffs with Defendant Lemonis after Plaintiffs' appearance on *The Profit*) and sought an exclusively Delaware remedy of dissolving ML Fashion.  (Dkt. No. 46-2.)[3]  On August 17, 2020, Plaintiffs here amended their complaint in this action, as of right and on their own, without any benefit of the Court's guidance as to the claims pending at bar.  (Dkt. No. 24.)  Defendants responded with motions to dismiss, which became fully submitted as of December 18, 2020.

Meanwhile, in Delaware, defendants sought to remove the Delaware action to the Delaware District Court but got remanded back to the Delaware Chancery Court on August 21, 2020.  (Ex. 2.) The Delaware claims were remanded because one of the defendants there, MLG Retail LLC, defeated diversity jurisdiction, given that its single member, ML Fashion, was a New York citizen just like plaintiff Stephanie Menkin.  As this Court is already aware, on March 30, 2021, the Delaware court ordered plaintiffs to resolve their Delaware claims together with the claims pending before this Court to avoid claim-splitting and stayed the Delaware action.  (Dkt. No. 57-1 at 31-34.)  Notably, when it did so, it believed that this Court had federal question jurisdiction over the claims under the RICO statute.  (*Id.* at 31-32.)

By that point, however, Plaintiffs' counsel amassed dozens of stories from the additional

---

[3]     By contrast, as addressed further below, Lemonis-owned entities, including defendant ML Retail, have already initiated **four additional actions** against Menkin and Goureau in four different courts in the same period of time—all arising from the same set of related common facts.  (Fox Aff. at ¶¶ 31-36.)

2

victims of the same pattern of misconduct alleged herein and was in the middle of the ongoing attempts to bring justice to Plaintiffs and the additional victims, now numbered at more than fifty, to a global resolution.  (*See generally* Fox Aff.)  As more victims continued to come forward and more evidence emerged with each day, it took all the time from then August 2021 to set forward a truly comprehensive pleading that avoids the disfavored practice of "serial" amendments.

Accordingly, on August 27, 2021, Plaintiffs moved for leave to further amend the complaint, arguing, *inter alia*, that their proposed amendment should moot defendants' pending motions to dismiss pursuant to this Court's "preferred course" of practice.  (Dkt Nos. 68-70.)  However, on September 2, 2021, the Court granted in part and denied in part defendants' motions to dismiss.  (Dkt. No. 77.)  On September 16, 2021, Plaintiffs moved for reconsideration (Dkt. Nos. 80-81), which the Court denied on October 15, 2021 without awaiting further briefing (Dkt. No. 89).  The Court also ordered that Plaintiffs must seek further leave to amend (if any) by November 19, 2021.  At this point, however, having dismissed Plaintiffs' RICO claims and denied reconsideration as to that dismissal order, the Court left diversity jurisdiction as the only remaining jurisdictional ground—yet Plaintiffs' amended claims, which the Delaware court directed to be litigated together with the claims asserted here, were already adjudged as non-diverse.[4]  Accordingly, Plaintiffs found themselves in a situation where they could not seek a futile amendment yet still had a further developed factual record supporting continuing viability of their amended claims.  Given that this Court had already pointed them to New York state courts for Gooberry's dissolution claim, and the Delaware court ordered for the Delaware claims to be litigated together with the claims asserted before this Court, Plaintiffs had no choice but to take their amended claims to a New York state court, which Plaintiffs did once they filed a notice of voluntary dismissal in this Court.  (Dkt. No. 94-1.)

---

[4]       Due to an unfortunate miscommunication inside Plaintiffs' legal team, Plaintiffs' November 19, 2021 correspondence to the Court pointed to the wrong new defendant as the culprit of the jurisdictional problem.  (*See also* Fox Aff. ¶¶ 26 & 29 (further explaining the miscommunication at issue).)  Plaintiffs regret the error.

**ARGUMENT**

## I.   REQUESTED RELIEF IS APPROPRIATE TO ACHIEVE SUBSTANTIAL JUSTICE AND/OR TO CORRECT OVERLOOKED MATTERS

Federal Rule of Civil Procedure 59(e) "permits a court to 'alter or amend judgment to correct a clear error of law or prevent manifest injustice.'"[5]  "Rule 59(e) covers a broad range of motions, including motions for reconsideration...."[6]

In turn, Rule 60(b)(1) "permits a district court to grant relief from a judgment based on 'mistake, inadvertence, surprise, or excusable neglect.'"[7]   The Second Circuit has interpreted "mistake" to include both errors of a party or his representatives and mistakes of law or fact made by the district court.[8]   The Court has "broad discretion" to grant relief under Rule 60(b)(1), and motions seeking such relief "should be broadly construed to do substantial justice, … [even though] final judgments should not be lightly reopened."[9]   Relief is appropriate where the movant shows: (1) there is minimal danger of prejudice to the non-moving party; (2) the length of the delay and its potential impact on judicial proceedings are minimal; (3) the reason for the delay is justifiable; and (4) the movant acted in good faith.[10]   Either Rule empowers the Court to revisit its earlier judgment if there are "controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[11]

---

[5]      *ING Glob. V. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014) (quoting *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008)); *see also Munafo v. Metropolitan Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (specifically approving district court's authority under Rule 59(e) to "alter or amend [a] judgment to correct a clear error of law or prevent manifest injustice").

[6]      *Association. for Retarded Citizens of Conn. v. Thome*, 68 F.3d 547, 553 (2d Cir. 1995).

[7]      *EMI Ent. World, Inc. v. Karen Recs., Inc.*, 2013 WL 2480212, at *2 (S.D.N.Y. June 10, 2013).

[8]      *In re 310 Assocs.*, 346 F.3d 31, 35 (2d Cir. 2003); *In re Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981).

[9]      *Rose v. Barnhart*, 2007 WL 549419, at *1 (S.D.N.Y. Feb. 16, 2007).

[10]      *See, e.g., In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 297 F.R.D. 90, 98 (S.D.N.Y. 2013), citing, *inter alia*, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 390 (1993) (explaining that the relevant inquiry is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission"); *see also United States v. Baker*, 2011 WL 5121099, at *2 (S.D.N.Y. Aug. 23, 2011) (granting relief and finding "minimal danger of prejudice to the government because the government will be in the same position it would have been in had the notice of appeal been timely filed"); *cf. In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987) (observing that relief is normally available for justifiable actions or "unavoidable" mistakes).

[11]      *Baker v. Anschutz Expl. Corp.*, 2016 WL 981858, at *1 (W.D.N.Y. Mar. 15, 2016), citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256 (2d Cir. 1995).

Here, should the Court clarify that Plaintiffs' claims have been dismissed with prejudice, with the single exception of Gooberry's dissolution claim, Plaintiffs seek an order altering or amending the Court's judgment or, alternatively, relief from said judgment on the grounds that despite the Court's October 15, 2021 Order directing them to seek leave to amend, Plaintiffs determined that any amendment would be futile in light of the Delaware court's order and the resulting necessity to add the Delaware claims involving a non-diverse defendant.  Accordingly, it was a justifiable action for Plaintiffs to seek dismissal without prejudice instead so that all the claims could be kept together in one court, as they were under an outstanding court order to do so.  It was also reasonable for Plaintiffs to believe that they retained the "as of" right dismissal without prejudice under Rule 41(a)(1)(A)(i). Should Plaintiffs have still sought leave to amend despite its futility or, in the alternative, sought the Court's approval for dismissal without prejudice under Rule 41(a)(2), Plaintiffs submit that the Court should reopen the case to allow them to pursue an appropriate vehicle for relief in the name of achieving substantial justice, given the above-described circumstances.

*First*, under the combined effect of the Delaware Chancery court and the Delaware federal court's orders, once this Court denied reconsideration of dismissal of Plaintiffs' RICO claims, any amendment would have been futile.  This is because the Delaware federal court has already determined that Plaintiffs' Delaware claims are beyond federal courts' diversity jurisdiction, given a New York plaintiff (Menkin) and a New York defendant (MLG Retail).  (Ex. 2.)  Moreover, the Delaware federal court also found that defendants' fraudulent joinder claims vis-à-vis MLG Retail were untenable.  (*Id.*)  Accordingly, any amendment adding the Delaware claims would have been futile.[12]

---

[12]    *See Greenidge v. Baya Moving & Storage*, 2015 WL 6755389, at *5 (E.D.N.Y. Nov. 4, 2015) ("In the absence of any apparent basis for subject-matter jurisdiction, the Court concludes that it would be futile to grant Plaintiff leave to amend her pleading."); *Mercado v. Playa Realty Corp.*, 2005 WL 1594306, at *8 (E.D.N.Y. July 7, 2005) ("As a result, the amended complaint that Mercado contemplates could assert only the state law contract claim against non-diverse defendants.  This federal court would lack subject matter jurisdiction over such a complaint, thus rendering the requested amendment futile.").

At the same time, the Delaware Chancery court has ruled that Plaintiffs cannot separate the Delaware claims from the claims asserted in this Court. (Dkt. No. 57-1 at 31-34.) Indeed, the Delaware court specifically found that separating the Delaware claims from Plaintiffs' claims here amounts to improper "claim splitting" (*id.* at 2), given that "Plaintiffs' claims in this [Delaware] action and the New York Action derive from a common nucleus of operative fact." (*Id.* at 31.)

Given the dilemma posed by the combined effect of the Delaware courts' orders on Plaintiffs' ability to amend, which only arose after the Court disposed of the federal question claims on October 15, 2021, Plaintiffs were left with only two options: seek a futile amendment or go to state court. The latter option was especially appropriate, given that the Court's October 15, 2021 Order **directed** Plaintiffs to state court for purposes of Gooberry's dissolution claims (which, logically, would extend to all the related corporate claims Gooberry is now asserting under New York law). As such, it was a justifiable move for Plaintiffs to forego a futile amendment in favor of a voluntary dismissal. Regrettably, the parties did not raise the above-described combined effect of the Delaware orders in their correspondence with the Court (partly in anticipation of a more formal motion practice), thus resulting in this Court's overlooking of this circumstance and its adverse effect on any further contemplated amendments.

*Second*, once it became clear that any contemplated amendment would be futile, it was reasonable for Plaintiffs to proceed via the unilateral voluntary dismissal under Rule 41(a)(1)(A)(i). The Rule's text plainly grants a plaintiff the right to dismiss—without a court order—"an action" prior to a defendant serving "either an answer or a motion for summary judgment." Moreover, this Court's granting of defendants' motions to dismiss, without more and leaving further leave to amend an open issue, does not operate to cut off Plaintiffs' rights to effectuate a voluntary dismissal as of right. As at least one court reasoned:

> [Defendant's] other arguments are equally unavailing. First, it states that the Court should not allow voluntary dismissal with[out] prejudice in this case because the

merits have already been decided.  In this case, however, the only substantive decision reached by this Court resolved a Motion to Dismiss, the purpose of which "is to test the sufficiency of the complaint, not to decide the merits."  *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  It appears then that the merits of this action have not been decided, making [Defendant's] position inapposite.[13]

Indeed, in *Estate of Sauter v. Citigroup Inc*., 2015 WL 3429112 (S.D.N.Y. May 27, 2015), after plaintiff failed to properly oppose a motion to dismiss, and the court denied leave to amend based on a finding of futility, the court still refused to deviate from the *Thorp* rule and declined to vacate plaintiff's "as of right" notice of voluntary dismissal:

> This ["as of right"] rule is intended to "establish [ ] a bright-line test marking the termination of a plaintiff's otherwise unfettered right voluntarily and unilaterally to dismiss an action."  Since no answer or motion for summary judgment has been filed, Plaintiff's dismissal without prejudice will not be vacated.
>
> \*\*\*
>
> Contrary to Defendants' assertions, the circumstances of this action do not qualify for the narrow exception to Rule 41(a)(1)(A) (i) … [which only applies in exceptional circumstances, such as where the court held] a preliminary injunction hearing that "last[ed] several days and generat[ed] a record of over 400 pages."  The Second Circuit subsequently stated that, "in cases falling short of the extreme exemplified by … [the above-described scenario], notices of dismissal filed in conformance with the explicit requirements of Rule 41(a)(1)(i) are not subject to vacatur" on the ground that the merits of the controversy had been raised before the court.  Those "extreme" circumstances are not present here.[14]

Accordingly, the combined effect of the considerations outlined above provides sufficient grounds for relief under both Rule 59 and Rule 60.  In particular as to latter, the *Pioneer* factors are satisfied here, counseling in favor of the relief requested because, *inter alia*: (1) any prejudice to defendants here would be minimal because they would find themselves in the same position as if leave to amend and/or dismissal under Rule 41(a)(2) was timely sought; (2) the length of the resulting

---

[13]     *N. Ins. Co. of New York v. Travelers Ins. Co*., 2017 WL 747557, at *2 (S.D. Ind. Feb. 27, 2017); *see also In re Martino*, 429 B.R. 66, 69-70 (Bankr. E.D.N.Y. 2010) ("The purpose of such a motion [to dismiss under Rule 12(b)(6)] is to test the formal sufficiency of a complaint and not the substantive merits of a claim."), citing, *inter alia, Koppel v. 4987 Corp*., 167 F.3d 125, 133 (2d Cir.1999); *cf. Thorp v. Scarne*, 599 F.2d 1169, 1176 (2d Cir. 1979) ("We hold, therefore, that at least in cases falling short of the extreme exemplified by [cases involving evidentiary hearings], notices of dismissal filed in conformance with the explicit requirements of Rule 41(a)(1)(i) are not subject to vacatur.").

[14]     *Id.* at *3-4, citing *Thorp*, 599 F.2d at 1174-76; *cf. Santiago v. Victim Services Agency*, 753 F.2d 219, 222 (2d Cir. 1985) ("We have recognized that Rule 41(a)(1)(i) means what it says ever since our Court, through Judge Learned Hand, held that a district court is powerless to vacate a voluntary dismissal under the rule even after a motion to dismiss had been filed."), *abrogated on other grounds by Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384 (1990).

delay would only amount to about a month that ensured between the Court's October 15, 2021 Order

and the November 19, 2021 deadline—which is negligible, considering the time that was necessary

for Plaintiffs to, *inter alia*, analyze the Court's decisions, evaluate whether they can still validly

amend the claims in light of those decisions, incorporate the results of their investigation conducted

to date and figure out where their amended claims should be asserted (*see* Fox Aff. at ¶¶ 26-28); and

(3) Plaintiffs acted in good faith because they merely tried to avoid futile gestures and adhere to the

preexisting court orders.  Importantly, as demonstrated above, the reasons underlying Plaintiffs'

actions—which, as the Second Circuit held, is "concededly the most important" of the *Pioneer*

factors[15]—are reasonable and justifiable, thus further counseling in favor of the requested relief.[16]

***

If the Court determines that Plaintiffs should have still sought leave to amend despite its

futility and/or should have pursued relief under Rule 41(a)(2), the Court should grant relief in the

form of allowing Plaintiffs to pursue those options for the reasons stated below.

## II.    PLAINTIFFS SATISFY RULE 41(a)(2) FACTORS

"A voluntary dismissal without prejudice under Rule 41(a)(2) will be allowed if the defendant

will not be prejudiced thereby."[17]  In fact, it is the **presumption** in this circuit … that a court should

grant a dismissal pursuant to Rule 41(a)(2)" unless defendant shows "substantial prejudice" caused

thereby.[18]  As the Second Circuit observed, "[t]he United States Supreme Court recognized long ago

that starting a litigation all over again does not constitute legal prejudice."[19]  Similarly, defendant's

---

[15]     *Williams v. KFC Nat. Mgmt. Co.*, 391 F.3d 411, 418 (2d Cir. 2004).

[16]     *Cf. Lenaghan v. Pepsico, Inc.*, 961 F.2d 1250, 1254 (6th Cir. 1992) (finding that district court abused its discretion in denying relief under Rule 60(b) where the litigants' actions were based on "excusable misreading of a somewhat ambiguous local rule").

[17]     *D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d Cir. 1996).

[18]     *Gap, Inc. v. Stone Int'l Trading, Inc.*, 169 F.R.D. 584, 588 (S.D.N.Y.), *aff'd*, 125 F.3d 845 (2d Cir. 1997); *see also Benitez v. Hitachi Metals Am., Ltd.*, 2012 WL 3249417, at *1 (S.D.N.Y. Aug. 6, 2012) ("[T]here is a general **presumption** that motions to dismiss claims without prejudice should be granted ….").

[19]     *D'Alto*, 100 F.3d at 283, citing *Jones v. Securities & Exchange Commission*, 298 U.S. 1, 19 (1936) ("The general rule is settled for the federal tribunals that a plaintiff possesses the unqualified right to dismiss his complaint ... unless

8

perception that "the plaintiff may obtain some tactical advantage by taking a voluntary dismissal is not sufficient grounds to deny a motion under Rule 41(a)(2)."[20]  In this Circuit, the required prejudice to defendants is measured by considering the following factors: "[1] the plaintiff's diligence in bringing the motion; [2] any 'undue vexatiousness' on plaintiff's part; [3] the extent to which the suit has progressed, including the defendant's efforts and expense in preparation for trial; [4] the duplicative expense of relitigation; and [5] the adequacy of plaintiff's explanation for the need to dismiss."[21]  Although "no one of [these factors], singly or in combination with another, is dispositive,"[22] "[c]ourts applying the[se] … factors frequently place the greatest emphasis on the efforts expended by the defendant in discovery and trial preparation and the corresponding prejudice the defendant would suffer if forced to relitigate."[23]

*First*, any delays in applying for relief under Rule 41(a)(2) here are justified by Plaintiffs' reasonable belief that they retained the right of unilateral dismissal without prejudice, as set forth above.  Moreover, before the Court's final dismissal of Plaintiffs' RICO claims on October 15, 2021, Plaintiffs retained federal question jurisdiction and thus had no occasion to depend on diversity of citizenship for their claims.  It was only as of October 15, 2021 that the diversity of citizenship became necessary to pursue Plaintiffs' claims in this Court.  As discussed above, Plaintiffs took the following month to analyze the Court's decision, incorporate additional evidence into their claims, determine their resulting viability and assess where the amended claims should be properly asserted.  As such, the first factor counsels in favor of allowing dismissal without prejudice.[24]

---

some plain legal prejudice will result to the defendant other than the mere prospect of a second litigation upon the subject matter."); *see also Camilli v. Grimes*, 436 F.3d 120, 123 (2d Cir. 2006) (indicating that the required prejudice must be something "other than the mere prospect of a second lawsuit").

[20]     *Benitez*, 2012 WL 3249417, at *2.

[21]     *D'Alto*, 100 F.3d at 283.

[22]     *Kwan v. Schlein*, 634 F.3d 224, 230 (2d Cir. 2011).

[23]     *Baldanzi v. WFC Holdings Corp.*, 2010 WL 125999, at *4 (S.D.N.Y. Jan. 13, 2010).

[24]     *See Benitez*, 2012 WL 3249417, at *2 (observing that "diligence should be measured by whether a plaintiff moved to dismiss the complaint without prejudice within a reasonable period of time after the occurrence of the event that led to the plaintiff's decision not to pursue the action" and finding "weeks" after the triggering event to qualify as a reasonable period).

*Second*, "[v]exatiousness implies a degree of ill-will or improper motive."[25]  Defendants will undoubtedly argue that Plaintiffs' conduct was unduly vexatious because they initiated actions in two courts, and the Delaware court determined that this amounted to claim splitting.  Yet the Delaware court also acknowledged Plaintiffs' reasons for proceeding in this fashion (*see* Dkt. No. 57-1 at 32-33 (staying rather than dismissing the action for those very reasons)), as the Delaware action sought dissolution of a company registered in Delaware (ML Fashion), which is an exclusive remedy available only in that court, and the action at bar sought dissolution of a New York corporation (Gooberry), which, as this Court has itself now confirmed, belongs in New York courts.  In turn, Plaintiffs' choice to proceed in this Court as opposed to New York state court was necessitated by their belief that they had a valid RICO claim.  This decisional matrix leaves no room for any improper motive but rather displays a reasoned analysis of all the available jurisdictional options.[26]

*Third*, "[w]ith regard to the third and fourth factors, on which we place particular importance, we emphasize the early stage at which plaintiff's motion is made.  The action has been pending for less than a year and only minimal discovery has yet been conducted.  Thus, defendants have not expended significant resources in litigating the suit and there would be little duplicative expense if the case were re-filed in state court."[27]  These factors weigh even heavier in favor of the "without prejudice" dismissal here because, although this action has been pending for about a year and a half,

---

[25]     *Mar-Cone Appliance Parts Co. v. Mangan*, 2012 WL 5906874, at *3 (W.D.N.Y. Nov. 7, 2012) (granting relief and finding that plaintiff's initial decision to proceed in another forum on "thin" jurisdictional grounds does not show undue vexatiousness).

[26]     By contrast, Lemonis-owned entities, including defendant ML Retail here, have shopped their claims against the Plaintiffs in four different courts by now, clearly displaying suspect motives by doing so.  (Fox. Aff. at ¶¶ 31-36.)  They first took their claims to a federal court in Illinois, suffered defeat there, *see ML Fashion, LLC v. Nobelle GW, LLC*, 2021 WL 170741, at *10 (N.D. Ill. Jan. 19, 2021), and withdrew.  They then split that action by taking one set of the asserted claims to Illinois state court, where they got thrown out for lack of jurisdiction by a decision that questioned whether they had any reasonable basis to venture into that forum in the first place.  The other set of claims went to a Connecticut federal court and are still pending there.  Just a few weeks ago, these same entitiesrefiled the claims that had been thrown out of the Illinois state court in New York state court, and the claims are currently pending there.  To sum up, the total tally of the actions that Lemonis entities, including Defendant ML Retail here, have commenced against the Plaintiffs in just over one year following Plaintiffs' initiation of the action at bar now stands at **four**—*i.e.*, these Lemonis entities **took the two actions filed against them and doubled them**.  Suffice it to say that Plaintiffs have moved for sanctions against these Lemonis entities following their voluntary dismissal in the Illinois federal court; that motion is still pending.

[27]     *Benitez*, 2012 WL 3249417, at *2.

it has been in active litigation only for about nine months, since this action was essentially dormant from December 2020, when defendants' motions to dismiss were submitted, and August 2021, when the Court issued its first decision on defendants' motions to dismiss.  Most importantly, no discovery has been conducted.[28]  As for any duplicative expense resulting from re-filing, Defendants will undoubtedly reassert their motion to dismiss arguments in state court, thus minimizing this consideration.[29]

*Finally*, Plaintiffs' stated reasoning for seeking relief, which is to re-assert the claims in New York state court so that all of their claims could be litigated in one proceeding in a court that can exercise jurisdiction over all of them, is not only legitimate but is also based on the Delaware court's explicit directions.  In any event, "any shortcomings in plaintiff's explanation are not sufficient to overcome the other four factors …."[30]  Undoubtedly, Defendants will argue that the claims in this action have been already dismissed with prejudice, save for the corporate dissolution claim.  However, this Court left the prejudice issue undecided when it directed the parties to further brief the issue of whether leave to amend would lie.[31]  And, as discussed below, leave to amend was likely because, save for the jurisdictional futility, Plaintiffs have substantially revised their claims to account for the results of a massive factual investigation undertaken to date.  As part of that investigation, Plaintiffs have also (unsuccessfully) pursued settlement talks with the existing defendants and additional new proposed defendants (such as NBCUniversal Media LLC ("NBC")), which is the reason why NBC

---

[28]   *See Gap*, 169 F.R.D. 584, 588 (granting relief where "[a]lthough this action has been pending for nearly four years, it has been relatively dormant for at least three of the four years, and the action is far from being on the 'eve of trial,'" as the parties engaged in only minimal discovery).

[29]   *See Ames v. Clifford*, 1996 WL 563098, at *1 (S.D.N.Y. Oct. 2, 1996) (granting relief where, *inter alia*, "the work involved in [defendants'] motion to dismiss, which was directed almost entirely to issues of state law, will be useable in a subsequent action in the state courts").

[30]   *Benitez*, 2012 WL 3249417, at *2 (granting relief under Rule 41(a)(2) even though plaintiff's desire to go to Pennsylvania state court where the case had been removed from New York state court remained largely unexplained).

[31]   *See Br N. 223, LLC v. Glieberman*, 2016 WL 7411127, at *3 (E.D. Mich. Dec. 22, 2016) (where motion to dismiss was granted "without prejudice to an independent decision on Plaintiff's pending motion for leave to file second amended complaint," granting plaintiff's request to dismiss one of the defendants without prejudice because that defendant could show no cognizable prejudice).

has been only recently proposed as an additional defendant and the amendment efforts had not been

initiated earlier.  In any event, nothing prevents Defendants form seeking dismissal with prejudice in

state court.[32]

As such, the Court's analysis of the latter three factors here would be similar to that in *Ames*,

where the court observed:

> Weighing the required factors, the Court finds that the Burns defendants will be
> minimally prejudiced by dismissal of this action pursuant to Rule 41(a)(2).  Although
> this action was filed over two years ago, a great deal of the time since that filing was
> absorbed by settlement negotiations, and the suit has not progressed to any significant
> degree.  The Burns defendants have not expended substantial effort or expense for trial
> preparation, and the work involved in their motion to dismiss, which was directed
> almost entirely to issues of state law, will be useable in a subsequent action in the state
> courts.  Finally, plaintiffs have presented an adequate explanation for their desire to
> dismiss this case—to permit them to proceed against all potential defendants in one
> action in the New York State courts.  Therefore, plaintiffs' motion to dismiss this
> action … without prejudice pursuant to Rule 41(a)(2) is granted.[33]

Plaintiffs submit that the same conclusions would apply here, counseling in favor of extending Rule

41(a)(2) to the Plaintiffs.

## III.   ALTERNATIVELY, LEAVE TO AMEND WOULD HAVE BEEN GRANTED IF THE COURT STILL HAD JURISDICTION OVER THE AMENDED CLAIMS

As Plaintiffs demonstrated in their prior application for leave to amend (see Dkt. Nos. 69 &

70), a lot had changed since Plaintiffs opposed Defendants' motions to dismiss last year.  At least

fifty other businesses have come forward claiming they fell victims to the expansive racketeering ring

that is behind *The Profit*.  All of these small businesses, most of which are family-run, have been

ruined by their experience on the show through an orchestrated, repeated and consistent pattern of

misconduct undertaken by Defendants here for more than a decade now, including lies, self-dealing,

cover up and intimidation.  And, as it turns out, it is not only Defendants that form this vast conspiracy

---

[32]   *See Protect-A-Bub USA, LLC v. D'Arcy*, 2006 WL 1408666, at *2 (S.D.N.Y. May 23, 2006) (granting relief and observing that "if the claims against the ... defendants are frivolous, vexatious, or lack merit, that issue can be adequately addressed" if the action is refiled).

[33]   *Id.*, 1996 WL 563098, at *1.

but also one of the largest most-trusted public broadcasting companies in the country—none other than NBC,[34] which lured the contestants in with its name-recognition and trusted reputation of a serious business network—only to ruin them in the end by purposefully feeding them into the well-oiled self-dealing and cheating machine that is "CNBC's Marcus Lemonis" and his cronies.

The facts that have been uncovered through the aforementioned investigation are numerous and compelling.  The proposed amendment complaint submitted with this motion sets forth this newly uncovered evidence to demonstrate that although the Court would not have had jurisdiction over the proposed amended claims, Plaintiffs would have made sufficient showing that these claims should be allowed to proceed elsewhere and should not be dismissed with prejudice.  Plaintiffs will not repeat their arguments supporting the proposed addition of the new parties—they have been set forth fully in their prior submissions, and they do not bear on the viability of the claims at issue.  As to the latter, the newly discovered evidence translates into stronger fraud and fiduciary allegations, among others, as set forth below.  Moreover, in addition to the ongoing investigation, all the relevant parties were in the midst of settlement talks designed to move the fifty-one heartbreaking stories of loss and betrayal toward a global resolution.  It is that continuously moving investigation, which have consistently brought forward more evidence on a daily basis, combined with the promise of a global resolution, that have precluded Plaintiffs from seeking to amend their complaint until recently to avoid the disfavored practice of "serial" amendments and, as set forth below, now provide compelling reasons to allow these claims to proceed---even if in another court altogether.

A.    **<u>The New Evidence Uncovered to Date</u>**

Although addressed in further detail in connection with the proposed amended pleading below, as well as in the proposed amendment complaint itself (*see* Ex. 1), the new evidence overall

---

[34]    NBCUniversal News Group, a division of NBCUniversal, owns and runs CNBC, a television business news channel that created and aired *The Profit*.  Accordingly, NBC and CNBC are used interchangeably throughout this motion.

demonstrates the following common scheme of defendants' orchestrated fraud, which confirms that defendants not only knew that their representations were provably false but actually intended to mislead the potential *The Profit* participants, including Plaintiffs here.  It can be briefly summarized as follows:

**The Hook.**  Each and every one of the small business owners were initially convinced to appear on *The Profit* as a result of factual representations by the representatives of NBC, Lemonis and Machete that appearing on the show would help their businesses.  Among other things, they were told that they will be in "good hands and not to worry" and that the show would be "great for their business."  False promises were often made about partnerships with other companies.  Or that Lemonis would make a far better offer than any other potential investor.  None of this was even close to true.  All of these lies are told by employees of NBCUniversal and Machete to get business owners to expose themselves to the embarrassment, shame, and humiliation that comes with participating on *The Profit*.  These material pretenses, representations, or promises, along with the allure of appearing on a network television program seen across the country, were the hook that initially lured the small business owners into defendants' scheme.

These business owners were then strong-armed to acquiesce to draconian contractual paperwork without seeking legal advice by defendants' employment of high-pressure sales tactics, such as they must "urgently sign the documents in order to secure their spot on the show" and to "not miss out on this once in a lifetime opportunity," as the agreements were a "take it or leave it" situation.  Some business owners were reassured that the language in the contracts is "boilerplate" and "did not apply to them or the show."  Others met or spoke with Machete producers, who again explained their falsely stated vision for the show to assuage their fears, reinforcing the false promises that they were producing an honest portrayal of an American family business for a reputable, highly regarded national news network.  Participants were assured that neither Machete nor NBC had anything but

the best intentions for the businesses, reinforcing what a once-in-a-lifetime opportunity it was to acquire an invaluable partner like Lemonis, who could raise their company to a new echelon. Throughout the whole recruitment process, producers played up their status as a program featured on a nationally recognized news network to fraudulently induce these people to hand their life work and company over to this mobster style scam.

Not one of the small business owners who expressed reservations was encouraged to seek independent legal advice, even though they were typically unsophisticated and without in-house legal guidance and were interacting with a well-represented, major television network.  Instead, the small business owners were told to "trust the process" as if the process had been designed to protect their interests, rather than the interests of the network and its star, Marcus Lemonis.

The high-pressured tactics were necessary because defendants knew that the "hook" representations were a lie and needed to cover up their tracks with boilerplate unknowing releases. Indeed, defendants made these representations knowing they were a lie because they knew that the past contestants were actually harmed (and many destroyed) by the show; moreover, they knew that instead of acting "in good faith" as expressly promised in their contracts, Lemonis had been actually involved in an extensive self-dealing scheme by, *inter alia*, causing participating companies to contribute funds to Lemonis' own companies and making participating companies incur substantial expenses and/or lose clients so that the company's owners would be left with no other choice but to agree to surrender most or all of the key assets of their companies to Lemonis.  Tellingly, of the fifty-one small businesses that have come forward, none improved their business circumstances following the appearance on *The Profit*, and a substantial percentage of them became insolvent, forced to close their businesses, or faced dramatically reduced profitability.  Others saw their owners forced out of their own companies.  And these profoundly negative consequences were all in the service of ensuring that "CNBC's Lemonis" enriched himself as a result of preying on the businesses he promised to

protect.

   **The Switch.**  Virtually every episode of *The Profit* begins with an initial on-air agreement that involves Lemonis purporting to make a substantial financial investment in the small business owner's company in exchange for an interest in the business.  The initial agreements follow a familiar pattern: they are always oral agreements and are never promptly formalized into a binding contract. Lemonis once bragged that he "never signs a contract right away," as if declining to sign an enforceable contract in advance of exercising power over one's counterparty is something to be avoided at all costs, as opposed to how all honest business people conduct their business affairs. Often, during the initial episode, Lemonis presents the small business owners with an oversized check in the amount of the promised investment, only for the Machete staff to take the check back from the small business owner once the cameras are no longer running.  The full promised investment virtually never materializes.  However, the show participants were told prior to filming and thus believed that the handshake, on-air deal reached with CNBC's employee Lemonis was real and that Lemonis or CNBC were investing in their business as an equal partner.  Defendants purposefully suppressed the fact that the reality of the actual deals in the past was in fact regularly vastly different from the deals shown on national television, such that the participants did not get the net infusion of capital once the debts imposed upon them during Lemonis' consultancy were put in place.

   Even though no legally binding contract exists, Lemonis decisively declares on air that he is "100% in charge" and effectively takes over the business, overcoming any lingering reluctance or trepidation by encouraging contestants to "trust the process," which is uttered as a solemn incantation that disarms the small business owners into believing that they are in the hands of an expert who will deliver on all of his promises.  The problem, of course, is that once disarmed, the small business owners find themselves increasingly underequipped to defend themselves against Lemonis' single-minded efforts to create a television program with conflict and drama and to enrich himself and his

own companies at the expense of the small business owners who appear on the show.

Following the initial on-air phony agreement and Lemonis' declaration that he is "100% in charge," Lemonis unilaterally orders significant and costly changes to the small business that invariably causes the business to go deeply into debt, leaving them highly vulnerable to and dependent on Lemonis' help.[35]  Along the way, Lemonis almost always lines his own pockets through a variety of means such as causing the companies to borrow money at very high interest rates from Lemonis' other entities and threatening to foreclose if they default.  All the while, Lemonis drives down profits, forcing the businesses to incur even more debt just to stay afloat.  Then, while these businesses are under his thumb, Lemonis leverages their businesses for his personal gain, enriching himself and boosting his personal brand at the businesses' expense.  Often, Lemonis then removes the business owners from their salaried employment positions and loots their businesses, and he often comingles

---

[35]      The changes Lemonis ordered on the shows depicting the fifty-one small businesses that have come forward included:
• Costly and unnecessary store or warehouse renovations, often using companies controlled by Lemonis to profit off the renovations. The cost of the renovations and the interruption of business activity caused by the store or warehouse closures, forces the businesses into debt and into becoming more deeply dependent on Lemonis;
• The closures for renovations are often accompanied by the sale of current inventory at steep discounts to allow the renovations to proceed, again making the businesses financially vulnerable and dependent on Lemonis;
• Closing low-cost warehouse arrangements (often owned by the business) and costly moves to new expanded spaces often requiring renovations;
• Relocating to new offices or comingling the assets with other businesses controlled by Lemonis; • Re-branding or brand redesign, often of a profitable and popular brand without a clearly articulated business rationale, resulting in the undermining of the brand;
• Switching to more expensive vendors or vendors with relationships with Lemonis;
• Re-formulation of recipes, ingredients, or changes in manufacturing processes or materials undermining the uniqueness of the product and the reason for its success;
• Forcing the company to purchase costly new equipment;
• Hiring new staff loyal to Lemonis, and firing of long-time staff loyal to the business owner;
• Directing the business owners to work on projects for the benefit of other Lemonis entities or other companies appearing on *The Profit*, without any or insufficient benefit to the owners and their companies, and often in violation of Labor Laws;
• Purchase of new inventory before expanding the customer base, where the new inventory often is not what the business owner's customers want, resulting in the business ultimately being forced to sell the new inventory at a deep discount, causing deeper debt;
• Expanding the number of stores (often requiring renovations) without appropriate due diligence to ensure the business need;
• Changing the business' core business model;
• Switching to a new, inferior manufacturer;
• Adding a new product line;
• Incurring unnecessary business expenses; and
• Forcing the business to work with a competitor.

17

these companies with his own businesses, wherein the owner loses everything. Lemonis charges excessively high interest rates to add to the leverage.  As such, defendants' script has consistently proved to be a mob-style bust out.

Many of the unnecessary changes ordered up by Lemonis had serious side effects, in addition to increased debt, that negatively impacted the small businesses.  For example, in connection with ordering some of the small businesses to relocate offices, stores, or warehouse space, Lemonis sometimes directed the small business owners to stop paying the business' current mortgage or rent, ultimately leading to foreclosures and/or evictions.  In other cases, Lemonis directed the small business owners to stop paying vendors and suppliers, ultimately leading to the loss of valuable business relationships and irreparably damaged reputations.  Other changes put unusual strains on relationships within the businesses, resulting in resignations, firings, untimely departures, and ruined personal relationships.

Once the businesses were thus weakened, they were ready to be preyed on.  At this point, Lemonis pressured them into changing the agreement aired during the show to include terms more favorable to him, but which the small business owners felt compelled to accept because of their increased dependence on Lemonis.  In the alternative, Lemonis simply failed to fulfil his commitments under the agreement while holding the small businesses to their commitments.  Many businesses were thereafter unable to recover and failed.  To the extent they complained, Lemonis and other defendants unleashed threats to demand immediate payment of the expenses incurred for the renovations, or to foreclose on the debts Lemonis had caused the businesses to incur, and to take control of the companies.  The businesses were also threatened with litigation and "review" episodes that further disparage them across the country.  Whoever dared to sue (like Plaintiffs did here), they were hit with a flurry of lawsuits; indeed, since initiating the case at bar, Plaintiffs have been already sued by Lemonis **four times in four different courts by now**, as discussed above.

## B.  Leave to Amend Would Have Been Proper

As this Court observed, "[c]ourts should freely give leave [to amend] when justice so requires."[36]  "Amendments are generally favored because they tend to facilitate a proper decision on the merits," and "[l]eave to amend should be freely given absent 'undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'"[37]

This generally welcoming approach is "consistent with the liberal standard of Rule[ ] 15 ..., and with the Second Circuit's '*strong preference* for resolving disputes on the merits.'"[38]  Indeed, according to the Second Circuit, "[w]hen a motion to dismiss is granted, the *usual practice* is to grant leave to amend the complaint."[39]  Unless Plaintiffs "can prove no set of facts" entitling them to relief, courts usually dismiss without prejudice to further amendment.[40]  This is especially so, given that Plaintiffs' previous amendment was of their own volition and without any benefit from the Court's guidance.  *See Loreley*, 797 F.3d at 190 (finding "absence of a definitive ruling" on defendants' dismissal arguments to be "critical" in considering leave to amend).[41]

---

[36]      *In re Madison Asset LLC*, 2021 WL 1894032, at *1 (S.D.N.Y. May 11, 2021) , citing Fed. R. Civ. P. 15(a); *see also Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) ("[I]t is rare for an appellate court to disturb a district court's discretionary decision to allow amendment.").

[37]      *Madison*, 2021 WL 1894032, at *1, citing, *inter alia, Foman v. Davis*, 371 U.S. 178, 182 (1962).

[38]      *Madison*, 2021 WL 1894032, at *2, citing, *inter alia, Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

[39]      *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)  ("Since Ronzani had not previously been given leave to amend [but rather amended on his own], and had offered to [further] amend his complaint, we hold that the court abused its discretion in dismissing the complaint without leave to amend."); *accord Luce v. Edelstein*, 802 F.2d 49, 56 (2 Cir.1986) ("Complaints dismissed under Rule 9(b) are '*almost always*' dismissed with leave to amend.").

[40]      *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (holding that leave to amend is to be granted unless it appears "beyond doubt" that the proposed pleading fits the aforementioned "no set of facts" standard); *see also Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) ("Where, as here, plaintiffs specifically request leave to amend in the event that the court is inclined to dismiss on Rule 9(b) grounds, the failure to grant leave to amend is an abuse of discretion unless the plaintiff has acted in bad faith or the amendment would be futile."); *cf. Williams v. Citigroup Inc.*, 659 F.3d 208, 213-14 (2d Cir. 2011) (reversing denial of leave to replead because such opportunities "shall be freely given when justice so requires," and "[t]he Supreme Court has emphasized that 'this mandate is to is to be heeded'").

[41]      *Cf. Casault v. Fed. Nat. Mortg. Ass'n*, 915 F. Supp. 2d 1113, 1138 (C.D. Cal. 2012) (granting further leave to amend by taking into account that plaintiff's "previously amended versions were submitted without the benefit of any court's input or guidance"), *aff'd sub nom. Casault v. One W. Bank FSB*, 658 F. App'x 872 (9th Cir. 2016); *see also King v. City of New York*, 2014 WL 4954621, at *30 (E.D.N.Y. Sept. 30, 2014) (taking into account the fact that the latest amendment "had the benefit of guidance by this Court's decision" in denying further leave to amend).

### 1.  No Undue Prejudice or Undue Delay

"The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial."[42]  Defendants cannot satisfy it here.  The case at bar is in its infancy.  There has been no discovery and no scheduling conferences—indeed, there have only been the complaint, Plaintiffs' amendment of the complaint, and Defendants' motions to dismiss, which have been briefed and submitted.  Defendants did not even have to oppose Plaintiffs' motion for reconsideration of the Court's initial dismissal order—the Court disposed of the motion on its own accord and without any opposition.  "[A]t this early stage in the litigation," this Court usually finds "no undue delay by Plaintiffs and prejudice to Defendant[s] from permitting amendment …."[43]  Notably, to the extent Defendants take issue with the amendment based on any increased costs of responding to the new evidence, that is not cognizable "undue" prejudice.[44]

Similarly, there is no "undue" delay.  As discussed, Plaintiffs have noticed their intent to amend the complaint as soon as the Delaware court stayed the related action before it and ordered Plaintiffs to litigate the claims asserted in Delaware in this Court instead.  Yet while Plaintiffs were in the middle of preparing an amended pleading to account for their Delaware claims, the underlying investigation of the experiences of the fifty other small businesses that were demolished by Lemonis and his cronies continued to produce additional evidence in support of Plaintiffs' claims here—and that evidence kept coming with more businesses joining each passing month.  Rather than waste this Court's valuable resources by engaging into the disfavored practice of "serial amendments,"[45]

---

[42]     *Ballard v. Parkstone Energy, LLC*, 2008 WL 4298572, *5 (S.D.N.Y. Sept. 28, 2008); *see also Randolph-Rand Corp. v. Tidy Handbags, Inc.*, 2001 WL 1286989, *3 (S.D.N.Y. Oct. 24, 2001) ("Prejudice alone … is insufficient to justify denial of leave to amend; rather the necessary showing is ***undue*** prejudice to the opposing party.") (original emphasis), citing *Foman*, 371 U.S. at 182.

[43]     *Madison*, 2021 WL 1894032, at *2 (finding that "[t]here is no undue prejudice because the parties are far from trial, no Defendant has answered, no Rule 16 conference has been held, and no discovery deadlines have been established"); *accord Env't Sols.*, 2021 WL 2075586, at *2; *New Oriental*, 2021 WL 930616, at *2.

[44]     *See Soroof Trading Dev. Co. v. GE Microgen, Inc*., 283 F.R.D. 142, 152-153 (S.D.N.Y. 2012) ("To the extent that [defendant] complains about added time and cost, [a]llegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.").

[45]     *De Ponceau v. Bruner*, 2012 WL 1030415, at *15 (N.D.N.Y. Feb. 21, 2012).

Plaintiffs elected to amass as much information as possible to bring it all together in one amended

pleading.[46]  In fact, Plaintiffs' requested amendment is proper even where based on their preexisting

knowledge (if any).[47]

.        Moreover, as this Court recently confirmed, "mere delay, absent bad faith or undue prejudice,

is not alone grounds to deny leave to amend."[48]  There is certainly no evidence of bad faith here, since

Plaintiffs' counsel have been pursuing global resolution through a series of settlement

communications with NBC, keeping the latter appraised of the new evidence being developed.

Plaintiffs' counsel also have been informed that Mr. Lemonis is in continuous communication with

NBC concerning the developing evidentiary record.  In fact, as outlined in Plaintiffs' communications

with the Court (*see* Dkt. No. 63), Mr. Lemonis had at one point instructed his legal counsel to seek a

global stay of all *The Profit*-related litigation, especially where Mr. Lemonis and his related entities

are defendants, as they are here.  Plaintiffs understood the instruction to be in furtherance of the

parties' efforts to achieve global resolution in the face of the mounting evidence involving fifty other

small businesses that have been harmed in the same way as Plaintiffs here.  Given that the new

evidence underlying much of the proposed amended allegations is of recent vintage, there is no

"undue" delay.[49]

        This is especially so given that this "Court is also mindful of judicial economy and preserving

---

[46]        *See Soroof*, 283 F.R.D. at 152-153 (granting leave to amend "approximately one year and seven months from the deadline for amendment" where the delay was caused by discovery of new facts underlying the proposed amendment), citing *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (citing cases where parties "have been permitted to amend their pleadings to assert new claims long after they acquired the facts necessary to support those claims"); *see also American Medical Ass'n v. United Healthcare Corp.*, 2006 WL 3833440, at *4 (S.D.N.Y. Dec. 29, 2006) (finding no undue delay where party moved to amend several months after learning relevant facts in discovery); *Securities and Exchange Commission v. DCI Telecommunications, Inc.*, 207 F.R.D. 32, 34-35 (S.D.N.Y. 2002) (allowing amendment where plaintiff obtained discovery supporting amendment a few months before filing motion).

[47]        *See Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 460 (S.D.N.Y. 2012) ("[T]he motion to amend will not be denied by reason of plaintiffs' delay in alleging facts that were previously within their knowledge."); *see also Affiliated FM Ins. Co. v. Liberty Mechanical Contractors, Inc.*, 2013 WL 4526246, *5 (S.D.N.Y. Aug. 27, 2013) (allowing amendment after nine months despite movant's knowledge of relevant information at time of initial pleading because party "need not prove that they uncovered new facts or law" to receive leave to amend).

[48]        *Madison*, 2021 WL 1894032, at *2, *cf. Richardson*, 825 F.2d  at 653 n.6  (collecting cases).

[49]        *See Madison*, 2021 WL 1894032, at *2 (concluding there was no undue delay where the amendment was based on recently uncovered deposition testimony, which existence defendant previously denied).

the parties' resources."[50]  As this Court observed, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint," and [g]ranting leave to amend the complaint after granting a motion to dismiss is particularly appropriate where, as here, the heightened pleading standard for fraud under Rule 9(b) applies."[51]  Finally, the amendment would be particularly appropriate here since it would have been Plaintiffs' first amendment that incorporated the Court's guidance, since their previous amendment was of their own volition.  *See Loreley*, 797 F.3d at 190.

## 2.  <u>No Futility (Aside from the Jurisdictional Problem)</u>

As discussed above, the proposed amendments would have been futile on the jurisdictional front because there is no diversity jurisdiction over the proposed claims.  When it comes to the amended claims' merits, however, that is another story altogether.  As an initial matter, however, it is unclear whether the Court would have even undertaken any futility analysis on the merits of the proposed claims.[52]  If, however, the Court chose to engage into the futility analysis, Defendants would have been unable to satisfy their burden of demonstrating futility,[53] as shown below.  This is because the proposed amendments "set[] forth facts and circumstances which may entitle the plaintiff to relief," which is all that required to support the proposed amendment.[54]

To the extent the proposed amendments seek to add greater specificity to the existing claims,

---

[50]  *Madison*, 2021 WL 1894032, at *2, citing *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020), and *In re "Agent Orange" Prod. Liab. Litig.*, 220 F.R.D. 22, 25 (E.D.N.Y. 2004) (considering "impact of granting leave on judicial economy").

[51]  *Madison*, 2021 WL 1894032, at *2, citing, *inter alia*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007), *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999), and *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990).

[52]  As this Court has observed, "[i]n the interests of judicial economy and in the absence of undue prejudice, the Court may decline to engage in a detailed futility analysis where the Court finds that these arguments are better suited for consideration in the context of a motion to dismiss."  *Madison*, 2021 WL 1894032, at *2 (concluding that the Court "declines to consider Defendants' futility arguments at this juncture"), citing *Chubb INA Holdings Inc. v. Chang*, 2016 WL 6841075, at *6 (D.N.J. Nov. 21, 2016) (collecting cases); *accord Env't Sols.*, 2021 WL 2075586, at *2; *New Oriental*, 2021 WL 930616, at *2.  There would have been no reasons to depart from that precedent here.

[53]  *See Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 377 (S.D.N.Y. 2020) (party opposing motion bears the burden of establishing futility).

[54]  *See Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statute of Liberty Ferry, Inc.*, 2003 WL 253094, at *1 (S.D.N.Y. Feb. 4, 2003) ("Even where the possibility of relief is remote, amendment must be permitted because 'it is the possibility of recovery, not its likelihood, that guides the court's analysis.'"); *see also Blaskiewicz v. County of Suffolk*, 29 F. Supp. 2d 134, 138 (E.D.N.Y. 1998) (holding that if the movant has at least colorable grounds for relief, justice requires that the court grant leave to amend a complaint).

they cannot render them futile; rather, they will make the claims stronger.  Back in June 2020, when the case at bar was initiated, Plaintiffs lacked the collective knowledge of the past contestants that they are in possession now.  It took time for the past contestants to come forward, and many still wish to remain anonymous for fear of retribution.  That collective knowledge, which underlies many of the allegations of the proposed amended complaint, may be properly considered as further strengthening Plaintiffs' claims, especially their fraud allegations.[55]

Specifically as to their amended fraud claims, as Plaintiffs have now learned, Defendants' "hook and bait" to lure Plaintiffs on the show by representing the past contestants' purported success stories and Lemonis' purported investment as seen on TV to help the featured businesses was false, and Defendants knew it.  Even if there were past successes, Defendants cannot speak in half-truths and conceal that many businesses were actually destroyed.[56]  In fact, Defendants' suppression of information concerning part contestants' failures amounts to Defendants' actual concealment.  Indeed, "[t]he suppression of material facts which a person is in good faith bound to disclose is evidence of and equivalent to a false representation."[57]  The alleged concealment is now further strengthened by Plaintiffs' allegations of fiduciary breaches, in addition to the already existing obligation based on Defendants' superior knowledge.[58]

---

[55]     *See, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp*., 450 F. Supp. 3d 379, 405-06 (S.D.N.Y. 2020) (approving plaintiffs' reliance on accounts of multiple confidential witnesses for purposes of particularized pleading under Rule 9(b) as long as the sources are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"), citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

[56]     *See, e.g., Williams v. Sidley Austin Brown & Wood, L.L.P.*, 832 N.Y.S.2d 9, 11 (1st Dep't 2007); *Sheridan Drive-In, Inc. v. State*, 228 N.Y.S.2d 576, 585 (4th Dep't 1962); *accord Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc*., 2000 WL 815894, at *4 (S.D.N.Y. June 23, 2000) (collecting New York authorities to demonstrate that "[f]raud in the inducement occurs when the victim of the fraud is aware that a contract is in contemplation, but his or her consent to the bargain is obtained by lies or half-truths").  Plaintiffs will assume application of New York law for purposes of this motion only.  While there are contractual documents in the record mandating application of California law, Plaintiffs have also alleged that those contracts were fraudulently induced.  Plaintiffs reserve their rights to argue application of California law should they find it applicable in the future.

[57]     *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*, 634 N.Y.S.2d 469, 470 (N.Y. 1995).

[58]     *See Powers v. Brit. Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995) ("A fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information; unique access to information can also trigger such a duty.").

While Plaintiffs could only suspect that other businesses must have been similarly harmed based on their own experience on the show,[59] now they know that fifty other businesses were actually harmed, and many destroyed.  (*See* Ex. 1 at ¶¶ 57-76 & 433.)  In addition to this overall concealment scheme that supports their allegations that defendants knowingly misrepresented what happened with other contestants on the show (that knowledge being superior/unique to defendants), Plaintiffs' proposed amended fraud claims are now based on the express misrepresentations and omissions by defendants to these specific Plaintiffs, each either related to an ascertainable past verifiable fact (*e.g.*, past participants' purported and consistent success on the show) or misrepresenting present intent (e.g., Lemonis' stated intent to act in good faith and in best interests of Gooberry and Plaintiffs).  (*See id*. at ¶ 432.)  As alleged, these 14 specifically outlined misrepresentations and omissions include that, for example, *The Profit* was designed with the purpose of putting Lemonis in position to improve already successful businesses like Gooberry, and the deals with Lemonis portrayed on *The Profit* were the same as those reached off-air and were obtained through a good faith and arm's length negotiation, per the Participant Agreement; moreover, Lemonis' stated intended role was to make a good faith effort to grow the company, increase its sales, and improve its brand reputation, per the Participant Agreement.  Furthermore, Plaintiffs now set forth corresponding specific reasons why each of those misrepresentations and/or omissions was false, such as, for example, that: (1) defendants knew that the design of the show was never to benefit Gooberry; instead, the design was to create a false narrative about Gooberry, its employees and Lemonis' impact on the business for profit; (2) defendants put Lemonis in a position of power to make changes to the business, unauthorized expenditures, and strong arm Gooberry into a position of weakness; moreover, although the

---

[59]    Notably, courts allow fraudulent omission claims to proceed despite "sparse" allegations where "plaintiffs' allegations rely on information that is more likely in the possession of defendants than plaintiffs," *see, e.g., Szymczak v. Nissan N. Am., Inc*., 2011 WL 7095432, at *19 (S.D.N.Y. Dec. 16, 2011).  The information concerning past contestants that were harmed by their appearance on the show was in Defendants' possession at the time they made their representations to Plaintiffs.

Participant Agreement states the deals shown on TV are "simulated," the Participant Agreement also promised Plaintiffs Lemonis would negotiate in good faith, and defendants knew (based on his past actions) that Lemonis did not intend to uphold his obligation; and (3) defendants knew that Lemonis had never acted in good faith and always intended to take advantage of Plaintiffs.  (*See id.* at ¶ 433.)  The combined effect of the amended allegations results in a valid fraud claim under New York law.[60]

## IV.    THE OVERLOOKED MATTER CONCERNING THE GOOD FAITH CLAIM

Although the Lemonis Defendants have specifically made their record that "[b]ecause the Gooberry Stock Purchase Agreement is governed by Illinois law, some or all of the claims in this action may be subject to Illinois law" (Dkt. No. 43 at 3; *see also* Dkt. No. 45 at 6, citing Compl. Ex. A at § 11.3), they then proceeded to ignore it when briefing their motion to dismiss by referring to the claim as an "outside of contract" claim.  But "[c]hoice-of-law provisions that govern a contract also govern related claims for breach of the implied covenant of good faith and fair dealing … [b]ecause breach of the implied covenant of good faith and fair dealing is a contractual cause of action …."[61]  Once the Court granted defendants' motion to dismiss on this claim on October 15, 2021, it became clear that the choice of law issue had become outcome dispositive.  This is because unlike under New York law applied by the Court, Illinois law allows implied covenant claims despite the "sole and absolute discretion" accorded to defendant under the contract.[62]  As such, Plaintiffs' implied covenant claim should not be dismissed with prejudice for this reason as well.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the requested relief in the form it finds most appropriate.

---

[60]    Plaintiffs' proposed amended complaint includes additional new claims, yet, since the futility burden is on the Defendants, it is beyond the scope of this motion to address all the proposed claims.  In this connection, the claims included in the proposed amended complaint under the Delaware order are similarly not futile, as Plaintiffs demonstrated through briefing before the Delaware court, which is incorporated fully herein.  (*See* Dkt Nos. 70-1, 70-2 & 70-3.)
[61]    *ARS Kabirwala, LP v. El Paso Kabirwala Cayman Co.*, 2017 WL 3396422, at *3 (S.D.N.Y. Aug. 8, 2017).
[62]    *See, e.g., McCleary v. Wells Fargo Sec., L.L.C.*, 2015 IL App (1st) 141287, ¶¶ 21 & 23.

Dated: December 9, 2021                         GERARD FOX LAW P.C.


                                                /s/ Gerard P. Fox
                                                Gerard P. Fox (admitted *pro hac vice*)
                                                1345 Sixth Avenue, 33rd Floor
                                                New York, New York 10105
                                                Telephone: (646) 690-4980
                                                Facsimile: (646) 368-9328
                                                gfox@gerardfoxlaw.com